# Exhibit M

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

In Re AMERICAN MUTUAL FUNDS FEE LITIGATION

CV 04-5593 GAF (RNBx)

March 20, 2009
9:59 a.m.

DEPOSITION of GEOFFREY H.
BOBROFF, JR., taken by Defendants,
pursuant to Notice, held at the offices of
MILBANK, TWEED, HADLEY & MCCLOY LLP, One
Chase Manhattan Plaza, New York, New York
before Wayne Hock, a Notary Public of the
State of New York.

VERITEXT REPORTING COMPANY

ae01ba2c-80d2-4cf8-843c-79c25196f907

Page 25

1                    G. H. Bobroff, Jr.

2     other advisers, enter into these on a best

3     efforts basis.

4          Q.    So that case didn't have

5     anything to do with 12b-1 fees?

6          A.    It may have, but I wasn't

7     involved in any 12b-1 aspect of it.

8          Q.    Were you involved in any part of

9     it that had to do with advisory fees?

10         A.    No, ma'am.

11         Q.    Let's talk about the next one,

12    American Century, number three on the

13    list.

14              You say you prepared an expert

15    report for the Defendant.

16              That, I assume, was American

17    Century Investment Management?

18         A.    Yes, ma'am.

19         Q.    Regarding the plaintiff's claim

20    of excessive fees.

21              What did your expert report say,

22    what did it involve?

23         A.    I'm really not at liberty to say

24    because I'm under a protective order

25    involved in that case.

G. H. Bobroff, Jr.

1

2       Q.      Can you tell me generally?

3       A.      It was a case that involved my

4  review of the process that the board of

5  American Century Funds performed in

6  reviewing and approving the management

7  agreements.

8       Q.      Would you say that some of the

9  same issues that are present here in the

10 American Funds case were similar to those

11 raised in the American Century case?

12      A.      There were similar issues, yes.

13      Q.      And if I asked you questions

14 such as what did the review process

15 involve at American Century, would you be

16 able to tell me?

17      A.      No, ma'am.

18      Q.      Is that case ongoing?

19      A.      To my knowledge the case is no

20 longer going, but I am still under a

21 protective order.

22      Q.      If I asked you sort of general

23 questions about American Century, about

24 your work there, would you be able to tell

25 me?

Page 27

G. H. Bobroff, Jr.

1

2    A.    It would depend on the nature of

3    the question.

4    Q.    Were 12b-1 fees at issue in the

5    American Century case?

6    A.    No, ma'am.

7    Q.    Would you say it was limited to

8    the advisory agreement?

9    A.    In the case of American Century,

10   which is not speaking beyond the framework

11   of the public marketplace, American

12   Century has a unique fee structure.  They

13   collect an all-inclusive fee which covers

14   the management of the money, the

15   shareholder services, so it is different

16   from the majority of the funds in the

17   industry.  So it was somewhat of a

18   different model than might exist at

19   American Funds.

20   Q.    Does American Century charge a

21   12b-1 fee?

22   A.    They did not at issue in the

23   time.  They have since added classes of

24   shares, but they were not the subject of

25   the litigation.

G. H. Bobroff, Jr.

1

2      Q.     Who retained you in the American

3   Century case?

4      A.     Mr. Benedict.

5      MR. BENEDICT: The plaintiffs in

6   that case had the common sense to

7   voluntarily dismiss the case the week

8   before trial and filed a stipulation

9   acknowledging that the case was

10   without merit.

11      Q.     Are you basing any of your

12   opinions in this case on materials that

13   you reviewed in American Century at all in

14   the sense of if you say something like the

15   materials that I've seen in American Funds

16   are some of the best I've seen, would that

17   take into account things you saw in

18   American Century?

19      A.     It would take into account

20   anything I've seen in my forty years of

21   being involved in the industry.

22      Q.     So that would include American

23   Century?

24      A.     Sure.

25      Q.     But you're not able to tell me

Page 29

1              G. H. Bobroff, Jr.
2     what you looked at in American Century?
3          A.    I am not.
4          Q.    And you're not able to tell me
5     what was in the materials at American
6     Century?
7          A.    I am not.
8          Q.    Let's talk about Waddell and
9     Reed, which is number four.  "I prepared
10    an expert report for the defendant."
11              I assume that was Waddell and
12    Reed Investment Management?
13         A.    Yes, ma'am.
14         Q.    "Regarding Plaintiff's claim of
15    excessive fees."
16              So on what issues did you opine
17    on Waddell and Reed?
18         A.    The process and approval of the
19    management agreement and 12b-1 fees.  But
20    here too I'm under a protective order.
21         Q.    So when you say you're under a
22    protective order, that means I can't ask
23    you what documents you reviewed or what
24    they said?
25         A.    That's correct.

Page 30

G. H. Bobroff, Jr.

1

2    Q.    I can ask you but you won't tell

3  me?

4    A.    Excuse me, that is correct.

5        MR. BENEDICT: He can't tell you.

6    Q.    Are you basing any part of your

7  opinion of what you saw in Waddell and

8  Reed in this case?

9        MS. POLLACK: Strike that.

10    Q.    Are you basing in this case any

11  part of your opinion of things you

12  reviewed in the Waddell and Reed case?

13    A.    As I mentioned earlier when you

14  asked the question, it's part of the body

15  of my knowledge of the industry, so yes,

16  in the broadest of contexts.

17    Q.    But if you're saying, for

18  example, these are some of the best

19  materials I've seen, in your mind you

20  would be comparing it to, among others,

21  among many others, Waddell and Reed;

22  correct?

23    A.    That's correct.

24    Q.    But you're not able to tell me

25  what was in the materials at Waddell and

G. H. Bobroff, Jr.

2  Reed; correct?

3     A.     That is correct.

4     Q.     And you're not able to describe

5  for me any of the processes that you

6  reviewed in terms of the approval of the

7  management agreement of the 12b-1 plan; is

8  that correct?

9     A.     That is correct.

10    Q.     Who hired you for Waddell and

11 Reed?

12    A.     An attorney in Kansas City by

13 the name of James Griffin, and he's a

14 partner and I don't know what the new name

15 of the firm is but at that time it was

16 called Blackwell Sanders something and

17 something.  It's been merged with some

18 other name now.

19    Q.     Was Milbank involved in that

20 case?

21    A.     No, ma'am, or at least not to my

22 knowledge.

23    Q.     Let me ask you just one minute

24 going back to American Century.

25            Did you conclude in American

Page 32

G. H. Bobroff, Jr.

1
2   Century that the process that the board
3   used to approve the management agreements
4   was appropriate and fair?
5          MR. BENEDICT: Objection.
6          I think the witness has already
7      testified he's under a protective
8      order which would be broad enough to
9      include his conclusions.  He gave you
10     the general scope and subject matter
11     of his testimony.
12     Q.    So you're not able to even tell
13  me the ultimate conclusion that you
14  reached about the management process?
15     A.    That's correct.
16     Q.    Is that the same answer that you
17  would give for Waddell and Reed in the
18  sense that you're going to take the
19  position that you're under a protective
20  order and unable to tell me what you
21  concluded ultimately about the process of
22  approval of the management agreement and
23  the 12b-1 plans; is that correct?
24     A.    That is correct.
25          MR. BENEDICT: The important

Page 33

G. H. Bobroff, Jr.

1

2    thing is what he concluded as to the

3    process of Capital Research and

4    American Funds, that he can tell you.

5        Q.    Now, in the matter of Lammert,

6    number five, you said you prepared an

7    expert report for one of the respondents.

8        What was your client there?

9        A.    Unfortunately I can't think of

10   the gentleman's name.  He was the low man

11   on the totem pole, he was the third named

12   respondent.  I can't remember his name.

13       Q.    So this was an individual?

14       A.    Yes, these were all individuals.

15       Q.    Was he an employee of Janus?

16       A.    Yes, he was.

17       Q.    And generally what was that case

18   about or what was your report about?

19       A.    The case involved whether or not

20   he as well as the other two defendants

21   were responsible for facilitating market

22   timing and late trading in the Janus

23   Funds.

24       Q.    Let's look at In Re Mutual Funds

25   Investment litigation.

Page 34

1          G. H. Bobroff, Jr.

2          Who was your client in that

3  case?

4     A.    Putnam Management Company.  And

5  here again I'm under a protective order.

6     Q.    That case related to market

7  timing as well?

8     A.    It did.

9     Q.    And did your report also relate

10 to market timing issues?

11    A.    Yes, ma'am.

12    Q.    And you can't tell me anything

13 more than that?

14    A.    No, ma'am.

15    Q.    Let's talk about the Fidelity

16 matter that's listed here.

17    A.    Yes, ma'am.

18    Q.    Again, you've got sort of the

19 general topic saying you prepared an

20 expert report for the defendants which I

21 assume is Fidelity Management and Research

22 and FMR Co.?

23    A.    Yes, ma'am.

24    Q.    Regarding excessive fees.

25          Again, on what issues did you

                        G. H. Bobroff, Jr.

1    opine?

3        A.    I'm really under the same
4    protective order.

5        Q.    I think you were able to
6    describe for me generally which agreements
7    were at issue for the other ones and
8    that's kind of what I'm asking here.

9        A.    The investment management
10   agreement.

11       Q.    Is that it, just the investment
12   management agreement?

13       A.    There are other agreements, but
14   there was no 12b-1.  The management
15   company provides transfer agency services
16   and other services for a fee.  Those were
17   all the subject of the litigation.

18       Q.    Who hired you in that case?

19       A.    Mr. Benedict.

20       Q.    Would you say that -- I think
21   you said before that you had reviewed the
22   process going into the management
23   agreements for some of the other cases.

24            Would you say that that is what
25   you did here?

1            G. H. Bobroff, Jr.

2     A.      Yes, ma'am.

3     Q.      In Fidelity?

4     A.      Yes, ma'am.

5     Q.      Are you able to tell me what you
6     concluded?

7     A.      No, ma'am.

8     Q.      Would you say that the materials
9     that you looked at in the Fidelity case
10    helped you form your opinions in the
11    American Funds case here in any way?

12            MR. BENEDICT: Objection.

13    A.      The materials are no different
14    than any other materials that I look at.

15    Q.      My question is similar to
16    before.

17            If you say in this case that, in
18    the American Funds case, that the American
19    Funds process and the materials used were
20    some of the best you've ever seen, would
21    that, in any way, have taken into account
22    the Fidelity materials as well?

23    A.      It would.

24            MR. BENEDICT: Along with a
25    hundred other fund groups that he's

**VERITEXT REPORTING COMPANY**

212-267-6868                          516-608-2400

ae01ba2c-80d2-4cf8-843c-79c25196f907

1          G. H. Bobroff, Jr.

2          MR. BENEDICT: Objection.

3          The witness is not here to

4     testify about reports of other cases,

5     but I will permit him to answer the

6     question.

7          A.    There are a couple of occasions

8     where I have found the information not to

9     be as complete and comprehensive.

10         Q.    And did you so testify to that

11    effect?

12         A.    Yes.

13         Q.    Which cases are those?

14         A.    I'm under a protective order.  I

15    can't discuss that.

16         Q.    Are you able to tell me if it

17    was one of the ones listed on your seven

18    cases?

19         MR. BENEDICT: He's under a

20    protective order.  He's not discussing

21    it.

22         Q.    So we would have no way of

23    verifying your testimony just now;

24    correct?

25         A.    That's correct.

Page 100

1       G. H. Bobroff, Jr.

2       MR. BENEDICT: He's here to

3   testify about Capital Research and

4   American Funds.

5       Q.    Now, in the case I think you

6   said you had a few instances where you

7   were hired as an expert and you found

8   materials to be somewhat lacking; is that

9   correct?

10      A.    Correct.

11      Q.    Were you under a protective

12  order in all of those cases?

13      A.    Yes, ma'am.

14      Q.    So we really have no way to know

15  at all the accuracy of that testimony;

16  correct?

17      MR. BENEDICT: Now you're being

18  argumentive.

19      MS. POLLACK: I'm asking a

20  question, I think.

21      MR. BENEDICT: The witness is

22  here testifying under oath.

23      MS. POLLACK: Yes, I understand.

24      Q.    We just have no way to verify

25  that; correct?

G. H. Bobroff, Jr.

1    among the best I have ever seen in the
2    mutual fund industry."
3        A.    Yes, ma'am.
4        Q.    So would you say that that is a
5    similar statement to what you made about
6    American Funds on page six?
7        A.    Well, I defined American Funds
8    as being very good.  In the case of
9    Fidelity, I'm defining it as being the
10   best I've ever seen.
11       Q.    I think you said among the best.
12       A.    Among the best.
13       Q.    So would you say very good is
14   different than --
15       A.    Yes, ma'am.
16       Q.    So you're saying that American's
17   are not quite as good as Fidelity's?
18            MR. BENEDICT: Objection.
19       A.    It's in the eyes of the
20   beholder.
21       Q.    Well, you were the beholder in
22   this case; weren't you?
23       A.    Yes, and I feel that Fidelity's
24   information is better, slightly better,

Page 160

1    G. H. Bobroff, Jr.

2

3

4

5

6

7

8

9

10

11

12

13    **REDACTED**

14

15

16

17

18

19

20

21

22

23

24

25

Page 161

G. H. Bobroff, Jr.

1
2
3
4
5
6
7
8
9
10
11
12
13
14          **REDACTED**
15
16
17
18
19
20
21
22
23
24
25

VERITEXT REPORTING COMPANY

212-267-6868

516-608-2400

ae01ba2c-80d2-4cf8-843c-79c25196f907

Page 162

G. H. Bobroff, Jr.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**REDACTED**

Page 163

1

G. H. Bobroff, Jr.

2

3

4

5

6

7

8

9

10

11

12

13

**REDACTED**

14

15

16

17

18

19

20

21

22

23

24

25

G. H. Bobroff, Jr.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**REDACTED**

VERITEXT REPORTING COMPANY

212-267-6868

516-608-2400

ae01ba2c-80d2-4cf8-843c-79c25196f907

G. H. Bobroff, Jr.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**REDACTED**

1          G. H. Bobroff, Jr.

2     testimony.

3          MS. POLLACK: Then he can correct

4     me.

5     A.    The point is that the court in

6  Gartenberg suggested that these are

7  factors to be contracted.  It didn't say

8  that all of them had to be present and

9  analyzed.  It is my view based on the

10  record before us that the board had

11  sufficient information without regard for

12  anything specific on economies of scale to

13  reach its business judgment.

14          MS. POLLACK: Let's just mark

15     this.

16          (Whereupon, a document entitled

17     Contracts Committee Guide was marked

18     Bobroff Exhibit 14

19     for identification.)

20     Q.    This is a document called

21  contracts committee guide, May 1, 2006,

22  O'Melveny and Myers.  It's CORBI 0041652

23  through 669.

24          I believe you cite this in your

25  report; correct?

G. H. Bobroff, Jr.

1

2    Q.    And they were able to do that

3    without knowing the extent to which --

4    A.    As I said to you a moment ago --

5    Q.    Let me finish my question.

6         And they were able to exercise,

7    in your view, their business judgment

8    regarding the level of advisory fees

9    without knowing the extent to which the

10   economies of scale were being shared with

11   the funds?

12   A.    As I said to you before, the

13   judge in the Gartenberg case and the

14   industry practice is that those are

15   considerations but they do not all have to

16   be answered.

17   Q.    That's fine.

18   A.    All I'm saying is that there is

19   no requirement that they be part of the

20   answer that the board reaches.

21   Q.    And that's a perfectly

22   acceptable answer.

23        I just want to make sure it's

24   very clear on the record the question that

25   I'm asking, which is: Is it your testimony

Page 214

1                       G. H. Bobroff, Jr.

2        A.      Yes.

3        Q.      So for example, salaries that

4   CRMC pays to run the business, that's a

5   passing along of economies of scale?

6        A.      To the extent that CRMC adds

7   additional portfolio counselors or

8   investment research people, they're

9   investing in the business and there are

10  benefits that inure to the shareholders

11  but it may be a benefit to CRMC as a

12  whole.

13       Q.      How is that a passing along of

14  the savings that it's achieving from

15  growth?

16       A.      It couldn't make these additions

17  if it didn't have the growth of assets to

18  which they would have been in a position

19  to hire additional portfolio counselors or

20  investment professionals.

21       Q.      Now, you state on page thirty,

22  "I am not aware of any fund group in the

23  industry which provides this type of

24  information to their fund directors."

25       A.      Yes, ma'am.

G. H. Bobroff, Jr.

1
2     Q.     What do you mean by this type of
3  information?
4     A.     The quantification of economies
5  of scale.
6     Q.     Now, when you say,
7  "quantification," do you mean any type of
8  analysis that has numbers in it?
9     A.     No.  People provide all sorts of
10  analysis.  I believe that Capital provides
11  useful information to the board about
12  things.  But I'm referring to a
13  mathematical analysis that gives rise to a
14  specific number or numbers.
15     Q.     Do you think that a regression
16  analysis of economies of scale would
17  constitute a mathematical analysis?
18        MR. BENEDICT: I'm going to
19     object now.
20        You're going to depose our
21     expert witness on economies of scale
22     in another week.  This witness is not
23     an expert on economies of scale.  I do
24     not mind you asking him questions
25     about economies of scale that are

Page 244

G. H. Bobroff, Jr.

1
2     within the range of profitability of other
3     advisers," are you going beyond the ones
4     that are in the board books that are --
5          A.    Yes, ma'am, I am relying on that
6     as a body of knowledge that I have looking
7     at others that I worked for at various
8     times throughout the year.
9          Q.    But you're unable to give me the
10    names of any?
11         A.    They're all under
12    confidentiality.
13         Q.    So we kind of have to take you
14    on your word for that?
15              MR. BENEDICT: You have him at
16         his word.
17         Q.    But we can't know which ones;
18    right?
19         A.    No, ma'am.
20         Q.    Now, when you say, "using their
21    own methods of cost allocation," are you
22    suggesting that CRMC uses some sort of
23    method of cost allocation here?
24         A.    No, what I'm referring to is
25    that most organizations are part of larger

# Exhibit N

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. BENNETT, GUY E. MILLER,<br>NANCY HAUGEN, MICHAEL F. MAGNAN,<br>KAREN L. MAGNAN, PRESELY C.<br>PHILLIPS, ANDREA M. PHILLIPS, and<br>CINDY SCHURGIN, for the use and benefit of<br>THE FIDELITY MAGELLAN FUND,<br>FIDELITY CONTRAFUND, FIDELITY<br>GROWTH & INCOME PORTFOLIO FUND,<br>FIDELITY BLUE CHIP GROWTH FUND, and<br>FIDELITY LOW-PRICED STOCK FUND,<br><br>              Plaintiffs,<br><br>     vs.<br><br>FIDELITY MANAGEMENT & RESEARCH<br>COMPANY and FMR CO., INC.,<br><br>              Defendants. | No. 04-CV-11651-MLW<br>(Lead case)<br><br>No. 04-CV-11756-MLW<br>(Consolidated case) |

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants hereby submit their Statement of Undisputed Facts in Support of their Motion

for Summary Judgment pursuant to Local Rule 56.1.

### A.     The Parties

1.     Plaintiffs Cynthia Bennett, Guy Miller, Nancy Haugen, Michael Magnan, Karen

Magnan, Presley Phillips, Andrea Phillips, and Cindy Schurgin ("Plaintiffs") purport to be

investors in five mutual funds that are managed and serviced by Fidelity: The Fidelity Magellan

Fund ("Magellan"), Fidelity Contrafund ("Contrafund"), Fidelity Growth & Income Portfolio

("Growth & Income"), Fidelity Blue Chip Growth Fund ("Blue Chip Growth"), and Fidelity



Low-Priced Stock Fund ("Low-Priced Stock") (collectively, the "Funds").  See Consolidated

Amended Complaint (Nov. 3, 2005) ("Complaint"), Ex.[1] 51 at ¶ 1.

2.      Defendants Fidelity Management and Research Company and Fidelity

Management and Research Company, Inc. (collectively, "Defendants," and, together with

affiliated entities, "Fidelity"), are registered investment advisers under the Investment Advisers

Act of 1940.  See Complaint, Ex. 51 at ¶¶ 42-43.  They serve as the investment adviser and

subadviser, respectively, of the Funds.  See id.  Other Fidelity entities also provide services to the

Funds and their shareholders.

**B.      The Independent Trustees Who Oversee the Funds**

3.      The Funds are overseen by a Board of Trustees.  During the relevant period,[2] over

70% of the Board was comprised of Independent Trustees who were, by statutory definition,

independent of Fidelity.  From 2000–2005, 10 of the 14 trustees (71.4%) were Independent; in

2006, 10 of the 13 (76.9%) were Independent; and in 2007, 10 of the 12 (83.3%) were

Independent.  See Expert Report of Geoffrey Bobroff ("Bobroff Report"), Ex. 28 at 14.

4.      Since 2004 the Independent Trustees have included the following individuals:

| Name | Background |
|---|---|
| Ned Lautenbach (Lead Independent Trustee) | Former Senior Vice President of IBM Corp. |
| Robert Gates (Former Lead Independent Trustee) | Current Secretary of Defense; former Director of the CIA; former president of Texas A&M. |

---

[1]      References in the form of "Ex. ___" refer to the documents attached to the Declaration of James S. Dittmar in Support of Defendants' Motion for Summary Judgment, dated February 6, 2009.

[2]      The following discussion of the Independent Trustees' negotiation and approval of the Funds' Management Agreements relates to the period from 2003 to 2006.  As in any business, the Board's membership, structure, and process have evolved from year to year, but the focus here on the 2003–2006 period is consistent with the general scope of fact discovery and the time period that is potentially relevant to Plaintiffs' claims.

2

| | |
|---|---|
| Marvin Mann (Former Lead Independent Trustee) | Former CEO and Chairman of Lexmark International; former senior executive of IBM. |
| Marie Knowles (Audit Committee Chair) | Former CFO of Atlantic Richfield Company. |
| J. Michael Cook | Former Chairman and CEO of Deloitte & Touche. |
| Ralph F. Cox | Former President of Greenhill Petroleum; former President and COO of Union Pacific Resources Co. |
| Dennis Dirks | Former COO of the Depository Trust & Clearing Corporation. |
| Albert Gamper | Former Chairman, CEO and President of CIT Group, Inc. |
| George Heilmeier | Inventor of Liquid Crystal Display technology; former Chairman and CEO of Telcordia Technologies. |
| James Keys | Former Chairman, President and CEO of Johnson Controls, Inc. |
| Donald Kirk | Former Governor of the American Stock Exchange; former Chairman of the Financial Accounting Standards Board. |
| William McCoy | Former Vice Chairman of the Board and President of BellSouth Corporation. |
| Cornelia Small | Former CIO and Director of Global Equity Investments of Scudder, Stevens and Clark. |
| William Stavropoulos | Former Chairman, President and CEO of Dow Chemical. |
| Kenneth Wolfe | Chairman and former CEO of Hershey Foods Corp. |

See Contrafund Statement of Additional Information ("SAI") (Feb. 28, 2004), Ex. 1 at BFMR_00050170-72; Contrafund SAI, (Feb. 29, 2008), Ex. 2 at 19-20.

5.      Many Independent Trustees have served, or currently serve, on the boards of directors of Fortune 500 companies (including, for example, Comcast Corporation, Dow Chemical Company, and Revlon, Inc.), as well as various charitable organizations. See Contrafund Statement of Additional Information ("SAI") (Feb. 28, 2004), Ex. 1 at BFMR_00050170-72; Contrafund SAI, (Feb. 29, 2008), Ex. 2 at 19-20.

3

6.      Geoffrey Bobroff, who has consulted for mutual fund boards of directors and investment advisers for more than 40 years, testified that the Trustees were "among the most qualified [he has] ever encountered." Bobroff Report, Ex. 28 at 6.

7.      Independent Trustees are nominated by the Governance and Nominating Committee, which is comprised of two to three Independent Trustees; the trustees affiliated with Fidelity (i.e., interested trustees) have no vote.  See Governance and Nominating Committee Charter, Ex. 10 at BFMR_00015842-44.

8.      Only individuals with no "material relationships" with Fidelity, its owners, or its management can be selected as Independent Trustees.  See id.  The Trustees testified that they had no social or business relationship with any Fidelity executive officer prior to being nominated to the Board.  See, e.g., Deposition of Marie Knowles, Ex. 39 at 47; Deposition of Ned Lautenbach, Ex. 41 at 21-22; Deposition of William McCoy, Ex. 43 at 52.

9.      Upon election, new Trustees participate in an extensive training program.  See Deposition of Ned Lautenbach, Ex. 41 at 23-24.

10.     The Independent Trustees are advised by independent, experienced mutual fund lawyers from the firm of Debevoise & Plimpton LLP ("Debevoise").  Debevoise advises the Independent Trustees with respect to their fiduciary duties and their review and consideration of the Funds' Management Agreements.  See Bobroff Report, Ex. 28 at 16-17; Deposition of William McCoy, Ex. 43 at 91-92.

**C.      The Funds' Contracts with Fidelity**

11.     Fidelity provides services to the Funds pursuant to four separate agreements.  See, e.g., Contrafund SAI (Feb. 28, 2004), Ex. 1 at BFMR_00050179, 88-89.  The agreements are negotiated and approved annually by the Independent Trustees.  See, e.g., id. at BFMR_00050169.

4

Management Agreement

12.      The Funds' Management Agreements cover investment management services, compliance with statutory and regulatory requirements, and a broad array of shareholder and administrative services.  See, e.g., Management Contract between Blue Chip Growth and Fidelity (June 1, 2006), Ex. 6 at BFMR_00090218-19.

13.      Investment management services include, among other things, choosing which stocks and other investments to buy and sell, researching potential investments, executing trades on behalf of the fund, and a broad range of compliance and operational support.  See, e.g., id.

14.      Shareholder and administrative services include, among other things, the development, operation, and maintenance of Fidelity's telephone call centers, more than 100 walk-in investor centers, and an award-winning website.  See, e.g., id.; see also Deposition of Ned Lautenbach, Ex. 41 at 42; "FPI Customer Service and Shareholder Satisfaction Review," Presentation to the Board of Trustees (May 18, 2006), Ex. 12 at BFMR_00170535; "Fidelity Investments – Business Review," Presentation to the Board of Trustees (Feb. 16, 2006), Ex. 13 at BFMR_00237145 (listing awards for Fidelity's website).  By virtue of these services, shareholders in the Funds can access their accounts and obtain information and investment guidance 24 hours a day, 365 days a year.  See "FPI Customer Service and Shareholder Satisfaction Review," Presentation to the Board of Trustees (May 18, 2006), Ex. 12 at BFMR_00170544.  See also Bobroff Report, Ex. 28 at 36 (describing website as "probably the best and most complete in the industry").

15.      In exchange for the services provided pursuant to the Management Agreements, the Funds pay Fidelity a management fee, which is expressed as a percentage of the Funds' assets under management.  See "Overview of Equity Funds," Memorandum to the Board of

5

Trustees (June 2, 2004), Ex. 19 at BFMR_00011128-35; see also, e.g., Management Contract between Blue Chip Growth and Fidelity (June 1, 2006), Ex. 6 at BFMR_00090219-20.

16.     The basic management fee for each of the Funds is the sum of two components: the "group fee" and a "fund-specific fee." See "Overview of Equity Funds," Memorandum to the Board of Trustees (June 2, 2004), Ex. 19 at BFMR_00011128-35; see also, e.g., Management Contract between Blue Chip Growth and Fidelity (June 1, 2006), Ex. 6 at BFMR_00090219-20.

17.     The group fee is the same for all of the Funds and is calculated by a formula that includes breakpoints which cause the group fee rate to decline as overall Fidelity mutual fund assets under management increase. See "Overview of Equity Funds," Memorandum to the Board of Trustees (June 2, 2004), Ex. 19 at BFMR_00011128; see also, e.g., Management Contract between Blue Chip Growth and Fidelity (June 1, 2006), Ex. 6 at BFMR_00090219-20.

18.     The fund-specific fee is a fixed rate that varies according to the fund's investment discipline. See "Overview of Equity Funds," Memorandum to the Board of Trustees (June 2, 2004), Ex. 19 at BFMR_00011128, 32-33; see also, e.g., Management Contract between Blue Chip Growth and Fidelity (June 1, 2006), Ex. 6 at BFMR_000902120.

19.     The management fees for all of the Funds, except Growth & Income, are also subject to performance adjustments. See "Review of Performance Adjustments," Memorandum to the Board of Trustees (June 2, 2004), Ex. 20 at BFMR_00011219-31. The performance adjustment is based on the fund's performance relative to its benchmark over a specified period of time, with a maximum adjustment of plus or minus 20 basis points (i.e., 0.20%). See id. at BFMR_00011219-20. If the fund outperforms its benchmark, the performance adjustment increases the management fee, and if the fund underperforms its benchmark, the performance adjustment reduces the management fee. See id.

6

Other Agreements

20.     The Funds also enter into separate Transfer Agent and Pricing and Bookkeeping Agreements with Fidelity, which require Fidelity to provide specifically enumerated administrative and recordkeeping services to the Funds and/or their shareholders. See, e.g., Transfer Agent Agreement with Fidelity Service Company, Inc. (Jan. 1, 1997), Ex. 7 at BFMR_00077598-602; Service Agent Agreement with Fidelity Service Company, Inc. (Jan. 1, 1997), Ex. 8 at BFMR_00077548-52.

21.     Distribution Agreements require Fidelity to market and sell shares of the Funds. See, e.g., Amended and Restated General Distribution Agreement between Fidelity Contrafund and Fidelity Distributors Corporation (May 19, 2005), Ex. 9 at BFMR_00071363-66. Fidelity does not receive a separate distribution fee to the Funds in exchange for these services; instead, it is authorized to pay for those services out of its management fee, past profits, and other resources pursuant to a distribution plan approved by the Board. See, e.g., Contrafund SAI (Feb. 28, 2004), Ex. 1 at BFMR_00050188-89.

**D.     The Total Fees Paid by the Funds**

22.     The sum of all the fees paid by a fund to Fidelity, together with other fund-borne expenses, when divided by the total assets of the fund, is known as the fund's total expense ratio. The following table summarizes the expense ratios for each of the Funds for each year from 2003 to 2007, expressed as a percent of assets:

| Fund | 2003 | 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|------|------|
| Magellan | 0.71% | 0.64% | 0.59% | 0.54% | 0.73% |
| Contrafund | 1.00% | 0.94% | 0.91% | 0.90% | 0.89% |
| Blue Chip Growth | 0.65% | 0.68% | 0.63% | 0.60% | 0.58% |

7

| Low-Priced Stock | 1.00% | 0.97% | 0.88% | 0.97% | 0.99% |
|---|---|---|---|---|---|
| Growth & Income | 0.71% | 0.70% | 0.69% | 0.68% | 0.68% |

See 2005 Lipper Data, Ex. 21 at BFMR_00020872-73, 75-77; Prospectuses for the Funds, 2006-2008, Exs. 3-5.

**E.     The Trustees' Annual Approval of the Funds' Management Agreements with Fidelity**

23.     The Board has eleven two-day, in-person meetings throughout the year—one per month, excluding the month of August.  See, e.g., "Annual Board Calendar," New Trustee Training (Jan. 22, 2005), Ex. 17 at BFMR_00062955.

24.     The Board has formed various standing committees, each of which is composed entirely of Independent Trustees.  See Contrafund SAI (Feb. 28, 2004), Ex. 1 at BFMR_00050174-77.  See also, e.g., Board Committees – 2007, Ex. 23 at BFMR_00152620.

25.     The Board allocates primary responsibility for certain issues to its Committees. For example, the Audit Committee takes the lead on profitability and various accounting-related issues.  See Audit Committee Charter, Ex. 11 at BFMR_00005279-81.  Among other responsibilities, the Audit Committee reviews and approves the methodologies used in preparing profitability results.  See id.  Marie Knowles, the former CFO of Atlantic Richfield, serves as the chair of the Audit Committee.  See Contrafund SAI (Feb. 28, 2004), Ex. 1 at BFMR_00050171, 75.

26.     Committees often meet between regular Board meetings, and they frequently request additional presentations or discussions with Fidelity personnel in order to address particular issues.  See, e.g., Deposition of Ned Lautenbach, Ex. 41 at 30; Deposition of Marie Knowles, Ex. 39 at 191-92.

8

27.     The Board has also created several Ad Hoc committees to perform in-depth reviews of other issues.  <u>See, e.g.</u>, Minutes of the Ad Hoc Committee on Fall-Out Benefits (May 19, 2004), Ex. 22 at BFMR_00014882-83.

F.      **Information Received and Considered by the Independent Trustees**

28.     The Independent Trustees devote hundreds of hours to preparing for Board meetings and reviewing materials provided by Fidelity.  <u>See</u> Deposition of Marie Knowles, Ex. 39 at 17-18; Deposition of Ned Lautenbach, Ex. 41 at 30; Deposition of William McCoy, Ex. 43 at 79; Deposition of Marvin Mann, Ex. 42 at 105-106; Deposition of William Stavropoulos, Ex. 50 at 100-01.

29.     In consultation with Debevoise, the Trustees develop and submit to Fidelity in advance of each meeting a list of questions and requests for additional information based upon their review of the Board materials.  <u>See</u> Bobroff Report, Ex. 28 at 20; Deposition of Ned Lautenbach, Ex. 41 at 141-42.

30.     The Independent Trustees receive extensive materials relevant to their negotiation of the Funds' Management Agreements, including information relating to each of the <u>Gartenberg</u> factors.  <u>See</u> "Location of Information Responsive to Gartenberg Factors," Ex. 24 at BFMR_00191652-53; Contrafund SAI (Feb. 28, 2004), Ex. 1 at BFMR_00050183-84.  Geoffrey Bobroff, who has reviewed board materials provided to more than 40 mutual fund boards of directors, opined that the information given to the Board is "comprehensive, fairly and clearly presented," and "among the best [he has] ever seen in the mutual fund industry."  <u>See</u> Deposition of Geoffrey Bobroff, Ex. 36 at 79-80; Bobroff Report, Ex. 28 at 25.

<u>Nature and Quality of Services</u>

31.     Materials the Board reviews with respect to the nature and quality of the services Fidelity provides to the Funds include:  (i) annual and semi-annual reviews of the Funds, which

9

include presentations from each of the Funds' portfolio managers, see, e.g., 2004 Fidelity

Magellan Fund Annual Review, Ex. 25 at BFMR_00014826-36; (ii) information about the

Funds' investment performance, including comparative data from third-party industry consultant

Lipper, Inc., see, e.g., 2005 Lipper Data, Ex. 21 at BFMR_00020872-73, 75-77; and (iii)

business reviews for each of the Fidelity entities that provide services to the Funds and their

shareholders, including information relating to shareholder satisfaction with the services

provided by Fidelity, see, e.g., "FPI Customer Service and Shareholder Satisfaction Review,"

Presentation to the Board of Trustees (May 18, 2006), Ex. 12 at BFMR_00170523-46.

  32. For much of the relevant time period, the investment performance for Contrafund

and Low-Priced Stock was consistently above average compared to their peers.  See 2005 Lipper

Data, Ex. 21 at BFMR_00020873, 76.  The managers of both of Low-Priced Stock and

Contrafund have been named "managers of the year" by third-party industry consultant

Morningstar, Inc.  See Murray Coleman, "Danoff, Gross win Morningstar's Top Manager

Award" (Jan. 3, 2008), Ex. 26; Christopher Traulsen, "Fidelity Logs a Strong Year in a Tough

Market" (Dec. 31, 2002), Ex. 27 at BFMR_00188292.

  33. The performance of the other Funds has been mixed, with periods of

overperformance and underperformance.  See, e.g., 2005 Lipper Data, Ex. 21 at

BFMR_00020872, 75, 77.

  34. Named Plaintiffs generally testified that they used many of Fidelity's services,

and considered them "good."  See Deposition of Nancy Haugen, Ex. 38 at 78, 130; Deposition of

Andrea Phillips, Ex. 45 at 25, 80; Deposition of Presley Phillips, Ex. 46 at 84-85.

10

Comparative Fees

35.    On an annual basis, the Board receives comparisons of the management fees and total expense ratios of the Funds with peer funds with similar investment objectives compiled in tabular and graphical format using data from third-party industry consultant Lipper, Inc. See, e.g., 2005 Lipper Data, Ex. 21.

36.    The Funds' expense ratios generally ranked in the lowest quartile of their respective peer groups and were at all times below the median. See, e.g., id. An analysis prepared by Professor Glenn Hubbard confirms that the Funds' fees are low relative to comparable funds. See Expert Report of Glenn Hubbard ("Hubbard Report"), Ex. 30 at ¶ Exhibits 28 & 29.

37.    Stewart Brown, Plaintiffs' expert, conceded that the Funds' fees are "generally low in the industry." See Deposition of Stewart Brown, Ex. 37 at 203. One named Plaintiff commented that Magellan's fees were low. See Deposition of Cindy Schurgin, Ex. 49 at 63-64.

Economies of Scale

38.    The Trustees have prepared formal, in-depth analyses of economies of scale every five years since at least as early as 1994. See Bobroff Report, Ex. 28 at 21-22, 29; Hubbard Report, Ex. 30 at ¶ 43.

39.    During the relevant period, they also have received numerous presentations and analyses from Fidelity regarding the appropriateness of the group fee structure. See, e.g., "Summary of Economies of Scale Discussions," Presentation to the Board of Trustees (Mar. 15, 2006), Ex. 14 at BFMR_00153911-24.

40.    Defendants' experts opined that they believed the materials regarding economies of scale provided to the Board were more than sufficient to allow the Board to properly consider

11

this factor in assessing the appropriateness of the management fees. See Bobroff Report, Ex. 28 at 21-22, 29, 39 (finding the materials "among the best and most comprehensive efforts [he has] seen by any investment adviser to deal with economies of scale" and "more than sufficient to allow the Board to make a reasonable business decision regarding the existence of economies of scale and, if so, whether they are being shared with fund investors."); Hubbard Report, Ex. 30 at ¶ 43 (describing the materials as "relevant, appropriate, and sufficient" for purposes of the Trustees' consideration of the issue).

41.    Plaintiffs' expert conceded that the Board received a regression analysis of economies of scale that was similar to the analyses he performed in his report. See Deposition of Steve Pomerantz, Ex. 47 at 308.

42.    Fidelity has spent approximately $2 billion per year during the relevant period on systems expenses. See, e.g., "Economies of Scale 1999-2003," Presentation to the Board of Trustees, Ex. 15 at BFMR_00015105. More recently, this number has risen to over $3 billion per year. See Deposition of Robert Reynolds, Ex. 48 at 194.

43.    Plaintiffs' experts concede that breakpoints and service enhancements are appropriate means of sharing the benefits of economies of scale with the Funds and their shareholders. See Deposition of Steve Pomerantz, Ex. 47 at 106, 378, 389-90, 393; Deposition of Stewart Brown, Ex. 37 at 130-31. By Plaintiffs' experts own calculations, Fidelity has shared more than $1.8 billion in supposed economies of scale with the Funds through the group fee structure alone. See Deposition of Steve Pomerantz, Ex. 47 at 389-90.

Fund Profitability

44.    Materials the Board receives with respect to fund profitability include: (i) a yearly comprehensive report from Fidelity detailing the profitability of managing and servicing

12

the Fidelity mutual funds both overall and on a fund-by-fund basis; see Bobroff Report, Ex. 28 at 28-29, 37-38; Expert Report of Russell Peppet ("Peppet Report"), Ex. 32 at 8-10; (ii) a yearly report from PricewaterhouseCoopers ("PwC") attesting to the accuracy of the profitability results and the reasonableness of the methodologies used in preparing them; see Bobroff Report, Ex. 28 at 28-29, 37-38; Peppet Report, Ex. 32 at 10-11; (iii) annual memoranda outlining Fidelity's cost-allocation methodologies used in generating the profitability results, and proposed methodology changes, see Bobroff Report, Ex. 28 at 28-29, 37-38; Peppet Report, Ex. 32 at 8-10; and (iv) comparative information (where available) on the profitability of other mutual fund complexes. See Bobroff Report, Ex. 28 at 38.

45.     In 2004, the profitability to Fidelity for managing the Funds ranged from 15.9% to 34.1%. See, e.g., 2005 Lipper Data, Ex. 21 at BFMR_00020780-81. According to industry expert Geoffrey Bobroff, this level of profitability is "well within the range of profitability other advisers estimate." See Bobroff Report, Ex. 28 at 37.

46.     Plaintiffs' cost-accounting expert conceded he has not calculated an alternative profit margin for any of the Funds. See Deposition of James Lamb, Ex. 40 at 116-17.

47.     Fidelity's overall profitability in managing the funds is below average as compared to publicly traded companies for which data is available. See Bobroff Report, Ex. 28 at 38.

Fall-Out Benefits

48.     The Board annually receives a memorandum outlining several potential sources of fall-out benefits, the revenues and expenses for each of those businesses, and an estimate of total potential fall-out benefits to Fidelity from its relationship with the Funds. See Bobroff Report, Ex. 28 at 38-39.

13

49.    In the aggregate the lines of business listed as potential fall-out benefits do not generate profits to Fidelity.  See id.

### G.    Fidelity's Non-Mutual Fund Clients

50.    In addition to managing and servicing a number of retail mutual funds, Fidelity provides investment management services to a number of non-mutual fund ("institutional") clients such as pension funds for investment products such as separate accounts.  These separate accounts require a minimum investment of $25 million.[3]  See "Institutional Products Overview," Presentation to the Board of Trustees (July 20, 2005), Ex. 16 at BFMR_00151572-73.

51.    Fidelity provides the Board with a yearly memorandum outlining the fees charged to Fidelity's non-mutual fund products and the reasons for differences between those fees and the fees charged to the Fidelity mutual funds.  See "Management Fee Rates for Other Equity Assets Managed by Fidelity," Memorandum to the Board of Trustees (June 2, 2004), Ex. 18 at BFMR_00011559-76; see also "Institutional Products Overview," Presentation to the Board of Trustees (July 20, 2005), Ex. 16 at BFMR_00151572-73, 79.

52.    Some of these so-called "institutional" clients pay higher fee rates than those paid by the Funds.  See Expert Report of John Peavy ("Peavy Report"), Ex. 31 at Exhibit 5.

53.    In contrast with the millions of shareholders that Fidelity must service for each of the Funds, institutional accounts such as separate accounts typically have a single investor.  See "Institutional Products Overview," Presentation to the Board of Trustees (July 20, 2005), Ex. 16 at BFMR_00151579.

---

[3]    In 2005, Fidelity created Pyramis Global Advisors ("Pyramis"), a stand-alone corporation focused on providing institutional products and servicing non-mutual fund institutional clients.  Prior to the creation of Pyramis, many of Fidelity's institutional accounts were handled by a separate unit of FMR Co.  See "Pyramis Global Advisors Overview," Ex. 53.

14

54.     In addition, mutual fund managers are also subject to numerous, costly regulatory burdens that are largely inapplicable to institutional accounts, such as obligations under the ICA, the Investment Advisers Act of 1940, Securities Exchange Act of 1934, Securities Act of 1933, Sarbanes Oxley, SEC rules and regulations, and other statutes.  See "Institutional Products Overview," Presentation to the Board of Trustees (July 20, 2005), Ex. 16 at BFMR_00151573. Plaintiffs' expert conceded that "no issuer of securities is subject to more detailed regulation than a mutual fund."  See Deposition of Steve Pomerantz, Ex. 47 at 191.

55.     As a result of these differences in services, John Peavy, an expert in the field of investment management, testified that the service and distribution costs for mutual funds are dramatically higher than those for non-mutual fund products.  See Deposition of John Peavy, Ex. 44 at 86-87, 124.  For example, Fidelity incurs significant costs in providing 24/7 telephone service, 100-plus walk-in investor centers, and an award-winning website for use by mutual fund shareholders.  See Peavy Report, Ex. 31 at 14.

56.     Plaintiffs' experts also concede that there are differences between the services Fidelity provides to its institutional and retail products.  See Deposition of Steve Pomerantz, Ex. 47 at 40-42, 146-47, 153, 157-60, 186-90; Deposition of Stewart Brown, Ex. 37 at 290-91.

57.     The Trustees testified that they believe comparisons of the fees charged to "institutional" accounts and those charged to Fidelity's mutual funds to be of limited value, given the vast differences in the services provided in connection with each.  See Deposition of Marvin Mann, Ex. 42 at 32-36; Deposition of Ned Lautenbach, Ex. 41 at 62-63; Deposition of Marie Knowles, Ex. 39 at 282; Deposition of William Stavropoulos, Ex. 50 at 45-46.

15

**H.   Competition in the Mutual Fund Industry**

58.   Plaintiffs' expert believes virtually all mutual fund fees to be excessive.  <u>See</u> Deposition of Stewart Brown, Ex. 37 at 115-16.

59.   The mutual fund industry bears the hallmarks of a competitive market.  <u>See</u> Hubbard Report, Ex. 30 at ¶¶ 62-116.  Thousands of mutual funds compete with one another—and with other types of investment products—for investors' assets.  <u>See</u> Deposition of Marie Knowles, Ex. 39 at 70-71.

60.   The number of mutual funds has increased substantially over recent decades, reflecting the low barriers to entry and expansion within the industry.  Hubbard Report, Ex. 30 at ¶¶ 62-74, Exhibit 17.

61.   Mutual fund shares are redeemable on demand, thus enabling many investors to move from one fund to another with relative ease.  Mutual fund prospectuses and other public filings fully disclose fund fees, as well as a wealth of other information that may be relevant to potential investors.  <u>See</u> Hubbard Report, Ex. 30 at ¶¶ 81-92.

62.   In 2004 and 2005, Fidelity engaged in a protracted and well-publicized "price war" with Vanguard, during which both complexes significantly reduced the fees charged to certain of their mutual funds.  <u>See</u> Hubbard Report, Ex. 30 at ¶¶ 78-79, note 66; <u>see also</u> Deposition of Steve Pomerantz, Ex. 47 at 59-60; Deposition of Stewart Brown, Ex. 36 at 60-61.

63.   Plaintiffs' expert concedes that the mutual fund industry is "intensely competitive" and that at least some advisers, including Fidelity, compete on fees.  <u>See</u> Deposition of Stewart Brown, Ex. 37 at 201-02.

16

64.     Plaintiffs' experts admit that they and many investors are aware of mutual fund fees and select funds, at least in part, based on the fees charged.  <u>See</u> Deposition of Stewart Brown, Ex. 37 at 10; <u>see also</u> Deposition of Steve Pomerantz, Ex. 47 at 92-93.

17

Dated:  February 6, 2009

Respectfully submitted,

GOODWIN PROCTER LLP
/s/ James S. Dittmar
   James S. Dittmar (BBO# 126320)
   David J. Apfel (BBO# 551136)
Exchange Place
53 State Street
Boston, MA 02109
Tel:  (617) 570-1000
Fax:  (617) 523-1231

MILBANK, TWEED, HADLEY & McCLOY LLP
   James N. Benedict (*pro hac vice*)
   Sean M. Murphy (*pro hac vice*)
   Robert J. Liubicic
   Robert R. Miller
   Andrew W. Robertson
   Elizabeth M. Virga
   Tommaso Bencivenga
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel:  (212) 530-5000
Fax:  (212) 530-5219

*Attorneys for Defendants Fidelity Management &*
*Research Company and FMR Co., Inc.*

18

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 6, 2009.

/s/ James S. Dittmar

# Exhibit O

CONFIDENTIAL

*Cynthia A. Bennett, et al.*

*v.*

*Fidelity Management & Research Company and FMR Co., Inc.*

# EXPERT REPORT OF

# GEOFFREY BOBROFF

June 30, 2008



PENGAD 800-631-6889

EXHIBIT
Bobroff
4
3|20|09    WH

## BASES AND REASONS FOR OPINIONS

Gartenberg provides the framework by which courts typically analyze the fees charged to mutual funds. Since the decision in Gartenberg, mutual fund trustees and advisers have considered the Gartenberg factors in reviewing and negotiating management fees. Independent trustees' counsel and board consultants have looked to the Gartenberg factors in providing advice and data for Independent Trustees in their fee approval decisions.

Section I of this report deals with the sixth Gartenberg factor,[6] a crucial factor that encompasses the amount, quality, and relevance of information provided to the Board, the Independent Trustees' qualifications, their independence from the investment adviser, the care and conscientiousness with which they perform their responsibilities, and related fund governance issues. These considerations all strongly support my conclusion that the Independent Trustees and FMR fulfilled their duties to the Funds' shareholders.

Section II of this report addresses the merits of the remaining five Gartenberg factors. Based on my experience in the mutual fund industry, my analysis of each of these factors supports my conclusion that the Independent Trustees fulfilled their responsibility to protect shareholders from excessive fees.

I.   **THE INDEPENDENT BOARD MEMBERS ARE QUALIFIED, INDEPENDENT, AND RECEIVE THOROUGH AND COMPLETE INFORMATION**

   A.   **Qualifications and Expertise of the Independent Trustees**

   1.   **Opinion**

The Independent Trustees are highly qualified by their educational and professional backgrounds, their knowledge and expertise, their accomplishments in business and civic endeavors, and their diverse life experiences. As a group, the Independent Trustees are among the most qualified I have encountered in the more than 39 years I have spent working in the mutual fund industry. The majority of the Independent Trustees are former Chief Executive Officers or Senior Executives of major public or private organizations. For example, using the composition of the Board in 2005 as a representative sample, ten of the 14 board members in 2005 were Independent Trustees.[7] Seven of these ten Independent Trustees are former Chief Executive Officers

---

[6] Judge Easterbrook primarily focused on the independence and conscientiousness of the trustees in his opinion in Jones v. Harris Assocs. L.P., 527 F.3d 627 (7th Cir. 2008), which is the sixth Gartenberg factor.

[7] The four interested Trustees were (1) Edward C. Johnson 3d who serves as Chair of the Board of the Fidelity Funds and Chief Executive Officer, Chairman and Director of FMR Corp. (which is now FMR LLC) (2) Abigail Johnson who served as President and Director of FMR and currently serves as President of Fidelity Employee Service Company (FESCo), (3) Steve Jonas who served as President of Fidelity Enterprise Operations and Risk Services and then as

6

5.      **Not-for-Profit and Community Involvement**

As noted above, most of the Independent Trustees have strong affiliations with not-for-profit and community organizations.

B.      **The Independent Trustees' Independence and Conscientiousness**

1.      **Opinion**

In 2005, ten of the 14 Board members were Independent Trustees. The Independent Trustees have demonstrated their independence in the contract renewal process and in their other dealings with FMR. The Independent Trustees exercised care and conscientiousness in carrying out their duties. They have also demonstrated their awareness of their fiduciary responsibilities to the shareholders, as they demonstrate in the 15(c) Process and throughout the year.

2.      **Independence Factors**

The ICA distinguishes "interested persons" (those affiliated with the investment adviser, in this case FMR) from persons who are not "interested" and thus independent of the investment adviser. *See* 15 U.S.C. § 80a-2(a)(19). The ICA expressly provides that "[a] natural person shall be presumed not to be a controlled person." 15 U.S.C. § 80(a)-2(a)(9). Courts have held that plaintiffs seeking to overcome this statutory presumption must carry their burden under a multi-factor legal standard that takes into account: (1) selection or nomination of the director by the controlling party; (2) existence of family ties; (3) social relations; (4) former business associations between the controlling person; (5) the amount of time spent by directors at meetings; (6) respective ages; (7) participation in recommending, evaluating and terminating policies; (8) independent knowledge of corporate affairs; (9) interlocking directors and officers, together with share ownerships; and (10) actual domination and operation. Strougo v. BEA Associates, 188 F. Supp. 2d 373, 381 (S.D.N.Y. 2002) ("Strougo factors"). None of the factors suggested in Strougo for overcoming the presumption of independence are present in this case.

The Independent Trustees have repeatedly demonstrated both their independence from FMR and their diligence on behalf of the Fidelity Funds' shareholders in many ways, including, for example, by negotiating fee reductions and breakpoints in the Group Fee; demanding additional information concerning the Fidelity Funds and the operation of the management company and negotiating a $42 million payment by Fidelity to certain funds in connection with an investigation into certain traders' improper receipt of gifts and gratuities. (See, e.g., BFMR_00015124-126; BFMR_00097875; BFMR_00143847-889.) Because many of the same facts support the Independent Trustees' independence and conscientiousness, this section addresses both these related issues.

12

3.    **Facts Demonstrating Independence and Conscientiousness**

a.    **Nomination and Election of Independent Trustees**

During the relevant time period and long before, the Board's Governance and Nominating Committee was comprised only of Independent Trustees. This Committee of two to three Independent Trustees makes nominations for the election or appointment of Independent Trustees and non-management members of any Advisory Board. (See BFMR_00091394-433.) This Committee also has the authority to retain a search firm to identify candidates based upon criteria established by the Independent Trustees. (See id.) During the relevant time period, this committee has regularly engaged Spencer Stuart, a nationally prominent search firm, to assist them with identifying trustee candidates. (See, e.g., NCL00001323-29.) All of the Independent Trustees that have served on the Board between 2000 and 2006 were identified by the Independent Trustees or Spencer Stuart. (See, e.g., McCoy Tr. at 54:11–56:23; Mann Tr. at 86:25–92:8.) This process distinguishes the Board from many other boards. In my experience, other investment management advisers often identify and/or suggest candidates for nomination as new independent trustees. In contrast, none of the Independent Trustees on the Board were identified and/or suggested by FMR.

The Governance and Nominating Committee has also adopted a Statement of Policy on Criteria for Selecting Independent Trustees. (See BFMR_00015407-08.) This Statement of Policy lists nine characteristics that the Committee expects all candidates to have. For example, "[t]he candidate needs the disposition to act independently in fact in respect of FMR and its affiliates and others in order to protect the interests of the Funds and all shareholders. It is expected that Independent Trustees will play an active and, if necessary, an adversarial role in pursuing the best interests of the Funds and shareholders." (See id.) In my experience in the mutual fund industry, I have never seen a criterion like this. The Statement of Policy also lists three additional characteristics that are desirable of the Independent Trustees as a group.[11] These include:

- that the Independent Trustees "be drawn from the ranks of respected and accomplished senior business leaders";

- that Independent Trustees "strive to achieve diversity in terms of gender, race and geographic location"; and

- that the Independent Trustees "reflect a diversity of business experience."

---

[11] The Statement of Policy also lists two characteristics that are desirable but not mandatory for candidates. These include: (1) "the ability to serve seven or more years before reaching mandatory retirement age" and (2) "diversity of interests evidenced by participation in community, charitable or other similar activities." (See id.)

13

(See id.)  During the relevant period of the litigation, the Board met the criteria set forth in this Statement of Policy.

**b.      Trustee Compensation**

The compensation of the Independent Trustees is set by the Independent Trustees, and not by FMR.  The Governance and Nominating Committee periodically reviews compensation and have on multiple occasions engaged Pearl Meyer & Partners, an independent compensation consultant, to assist in this review and make recommendations to the Board.  (See BFMR_00022881-82; BFMR_00009877.)  In my opinion, in light of the caliber of the individuals who make up the Board, the tremendous amount of work that they do throughout the year, the number of Board meetings per year, the size of the Fidelity organization and the various board memberships available to the Independent Trustees, the Independent Trustees' compensation is in line with the compensation received by independent trustees on other mutual fund boards.

**c.      The Independent Trustees are Shareholders**

The Independent Trustees are shareholders in Fidelity Funds.  In 1995, the Independent Trustees adopted a "mandatory deferral policy" requiring a portion of an Independent Trustee's base compensation to be deferred and invested in specific Fidelity Funds.  (See BFMR_00091394-433.)  The current policy requires that the Indendent Trustees defer 50% of their base compensation.  Additionally, the Independent Trustees can elect to defer an additional portion of their base compensation beyond the mandatory 50%.  (See MLK00013117-123.)  All of the Independent Trustees invest in many of the Fidelity Funds, including the five funds at issue.  (See, e.g., Lautenbach Tr. at 80:21-81:25.)  This aligns their interests with those of the shareholders they represent.

In my experience in the mutual fund industry, Fidelity's mandatory deferral policy is one of the better and more formal policies I have seen.

**d.      Super-Majority of Independent Trustees**

From 2000 through 2005, ten of the 14 Board members (71.4%) were Independent Trustees.  In 2006, the number of Board members changed from 14 to 13.  Of these 13 Board members, ten were Independent Trustees (76.9%).  In 2007, the total number of Board members again changed from 13 to 12.  Of these 12 Board members, ten were Independent Trustees (83.3%).  During the relevant period, the Board has exceeded the super-majority recommendations advocated by the Investment Company Institute and the SEC.

**e.      Committee Structure**

The Board has adopted a committee structure which should be a model for the rest of the mutual fund industry.  All of the committees are composed exclusively of Independent Trustees.  In 2005, the committees included: (i) the Operations Committee; (ii) the Fair Value Oversight Committee; (iii) the Fixed-Income and International

14

Committee; (iv) the Equity Committee; (v) the Select and Special Committee; (vi) the Equity Contract Committee; (vii) the Fixed-Income Contract Committee; (viii) the Shareholder Services, Brokerage and Distribution Committee; (ix) the Audit Committee; and (x) the Governance and Nominating Committee.[12]  (See BFMR_00017776.)

Additionally, the Operations Committee over the years has established various Ad Hoc Committees to address new issues that arise from time to time.  In many cases, these Ad Hoc Committees became standing Committees if and when the Board determined that the subject was sufficiently recurring to warrant on-going attention.  For example, since 2000 the Operations Committee has established, among others, the following Ad Hoc Committees:  (i)  Ad Hoc Committee in Foreign Custodians (see BFMR_00024473); (ii) Ad Hoc Committee on Performance Fees (to review the Fidelity funds' performance adjustment arrangements) (see BFMR_00026249-260); (iii) Ad Hoc Committee on Management Contract Renewals (see MLK00012295-299);  (iv) Ad Hoc Committee on Training and Education (see BFMR_00016129); (v) Ad Hoc Committee on Fall-out Benefits (see BFMR_00009221-23); (vi) Ad Hoc Committee on Compliance (see BFMR_00014903; BFMR_00019641-64); (vii) Ad Hoc Committee on Proxy Voting (see BFMR_00021223); (viii) Ad Hoc Committee on Fidelity Services (focus on the use by FMR employees and cost for using facilities and/or services provided by a FMR affiliates) (see BFMR_00017818-66); and (ix) Ad Hoc Committee on Customer Sentiment (examining the investor experience in using all the varied customer services offered by FMR and how customer communications and the responses are handled) (see BFMR_00163124).

The Board's committee structure enables the Independent Trustees to be more effective and specialized in their oversight of the more than 350 Fidelity funds, as more attention can be provided to governance, compliance, contract renewal and fund performance – all very important issues for investors with a significant focus on outliers.  Moreover, the Committees can perform their designated functions – reviewing common fund audits, questioning the performance of under-performing funds, and reviewing management's compliance with SEC regulations – without any risk of being inhibited by the presence of the interested trustees.  A list of the Committees and the membership on each Committee from 2000 through 2006 is included in Exhibit 3.

Marvin Mann, in his testimony before the United States Senate Committee on Banking Housing and Urban Affairs, explained how the Board structure "is a critical factor in [the Independent Trustees'] ability to oversee the Funds.  The structure, mission

---

[12] Since 2005, the Ad Hoc Compliance Committee and the Ad Hoc Proxy Voting Committee became standing committees.  Additionally, it is my understanding that in 2007 the Board, together with FMR, made the decision to reorganize the Board into two separate boards whereby one board will oversee Fidelity's equity and high-income funds, while the second board will oversee Fidelity's investment-grade bond, money market, and asset allocation funds.  It is my understanding that in order to implement this change shareholder approval is necessary and that Fidelity is in the process of soliciting shareholder approval.  Because, as of the date of this report, the two board structure has not yet been implemented, I have not commented on or rendered an opinion concerning this proposed structure in my report.

15

and membership of each Board committee are decided solely by the Independent Trustees. These committees are chaired by, and consist exclusively of, Independent Trustees. This assures that the committee agendas and decisions are controlled by the Independent Trustees." Additionally, Mr. Mann explained that "[t]he time and effort involved in overseeing a large number of funds with common elements is, therefore, not the same as would be required to serve on separate boards of the same number of unaffiliated operating companies. A well-functioning unified fund board can leverage its knowledge of the common elements, address them in an efficient manner and in the process do a superior job in exercising its fiduciary duties and looking after the best interests of fund shareholders." (See Statement of Marvin Mann, Chairman of the Independent Trustees of the Fidelity Funds Before the Senate Committee on Banking, Housing and Urban Affairs on *Review of Current Investigations and Regulatory Actions Regarding the Mutual Fund Industry: Fund Operations and Governance*", dated March 2, 2004.)

Based on my experience in the mutual fund industry, Fidelity's committee structure is uncharacteristic of most fund boards because the majority of the business conducted by the committees is done exclusively by the Independent Trustees. Additionally, Fidelity's committee structure allows for greater efficiency and focused oversight by the Independent Trustees.

### f.   Independent Counsel

The Independent Trustees seek and receive substantial guidance from independent legal counsel. Since approximately 1986, Woodrow W. Campbell, Jr., a senior partner specializing in investment management in the New York City office of Debevoise & Plimpton LLP, has served as independent counsel to the Independent Trustees. He has been assisted at times by his partner Ken Berman. As required by the SEC's rules, Mr. Campbell and Mr. Berman were and are independent from FMR.

The role of independent counsel has been to advise the Independent Trustees on various legal issues and obligations, including mutual fund governance issues, performance of their fiduciary duties to shareholders, and the 15(c) Process. Mr. Campbell and Mr. Berman have provided advice to the Independent Trustees regarding the broad range of their duties and responsibilities. The Independent Trustees also consult Mr. Campbell and Mr. Berman with respect to the annual self evaluation of the Independent Trustees. Mr. Campbell and Mr. Berman also provide their insights as to changes in the regulatory environment and the mutual fund industry that could affect the role of Independent Trustees and bring to the attention of the Independent Trustees continuing educational opportunities relevant to their duties. Mr. Campbell and Mr. Berman attend virtually all Board and Committee meetings, regularly meet with the Independent Trustees in private sessions, regularly consult with the Lead Independent Trustee and chairs of the various committees, advise the Independent Trustees on the performance of their duties, and are available to answer questions or queries from the Independent Trustees at any time.

16

I regard the fact that the Fidelity Funds Board has been guided by highly regarded independent counsel as an important element in evaluating whether the Independent Trustees were fully informed and conscientious in their decision making.

### g.      Fund Counsel

The Independent Trustees also received guidance from counsel to the Fidelity Funds. During the relevant period, the funds have been represented by Richard Phillips of Kirkpatrick & Lockhart Preston Gates & Ellis LLP and later Robert Helm of Dechert LLP. Fund counsel has primary responsibility for regulatory matters affecting the funds, including SEC filings. Fund counsel attends the Board meetings and is also available to the Independent Trustees to provide advice or guidance.

### h.      Lead Independent Trustee

During the relevant period of this litigation and long before, the Independent Trustees have elected a Lead Independent Trustee (or Chairman of the Independent Trustees). This person is responsible for setting the Board agenda. Mr. Gerald McDonough was Lead Independent Trustee from 1996 through 2000. Mr. Mann was Lead Independent Trustee from 2001 through 2005. From 2005 to 2006, Dr. Gates was Lead Independent Trustee. Mr. Lautenbach is the current Lead Independent Trustee.

### i.      Orientation for New Trustees

In 2003, the Independent Trustees designed a formal two-day orientation program for new Independent Trustees. This program was designed to introduce new Trustees to the Fidelity organization, its various business units, and the role and responsibilities of the Independent Trustees. (See BFMR_00150130-36.) This orientation program is in addition to a prospective trustee's service on the Advisory Board, as well as other informal training sessions that take place throughout the year. Prior to 2003, prospective trustees served on the Advisory Board and attended informal training sessions which included visitations to various Fidelity locations and tutorial presentations at Board meetings.

### j.      Self-Evaluations

The Governance and Nominating Committee has overseen an annual self-evaluation of the Independent Trustees. In connection with this self-evaluation process, the Committee prepares a report which is submitted to the Interested Trustees for review. (See MLM00000481-91; NCL00004479-91.) These reports typically suggest ways to improve the Board process. For example, in 2005 the Independent Trustees determined that they wanted additional information regarding FMR's effectiveness in responding to shareholder concerns and decided to form an Ad Hoc Committee for obtaining and evaluating this information. (See NCL00004479-91.) This self-evaluation process has been in place since at least 2004, even though the SEC did not require self-evaluations by Independent Trustees until 2006.

17

The Board views the 15(c) Process as a year long process which is incorporated into each Board meeting. As set forth in Exhibit 4, the Board considers various issues relevant to the 15(c) Process at each Board meeting. For example, the Board considers fund profitability in connection with the April Board meeting, fall-out benefits in connection with the May Board meeting, and investment performance in connection with the May and June Board meetings. In addition, the consideration and renewal of the various contracts (i.e., 12b-1, transfer agent, general distribution, advisory and pricing and bookkeeping) are spread out over the course of the year. Moreover, the Board meets with portfolio managers of the Fidelity funds throughout the year.

The Board incorporates the information it has reviewed throughout the year in connection with its formal consideration to the Funds' management contracts, which takes place over a two month period during the June and July Board meetings.[13] Indeed, Marvin Mann in his testimony before the Senate Committee stated that he wanted to dispel any "notion that all of the issues relating to investment advisory contracts are considered at a single meeting. The formal contract reviews occur over a series of meetings. Moreover, we receive data and information relevant to that review throughout the year, including the fund reviews that I discussed above." (See Statement of Marvin Mann, Chairman of the Independent Trustees of the Fidelity Funds Before the Senate Committee on Banking, Housing and Urban Affairs on "Review of Current Investigations and Regulatory Actions Regarding the Mutual Fund Industry: Fund Operations and Governance", dated March 2, 2004.)

In connection with the Board's formal consideration of the equity funds' management contracts, FMR provides, at the Board's request, targeted information relevant to the consideration and renewal of the Funds' management contracts (the "15(c) Materials") prior to the June Board meeting. These materials are typically provided to the Board at least one week in advance of the June Board meeting and are separate and apart from the monthly board materials the Trustees receive. During the June Board meeting, the Independent Trustees (and specifically the Equity Contract Committee) will discuss the 15(c) Materials. With assistance from their independent counsel, the Independent Trustees devise a list of questions and requests for additional information, which is submitted to FMR (the "Q&A Process"). In response, FMR provides the Independent Trustees detailed supplemental information in advance of the July Board meeting which the Independent Trustees use to evaluate the management contracts and fee schedules. (See, e.g., BFMR_00143847-89.) Once the Board has fully considered the relevant information, it votes on the equity funds' management contracts. This vote typically takes place at the July Board meeting.

---

[13] The Board splits its review of the Fidelity funds' management contracts by equity funds and fixed-income and money market funds. The consideration and renewal of the fixed-income and money market funds' management contracts takes place over the months of May and June. The consideration and renewal of the equity funds' management contracts takes place over the months of June and July. See Exhibit 4.

20

The Board has sought to continually improve the 15(c) Process over the years. For example, in December 2003, the Operations Committee formed two Fund Contract Committees (the Equity Contract Committee and the Fixed-Income Contract Committee) comprised solely of Independent Trustees to assist in the Board's consideration and renewal of the management contracts. These Committees review the 15(c) Materials provided by FMR in advance of the June Board meetings and make recommendations concerning approval of the management contracts to the full Board.

Additionally, in 2003 the Independent Trustees formed an Ad Hoc Committee on Management Contract Renewals to review the 15(c) Process and consider improvements that could be made. The Ad Hoc Committee put together a memorandum of recommendations that was submitted to FMR. Among the recommendations, the Independent Trustees asked that the 15(c) Process informally begin in January/February with a presentation from FMR providing its perspective on the business environment during the preceding year and looking forward. The Independent Trustees asked for this presentation because throughout the year the Board receives presentations from the heads of Fidelity's various business units and they thought it would be beneficial for FMR to provide an overview of the business environment at the beginning of the year so they could assess whether the various business units were on target in light of the company's projected goals. The Independent Trustees also asked Fidelity to create a "Fund Data Page" (a/k/a the "Quad Chart") in connection with the 15(c) Materials so that the most relevant information relating to each fund is captured on one page. (See MLK00012295-99.)

More recently, the Independent Trustees asked Fidelity to provide a "cross reference" sheet that sets forth the location of information responsive to each Gartenberg factor in the 15(c) Materials. Fidelity responded by explaining that it provides the Board with information relevant to the Gartenberg factors throughout the year. Additionally, Fidelity provided the Independent Trustees with a chart setting forth the location of information within the Board Materials and 15(c) Materials that is responsive to each of the Gartenberg factors. (See BFRM_00143847-48, BFMR_00143865.)

Overall, the Board's 15(c) Process allows the Independent Trustees ample opportunity to review and analyze the materials, raise any follow-up questions, request additional information, and engage in arms-length negotiations with FMR. Based on my experience with other fund boards and the actions taken by other fund boards, it is my opinion that the Independent Trustees thoroughly considered the Gartenberg factors as well as a plethora of other information in connection with their consideration and approval of the management contracts. Moreover, the Independent Trustees were advised by independent legal counsel concerning their legal obligations as fiduciaries to Fund shareholders.

6. **Consideration of the Group Fee Structure**

The Independent Trustees have demonstrated their independence from FMR and their conscientiousness on behalf of mutual fund shareholders by continually reviewing and considering Fidelity's group fee structure (Fidelity's group fee structure is described

21

306

in Section I.D.6, infra). Since at least 1994, the Independent Trustees have repeatedly analyzed the group fee structure and have concluded each time that this group fee structure is appropriate and adequately takes into account potential economies of scale achieved by the funds.

For example, every five years the Board has worked with FMR to conduct an in-depth economies of scale analysis.[14] In connection with the 1994 economies of scale analysis, the Ad Hoc Committee on Economies of Scale considered three alternatives to the group fee, including a proposal to include fund-level breakpoints. (See BFMR_00098205-06.). The Committee rejected all three alternatives in favor of the group fee. (See id.) Additionally, in connection with the 1999 economies of scale analysis, the Board determined that in light of the growth in mutual fund assets from 1994 to 1999, additional breakpoints to the group fee schedule were necessary. FMR proposed adding eight new breakpoints starting at $650 billion for every 10% growth in group assets up to $1.268 trillion. (See BFMR_00097842-8165.) The Ad Hoc Committee on Economies of Scale reviewed FMR's proposal and recommended that the breakpoints begin at $587 billion, instead of $650 billion. After additional negotiations, FMR accepted the Committee's proposal which was very beneficial to fund shareholders. (See BFMR_00097867-68.)

Additionally, in 2002 through 2003, the Independent Trustees, led by Independent Trustee Donald Kirk, investigated whether (i) it would be more appropriate to base the group fee on discipline-specific assets rather than total assets and (ii) whether the marginal rate of decline should be the same for equity and fixed-income assets. At the conclusion of this review, the Independent Trustees determined that the current group fee structure was appropriate and benefited shareholders. (See BFMR_00005785-91.)

In 2005 through 2006, the Independent Trustees raised a number of questions about economies of scale and the profitability of the some of the larger equity funds. In connection with these questions, the Independent Trustees and FMR explored issues relating to the consumption of investment management resources by large equity funds and how that consumption is reflected in Fidelity's cost allocation methodologies, and the appropriateness of fund-level breakpoints. After a thorough investigation of the issue, the Independent Trustees determined that fund level breakpoints were not necessary or appropriate although it is something that they will continue to evaluate. (See BFMR_00059253-70; BFMR_00153911-37; BFMR_00167371-94.)

Additionally, in 2007, the Independent Trustees negotiated four additional breakpoints to the group fee schedule for growth in assets over $1.845 trillion. (See Statement of Additional Information for Contrafund, dated February 29, 2008.) These new breakpoints can reasonably be expected to save fund shareholders millions of dollars as Fidelity continues to grow.

---

[14] These detailed studies supplement the board materials the Independent Trustees receive annually, which include information relevant to economies of scale.

22

independent; and that the independent trustees (i) appoint a "lead independent director" to serve as liaison with the adviser; (ii) retain independent counsel and other experts and consultants as needed; (iii) set their own trustees' fees; (iv) select new independent trustees; and (v) meet separately from management and the interested trustees. (ICI Best Practices Nos. 1, 3, 4, 6, 9 & 10.) The Board meets or exceeds all these requirements, and has done so since at least 1999.

The ICI also recommended that independent trustees invest in the Funds they oversee (No. 5); and the Independent Trustees comply with this practice. To further enhance the independent directors' independence and effectiveness, the ICI recommended that they complete annual questionnaires identifying any business, financial, or family relationships with the investment adviser or its affiliates or service providers. (No. 7.) The Board also complies with this practice. Additionally, the Board complies with each of the recommended best practices designed to ensure the effective and independent operation of the Audit Committee (No. 8), and with the ICI's recommendation that fund boards adopt retirement policies for independent directors. (No. 13.)

The two additional best practices that the ICI recommended in 2003 were prohibiting "close family members" of employees of the fund, its adviser and principal underwriter from serving as independent trustees and implementing audit committee requirements similar to those applicable to operating companies under Section 301 of the Sarbanes Oxley Act. The Board complies with both of these recommended best practices as well.

**D.      The Quality of the Board Materials is Unsurpassed**

**1.      Opinion**

The Independent Trustees studied and considered voluminous information concerning each of the Gartenberg factors in negotiating the fee paid to FMR in connection with managing the mutual funds. FMR provided the Independent Trustees with extensive materials that were comprehensive, fairly and clearly presented, and provided sufficient factual detail and explanatory background to allow the Independent Trustees to fulfill their responsibilities to Fund shareholders. FMR provided the Trustees with materials ("Board Books") at each of the eleven Board meetings held each year; detailed 15(c) Materials; detailed data for Board Committee meetings; and other additional information requested by the Board. Additionally, at each Board meeting FMR put together a number of presentations for the Trustees based on the materials in the Board Books. Throughout this period, the Independent Trustees did an outstanding job of demanding the appropriate information from FMR necessary to fulfill their fiduciary duties. The Board Materials (including the 15(c) Materials) provided by FMR are among the best I have ever seen in the mutual fund industry.

25

(ii)     Education and Guidance Tools

FMR prides itself in delivering to the fund shareholders exceptional education and guidance tools to meet their various needs from college savings, retirement savings to retirement income planning. (See Section II.A.3, infra.) The Board is provided with periodic information detailing FMR's various initiatives. (See, e.g., BFMR_00170538.) Additionally, the Board is given periodic results from customer satisfaction surveys. (See, e.g., BFMR_00170523-46; BFMR_00162301-313.) For example, in 2005 FMR put together a presentation for the Board titled "Voice of the FPI Customer". This presentation highlighted Fidelity's "customer first" culture and noted, among others things, that this culture has improved the customer experience and Fidelity's customer satisfaction scores have steadily risen over the years. For instance, from July 2003 to July 2005, customer satisfaction with Fidelity's website rose from 66% to 75%. Similarly, customer satisfaction with Fidelity's investor centers rose from 82% to 89%. (See BFMR_00020644.)

(iii)     Valuation of Portfolio Securities

Through an affiliate, FMR determines the per share net asset value for each of the Fidelity Funds. This service is described in various procedural memoranda established by the Board and implemented by FMR. (See, e.g., BFMR_00021031-42.) The Board has established a Fair Value Oversight Committee which reviews on a quarterly basis any fund pricing (of portfolio securities) issues that might arise.

**3.     Information Regarding Profitability**

**a.     Opinion**

FMR provides the Independent Trustees with information regarding profitability that is thorough in its presentation and in its detailed analysis.

**b.     Detailed Reports and Other Information**

FMR provides the Independent Trustees with an annual profitability analysis, as well as memoranda which detail the methodology followed, and a thorough review of any changes or refinements to the methodology from year-to-year. (See, e.g., BFMR_00061633-2097; BFMR_00020744-47; BFMR_00016398-405.) In connection with the annual profitability analysis, the Independent Trustees receive profit and loss statements for each fund. (See, e.g., BFMR_00061834.) In addition, PriceWaterhouseCoopers ("PWC") reviews the profitability analysis prepared by FMR and comments on FMR's compliance with the methodology and any proposed modifications. (See, e.g., BFMR_0052796-865.)

FMR also provides the Board with comparative information on the profitability of other mutual fund complexes where this information is publicly available. (See, e.g., BFMR_00052763.) This information is provided to the Independent Trustees each year by FMR as part of the 15(c) Process. The information is assembled by FMR from public

28

documents of each of these firms. These comparisons, discussed in Section II.B.2, infra, demonstrate that FMR's overall profit margin is below average.

### 4.   Information Regarding Economies of Scale

#### a.   Opinion

The Independent Trustees have received and considered relevant information concerning economies of scale. The information provided to the Independent Trustees on economies of scale is equal to, if not better than, the information I have seen provided to independent trustees in other fund complexes.

#### b.   Detailed Reports and Other Information

Since at least 1994, the Board has worked with FMR to conduct an in depth analysis of economies of scale every five years. These in depth economies of scale analyses were conducted in 1994, 1999 and 2004. (See BFMR_00098168-247; BFMR_00097844-76; BFMR_00015091-112.) These analyses are among the best and most comprehensive efforts I have seen by any investment adviser to deal with economies of scale. This information is provided on a complex-wide basis.[19]

Additionally, in connection with the 15(c) Process, FMR annually provides the Independent Trustees with information which allows them to analyze economies of scale. For example, FMR provides the Independent Trustees with a five-year trend of assets under management and profitability on a fund-by-fund basis. (See, e.g., BFMR_00020872.) Additionally, FMR has periodically provided the Board with additional information concerning economies of scale at the request of the Independent Trustees, namely through the Q&A Process. For example, in 2005 and 2006 FMR put together a series of presentations relating to economies of scale for the Board in response to certain questions it had raised regarding whether large equity funds should have individual fund breakpoints. (See, e.g., BFMR_00143852; BFMR_00059253-270; BFMR_000153911-37.)

### 5.   Information Regarding Fall-Out Benefits

#### a.   Opinion

FMR provides the Independent Trustees with detailed information concerning fall-out benefits.

---

[19] It should be noted that there is no regulatory mandate or industry practice that requires an investment adviser to provide a fund-by-fund economies of scale analysis. Indeed, I have never seen such an analysis in more than 39 years in the mutual fund industry. Furthermore, the Independent Trustees attempted to conduct a fund level analysis of economies of scale in 1994, and observed that "conclusions are often difficult to draw on a fund-by-fund basis because of the inherent limitations in cost allocation methodology." (See BFMR_00098176-77.)

29

3. **Customer Service**

FMR prides itself in delivering to investors a 24/7/365 service which is probably the best and most complete in the industry. Fidelity is accessible to investors by the phone, through investor centers, and an award-winning website (Fidelity.com). In order to provide the best and most complete experience, Fidelity invests large sums of money in its business. For example, since 2002 Fidelity has spent over $130 million annually on its website. (See BFMR_00170526.) Between 2003 through 2005, Fidelity also spent approximately $40 million annually on new investor centers, relocations and renovations. (See id.) The investor centers (which total approximately 116[25] (see BFMR_00170536)) are in major cities throughout the United States and, along with the call centers, allow investors to research investments and access a variety of educational and guidance tools.

a. **Investments in Enhanced Services**

Over the last few years, FMR has made substantial investments in its technology for shareholder service operations and other operations related to running the various businesses conducted by FMR. Since 1996, FMR has spent annually in excess of $1 billion dollars on systems and most recently that amount has risen to over $3 billion. (See BFMR_00015105; Reynolds Tr. at 194:5-20.) The cost of these investments is borne by FMR.

Furthermore, over the years FMR, under pressure from the Board, has made significant changes in how the investment research process is performed. The costs for these changes/enhancements has been significant and has also been borne by FMR. (See BFMR_00250608.)

4. **Investment Guidance**

During the relevant period, FMR has invested tens of millions of dollars in the development and implementation of a number of education and guidance tools to enhance the shareholder experience. Some examples include:[26]

- Retirement Quick Check: A service provided to customers who are in the accumulation state of their investment life cycle. This service uses broad and personalized information to help customers determine if they are saving enough for retirement.

- Retirement Income Planner: A service for customers who are approaching retirement or are already retired. This service helps customers determine how long their income will last by providing a detailed retirement income plan.

---

[25] Fidelity has plans to grow that number to 140 branches by 2009. (See id.)

[26] See BFMR_00170538.

36

- **Portfolio Review**:  A service for customers with complex investment needs who are at any stage of the investment cycle.  This service allows retail customers the ability to review and analyze their portfolios online and provides comprehensive guidance on specific investment strategies for retirement and other goals.

- **MyPlan**:  An interactive tool to help investors overcome procrastination with respect to their retirement planning by providing both a quick, simple snapshot of how much they should save for retirement and a checklist that emphasizes obtaining maximum retirement benefits from users' employers.  The MyPlan tool also allows customers who have completed the Portfolio Review, Retirement Income Planner, or Retirement Quick Check applications to review their retirement track.

Fidelity's guidance tools are among the best I have seen in the industry.

### 5.      Outside Reviews of Fidelity

Fidelity has been lauded for its investment performance, shareholder services and its overall quality as a company.  Some examples include:

- Fidelity's website -- Best overall mutual fund site for consumers as determined by Dalbar for the period 2001 through 2005.[27]

- According to Boston Research Group's DCP Retirement Advisor Satisfaction and Loyalty Study, Fidelity's website was ranked 1st in 2004 and 3rd in 2005.

- Kasina named Fidelity to its list of Top 10 Websites for Financial Intermediaries in 2000, 2001, 2003, 2004, 2005 and 2006 studies.

### B.      Profitability

#### 1.      Opinion

I have examined the materials provided to the Independent Trustees concerning the profitability of the Funds to FMR.  These disclosures were thorough and complete and enabled the Board to consider this factor.  Moreover, these disclosures are among the best I have seen in the industry.  Additionally, based on my experience in the mutual fund industry, the profitability of the Funds to FMR is well within the range of profitability other advisers estimate for their largest equity funds using their own methods of cost allocation.

---

[27] Fidelity's website ranked first overall for mutual fund consumers and was named an Excellent Website for every quarter in 2001 through 2005.  (See Dalbarinc.com.)

37

2.      **Comparisons to Public Companies**

There is only a limited group of publicly traded investment management firms whose profitability is publicly available.[28] As noted above, the 15(c) Materials include comparisons of FMR's profit margin to those of these publicly traded firms. (See Section I.D.3, supra.) These comparisons show that FMR's profitability from managing mutual funds is below average.

3.      **Fund-by-Fund Profitability**

The Independent Trustees receive fund profitability data prepared pursuant to a methodology that has been approved by both the Independent Trustees and PWC. The Board also receives a report from PWC that the profitability information was prepared pursuant to the agreed-upon methodology.

The profitability reports provided to the Board set forth approximations of each Fund's profitability on a pre- and post-tax basis. The reports also break down various components of the costs, including the expense for "investment management", "servicing" and "marketing and distribution". The approximate profitability margins of the Funds from 2000 to the present are consistent with those generated by large funds in other mutual fund complexes.

It should be noted that there is no statute, SEC rule, or industry practice requiring investment advisers to report profitability on a fund-by-fund basis, rather than in the aggregate on a firm-wide basis. Indeed, I am aware of some investment advisers that choose not to report profitability on a fund-by-fund basis. However, FMR provides the Board with the approximate profitability of each fund, as well as for the entire Fidelity Funds complex.

C.      **Fall-Out Benefits**

1.      **Opinion**

I have examined FMR's disclosures in its Board Materials of potential fall-out benefits. These disclosures were both thorough and complete and enabled the Board to properly consider this factor.

---

[28] There are approximately 13 public companies whose primary business involves managing mutual funds. This is the only publicly available information regarding the profitability of firms in a similar business. None of these firms have funds that were subject to a performance adjustment as are many of the Fidelity Funds. It should be understood that each of these firms also may engage in other aspects of the money management business (primarily an institutional asset manager, manager of significant number of closed-end funds, institutional separate accounts, etc.). One of the firms relies on a captive sales force with the cost of that sales force included in their financials. The lack of publicly-available information places limitations on the use of information from these public companies to benchmark the level of profitability. FMR explains this limitation on use of that data in the Board Materials.

38

**2.** **To the Extent that Fall-Out Benefits Exist, They are More of a Drag on Fund Profitability Rather than a Contributor to it**

In the material presented to the Board, FMR identified its various businesses that may benefit indirectly from association with FMR's mutual funds. The information is intended as a broad supplement to the information provided to the Board on profitability. For example, in 2005 FMR identified the following non-mutual fund businesses that may derive potential fall-out benefits from relationships with the Fidelity funds: (a) brokerage; (b) employer services; (c) intermediary; and (d) other. (See BFMR_00018949-962.) The aggregate pretax-loss of these Fidelity businesses has ranged from $4 million in 2003 to $92.2 million in 2004. (See id.) FMR believes that it is not possible to attribute revenue or profit from the business which would not have been earned but for the relationship of FMR or any affiliate to any individual fund or group of funds managed by FMR.

Importantly, if these potential fall-out benefits were included in fund profitability, they would decrease FMR's profit margins relating to the management of the Funds. This could have an adverse effect on the fees charged to shareholders because the management fees would likely have to be increased in order for Fidelity to maintain its current margins.

**3.** **Soft Dollars**

As noted above, FMR has been a vocal advocate for unbundling brokerage commissions so as to identify what portion relates to execution and what portion relates to research or other services. To that end, as of July 1, 2004, FMR decided that it would stop using fund brokerage commissions to pay for market data, subscriptions, membership fees and related systems expenditures. This change, if FMR continues to receive these services will have the effect of increasing Fidelity's costs by over REDACTED REDACTED annually and, in turn, will reduce profits accordingly. (See BFMR_00196215-16.)

In October 2005, FMR unbundled commission trades from research from many of the largest broker dealers, and now pays separately for proprietary research. This change has, on an annual basis, increased the cost to FMR by over REDACTED . (See BFMR_00225491; BFMR_00183709.)

**D.** **Economies of Scale**

**1.** **Opinion**

Information concerning potential economies of scale has been provided to the Independent Trustees and thoroughly discussed by them. I am not aware of any other mutual fund complex where the Board and management have been engaged in such a thorough and virtually continuous review of economies of scale. This data is more than sufficient to allow the Board to make a reasonable business decision regarding the existence of economies of scale and, if so, whether they are being shared with fund investors.

39

2.      **Five-Year Review**

The Board, working with FMR, has conducted in-depth five-year analyses of economies of scale in 1994, 1999 and 2004. This is in addition to the annual information the Board is provided that allows them to evaluate economies of scale. These five-year economies of scale analyses are extensive and provide the Board meaningful insight into the operations and future direction of the Fidelity organization. Additionally, the Board routinely seeks additional information outside of these five-year analyses concerning economies of scale. (See Section I.D.4, supra.)

3.      **Complex-Wide Analysis**

As noted above, detailed and thorough information on economies of scale is provided to the Independent Trustees on a complex-wide basis. Such complex-wide data is reasonable in light of the difficulties of analyzing economies of scale at the individual fund level. Indeed, in my experience, I have never seen economies of scale analyzed and presented to any mutual fund board at the individual fund level.

4.      **Sharing**

a.      **Benefits from the Group Fee**

As set forth in Section I.B.6 supra, the Board reviews the group fee structure and the benefits of the group fee structure at least annually and negotiates for additional breakpoints to the group fee schedule as appropriate. For example, in 2007 the Independent Trustees negotiated four additional breakpoints to the group fee schedule for growth in assets up to $1.845 trillion. (See Statement of Additional Information for Contrafund, dated February 29, 2008.)

b.      **Funds Management Fees are Priced to Scale at Their Inception**

FMR has established individual fund fees for different investment styles that when added to the group fee, result in fees that are very competitive. These individual fund fees do not change as a fund grows. This process is different than for most fund groups which start a new fund at a higher level in order to cover start-up costs and then, over time, add breakpoints to the fee schedule as the fund's assets increase in order to share any economies of scale.

Fidelity's group fee structure allows it to price new funds at inception at fee levels which are typically comparable to that of competitive funds with substantially more assets.

c.      **Enhancements in the Business**

In a 2000 SEC staff report, the SEC recognized that mutual fund trustees had an obligation to ensure that economies of scale were being shared with shareholders. The SEC Report noted that this sharing could be achieved by requiring that the adviser's fees

40

be lowered, including breakpoints in the adviser's fees, or having the adviser provide additional or enhanced services under the advisory contract. (See BFMR_00051099.)

FMR provides the Independent Trustees with periodic information detailing FMR's various initiatives and enhancements to its business. During the relevant period, Fidelity has spent many millions of dollars on enhancements to its business. For example, FMR has recently revamped its investment research effort, eliminated bundled commissions (resulting in an annual savings to the Fidelity Funds by reducing the brokerage commissions paid), added enhanced guidance tools and built out a compliance function (i.e., Chief Compliance Office) mandated by the SEC (as well as complying with the requirements of Sarbanes-Oxley and the implementation of new Rule 22c-2 under the ICA). This information further enhanced the Board's ability to analyze issues relating to economies of scale.

E.    **Comparative Fee and Total Expense Comparisons**

1.    **Opinion**

The Independent Trustees have been given detailed information concerning the Funds' management fees and the management fees of comparable funds which has enabled them to thoroughly consider this factor. Additionally, based on my experience in the mutual fund industry, the comparative fee information provided to the Board shows that the fees charged to the Funds are generally lower than those charged by their peers. Moreover, Plaintiffs' expert presents a flawed analysis on the topic of comparative fee structures when comparing the Fidelity Funds to the fees charged to the Vanguard funds.

2.    **The Fees Charged by FMR to the Funds are in Line with, if Not Lower than Fees Charged to Their Peers**

The fees charged by FMR to the Funds at issue for the five fiscal years 2000 through 2004 are in the lowest first or second quartile, whether they are compared with the Mapped Group or the Asset-Size Peer Group. (See Exhibit 6.) For purposes of the comparison, I believe it is preferable to look at the management fee on a contractual basis with and without the performance fee adjustment. With respect to the Funds, Low-Priced Stock Fund and Contrafund had strong investment performance and FMR benefited by receiving a higher fee because of the performance adjustment. On the other hand, Magellan, Blue Chip Growth and Growth & Income had weaker investment performance and FMR lost revenue because of the adjustment.

3.    **The Fees Charged the Fidelity Funds are Not Comparable with the Fees Charged to Fidelity's Other Equity Products**

The inherent differences between the services provided by FMR to the Funds and those provided to other equity products (i.e., institutional and sub-advised accounts) make general comparisons of fee levels and/or breakpoints inappropriate. Among other things, (i) mutual funds tend to serve many more individual investors with smaller account balances than institutional products; (ii) mutual fund cash flows are less predictable than

41

# Exhibit P

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY
(Pages 317-334)

# Exhibit Q

CONFIDENTIAL

**Expert Report of R. Glenn Hubbard**

*In re American Mutual Funds Fee Litigation*

CONFIDENTIAL

also served as Chair of the Economic Policy Committee for Organization for Economic Co-operation and Development (OECD) in Paris. From 1991 to 1993, I served as Deputy Assistant Secretary (Tax Analysis) of the U.S. Department of the Treasury, where I was responsible for economic analysis of tax policy, the administration's revenue estimates, and health care policy issues. I have also been an adviser or consultant to the Board of Governors of the Federal Reserve System, Social Security Administration, Congressional Budget Office, Federal Reserve Bank of New York, Internal Revenue Service, International Trade Commission, National Science Foundation, U.S. Department of Energy, and U.S. Department of the Treasury.

3.      My *curriculum vitae*, which is attached as **Appendix A**, gives more biographical details and lists my writings. **Appendix B** specifies the testimony that I have given as an expert witness since 2005.

## II.      Report Preparation

4.      I have been asked by counsel for Defendants Capital Research and Management Company ("CRMC") and American Funds Distributors, Inc. ("AFD") (collectively, "Defendants") to perform an economic analysis of the plaintiffs' claims that CRMC charged excessive fees to the American funds at issue in this matter.[1] I was also asked to evaluate and opine on the report of plaintiffs' expert, Edward O'Neal ("O'Neal Report").[2]

5.      I am being compensated for my time in this matter at my standard billing rate of $1,200 per hour. The materials that I, and those working under my direction, have considered or relied upon in my analysis are listed in **Appendix C** of this report. My work on this matter is

---

[1] The eight American Funds funds at issue are AMCAP Fund, Inc. ("AMCAP"), American Balanced Fund, Inc. ("AMBAL"), The Bond Fund of America, Inc. ("BFA"), Capital Income Builder, Inc. ("CIB"), Capital World Growth and Income Fund, Inc. ("WGI"), The Growth Fund of America, Inc. ("GFA"), The Income Fund of America, Inc. ("IFA"), and the Investment Company of America ("ICA") (collectively, "the Funds").

[2] Edward S. O'Neal, Expert Report in the matter of *In re American Mutual Funds Fee Litigation,* February 13, 2009.

2

CONFIDENTIAL

ongoing, and I may review additional materials or conduct further analysis. I reserve the right to update, refine, or revise my opinion.

### III.     Summary of Opinions

6.     I have reached the following opinions in this matter.

a.     An investor's well-being is affected by the total fee that he or she pays for a mutual fund. An individual mutual fund investor's economic interest is not affected by whether or how a given total fee is divided into different fee components. For this reason, an economic analysis of whether mutual fund fees are excessive should focus on total fees paid by investors.

b.     Economists use competitive markets as the standard benchmark to evaluate prices. Mutual funds, including the Funds, are sold in a competitive market. This market includes a large number of competitors, many substitutes for mutual funds, low barriers to entry, competitors who lower their fees, and low switching costs.

c.     The competitiveness of the market in which mutual funds are sold and the sensitivity of mutual fund demand to fees prevent mutual fund advisers from sustaining economically excessive fees over the long-run.

d.     The Funds' expense ratios compare very favorably to the industry norm throughout the relevant period in this matter. The Funds' expense ratios were among the lowest, and often the lowest, expense ratios among funds in their respective peer groups. Because mutual funds are sold in a competitive market, these comparisons mean that, during the period from 2003 through 2007, the fees that CRMC charged the Funds were not excessive from an economic perspective.

3

CONFIDENTIAL

management fee does not vary across share classes. The Rule 12b-1 fee does vary across share classes. For example, in 2007, share classes B and C of the Funds were charged approximately a one percent 12b-1 fee;[17] share class A fees ranged from 0.23 to 0.25 percent depending on the fund. The transfer agent fee can also vary across share classes.[18]

21.     Because of variation in how complexes define management fees and other components of the expense ratios, comparisons of management fees and other individual components across investment complexes may not be meaningful. Of particular relevance to this matter, comparisons of the Funds' management fees and Rule 12b-1 fees to those of other complexes' funds would suffer from this problem. In contrast, regardless of how the components of the expense ratio are defined, the expense ratio equals the total annual fee deducted from fund assets.

22.     From an economic perspective, the variation in definitions for the components of the expense ratio is inconsequential to individual mutual fund investors. Given the total fee associated with a fund, a mutual fund investor's economic well-being is not affected by how that total fee is allocated among different fee categories.

**D.     A mutual fund is an integrated product with many different elements**

23.     Mutual funds are differentiated products. Some differentiation occurs at the fund level: different investment styles, different distribution channels, and different expected performance.[19] Complex-level attributes also contribute to this differentiation. Complex

---

[17] Rule 12b-1 fees are discussed in more detail in a subsequent section. An exhibit in that section, **Exhibit 23**, presents 12b-1 fee values for the Funds over time.

[18] For example, see American Funds AMBAL Statement of Additional Information, March 1, 2004, CORBI_0060499-0060587 at CORBI_0060514.

[19] See SEC description of mutual fund attributes (http://sec.gov/answers/mutfund.htm, accessed February 22, 2009) and U.S. General Accounting Office, *Report to the Subcommittee on Finance and Hazardous Materials: Mutual Fund Fees*, p. 61.

10

CONFIDENTIAL

expense ratios less 12b-1 fees for each of the Funds were below the median of funds in the

Lipper benchmark group (excluding funds of funds). Additionally, from 2004 to 2008, each of

the Funds had expense ratios less distribution expenses that were less than 81 percent of each

Fund's peer group.  Lastly, in 2007 (the last year for which there are data for all eight Funds), all

eight Funds ranked among the lowest four funds in each Fund's respective benchmark group.[35]

     42.     To summarize, my analysis of the Funds' fees, as well as the expense ratio

comparisons presented to the Funds' Directors, show that, during the relevant period, the Funds'

expense ratios were among the lowest, if not the lowest, among comparable funds in the

industry. Thus, the Funds' expense ratios could not be considered excessive unless the expense

ratios of mutual funds offered by most other mutual fund complexes were even more excessive.

By themselves these comparisons of the Funds' expense ratios to the industry norm imply that

there is no economic basis for considering the expense ratios of the Funds to be excessive.

## VII.   Market Protections Against Excessive Fees

     43.     Competitive market forces can protect mutual fund investors from economically

excessive fees under certain conditions. In particular, if many mutual fund providers compete for

investors' assets and if demand for mutual funds is sensitive to mutual fund fees, then a mutual

fund provider that attempted to charge fees that were excessive relative to fees of similar

---

[35] The number of funds in the benchmark groups ranged from 14 to 30, including the American Fund being studied. The comparison groups include only  Class A shares and do not include funds of funds.  These documents also include comparisons of advisory fees, transfer agency fees, and distribution expenses. Throughout the 2003 – 2008 period, the Funds' fees for those services were also low relative to the fees charged by similar funds.   See  CORBI_0343223; CORBI_0342647; CORBI_0051998; CORBI_0040662; CORBI_0029736; CORBI_0018088; CORBI_0343219; CORBI_0342643; CORBI_0051990; CORBI_0040654; CORBI_0029728; CORBI_0018080; CORBI_0342161; CORBI_0339617; CORBI_0042719; CORBI_0032679; CORBI_0020988; CORBI_0017796; CORBI_0350038; CORBI_0349839; CORBI_0041734; CORBI_0031164; CORBI_0019554; CORBI_0097669; CORBI_0052649; CORBI_0032115; CORBI_0030254; CORBI_0018591; CORBI_0348008; CORBI_0052318; CORBI_0040969; CORBI_0030017; CORBI_0018345; CORBI_0350034; CORBI_0031156; CORBI_0019546; CORBI_0349835; CORBI_0041726; CORBI_0009950; CORBI_0358806; CORBI_0042038; CORBI_0031459; CORBI_0019896; CORBI_0010515 (2003-2008 American Funds directors' information books).

CONFIDENTIAL

products would find that fee-sensitive investors choose to invest elsewhere.[36] The prospect of forgoing the revenue associated with these assets provides mutual fund advisers with a strong economic incentive not to charge economically excessive fees. In the sections that follow, I show that these conditions hold in the mutual fund industry, and I explain in more detail why these conditions protect investors, including American Funds shareholders, from excessive fees.

### A.   Competition constrains prices

44.    The ability of competition to restrain pricing is a basic tenet of economics.[37] In a competitive market, in order to survive in the long run, profit-maximizing firms must consider the ability and willingness of consumers to choose between substitute products. In the long run, the motivation to maximize profits leads firms in a competitive market to produce only those goods and services for which consumer value exceeds the incremental cost of production.

45.    In a competitive market, no firm finds it profitable over the long run to set a price that exceeds its economic costs.[38] The reason for this is that a competitive market includes rival firms also motivated to maximize profit. If one firm sets its price above economic cost, then rival firms motivated by the desire to earn profits would enter the market or expand production in order to attract consumers by offering a product that provides consumers with more value and/or

---

[36] Not all investors have to be fee-sensitive in order for competition to restrain fees. As long as fee-sensitive investors control a sufficient amount of potential mutual fund investments, then over the long run competition for these investors will prevent firms from charging excessive fees.

[37] Many economics textbooks discuss competitive markets and their advantages. See, for example, R. Glenn Hubbard and Anthony Patrick O'Brien, *Economics*, 2nd ed., Pearson Prentice Hall 2006, pp. 374-377.

[38] In other words, in a competitive market, "economic profit" is zero. This feature does not imply that firms in competitive markets cannot earn profits in the sense of revenues exceeding explicit costs ("accounting profit"). One economic cost not explicitly considered in firms' accounting statements is the opportunity cost of capital. A firm must earn sufficient accounting profit to compensate investors for use of their capital, with this compensation varying across firms depending on the risk involved in each firm's business. (The investors to which I refer in the preceding sentence are the firm's owners or equity-holders and should not be confused with investors in a mutual fund's shares.) Observing that firms earn positive accounting profits in a competitive market is not an indication of excessive prices.

19

CONFIDENTIAL

lower prices. Consumers would then purchase from rivals with better values and/or lower prices instead of from the firm attempting to charge a price above economic costs. In turn, the firm attempting to set its price above economic costs would have to lower its price or continue to lose sales and profits.

46.     In summary, in a competitive market, firms' motivations to maximize profits inextricably links prices to economic costs, and firms cannot sustain excessive prices over the long run. In other words, competition ensures that, in the long run, prices are set such that: sellers and buyers enter only those transactions that they expect will make them better off; and prices do not exceed economic costs. As a consequence, prices that prevail in a competitive market over time cannot exceed the prices that would result from arm's-length negotiations.

**B.      The mutual fund industry exhibits the structural characteristics of a competitive market**

47.     Common features of competitive markets include a relatively large number of suppliers, the availability of substitute products, unconcentrated supply, the absence of substantial barriers to entry and expansion, and low switching costs. A competitive market need not possess all of these features, and competition constrains prices in many markets that lack one or more of those characteristics. As I discuss below, the Funds were sold in a market that possesses these characteristics.

20

CONFIDENTIAL

*The industry includes a large number of funds and fund providers*

48.     Economic theory and empirical studies show, across various industries, that prices decline as the number of competitors increases and concentration of sales declines.[39] Although many competitors are not necessary for the elimination of supra-competitive pricing, maintaining such pricing is increasingly difficult as the number of competitors increases.

49.     **Exhibit 8** shows that hundreds of complexes currently offer thousands of mutual funds to investors, and these numbers have generally grown over time. Over the period from 1985 to 2008, the number of mutual funds increased 457.5 percent (from 1,042 to 5,809) while the number of complexes offering mutual funds increased 193.5 percent (from 199 to 584).[40] This large number of complexes and funds is consistent with the mutual fund industry being competitive.

*Potential substitutes exist*

50.     The existence of substitutes for mutual funds mean that investors have alternative choices if mutual fund providers were to offer products with less value or higher prices than investors could achieve elsewhere. In addition to similar mutual funds offered by other providers

---

[39] Lance Brannman, J. Douglass Klein, and Leonard W. Weiss, "The Price Effects of Increased Competition in Auction Markets," in *Concentration and Price,* Leonard W. Weiss, ed., MIT Press 1989, pp. 67-84; James M. MacDonald, "Competition and Rail Rates for the Shipment of Corn, Soybeans, and Wheat," 18 *Rand Journal of Economics* 151 (1987); Steven N. Wiggins and Robert Maness, "Price Competition in Pharmaceuticals: The Case of Anti-Infectives," 42 *Economic Inquiry* 247-63 (April 2004); Thomas Gale Moore, "U.S. Airline Deregulation: Its Effects on Passengers, Capital, and Labor," 29 *Journal of Law & Economics* 1 (April 1986); Ian Domowitz, R. Glenn Hubbard, and Bruce C. Petersen, "Business Cycles and the Relationship Between Concentration and Price-Cost Margins," 17 *Rand Journal of Economics* 1 (Spring 1986); and Ian Domowitz, R. Glenn Hubbard, and Bruce C. Petersen, "Oligopoly Supergames: Some Empirical Evidence on Prices and Margins," 35 *Journal of Industrial Economics* 379 (June 1987).

[40] These calculations rely on data collected from Strategic Insight's Simfund ("Simfund") database, which includes data on mutual fund assets beginning in 1985.  These figures do not include closed-end funds, exchange-traded funds, funds of funds, exchange funds, and money market funds.

21

CONFIDENTIAL

or other types of mutual funds, several other investment options are potential substitutes. These include ETFs,[41] individual securities, annuities, and savings accounts of various types.

### *The industry does not have substantial barriers to entry or expansion*

51.     Low barriers to entry in an industry mean that if a firm observes an opportunity to earn an economic profit by introducing a competing product or by expanding production of an existing product, the firm can do so relatively quickly and easily. In addition, even if we do not observe firms actually entering a market, a group of firms may be poised to enter the market should profit-making opportunities arise. If the industry lacks barriers to entry into and exit from the industry, this pool of potential entrants facilitates competition by constraining existing firms to set their fees competitively.[42]

52.     The mutual fund industry exhibits characteristics consistent with low barriers to entry. There are also many complexes providing mutual fund services with the ability and resources to introduce products in new areas (new investment styles) or through new distribution

---

[41] ETFs are investment vehicles that typically invest in the securities contained in a stock or index (the S&P 500, for example). ETFs are legally classified in ways similar to mutual funds, but once ETF shares are purchased, they may be sold to other investors (through an exchange) or, in some circumstances, redeemed for the fund's underlying equities. U.S. Securities and Exchange Commission, *Exchange-Traded Funds (ETFs)*, www.sec.gov/answers/etf.htm (accessed February 22, 2009). Relative to index mutual funds, ETFs have the advantages of convenience of buying and selling at any time of the day instead of waiting until the end of the day for an index fund; and the ability to buy on margin and sell short. In addition, because ETFs are traded, investors can place stop, stop-loss and limit orders to purchase these funds. Leonard Kostovetsky, "Index Mutual Funds and Exchange-Traded Funds," 29 *Journal of Portfolio Management* 80 (Summer 2003). However, like trading in an individual security, investors purchasing or selling ETF shares generally have to pay a trading commission to a broker.

[42] Economists refer to such a market, in which firms not yet selling goods in the market nonetheless help to constrain prices in the industry, as a "contestable market." A perfectly contestable market is one in which entry into or exit from the market is costless and unimpeded. See William J. Baumol and Alan S. Blinder, *Microeconomics: Principles and Policy*, 10th ed., Thomson 2006, p. 250.

Just as no real-world market is perfectly competitive, no market is perfectly contestable. However, markets can be highly contestable. In my opinion, the market for advisory services in the mutual fund industry is likely to be highly contestable.

22

CONFIDENTIAL

channels. As noted above, there has been substantial entry into the mutual fund industry during the period from 1985 to 2008.[43]

53.     Several firms have successfully entered the mutual fund industry. For example, **Exhibit 9** shows the 20 largest mutual fund complexes in terms of assets under management existing in 2008 that did not offer mutual funds in 1998. These 20 complexes that entered the mutual fund business in or after 1998 were ranked in the top 40 percent of all mutual fund complexes in terms of 2008 mutual fund assets under management.

54.     Similarly, many mutual funds have entered the industry in the recent past. **Exhibit 10** presents the twenty largest mutual funds in 2008 that did not exist in 1998. This exhibit shows that funds entered the industry after 1998, and were able to attract substantial assets by 2008. It also shows that some of these funds grew to be industry leaders in terms of assets under management. For example, the Dodge & Cox International Stock fund, which did not exist in 1998, grew to $25 billion in assets by 2008, and was larger than 99.5 percent of all mutual funds.

55.     Clearly, both individual funds and fund complexes enter the industry, and the success of entrants shows there are no substantial barriers to entry in this industry.

*The industry is not concentrated*

56.     When assessing concentration in markets, regulators consider the effect on concentration from potential entrants. These are producers in the same or similar industries with the ability to enter a given market given profit opportunities in that market, but who have not yet

---

[43] John C. Coates and I discuss how the mutual fund business has relatively low costs of entry. See John C. Coates IV and R. Glenn Hubbard, "Competition in the Mutual Fund Industry: Evidence and Implications for Policy," *Journal of Corporation Law* 33 (2007), 151-222 at pp. 167-170, as well as sources it cites.

23

CONFIDENTIAL

done so. When assessing the likely effect of a merger, for example, the Department of Justice

requires consideration of such likely entry.[44]

57.    Mutual fund companies could possibly create a new fund to compete, or could

adjust the investment objective of an existing fund so that it competes in the market in

question.[45] Given the low barriers to entry and the possibility of changes in existing funds'

investment objectives, it is reasonable to conclude that the set of funds to consider for purposes

of calculating measures of concentration is all mutual funds.[46]

58.    Most mutual fund assets are held at complexes that offer mutual funds in multiple

investment categories and through multiple distribution channels. In 2008, approximately

41 percent of complexes distributed mutual funds through more than one of six distribution

channels, and these complexes managed approximately 92 percent of mutual fund assets.[47]

Similarly, approximately 99 percent of mutual fund assets were held at complexes that offered

---

[44] U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, issued April 2, 1992, revised April 8, 1997, § 1.

[45] Simfund data indicate that approximately one in five of the funds that were in existence throughout 2003 to 2008, changed their Morningstar investment categories at least once during that period (I restricted the period to 2003 to 2008 because Morningstar added new categories between 2002 and 2003). These figures exclude closed-end funds, ETFs, funds of funds, exchange funds, and money market funds.

[46] *Horizontal Merger Guidelines, supra* note 44, §§ 1.3 and 3.

[47] These calculations are based on Simfund data. I use the following distribution channels: direct, non-proprietary, proprietary, institutional retirement, institutional non-retirement, and bank retail. The direct, non-proprietary, and proprietary channels are defined by Simfund. The bank retail channel includes funds that Simfund classifies in the bank proprietary distribution channel and retail customer type. The institutional retirement channel includes share classes in Simfund's "institutional" distribution channels and with retirement equal to "Yes." The institutional retirement channel also includes share classes in the Simfund's bank proprietary distribution channel, institutional/trust customer type, and retirement equal to "Yes." The institutional non-retirement channel includes share classes in Simfund's "institutional" distribution channels and with retirement equal to "No." The institutional non-retirement channel also includes share classes in the Simfund's bank proprietary distribution channel, institutional/trust customer type, and retirement equal to "No."

24

CONFIDENTIAL

funds in at least two of seven investment style categories, and approximately 69 percent of assets were held at complexes that offered funds in at least six of seven investment style categories.[48]

59.     The frequency with which complexes offer mutual funds in multiple distribution channels and multiple investment categories implies that many complexes could easily expand and/or enter a new distribution channel or investment category if there were opportunities for economic profit. Consequently, the correct measure of concentration is across all mutual funds. The ability of mutual fund complexes to compete for investors' assets by offering mutual funds through multiple channels and multiple investment categories means that concentration should be measured across all mutual fund assets.

60.     The analysis presented in **Appendix F** indicates that investors will substitute across distribution channels and/or across Morningstar investment categories in response to

---

[48] These calculations are based on Simfund data. The seven investment categories are defined as follows: (1) Domestic Equity - Large is an aggregation of all funds in the following Morningstar categories: Large Blend, Large Growth, and Large Value; (2) Domestic Equity - Mid is an aggregation of all funds in the following Morningstar categories: Mid Blend, Mid Growth, and Mid Value; (3) Domestic Equity - Small is an aggregation of all funds in the following Morningstar categories: Small Blend, Small Growth, and Small Value; (4) International Equity is an aggregation of all funds in the following Morningstar categories: Diversified Emerg Mkts, Diversified Pac/Asia, Europe Stock, Foreign Large Blend, Foreign Large Growth, Foreign Large Value, Foreign Small/Mid Growth, Foreign Small/Mid Value, Foreign Stock, Japan Stock, Latin America Stock, Pac/Asia ex-Japan Stk, Global Real Estate and World Stock; (5) Domestic Bond is an aggregation of all funds in the following Morningstar categories: Bank Loan, High Yield Bond, High Yield Muni, Inflation-Protected Bond, Interm-Term Bond, Intermediate Govt, Long Government, Long-Term Bond, Multisector Bond, Muni CA Interm/Short, Muni CA Long, Muni FL, Muni MA, Muni MN, Muni NJ, Muni NY Interm/Short, Muni NY Long, Muni National Interm, Muni National Long, Muni National Short, Muni OH, Muni PA, Muni Single State Interm, Muni Single State Lng, Muni Single State Short, Short Government, Short-Term Bond, and Ultrashort Bond; (6) International Bond is an aggregation of all funds in the following Morningstar categories: Emerging Markets Bond and World Bond; and (7) Allocation is an aggregation of all funds in the following Morningstar categories: Conservative Allocation, Domestic Hybrid, Moderate Allocation, Target-Date 2000-2014, Target-Date 2015-2029, Target-Date 2030+, and World Allocation.

CONFIDENTIAL

changes in relative fees.[49]  These results provide another indication that market concentration should be measured across all mutual funds.[50]

61.     Based on my experience, and the opinions of fellow economists, economists' standard measure of concentration is the Herfindahl-Hirschman Index ("HHI").[51] The HHI can range from zero to 10,000, with lower values indicating less concentration. The U.S. Department of Justice and Federal Trade Commission in their Horizontal Merger Guidelines consider HHI values of 1,000 or less to be unconcentrated.[52]

62.     **Exhibit 8** shows the HHI of mutual fund assets by complex during the period from 1985 through 2008.[53] The exhibit shows that the HHI for mutual fund assets remained well below 1,000 throughout this period. The lack of concentration in the mutual fund business is consistent with a competitive market.

---

[49] **Exhibit F-3** to **Appendix F** shows that the cross-price elasticities for the distribution channels are positive.  The exhibit also shows that the own-price elasticity of each of the distribution channels is sufficiently high such that a hypothetical monopolist could not profit from raising the expense ratio of all the funds in a channel.  See **Appendix F** for description of the estimation method.

[50] **Exhibit F-4** to **Appendix F** shows that the cross-price elasticities for the Morningstar investment categories are positive.  The exhibit also shows that the own-price elasticity of each of the distribution channels is sufficiently high such that a hypothetical monopolist could not profit from raising the expense ratio of all the funds in a Morningstar investment category.  See **Appendix F** for description of the estimation method.

[51] Dennis W. Carlton and Jeffery M. Perloff, *Modern Industrial Organization*, 4th ed., Pearson Addison Wesley, 2005, p. 255. The U.S. government relies on HHI as a measure of the level of concentration in a market when it is considering whether to challenge mergers on the basis that consolidation might have anticompetitive effects. U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines, supra* note 44, § 1.5.

[52] The *Guidelines* state that most mergers in markets that would result in an HHI below 1,000 do not raise competitive concerns, and the DOJ and FTC generally require no further analysis of such mergers. (*Horizontal Merger Guidelines, supra* note 44, § 1.51).

[53] I computed the HHI using Simfund data on mutual fund assets. These data begin in 1985. The HHI equals the sum of the squared complex shares of mutual fund assets under management. I excluded closed-end funds, ETFs, funds of funds, exchange, and variable annuities from the computation.

26

CONFIDENTIAL

*Mutual fund providers lower their fees*

63.     Mutual fund providers reduce their fees frequently, a fact that is consistent with advisers competing on the basis of fees. **Exhibit 11** presents the percentages of share classes in each year associated with changes in expense ratios of more than 5 basis points.[54] In 2008, approximately 11.7 percent of funds had expense ratio reductions, while approximately 10.3 percent had expense ratio increases. In 2007, approximately 17.5 percent of funds had expense ratio reductions, while only approximately 7.6 percent had expense ratio increases. The relative frequency of expense ratio increases and expense ratio decreases varies over time, but as **Exhibit 11** shows, decreases in expense ratios were common throughout the 2003 to 2008 period. The prevalence of expense ratio reductions is consistent with an industry that competes on expense ratios.

64.     One specific example of fee decreases is the fee war of a few years ago between Fidelity and Vanguard during which fees on index funds fell substantially. This fee war illustrates that mutual fund advisers lower fees in the face of competition.[55]

---

[54] I identify waivers in Simfund by comparing the gross expense ratio (the contracted ratio) with the net expense ratio (the ratio paid by the investor). These two can differ because of waivers, but also because of other factors, such as reimbursements to investors. In my analysis, I focus on differences of more than five basis points because of this ambiguity.

[55] In August 2004, Fidelity made provisional cuts in the fees imposed on five of its index funds "sending an unmistakable shot across the bow of Vanguard, the widely recognized champion of low-fee index investing" (Chet Currier, "Big Three Call the Shots as Fund-Fee Wars Heat Up," *Bloomberg*, April 22, 2005). Vanguard's Chairman, Jack Brennan, dismissed Fidelity's cuts as a marketing ploy, after which Fidelity made the provisional reductions permanent, stating that "Fidelity's price cuts recognize that index funds are regarded as a commodity" (William M. Bulkeley, "Fidelity Makes Fee Cuts Permanent," *The Wall Street Journal*, March 2, 2005, p. C15). Then, around mid-2005, Vanguard responded by lowering the minimum investment in its Admiral share classes to, which have fees as low as 0.09 percent of assets, to $100,000 from $250,000 (Tom Lauricella, "Fidelity Cuts Fees for Big Investors," *The Wall Street Journal*, October 18, 2005, p. C15). In October 2005, Fidelity responded by cutting the expense ratio by 30 percent on its five Spartan equity index funds for portfolios with assets of $100,000 or more. Fidelity said fees on its newly created Advantage Class shares, which are those with a minimum of $100,000, are now 0.07 percent (Frank Byrt, "Fidelity Cuts Equity Index Fund Fee," *Dow Jones Newswires*, October 17, 2005).

27

CONFIDENTIAL

65.     One way in which mutual fund advisers reduce their expense ratios is through fee waivers. Fee waivers are relatively easy for an adviser to implement because they do not require board or shareholder approval.

66.     CRMC reduced its fees through fee waivers during 2004 to 2008. A fee waiver that began September 1, 2004 reduced the advisory fees of all American Funds by five percent, and this fee reduction waiver was increased to 10 percent beginning April 1, 2005.[56] From September 2004 through June 2008, these waivers reduced management fees paid by American Funds by approximately $1.087 billion, of which approximately $542 million was attributable to reductions in the advisory fees for the Funds.[57] The waiver was implemented to share possible benefits resulting from a period of increased asset growth.[58] The American Funds' boards agreed to end the waiver in December 2008, effective early in 2009.[59]

*Many investors do not face substantial switching costs*

67.     An important feature of open-end mutual funds, like the Funds, is that investors can, on any day, redeem the shares of a mutual fund for the net asset value of the fund.[60] The ability to redeem shares in this manner is an important protection for investors because it allows

---

[56] See, for example, CORBI_0209384-0209400 at CORBI_0209384.

[57] See CRMC Reduction of Management Fee Revenue through June 2008, CORBI_0343225–0343226.  Also see CRMC Reduction of Management Fee Revenue through April 2008, CORBI_0350039-0350041; CRMC, Memorandum re Mutual Fund Fee Waiver, March 8, 2005, CORBI_0209384-0209400 at CORBI_0209387.

[58]  CRMC, Memorandum on Mutual Fund Fee Waiver, October 13, 2004, CORBI_0219417-0219461 at CORBI_0219417.

[59] Deposition of Kirk Pendleton, February 11, 2009, pp. 209-210.  (See also CRMC, Memorandum on Mutual Fund Fee Waiver, November 21, 2008, CORBI_0368697-0368715 at CORBI_0368700)

[60] In some cases, as in the class B shares of the Funds, a redemption fee or back-end load may be deducted from the redemption proceeds.

28

CONFIDENTIAL

investors to "vote with their feet" and easily terminate a relationship with a mutual fund adviser for any reason, including poor performance or a desire to switch to a fund with lower fees.

68.     As I discuss below, the costs to investors of switching from one fund to another have been substantially reduced since the early 1980s. This reduction in switching costs facilitates competition among mutual fund advisers.

69.     One historical barrier was the tax consequences of such a reallocation.[61] In this regard, an important shift has been the increase in mutual fund investments held in retirement savings accounts, such as 401(k) plans and IRA savings accounts. In contrast to mutual fund balances held outside of retirement and other non-taxable accounts, an investor may redeem shares of a mutual fund held in a 401(k), 403(b), or IRA account without incurring a capital gains tax. The elimination of the potential tax liability has reduced the cost of redeeming mutual fund shares.

70.     **Exhibit 12** reports mutual fund assets (excluding money market fund assets) invested through tax-deferred accounts between 1985 and 2007.[62] Since 1985, amounts invested in tax-deferred accounts have increased from $31.1 billion to $3.32 trillion. Over this same period, the percentage of mutual fund assets invested through IRAs and defined contribution pension plans has increased dramatically from about 13 percent to about 42 percent of mutual fund assets. The exhibit also shows that since 1998, over 40 percent of mutual fund assets were held in tax-deferred accounts. Because investors can typically shift investments from a mutual fund to another investment within a tax-deferred account without tax implications, economic

---

[61] Selling shares of a mutual fund may result in a capital gain if the shares are not held in a tax-deferred account. Thus, capital gains taxes can impose a cost on investors who sell shares of one mutual fund in order to purchase shares of another mutual fund.

[62] The data for 2008 were not available.

29

CONFIDENTIAL

theory predicts that the increase in the fraction of mutual fund assets held in tax-deferred

accounts will increase the likelihood that mutual fund investors will switch investments in

response to a difference in fees and/or mutual fund attributes.[63]

71.     For taxable mutual fund accounts, the potential switching costs imposed by

capital gains taxes are lower when capital gains tax rates are lower. The effective maximum

long-term capital gains tax rate has fallen from approximately 40 percent in 1977 to

approximately 16 percent in 2004.[64] The reduction in maximum long-term capital gains tax rates

has reduced the switching costs faced by investors holding mutual funds in non-retirement

accounts.

72.     Reductions in loads are another change that has reduced investors' costs of

switching mutual funds. Loads may act as a cost that could limit investors' willingness to shift

funds. Part of the decline in loads came from a shift by investors from load to no-load funds.

Between 1980 and 2001, the percent of equity fund sales to no-load share classes rose from 34

percent to 58 percent, while the share of no-load sales of bond funds increased from 47 percent

to 64 percent.[65] From 2001 to 2007, no-load share classes as a percentage of total sales increased

---

[63] The investment committees for large DC plans select the investment vehicles that will be available for thousands of plan participants. Each of the investment committees has a legal obligation to consider fees when selecting investment options for the retirement plan. As a result, investment committees may expend substantial resources in comparing available investment options, including the fees charged on those investment options. For example, many DC plans retain sophisticated consultants to assist them in selecting mutual funds to include as investment options on the plan, while other plans draw on the expertise of employees of the plan sponsor. The relatively large size of many DC plans means that mutual fund complexes have incentives to compete vigorously to be selected for inclusion in the plans' menu of investment options. The competition for the opportunity to be part of a DC plan includes competition on fees as well as competition on fund attributes, including services.

[64] http://www.treas.gov/offices/tax-policy/library/capgain1-2008.pdf, last accessed January 15, 2009. The document explains that the maximum statutory rate on capital gains was 15 percent, but particular classes of capital gains are taxed at higher rates, leading to a slightly higher effective rate.

[65] Brian K. Reid and John D. Rea, "Mutual Fund Distribution Channels and Distribution Costs," Investment Company Institute, 9 *Perspective* 16 (July 2003).

30

CONFIDENTIAL

from 55 percent to 79 percent.[66] Among funds with loads, average front loads declined from 5.6 percentage points in 1980 to 1.25 percent in 2005, and average maximum front loads fell from 8 percent in 1980 to 5 percent in 2005.[67] American Funds introduced its B and C share classes in 2000 and 2001, offering investors the option of investing without front loads.

73.     The introduction and growth of "fund supermarkets" beginning in the 1990s has further reduced investor switching costs by providing a mechanism for no-transaction-fee investing in numerous funds, as well as providing web-based information on funds offered by many different complexes. Another important way in which fund supermarkets have reduced investor transaction costs is that fund supermarkets send each client a consolidated statement reporting information on all accounts held in the supermarket. Hence, the creation of the fund supermarket has allowed investors to achieve the convenience of a single statement and easily transferable assets, while allowing investors to hold mutual funds offered by a variety of fund complexes.[68]

74.     Switching costs have been further reduced by increased disclosure requirements and third-party coverage of the mutual fund industry, which have increased the simplicity with which investors can evaluate and compare mutual fund fees. The easy availability of such information reduces the costs and increases the probability of switching by investors.

75.     Since the early 1980s, new rules and regulations have been implemented to facilitate investors' fee comparisons. Regulatory and lawmaking bodies have passed rules and

---

[66] Investment Company Institute, *2008 Investment Company Fact Book*, 48th Ed., Figure 2.7.

[67] Investment Company Institute, *2006 Investment Company Fact Book*, 46th Ed., p. 39.

[68] Assets in Charles Schwab's Marketplace fund supermarket increased more than fifteen-fold from $31 billion in 1994 to $488.4 billion at the end of 2007 (Charles Schwab, *2007 Annual Report* (2008); Charles Schwab, *1999 Annual Report* (2000), http://www.aboutschwab.com/investor/AR2007/index.html).

31

CONFIDENTIAL

regulations to make fee disclosures more transparent and easier to compare across funds. For example, in 1988, the SEC began to require mutual funds to include a table of fees and expenses in the mutual fund prospectuses.[69] At the same time, the SEC began requiring funds to include an example illustrating how expenses affect the returns shareholders would earn on a hypothetical investment of $1,000 based on hypothetical returns and redemptions at the end of a one-, three-, five-, and ten-year periods.[70] In 1999, the SEC added a line item for shareholder account fees and changed the hypothetical investment to $10,000.[71]  At the same time, the reporting of operating expenses was changed from net of waivers and reimbursements to the full contractual amount, and expenses net of waivers and reimbursements can be presented in a footnote.[72]

76.     In addition to the funds' required disclosures, several third-parties have developed tools that help investors compare fund returns and fees. For example, Morningstar's website provides independent reviews of mutual fund performance and offers free screening tools to allow investors to locate funds with particular performance attributes, including investment category, manager tenure, fund expense ratios, Morningstar ratings, risk, and returns.[73] Morningstar also provides general information on investing through its "Investing Classroom," which includes a mutual fund curriculum.[74] *The Wall Street Journal* and other newspapers publish quarterly reports on fund performance that make it simple for investors to learn about the

---

[69] *Consolidated Disclosure of Mutual Fund Expenses*, February 4, 1988, 53 Fed. Reg. 3192, pp. 10-11.

[70] *Supra* note 69, p. 7.

[71] Investment Company Institute, Press Release: *SEC Adopts Form N-1A Amendments and Profile Rule*, March 20, 1998.

[72] *Supra* note 71.

[73] http://screen.morningstar.com/FundSelector.html?fsection=ToolScreener, last accessed February 22, 2009.

[74] http://news.morningstar.com/classroom2/home.asp?colId=76&CN=COM, last accessed February 22, 2009.

32

CONFIDENTIAL

performance of their investments and also compare returns across investments.[75] Moreover, to encourage investors to use the information available in required disclosures, the SEC introduced an internet-based "calculator" that allows investors to compare the costs of owning particular funds with the costs of similar funds.[76]

77.     Observing meaningful changes in asset shares of complexes indicates that investors are willing and able to change their allocation of investments across mutual fund complexes. **Exhibit 13** shows the shares of mutual fund assets at the top twenty mutual fund complexes during selected years in the period from 1990 to 2008.[77] The exhibit shows that these shares have varied over time. For example, Vanguard increased its share from approximately 5.8 percent to approximately 15.5 percent while Morgan Stanley's share fell from approximately 3.6 percent to approximately 0.2 percent. These changes in asset shares over time are consistent with competition among mutual fund advisers.

78.     Another way to examine changes in asset shares is to look at how complex rankings by mutual fund asset shares change over time. **Exhibit 14** shows that of the top 20 complexes in 2008, five were not in the top 20 in 2003. In addition, all but one of these complexes in 2003 had a different ranking in 2008. Thirteen of the complexes that were among the top 20 complexes in 2008 improved their rankings from 2003, and six complexes fell to

---

[75] See the "Investing in Funds" page on the *Wall Street Journal's* website, http://online.wsj.com/public/page/2_1579.html, and in particular the drop-down menu under the heading "Investing in Funds: A Monthly Analysis," accessed February 22, 2009.

[76] See http://sec.gov/news/press/pressarchive/1999/99-36.txt for the press announcement about the launch of the mutual fund cost calculator. The calculator itself is available at http://www.sec.gov/investor/tools/mfcc/mfcc-intsec.htm. Both websites were accessed on February 22, 2009.

[77] This table includes more than 20 rows because investors have shifted their assets in sufficient numbers to move several complexes into or out of the top 20 over this 18-year period. I acknowledge that changes in asset shares over time could be due, at least in part, to returns on existing assets. However, I have also examined changes in the same complexes' asset flow shares over time; asset flow shares also change considerably. I have also examined the possibility that some of the changes in asset shares were the result of mergers and found no indication that mergers drive my results.

CONFIDENTIAL

worse rankings. These changes in rankings suggest that investors are willing and able to substitute across mutual fund complexes.

### C.     Investors are sensitive to fees

79.     From a demand-side perspective, an economist would expect the competition for investor assets to constrain fees if, as I discuss below, demand for mutual funds is sensitive to fees.[78]

80.     The law of demand is a fundamental principle of economics, which states that, holding everything else constant, when the price of a good (or service) decreases, the quantity demanded for the good rises, and when the price of a good increases, the quantity demanded for the good falls.[79] In other words, the law of demand says that potential purchasers of goods and services care about prices as well as product attributes. There is no economic reason to expect mutual fund investors to be an exception to this rule. In the context of mutual funds, as mentioned previously, investors care about the total cost they face in making a particular mutual fund investment.

81.     Moreover, investor sensitivity to fund performance implies that investors are also sensitive to fees since performance is reported net of fees. Individuals purchase investments such as mutual funds today so that they will have increased wealth in future periods. The amount of wealth that investors will have in future periods is determined by their contributions and by the

---

[78] While fee sensitivity and the willingness and ability to substitute across mutual funds are important facilitators of competition, it should be remembered that not all investors must possess these characteristics in order for competition to restrain fees. As long as a sufficient number of investors are fee-sensitive and are able and willing to substitute mutual funds, then profit-maximizing mutual fund providers must set fees low enough to attract and retain those investors. Because mutual fund providers are required to charge the same fees to all investors in the same share class, all investors – including any investors who are not fee-sensitive or who are unable or unwilling to substitute funds – will benefit from the prices that result from competition for fee-sensitive investors.

[79] Most basic principles of economics textbooks discuss the law of demand. See, for example, Hubbard and O'Brien, *supra* note 37, p. 66.

34

CONFIDENTIAL

returns that their investments will earn. Investors also care about the riskiness of their investments. Thus, investors are naturally concerned with the riskiness and level of returns that mutual funds will earn in future periods. If investors base their expectations of future returns on how funds have performed in the past, then all else equal, funds with relatively good historical returns should attract more assets than funds with relatively poor historical returns. The return that a mutual fund investor receives is net of fees. In other words, the return that an investor receives equals the return to the investment portfolio managed by the mutual fund less the fees charged by the mutual fund. For this reason, investors' concern for return means that investors necessarily care about mutual fund fees.

*Measuring fee sensitivity*

82.     **Exhibit 15** shows that investors are overwhelmingly invested in low fee funds. The exhibit presents, for all mutual funds, the percentage of assets invested in mutual funds having expense ratios in the lowest 20 percent, 40 percent, and 50 percent of all expense ratios. Approximately 88 percent of fund assets are in funds with expense ratios at or below the median, and approximately 57 percent of assets are in funds with expense ratios in the bottom 20 percent of all funds' expense ratios.

83.     One would expect the size of front loads to affect investors' purchases of mutual funds.[80] In some of the following analyses, to account for the front load, I calculate a "total shareholder cost" which adds the expense ratio to an annualized version of the front load. Although the front load is paid at the outset, one can think of the amount paid as a cost spread over the life of the investment. Based on research conducted by the Investment Company

---

[80] Investors may also care about back-end loads; however, since back-end loads typically eventually disappear as holding period increases, available data on maximum back-end loads are not a good proxy for back-end loads that investors expect to pay.

35

CONFIDENTIAL

Institute, mutual fund investors, on average, sell about one-fifth of their assets each year.[81] On average, then, investors paying a five percent front load can be thought of as paying one percent of that load each year for the five years those shares are held. This charge is the annualized version of the front load (calculated using load figures for each fund and share class) that I add to each share class' expense ratio to compute the total shareholder cost.

84.     **Exhibit 16** presents the percentage of assets invested in mutual funds having total shareholder costs in the lowest 20 percent, 40 percent, and 50 percent of shareholder costs. Approximately 69 percent of assets are held in funds with total shareholder costs at or below the median.

85.     Although **Exhibits 15** and **16** are consistent with investors being fee-sensitive and preferring low-fee funds, the analysis in the exhibit does not control for other factors that may explain the relationship between assets and fees. For this reason, I use a regression analysis to control for various fund attributes that could be expected to affect the demand for mutual funds. By controlling for fund attributes, I can evaluate the relationship between assets and fees independent of the effect that these fund attributes may have on fund assets, thereby isolating the effect of fee sensitivity on the part of mutual fund investors.

86.     An important aspect of a fund's investment objective is whether the fund is actively or passively managed. On the one hand, an actively managed fund is one in which the investment manager attempts to construct a portfolio of securities that will achieve a high return consistent with the fund's objective. On the other hand, an investment manager operating a passively managed fund attempts to construct a portfolio that mimics the holdings of a particular

---

[81] Investment Company Institute, *2008 Investment Company Fact Book*, 48th Ed., Table 25. The redemption rates from 2003 to 2007 were 24.2, 20.4, 19.7, 19.9, and 22.9 percent.

36

CONFIDENTIAL

stock or bond market index (for example, the S&P 500 Index). Such funds are also referred to as index funds. Because this case involves only actively managed funds, I limit my analysis to actively managed funds.

87.     The past performance of a fund's portfolio is a fund attribute. Investors interested in achieving the best risk-adjusted return from a mutual fund are likely to examine the past performance of funds in order to select the most appropriate funds. Academic research has shown that past performance of a fund is correlated with increases in flows to that fund, so past performance appears to be an important attribute that shareholders consider when purchasing fund shares.[82]

88.     Other fund attributes that my regression analysis controls for include the Morningstar investment category, number of mutual funds in the complex,[83] distribution channel, Morningstar performance rating,[84] and fund age. Previous research has found these attributes to be related to the amount of mutual fund assets and/or the amount of fund asset flows. In addition, there are intuitive reasons for including these control variables. For example, the paper that I co-wrote with John Coates found that these attributes are significantly related to fund assets.[85]

---

[82] See, for example, K.C. Brown, W. V. Harlow, and Laura T. Starks, "Of Tournaments and Temptations: An Analysis of Managerial Incentives in the Mutual Fund Industry," 51 *Journal of Finance* 85-110 (1996); Judith Chevalier and Glenn Ellison, "Risk Taking by Mutual Funds as a Response to Incentives," 105 *Journal of Political Economy* 1167 (1997); and Erik Sirri and Peter Tufano, "Costly Search and Mutual Fund Flows," 53 *Journal of Finance* 1589-1622 (1998).

[83] Baumol, Goldfeld, Gordon, and Koehn find that fund flows are positively related to the number of funds in a complex (William Baumol, Stephen Goldfeld, Lilli Gordon, and Michael Koehn *The Economics of Mutual Fund Markets: Competition Versus Regulation,* Kluwer Academic Publishers, 1990).

[84] Del Guercio and Tkac report that Morningstar ratings have a significant effect on mutual fund demand. (Diane Del Guercio and Paula Tkac, "Star Power: The Effect of Morningstar Ratings on Mutual Fund Flows," Working Paper, University of Oregon, February 2007).

[85] Coates and Hubbard, *supra* note 43.

37

CONFIDENTIAL

89.     One potential explanation for why large funds have lower fees (other than because investors prefer low-fee funds) is that economies of scale may exist. However, as discussed in more detail below, to the extent economies of scale exist in the mutual fund industry, such economies are modest and become exhausted once complexes reach a certain scale.

90.     In our paper, John Coates and I estimated the relationship between assets and fees using the two-stage least squares regression technique to control for any effect that economies of scale may have on the relationship between mutual fund assets under management and the expense ratio. Our results showed that, all else equal, higher expense ratios were associated with a lower level of assets under management and that this relationship was due to investors' fee sensitivity and not to economies of scale. In the analysis that follows, I provide further evidence that the demand for mutual funds is sensitive to fees.

91.     I have updated the analyses I conducted for the paper with John Coates. Using data for years 2003 to 2008,[86] I find similar results to those in the Coates-Hubbard paper. These results, presented in **Exhibit 17**, show that, all else equal, investors are sensitive to fees.[87] The results show that the amount of money invested in a mutual fund is negatively and significantly related to the fund's expense ratio, with a one percent higher expense ratio being associated with a 2.9 to 3.1 percent fewer assets under management. **Exhibit 18** provides similar results using total shareholder cost as the fee measure. **Appendices D** and **E** provide the coefficient estimates for the explanatory variables in these estimations.

---

[86] I modified the model used in the paper slightly in order to accommodate more fund types (bond, international, etc.).

[87] The estimated regression coefficients not reported in **Exhibits 17** and **18** show that fund attributes significantly affect the amount of assets invested in a fund. All else equal, higher Morningstar ratings and older funds attract more assets. The number of funds offered by a fund's complex also increases the money invested in the fund. The results also show that distribution channels and investment styles can significantly affect the investor demand for a fund.

38

CONFIDENTIAL

92.     For completeness, I also estimated the relationship of assets and fees using a well-accepted but more complicated technique that I and my previous coauthors have used in the past to estimate determinants of mutual fund demand in a forthcoming book.[88] This method also shows that mutual fund demand is sensitive to fees and that this sensitivity is sufficient to restrain fees that American Funds could profitably charge. **Appendix F** describes this method and results.

93.     To summarize, **Exhibits 17** and **18** demonstrate that, holding fund attributes constant, and using the two stage least squares technique to control for any effect that economies of scale may have on the relationship between mutual fund assets under management and fees, lower fees are associated with higher levels of assets. Thus, the results show that demand for mutual funds is sensitive to fees (that is, investors care about fund fees when selecting funds).

**D.      Implications of competition for mutual fund fees**

94.     Given the structural characteristics of the mutual fund industry (many competitors, low concentration, low barriers to entry, and low switching costs), the sensitivity of mutual fund demand to fees will lead profit-maximizing mutual fund complexes to compete on fees. The extent to which individual complexes focus their competitive efforts on fees, as opposed to product attributes, will vary across complexes. Some complexes may position themselves as low-fee options, while other complexes may offer high-quality shareholder services or superior performance in exchange for higher fees. In any event, competition between complexes on the combination of fees and product attributes has and will prevent mutual fund providers from sustaining economically excessive fees.

---

[88] R. Glenn Hubbard, Michael F. Koehn, Stanley I. Ornstein, Jimmy Royer, Marc VanAudenrode, *The Mutual Fund Industry: Competition and Investor Welfare* (forthcoming).

39

CONFIDENTIAL

95.     Given the competitiveness of the mutual fund industry, over the long run, the total

shareholder costs charged to mutual funds with similar characteristics cannot exceed the range of

fees that would result from arm's-length negotiations.

**E.      Competition forces firms to share the benefits of any economies of scale that
may exist**

96.     In a competitive market, if there are economies of scale, then in order to avoid

losing customers to rival firms, a firm must charge prices that reflect the cost savings that can be

achieved with increases in the scale of production. If, for some reason, a firm attempted to avoid

sharing the benefits from economies of scale with customers, rival firms would be able to lure

customers away from the non-sharing firm by charging lower prices and/or providing higher-

quality products. Consumers would shift purchases away from the non-sharing firm and towards

the firms sharing the benefits of economies of scale. The non-sharing firm would continue to lose

customers until it either went out of business or began to share the benefits of economies of

scale. Because, as discussed above, the mutual fund industry is competitive, over the long run,

cost savings – including cost savings realized through economies of scale – will be passed on to

investors.

**F.      Competition constrains fees even if boards do not negotiate at arm's-length**

97.     Plaintiffs state that investors paid excessive fees because the hallmarks of arm's-

length bargaining are absent in the annual negotiation between the investment adviser and the

mutual fund board over the level of advisory fees.[89] However, even if true, this observation

reveals nothing about whether competition constrains mutual fund fees.  Additionally, I

understand that the standard for approving Rule 12b-1 fees is not that the negotiation on the fee

be at arm's length, but that the fee could have resulted from an arms-length negotiation. Because

---

[89] Fourth Amended Complaint, May 16, 2008, ¶ 147.

40

CONFIDENTIAL

advisers compete to attract investors, in the long run, an adviser operating in its own self interest will set fees at the competitive level even if the mutual fund board was unable or unwilling to do so. Thus, a competitive market would prevent advisers from sustaining excessive fees over time even if mutual fund boards did not.[90]

G.     **Variation in fees among mutual fund products is consistent with competition**

98.     In competitive markets, firms may compete on product attributes as well as on price. Customers care about these attributes to differing degrees, and a particular customer will purchase the product that provides him or her with the best combination of product attributes and price given that consumer's preferences. For example, in addition to price, coffee store chains compete on the flavor of their coffees and other drinks, product variety, selection of food items, store ambiance, and hours of operation. When purchasing a cup of coffee, one customer may care only about flavor – roast of coffee, type of preparation, amount of added milk, sweetener, or other flavorings – while a second customer may care more about comfortable surroundings at the store, and a third customer may trade off a slightly less flavorful drink and slightly less comfortable surroundings for a lower price. These attributes matter to consumers, and different firms will take different approaches to cater to different groups of consumers.

99.     While basic commodities have little price dispersion in a competitive market, products with different attributes often sell at different prices. Mutual fund advisers, including

---

[90] For example, many advisers launch new mutual funds at a price that is competitive from the beginning with larger, established funds. In a competitive market, a profit-maximizing adviser would not attempt to negotiate a fee above the competitive level for a new fund. This observation holds even though a small, newly launched fund could not have achieved any meaningful economies of scale. In this case, the adviser does not propose fees above the competitive level because such fees would reduce the adviser's long-run expected profits by reducing the fund's ability to attract investors' assets. Even if mutual fund boards were abolished, one would still observe the same competitive pricing strategy for new funds.

Competition for investor assets also explains why advisers make voluntary fee reductions even in the absence of pressure from fund boards.

41

CONFIDENTIAL

American Funds, offer mutual funds with features and services that differentiate the funds from mutual funds offered by other complexes. Examples of differences in fund attributes that may lead to variation in fees in a competitive market for mutual funds include differences in investment objective, historical performance, and levels of shareholder services. Some of these characteristics were discussed above; I discuss differences in shareholder services below.

100.    Funds with different objectives invest in different types of investments. Because the costs of operating a mutual fund may vary depending on the type of investments being made, fees charged to shareholders may vary with the investment category of the fund. Fees can vary substantially for different investment categories. For example, among actively managed funds, international equity funds typically have higher fees than domestic large capitalization equity funds. In 2008, the median expense ratio for international equity funds was 1.50 percent, while that for large-capitalization domestic equity funds was 1.25 percent. Domestic bond funds had an even lower median expense ratio -- approximately 0.93 percent in 2008.[91]

101.    Even within the distribution channel through which most of American Funds' assets are distributed, non-proprietary, fees vary substantially across investment categories. For example, in 2008, the median expense ratio of international bond funds in the non-proprietary distribution channel was 1.30 percent, and the median for small capitalization domestic equity funds was 1.95 percent.

102.    Fees vary across distribution channels as well. In 2008, median expense ratios of actively managed funds by Strategic Insight distribution channel ranged from approximately 0.84 percent for funds distributed through the non-retirement institutional channel to approximately

---

[91] The analyses presented in the remainder of this section rely on data from Simfund.  In these analyses, I exclude closed-end funds, ETFs, funds of funds, exchange funds, index funds, index-enhanced funds, and money market funds.

42

CONFIDENTIAL

1.63 percent for funds in the proprietary channel. Since different distribution channels entail different levels of service (ease of contact with the complex, amount of educational material provided, or amount of personal financial planning advice offered, for example), it is reasonable that fees would vary across these different channels. Because 12b-1 fees compensate in part for these differences in services, the variation across distribution channels of expense ratios less 12b-1 fees should be less than that for expense ratios. In 2008, median expense ratios net of 12b-1 fees for actively managed funds by distribution channel ranged from approximately 0.81 percent in the non-retirement institutional channel to approximately 1.04 percent in the direct channel. The prevalence of front loads varies across distribution channels as well. For example, in 2008 approximately 36.2 percent of [actively-managed funds in the] non-proprietary share classes have front loads compared to approximately 0.1 percent of share classes in the direct channel.

103.    Fees also vary across load types within a distribution channel. In 2008, median expense ratios of actively managed funds within the non-proprietary channel varied from approximately 0.87 percent for low load funds to approximately 1.89 percent for level load funds, with front load funds having a median of approximately 1.18 percent. Such differences potentially reflect variation in services, but also allow different investors to choose more suitable fee arrangements, depending on their investment horizons. For example, an investor with a short-term investment horizon may be more interested in a share class with no front load, but a higher expense ratio, while an investor with a longer-term investment horizon may be interested in a class with a front load, but low recurring costs going forward.

104.    Differences in levels of service also contribute to different prices across mutual fund complexes. Some firms have many physical investor center locations (for example,

43

CONFIDENTIAL

Fidelity), while others have very few or none at all. Some appear to place emphasis on having shareholder websites (for example, Fidelity, T. Rowe Price), while others do not have websites for shareholders. Likewise, some firms provide guidance and educational tools, while others do not. Investors in funds sold through third parties (like the American Funds) may receive personalized financial advice and investor education from financial advisers who distribute the funds. Complexes also vary in the number of different portfolios they offer and in the overall Morningstar ratings of their portfolios.

105.    American Funds delivers services providing a wide range of benefits to customers. Discussed in more detail in a subsequent section, these services include portfolio management, investment research, investor education, financial advice, retirement planning advice, the ability to adjust investments and learn through American Funds' website, account statements, fund information, and redeemable shares, among others. The provision of services is consistent with a competitive marketplace in which providers compete for investors in part by providing services that investors value.

106.    In summary, mutual fund attributes differ significantly across funds and complexes. Given this variation, one would expect to see fees vary across funds, and such variation in fees is consistent with mutual fund providers competing on fund attributes as well as fees. Each of the American Funds, and share classes of those funds, provide different attributes to investors. This variation is consistent with competition.