# Exhibit R

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

In Re AMERICAN MUTUAL FUNDS FEE LITIGATION

CV 04-5593 GAF (RNBx)

March 30, 2009
9:07 a.m.

DEPOSITION of R. GLENN HUBBARD, taken by Defendants, pursuant to Notice, held at the offices of MILBANK, TWEED, HADLEY & MCCLOY LLP, One Chase Manhattan Plaza, New York, New York before Wayne Hock, a Notary Public of the State of New York.

R. Glenn Hubbard

1   Q.    But would it be incumbent upon

2   fund directors to be vigilant about

3   looking at each of the component fees to

4   make sure that they're not excessive?

5       MR. MURPHY: Objection to form.

6   A.    I'm not a lawyer.  My

7   understanding is that is indeed what the

8   independent directors are doing.  From an

9   economic prospective, the only thing that

10  would be relevant is the total.  If you're

11  asking me my understanding of the

12  regulation under the law, that would be

13  somewhat different.

14  Q.    To your knowledge, has any

15  mutual fund ever fired or failed to renew

16  their investment adviser?

17  A.    I can only think of one and I

18  forget the guy now.  It was a celebrated

19  case a few years ago.  It's very rare.  I

20  can only recall one in the past several

21  years.

22  Q.    What about has any mutual funds

23  ever fired their principle underwriter?

24  A.    That I don't know.  It would be

1          R. Glenn Hubbard

2    is clear, it's the total.  What I've done

3    in the report is both the total and the

4    component by component.  The dog won't

5    hunt either way.

6          Q.    But you're able to look at it

7    not as a bundle; right?

8                MR. MURPHY: When you say, you --

9          Q.    As a director.

10         A.    But only in the fiction of what

11   is required, not in terms of an actual

12   possible commercial transaction.

13         Q.    I'm saying, as a director, you

14   would be able to look at the services

15   under bundled, just individually, you'd be

16   able to analyze them?

17                MR. MURPHY: Objection to form.

18         A.    If I understand your question,

19   no.  What you would do as a director is

20   try to opine on the reasonableness of each

21   component but you're in no way suggesting

22   that they're purchasable that way.

23         Q.    In your report I noted that, in

24   several locations, you concluded that

25   mutual fund advisers would not be able to

1                    R. Glenn Hubbard

2    sustain excessive fees over the long term

3    or in the long run.

4                    Have you actually conducted any

5    kind of analysis with regards to the

6    length of time that a long term or a long

7    run is?

8        A.    Well, given the empirical

9    estimates I represent, it can't be very

10   long and the own price elasticities are

11   very large and the cross-price

12   elasticities indicate a great deal of

13   substitutability, too.  You can't put a

14   specific date, but a very short period of

15   time.

16       Q.    What is a very short period of

17   time, is that twenty years or is that ten

18   years?

19       A.    No, no, much, much less.  I

20   would expect to see significant fund flows

21   due to excess pricing just within a year.

22       Q.    Within one year?

23       A.    Yes.

24       Q.    What is the basis for that?

25       A.    The very high elasticity

1             R. Glenn Hubbard

2    estimates.  In other words, investors are

3    very fee sensitive.

4        Q.    So based on your analysis about

5    fee sensibility --

6             MR. MURPHY: Sensitivity.

7        Q.    Sensitivity, excuse me, is that

8    the basis of your belief that most funds

9    in the industry cannot charge retail fund

10   investors excessive fees?

11            MR. MURPHY: Objection to form.

12       A.    That is an element.  The entire

13   report centers on different elements of

14   competition.  But fee sensitivity is

15   certainly one very, very important item.

16       Q.    Let's just go on specifically to

17   page eighteen, paragraph forty-three which

18   I guess is the beginning of your expert

19   report concerning the competitive forces

20   specifically.

21            You state that, "competitive

22   market forces can protect mutual fund

23   advisers from economically excessive fees

24   under certain conditions."

25            What are those conditions?

Page 123

R. Glenn Hubbard

1.    A.    The conditions that are spelled
2. out there, the underpinnings of
3. competition, easy entry and exit, a lot of
4. suppliers, fee sensitivity, all the things
5. that we spelled out.
6.    Q.    And each of those conditions --
7. so in your analysis, each of those
8. conditions is present with respect to the
9. funds at issue?
10.    A.    Yes, they're statements about
11. the industry so yes, they would be also
12. for the funds at issue.
13.    Q.    So your opinion is really a
14. general opinion concerning the mutual fund
15. industry, not necessarily in particular to
16. the American Funds?
17.    A.    Competition is stated about a
18. market, not about a player.  My testimony
19. is these funds are being sold in a
20. competitive market.
21.    Q.    So on page twenty-one, you start
22. talking about the specific characteristics
23. of a competitive market.  You state that,
24. "the industry includes a large number of

1              R. Glenn Hubbard

2    funds and fund providers." In paragraph

3    forty-eight you state, "although many

4    competitors are not necessary for the

5    elimination of supracompetitive pricing,

6    maintaining such pricing is increasingly

7    difficult as the number of competitors

8    increases."

9              When does maintain pricing

10   become difficult?  What is the threshold?

11        A.    Well, there's studies including

12   work cited here that as few as two can

13   discipline competition, but here we're

14   talking about hundreds.

15        Q.    What about the --

16        MS. SUN: Strike that.

17        Q.    With respect to the mutual fund

18   industry specifically, have you quantified

19   the ratio of the number of investors

20   versus say the amount of investor assets

21   that are available?

22        A.    Yes.  I do present -- I don't

23   know that I do it exactly like that but I

24   give information in the report both on

25   assets under management for the industry

Page 125

1            R. Glenn Hubbard

2    and fraction of households owning a mutual

3    fund, if that's what you're asking.

4        Q.    I guess what I'm asking is how

5    many mutual funds do you need for there --

6    how many competitors are necessary, in

7    your analysis, for the elimination of

8    supracompetitive pricing?

9        A.    There's no unique answer to that

10   question, but certainly of you look at

11   Department of Justice guidelines, there

12   industry's way under any threshold for

13   looking for anticompetitive behaviors.

14   Maybe that's the cleanest demarcations.

15       Q.    Have you I guess analyzed what

16   the actual demarcation is?  When did the

17   mutual funds begin to exhibit the

18   competitive indices that you've described?

19       A.    I presented a table on this very

20   point.  At no point had they violated the

21   DOJ guidelines.

22       Q.    I'm not asking --

23       A.    You're asking a question that

24   isn't answerable.  I'm trying to translate

25   it into something that is.

Page 126

1              R. Glenn Hubbard

2       Q.    Let me try to clarify it a

3   little bit.

4              1980, I'm going to pick a

5   year --

6       A.    Where are you?

7       Q.    I'm just picking a year that

8   isn't in your table.

9              In 1980, had you analyzed

10  whether the market for mutual funds was

11  competitive then?

12      A.    I did not, no.

13      Q.    Do you know, as a matter of

14  fact, if the market was competitive?

15      A.    I'm afraid it would have to

16  follow from your previous question.  If I

17  haven't analyzed it, I'm not prepared to

18  offer you an opinion on it.

19      Q.    Do you know whether the

20  competitive forces in the mutual fund

21  industry have changed since 1980?

22      A.    We know that the number of

23  sellers have increased, we know that tax

24  law changes have made transaction costs

25  much easier, so the presumption would be

R. Glenn Hubbard

1  certainly yes.

2

3     Q.    But you didn't analyze it

4  specifically?

5     A.    It's not germane to what I did

6  here.

7     Q.    So the second factor I guess of

8  potential substitutes, how do investors

9  learn about the substitutes that you speak

10 of for one fund versus another?

11          MR. MURPHY: How do they learn

12    generally?

13    Q.    How do investors learn about the

14 alternative choices?

15    A.    There are a variety of ways.

16 They could learn from a financial adviser,

17 they could learn from financial magazines,

18 some people have their own expertise, some

19 people could do the research on the Web.

20 It depends on the investor.

21    Q.    In your opinion, in researching

22 these alternatives, what are investors

23 looking for?  Are they looking primarily

24 at return performance?

25          MR. MURPHY: Objection to form.

Page 154

1                    R. Glenn Hubbard

2     residual skill or true excess returns.

3          Q.    So if a fund charged much, much,

4     much higher fees than its competitors with

5     you offered a much, much higher return in

6     one year, would do you consider that the

7     fees that the fund is charging to be

8     competitive or reasonable?

9                MR. MURPHY: Objection to form.

10         A.    You'd need to know so many more

11    things about that to know where the return

12    came from, whether it was a bet versus

13    true skill.  What you can say with more

14    confidence is, over the span of not too

15    much time, the only way you'd be able to

16    sustain those high fees is to have had

17    some either very superior performance or

18    superior service.

19         Q.    How long a period of time do you

20    need to look at to evaluate whether the

21    fees were excessive in relation to the

22    returns?

23                MR. MURPHY: Objection to the

24         form.

25                What does that mean?

                    R. Glenn Hubbard

1

2      A.    Now you lost me.  It's a

3  different question.

4      Q.    Let me ask you a more basic

5  question.

6           In evaluating whether fees that

7  a mutual fund company is charging is

8  excessive or not, do you always have to

9  look at the return performance that it's

10  been achieving?

11          MR. MURPHY: Objection to form.

12     A.    Let's talk about what I did.

13          So I controlled for Morningstar

14  category, load type, size, I tried to form

15  a peer group that looked more close to an

16  individual fund you're trying to compare.

17  Investors who spend more time will look at

18  attribution analysis from funds, but it's

19  fairly easy to do.

20     Q.    So in your expert report on page

21  forty, you make a conclusion that, in

22  addition to competitive forces eliminating

23  excessive fees, competitive forces forms

24  to share the basis of the economies of

25  scale.  So you make that conclusion as

Page 156

1           R. Glenn Hubbard

2     well; correct?

3         A.    Yes, that would be a necessary

4     consequence of competition.

5         Q.    Is the basis for this opinion

6     the same as the basis for your opinion

7     that competition is able to weed out

8     excessive fees?

9             MR. MURPHY: Objection to form.

10        A.    The same underlying economic

11    characteristics, yes.

12        Q.    You can't conduct any other

13    analysis or studies to support the

14    specific conclusion that competition

15    forces firms to share economies?

16        A.    No, that's not true.  I

17    calculated the various breakpoints, fee

18    waivers, and low fees passed on by the

19    American Funds.  Share is a term that, to

20    an economist doesn't mean much.  But you

21    can certainly point out there are large

22    amounts of money being transferred to

23    consumers here.

24        Q.    I wasn't yet specifically

25    speaking about the American Funds or what

R. Glenn Hubbard

1   you've done with regard to the statements

2   you made on economies of scale with regard

3   to the American Funds.  I was specifically

4   speaking about paragraph ninety-six.

5      A.     Paragraph ninety-six follows

6   from econ 101.  In a competitive market,

7   that necessarily is the case.

8      Q.     You didn't conduct any other

9   studies or analysis aside from those we

10  talked about with regards to how

11  competition is able to weed out excessive

12  fees to make the conclusion that

13  competition is also able to force firms to

14  share the benefits of the economies of

15  scale?

16     A.     That's right, I wouldn't need

17  to, this necessarily follows.

18     Q.     So is it your opinion that, even

19  if a fund continued to perform well,

20  investors would redeem their shares with

21  the scale economies were not being shared?

22        MR. MURPHY: Objection to form.

23     A.     You haven't given me a

24  counterfactual.  I would need to know what

R. Glenn Hubbard

1    other alternatives were available.  In a

2    competitive marketplace, you're talking

3    about something where there are lot of

4    substitutes.  Your example sounds like

5    you're trying to define a hypothetical

6    that's different.

7    Q.    In a situation where you're

8    invested in fund A and fund A is doing

9    pretty much the same year to year?

10          Do you expect an investor to

11   redeem their shares if, in fact, fund A

12   wasn't sharing the economies of scale?

13   For example, there's no fee waivers,

14   there's no breakpoints as its actual

15   assets are going up but the return

16   performance --

17   A.    If it were in the world of

18   paragraph ninety-six which is a

19   competitive market where there are

20   substitutes available for that fund, then

21   absolutely.

22   Q.    What do you mean by substitutes

23   with regards to my hypothetical?

24   A.    We talked about that, so that

Page 163

R. Glenn Hubbard

1      MR. MURPHY: Objection to form.

2      A.      Because it's a competitive

3   market.  If distribution is tight, one of

4   two things is the case.  Either it's a

5   competitive market, which I've asserted,

6   or there's some global conspiracy among

7   hundred of mutual fund providers with no

8   one ever cheated, which would be the

9   alternative although farcical.

10      Q.      Is it possible to keep prices at

11   inflated levels across an industry?

12      A.      No, not -- theories of cartels

13   are riddled with the incentives to cheat

14   even when there's a few players.  Here

15   we're talking about thousands at the

16   levels of funds, hundreds at the level of

17   complexes.  You would have no reason to

18   believe that's the case.

19      Q.      What's the basis for that

20   opinion?  Are you drawing from specific

21   studies?

22      A.      The characteristics of

23   competition, the tightness within the

24   distributes, the high fee sensitivity of

Page 174

1         R. Glenn Hubbard

2      A.    No, I brought Analysis Group.

3      Q.    I noted that this is

4 substantially the same argument that you

5 presented in your expert report at least

6 with respect to I guess pages eighteen

7 through forty-four of your expert report

8 which is that section titled Market

9 Protections Against Excessive Fees; is

10 that correct?

11      A.    Yes, that's what I said to you

12 this morning.  Basic economics doesn't

13 change.

14      Q.    Are there any conclusions that

15 you made in this paper that defer from the

16 conclusions that you made with regards to

17 that section, market protections against

18 excessive fees?

19      A.    None that I'm aware of.

20      Q.    Do you know if anything --

21      MS. SUN: Strike that.

22      Q.    You have another paper

23 concerning the mutual fund industry that's

24 forthcoming; correct?

25      A.    It's a book actually.

R. Glenn Hubbard

1

2  A.    That's true by definition.

3  Q.    And by services offered, is that

4  always the same as return performance?

5  A.    No.

6  Q.    So I wanted to turn to page ten

7  of this paper where you note that there's

8  been some scandals in the mutual fund

9  industry.

10        I believe at the time this was

11  written the market -- some of the market

12  timing and other late trading things had

13  already become publicized.

14  A.    Yes.

15  Q.    In your opinion, don't these

16  scandals in the mutual fund industry

17  indicate that investment advisers can

18  breach their fiduciary duties for years

19  without the knowledge of investors?

20        MR. MURPHY: Objection to form.

21        Are you talking about general

22      filled duties or fiduciary duties with

23      respect to fees?

24        MS. SUN: First I'm going to talk

25      about general fiduciary duties.

Page 193

R. Glenn Hubbard

1      Q.    How does your theory account for

2  the possibility that --

3      MS. SUN: Strike that.

4      Q.    So Judge Posner also notes on

5  the second column above in the first

6  incomplete paragraph in the middle of the

7  page, it says, "the governance structure

8  that enables mutual fund advisers to

9  charge exorbitant fees is industry-wide so

10 the panels," and he's referring to the

11 Seventh Circuit panel that denied the

12 rehearing, "so the panel's comparability

13 approach would, if widely followed, allow

14 those fees to become the industry's

15 floor."

16     Do you agree with this

17 rationale?

18     A.    No.

19     Q.    How do you account for the

20 possibility that the entire retail mutual

21 funds industry isn't charging excessive

22 fees?

23     MR. MURPHY: Did you read his

24 expert report?

1          R. Glenn Hubbard

2          MS. SUN: Yes.

3      A.    I mean, it's certainly the

4   subject of the whole report, but I'll try

5   to give you a few sentences.

6          Going back to George Stigler's

7   work on the theory of cartels, which

8   clearly both of these gentlemen would be

9   very familiar with, it is virtually

10   impossible to hold a cartel together even

11   with a handful of players, much less

12   hundred if not thousands.

13          Second, outside the mutual fund

14   business there is zillions of competitors

15   for the same assets, again discussed at

16   length in my report.  It is simply

17   impossible.

18      Q.    So after reviewing this dissent

19   by Judge Posner, did it change your

20   opinions at all with regards to how -- the

21   three legs you were talking about and how

22   competition could function?

23      A.    No.  There are two important

24   errors in his opinion, one of which I

25   talked about.  But no, it didn't change my

1            R. Glenn Hubbard

2        He's testified about this ten

3    times this morning.

4        A.    What I've said repeatedly is

5    it's for service and distribution for the

6    funds, it's for access to that channel,

7    compensation for that.

8        Q.    I want to go down the list of

9    the intended purpose to make sure -- to

10   see whether you understand the purpose

11   that's been discussed in the American

12   Funds documents comport with the intended

13   purpose and results of 12b-1 fees of

14   Congress when they enacted.

15       A.    That's what I can't help you

16   with.  I'm neither a member of Congress

17   nor a lawyer.

18       Q.    I'm not asking you for your

19   knowledge of what Congress enacted.  I'm

20   going to read off of Lori Walsh's summary

21   of what the intended purposes and I just

22   want to have an understanding --

23       A.    But this is an unrefereed paper

24   written by an economist who is also no

25   either a lawyer or a member of Congress.

Page 270

1                R. Glenn Hubbard

2        controversy.

3        Q.    Well, you considered Dr.

4    O'Neal's analysis of the Rule 12b-1 fees

5    as being too high, as being excessive;

6    correct?

7        A.    Yes.

8        Q.    In your report.

9              In making this evaluation, was

10   your opinion informed by what the intended

11   purposes of the 12b-1 plans are, what the

12   Congressional intention is behind 12b-1

13   plans?

14       A.    I'm sorry, are you representing

15   there is a unique Congressional intent?

16   I'm not aware of one.

17       Q.    I'm asking you --

18       A.    I've already answered what I

19   viewed is my interpretation.  I've also

20   told you repeatedly I'm not a member of

21   Congress nor a lawyer and can't help you

22   why Congress thought what they thought and

23   why the SEC clarified the way they did.

24       Q.    I'm not asking you to give me

25   what the intention behind 12b-1 plans are

R. Glenn Hubbard

1  or what Congress' intention behind 12b-1

2  plans, in fact, are.  I'm asking you if

3  you considered the Congressional intent

4  that is summarized by Lori Walsh in

5  forming your opinion about Dr. O'Neal's

6  analysis.

7  A.    I'm not sure what you mean.

8          You're representing that Lori

9  Walsh as an economist is able to opine on

10  Congressional intent here and I should

11  somehow comment on that.  That's the

12  second derivative of a problem.  She's not

13  a lawyer and neither am I.  I told you

14  what I relied on.

15  Q.    Am I correct that you have a

16  different approach to the -- you have a

17  different approach from Lori Walsh in what

18  you view the intended purpose of 12b-1

19  plans are?

20  A.    You've pointed me to one

21  sentence in her paper.  I don't know what

22  her total approach is.

23          What I did was look at it as

24  servicing and distribution and looked at

1          R. Glenn Hubbard

2    in that paper.

3         Q.    Do you have any basis to expect

4    that competition for --

5              MS. SUN: Strike that.

6         Q.    Did you perform any specific

7    analysis to show that competition, in

8    fact, weeds out excessive 12b-1 fees?

9              MR. MURPHY: Objection to form.

10        A.    I've already stated it.  From an

11   economist's prospective, that's not the

12   exercise you would do.  You look at total

13   fees.  I also stated that in Exhibit 23, I

14   believe, I looked at the 12b-1 feels paid

15   by the funds and the distribution of their

16   peers and found them squarely within if

17   not in the bottom of the distribution.

18        Q.    Can you please turn to page

19   seventeen in the report.

20              She states in the middle right

21   above section D that, "taken as a whole,

22   12b-1 fees appear to increase flow

23   volatility and decrease gross returns."

24   She notes that the results are not overly

25   strong.

# Exhibit S

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY
(Pages 390-393)

# Exhibit T

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY
(Pages 394-405)

# Exhibit U

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY
(Pages 406)

# Exhibit V

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY
(Pages 407-408)