GIBSON, DUNN & CRUTCHER LLP
GARETH T. EVANS, SBN 138992
ANDREW Z. EDELSTEIN, SBN 218023
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
e-mail: _gevans@gibsondunn.com_

MILBANK, TWEED, HADLEY &
  McCLOY LLP
JAMES N. BENEDICT, Admitted _Pro Hac Vice_
SEAN M. MURPHY, Admitted _Pro Hac Vice_
JAMES G. CAVOLI, Admitted _Pro Hac Vice_
C. NEIL GRAY, Admitted _Pro Hac Vice_
ROBERT R. MILLER, Admitted _Pro Hac Vice_
One Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
e-mail: _jbenedict@milbank.com_

Attorneys for Defendants
Capital Research and Management Company
and American Funds Distributors, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| In re AMERICAN MUTUAL FUNDS FEE LITIGATION | CASE NO. CV 04-5593 GAF (RNBx) **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO STRIKE THE OPINIONS AND PROPOSED TESTIMONY OF DEFENDANTS' EXPERT R. GLENN HUBBARD** |

Judge:    Hon. Gary A. Feess

Date:     May 18, 2009
Time:    9:30 A.M.
Place:   Courtroom 740
          255 E. Temple Street
          Los Angeles, CA 90012

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... iii

I. PRELIMINARY STATEMENT .......................................................... 1

II. SUMMARY OF EXPERT REPORT OF DR. HUBBARD ............................ 5

    A.    The Growth of the Mutual Fund Industry Since the Early
           1980s .................................................................................. 7

    B.    Comparison of the Funds to Peer Funds ........................... 7

    C.    Competition in the Mutual Fund Industry .......................... 8

    D.    Economies of Scale ......................................................... 9

III. ARGUMENT ................................................................................ 9

    A.    Legal Standard ................................................................. 9

    B.    Dr. Hubbard's Opinion Is Relevant To The Issues
           Presented In This Case ..................................................... 10

           1.    Plaintiffs' Disagreement With Dr. Hubbard's
                  Opinion That Vigorous Competition Exists
                  Provides No Basis For Excluding His Testimony
                  And, In Any Event, Is Contrary to Recent Case
                  Law And The Testimony Of Plaintiffs' Own
                  Expert ................................................................. 11

                  a.    Mere Disagreement Is Insufficient As A
                        Matter of Law ...................................... 11

                  b.    Vigorous Competition Exists ................. 13

           2.    Competition Has Consistently Been Recognized
                  As Relevant When Assessing Fees Under Section
                  36(b) .................................................................. 16

           3.    Plaintiffs Mischaracterize Dr. Hubbard's Opinions ................ 19

4.   The Eighth Circuit's Decision In *Gallus* Provides No Basis For Excluding The Testimony Of Dr. Hubbard...................................................................20

a.   *Gallus* Is Contrary To The Text Of Section 36(b), The Weight Of Authority, And This Court's Prior Rulings..................................................21

b.   Plaintiffs' Are, In Fact, Pursuing An Excessive Fee Claim, Rendering Dr. Hubbard's Testimony Squarely Relevant On The Issue Of Liability..................................................23

c.   Dr. Hubbard's Testimony Is Also Relevant On The Issue Of Damages...........................................24

IV. CONCLUSION..................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Bellikoff v. Eaton Vance Corp.,
    481 F.3d 110 (2d Cir. 2007) ................................................................ 25

Daubert v. Merrell Dow Pharm.,
    509 U.S. 579 (1993)............................................................... 10, 11

Gallus v. Ameriprise Fin., Inc.,
    No. 07-2947, 2009 WL 928920 (8th Cir. Apr. 8, 2009)........................ passim

Gartenberg v. Merrill Lynch Asset Mgmt., Inc. ("Gartenberg I"),
    694 F.2d 923 (2d Cir. 1982),
    aff'd 528 F. Supp. 1038 (S.D.N.Y. 1981),
    cert. denied, 461 U.S. 906 (1983).......................................... passim

Gartenberg v. Merrill Lynch Asset Mgmt., Inc. ("Gartenberg II"),
    740 F.2d 190 (2d Cir. 1984),
    aff'g 573 F. Supp. 1293 (S.D.N.Y. 1983)..................................... 18

Green v. Fund Asset Mgmt., L.P.,
    286 F.3d 682 (3d Cir. 2002) ................................................ 24

Green v. Nuveen Advisory Corp.,
    295 F.3d 738 (7th Cir. 2002) ............................................. 24, 27

Hemmings v. Tidyman's Inc.,
    285 F.3d 1174 (9th Cir. 2002) ............................................. 11

In re Am. Mut. Funds Fee Litig.,
    No. CV-04-5593 GAF (RNBx), 2007 U.S. Dist. LEXIS 8276
    (C.D. Cal. Jan. 17, 2007) ................................................. 19

In re Franklin Mut. Funds Fee Litig.,
    478 F. Supp. 2d 677 (D.N.J. 2007)....................................... 24

ING Principal Prot. Funds Derivative Litig.,
    369 F. Supp. 2d 163 (D. Mass. 2005)..................................... 25

Gibson, Dunn &
Crutcher LLP

Jones v. Harris Assocs., L.P.,
    527 F.3d 627 (7th Cir. 2008),
    aff'd, No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27,
    2007),
    cert. granted No. 08-586, 2009 WL 578699 (Mar. 9, 2009) .............. 3, 14, 15

Kalish v. Franklin Advisers, Inc.,
    742 F. Supp. 1222 (S.D.N.Y. 1990),
    aff'd, 928 F.2d 590 (2d Cir.),
    cert. denied, 502 U.S. 818 (1991) ................................................................ 18

Korland v. Capital Research and Mgmt. Co.,
    No. CV-08-4020 GAF (RNBx), 2009 WL 936612 (C.D. Cal.
    Feb. 10, 2009) ................................................................................ 19, 25

Krasner v. Dreyfus Corp.,
    500 F. Supp. 36 (S.D.N.Y. 1980) ................................................. 28

Krasner v. Dreyfus Corp.,
    90 F.R.D. 665 (S.D.N.Y. 1981) ................................................... 28

Krinsk v. Fund Asset Mgmt., Inc.,
    875 F.2d 404 (S.D.N.Y.), aff'd 875 F.2d 404 (2d Cir.), cert.
    denied 493 U.S. 919 (1989) ............................................. 18, 19, 20

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999) ................................................................... 10

McClure Enters. v. Gen. Ins. Co. of America,
    No. CV 05-3491-PHX-SMM, 2008 U.S. Dist. LEXIS 44006
    (D. Ariz. June 4, 2008) ............................................................... 10

Meyer v. Oppenheimer Mgmt. Corp.,
    715 F. Supp. 574 (S.D.N.Y. 1989),
    aff'd, 895 F.2d 861 (2d Cir. 1990) .............................................. 18

Migdal v. Rowe Price-Fleming Int'l, Inc.,
    248 F.3d 321 (4th Cir. 2001) ...................................................... 24

Mukhtar v. California State Univ. Hayward,
    299 F.3d 1053 (9th Cir. 2002) .................................................... 10

Rebel Oil Co., v. Atlantic Richfield Co.,
    51 F.3d 1421 (9th Cir. 1995) ........................................................ 9

<u>Schuyt v. Rowe Price Prime Reserve Fund, Inc.</u>,
 663 F. Supp. 962 (S.D.N.Y.),
 <u>aff'd</u>, 835 F.2d 45 (2d Cir. 1987),
 <u>cert. denied</u>, 485 U.S. 1034 (1988) .......................................................... 18, 21

<u>United States v. 87.98 Acres of Land More or Less in the County</u>
 <u>of Merced</u>,
 530 F.3d 899 (9th Cir. 2008) ........................................................................ 10

<u>United States v. Bonds</u>,
 12 F.3d 540 (6th Cir. 1993) .......................................................................... 11

## STATUTES AND REGULATIONS

15 U.S.C. § 80a-35(a) .................................................................................... 22

15 U.S.C. § 80a-35(b) .................................................................................... 22

15 U.S.C. § 80a-35(b)(3) ............................................................................... 25

## OTHER AUTHORITIES

John C. Coates & R. Glenn Hubbard, <u>Competition in the Mutual</u>
 <u>Fund Industry:  Evidence and Implications for Policy</u>, 33 Iowa
 J. Corp. L. 151 (2007).................................................................................. 15

S. Rep. No. 91-184 (1970), <u>reprinted in</u> 1970 U.S.C.C.A.N. at
 4902) ............................................................................................................. 19

## RULES

Fed. R. Evid. 702 ...................................................................................... 2, 10

# I.

## PRELIMINARY STATEMENT

Dr. Robert Glenn Hubbard prepared an expert report dated February 26, 2009 in which he analyzes the characteristics of the market for mutual funds (the "Hubbard Report").[1]  Specifically, and among other things, Dr. Hubbard analyzed and opined on the issue of whether the mutual fund market was, during the relevant time period, competitive such that fees were subject to competitive forces, and analyzed how the fees for eight mutual funds managed and serviced by Capital Research and Management Company ("CRMC") and American Funds Distributors, Inc. ("AFD") (collectively "Defendants") compared to similar funds within that competitive marketplace.[2]  Additionally, Dr. Hubbard analyzed the flaws in Plaintiffs' arguments concerning economies of scale, addressing certain claims and assertions raised by Dr. Edward O'Neal, an expert proffered by Plaintiffs.

In motion papers dated April 14, 2009 (cited as "Pls.' Hubbard Br."), Plaintiffs move to strike the opinions and proposed testimony of Dr. Hubbard, claiming that such opinions and testimony are somehow irrelevant.[3]  Plaintiffs' motion is baseless and should be denied.

---

[1]  The February 26, 2009 Hubbard Report is attached hereto as Exhibit 7 to the Declaration of Andrew Z. Edelstein.

[2]  The eight at-issue American Funds are:  American Balanced Fund, Inc., AMCAP Fund, Inc., The Bond Fund of America, Inc., Capital Income Builder, Inc., Capital World Growth and Income Fund, Inc., The Growth Fund of America, Inc., The Income Fund of America, Inc. and The Investment Company of America (collectively, the "Funds").

[3]  Plaintiffs apparently move to strike Dr. Hubbard's opinions and testimony, as set forth in his reports, in their entirety (see Pls.' Hubbard Br. 1), but they do not address, let alone challenge, Dr. Hubbard's qualifications or portions of his opinions, such as his analysis regarding economies of scale.  Accordingly,

Dr. Hubbard is clearly qualified by his "knowledge, skill, experience, training, [and] education" (Fed. R. Evid. 702), to offer his expert opinions on the economic characteristics of the mutual fund industry and CRMC's fees within that industry, and Plaintiffs do not contend otherwise.[4] Dr. Hubbard, who holds A.M. and Ph.D. degrees in economics from Harvard University, is one of the leading and most widely recognized economists in the country. He is currently the Dean of the Graduate School of Business at Columbia University, where he is also a professor of economics. In addition, Dr. Hubbard is a research associate at the National Bureau of Economic Research, a visiting scholar at the American Enterprise Institute, an advisor to the President of the Federal Reserve Bank of New York, and an independent director of BlackRock Closed-End Funds. From 2001 to 2003, he served as the chief economic advisor to the President of the United States. Dr. Hubbard has also authored more than 100 research articles, a leading textbook on money and financial markets, and a textbook on principles of economics. (See Hubbard Report ¶ 2, App. A.)

Dr. Hubbard's expert report falls squarely within his area of expertise—an economic analysis of the market in which Defendants compete and how market forces impact the fee levels of mutual funds. Dr. Hubbard opines that "[t]he competitiveness of the market in which mutual funds are sold and the sensitivity of mutual fund demand to fees prevent mutual fund advisers from sustaining economically excessive fees over the long-run." (Hubbard Report ¶ 6(c).) His opinions are based on more than sufficient facts and data and are the product of well-accepted economic principles and methodologies. This is the same type of

---

Plaintiffs have conceded that such testimony is proper under Fed. R. Evid. 702, and any request to strike Dr. Hubbard's testimony in its entirety is baseless.

[4] A complete copy of Dr. Hubbard's *curriculum vitae* is attached as Appendix A to the Hubbard Report.

evidence that has been previously offered in numerous Section 36(b) cases, including Gartenberg.

While Plaintiffs seek to preclude Dr. Hubbard's testimony as irrelevant, they fail to identify a single flaw in his methodology or analysis. Rather, they assert— for three purported reasons, and without any contrary economic analysis from an expert of their own—that Dr. Hubbard's conclusions with respect to the existence and impact of competition in the mutual fund industry are somehow irrelevant to the issues presented in this case (or in any Section 36(b) action, for that matter). See Pls.' Hubbard Br. 3-5.

First, Plaintiffs simply disagree with Dr. Hubbard's fully-supported opinion that vigorous competition exists in the mutual fund industry, citing supposed legal authority from the 1970s and 1980s, **not** economic analysis regarding the **current** state of the market, in support of their position. See Pls.' Hubbard Br. 3-4. This argument is baseless and legally insufficient to exclude his testimony. Numerous cases—simply ignored by Plaintiffs[5]—make clear that market competition is in fact a relevant and proper consideration in assessing excessive fee claims under Section 36(b).[6] Indeed, one of Plaintiffs' own proffered experts in the mutual fund industry, since withdrawn by Plaintiffs, recently testified at his deposition that competition in the mutual fund industry does, in fact, exist, and that the fees

---

[5] See Jones v. Harris Assocs., L.P., 527 F.3d 627 (7th Cir. 2008), aff'g, No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007), cert. granted No. 08-586, 2009 WL 578699 (Mar. 9, 2009). Although Plaintiffs provide cursory treatment to the Seventh Circuit's decision in Jones in support of their assertion that Section 36(b) provides a basis of liability independent of the fee level, they are completely silent as to the most salient holding of Jones as it relates to the instant motion: that competition is relevant and critically important when assessing fees under Section 36(b).

[6] Even if the authorities cited by Plaintiffs contradicted Dr. Hubbard's opinion regarding the existence of competition in the fund industry (and they do not), at most they provide a basis for cross examination, not for excluding his testimony.

charged by mutual funds are largely set by competition.  See March 12, 2009 Deposition Transcript of Daniel Calabria 72-76.[7]

Second, Plaintiffs mischaracterize Dr. Hubbard's proffered testimony and opinions as concluding that "because excessive fees can not exist in the marketplace, violations of Section 36(b) also can not exist." Pls.' Hubbard Br. 4-5. From this, they employ the tortured logic that Dr. Hubbard "effectively argues Section 36(b) out of existence," and thus his opinions are "not relevant to this case."  Id. at 5.  Plaintiffs are wrong again.  Nowhere can this grossly oversimplified and self-serving characterization of Dr. Hubbard's testimony be found in his Report.  Indeed, while ignored by Plaintiffs, Dr. Hubbard made clear—in response to questions posed by Plaintiffs' counsel during deposition— that market competition is but *one factor* that is properly considered when assessing whether mutual fund fees are excessive.  See March 30, 2009 Deposition Transcript of R. Glenn Hubbard at 182:21-183:12.[8]  Moreover, the case law makes clear that numerous factors are properly considered in determining whether a given fee is excessive under Section 36(b), including, as noted above, market competition.

Finally, Plaintiffs contend that Dr. Hubbard's opinions and analyses are somehow irrelevant because a recent decision, Gallus v. Ameriprise Fin., Inc., No. 07-2947, 2009 WL 928920 (8th Cir. Apr. 8, 2009), affords Plaintiffs a new theory of Section 36(b) liability that does not require them to demonstrate a fee is "excessive."  (Pls.' Hubbard Br. 5-6.)  This final argument is also completely

---

[7]  Relevant excerpts of the March 12, 2009 Deposition Transcript of Dan Calabria are attached hereto as Exhibit 5 to the Declaration of Andrew Z. Edelstein.

[8]  Relevant excerpts of the March 30, 2009 Deposition Transcript of R. Glenn Hubbard are attached hereto as Exhibit 8 to the Declaration of Andrew Z. Edelstein.

baseless for numerous reasons.    First, the Gallus opinion is contrary to the overwhelming weight of authority, including **this Court's** clear rulings, that Plaintiffs must prove that a fee is excessive under Section 36(b).   Second, even if Gallus carried any weight, it is absolutely clear that Plaintiffs are pursuing an excessive fee claim here and intend to offer evidence about whether the fees were excessive.   Unless and until Plaintiffs withdraw that claim, they cannot seriously contend that Dr. Hubbard's testimony is irrelevant to this case.   Finally, regardless of whether Dr. Hubbard's testimony regarding market competition was relevant to **liability**, it would still clearly be relevant to the issue of actual **damages**, which Plaintiffs must plead and prove in order to obtain any recovery in this matter.

In short, Dr. Hubbard is eminently qualified, and all of his testimony, including that regarding the vigorous competition in the mutual fund industry, and his comparative fees analysis, is wholly relevant and properly admitted.

## II.

## SUMMARY OF EXPERT REPORT OF DR. HUBBARD

Dr. Hubbard's Report evaluates whether, from an economic perspective, the fees that Defendants charged to the Funds' shareholders from 2003 through 2007 were subject to competitive forces in the marketplace, and were thus excessive in light of supply and demand dynamics.   (See Hubbard Report ¶ 6(d).)   Dr. Hubbard determined that "[t]he Funds' expense ratios[9] compare very favorably to the industry norm throughout the relevant period in this matter.   The Funds' expense ratios were among the lowest, and often the lowest, expense ratios among the funds in their respective peer groups."   (Id.)   Dr. Hubbard concluded that "[b]ecause mutual funds are sold in a competitive market, these comparisons mean that,

---

[9] A Fund's expense ratio is the sum of the fees paid by the Fund to CRMC and its affiliates, together with other fund-borne expenses, divided by the total assets of the fund.

during the period from 2003 through 2007, the fees that CRMC charged the Funds were not excessive from an economic perspective." (Id.)  The opinions and conclusions set forth in Dr. Hubbard's Report are based on basic tenets of economics and supported by reputable and well-accepted analyses and methodologies. (Id. ¶ 44.)

Dr. Hubbard's conclusion that the fees paid by the Funds are economically reasonable, and not excessive from a market competition perspective, is based upon several foundational underpinnings.  First, Dr. Hubbard explores how mutual funds are structured and managed and explains how the industry has experienced substantial growth since the early 1980s.  (Id. ¶¶ 7-16.)  Next, Dr. Hubbard compares the Funds' fees to relevant peer groups and concludes that the Funds' fees are among the lowest in the industry.  (Id. ¶¶ 34-42.)  Dr. Hubbard then presents evidence for why the mutual fund industry is competitive and how the competition within the industry guards against sustained, long term economically excessive fees.  (Id. ¶¶ 43-106.)  Dr. Hubbard utilizes a demand elasticity model to demonstrate, using economic analysis, that investors are fee sensitive.

On the topic of economies of scale, Dr. Hubbard explains how any scale economies that the Funds realized were adequately returned to shareholders and that "competition in the mutual fund industry is sufficient to guarantee that shareholders benefit from any economies of scale that may exist." (Id. ¶ 124.) Additionally, Dr. Hubbard explains various examples of how CRMC shared any potential economies of scale with shareholders.  (Id. ¶¶ 124-137.)

Each component of Dr. Hubbard's analysis contributes to his ultimate conclusion that "[t]he fees that CRMC charged to the Funds were within the range of fees prevailing in the competitive market for mutual funds.  As such, these fees were not excessive from an economic perspective." (Id. ¶ 155.)

Gibson, Dunn & Crutcher LLP

### A.       The Growth of the Mutual Fund Industry Since the Early 1980s

Dr. Hubbard explains that "[s]ince the early 1980s, there has been a dramatic increase in the acceptance of and interest in mutual funds by investors." (Id. ¶ 14.) Dr. Hubbard analyzed data relating to assets under management for U.S. mutual funds between 1985 and 2008, as well as changes in the number and percentage of U.S. households owning mutual funds between 1980 and 2008. (See id. ¶¶ 14-16, Exs. 1-2.)  His analysis shows that more investors began purchasing mutual funds during this time period, thus increasing the overall mutual fund assets under management.   Dr. Hubbard establishes "that the number of U.S. households owning mutual funds increased from approximately 4.6 million in 1980 to approximately 52.5 million in 2008." (Id. ¶ 16.)

### B.       Comparison of the Funds to Peer Funds

Dr. Hubbard explains that "the expense ratios charged to similar funds provide a benchmark for evaluating whether the Funds' fees are excessive" because competition in the mutual fund industry ensures that advisers cannot sustain excessive prices over the long term.  (Id. ¶ 34.) Dr. Hubbard made this conclusion by comparing the Funds' expense ratios to "peer" funds. (Id. ¶ 35.) Dr. Hubbard found that the Funds' expense ratios were among the lowest expense ratios among all funds in their respective peer groups.  (Id.) Specifically,  Dr. Hubbard's analysis established that "throughout the 2003 through 2008 period, the expense ratios of the Funds' A, B, and C share classes[10] were *lower than 92 percent of the funds in their respective peer groups*" and "show that the majority of the Funds' A, B, and C share classes were lower than 99 percent of share classes in their respective peer groups."  (Id. at ¶ 36; Exhibits 7A-7H (emphasis added).) Based on these comparisons, Dr. Hubbard opines that "the Funds' expense ratios could  not  be  considered  excessive  unless  the  expense  ratios  of  mutual  funds

---

[10] Each of these share classes within a single fund constitutes a separate security.

Gibson, Dunn & Crutcher LLP

offered by most other mutual fund complexes were even more excessive." (Id. at ¶ 42.)

## C.   **Competition in the Mutual Fund Industry**

Dr. Hubbard opines on the nature, qualities, and characteristics of the current mutual fund industry. He notes that "if many mutual fund providers compete for investors' assets and if demand for mutual funds is sensitive to mutual fund fees, then a mutual fund provider that attempted to charge fees that were excessive relative to fees of similar products would find that fee-sensitive investors choose to invest elsewhere." (Id. ¶ 43.) Based on detailed analysis, he concludes that mutual fund providers vigorously compete for investor assets, and that the industry is characterized by meaningful price competition.

Dr. Hubbard's conclusion in this respect is based on numerous and varied economic factors. He notes, for example, that the number of funds and mutual fund providers has increased at an astounding rate. Indeed, as detailed by Dr. Hubbard, between 1985 through 2008, the number of mutual funds increased from 1,042 to 8,809 (an increase of over 457%), while the number of mutual fund complexes increased from 199 to 584 (an increase of over 195%). (Id. ¶ 49.) In addition to the sheer number of providers, Dr. Hubbard opines that numerous other market characteristics evidence that the industry experiences quite vigorous competition. (Id. ¶¶ 43-106.) Such characteristics include (1) the existence of numerous potential substitute mutual funds; (2) the absence of any substantial barriers to entry or expansion;[11] (3) low industry and market concentration levels; (4) continued lowering of mutual fund fees over time; and (5) insubstantial costs to investors in switching between mutual fund investments, and the relative ease of engaging in such switching. (Id. at ¶¶ 47-78.)

---

[11] So-called "barriers to entry" are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." Rebel Oil Co., v. Atlantic Richfield Co., 51 F.3d 1421, 1439 (9th Cir. 1995).

Importantly, Dr. Hubbard also opines that fund advisers are unlikely to increase fees because a sufficient number of mutual fund investors are sensitive to fee levels.  (Id. at ¶¶ 82-85.)  Dr. Hubbard observes that "lower fees are associated with higher levels of assets," and  "that demand for mutual funds is sensitive to fees (that is, investors care about fund fees when selecting funds)."  (Id. at ¶ 93.)

## D.   Economies of Scale

Finally, Dr. Hubbard analyzed economies of scale at some length, showing how any economies of scale realized during the relevant time period were adequately shared with Fund shareholders.  (Id. at ¶¶ 107-46.)  Dr. Hubbard explains that any economies of scale were shared with Fund shareholders in the following ways, among others:  (1) initial fee levels were very low; (2) breakpoints were introduced into the advisory fee schedules; (3) fee waivers were implemented (in addition to the added breakpoints); (4) transfer agent services were provided at cost; and (5) shareholder services improved over time.  As noted, Plaintiffs have not challenged Dr. Hubbard's analysis and opinions regarding economies of scale, which are clearly admissible under Fed. R. Evid. 702.

## III.

## ARGUMENT

## A.   Legal Standard

Under Fed. R. Evid. 702, a witness qualified as an expert can give testimony, in the form of opinion or otherwise, if it is reliable and  "assist[s] the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

To be sufficiently reliable, the opinion must be "either scientifically reliable, or otherwise reasonably reliable."  United States v. 87.98 Acres of Land More or Less in the County of Merced, 530 F.3d 899, 904 (9th Cir. 2008) (citing Daubert v. Merrell  Dow  Pharm., 509  U.S.  579,  592-95  (1993)  and  Kumho  Tire  Co.  v.

<u>Carmichael</u>, 526 U.S. 137, 159 (1999)).  "To be relevant, the testimony must 'assist the trier of fact to . . . determine a fact at issue.'"  <u>McClure Enters. v. Gen. Ins. Co. of America</u>, No. CV 05-3491-PHX-SMM, 2008 U.S. Dist. LEXIS 44006, at *3 (D. Ariz. June 4, 2008); <u>see</u> <u>Mukhtar v. California State Univ. Hayward</u>, 299 F.3d 1053, 1063 n.7 (9th Cir. 2002) ("Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the central concern of Rule 702.") (citations and quotations omitted).  As the text of the rule makes clear, the relevance "requirement merely looks at whether the evidence and testimony is relevant to any issue in the case."  <u>United States v. Bonds</u>, 12 F.3d 540, 557 (6th Cir. 1993) (citing <u>Daubert</u>); <u>see also</u> <u>Hemmings v. Tidyman's Inc.</u>, 285 F.3d 1174, 1184 (9th Cir. 2002).

Plaintiffs do not challenge Dr. Hubbard's qualifications as an expert economist to testify in connection with competitive forces in the mutual fund industry.  Nor do Plaintiffs take issue with the sound, accepted methodologies employed by Dr. Hubbard in reaching his conclusions.  Instead, the sole basis for Plaintiffs' challenge to Dr. Hubbard's analysis and opinions is that testimony relating to competition in the mutual fund industry is irrelevant.  Plaintiffs' contentions are clearly baseless.  In this case, where Plaintiffs claim that the Funds in question have paid excessively high fees, and seek damages, Dr. Hubbard's testimony regarding the existence of vigorous market competition, and the fact that American Fund fees are *lower* than 92% of peer funds, more than satisfies the relatively generous relevancy standard articulated above.  <u>See</u> Hubbard Report ¶ 36.

**B.**     **<u>Dr. Hubbard's Opinion Is Relevant To The Issues Presented In This Case</u>**

Dr. Hubbard's opinion in connection with the existence and impact of competition in the mutual fund industry is based upon a sound foundation of legal

and factual relevance, and no mischaracterization of the law or the facts can serve to obfuscate the clear saliency of Dr. Hubbard's opinion to Plaintiffs' Section 36(b) claim.   Indeed, in one recent decision, the Seventh Circuit explicitly deemed competition not only relevant to a claim brought pursuant to Section 36(b), but critically important. See Jones, 527 F.3d 627.

    **1.**    **Plaintiffs' Disagreement With Dr. Hubbard's Opinion That Vigorous Competition Exists Provides No Basis For Excluding His Testimony And, In Any Event, Is Contrary To Recent Case Law And The Testimony Of Plaintiffs' Own Expert**

        **a.**    **Mere Disagreement Is Insufficient As A Matter of Law**

While Plaintiffs cast their challenge to Dr. Hubbard's testimony as one of "relevancy" (see Pls.' Hubbard Br. 3), their primary attack is premised on nothing more than their *disagreement* with Dr. Hubbard's conclusion that vigorous competition exists in the mutual fund industry.  (See id. 3 ("As a threshold matter, to accept Dr. Hubbard's opinion, this Court must first accept Dr. Hubbard's assertion that there is such competition in the mutual fund industry.").)  Plaintiffs assert that Dr. Hubbard's testimony is inadmissible because "the legislative history of Section 36(b), as well as several courts, rejected this view . . . ." (Id. 3-4.)

Even if Plaintiffs were correct (and they are not), disagreement with Dr. Hubbard's opinions on the level of competition does not, as a matter of law, provide a basis for excluding his testimony.   In determining admissibility, a "district court is not charged with weighing the correctness of an expert's testimony, nor must the court choose between" competing views.  Royal Ins. Co. of America v. Joseph Daniel Constr., Inc., 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002).  "Once the thresholds of reliability and relevance are met, the testimony is admissible."  Id.   As the Supreme Court has made clear, in determining the threshold issue of admissibility of proffered expert testimony, "[t]he focus, of

course, must be solely on principles and methodology, <u>not</u> on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 595 (emphasis added). A "Court may not exclude the expert testimony simply because it disagrees with the results stated by the expert." <u>DSU Med. Corp. v. JMS Co.</u>, 296 F. Supp. 2d 1140, 1156 (N.D. Cal. 2003).

Here, Plaintiffs do not question Dr. Hubbard's principles and methodology. Instead, they rely on purportedly relevant legal authority that supposedly suggests that effective competition in the mutual fund industry does not exist. In so doing, they disagree with Dr. Hubbard's careful analysis to the contrary, and ask this Court to exclude Dr. Hubbard's testimony based on this disagreement. As the above legal principles make clear, such a result is legally improper. At most, Plaintiffs' "disagreement"—and the "authorities" they rely on to conjure it—goes to weight, ***not*** admissibility, and these matters can be fully explored by Plaintiffs on cross examination. As the Ninth Circuit has made clear:

> The test is whether or not the reasoning is scientific [or otherwise reliable] and will assist the jury. If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony. In arriving at a conclusion, the factfinder may be confronted with opposing experts, additional tests, experiments, and publications, all of which may increase or lessen the value of the expert's testimony. But their presence should not preclude the admission of the expert's testimony-they go to the weight, not the admissibility.

<u>Kennedy v. Collagen Corp.</u>, 161 F.3d 1226, 1230-31 (9th Cir. 1998).

Gibson, Dunn & Crutcher LLP

### b.   **Vigorous Competition Exists**

In any event, there is absolutely no basis for Plaintiffs' "disagreement" with Dr. Hubbard's conclusion that competition in the current mutual fund industry is vigorous, has been during the period at issue in this case (2003 to the present), and that fees charged to funds are kept in check by that competition.  Plaintiffs' support for their position emanates from significantly dated observations in the legal context that do not, and do not purport to, comment on the current competitive landscape of the mutual fund industry.[12]  But they essentially ignore very recent case law that makes plain that vigorous competition in the mutual fund industry does, in fact, exist, fully supporting Dr. Hubbard's conclusions.

---

[12] Rather than address recent precedent directly on point, Plaintiffs rely upon an ancient regime of cases from the 1980s that, according to Plaintiffs, stand for the proposition that the mutual fund industry "lack[s] . . . effective competition." Pls.' Hubbard Br. 4 (citing cases).  Given the historical time frame at issue in those cases, they have absolutely no relevance to the current state of the mutual fund industry, or the competitive landscape during the time frame at issue in this case.  As recognized by the Seventh Circuit in Jones, that competition may have been subdued in 1970 (when Congress enacted Section 36(b)), or in 1982 (when Gartenberg was decided), does not in any way mean that competition in the mutual fund industry is not vigorous today. See Jones, 527 F.3d at 633 ("Statements made during the debates between 1968 and 1970 rest on beliefs about the structure of the mutual-fund market *at the time*, and plaintiffs say that because many members of Congress deemed competition inadequate (and regulation essential) in 1970, we must act as if competition remains weak today.  Why?  Congress did not enact its members' beliefs; it enacted a text.") (emphasis added).

More importantly, not only do these cases have no bearing (by definition) on the state of competition today, not a single decision cited by Plaintiffs supports the conclusion that whether competition exists in the mutual fund market, and the extent of that competition, is irrelevant when assessing fees in the context of a Section 36(b) claim.  Indeed, cases such as Gartenberg and Krinsk, both cited by Plaintiffs, each make clear that competition is, in fact, a relevant consideration in assessing claims for excessive fees under Section 36(b).  See infra Section II.B.2.

Gibson, Dunn & Crutcher LLP

In _Jones_, the Seventh Circuit addressed the issue of whether the district court properly granted summary judgment in favor of defendants in an action brought pursuant to Section 36(b) of the Investment Company Act of 1940 ("ICA").  In affirming dismissal, Judge Easterbrook explicitly reviewed the **_current competitive landscape_** of the mutual fund industry, finding that there have been significant, fundamental changes in the market since the 1980s.  See _Jones_, 527 F.3d at 633-34 ("Today thousands of mutual funds compete.  The pages of the Wall Street Journal teem with listings.  People can search for and trade funds over the Internet, with negligible transactions costs").  Judge Easterbrook concluded that such changes have given rise to an intensely competitive mutual fund industry which serves as an important data point in assessing the reasonableness of fees challenged under Section 36(b).  See _id._ at 634 (noting that Section 36(b) does not create a rate-regulation mechanism: "Judges would not dream of regulating the price of automobiles, which are produced by roughly a dozen large firms; why then should 8,000 mutual funds seem 'too few' to put competitive pressure on advisory fees?").

Importantly, in concluding that mutual funds operate in a highly competitive market, Judge Easterbrook cited directly to an article co-authored by Dr. Hubbard, finding Dr. Hubbard's analysis both relevant and helpful in assessing the Section 36(b) claim there at issue.  See _Jones_, 527 F.3d at 634 ("A recent, careful study concludes that thousands of mutual funds are plenty, that investors can and do protect their interests by shopping . . . .") (citing John C. Coates & R. Glenn Hubbard, Competition in the Mutual Fund Industry:  Evidence and Implications for Policy, 33 Iowa J. Corp. L. 151 (2007)).  Many facets of this study appear in and form the basis of Dr. Hubbard's Report.

Moreover, Plaintiffs' own expert—with 40 years of experience in the mutual fund industry—also fully supports Dr. Hubbard's view that competition exists in the mutual fund industry, and serves as a check on prices.  During his March 21,

2009 deposition,  Mr. Daniel Calabria explicitly conceded that mutual fund fees
are set in a competitive market:

> Q:    Do you agree . . . that, in the . . . current mutual fund environment,
>       that distribution [Rule 12b-1 fees] must be paid for at prices that are
>       set by the marketplace ?
>
> A:    I believe so, yes.

(Calabria Tr. 72:21-25-73:5.)

> Q:    You just ended with the notion that there are some things beyond the
>       independent directors' control?
>
> A:    Yes, sir.
>
> Q:    Is one of those things, in your opinion, the price paid for distribution?
>
> A:    ***Yes.  But I would go beyond that and say it's based on competition
>       and what is taking place in the marketplace, on the battlefield where
>       the competition is fund A versus fund B group and you have to meet
>       the competition.***
>
> Q:    So if 12b-1 fees are going to be paid, it's your view that you need to
>       meet the competition?
>
> A:    One of the factors, yes.

(Calabria Tr. 75:19-25-76:1-10) (emphasis added).

In short, even if relevant to the current inquiry, the "correctness" of Dr.
Hubbard's opinion cannot seriously be disputed by Plaintiffs:  very recent case law
holds that, today, vigorous competition exists in the mutual fund industry and
serves to benefit consumers on fees, and an expert hired by Plaintiffs themselves
fully agrees.[13]   More importantly, as explained below, regardless of the relative

---

[13] Likewise, the SEC has also repeatedly made clear that competition exists within
the mutual fund industry.  See, e.g., SEC Div. of Inv. Mgmt., Report on Mutual
Fund Fees and Expenses (Dec. 2000) ("In addition to competing among

merit of any competing views on this issue, one thing is clear:  virtually every case that has addressed the issue, including cases from the early 1980s, has made clear that the existence and nature of competition, and the comparative fee levels of the funds in question, are appropriate and relevant considerations in assessing claims under Section 36(b).

## 2.    <u>Competition Has Consistently Been Recognized As Relevant When Assessing Fees Under Section 36(b)</u>

In this case, Plaintiffs clearly advance an "excessive fee" claim under Section 36(b) of the ICA.  As set forth in the Fourth Amended Complaint ("FAC"), Plaintiffs purport to challenge as "excessive" those fees paid by eight American Funds within the American Funds family of mutual funds.  According to Plaintiffs, "during the relevant time frame of July 15, 2003 to . . . the present, the 12b-1 and advisory fees received by Defendants were *disproportionate to the value of the services provided* and not within the bounds of what would have been negotiated at arm's-length."  (FAC ¶ 1 (emphasis added); <u>see</u> <u>id.</u> ¶ 4.)  To recover under Section 36(b), a fee must be "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  <u>Gartenberg v. Merrill Lynch Asset Mgmt., Inc.</u> ("Gartenberg I"), 694 F.2d 923, 928 (2d Cir. 1982), <u>aff'd</u> 528 F. Supp. 1038 (S.D.N.Y. 1981), <u>cert. denied</u>, 461 U.S. 906 (1983).   This standard has been cited with approval in hundreds of cases and has provided the governing standard in all of the cases under Section 36(b) that have reached final judgment after trial.[14]  Indeed, this Court has

themselves, mutual funds face increased competition from sources outside of the fund industry").

[14]  <u>See, e.g.</u>, <u>Gartenberg v. Merrill Lynch Asset Mgmt., Inc.</u> ("Gartenberg II"), 740 F.2d 190 (2d Cir. 1984), <u>aff'g</u> 573 F. Supp. 1293 (S.D.N.Y. 1983); <u>Krinsk v. Fund Asset Mgmt., Inc.</u>, 715 F. Supp. 472 (S.D.N.Y.), <u>aff'd</u> 875 F.2d 404 (2d Cir. 1988), <u>cert. denied</u> 493 U.S. 919 (1989); <u>Schuyt v. Rowe Price Prime Reserve Fund, Inc.</u>, 663 F. Supp. 962 (S.D.N.Y.), <u>aff'd</u>, 835 F.2d 45 (2d Cir. 1987), <u>cert. denied</u>, 485

consistently applied <u>Gartenberg</u> in addressing Section 36(b) claims.  <u>See, e.g.</u>, <u>Korland v. Capital Research and Mgmt. Co.</u>, No. CV-08-4020 GAF (RNBx), 2009 WL 936612 (C.D. Cal. Feb. 10, 2009); <u>In re Am. Mut. Funds Fee Litig.</u>, No. CV-04-5593 GAF (RNBx), 2007 U.S. Dist. LEXIS 8276 (C.D. Cal. Jan. 17, 2007).[15]

In applying the <u>Gartenberg</u> disproportionality standard, courts routinely review and analyze six factors:  (1) the independence and conscientiousness of the fund's directors; (2) the nature and quality of the investment adviser's services; (3) the fees charged to comparable mutual funds; (4) the profitability of the fund to the adviser; (5) whether the adviser realized economies of scale in managing the fund and, if so, whether those economies were equitably shared with fund shareholders; and (6) fall-out benefits, or indirect profits, to the adviser from its relationship with the fund.  <u>See</u> <u>Gartenberg I</u>, 694 F.2d at 928-29; <u>Krinsk</u>, 875 F.2d at 409.  These non-exhaustive factors, commonly called the "<u>Gartenberg</u> factors," were drawn directly from the legislative history of Section 36(b).

In the Second Circuit's 1982 opinion in <u>Gartenberg I</u>, the court specifically found that competition in the mutual fund industry was a relevant consideration in assessing a Section 36(b) claim.  <u>See</u> <u>Gartenberg I</u>, 694 F.2d at 929.  While, ***at the time***, the court questioned the extent to which market forces and competition would effectively constrain fees, it made clear that such forces should be analyzed

_____

U.S. 1034 (1988); <u>Meyer v. Oppenheimer Mgmt. Corp.</u>, 715 F. Supp. 574 (S.D.N.Y. 1989), <u>aff'd</u>, 895 F.2d 861 (2d Cir. 1990); <u>Kalish v. Franklin Advisers, Inc.</u>, 742 F. Supp. 1222 (S.D.N.Y. 1990), <u>aff'd</u>, 928 F.2d 590 (2d Cir.), <u>cert. denied</u>, 502 U.S. 818 (1991).

[15] Plaintiffs themselves have also repeatedly acknowledged the applicability of <u>Gartenberg</u> to their Section 36(b) claim, either referring directly to Second Circuit's decision itself or discussing the relevant "<u>Gartenberg</u> factors."  <u>See</u> FAC ¶¶ 1, 5, 29, 71-137, 151; <u>see also</u> Joint Stipulation in Support of Motion to Compel Document Production from Deloitte & Touch LLP at 2 (Nov. 25, 2008) (Docket Entry No. 270); Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Entry of a Scheduling Order (Nov. 10, 2008) (Docket Entry No. 257).

and considered, along with other factors, in determining whether a fee was excessive. See id. ("We disagree with the district court's suggestion that the principal factor to be considered . . . is the price charged by other similar advisers to funds managed by them," but "[w]e do **not** suggest that rates charged by other adviser-managers to other similar funds are not a factor to be taken into account.") (emphasis added). Indeed, one of the "Gartenberg factors"—comparative fees— directly draws upon market forces in comparing those fees charged to substantially similar funds—which is exactly what Dr. Hubbard does in his Report.[16]   Other cases cited by Plaintiffs in their current motion stand for the same proposition, and completely undermine Plaintiffs' strained assertion that competition in the mutual fund industry is "irrelevant" in assessing claims under Section 36(b).   See, e.g., Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. at 497 (comparing the fees of the fund at issue to others in the industry).

Furthermore, as the legislative history and the Second Circuit's opinion make abundantly clear, the six "Gartenberg factors" are **non-exhaustive**, and do not preclude the consideration of competition either in connection with comparative fees or as a stand-alone inquiry. See Gartenberg I, 694 F.2d at 930 (quoting S. Rep. No. 91-184 (1970), reprinted in 1970 U.S.C.C.A.N. at 4910)); see also, Schuyt, 663 F. Supp. at 972 ("all pertinent facts must be weighed in the

---

[16]   Contrary to Plaintiffs' claims, the legislative history to Section 36(b) also recognizes the relevance of considering market competition.  As observed in Gartenberg I, "to the extent that other managers have tended 'to reduce their effective charges as the fund grows in size,'" the Senate Committee noted that such a reduction presents 'the best industry practice [which] **will provide a guide**.'" Gartenberg I, 694 F.2d at 929 (quoting S. Rep. No. 91-184 (1970), reprinted in 1970 U.S.C.C.A.N. at 4902) (emphasis added).

determination of whether a fee is so excessive as to constitute a breach of fiduciary duty").[17]

### 3.   **Plaintiffs Mischaracterize Dr. Hubbard's Opinions**

Plaintiffs falsely assert that Dr. Hubbard's testimony regarding the existence of strong competition stands for the proposition that "because excessive fees can not exist in the marketplace, violations of Section 36(b) also can not exist." Pls.' Hubbard Br. 4-5.  From this, they strain to argue that Dr. Hubbard "effectively argues Section 36(b) out of existence" (whatever that means), and thus his opinions are "not relevant to this case." Id. at 5.  These arguments are based on fiction and, in any event, are irrelevant.

Nowhere can Plaintiffs' self-serving characterization of Dr. Hubbard's testimony be found in his Report.  Indeed, Dr. Hubbard made clear during his deposition that market competition is but one factor that serves as a check against supra-competitive mutual fund fees.  See March 30, 2009 Deposition Transcript of R. Glenn Hubbard at 160-62.  In fact, Dr. Hubbard specifically testified that other principal checks against such fees include independent fund directors, **and lawsuits under Section 36(b)**.  Id. at 161:20-162:5 (The "interaction of boards and competition will protect investors *with 36(b) as a third backstop*.  I refer[] to it as three legs of the stool.") (emphasis added).  It is thus completely disingenuous for Plaintiffs to assert that Dr. Hubbard's testimony "effectively argues Section 36(b) out of existence."  In fact, his testimony is precisely to the contrary.

---

[17]  Despite Plaintiffs assertions to the contrary, Schuyt does not support the exclusion of Dr. Hubbard's expert opinion as irrelevant.  (See Pls.' Hubbard Br. 4.)  To the contrary, the court in Schuyt explicitly considered testimony relating to the existence and impact of competition in the mutual fund industry.  See Schuyt, 663 F. Supp. at 974.  That the court ultimately disagreed with the conclusion goes only to the weight and **not** admissibility of that evidence.

More importantly, the case law makes clear that numerous factors are properly considered in determining whether a given fee is excessive under Section 36(b), <u>including, as established above,</u> market competition.  Plaintiffs' strained suggestion to the contrary, which in any event is premised on a mischaracterization of Dr. Hubbard's testimony, provides no basis for finding that Dr. Hubbard's testimony is irrelevant.  The Seventh Circuit's recent decision in <u>Jones</u>, which itself considered and relied upon Dr. Hubbard's learned views, makes clear that Dr. Hubbard's proffered testimony regarding competition is highly relevant and admissible in this case.

**4.      The Eighth Circuit's Decision In _Gallus_ Provides No Basis For Excluding The Testimony Of Dr. Hubbard**

In a last-ditch effort, Plaintiffs contend that the Eighth Circuit's recent decision in <u>Gallus</u>, 2009 WL 928920, renders Dr. Hubbard's testimony irrelevant and thus inadmissible.  Plaintiffs contend that <u>Gallus</u>:  (1) holds that an excessively high fee "is not the only way a plaintiff can prove a breach of fiduciary duty" under Section 36(b); and (2) recognizes a theory of liability for Section 36(b) under which a plaintiff need only prove that "the adviser was not honest and transparent throughout the negotiation process," regardless of whether the fee itself was proportionate to the value of the services rendered.   (Pls.' Hubbard Br. 6 (quotations omitted).)[18]  From this Plaintiffs conclude that "Dr. Hubbard's opinions are irrelevant to the facts at issue in this case . . . even if this Court concludes that there is competition in the mutual fund market" because "Plaintiffs still have a cause of action for breach of fiduciary duty under Section 36(b)."  <u>Id.</u>  Plaintiffs'

---

[18] <u>But see</u> <u>Gallus</u>, 2009 WL 928920, at 11 (noting that <u>Gartenberg</u> "provide[s] a useful framework for resolving claims of excessive fees, notwithstanding the substantial changes in the mutual fund industry that have occurred in the intervening years.")

arguments fail on several levels, and provide absolutely no basis for excluding the testimony of Dr. Hubbard.[19]

### a.   *Gallus* Is Contrary To The Text Of Section 36(b), The Weight Of Authority, And This Court's Prior Rulings

The plain language of the statute makes clear that Section 36(b) provides a focused remedy for excessive fees, not a general action for alleged misconduct by investment advisors or board members.  Section 36(b) creates a fiduciary duty only "with respect to the receipt of compensation," 15 U.S.C. § 80a-35(b) (emphasis added), as opposed to Section 36(a)'s general fiduciary duty.  15 U.S.C. § 80a-35(a).   Indeed, the legislative history of Section 36(b) confirms that Congress intended to address a specific area of concern—excessive management fees—and did not intend for Section 36(b) to be employed as a mechanism for challenging every aspect of the board's review of the advisory contracts.

Courts have consistently held that Congress did not intend for Section 36(b) to be utilized as a catch-all damages remedy for any alleged bad acts by advisers, directors, and managers.  Rather, as the Third Circuit explained in Green v. Fund Asset Mgmt., L.P., Section 36(b) "was intended to provide a very specific, narrow

---

[19] After advancing this new legal theory, Plaintiffs devote four pages of their brief to gratuitous substantive discussion of the supposed "facts" they uncovered during the discovery process, facts which they claim show that the Defendants were not candid and transparent with board members regarding issues of fund growth and size during the negotiation process.  (See Pls.' Hubbard Br. 6-9.)  Even if Plaintiffs' new and novel theory had legal or factual merit (and it does not), a discussion of the factual merits of that theory has absolutely no place in a motion to strike expert testimony.  Moreover, contrary to Plaintiffs' baseless assertions and wholesale speculation, the evidence at trial will establish that the Defendants conducted themselves in an entirely appropriate manner, and engaged in fulsome discussion with Fund board members regarding fund size and all other pertinent issues.  As Gallus itself holds, "[c]andid, transparent negotiation does not require discussion of every issue that a plaintiff might find relevant; and it does not require the adoption of a particular negotiation strategy."  Gallus, 2009 WL 928920, at 14.

federal remedy that is significantly more circumscribed than common law fiduciary duty doctrines." 286 F.3d 682, 685 (3d Cir. 2002). And, as the Fourth Circuit has recognized, Section 36(b) is "limited to cases where there was excessive compensation," and "[g]eneral breach of fiduciary duty claims … are not properly within the scope of Section 36(b)." <u>Migdal v. Rowe Price-Fleming Int'l, Inc.</u>, 248 F.3d 321, 329 (4th Cir. 2001); <u>see also</u> <u>Green v. Nuveen Advisory Corp.</u>, 295 F.3d 738, 743 (7th Cir. 2002) (an adviser's fiduciary duty under Section 36(b) is "significantly more circumscribed than common law fiduciary duty doctrines"); <u>In re Franklin Mut. Funds Fee Litig.</u>, 478 F. Supp. 2d 677, 683-84 (D.N.J. 2007) (same).

Thus, the statute itself (and its legislative history) is contrary to any suggestion in <u>Gallus</u> that liability under Section 36(b) may be premised on lack of candor or transparency, regardless of whether a fee is proportionate to the value of services rendered. Indeed, numerous Courts have consistently held that, to establish a violation of Section 36(b), a plaintiff must plead and prove that the fee in question was "excessive" in that the fee level was significantly disproportionate to the value of services rendered in exchange for the fee. <u>See</u> <u>Gartenberg I</u>, 694 F.2d at 928; <u>ING Principal Prot. Funds Derivative Litig.</u>, 369 F. Supp. 2d 163, 167-69 (D. Mass. 2005); <u>Bellikoff v. Eaton Vance Corp.</u>, 481 F.3d 110, 117 (2d Cir. 2007) (quoting <u>Gartenberg I</u>, 694 F.2d at 928.). In fact, this Court very recently held that 12b-1 fees—upon which Plaintiffs here focus—cannot be found "excessive" under Section 36(b) based on allegations that the strictures of Rule 12b-1 were not satisfied. <u>See</u> <u>Korland</u>, 2009 WL 936612, at *2 ("under applicable case law it is not sufficient to plead that an expenditure under Rule 12b-1 is unlawful or unauthorized; more must be alleged"). The Court made clear that, under Section 36(b), "[t]o breach its fiduciary duty with respect to 12b-1 fees, an investment adviser must charge a fee that is ***so disproportionately large that it***

***bears no reasonable relationship to the services rendered*** and could not have been
the product of arm's-length bargaining." <u>Id.</u> (emphasis added) (internal citations
and quotations omitted)

In short, the Gallus opinion is contrary to the overwhelming weight of
authority, including <u>this</u> <u>Court's</u> clear rulings that, to establish a violation of
Section 36(b), Plaintiffs' must plead and prove that a fee is excessive.

**b.**     **<u>Plaintiffs' Are, In Fact, Pursuing An Excessive Fee Claim,
Rendering Dr. Hubbard's Testimony Squarely Relevant On
The Issue Of Liability</u>**

Second, even if <u>Gallus</u> carried any weight, Dr. Hubbard's testimony clearly
remains relevant since Plaintiffs are pursuing an excessive fee claim.   In the
operative complaint, Plaintiffs repeatedly allege that "the 12b-1 and advisory fees
received by Defendants were ***disproportionate to the value of the services
provided*** and not within the bounds of what would have been negotiated at arm's-
length." FAC ¶ 1 (emphasis added); <u>see also id.</u> ¶ 151 ("the fees received by the
Distributor and Investment Adviser Defendants were *excessive*, in that they were
so *disproportionately* large that they bore no relationship to the services rendered .
. . .") (emphasis added).   And, in their present motion, Plaintiffs make absolutely
clear that they continue to pursue this theory of liability.  <u>See</u> Pls.' Hubbard Br. 3
("The issue that the Court must resolve in this case is whether Defendants violated
Section 36(b) by breaching their fiduciary duties with respect to fees, ***including by
charging excessive fees***.") (emphasis added).

At bottom, Plaintiffs' contention that Dr. Hubbard's testimony is somehow
irrelevant because <u>Gallus</u> might afford them an alternate theory of liability
unhinged to the "excessive" nature of the fees they challenge is well off the mark.
Even if that was the case (and it is not), it is plain that Plaintiffs are pressing an
excessive fee claim in this action, which clearly raises issues as to which Dr.

Hubbard's testimony is directly relevant.   Plaintiffs are obviously free to withdraw and waive any theory of liability based on "excessiveness," and attempt to pursue a theory based solely on the statements in Gallus.  But it is plain that they have no plans to do so.   Unless and until they do, Dr. Hubbard's testimony is clearly relevant with respect to Plaintiffs' own theory of liability.

### c.   Dr. Hubbard's Testimony Is Also Relevant On The Issue Of Damages

Of course, even if this Court adopted Gallus (and it should not), and even if Plaintiffs' abandoned their "excessiveness" theory, Dr. Hubbard's testimony regarding market competition and its impact on fees is still relevant and admissible with respect to the issue of damages.

Section 36(b) of the ICA imposes a duty on all plaintiffs to prove not only liability, but also "***actual damages*** resulting from the breach of fiduciary duty . . . ." 15 U.S.C. § 80a-35(b)(3); see also Green v. Nuveen Advisory Corp., 295 F.3d at 743 ("shareholder may sue only the recipient of the fees in question and has the burden of proving the breach of duty; recovery is limited to actual damages; and damages are recoverable only for the one-year period before the filing of the action.").  Indeed, even the Gallus court explicitly acknowledged the duty imposed on plaintiffs to establish the existence of actual damages, wholly apart from any purported breach of fiduciary duty imposed by Section 36(b).  See Gallus, 2009 WL 928920, at 12 (noting that "Congress allocated the burden of proof to plaintiffs, both with respect to establishing the existence of a breach of fiduciary duty, as well as demonstrating the existence of cognizable financial harm resulting from that breach").  Actual damages, in turn, are limited to the amount by which the fee in question exceeds a "fair" fee, a benchmark that clearly requires consideration of competition in the industry and the impact of competitive market forces on fees in general in the marketplace.  See, e.g., Krasner v. Dreyfus Corp.,

90 F.R.D. 665, 667 (S.D.N.Y. 1981); <u>Krasner v. Dreyfus Corp.</u>, 500 F. Supp. 36, 42-44 (S.D.N.Y. 1980) (determining "fairness" of fee levels by analyzing and comparing fees of other investment advisors in the industry).   Dr. Hubbard's testimony is relevant on this issue as well, and Plaintiffs fail to claim otherwise.

## IV.

## CONCLUSION

For each of the foregoing reasons, Plaintiffs' motion should be denied in its entirety.

DATED: May 1, 2009

Respectfully submitted

GIBSON, DUNN & CRUTCHER LLP
ANDREW Z. EDELSTEIN


By:       /s/
           Andrew Z. Edelstein

MILBANK, TWEED, HADLEY &
  McCLOY LLP
JAMES N. BENEDICT
SEAN M. MURPHY
JAMES G. CAVOLI
C. NEIL GRAY
ROBERT R. MILLER


By:       James N. Benedict

Attorneys for Defendants
  Capital Research and Management Company and
  American Funds Distributors, Inc.

Gibson, Dunn &
Crutcher LLP