# Exhibit 7

CONFIDENTIAL

**Expert Report of R. Glenn Hubbard**

*In re American Mutual Funds Fee Litigation*

CONFIDENTIAL

## Table of Contents

I.      Introduction .................................................................................................................1
II.     Report Preparation ......................................................................................................1
III.    Summary of Opinions ..................................................................................................2
IV.     Background on Mutual Funds and the Mutual Fund Industry .....................................3
        A.    The structure and management of mutual funds..................................................5
        B.    The growth of the mutual fund industry .............................................................5
        C.    Mutual fund fees ................................................................................................7
        D.    A mutual fund is an integrated product with many different elements................8
        E.    Mutual funds and distribution.........................................................................10
V.      The American Funds....................................................................................................11
VI.     Comparison of the Funds' Fees to the Industry Norm................................................14
VII.    Market Protections Against Excessive Fees ...............................................................15
        A.    Competition constrains prices..........................................................................18
        B.    The mutual fund industry exhibits the structural characteristics of a competitive
              market .............................................................................................................19
        C.    Investors are sensitive to fees .........................................................................20
        D.    Implications of competition for mutual fund fees.............................................34
        E.    Competition forces firms to share the benefits of any economies of scale that may
              exist .................................................................................................................39
        F.    Competition constrains fees even if boards do not negotiate at arm's-length ........40
        G.    Variation in fees among mutual fund products is consistent with competition........40
VIII.   Economies of Scale.....................................................................................................41
        A.    Background .......................................................................................................45
        B.    Total costs determine whether economies of scale exist ...................................45
        C.    An economic analysis of mutual fund scale economies is properly done at the
              complex level....................................................................................................46
        D.    Evidence that mutual fund economies of scale are not substantial.......................48
        E.    CRMC provides the American Funds' directors with information relevant to
              economies of scale ...........................................................................................49
        F.    CRMC shares the benefits of any economies of scale ......................................51
IX.     Flaws in Dr. O'Neal's Economies of Scale Analysis .................................................53
        A.    Analysis of CRMC financial data .....................................................................60
        B.    Sharing of economies of scale ..........................................................................60
X.      Flaws in the Plaintiffs' and Dr. O'Neal's Analyses of Rule 12b-1 Fees ........................61
        A.    Plaintiffs' allegations .......................................................................................62
        B.    Flaws in Dr. O'Neal's analyses of 12b-1 fees ..................................................62
XI.     Conclusion ..................................................................................................................64
        ......................................................................................................................................65

**Expert Report of R. Glenn Hubbard**

*In re American Mutual Funds Fee Litigation*

## I.   Introduction

1.   My name is R. Glenn Hubbard. I hold the Russell L. Carson Professorship in Finance and Economics in the Graduate School of Business of Columbia University, where I am also the Dean. In addition, I am a Professor of Economics in the Department of Economics of the Faculty of Arts and Sciences. At the National Bureau of Economic Research, I am a research associate in programs on corporate finance, public economics, industrial organization, monetary economics, and economic fluctuations and growth. I am an adviser to the President of the Federal Reserve Bank of New York. Prior to joining the Columbia faculty as Professor of Economics and Finance in 1988, I taught in the Department of Economics at Northwestern University. I have also served as Visiting Professor of Business Administration at Harvard Business School, John M. Olin Visiting Professor at the University of Chicago, Visiting Professor and Research Fellow of the Energy and Environmental Policy Center at the John F. Kennedy School of Government and John M. Olin Fellow at the National Bureau of Economic Research. I hold A.M. and Ph.D. degrees in economics from Harvard University, and B.A. and B.S. degrees from the University of Central Florida, *summa cum laude*.

2.   My professional work has centered on problems in finance, public economics, industrial organization, monetary economics, and natural resource economics. I have authored more than 100 research articles, edited a number of books, and authored a leading textbook on money and financial markets and a textbook on principles of economics. From 2001 to 2003, I served as Chairman of the President's Council of Economic Advisers; over that time period, I

CONFIDENTIAL

also served as Chair of the Economic Policy Committee for Organization for Economic Co-operation and Development (OECD) in Paris. From 1991 to 1993, I served as Deputy Assistant Secretary (Tax Analysis) of the U.S. Department of the Treasury, where I was responsible for economic analysis of tax policy, the administration's revenue estimates, and health care policy issues. I have also been an adviser or consultant to the Board of Governors of the Federal Reserve System, Social Security Administration, Congressional Budget Office, Federal Reserve Bank of New York, Internal Revenue Service, International Trade Commission, National Science Foundation, U.S. Department of Energy, and U.S. Department of the Treasury.

3.     My *curriculum vitae*, which is attached as **Appendix A**, gives more biographical details and lists my writings. **Appendix B** specifies the testimony that I have given as an expert witness since 2005.

## II.     Report Preparation

4.     I have been asked by counsel for Defendants Capital Research and Management Company ("CRMC") and American Funds Distributors, Inc. ("AFD") (collectively, "Defendants") to perform an economic analysis of the plaintiffs' claims that CRMC charged excessive fees to the American funds at issue in this matter.[1] I was also asked to evaluate and opine on the report of plaintiffs' expert, Edward O'Neal ("O'Neal Report").[2]

5.     I am being compensated for my time in this matter at my standard billing rate of $1,200 per hour. The materials that I, and those working under my direction, have considered or relied upon in my analysis are listed in **Appendix C** of this report. My work on this matter is

---

[1] The eight American Funds funds at issue are AMCAP Fund, Inc. ("AMCAP"), American Balanced Fund, Inc. ("AMBAL"), The Bond Fund of America, Inc. ("BFA"), Capital Income Builder, Inc. ("CIB"), Capital World Growth and Income Fund, Inc. ("WGI"), The Growth Fund of America, Inc. ("GFA"), The Income Fund of America, Inc. ("IFA"), and the Investment Company of America ("ICA") (collectively, "the Funds").

[2] Edward S. O'Neal, Expert Report in the matter of *In re American Mutual Funds Fee Litigation*, February 13, 2009.

CONFIDENTIAL

ongoing, and I may review additional materials or conduct further analysis. I reserve the right to update, refine, or revise my opinion.

## III.   Summary of Opinions

6.      I have reached the following opinions in this matter.

a.      An investor's well-being is affected by the total fee that he or she pays for a mutual fund. An individual mutual fund investor's economic interest is not affected by whether or how a given total fee is divided into different fee components. For this reason, an economic analysis of whether mutual fund fees are excessive should focus on total fees paid by investors.

b.·      Economists use competitive markets as the standard benchmark to evaluate prices. Mutual funds, including the Funds, are sold in a competitive market. This market includes a large number of competitors, many substitutes for mutual funds, low barriers to entry, competitors who lower their fees, and low switching costs.

c.      The competitiveness of the market in which mutual funds are sold and the sensitivity of mutual fund demand to fees prevent mutual fund advisers from sustaining economically excessive fees over the long-run.

d.      The Funds' expense ratios compare very favorably to the industry norm throughout the relevant period in this matter. The Funds' expense ratios were among the lowest, and often the lowest, expense ratios among funds in their respective peer groups. Because mutual funds are sold in a competitive market, these comparisons mean that, during the period from 2003 through 2007, the fees that CRMC charged the Funds were not excessive from an economic perspective.

3

CONFIDENTIAL

e.       Mutual fund providers distribute funds through a variety of distribution channels, and these channels differ across funds. CRMC distributes its funds primarily through unaffiliated financial advisers. These financial advisers provide services to the Funds' shareholders, and the Funds compensate these financial advisers for these services.

f.       CRMC shares the benefits of any economies of scale with the Funds and their shareholders through low fees, fee waivers, fee structures (that is, breakpoints) that reduce management fees as assets increase, fee structures that share any cost reductions in transfer agency services, and investments in improved products and services. Plaintiffs and plaintiffs' experts fail to consider many of the ways that CRMC shares any potential economies of scale.

g.      The Dr. O'Neal's purported economies of scale analyses are fundamentally flawed and unreliable. These analyses do not show that economies of scale were realized by CRMC in the management and servicing of the Funds.

h.      I have reviewed materials presented to the Boards pertaining to economies of scale, and I have found these materials to be relevant, informative, and helpful to a reader assessing economies of scale at CRMC. The materials contain the types of information that would allow the Boards to make informed business judgments regarding the relevant economic issues at CRMC.

i.      Plaintiffs' and Dr. O'Neal's discussions of 12b-1 fees are inconsistent with the economics of mutual fund distribution. As is the case with mutual funds offered by many complexes, some of the Funds' 12b-1 fees are used to compensate financial advisers and distributors for providing services to shareholders. The plaintiffs and

4

CONFIDENTIAL

plaintiffs' discussions of 12b-1 fees ignore the benefits investors receive from the services provided by financial advisers and AFD.

## IV.   Background on Mutual Funds and the Mutual Fund Industry

### A.   The structure and management of mutual funds

7.      Each mutual fund is an independent company that begins when a sponsor appoints the fund's initial board of directors,[3] establishes the fund's investment policy, and provides initial assets to the fund. The plaintiffs' allegations and this report focus on open-end funds. Open-end funds have shares that are redeemable with the mutual fund company that issued them, an important feature of mutual funds that gives investors the ability to "fire" an adviser.[4] The mutual fund sponsor is almost always the mutual fund adviser, and in what follows, I use these terms interchangeably. Although a mutual fund is an independent entity with a board of directors, a mutual fund generally has few, if any, direct employees. Rather, the fund's board of directors contracts with other entities to perform the activities necessary to manage and service the mutual fund and its shareholders. Typically, many, if not all of these activities are contracted out to the mutual fund adviser and its affiliated entities.[5] The mutual fund adviser may in turn subcontract with other entities to perform certain activities.

8.      Managing a mutual fund portfolio involves selecting a diversified set of investments that maximize expected returns while keeping the fund's portfolio true to its

---

[3] Mutual funds can be organized as corporations or as trusts. In the former case, a mutual fund will have a board of directors; in the latter case, a board of trustees. Six separate boards of directors supervise the Funds.

[4] In contrast, closed-end funds sell a fixed number of shares initially, and those shares are then traded in the open market. A closed-end fund shareholder cannot redeem his or her shares with the fund. The only way to liquidate holdings in a closed-end fund is through sale of shares to another individual.

[5] Robert C. Pozen, *The Mutual Fund Business*, 2nd ed., Houghton Mifflin Company 2002, pp. 13-14, and Lee Gremillion, *Mutual Fund Industry Handbook*, John Wiley & Sons 2005, pp. 45-50.

5

CONFIDENTIAL

investment objectives, maintaining sufficient liquidity to meet redemption requests from investors, executing security trades in an efficient manner, and in the case of active management, researching potentially thousands of possible investments. It also involves distributing shares of the fund to the public, maintaining investor accounts, and providing account statements to investors.

9.     Mutual fund advisers also provide many other services to fund shareholders. The nature and level of services vary depending on the fund adviser, and may include providing investment advice and investor education, staffing phone centers and physical outlets to dispense this information (among other services), and creating and maintaining websites that allow access to account and investment information.

10.     In addition, mutual fund advisers perform many other functions related to the maintenance of a mutual fund such as recordkeeping, regulatory compliance, providing redeemable shares, daily portfolio valuation, and the ability to easily transfer assets between funds within the same complex.[6]

11.     A fund adviser may issue different share classes of the same mutual fund. Some share classes are available to retail customers, while others are for retirement plans, 529 plans, or institutional purchase. Fees, services, and minimum or maximum investment requirements may vary across share classes. Different share classes may be distributed through different distribution channels. For example, at American Funds, share classes A, B, C, and F are primarily distributed through broker-dealers, or financial advisers,[7] but R share classes are

---

[6] See Pozen, *supra* note 5, pp. 13-14, 303-311, 360, 396-408. Also see Gremillion, *supra* note 5, pp. 220-221, 275.

[7] In this report, I use the terms financial adviser and broker-dealer interchangeably. "Financial adviser" encompasses registered investment advisers, commission-based broker-dealers, and broker-dealers working under fee-based arrangements.

6

CONFIDENTIAL

distributed through retirement plans, and 529-E shares are distributed through employer-sponsored 529 plans.

12.     The mutual fund industry in the United States is regulated by the Securities and Exchange Commission (SEC) and by the Financial Industry Regulatory Authority (FINRA) within the legal framework of the Investment Company Act of 1940 ("ICA") and other related laws.[8] Some mutual fund regulations impose requirements on the type of advertising in which mutual fund advisers may engage, and what mutual fund advisers may disclose about the performance of funds.[9]  The ICA requires, among other things, that each fund have a board of directors and that a certain percentage of directors must be "non-interested."

13.     Some mutual fund regulations pertain to fees. These regulations require that fees must be clearly disclosed both in filings with the SEC and in documents sent to investors.[10] The board of directors must approve any increase in compensation to the adviser. A fund's independent directors must approve the investment advisory agreement and the principal underwriting agreement annually.[11] In addition, shareholders must approve any increase in an adviser's contractual compensation.[12]

**B.     The growth of the mutual fund industry**

14.     Mutual funds provide a convenient way for individual investors to invest in professionally managed portfolios of securities. Since the early 1980s, there has been a dramatic

---

[8] FINRA was formed in 2007 through the combination of NASD and the member regulation, enforcement, and arbitration functions of the New York Stock Exchange.

[9] Clifford E. Kirsch, *Mutual Fund Regulation*, Practicing Law Institute March 2004, Ch. 1, pp. 18-19.

[10] U.S. Securities and Exchange Commission, Form N1-A, Item 14.

[11] 15 U.S.C.S. § 80a-15(c).

[12] Kirsch, *supra* note 9, p. 6-7.

7

CONFIDENTIAL

increase in the acceptance of and interest in mutual funds by investors. That acceptance has led to growth in the number of mutual funds, growth in the amount of assets invested in mutual funds, and an increase in the percentage of households owning mutual funds.

15.     From year-end 1985 through year-end 2008, assets under management at all mutual funds grew by approximately 1,870 percent, from $254.7 billion to approximately $5.0 trillion, as seen in **Exhibit 1**.[13] During the same period, the S&P 500 equity index increased by 327.5 percent, and the Barclays Capital US Aggregate Bond Index (previously Lehman Brothers Aggregate Bond Index) increased by 473.3 percent. Thus, the increase in mutual fund assets is not simply explained by the appreciation of assets already invested in mutual funds as of 1985 and must be due in large part to the fact that many investors found mutual funds to be an attractive investment relative to other investment options.

16.     That an increasing number of investors came to see mutual funds as attractive investment vehicles is evident in **Exhibit 2**, which shows that the number of U.S. households owning mutual funds increased from approximately 4.6 million in 1980 to approximately 52.5 million in 2008.

**C.     Mutual fund fees**

17.     Mutual fund fees can be categorized as ongoing or one-time. Mutual fund fees deducted from fund assets on an ongoing basis are referred to as expenses. The expense ratio is the sum of a fund's expenses and is expressed as a percentage of fund assets. In contrast to ongoing expenses, which are paid by the fund, shareholders may pay other one-time fees, which

---

[13] The data used in this and several other exhibits to this report are from Strategic Insight's Simfund Database. The latest available data provide information on many aspects of mutual funds, including assets under management, as of year-end 2008. Since some mutual funds have not filed their 2008 prospectuses (for example, 5 of the 8 American Funds at issue do not have fee data for 2008), the fee data for 2008 are not as well populated as in previous years. However, I find that there are sufficient observations to perform my analyses using 2008 fee data. The data for assets under management are not affected by this issue and are similarly populated in 2008 and previous years.

8

CONFIDENTIAL

are sometimes referred to collectively as "shareholder fees." Shareholder fees may include front loads, back-end loads, purchase fees, redemption fees, exchange fees, and account maintenance fees.

18.    Some advisers, including CRMC, allocate expenses into various components, such as the management fee, Rule 12b-1 fee, transfer agent fee, and other expenses.[14] There is no standard definition for the components of the expense ratio, and there can be substantial variation in how expense ratios are allocated across fee categories, even among complexes with similarly named categories.[15]

19.    With respect to each of the Funds, expenses fall into the following categories: management fees (or "advisory fees"), Rule 12b-1 fees, and shareholder, administrative and other services fees.[16]

20.    According to the Funds' current fee schedules, the management fee for each of the Funds declines as the fund's assets under management ("AUM") increase, and the

---

[14] The transfer agent fee pays for certain of the various services provided to shareholders, typically including establishing investor accounts, processing share transactions, ensuring compliance with minimum account requirements and frequent trading restrictions, providing shareholders with quarterly account statements, providing tax information to shareholders, and distributing annual reports, semiannual reports, prospectuses, and proxy statements to investors. Rule 12b-1 fees are typically used to pay for marketing and distribution expenses and/or shareholder services. Other expenses include certain fund-paid expenses, such as pricing and bookkeeping fees and board compensation.

[15] For example, the SEC writes, "Some funds define the term management fee narrowly, to cover only the cost of selecting portfolio securities. These funds pay for administration, record keeping, and other services under separate contracts with other service providers. Other funds define the management fee broadly, to cover a variety of administrative and other services, in addition to expenses associated with selecting portfolio securities. A few funds have "unified" fees under which the management fee pays for all fund expenses ... Thus, if Fund A has a higher management fee than Fund B, it may mean that Fund A pays a higher fee to its adviser. Alternatively, it may mean that Fund A's management fee pays for services that are provided and charged for separately by Fund B's adviser, an affiliate of the adviser, or outside contractors." (Division of Investment Management, U.S. Securities and Exchange Commission, "Report on Mutual Fund Fees and Expenses," December 2000, § III.B.1 and footnote 60.)

[16] Rule 12b-1 fees are discussed in more detail in other sections. Shareholder, administrative and other service fees include "retirement plan recordkeeping/transfer agent activities, representation by independent legal counsel and services provided by the fund's custodian and independent auditor." CRMC, Mutual Fund Fees and Expenses White Paper, August 16, 2007, CORBI_0231581-0231618 at CORBI_0231585.

9

CONFIDENTIAL

management fee does not vary across share classes. The Rule 12b-1 fee does vary across share classes. For example, in 2007, share classes B and C of the Funds were charged approximately a one percent 12b-1 fee;[17] share class A fees ranged from 0.23 to 0.25 percent depending on the fund. The transfer agent fee can also vary across share classes.[18]

21.    Because of variation in how complexes define management fees and other components of the expense ratios, comparisons of management fees and other individual components across investment complexes may not be meaningful. Of particular relevance to this matter, comparisons of the Funds' management fees and Rule 12b-1 fees to those of other complexes' funds would suffer from this problem. In contrast, regardless of how the components of the expense ratio are defined, the expense ratio equals the total annual fee deducted from fund assets.

22.    From an economic perspective, the variation in definitions for the components of the expense ratio is inconsequential to individual mutual fund investors. Given the total fee associated with a fund, a mutual fund investor's economic well-being is not affected by how that total fee is allocated among different fee categories.

### D.    A mutual fund is an integrated product with many different elements

23.    Mutual funds are differentiated products. Some differentiation occurs at the fund level: different investment styles, different distribution channels, and different expected performance.[19] Complex-level attributes also contribute to this differentiation. Complex

---

[17] Rule 12b-1 fees are discussed in more detail in a subsequent section. An exhibit in that section, **Exhibit 23**, presents 12b-1 fee values for the Funds over time.

[18] For example, see American Funds AMBAL Statement of Additional Information, March 1, 2004, CORBI_0060499-0060587 at CORBI_0060514.

[19] See SEC description of mutual fund attributes (http://sec.gov/answers/mutfund.htm, accessed February 22, 2009) and U.S. General Accounting Office, *Report to the Subcommittee on Finance and Hazardous Materials: Mutual Fund Fees*, p. 61.

10

CONFIDENTIAL

attributes include brand awareness, longevity, the number of available funds, the quality of investor statements, the quality of investor education tools, and the quality of investor support.

24.     It is important to realize that a mutual fund investor, when purchasing a mutual fund share, is purchasing a combination of services. These include portfolio management – which delivers a particular risk/return distribution within a particular investment category to the investor – but also transfer agency,[20] distribution services, and other services.[21]  Prospective purchasers of fund shares must purchase the entire package of services; they do not have the ability to purchase management services from one company and distribution or transfer agency services from another.

25.     Like firms in any industry, a firm in the mutual fund industry can choose, depending on its skills and aims, to produce some of these services itself and contract out for others.

### E.    Mutual funds and distribution

26.     The different ways of distributing mutual funds are referred to as distribution channels. For example, funds sold through brokers or financial advisers are sold through the non-proprietary distribution channel, while funds sold directly to investors are sold through the direct

---

[20] The transfer agent provides various services to shareholders, typically including establishing investor accounts, processing share transactions, ensuring compliance with minimum account requirements and frequent trading restrictions, providing shareholders with quarterly account statements, providing tax information to shareholders, and distributing annual reports, semiannual reports, prospectuses, and proxy statements to investors. See Pozen, *supra* note 5, pp. 393 – 402.

[21] Marketing and distribution services may also include advertising, printing and mailing prospectuses to new investors, and printing and mailing of sales literature (see SEC Report, *Invest Wisely: An Introduction to Mutual Funds*, p. 9). Other expenses include certain fund-paid expenses, such as board compensation and fees for securities custodians, providers of shareholder accounting services, attorneys, and auditors (see U.S. Securities and Exchange Commission, supra note 15, p. 16).

11

CONFIDENTIAL

channel.[22] Many funds are offered through multiple distribution channels. A complex may have separate share classes for each of the distribution channels through which its fund is distributed.

27.    **Exhibit 3** presents percentages of mutual fund assets under management in 2008 by distribution channel for the largest 20 complexes. Several of these complexes distribute funds primarily through the non-proprietary channel, the primary channel employed by CRMC in distributing the American Funds. For example, Oppenheimer Funds and Van Kampen Funds distributed the vast majority of their funds' assets through the non-proprietary channel in 2008. Other complexes distribute their funds in completely different ways. For example, Vanguard, Fidelity, T. Rowe Price, and Dodge & Cox distribute very little or none of their funds' assets through the non-proprietary channel, instead selling their funds mostly or entirely through the direct channel.

28.    Like many other complexes, American Funds has chosen to contract out for the provision of distribution and some ongoing shareholder services.[23] These services include sales of fund shares themselves, but also education and financial planning advice provided to investors

---

[22] Different sources may use different terms for these channels. In this report, I use channel names from Strategic Insight's Simfund database. The Simfund database assigns one distribution channel to each share class, providing the primary distribution channel for that share class. Strategic Insight defines the non-proprietary distribution channel as including funds sold primarily or exclusively through brokers not affiliated with the mutual fund adviser. The institutional retirement channel includes funds that Strategic Insight categorizes as being retirement share classes and that are either (1) in Strategic Insight's institutional distribution channel or (2) in the bank institutional channel (bank institutional includes all funds in Strategic Insight's bank proprietary distribution channel with a trust/institutional bank customer). The institutional non-retirement channel includes all funds that Strategic Insight categorizes as not being retirement share classes and that are either (1) in Strategic Insight's institutional distribution channel or (2) in the bank institutional channel. Strategic Insight defines the proprietary channel as including funds sold primarily or exclusively through the captive sales force of the fund's managing company. The direct channel is defined by Strategic Insight as including funds directly marketed to the public without an intermediary broker. The bank retail channel includes funds in Simfund's bank proprietary channel (funds advised and/or sold primarily by a specific bank) with a retail bank customer type.

[23] As a practical matter, CRMC distributes its funds through its subsidiary, American Funds Distributors ("AFD"). AFD contracts with financial advisers who are in direct contact with investors. As of March 2005, the AFD sales force consisted of [illegible] associates, supported by an internal sales support and service team of [illegible] associates. CRMC, Overview of American Funds Distributors, Inc. ("Overview of AFD"), March 8, 2005, CORBI_0209265-0209293 at CORBI_0209266-267.

12

CONFIDENTIAL

and potential investors. It does this through financial advisers with whom it contracts to provide a particular level of service, advice, and education to investors.[24]

29.    American Funds' 12b-1 fees are sometimes referred to as "distribution and/or service" fees because AFD uses them to pay for expenses related to a multitude of distribution and service activities, including compensation to financial advisers for the services they provide to shareholders.[25] Approximately ·REDACTED of the 12b-1 fees that AFD receives are paid to third parties.[26] As I discuss in more detail below, the services that financial advisers provide to investors in exchange for these fees include account setup, share selection and purchasing, portfolio reviews, investment recommendations, financial planning, and retirement asset management.[27] The compensation a financial adviser receives for these services depends on the class of American Fund shares he or she sells to an investor.[28]

# REDACTED

---

[24] "The term 'financial adviser' includes traditional commission-based broker-dealers, as well as registered investment advisers (commonly known as RIAs) and other broker-dealers who operate under fee-based arrangements." Overview of AFD, *supra* note 23, pp. 2-3.

[25] See, for example, American Funds AMBAL Prospectus, March 1, 2004, CORBI_0058678-0058709 at CORBI_0058683.

[26] See October 22, 2008, letter from Milbank, Tweed, Hadley & McCloy LLP to Milberg LLP re Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendants, Attachment 1. The percentages for 2004 to 2007 (all years provided in the attachment) range from approximately REDACTED to approximately REDACTED percent.

[27] See, for example, Investment Company Institute, Research Fundamentals, "Why Do Mutual Fund Investors Use Professional Financial Advisers," April 2007, Vol. 16, No. 1, pp. 1-3.

[28] See **Exhibits 4A-4C**.

13

CONFIDENTIAL

# REDACTED

.29

## V.    The American Funds

31.     The American Funds provide a broad range of investing options to investors. Collectively, according to Simfund, the American Funds are presently composed of 42 individual funds (composed of 31 retail funds, 9 funds of funds, and 2 endowment funds), each fund being composed of several different share classes.[30] Amounts invested in the American Funds are invested in various types of assets, and the fractions invested in each type have varied somewhat over time. **Exhibit 5** presents the fraction of total American Funds assets under management invested in different Morningstar investment categories, total assets under management, the number of funds, the number of share classes at American Funds by year for the period from 2003 through 2008. Historically, domestic large cap growth has been the asset class with the most assets under management, but international equity and allocation funds[31] also make up a substantial, and over time  increasing, fraction of assets under management.

32.     According to Strategic Insight's classifications, American Funds are distributed through three distribution channels. In each year during the 2003-2008 period, over 85 percent of

---

<sup>29</sup> **REDACTED**

.

[30] The American Funds website (www.americanfunds.com/funds/returns/alphabetically.htm, last accessed February 23, 2009) lists forty funds.  Simfund reports these forty plus two additional funds:  Endowments Bond Fund and Endowments Growth and Income Fund.  Morningstar.com also provides descriptions of these two funds (http://quicktake.morningstar.com/FundNet/Snapshot.aspx?Country=USA&Symbol=BENDX, last accessed February 23, 2009 and http://quicktake.morningstar.com/FundNet/Snapshot.aspx?Country=USA&Symbol=ENDIX, last accessed February 23, 2009).

[31] Allocation (or hybrid) funds may invest in multiple asset classes.

14

CONFIDENTIAL

American Fund's mutual fund assets under management were in share classes that Strategic Insight classified as being distributed through the non-proprietary distribution channel.[32]

# REDACTED

[32]        REDACTED

15

CONFIDENTIAL

# REDACTED

---

33

34

REDACTED

REDACTED

16

CONFIDENTIAL

# REDACTED

41.    I have reviewed these materials for the 2003–2008 period, and as is the case with my independent analyses, these materials show that the Funds have some of the lowest fees in their peer groups.  Specifically, the materials show that throughout the 2003 to 2008 period, the

17

CONFIDENTIAL

expense ratios less 12b-1 fees for each of the Funds were below the median of funds in the Lipper benchmark group (excluding funds of funds). Additionally, from 2004 to 2008, each of the Funds had expense ratios less distribution expenses that were less than 81 percent of each Fund's peer group. Lastly, in 2007 (the last year for which there are data for all eight Funds), all eight Funds ranked among the lowest four funds in each Fund's respective benchmark group.[35]

     42.     To summarize, my analysis of the Funds' fees, as well as the expense ratio comparisons presented to the Funds' Directors, show that, during the relevant period, the Funds' expense ratios were among the lowest, if not the lowest, among comparable funds in the industry. Thus, the Funds' expense ratios could not be considered excessive unless the expense ratios of mutual funds offered by most other mutual fund complexes were even more excessive. By themselves these comparisons of the Funds' expense ratios to the industry norm imply that there is no economic basis for considering the expense ratios of the Funds to be excessive.

## VII.   Market Protections Against Excessive Fees

     43.     Competitive market forces can protect mutual fund investors from economically excessive fees under certain conditions. In particular, if many mutual fund providers compete for investors' assets and if demand for mutual funds is sensitive to mutual fund fees, then a mutual fund provider that attempted to charge fees that were excessive relative to fees of similar

---

[35] The number of funds in the benchmark groups ranged from 14 to 30, including the American Fund being studied. The comparison groups include only Class A shares and do not include funds of funds. These documents also include comparisons of advisory fees, transfer agency fees, and distribution expenses. Throughout the 2003 – 2008 period, the Funds' fees for those services were also low relative to the fees charged by similar funds.  See CORBI_0343223; CORBI_0342647; CORBI_0051998; CORBI_0040662; CORBI_0029736; CORBI_0018088; CORBI_0343219; CORBI_0342643; CORBI_0051990; CORBI_0040654; CORBI_0029728; CORBI_0018080; CORBI_0342161; CORBI_0339617; CORBI_0042719; CORBI_0032679; CORBI_0020988; CORBI_0017796; CORBI_0350038; CORBI_0349839; CORBI_0041734; CORBI_0031164; CORBI_0019554; CORBI_0097669; CORBI_0052649; CORBI_0032115; CORBI_0030254; CORBI_0018591; CORBI_0348008; CORBI_0052318; CORBI_0040969; CORBI_0030017; CORBI_0018345; CORBI_0350034; CORBI_0031156; CORBI_0019546; CORBI_0349835; CORBI_0041726; CORBI_0009950; CORBI_0358806; CORBI_0042038; CORBI_0031459; CORBI_0019896; CORBI_0010515 (2003-2008 American Funds directors' information books).

18

CONFIDENTIAL

products would find that fee-sensitive investors choose to invest elsewhere.[36] The prospect of forgoing the revenue associated with these assets provides mutual fund advisers with a strong economic incentive not to charge economically excessive fees. In the sections that follow, I show that these conditions hold in the mutual fund industry, and I explain in more detail why these conditions protect investors, including American Funds shareholders, from excessive fees.

### A.   Competition constrains prices

44.     The ability of competition to restrain pricing is a basic tenet of economics.[37] In a competitive market, in order to survive in the long run, profit-maximizing firms must consider the ability and willingness of consumers to choose between substitute products. In the long run, the motivation to maximize profits leads firms in a competitive market to produce only those goods and services for which consumer value exceeds the incremental cost of production.

45.     In a competitive market, no firm finds it profitable over the long run to set a price that exceeds its economic costs.[38] The reason for this is that a competitive market includes rival firms also motivated to maximize profit. If one firm sets its price above economic cost, then rival firms motivated by the desire to earn profits would enter the market or expand production in order to attract consumers by offering a product that provides consumers with more value and/or

---

[36] Not all investors have to be fee-sensitive in order for competition to restrain fees. As long as fee-sensitive investors control a sufficient amount of potential mutual fund investments, then over the long run competition for these investors will prevent firms from charging excessive fees.

[37] Many economics textbooks discuss competitive markets and their advantages. See, for example, R. Glenn Hubbard and Anthony Patrick O'Brien, *Economics,* 2nd ed., Pearson Prentice Hall 2006, pp. 374-377.

[38] In other words, in a competitive market, "economic profit" is zero. This feature does not imply that firms in competitive markets cannot earn profits in the sense of revenues exceeding explicit costs ("accounting profit"). One economic cost not explicitly considered in firms' accounting statements is the opportunity cost of capital. A firm must earn sufficient accounting profit to compensate investors for use of their capital, with this compensation varying across firms depending on the risk involved in each firm's business. (The investors to which I refer in the preceding sentence are the firm's owners or equity-holders and should not be confused with investors in a mutual fund's shares.) Observing that firms earn positive accounting profits in a competitive market is not an indication of excessive prices.

19

CONFIDENTIAL

lower prices. Consumers would then purchase from rivals with better values and/or lower prices instead of from the firm attempting to charge a price above economic costs. In turn, the firm attempting to set its price above economic costs would have to lower its price or continue to lose sales and profits.

46.     In summary, in a competitive market, firms' motivations to maximize profits inextricably links prices to economic costs, and firms cannot sustain excessive prices over the long run. In other words, competition ensures that, in the long run, prices are set such that: sellers and buyers enter only those transactions that they expect will make them better off; and prices do not exceed economic costs. As a consequence, prices that prevail in a competitive market over time cannot exceed the prices that would result from arm's-length negotiations.

### B.     The mutual fund industry exhibits the structural characteristics of a competitive market

47.     Common features of competitive markets include a relatively large number of suppliers, the availability of substitute products, unconcentrated supply, the absence of substantial barriers to entry and expansion, and low switching costs. A competitive market need not possess all of these features, and competition constrains prices in many markets that lack one or more of those characteristics. As I discuss below, the Funds were sold in a market that possesses these characteristics.

20

CONFIDENTIAL

*The industry includes a large number of funds and fund providers*

48.    Economic theory and empirical studies show, across various industries, that prices decline as the number of competitors increases and concentration of sales declines.[39] Although many competitors are not necessary for the elimination of supra-competitive pricing, maintaining such pricing is increasingly difficult as the number of competitors increases.

49.    **Exhibit 8** shows that hundreds of complexes currently offer thousands of mutual funds to investors, and these numbers have generally grown over time. Over the period from 1985 to 2008, the number of mutual funds increased 457.5 percent (from 1,042 to 5,809) while the number of complexes offering mutual funds increased 193.5 percent (from 199 to 584).[40] This large number of complexes and funds is consistent with the mutual fund industry being competitive.

*Potential substitutes exist*

50.    The existence of substitutes for mutual funds mean that investors have alternative choices if mutual fund providers were to offer products with less value or higher prices than investors could achieve elsewhere. In addition to similar mutual funds offered by other providers

---

[39] Lance Brannman, J. Douglass Klein, and Leonard W. Weiss, "The Price Effects of Increased Competition in Auction Markets," in *Concentration and Price,* Leonard W. Weiss, ed., MIT Press 1989, pp. 67-84; James M. MacDonald, "Competition and Rail Rates for the Shipment of Corn, Soybeans, and Wheat," 18 *Rand Journal of Economics* 151 (1987); Steven N. Wiggins and Robert Maness, "Price Competition in Pharmaceuticals: The Case of Anti-Infectives," 42 *Economic Inquiry* 247-63 (April 2004); Thomas Gale Moore, "U.S. Airline Deregulation: Its Effects on Passengers, Capital, and Labor," 29 *Journal of Law & Economics* 1 (April 1986); Ian Domowitz, R. Glenn Hubbard, and Bruce C. Petersen, "Business Cycles and the Relationship Between Concentration and Price-Cost Margins," 17 *Rand Journal of Economics* 1 (Spring 1986); and Ian Domowitz, R. Glenn Hubbard, and Bruce C. Petersen, "Oligopoly Supergames: Some Empirical Evidence on Prices and Margins," 35 *Journal of Industrial Economics* 379 (June 1987).

[40] These calculations rely on data collected from Strategic Insight's Simfund ("Simfund") database, which includes data on mutual fund assets beginning in 1985. These figures do not include closed-end funds, exchange-traded funds, funds of funds, exchange funds, and money market funds.

21

CONFIDENTIAL

or other types of mutual funds, several other investment options are potential substitutes. These include ETFs,[41] individual securities, annuities, and savings accounts of various types.

*The industry does not have substantial barriers to entry or expansion*

51.　　Low barriers to entry in an industry mean that if a firm observes an opportunity to earn an economic profit by introducing a competing product or by expanding production of an existing product, the firm can do so relatively quickly and easily. In addition, even if we do not observe firms actually entering a market, a group of firms may be poised to enter the market should profit-making opportunities arise. If the industry lacks barriers to entry into and exit from the industry, this pool of potential entrants facilitates competition by constraining existing firms to set their fees competitively.[42]

52.　　The mutual fund industry exhibits characteristics consistent with low barriers to entry. There are also many complexes providing mutual fund services with the ability and resources to introduce products in new areas (new investment styles) or through new distribution

---

[41] ETFs are investment vehicles that typically invest in the securities contained in a stock or index (the S&P 500, for example). ETFs are legally classified in ways similar to mutual funds, but once ETF shares are purchased, they may be sold to other investors (through an exchange) or, in some circumstances, redeemed for the fund's underlying equities. U.S. Securities and Exchange Commission, *Exchange-Traded Funds (ETFs)*, www.sec.gov/answers/etf.htm (accessed February 22, 2009). Relative to index mutual funds, ETFs have the advantages of convenience of buying and selling at any time of the day instead of waiting until the end of the day for an index fund; and the ability to buy on margin and sell short. In addition, because ETFs are traded, investors can place stop, stop-loss and limit orders to purchase these funds. Leonard Kostovetsky, "Index Mutual Funds and Exchange-Traded Funds," 29 *Journal of Portfolio Management* 80 (Summer 2003). However, like trading in an individual security, investors purchasing or selling ETF shares generally have to pay a trading commission to a broker.

[42] Economists refer to such a market, in which firms not yet selling goods in the market nonetheless help to constrain prices in the industry, as a "contestable market." A perfectly contestable market is one in which entry into or exit from the market is costless and unimpeded. See William J. Baumol and Alan S. Blinder, *Microeconomics: Principles and Policy*, 10th ed., Thomson 2006, p. 250.

Just as no real-world market is perfectly competitive, no market is perfectly contestable. However, markets can be highly contestable. In my opinion, the market for advisory services in the mutual fund industry is likely to be highly contestable.

22

254

CONFIDENTIAL

channels. As noted above, there has been substantial entry into the mutual fund industry during the period from 1985 to 2008.[43]

53.     Several firms have successfully entered the mutual fund industry. For example, **Exhibit 9** shows the 20 largest mutual fund complexes in terms of assets under management existing in 2008 that did not offer mutual funds in 1998. These 20 complexes that entered the mutual fund business in or after 1998 were ranked in the top 40 percent of all mutual fund complexes in terms of 2008 mutual fund assets under management.

54.     Similarly, many mutual funds have entered the industry in the recent past. **Exhibit 10** presents the twenty largest mutual funds in 2008 that did not exist in 1998. This exhibit shows that funds entered the industry after 1998, and were able to attract substantial assets by 2008. It also shows that some of these funds grew to be industry leaders in terms of assets under management. For example, the Dodge & Cox International Stock fund, which did not exist in 1998, grew to $25 billion in assets by 2008, and was larger than 99.5 percent of all mutual funds.

55.     Clearly, both individual funds and fund complexes enter the industry, and the success of entrants shows there are no substantial barriers to entry in this industry.

*The industry is not concentrated*

56.     When assessing concentration in markets, regulators consider the effect on concentration from potential entrants. These are producers in the same or similar industries with the ability to enter a given market given profit opportunities in that market, but who have not yet

---

[43] John C. Coates and I discuss how the mutual fund business has relatively low costs of entry. See John C. Coates IV and R. Glenn Hubbard, "Competition in the Mutual Fund Industry: Evidence and Implications for Policy," *Journal of Corporation Law* 33 (2007), 151-222 at pp. 167-170, as well as sources it cites.

23

CONFIDENTIAL

done so. When assessing the likely effect of a merger, for example, the Department of Justice requires consideration of such likely entry.[44]

57.    Mutual fund companies could possibly create a new fund to compete, or could adjust the investment objective of an existing fund so that it competes in the market in question.[45] Given the low barriers to entry and the possibility of changes in existing funds' investment objectives, it is reasonable to conclude that the set of funds to consider for purposes of calculating measures of concentration is all mutual funds.[46]

58.    Most mutual fund assets are held at complexes that offer mutual funds in multiple investment categories and through multiple distribution channels. In 2008, approximately 41 percent of complexes distributed mutual funds through more than one of six distribution channels, and these complexes managed approximately 92 percent of mutual fund assets.[47] Similarly, approximately 99 percent of mutual fund assets were held at complexes that offered

---

[44] U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, issued April 2, 1992, revised April 8, 1997, § 1.

[45] Simfund data indicate that approximately one in five of the funds that were in existence throughout 2003 to 2008, changed their Morningstar investment categories at least once during that period (I restricted the period to 2003 to 2008 because Morningstar added new categories between 2002 and 2003). These figures exclude closed-end funds, ETFs, funds of funds, exchange funds, and money market funds.

[46] *Horizontal Merger Guidelines*, *supra* note 44, §§ 1.3 and 3.

[47] These calculations are based on Simfund data. I use the following distribution channels: direct, non-proprietary, proprietary, institutional retirement, institutional non-retirement, and bank retail. The direct, non-proprietary, and proprietary channels are defined by Simfund. The bank retail channel includes funds that Simfund classifies in the bank proprietary distribution channel and retail customer type. The institutional retirement channel includes share classes in Simfund's "institutional" distribution channels and with retirement equal to "Yes." The institutional retirement channel also includes share classes in the Simfund's bank proprietary distribution channel, institutional/trust customer type, and retirement equal to "Yes." The institutional non-retirement channel includes share classes in Simfund's "institutional" distribution channels and with retirement equal to "No." The institutional non-retirement channel also includes share classes in the Simfund's bank proprietary distribution channel, institutional/trust customer type, and retirement equal to "No."

24

CONFIDENTIAL

funds in at least two of seven investment style categories, and approximately 69 percent of assets were held at complexes that offered funds in at least six of seven investment style categories.[48]

59.   The frequency with which complexes offer mutual funds in multiple distribution channels and multiple investment categories implies that many complexes could easily expand and/or enter a new distribution channel or investment category if there were opportunities for economic profit. Consequently, the correct measure of concentration is across all mutual funds. The ability of mutual fund complexes to compete for investors' assets by offering mutual funds through multiple channels and multiple investment categories means that concentration should be measured across all mutual fund assets.

60.   The analysis presented in **Appendix F** indicates that investors will substitute across distribution channels and/or across Morningstar investment categories in response to

---

[48] These calculations are based on Simfund data. The seven investment categories are defined as follows: (1) Domestic Equity - Large is an aggregation of all funds in the following Morningstar categories: Large Blend, Large Growth, and Large Value; (2) Domestic Equity - Mid is an aggregation of all funds in the following Morningstar categories: Mid Blend, Mid Growth, and Mid Value; (3) Domestic Equity - Small is an aggregation of all funds in the following Morningstar categories: Small Blend, Small Growth, and Small Value; (4) International Equity is an aggregation of all funds in the following Morningstar categories: Diversified Emerg Mkts, Diversified Pac/Asia, Europe Stock, Foreign Large Blend, Foreign Large Growth, Foreign Large Value, Foreign Small/Mid Growth, Foreign Small/Mid Value, Foreign Stock, Japan Stock, Latin America Stock, Pac/Asia ex-Japan Stk, Global Real Estate and World Stock; (5) Domestic Bond is an aggregation of all funds in the following Morningstar categories: Bank Loan, High Yield Bond, High Yield Muni, Inflation-Protected Bond, Interm-Term Bond, Intermediate Govt, Long Government, Long-Term Bond, Multisector Bond, Muni CA Interm/Short, Muni CA Long, Muni FL, Muni MA, Muni MN, Muni NJ, Muni NY Interm/Short, Muni NY Long, Muni National Interm, Muni National Long, Muni National Short, Muni OH, Muni PA, Muni Single State Interm, Muni Single State Lng, Muni Single State Short, Short Government, Short-Term Bond, and Ultrashort Bond; (6) International Bond is an aggregation of all funds in the following Morningstar categories: Emerging Markets Bond and World Bond; and (7) Allocation is an aggregation of all funds in the following Morningstar categories: Conservative Allocation, Domestic Hybrid, Moderate Allocation, Target-Date 2000-2014, Target-Date 2015-2029, Target-Date 2030+, and World Allocation.

25

CONFIDENTIAL

changes in relative fees.[49] These results provide another indication that market concentration should be measured across all mutual funds.[50]

61.　　Based on my experience, and the opinions of fellow economists, economists' standard measure of concentration is the Herfindahl-Hirschman Index ("HHI").[51] The HHI can range from zero to 10,000, with lower values indicating less concentration. The U.S. Department of Justice and Federal Trade Commission in their Horizontal Merger Guidelines consider HHI values of 1,000 or less to be unconcentrated.[52]

62.　　**Exhibit 8** shows the HHI of mutual fund assets by complex during the period from 1985 through 2008.[53] The exhibit shows that the HHI for mutual fund assets remained well below 1,000 throughout this period. The lack of concentration in the mutual fund business is consistent with a competitive market.

---

[49] **Exhibit F-3 to Appendix F** shows that the cross-price elasticities for the distribution channels are positive. The exhibit also shows that the own-price elasticity of each of the distribution channels is sufficiently high such that a hypothetical monopolist could not profit from raising the expense ratio of all the funds in a channel. See **Appendix F** for description of the estimation method.

[50] **Exhibit F-4 to Appendix F** shows that the cross-price elasticities for the Morningstar investment categories are positive. The exhibit also shows that the own-price elasticity of each of the distribution channels is sufficiently high such that a hypothetical monopolist could not profit from raising the expense ratio of all the funds in a Morningstar investment category. See **Appendix F** for description of the estimation method.

[51] Dennis W. Carlton and Jeffery M. Perloff, *Modern Industrial Organization*, 4th ed., Pearson Addison Wesley, 2005, p. 255. The U.S. government relies on HHI as a measure of the level of concentration in a market when it is considering whether to challenge mergers on the basis that consolidation might have anticompetitive effects. U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines, supra* note 44, § 1.5.

[52] The *Guidelines* state that most mergers in markets that would result in an HHI below 1,000 do not raise competitive concerns, and the DOJ and FTC generally require no further analysis of such mergers. (*Horizontal Merger Guidelines, supra* note 44, § 1.51).

[53] I computed the HHI using Simfund data on mutual fund assets. These data begin in 1985. The HHI equals the sum of the squared complex shares of mutual fund assets under management. I excluded closed-end funds, ETFs, funds of funds, exchange, and variable annuities from the computation.

26

CONFIDENTIAL

*Mutual fund providers lower their fees*

63.    Mutual fund providers reduce their fees frequently, a fact that is consistent with advisers competing on the basis of fees. **Exhibit 11** presents the percentages of share classes in each year associated with changes in expense ratios of more than 5 basis points.[54] In 2008, approximately 11.7 percent of funds had expense ratio reductions, while approximately 10.3 percent had expense ratio increases. In 2007, approximately 17.5 percent of funds had expense ratio reductions, while only approximately 7.6 percent had expense ratio increases. The relative frequency of expense ratio increases and expense ratio decreases varies over time, but as **Exhibit 11** shows, decreases in expense ratios were common throughout the 2003 to 2008 period. The prevalence of expense ratio reductions is consistent with an industry that competes on expense ratios.

64.    One specific example of fee decreases is the fee war of a few years ago between Fidelity and Vanguard during which fees on index funds fell substantially. This fee war illustrates that mutual fund advisers lower fees in the face of competition.[55]

---

[54] I identify waivers in Simfund by comparing the gross expense ratio (the contracted ratio) with the net expense ratio (the ratio paid by the investor). These two can differ because of waivers, but also because of other factors, such as reimbursements to investors. In my analysis, I focus on differences of more than five basis points because of this ambiguity.

[55] In August 2004, Fidelity made provisional cuts in the fees imposed on five of its index funds "sending an unmistakable shot across the bow of Vanguard, the widely recognized champion of low-fee index investing" (Chet Currier, "Big Three Call the Shots as Fund-Fee Wars Heat Up," *Bloomberg*, April 22, 2005). Vanguard's Chairman, Jack Brennan, dismissed Fidelity's cuts as a marketing ploy, after which Fidelity made the provisional reductions permanent, stating that "Fidelity's price cuts recognize that index funds are regarded as a commodity" (William M. Bulkeley, "Fidelity Makes Fee Cuts Permanent," *The Wall Street Journal*, March 2, 2005, p. C15). Then, around mid-2005, Vanguard responded by lowering the minimum investment in its Admiral share classes to, which have fees as low as 0.09 percent of assets, to $100,000 from $250,000 (Tom Lauricella, "Fidelity Cuts Fees for Big Investors," *The Wall Street Journal*,, October 18, 2005, p. C15). In October 2005, Fidelity responded by cutting the expense ratio by 30 percent on its five Spartan equity index funds for portfolios with assets of $100,000 or more. Fidelity said fees on its newly created Advantage Class shares, which are those with a minimum of $100,000, are now 0.07 percent (Frank Byrt, "Fidelity Cuts Equity Index Fund Fee," *Dow Jones Newswires*, October 17, 2005).

27

CONFIDENTIAL

65.     One way in which mutual fund advisers reduce their expense ratios is through fee waivers. Fee waivers are relatively easy for an adviser to implement because they do not require board or shareholder approval.

66.     CRMC reduced its fees through fee waivers during 2004 to 2008. A fee waiver that began September 1, 2004 reduced the advisory fees of all American Funds by five percent, and this fee reduction waiver was increased to 10 percent beginning April 1, 2005.[56] From September 2004 through June 2008, these waivers reduced management fees paid by American Funds by approximately $1.087 billion, of which approximately $542 million was attributable to reductions in the advisory fees for the Funds.[57] The waiver was implemented to share possible benefits resulting from a period of increased asset growth.[58] The American Funds' boards agreed to end the waiver in December 2008, effective early in 2009.[59]

*Many investors do not face substantial switching costs*

67.     An important feature of open-end mutual funds, like the Funds, is that investors can, on any day, redeem the shares of a mutual fund for the net asset value of the fund.[60] The ability to redeem shares in this manner is an important protection for investors because it allows

---

[56] See, for example, CORBI_0209384-0209400 at CORBI_0209384.

[57] See CRMC Reduction of Management Fee Revenue through June 2008, CORBI_0343225-0343226. Also see CRMC Reduction of Management Fee Revenue through April 2008, CORBI_0350039-0350041; CRMC, Memorandum re Mutual Fund Fee Waiver, March 8, 2005, CORBI_0209384-0209400 at CORBI_0209387.

[58] CRMC, Memorandum on Mutual Fund Fee Waiver, October 13, 2004, CORBI_0219417-0219461 at CORBI_0219417.

[59] Deposition of Kirk Pendleton, February 11, 2009, pp. 209-210. (See also CRMC, Memorandum on Mutual Fund Fee Waiver, November 21, 2008, CORBI_0368697-0368715 at CORBI_0368700)

[60] In some cases, as in the class B shares of the Funds, a redemption fee or back-end load may be deducted from the redemption proceeds.

28

CONFIDENTIAL

investors to "vote with their feet" and easily terminate a relationship with a mutual fund adviser for any reason, including poor performance or a desire to switch to a fund with lower fees.

68.    As I discuss below, the costs to investors of switching from one fund to another have been substantially reduced since the early 1980s. This reduction in switching costs facilitates competition among mutual fund advisers.

69.    One historical barrier was the tax consequences of such a reallocation.[61] In this regard, an important shift has been the increase in mutual fund investments held in retirement savings accounts, such as 401(k) plans and IRA savings accounts. In contrast to mutual fund balances held outside of retirement and other non-taxable accounts, an investor may redeem shares of a mutual fund held in a 401(k), 403(b), or IRA account without incurring a capital gains tax. The elimination of the potential tax liability has reduced the cost of redeeming mutual fund shares.

70.    **Exhibit 12** reports mutual fund assets (excluding money market fund assets) invested through tax-deferred accounts between 1985 and 2007.[62] Since 1985, amounts invested in tax-deferred accounts have increased from $31.1 billion to $3.32 trillion. Over this same period, the percentage of mutual fund assets invested through IRAs and defined contribution pension plans has increased dramatically from about 13 percent to about 42 percent of mutual fund assets. The exhibit also shows that since 1998, over 40 percent of mutual fund assets were held in tax-deferred accounts. Because investors can typically shift investments from a mutual fund to another investment within a tax-deferred account without tax implications, economic

---

[61] Selling shares of a mutual fund may result in a capital gain if the shares are not held in a tax-deferred account. Thus, capital gains taxes can impose a cost on investors who sell shares of one mutual fund in order to purchase shares of another mutual fund.

[62] The data for 2008 were not available.

29

CONFIDENTIAL

theory predicts that the increase in the fraction of mutual fund assets held in tax-deferred accounts will increase the likelihood that mutual fund investors will switch investments in response to a difference in fees and/or mutual fund attributes.[63]

71.    For taxable mutual fund accounts, the potential switching costs imposed by capital gains taxes are lower when capital gains tax rates are lower. The effective maximum long-term capital gains tax rate has fallen from approximately 40 percent in 1977 to approximately 16 percent in 2004.[64] The reduction in maximum long-term capital gains tax rates has reduced the switching costs faced by investors holding mutual funds in non-retirement accounts.

72.    Reductions in loads are another change that has reduced investors' costs of switching mutual funds. Loads may act as a cost that could limit investors' willingness to shift funds. Part of the decline in loads came from a shift by investors from load to no-load funds. Between 1980 and 2001, the percent of equity fund sales to no-load share classes rose from 34 percent to 58 percent, while the share of no-load sales of bond funds increased from 47 percent to 64 percent.[65] From 2001 to 2007, no-load share classes as a percentage of total sales increased

---

[63] The investment committees for large DC plans select the investment vehicles that will be available for thousands of plan participants. Each of the investment committees has a legal obligation to consider fees when selecting investment options for the retirement plan. As a result, investment committees may expend substantial resources in comparing available investment options, including the fees charged on those investment options. For example, many DC plans retain sophisticated consultants to assist them in selecting mutual funds to include as investment options on the plan, while other plans draw on the expertise of employees of the plan sponsor. The relatively large size of many DC plans means that mutual fund complexes have incentives to compete vigorously to be selected for inclusion in the plans' menu of investment options. The competition for the opportunity to be part of a DC plan includes competition on fees as well as competition on fund attributes, including services.

[64] http://www.treas.gov/offices/tax-policy/library/capgain1-2008.pdf, last accessed January 15, 2009. The document explains that the maximum statutory rate on capital gains was 15 percent, but particular classes of capital gains are taxed at higher rates, leading to a slightly higher effective rate.

[65] Brian K. Reid and John D. Rea, "Mutual Fund Distribution Channels and Distribution Costs," Investment Company Institute, 9 *Perspective* 16 (July 2003).

30

CONFIDENTIAL

from 55 percent to 79 percent.[66] Among funds with loads, average front loads declined from 5.6 percentage points in 1980 to 1.25 percent in 2005, and average maximum front loads fell from 8 percent in 1980 to 5 percent in 2005.[67] American Funds introduced its B and C share classes in 2000 and 2001, offering investors the option of investing without front loads.

73.     The introduction and growth of "fund supermarkets" beginning in the 1990s has further reduced investor switching costs by providing a mechanism for no-transaction-fee investing in numerous funds, as well as providing web-based information on funds offered by many different complexes. Another important way in which fund supermarkets have reduced investor transaction costs is that fund supermarkets send each client a consolidated statement reporting information on all accounts held in the supermarket. Hence, the creation of the fund supermarket has allowed investors to achieve the convenience of a single statement and easily transferable assets, while allowing investors to hold mutual funds offered by a variety of fund complexes.[68]

74.     Switching costs have been further reduced by increased disclosure requirements and third-party coverage of the mutual fund industry, which have increased the simplicity with which investors can evaluate and compare mutual fund fees. The easy availability of such information reduces the costs and increases the probability of switching by investors.

75.     Since the early 1980s, new rules and regulations have been implemented to facilitate investors' fee comparisons. Regulatory and lawmaking bodies have passed rules and

---

[66] Investment Company Institute, *2008 Investment Company Fact Book*, 48th Ed., Figure 2.7.

[67] Investment Company Institute, *2006 Investment Company Fact Book*, 46th Ed., p. 39.

[68] Assets in Charles Schwab's Marketplace fund supermarket increased more than fifteen-fold from $31 billion in 1994 to $488.4 billion at the end of 2007 (Charles Schwab, *2007 Annual Report* (2008); Charles Schwab, *1999 Annual Report* (2000), http://www.aboutschwab.com/investor/AR2007/index.html).

31

CONFIDENTIAL

regulations to make fee disclosures more transparent and easier to compare across funds. For example, in 1988, the SEC began to require mutual funds to include a table of fees and expenses in the mutual fund prospectuses.[69] At the same time, the SEC began requiring funds to include an example illustrating how expenses affect the returns shareholders would earn on a hypothetical investment of $1,000 based on hypothetical returns and redemptions at the end of a one-, three-, five-, and ten-year periods.[70] In 1999, the SEC added a line item for shareholder account fees and changed the hypothetical investment to $10,000.[71]  At the same time, the reporting of operating expenses was changed from net of waivers and reimbursements to the full contractual amount, and expenses net of waivers and reimbursements can be presented in a footnote.[72]

76.    In addition to the funds' required disclosures, several third-parties have developed tools that help investors compare fund returns and fees. For example, Morningstar's website provides independent reviews of mutual fund performance and offers free screening tools to allow investors to locate funds with particular performance attributes, including investment category, manager tenure, fund expense ratios, Morningstar ratings, risk, and returns.[73] Morningstar also provides general information on investing through its "Investing Classroom," which includes a mutual fund curriculum.[74] *The Wall Street Journal* and other newspapers publish quarterly reports on fund performance that make it simple for investors to learn about the

---

[69] *Consolidated Disclosure of Mutual Fund Expenses*, February 4, 1988, 53 Fed. Reg. 3192, pp. 10-11.

[70] *Supra* note 69, p. 7.

[71] Investment Company Institute, Press Release: *SEC Adopts Form N-1A Amendments and Profile Rule*, March 20, 1998.

[72] *Supra* note 71.

[73] http://screen.morningstar.com/FundSelector.html?fsection=ToolScreener, last accessed February 22, 2009.

[74] http://news.morningstar.com/classroom2/home.asp?colId=76&CN=COM, last accessed February 22, 2009.

CONFIDENTIAL

performance of their investments and also compare returns across investments.[75] Moreover, to encourage investors to use the information available in required disclosures, the SEC introduced an internet-based "calculator" that allows investors to compare the costs of owning particular funds with the costs of similar funds.[76]

77.     Observing meaningful changes in asset shares of complexes indicates that investors are willing and able to change their allocation of investments across mutual fund complexes. **Exhibit 13** shows the shares of mutual fund assets at the top twenty mutual fund complexes during selected years in the period from 1990 to 2008.[77] The exhibit shows that these shares have varied over time. For example, Vanguard increased its share from approximately 5.8 percent to approximately 15.5 percent while Morgan Stanley's share fell from approximately 3.6 percent to approximately 0.2 percent. These changes in asset shares over time are consistent with competition among mutual fund advisers.

78.     Another way to examine changes in asset shares is to look at how complex rankings by mutual fund asset shares change over time. **Exhibit 14** shows that of the top 20 complexes in 2008, five were not in the top 20 in 2003. In addition, all but one of these complexes in 2003 had a different ranking in 2008. Thirteen of the complexes that were among the top 20 complexes in 2008 improved their rankings from 2003, and six complexes fell to

---

[75] See the "Investing in Funds" page on the *Wall Street Journal's* website, http://online.wsj.com/public/page/2_1579.html, and in particular the drop-down menu under the heading "Investing in Funds: A Monthly Analysis," accessed February 22, 2009.
[76] See http://sec.gov/news/press/pressarchive/1999/99-36.txt for the press announcement about the launch of the mutual fund cost calculator. The calculator itself is available at http://www.sec.gov/investor/tools/mfcc/mfcc-intsec.htm. Both websites were accessed on February 22, 2009.

[77] This table includes more than 20 rows because investors have shifted their assets in sufficient numbers to move several complexes into or out of the top 20 over this 18-year period. I acknowledge that changes in asset shares over time could be due, at least in part, to returns on existing assets. However, I have also examined changes in the same complexes' asset flow shares over time; asset flow shares also change considerably. I have also examined the possibility that some of the changes in asset shares were the result of mergers and found no indication that mergers drive my results.

33

CONFIDENTIAL

worse rankings. These changes in rankings suggest that investors are willing and able to substitute across mutual fund complexes.

### C.    Investors are sensitive to fees

79.    From a demand-side perspective, an economist would expect the competition for investor assets to constrain fees if, as I discuss below, demand for mutual funds is sensitive to fees.[78]

80.    The law of demand is a fundamental principle of economics, which states that, holding everything else constant, when the price of a good (or service) decreases, the quantity demanded for the good rises, and when the price of a good increases, the quantity demanded for the good falls.[79] In other words, the law of demand says that potential purchasers of goods and services care about prices as well as product attributes. There is no economic reason to expect mutual fund investors to be an exception to this rule. In the context of mutual funds, as mentioned previously, investors care about the total cost they face in making a particular mutual fund investment.

81.    Moreover, investor sensitivity to fund performance implies that investors are also sensitive to fees since performance is reported net of fees. Individuals purchase investments such as mutual funds today so that they will have increased wealth in future periods. The amount of wealth that investors will have in future periods is determined by their contributions and by the

_____

[78] While fee sensitivity and the willingness and ability to substitute across mutual funds are important facilitators of competition, it should be remembered that not all investors must possess these characteristics in order for competition to restrain fees. As long as a sufficient number of investors are fee-sensitive and are able and willing to substitute mutual funds, then profit-maximizing mutual fund providers must set fees low enough to attract and retain those investors. Because mutual fund providers are required to charge the same fees to all investors in the same share class, all investors -- including any investors who are not fee-sensitive or who are unable or unwilling to substitute funds -- will benefit from the prices that result from competition for fee-sensitive investors.

[79] Most basic principles of economics textbooks discuss the law of demand. See, for example, Hubbard and O'Brien, *supra* note 37, p. 66.

34

CONFIDENTIAL

returns that their investments will earn. Investors also care about the riskiness of their investments. Thus, investors are naturally concerned with the riskiness and level of returns that mutual funds will earn in future periods. If investors base their expectations of future returns on how funds have performed in the past, then all else equal, funds with relatively good historical returns should attract more assets than funds with relatively poor historical returns. The return that a mutual fund investor receives is net of fees. In other words, the return that an investor receives equals the return to the investment portfolio managed by the mutual fund less the fees charged by the mutual fund. For this reason, investors' concern for return means that investors necessarily care about mutual fund fees.

### Measuring fee sensitivity

82.     **Exhibit 15** shows that investors are overwhelmingly invested in low fee funds. The exhibit presents, for all mutual funds, the percentage of assets invested in mutual funds having expense ratios in the lowest 20 percent, 40 percent, and 50 percent of all expense ratios. Approximately 88 percent of fund assets are in funds with expense ratios at or below the median, and approximately 57 percent of assets are in funds with expense ratios in the bottom 20 percent of all funds' expense ratios.

83.     One would expect the size of front loads to affect investors' purchases of mutual funds.[80] In some of the following analyses, to account for the front load, I calculate a "total shareholder cost" which adds the expense ratio to an annualized version of the front load. Although the front load is paid at the outset, one can think of the amount paid as a cost spread over the life of the investment. Based on research conducted by the Investment Company

---

[80] Investors may also care about back-end loads; however, since back-end loads typically eventually disappear as holding period increases, available data on maximum back-end loads are not a good proxy for back-end loads that investors expect to pay.

35

CONFIDENTIAL

Institute, mutual fund investors, on average, sell about one-fifth of their assets each year.[81] On average, then, investors paying a five percent front load can be thought of as paying one percent of that load each year for the five years those shares are held. This charge is the annualized version of the front load (calculated using load figures for each fund and share class) that I add to each share class' expense ratio to compute the total shareholder cost.

84.    **Exhibit 16** presents the percentage of assets invested in mutual funds having total shareholder costs in the lowest 20 percent, 40 percent, and 50 percent of shareholder costs. Approximately 69 percent of assets are held in funds with total shareholder costs at or below the median.

85.    Although **Exhibits 15** and **16** are consistent with investors being fee-sensitive and preferring low-fee funds, the analysis in the exhibit does not control for other factors that may explain the relationship between assets and fees. For this reason, I use a regression analysis to control for various fund attributes that could be expected to affect the demand for mutual funds. By controlling for fund attributes, I can evaluate the relationship between assets and fees independent of the effect that these fund attributes may have on fund assets, thereby isolating the effect of fee sensitivity on the part of mutual fund investors.

86.    An important aspect of a fund's investment objective is whether the fund is actively or passively managed. On the one hand, an actively managed fund is one in which the investment manager attempts to construct a portfolio of securities that will achieve a high return consistent with the fund's objective. On the other hand, an investment manager operating a passively managed fund attempts to construct a portfolio that mimics the holdings of a particular

---

[81] Investment Company Institute, *2008 Investment Company Fact Book,* 48th Ed., Table 25. The redemption rates from 2003 to 2007 were 24.2, 20.4, 19.7, 19.9, and 22.9 percent.

CONFIDENTIAL

stock or bond market index (for example, the S&P 500 Index). Such funds are also referred to as index funds. Because this case involves only actively managed funds, I limit my analysis to actively managed funds.

87.    The past performance of a fund's portfolio is a fund attribute. Investors interested in achieving the best risk-adjusted return from a mutual fund are likely to examine the past performance of funds in order to select the most appropriate funds. Academic research has shown that past performance of a fund is correlated with increases in flows to that fund, so past performance appears to be an important attribute that shareholders consider when purchasing fund shares.[82]

88.    Other fund attributes that my regression analysis controls for include the Morningstar investment category, number of mutual funds in the complex,[83] distribution channel, Morningstar performance rating,[84] and fund age. Previous research has found these attributes to be related to the amount of mutual fund assets and/or the amount of fund asset flows. In addition, there are intuitive reasons for including these control variables. For example, the paper that I co-wrote with John Coates found that these attributes are significantly related to fund assets.[85]

---

[82] See, for example, K.C. Brown, W. V. Harlow, and Laura T. Starks, "Of Tournaments and Temptations: An Analysis of Managerial Incentives in the Mutual Fund Industry," 51 *Journal of Finance* 85-110 (1996); Judith Chevalier and Glenn Ellison, "Risk Taking by Mutual Funds as a Response to Incentives," 105 *Journal of Political Economy* 1167 (1997); and Erik Sirri and Peter Tufano, "Costly Search and Mutual Fund Flows," 53 *Journal of Finance* 1589-1622 (1998).

[83] Baumol, Goldfeld, Gordon, and Koehn find that fund flows are positively related to the number of funds in a complex (William Baumol, Stephen Goldfeld, Lilli Gordon, and Michael Koehn *The Economics of Mutual Fund Markets: Competition Versus Regulation*, Kluwer Academic Publishers, 1990).

[84] Del Guercio and Tkac report that Morningstar ratings have a significant effect on mutual fund demand. (Diane Del Guercio and Paula Tkac, "Star Power: The Effect of Morningstar Ratings on Mutual Fund Flows," Working Paper, University of Oregon, February 2007).

[85] Coates and Hubbard, *supra* note 43.

37

CONFIDENTIAL

89.     One potential explanation for why large funds have lower fees (other than because investors prefer low-fee funds) is that economies of scale may exist. However, as discussed in more detail below, to the extent economies of scale exist in the mutual fund industry, such economies are modest and become exhausted once complexes reach a certain scale.

90.     In our paper, John Coates and I estimated the relationship between assets and fees using the two-stage least squares regression technique to control for any effect that economies of scale may have on the relationship between mutual fund assets under management and the expense ratio. Our results showed that, all else equal, higher expense ratios were associated with a lower level of assets under management and that this relationship was due to investors' fee sensitivity and not to economies of scale. In the analysis that follows, I provide further evidence that the demand for mutual funds is sensitive to fees.

91.     I have updated the analyses I conducted for the paper with John Coates. Using data for years 2003 to 2008,[86] I find similar results to those in the Coates-Hubbard paper. These results, presented in **Exhibit 17**, show that, all else equal, investors are sensitive to fees.[87] The results show that the amount of money invested in a mutual fund is negatively and significantly related to the fund's expense ratio, with a one percent higher expense ratio being associated with a 2.9 to 3.1 percent fewer assets under management. **Exhibit 18** provides similar results using total shareholder cost as the fee measure. **Appendices D** and **E** provide the coefficient estimates for the explanatory variables in these estimations.

---

[86] I modified the model used in the paper slightly in order to accommodate more fund types (bond, international, etc.).

[87] The estimated regression coefficients not reported in **Exhibits 17** and **18** show that fund attributes significantly affect the amount of assets invested in a fund. All else equal, higher Morningstar ratings and older funds attract more assets. The number of funds offered by a fund's complex also increases the money invested in the fund. The results also show that distribution channels and investment styles can significantly affect the investor demand for a fund.

38

CONFIDENTIAL

92.     For completeness, I also estimated the relationship of assets and fees using a well-accepted but more complicated technique that I and my previous coauthors have used in the past to estimate determinants of mutual fund demand in a forthcoming book.[88] This method also shows that mutual fund demand is sensitive to fees and that this sensitivity is sufficient to restrain fees that American Funds could profitably charge. **Appendix F** describes this method and results.

93.     To summarize, **Exhibits 17** and **18** demonstrate that, holding fund attributes constant, and using the two stage least squares technique to control for any effect that economies of scale may have on the relationship between mutual fund assets under management and fees, lower fees are associated with higher levels of assets. Thus, the results show that demand for mutual funds is sensitive to fees (that is, investors care about fund fees when selecting funds).

**D.      Implications of competition for mutual fund fees**

94.     Given the structural characteristics of the mutual fund industry (many competitors, low concentration, low barriers to entry, and low switching costs), the sensitivity of mutual fund demand to fees will lead profit-maximizing mutual fund complexes to compete on fees. The extent to which individual complexes focus their competitive efforts on fees, as opposed to product attributes, will vary across complexes. Some complexes may position themselves as low-fee options, while other complexes may offer high-quality shareholder services or superior performance in exchange for higher fees. In any event, competition between complexes on the combination of fees and product attributes has and will prevent mutual fund providers from sustaining economically excessive fees.

---

[88] R. Glenn Hubbard, Michael F. Koehn, Stanley I. Ornstein, Jimmy Royer, Marc VanAudenrode, *The Mutual Fund Industry: Competition and Investor Welfare* (forthcoming).

39

CONFIDENTIAL

95.     Given the competitiveness of the mutual fund industry, over the long run, the total shareholder costs charged to mutual funds with similar characteristics cannot exceed the range of fees that would result from arm's-length negotiations.

### E.   Competition forces firms to share the benefits of any economies of scale that may exist

96.     In a competitive market, if there are economies of scale, then in order to avoid losing customers to rival firms, a firm must charge prices that reflect the cost savings that can be achieved with increases in the scale of production. If, for some reason, a firm attempted to avoid sharing the benefits from economies of scale with customers, rival firms would be able to lure customers away from the non-sharing firm by charging lower prices and/or providing higher-quality products. Consumers would shift purchases away from the non-sharing firm and towards the firms sharing the benefits of economies of scale. The non-sharing firm would continue to lose customers until it either went out of business or began to share the benefits of economies of scale. Because, as discussed above, the mutual fund industry is competitive, over the long run, cost savings – including cost savings realized through economies of scale – will be passed on to investors.

### F.   Competition constrains fees even if boards do not negotiate at arm's-length

97.     Plaintiffs state that investors paid excessive fees because the hallmarks of arm's-length bargaining are absent in the annual negotiation between the investment adviser and the mutual fund board over the level of advisory fees.[89] However, even if true, this observation reveals nothing about whether competition constrains mutual fund fees. Additionally, I understand that the standard for approving Rule 12b-1 fees is not that the negotiation on the fee be at arm's length, but that the fee could have resulted from an arms-length negotiation. Because

---

[89] Fourth Amended Complaint, May 16, 2008, ¶ 147.

40

CONFIDENTIAL

advisers compete to attract investors, in the long run, an adviser operating in its own self interest will set fees at the competitive level even if the mutual fund board was unable or unwilling to do so. Thus, a competitive market would prevent advisers from sustaining excessive fees over time even if mutual fund boards did not.[90]

### G.    Variation in fees among mutual fund products is consistent with competition

98.    In competitive markets, firms may compete on product attributes as well as on price. Customers care about these attributes to differing degrees, and a particular customer will purchase the product that provides him or her with the best combination of product attributes and price given that consumer's preferences. For example, in addition to price, coffee store chains compete on the flavor of their coffees and other drinks, product variety, selection of food items, store ambiance, and hours of operation. When purchasing a cup of coffee, one customer may care only about flavor – roast of coffee, type of preparation, amount of added milk, sweetener, or other flavorings – while a second customer may care more about comfortable surroundings at the store, and a third customer may trade off a slightly less flavorful drink and slightly less comfortable surroundings for a lower price. These attributes matter to consumers, and different firms will take different approaches to cater to different groups of consumers.

99.    While basic commodities have little price dispersion in a competitive market, products with different attributes often sell at different prices. Mutual fund advisers, including

---

[90] For example, many advisers launch new mutual funds at a price that is competitive from the beginning with larger, established funds. In a competitive market, a profit-maximizing adviser would not attempt to negotiate a fee above the competitive level for a new fund. This observation holds even though a small, newly launched fund could not have achieved any meaningful economies of scale. In this case, the adviser does not propose fees above the competitive level because such fees would reduce the adviser's long-run expected profits by reducing the fund's ability to attract investors' assets. Even if mutual fund boards were abolished, one would still observe the same competitive pricing strategy for new funds.

Competition for investor assets also explains why advisers make voluntary fee reductions even in the absence of pressure from fund boards.

41

273

CONFIDENTIAL

American Funds, offer mutual funds with features and services that differentiate the funds from mutual funds offered by other complexes. Examples of differences in fund attributes that may lead to variation in fees in a competitive market for mutual funds include differences in investment objective, historical performance, and levels of shareholder services. Some of these characteristics were discussed above; I discuss differences in shareholder services below.

100.    Funds with different objectives invest in different types of investments. Because the costs of operating a mutual fund may vary depending on the type of investments being made, fees charged to shareholders may vary with the investment category of the fund. Fees can vary substantially for different investment categories. For example, among actively managed funds, international equity funds typically have higher fees than domestic large capitalization equity funds. In 2008, the median expense ratio for international equity funds was 1.50 percent, while that for large-capitalization domestic equity funds was 1.25 percent. Domestic bond funds had an even lower median expense ratio -- approximately 0.93 percent in 2008.[91]

101.    Even within the distribution channel through which most of American Funds' assets are distributed, non-proprietary, fees vary substantially across investment categories. For example, in 2008, the median expense ratio of international bond funds in the non-proprietary distribution channel was 1.30 percent, and the median for small capitalization domestic equity funds was 1.95 percent.

102.    Fees vary across distribution channels as well. In 2008, median expense ratios of actively managed funds by Strategic Insight distribution channel ranged from approximately 0.84 percent for funds distributed through the non-retirement institutional channel to approximately

---

[91] The analyses presented in the remainder of this section rely on data from Simfund. In these analyses, I exclude closed-end funds, ETFs, funds of funds, exchange funds, index funds, index-enhanced funds, and money market funds.

42

CONFIDENTIAL

1.63 percent for funds in the proprietary channel. Since different distribution channels entail different levels of service (ease of contact with the complex, amount of educational material provided, or amount of personal financial planning advice offered, for example), it is reasonable that fees would vary across these different channels. Because 12b-1 fees compensate in part for these differences in services, the variation across distribution channels of expense ratios less 12b-1 fees should be less than that for expense ratios. In 2008, median expense ratios net of 12b-1 fees for actively managed funds by distribution channel ranged from approximately 0.81 percent in the non-retirement institutional channel to approximately 1.04 percent in the direct channel. The prevalence of front loads varies across distribution channels as well. For example, in 2008 approximately 36.2 percent of [actively-managed funds in the] non-proprietary share classes have front loads compared to approximately 0.1 percent of share classes in the direct channel.

103.    Fees also vary across load types within a distribution channel. In 2008, median expense ratios of actively managed funds within the non-proprietary channel varied from approximately 0.87 percent for low load funds to approximately 1.89 percent for level load funds, with front load funds having a median of approximately 1.18 percent. Such differences potentially reflect variation in services, but also allow different investors to choose more suitable fee arrangements, depending on their investment horizons. For example, an investor with a short-term investment horizon may be more interested in a share class with no front load, but a higher expense ratio, while an investor with a longer-term investment horizon may be interested in a class with a front load, but low recurring costs going forward.

104.    Differences in levels of service also contribute to different prices across mutual fund complexes. Some firms have many physical investor center locations (for example,

43

CONFIDENTIAL

Fidelity), while others have very few or none at all. Some appear to place emphasis on having shareholder websites (for example, Fidelity, T. Rowe Price), while others do not have websites for shareholders. Likewise, some firms provide guidance and educational tools, while others do not. Investors in funds sold through third parties (like the American Funds) may receive personalized financial advice and investor education from financial advisers who distribute the funds. Complexes also vary in the number of different portfolios they offer and in the overall Morningstar ratings of their portfolios.

105.    American Funds delivers services providing a wide range of benefits to customers. Discussed in more detail in a subsequent section, these services include portfolio management, investment research, investor education, financial advice, retirement planning advice, the ability to adjust investments and learn through American Funds' website, account statements, fund information, and redeemable shares, among others. The provision of services is consistent with a competitive marketplace in which providers compete for investors in part by providing services that investors value.

106.    In summary, mutual fund attributes differ significantly across funds and complexes. Given this variation, one would expect to see fees vary across funds, and such variation in fees is consistent with mutual fund providers competing on fund attributes as well as fees. Each of the American Funds, and share classes of those funds, provide different attributes to investors. This variation is consistent with competition.

44

CONFIDENTIAL

## VIII.   Economies of Scale

### A.      Background

107.   *Economies of scale* exist when long-run average costs of production decrease as output quantity increases. Conversely, *diseconomies of scale* exist when long-run average costs increase as output quantity increases.

108.   In most industries, the relationship between average costs and output is as follows. For relatively low levels of output, economies of scale exist. At some level of output, economies of scale are exhausted. The level of output at which economies of scale are exhausted is called the minimum efficient scale, which is the minimum scale of operations that allows a firm to achieve the minimum long-run average costs. In many industries, the minimum efficient scale is the low end of a range of outputs for which the firm achieves the same average costs. Over this range, the firm does not experience economies of scale or diseconomies of scale. For firms that exceed the high end of this range, average costs increase as output expands. Over this range of output, production exhibits diseconomies of scale.[92] In the mutual fund industry, scale is measured by assets under management, the number of shareholder accounts, or the number of funds.

109.   The plaintiffs assert in their complaint that the defendants failed to share the benefits of economies of scale, stating that "the [American] Funds grew to gargantuan size but so did the expenses."[93] The plaintiffs also assert that "[o]n a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur on both the fund

---

[92] See for example, Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics.*, 6th ed., Pearson Prentice Hall, 2005, p. 237.

[93] See Fourth Amended Complaint, May 16, 2008, ¶ 38.

45

CONFIDENTIAL

complex and portfolio level for various costs incurred."[94] Dr. O'Neal implies that CRMC shared with investors only a small portion of the total savings from economies of scale.[95] The plaintiffs also allege that the CRMC's advisory fees were excessive because economies of scale were not passed on to investors. The following sections explain the proper approach to analyzing economies of scale, and how the plaintiffs and their expert fail to account for the many ways in which CRMC has shared with investors the benefits of any economies of scale that may exist.

**B.      Total costs determine whether economies of scale exist**

110.    To determine whether economies of scale exist, it is necessary to examine how total costs change with the level of output (and to distinguish such cost changes from cost changes resulting from other factors), and it is incorrect to base an analysis of economies of scale on the relationship between output and a subset of costs. An analysis based only on a subset of costs could produce misleading results because the analysis would not allow for the possibility that, even if a firm realizes economies of scale in one function, these economies may be overwhelmed by diseconomies in other functions. Accordingly, an analysis that focuses on only a portion of total costs can often lead to incorrect conclusions.

111.    The following example from Dennis Carlton and Jeffrey M. Perloff's textbook *Modern Industrial Organization* highlights the importance of studying total costs when evaluating whether economies of scale exist.

> Suppose that a firm produces pasteurized milk and delivers it to grocery stores. The fewer the plants, the farther, on average, the milk has to be shipped, and the higher the transportation costs. Even if there are substantial economies of scale in production, it is not efficient to have one plant if transportation costs are very

---

[94] *Ibid.*, ¶ 95.

[95]

REDACTED

46

CONFIDENTIAL

high. The relevant average costs curve is the sum of the costs of producing the milk and the costs of transporting it to customers.[96]

112.    As Carlton and Perloff suggest, focusing on only one component of cost (in their example, transportation or production) could lead to inaccurate conclusions about economies of scale. The same holds true in the mutual fund industry. An analysis of economies of scale in the mutual fund industry should study how the total costs associated with managing and servicing the mutual fund change with the size of the fund.[97] These costs include not only the cost of portfolio management, but may also include the costs associated with shareholder services, transfer agency services, and many other services provided to the fund and its shareholders by the adviser.[98]

113.    Dr. O'Neal's analysis violates this fundamental economic principle. Dr. O'Neal's analysis of economies of scale only considers costs to CRMC alone, ignoring costs required to provide important components of the mutual funds, namely those of AFD and American Funds Service Company ("AFS").[99] As a consequence, Dr. O'Neal's analysis fails to measure economies of scale.

---

[96] Dennis W. Carlton and Jeffery M. Perloff, *supra* note 51, p. 38.

[97] With respect to mutual funds, economies of scale analyses are complicated by the multi-dimensional aspect of a mutual fund. For example, the dimensions of mutual fund quantity include the amount of assets under management, number of shareholder accounts, as well as the amount and quality of services.

[98] As I discuss below, an analysis of economies of scale also needs to control for product changes. In the case of mutual funds, one would need to control for changes in the types and levels of service provided.

[99] O'Neal Report, ¶ 60.

47

CONFIDENTIAL

C.   **An economic analysis of mutual fund scale economies is properly done at the complex level**

## REDACTED

[101]

115.   Because important components of CRMC's costs are joint and common across funds, the cost of managing and servicing a single fund can be estimated only by allocating the shared costs among the various funds in the complex. For example, CRMC's expenses are composed of "research expenses that could not be meaningfully allocated among the many funds managed by CRMC."[102] In managing fund portfolios, analysts provide analysis for several components of different funds, making their efforts difficult to allocate to particular funds.[103]

116.   When a cost is joint and common to multiple products, it is impossible to measure the cost of a single product without ambiguity because there is more than one reasonable way to allocate the joint-and-common cost to the different products.[104] In such cases, different reasonable allocations of joint-and-common costs can produce very different measures of

---

[100] AMBAL / IFA Directors Information Book, August 14, 2008, CORBI_00343128-00343297 at CORBI_0343133-CORBI_0343134.

[101] AMBAL / IFA Directors Information Book, August 14, 2008, CORBI_00343128-00343297 at CORBI_0343133-CORBI_0343134.

[102] Minutes of Joint Meeting of Contract Committees of the Boards of Directors for American High-Income Trust ("AHIT"), the Bond Fund of America ("BFA"), Capital World Bond Fund, Inc. ("WBF"), Intermediate Bond Fund of America ("IBFA"), the Tax-Exempt Money Fund of America ("CTEX"), the U.S. Treasury Money Fund of America, Inc. ("CTRS"), August 9, 2006, CORBI_0051852-0051859 at CORBI_0051857.

[103] Paul Haaga, Email to Various Recipients re Conference Call, May 24, 2005, CORBI_0416413.  See also the Deposition of Richard Newman, October 28, 2008, p. 113, lines 18-24.

[104] Kirk Pendleton, a non-interested director of the AMCAP fund, explained that such allocations are difficult at best and ambiguous.  Deposition of Kirk Pendleton, February 11, 2009, pp. 260-261.

48

CONFIDENTIAL

# REDACTED

**D.     Evidence that mutual fund economies of scale are not substantial**

*Difficulties of analyzing the relationship between average total cost and assets*

118.     A difficulty with analyzing relationships between average total cost and mutual fund assets is determining whether an observed difference in costs results from differences in assets under management or from other factors. When a fund's average costs decrease over a period in which the funds' assets increase, scale economies are only one possible explanation for the decrease in average costs. There are numerous other reasons why costs could change irrespective of scale. For example, a technological change could have reduced the cost of providing mutual fund services at every asset level. Similarly, the price of an input (including, for example, wages and salaries) may have fallen, reducing the cost of providing mutual fund services at all asset levels. Additionally, the mutual fund adviser may have taken steps to be more cost efficient, and this efficiency may have nothing to do with scale. Finally, the adviser may have changed the level or quality of shareholder services that it provides, which would make it more or less costly to provide mutual fund services at every level of assets. In summary, economies of scale are only one of many factors that may cause costs to vary over time or across

49

CONFIDENTIAL

funds. Therefore, one needs to be very careful in drawing conclusions about the cause of any observed correlation between costs and assets under management.

*Academic research*

119.    Research on economies of scale in the mutual fund industry has been limited by a lack of industry cost data. As a substitute for cost data, the existing published research on mutual fund economies of scale has focused on the relationship between fees and assets under management. The use of fees as a proxy for costs is unsatisfactory because costs are only one of many factors that affect fees. Nonetheless, academic research generally concludes that, while economies of scale may exist for low levels of assets, there is no consensus as to the magnitude of any scale economies or the level of assets at which scale economies are exhausted.[105]

*Survivorship rates*

120.    In a recent article, John Coates and I study the importance of economies of scale in the equity mutual fund industry by looking at the survival rate of funds and complexes of various sizes.[106] The survivorship method is based on the intuitive idea that, if there exists a range of firm sizes that allow a firm to produce more efficiently, then firms outside this range would be at a cost disadvantage relative to the firms within the range of efficient sizes. Thus, if economies of scale were large and inexhaustible (that is, existing at all levels of output), then in a

---

[105] Sean Collins and Phillip Mack look at the relationship between expense ratios and complex assets. They report that complex-level economies of scale become exhausted somewhere in the range of $20 billion to $40 billion in complex assets under management. (Sean Collins and Phillip Mack, "The Optimal Amount of Assets under Management in the Mutual Fund Industry," *Financial Analysts Journal* 67-73 (September/October 1997)). David A. Latzko looks at the relationship between expense ratios and fund assets and concludes that economies of scale are exhausted by $3.5 billion in fund assets under management. (David A. Latzko, "Economies of Scale in Mutual Fund Administration," 22 *Journal of Financial Research* 331-39 (Fall 1999)).

[106] John C. Coates IV and R. Glenn Hubbard, "Competition in the Mutual Fund Industry: Evidence and Implications for Policy," 33 *Journal of Corporation Law* 190-191 (2007).

CONFIDENTIAL

competitive industry, only a very small number of very large firms would survive because small firms would be at a substantial cost disadvantage relative to large firms. Conversely, if economies of scale are relatively unimportant, then size would not confer a cost advantage, and firms of a wide variety of sizes could survive and compete with one another.

121. John Coates and I find that hundreds of complexes of varying sizes continue to offer thousands of funds of varying sizes for long periods of time. I used updated data to perform a survivorship study similar to the study in Coates and Hubbard. **Exhibit 19** presents information on mutual funds that existed in 1988 and 1998 and the extent to which they survived in 2008 by size deciles based on assets under management.[107] The exhibit shows that substantial portions of surviving funds remained in the same size decile (or lower deciles) after 10 or 20 years. **Exhibit 20** shows that the same is true for mutual fund complexes grouped by assets under management.

122. Together, **Exhibits 19** and **20** show that small funds and complexes survive alongside large funds and complexes over long periods of time. Given the competitiveness of the mutual fund business,[108] this dispersion in the size of funds and complexes is simply inconsistent with large and inexhaustible economies of scale. Thus, economies of scale cannot be a defining feature of the industry, and any such economies are at most small relative to the size of the market. In other words, economies of scale are not large and inexhaustible.

# REDACTED

---

[107] For purposes of the analyses in this paragraph, all assets are included except money market funds.

[108] See, *supra* Section VII.

51

CONFIDENTIAL

informed business judgments regarding the relevant economic issues at CRMC. Among other things, CRMC has provided such information to the Boards via "directors' information books" as part of the annual 15(c) process.[109] These books contain qualitative discussions of economies of scale as well as data on the Funds' investment advisory fees and their associated breakpoints.[110]

## REDACTED

[111] I have reviewed materials presented to the Boards pertaining to economies of scale, and I have found these materials to be relevant, informative, and helpful to a reader assessing economies of scale at CRMC. The materials provide background on investment advisory fee schedules, and comparisons of performance and share redemption rates to indices, among other information. As I discuss above, the Directors receive comparison of the Funds' fees relative to their respective Lipper peer groups.[112] The comparisons show that the Funds' expense ratios and advisory fees are among the

---

[109] CORBI_0009886-0010205, CORBI_0010480-0010637, CORBI_0017716-0017975, CORBI_0017994-0018277, CORBI_0018283-0018503, CORBI_0018519-0018784, CORBI_0019482-0019832, CORBI_0019838-0020076, CORBI_0020916-0021200, CORBI_0029650-0029954, CORBI_0029955-0030185, CORBI_0030195-0030402, CORBI_0031068-0031371, CORBI_0031387-0031642, CORBI_0032009-0032326, CORBI_0032599-0032886, CORBI_0040542-0040873, CORBI_0040893-0041162, CORBI_0041630-0042155, CORBI_0042623-0042953, CORBI_0051878-0052937, CORBI_0097547-0097801, CORBI_0339511-0339758, CORBI_0342049-0342299, CORBI_0342556-0342722, CORBI_0343128-0343297, CORBI_0347930-0348081, CORBI_0349760-0349912, CORBI_0349961-0350109, CORBI_0358746-0358867, CORBI_0468440-0468879, CORBI_0468917-0469261, CORBI_0469418-0469421, CORBI_0469428-0469798, CORBI_0470302- 0470422, and CORBI_041960-0042155 (2003-2008 American Funds directors' information books).

[110] See, for example, CORBI_0017994-0018277 at CORBI_0018014-0018015, CORBI_0018018, and CORBI_0018222-0018229; and CORBI_0343128-0343297 at CORBI_0343143-0343144, CORBI_0343155-0343157, and CORBI_0343191-0343199 (2003 and 2008 American Funds directors' information books).

[111] CORBI_0230802-0230819 (and tabs and exhibits at CORBI_0230820-0231006, CORBI_0231009-0231264, and CORBI_0231285-0231580). For deposition testimony on issues related to economies of scale, see, for example, the deposition of Gail Neale, August 19, 2008, pp. 26-35, 70-72, 74-79, 103-107, 136-140, and 142-152; the deposition of H. Frederick Christie, July, 15, 2008, pp. 29-40, 49-65, and 194-197; the deposition of Martin Fenton, May 8, 2008, pp. 129-132, 152-154, and 161-174; the deposition of Patricia Woolf, pp. 26-27, 33-35, 68-71, 73-77, 81-83, 85, 88-90, 94, 107, and 114-115; the deposition of Richard Newman, October 28, 2008, pp. 25-29, 32-35, 59-60, and 62-63; and the deposition of Paul Haaga, January 28, 2009, pp. 8-32, 50-58, 90-94, and 170-175.

[112] See paragraph 40 above.

52

CONFIDENTIAL

lowest and in some cases the lowest, in their respective peer group. These facts indicate that the Funds share benefits of any economies of scale that may exist through low fees.[113]

### F.    CRMC shares the benefits of any economies of scale

124.    As I discuss in Section VII.E, competition in the mutual fund industry is sufficient to guarantee that shareholders benefit from any economies of scale that may exist. In this section, I discuss some of the ways that CRMC has shared the benefits of any scale economies that may exist.

*Low fees*

125.    The simple fact that the Funds' fees are very low relative to those of other similar mutual funds indicates that investors are sharing in the benefits of any economies of scale that may exist at American Funds.

*Management fee breakpoints*

126.    As was the case for expense ratios, advisory fees charged to the Funds were very low in comparison to those of peer groups. Management fee (or advisory fee) schedules are one way that CRMC shares with investors any economies of scale that may exist.[114] The

---

[113] The SEC considers low fees one of the ways that Funds may share benefits of scale economies. Division of Investment Management, U.S. Securities and Exchange Commission, "Report on Mutual Fund Fees and Expenses," December 2000, § IV.B.1.

[114] CRMC takes into account any economies of scale when setting its management fees, as is described in a number of internal CRMC documents, including an August 2006 white paper to the American Funds' boards of directors. (See CORBI_0230802-0230819 at CORBI_0230803) A July 2004 CRMC memo states as its objective the examination of management fees in order to "determine if economies of scale could be better shared with the shareholder." (See CORBI_0248911-0248917 at CORBI_0248911.) Also, at a May 2005 meeting of the Governance and Contracts Committee for Growth Fund of America, Inc., the members of the committee "noted that the advisory fee structure included significant breakpoints as fund assets increase, in order to reflect economies of scale." CORBI_0253285-0253302 at CORBI_0253285.

CONFIDENTIAL

management fee schedules include "breakpoints" that lower fees paid by the Funds.[115] As mutual

fund assets at CRMC increase, the management fee declines. Such declines in the management

fee as assets grow automatically share economies of scale, if any, with investors by reducing the

American Funds' expense ratios.

127.    During the period from 2003-2007, the advisory fee schedules for the American

Funds at issue in this matter varied across funds as well as over time. **Exhibits 21A** through **21H**

represent graphically the advisory fee schedules of the Funds over time and at differing levels of

assets. For each fund, the advisory fees decline significantly as assets increase. For example, in

**Exhibit 21A**, the advisory fee schedule effective July 1, 1993 for AMCAP showed an advisory

fee just below 35 basis points at an asset level of $10 billion and a 32 basis point advisory fee

once assets reach $35 billion. These exhibits show that the Funds' management fee schedules

include breakpoints that reduce fees as assets increase and that several of these changes in the fee

schedules have occurred since 2003. Over time, the Funds' directors have approved changes in

these breakpoints. This change can be seen in the shifting downward of the schedules depicted

on **Exhibits 21A** through **21H**. For example, **Exhibit 21B** for AMBAL shows that the advisory

fee schedule effective November 1, 1997 provided for higher fees at the same asset levels than

did the fee schedule that became effective January 1, 2006.

128.    Not only have the Boards approved some of CRMC's proposed reductions in fees;

they have also actively sought reductions in fees and at times questioned CRMC's fee structures,

as is evidenced by the minutes of several American Fund contracts committee meetings. In an

August 2002 meeting of the AMBAL and IFA) contracts committees, the Boards asked CRMC

---

[115] See advisory fee history, *supra* note 110; the deposition of Gail Neale, August 19, 2008, pp. 33-35, 70-72, 74-79, and 139-140; the deposition of H. Frederick Christie, July, 15, 2008, pp. 49-65; the deposition of Martin Fenton, May 8, 2008, pp. 129-132, 152-154, and 161-164; and the deposition of Richard Newman, October 28, 2008, pp. 25-28 and 62-63.

54

CONFIDENTIAL

to consider adding additional breakpoints to the AMBAL advisory fee schedule and to consider lowering the IFA advisory fee to be "more in line" with the AMBAL fee.[116] During 2004, the AMBAL and IFA contracts committees asked why CRMC proposed a five-percent advisory fee waiver (as opposed to some other percentage).[117] In questioning the appropriateness of some of CRMC's fees, the Boards have also asked CRMC for "additional information about the nature of [economies of scale] and the way in which advisory fees and breakpoints are set in order to share those economies with shareholders as the Funds' asset levels grow."[118]

129.    Changes in the fee schedules have led to substantial savings to investors. **Exhibit 22** shows that during the 2003-2008 period, the introduction of new fee schedules and the effects of breakpoints reduced the corresponding fees paid by approximately REDACTED The magnitude of these savings is consistent with internal CRMC documents in which the effects of breakpoints have in reducing management fee revenues is measured.  For example, in one instance, CRMC measured these reductions in fees paid by the Funds comparing fees that would have prevailed using fiscal year 2003's fee schedule applied to assets in fiscal year 2004 with the fees that were actually charged in fiscal year 2004.[119] A similar CRMC analysis for the period

---

[116] AMBAL / IFA Contracts Committee Meeting Minutes, August 15, 2002, CORBI_0097813-0097815 at CORBI_0097814.

[117] AMBAL / IFA Contracts Committee Meeting Minutes, August 12, 2004, CORBI_0051875-0051877 at CORBI_0051876-77.

[118] FI / GFA Contracts Committee Meeting Minutes, August 11, 2004, CORBI_0030416-0030419 at CORBI_0030416-18. Also see, for example, FI / GFA Contracts Committee Meeting Minutes, May 18, 2004, CORBI_0032015-0032020 at CORBI_0032018-19; FI / GFA Contracts Committee Meeting Minutes, May 24, 2005, CORBI_0041164-0041168 at CORBI_0041167; AMBAL / IFA Contracts Committee Meeting Minutes, October 19, 2004, CORBI_0029646-0029649 at CORBI_0029647-48.

[119] This calculation is illustrated in CRMC, Memorandum re Mutual Fund Fee Waiver, October 13, 2004, CORBI_0219417-0219461 at CORBI_0219433, Exhibit A.  By comparing actual fees to hypothetical fees calculated based on last year's fee schedule and current assets, CRMC is also implicitly capturing the effect of any new fee schedule introductions, if any occurred during the year.

55

CONFIDENTIAL

July 2001 through June 2008 indicates total savings from breakpoints for all American Funds was over REDACTED and savings were more than REDACTED for the Funds.[120]

*Fee waivers*

130.    As discussed above, American Funds reduced its fees through fee waivers during September 2004 to June 2008 by approximately REDACTED For the Funds at issue in this case, American Funds waived fees worth approximately .REDACTED for the same period. Thus, if American Funds was experiencing economies of scale during this period, these fee waivers would have share the benefits of such economies of scale with investors.

*Transfer agent fees*

131.    CRMC provides transfer agent services at cost to the American Funds through its subsidiary, AFS.[121] The Funds' contracts with AFS set out fees charged to the Funds that allow AFS to earn amounts sufficient to provide capital for facilities and operations, but AFS may not distribute accumulated earnings to its parent or affiliates.[122] This means that any reduction in cost at AFS is passed along to investors in the form of lower fees. As a consequence, if there are any cost reductions at AFS that result from economies of scale, those are passed on to investors, and those economies are shared with the investors.

---

[120] CRMC Reduction of Management Fee Revenue through June 2008, CORBI_0343225-226. Also see CRMC Reduction of Management Fee Revenue through April 2008, CORBI_0350039-041. CRMC, Memorandum re Mutual Fund Fee Waiver, March 8, 2005, CORBI_0209384-0209400 at CORBI_0209387.

[121] CRMC, Economies of Scale White Paper, August 11, 2006, CORBI_0230802-0230819 at CORBI_0230812.

[122] AMBAL / IFA Directors' Information Book, August 18, 2005, CORBI_0040542-00405873 at CORBI_0040774.

56

CONFIDENTIAL

# REDACTED

From fiscal years 2002 through 2007, these companies spent more than REDACTED on such technology, with annual spending increasing from REDACTED in fiscal 2002 to REDACTED in fiscal 2007, a compound annual increase of REDACTED [125]

---

[123] 2002-2007 Americanfunds.com – Shareholder Enhancements, CORBI_0248919-0248946.

[124] See http://www.americanfunds.com/custom-home.htm.

[125] The REDACTED in technology expenditures includes allocations of common costs (*e.g.*, costs of "associates") and is for CRMC, ASD, ASF, and Capital Research Company, an affiliated company that serves CRMC's investment research needs. Capital Bank and Trust Company's technology expenditures, a subsidiary of Capital Group Companies, Inc., are excluded from the REDACTED See Capital Group Companies, Inc., Charts on Technology Expenses, Number of Offices and Staffing Growth, CORBI_0248892-0248909 at CORBI_0248900.

57

CONFIDENTIAL

134.    CRMC also shares the benefits of potential economies of scale with investors through investments in research capabilities. For example, during the period from June 2002 through June 2006, CRMC and Capital Research Company increased the number of equity and fixed income research analysts and associates they employed by REDACTED   in June 2002, they employed REDACTED research analysts and associates; by June 2006, they employed REDACTED.[126]

135.    Furthermore, since 2003, CRMC and its affiliated companies invested in improving transfer agent/administrative services to the direct benefit of American Fund shareholders. Regular transfer agent services, which are provided by AFS or third parties, include shareholder account maintenance, transaction processing, tax information reporting, and shareholder and fund communications.[127]

136.    American Fund shareholders have also benefited from the defendants' investments in services for and in the education of financial advisers. According to Gail Neale, an American Funds director, the in-depth knowledge of the various American Funds that financial advisers gain from the defendants' education programs helps them to serve shareholders better.[128] As discussed below, one of the primary services financial advisers provide to shareholders is investment guidance (which involves, among other things, consideration of shareholders' investment horizons, the composition of assets in the various American Funds, the

---

[126] See, for example, AMBAL / IFA Directors' Information Book, August 14, 2003, CORBI_0017994-0018277 at CORBI_0018158; and AMBAL / IFA Directors Information Book, August 17, 2006, CORBI_0051878-0052235 at CORBI_0052092.

[127] See, for example, CORBI_0343128-0343297 at CORBI_0343268.

[128] See the deposition of Gail Neale, August 19, 2008, pp. 74-80, 149-152, and 241-250. Also see the deposition of Kenneth Gorvetzian, November 24, 2008, pp. 256-277; the deposition of Martin Fenton, pp. 138-140; the deposition of Patricia Woolf, July 30, 2008, pp. 149-151 and 153-154; the deposition of Richard Newman, October 28, 2008, pp. 18-20, 50-51, 73-78, and 92-97; the deposition of David Short, January 14, 2009, pp. 41-43, 149-152, and 197-200; and the deposition of Paul Haaga, January 28, 2009, pp. 101-103, 120-128, 138-141, and 153-154. Kevin Clifford explained that AFD pays additional compensation to selected broker-dealers to support efforts to educate and train advisers; deposition of Kevin Clifford, January 23, 2009, pp. 43-47.

58

CONFIDENTIAL

funds' investment objectives, etc.). AFD assists financial advisers with this guidance by
providing an online fund selection tool (known as "Portfolio Planner") as well as software-
generated hypothetical investment illustrations, or "hypos," that forecast investment returns
under alternative scenarios.[129] AFD's service centers also fulfill requests (on the order of several
thousand per day) from financial advisers seeking literature or other information about American
Funds.[130] The fact that American Fund shareholders have been satisfied with the services
provided by financial advisers and, more generally, with the performance of the funds is
reflected in the relatively low redemption rates of American Fund shares.[131] During the 2003-
2008 period, redemption rates for the American Fund shares at issue in this matter have been
consistently lower than those of other funds in the industry.[132]

     137.   The methods by which American Funds share potential economies of scale
provide benefits to investors regardless of whether the Funds are experiencing economies of
scale. Thus, even if it were possible to evaluate economies of scale with precision, such an
analysis would not alter the conclusion that investors in the Funds are sharing the in benefits of
any economies of scale.

---

[129] After an adviser selects the investor's time horizon (or income need) and risk tolerance, the Portfolio Planner
software recommends asset allocations; the adviser then selects funds and creates presentations for the investor. See,
for example, CORBI_0209403-0209408 and CORBI_0209265-0209293 at CORBI_0209282. AFD generated tens
of thousands of hypos per month during the August 2006-July 2008 period. CORBI_0362622-0362872 at
CORBI_0362668.

[130] CORBI_0182004-0182137 at CORBI_0182022; and CORBI_0362622-0362872 at CORBI_0362668.

[131] See, for example, the deposition of Martin Fenton, pp. 138-143; the deposition of Patricia Woolf, July 30, 2008,
pp. 153-154; and the deposition of Richard Newman, October 28, 2008, pp. 57-59.

[132] In the American Funds directors' information books, redemption rates are defined as the annualized three-month
moving total redemptions as a percentage of assets. See CORBI_0343128-0343297 at CORBI_0343266;
CORBI_0347930-0348081 at CORBI_0348071; CORBI_0342049-0342299 at CORBI_0342266; CORBI_0349961-
0350109 at CORBI_0350099-0350100; CORBI_0097547-0097801 at CORBI_0097779; and CORBI_0358746-
0358867 at CORBI_0358861 (American Funds 2007 and 2008 directors' information books).

59

CONFIDENTIAL

**IX.**     **Flaws in Dr. O'Neal's Economies of Scale Analysis**

     **A.**      **Analysis of CRMC financial data**

     138.     Dr. O'Neal claims that economies of scale exist in the mutual fund industry. Part of his justification is that it "costs essentially the same to research a stock in which the fund might buy one thousand shares as it does one in which the fund might buy one million shares."[133] On the basis of this unsupported claim, Dr. O'Neal proceeds to analyze a portion of CRMC-specific costs as though its costs exhibit economies of scale.

     139.     Because Dr. O'Neal's analysis evaluates only CRMC expenses (that is, it excludes AFS and AFD expenses), it violates the principle that economies of scale should be based on total costs. Specifically, the analysis excludes the costs associated with the various other types of services provided to the Funds and their shareholders, including, for example, shareholder services, transfer agency services, custodial services, etc. Thus, the analysis says nothing meaningful about economies of scale in connection with managing and servicing the Funds because it does not address how average total costs change with fund size.

     140.     Furthermore, as part of his calculation, Dr. O'Neal has altered CRMC's financial statements to conduct his "analysis." He claims that part of CRMC's employee compensation, the portion paid through a "profit sharing plan" comes from profit, and therefore is not an expense of the company. I have been informed that CRMC considers these payments to be a compensation expense and not profit. Dr. O'Neal's claim that this employee compensation is the same as profit makes no economic sense, as compensation is clearly a cost to CRMC. Lastly,

---

[133] O'Neal Report, *supra* note 2, paragraph 49.

CONFIDENTIAL

CRMC's compensation is competitive with the industry.[134] Consequently, Dr. O'Neal's alteration of CRMC's financials is incorrect.

141.  Economies of scale pertain to long-run total costs. Dr. O'Neal has done no analysis of how size affects long-run total costs, nor has he attempted to control for how changes in technology or changes in input costs have affected the costs of CRMC. He has done no analysis capable of evaluating whether economies of scale exist in the production of the Funds during the relevant period.

142.  In summary, Dr. O'Neal's purported analysis violates many economic principles related to the calculation of economies of scale. Consequently, the analysis is fundamentally flawed and unreliable.

**B.    Sharing of economies of scale**

143.  In his report, Dr. O'Neal purports to "derive an estimate of the size of economies of scale that were realized by CRMC."[135] However, his approach is plagued with fundamental errors and does not provide any information about whether economies of scale exist or the degree to which any such economies are shared.

144.  As I discussed in Section VIII.F, there are several mechanisms through which CRMC shares any economies of scale that may exist. Dr. O'Neal's "sharing analysis," however, assumes that the only way to share economies of scale is through fee reductions.  This definition defies economic logic because it ignores the fact that investors can benefit from service

---

[134] CRMC recognizes that "attracting and retaining investment talent is a critical part" of its success, and that employees other alternatives are "at least equally lucrative." CRMC, Mutual Fund Fee Waiver Memorandum, October 13, 2004, , CORBI_0219417-0219461 at CORBI_0219454.

[135] O'Neal Report, *supra* note 2, paragraph 59.

61

CONFIDENTIAL

enhancements, from reductions in transfer agency fees, and from overall low fees that do not result from breakpoints.[136]

145.    In any event, Dr. O'Neal reports that, according to his (flawed and unreliable) calculations, over the period from 2004 to 2007 alone, CRMC has shared close to REDACTED million in economies of scale benefits with investors in the American Funds.[137] Thus, Dr. O'Neal concludes that CRMC has, in fact, shared economies of scale with the Funds.

146.    To the extent that Dr. O'Neal is taking issue with a portion of the benefits of any economies of scale that CRMC shared with the Funds, I understand that no policy requires advisers to pass along all cost savings to investors. In fact, such a policy would reduce advisers' incentives to find ways to reduce costs. For this reason, requiring advisers to pass along all cost savings from economies of scale would not make economic sense and, in the long run, could result in higher costs and fees.

## X.    Flaws in the Plaintiffs' and Dr. O'Neal's Analyses of Rule 12b-1 Fees

### A.    Plaintiffs' allegations

147.    The plaintiffs allege in their complaint that the Funds' 12b-1 fees are too high. There is no support for this assertion. The use of 12b-1 fees varies with distribution channel and load structure. For example, in 2008, among actively managed funds in the direct distribution channel, 5 percent of share classes had 12b-1 fees above 27.5 basis points, whereas in the non-proprietary channel, 61 percent did. Any analysis comparing 12b-1 fees that does not account for distribution channel and load type will be misleading, as the plaintiffs' comparisons are.

---

[136] Dr. O'Neal's assumption is also inconsistent with the views of the SEC, which recognize that economies of scale may be shared through the provision of additional services. Division of Investment Management, U.S. Securities and Exchange Commission, "Report on Mutual Fund Fees and Expenses," December 2000, § IV.B.1.

[137] O'Neal Report, *supra* note 2, Table 24.

CONFIDENTIAL

Similarly, within a distribution channel, it is important to control for load type. For example, among non-proprietary channel funds, 99.6 percent of share classes with a back or level load have 12b-1 fees greater than 27.5 basis points compared to only 18.4 percent of funds with a front load.[138]

148.    Comparisons of 12b-1 fees by distribution channel and load type shows that many funds charge very similar fees. For example, among share classes in the non-proprietary channel with a front load, 59 percent had 12b-1 fees between 22.5 and 27.5 basis points.[139]

149.    To compare the Funds' 12b-1 fees in a meaningful way, I have calculated the number of peer group share classes within 2.5 basis points (above or below) of 25, and the number of share classes below or above this range. I calculated similar numbers for the B and C share classes, which tend to cluster around 100 basis points. Results from these calculations are presented in **Exhibit 23**. These results show that, contrary to the plaintiffs' assertions, the Fund's 12b-1 fees are within the range of most share classes in their respective peer groups.

150.    The plaintiffs also allege that 12b-1 fees of the Funds, as a ratio of the Funds' advisory fees, are too high.  However, as a matter of arithmetic, this outcome is not because the Funds' 12b-1 fees are too high, but because their advisory fees are very low. ·

REDACTED

Incidentally, in part because of these low advisory fees, the Funds' expense ratios are extremely low, as was shown in

---

[138] These figures are calculated using data from Simfund.  I exclude closed-end funds, ETFs, funds of funds, exchange funds, index funds, enhanced-index funds, and money market funds from the computation.

[139] These figures are calculated using data from Simfund and imposing the same restrictions as described in note 138.

CONFIDENTIAL

**Exhibits 7A through 7H.** Investors incur very low expenses from the Funds, not excessive fees as alleged by the plaintiffs.

**B.    Flaws in Dr. O'Neal's analyses of 12b-1 fees**

151.    Dr. O'Neal purports to analyze the benefit to shareholders from paying 12b-1 fees.[140] Dr. O'Neal's analysis is improperly conceived because, as mentioned above, investors evaluate the total cost of investing in mutual funds when deciding whether to purchase shares. As a result, independent analysis of one isolated component of total cost (those related to distribution) is not appropriate.

152.    Dr. O'Neal measures the benefit from 12b-1 fees in the same way he measured the benefits from economies of scale: by comparing actual management fees to hypothetical fees held fixed at their level in 2003. As pointed out above, this does not include all of the benefits to investors from services provided in exchange for 12b-1 fees.

REDACTED

As a result, his claim that "…the gaps by which 12b-1 costs to American fund shareholders exceeded the benefits received by those shareholders as a result of growth in the underlying assets of the funds were…large…"[141] is incorrectly measured and is therefore unreliable.

---

[140] O'Neal Report, *supra* note 2, paragraphs 71-80.

[141] O'Neal Report, *supra* note 2, paragraph 79.

64

CONFIDENTIAL

153.    Dr. O'Neal does not understand the economics of mutual fund distribution. If American Funds did not compensate broker-dealers or financial advisers, those broker-dealers would not provide services to investors, and the product as we know it today would cease to exist.[142] For example, the termination of broker-dealer compensation would likely have caused broker-dealers to charge investors directly or force investors to forgo services they demand currently. Investors that prefer not to have broker-dealer services can currently invest through other distribution channels.

154.    The fees that the Funds pay for distribution services are not excessive. Rather, as shown in **Exhibit 23**, the Funds have roughly the same 12b-1 fees as most other funds in the non-proprietary channel.

**XI.    Conclusion**

155.    The fees that CRMC charged to the Funds were within the range of fees prevailing in the competitive market for mutual funds. As such, these fees were not excessive from an economic perspective.

Signed on the 26th day of February, 2009, at New York, New York.

_R. Glen  Hubbard_
R. Glenn Hubbard

---

[142] The fees for distribution are determined by competition among broker-dealers. According to a RAND report sponsored by the SEC, as of 2006, there were more than 5,000 registered U.S. broker dealer firms in the United States. RAND technical report sponsored by the SEC, "Investor and Industry Perspectives on Investment Advisers and Broker-Dealers," 2008, pp. 189 and 192. In this case, I understand that AFD has selling group agreements with over 2,500 broker dealer firms. See, for example, CORBI_0182004-0182137 at CORBI_0182020.

65

CONFIDENTIAL

# Appendix A

### ROBERT GLENN HUBBARD

*Curriculum Vitae*

**PERSONAL DATA**

| | |
|---|---|
| Born: | In Orlando, Florida. |
| Marital Status: | Married to Constance Pond Hubbard. Two children, Robert Andrew Pond Hubbard and William Charles Pond Hubbard. |

**FIELDS OF SPECIALIZATION**

Public Economics, Corporate Finance and Financial Institutions, Macroeconomics, Industrial Organization, Natural Resource Economics, Public Policy.

**EDUCATION**

Ph.D., Economics, Harvard University, May 1983.
Dissertation: *Three Essays on Government Debt and Asset Markets*, supervised by Benjamin M. Friedman, Jerry A. Hausman, and Martin S. Feldstein.

A.M., Economics, Harvard University, May 1981.

B.A., B.S., Economics, University of Central Florida, June 1979, *summa cum laude*.

**HONORS AND AWARDS**

Joint American Economic Association/American Finance Association Distinguished Speaker, 2008.

Cairncross Lecture, University of Oxford, 2007.

Fellow of the National Association of Business Economists, 2005.

William F. Butler Memorial Award, New York Association of Business Economists Award, 2005.

Exceptional Service Award, The White House, 2002.

Michelle Akers Award for Distinguished Service, University of Central Florida, 2001.

Alumni Hall of Fame, University of Central Florida, 2000.

Best Paper Award for Corporate Finance, Western Finance Association, 1998.

Exceptional Service Award, U.S. Department of the Treasury, 1992.

Distinguished Alumnus Award, University of Central Florida, 1991.

John M. Olin Fellowship, National Bureau of Economic Research, 1987-1988.

Teaching Commendations, Graduate School of Business, Columbia University.

Northwestern University Associated Student Government Teaching Awards, announced in 1985, 1986, and 1987.

Graduate Distinctions: National Science Foundation Fellowship, Alfred P. Sloan Foundation Fellowship.

Robert Glenn Hubbard

CONFIDENTIAL

# Appendix A

Undergraduate Distinctions: National Merit Scholarship, National Society of Professional Engineers Award, Florida Society of Professional Engineers Award, National Council of Teachers of English Award, Omicron Delta Kappa, Financial Management Association Honor Society.

## POSITIONS HELD

| | |
|---|---|
| 2004-present | Dean, Graduate School of Business, Columbia University |
| 1994-present | Russell L. Carson Professor of Economics and Finance, Graduate School of Business, Columbia University |
| 1997-present | Professor of Economics, Faculty of Arts and Sciences, Columbia University |
| 2007-present | Panel of Economic Advisors, Federal Reserve Bank of New York (also 1993-2001) |
| 2003-present | Featured commentator, *Nightly Business Report* |
| 2003-present | Featured commentator, *Marketplace* |
| 2003-2007 | Visiting Scholar American Enterprise Institute (also 1995-2001) |
| 1999-2004 | Co-Director, Columbia Business School Entrepreneurship Program |
| 2004-2005 | Viewpoint Columnist, *Business Week* |
| 2004-2006 | Member, Panel of Economic Advisors, Congressional Budget Office |
| 2001-2003 | Chairman, President's Council of Economic Advisers |
| 2001-2003 | Chairman, Economic Policy Committee, Organization for Economic Cooperation and Development |
| 2001-2003 | Member, White House National Economic Council and National Security Council |
| 2001-2003 | Member, President's Council on Science and Technology |
| 1997-1998 | Visiting Professor of Business Administration, Harvard Business School |
| 1995-2001 | Visiting Scholar and Director of Tax Policy Program, American Enterprise Institute |
| 1994-1997 | Senior Vice Dean, Graduate School of Business, Columbia University |
| 1994 | MCI Fellow, American Council for Capital Formation |
| 1994 | John M. Olin Visiting Professor, Center for the Study of Economy and the State, University of Chicago |
| 1991-1993 | Deputy Assistant Secretary (Tax Analysis), U.S. Department of the Treasury |
| 1988-present | Professor of Economics and Finance, Graduate School of Business, Columbia University |
| 1987-1988 | John M. Olin Fellow in residence at the National Bureau of Economic Research |
| 1983-1988 | Assistant Professor of Economics, Northwestern University, with half-time research appointment in the Center for Urban Affairs and Policy Research |
| 1985 | Visiting Scholar, Center for Business and Government, John F. Kennedy School of Government, Harvard University |
| 1981-1983 | Teaching Fellow (Department of Economics) and Resident Tutor in Economics (Dunster House), Harvard University |

Page 2 of 17

299

Robert Glenn Hubbard                                                          CONFIDENTIAL

# Appendix A

## DIRECTORSHIPS

| | |
|---|---|
| 2007-present | Met Life |
| 2006-2008 | Capmark Financial Corporation; Information Services Group |
| 2004-present | ADP, Inc.; KKR Financial Corporation; BlackRock Closed-End Funds |
| 2004-2008 | Duke Realty Corporation |
| 2004-2006 | Dex Media/R.H. Donnelley |
| 2003-2005 | ITU Ventures |
| 2000-2001 | Angel Society, LLC; Information Technology University, LLC |

## CONSULTING OR ADVISORY RELATIONSHIPS

| | |
|---|---|
| 2008-present | Laurus Funds |
| 2005-present | Arcapita, Nomura Holdings America |
| 2003-present | Analysis Group (also 1995-2003) |
| 2005-2008 | Chart Venture Partners |
| 2003-2009 | Ripplewood Holdings |

## POSTS IN NON-PROFIT ORGANIZATIONS

| | |
|---|---|
| 2008-present | Chairman, Economic Club of New York |
| 2008-present | Elder, Fifth Avenue Presbyterian Church |
| 2006-present | Co-Chair, Committee on Capital Markets Regulation |
| 2006-present | Member, Board of Directors, Resources for the Future |
| 2004-present | Trustee, Economic Club of New York |
| 2004-present | Member, Advisory Board, National Center on Addiction and Substance Abuse |
| 2003-present | Member, Manhattan District Council Board, Boy Scouts of America |
| 2003-present | Trustee, Tax Foundation |
| 2004-2007 | Trustee, Fifth Avenue Presbyterian Church, New York |

## PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 1987-present | Research Associate, National Bureau of Economic Research (Monetary Economics, Corporate Finance, Public Economics, Economic Fluctuations, Industrial Organization) |
| 2007-present | Life Member, Council on Foreign Relations |
| 2003 | Member, Committee of Visitors, National Science Foundation |
| 2000 | Panelist, Graduate Fellowship Selection Committee, National Science Foundation |

Robert Glenn Hubbard                                                                        CONFIDENTIAL

# Appendix A

| | |
|---|---|
| 1999-2001 | Director, Project on Nonprofit Organizations, National Bureau of Economic Research |
| 1997-2001 | Member, COSSA-Liaison Committee, American Economic Association |
| 1993-2001 | Board of Advisors, Institutional Investor Project, School of Law, Columbia University |
| 1995-1999 | Member, Board of Academic Consultants, American Law Institute |
| 1997 | Member, Grants Panel for Integrative Graduate Education and Research Training Program, National Science Foundation |
| 1994-1998 | Member, Economics Grants Panel, National Science Foundation |
| 1993-1996 | Member, Federal Taxation and Finance Committee, National Tax Association |
| 1990-1995 | Co-organized research program on International Aspects of Taxation at the National Bureau of Economic Research, Cambridge, Massachusetts |
| 1995 | Member, Program Committee, American Economic Association Meeting |
| 1983-1987 | Faculty Research Fellow, National Bureau of Economic Research |
| 1983-1986 | Adjunct Faculty Research Fellow, Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, Cambridge, Massachusetts |
| 1986, 1988, 1994 | Member of the Brookings Panel on Economic Activity |
| 1985, 1987 | Special guest of the Brookings Panel on Economic Activity |
| 1990-1991 | Organized research program on Environmental Economics and Public Policy at the National Bureau of Economic Research, Cambridge, Massachusetts |
| 1988-1990 | Co-organized research program on Dynamic Models of Firms and Industries at the National Bureau of Economic Research, Cambridge, Massachusetts |
| 1985-1989 | Organized research program and workshops on contracting in financial markets at the Summer Institute, National Bureau of Economic Research, Cambridge, Massachusetts |
| 1988 | Organized Economic Fluctuations program on Industrial Economics and Macroeconomics, National Bureau of Economic Research, Stanford, California |
| 1986-1988 | Organized research program and workshop on links between macroeconomics and industrial organization at the Summer Institute, National Bureau of Economic Research, Cambridge, Massachusetts |
| 1991 | Member, Program Committee, Econometric Society Winter Meetings |
| 1982-1983 | Member, Energy Modeling Forum VII Study Group, Stanford University, Stanford, California |
| 1981-present | Consultant on research projects with private corporations and government and international agencies, including the Internal Revenue Service, Social Security Administration, U.S. Department of Energy, U.S. Department of State, U.S. Department of Treasury, and U.S. International Trade Commission; National Science Foundation; The World Bank; Board of Governors of the Federal Reserve System; Federal Reserve Bank of New York; Congressional Budget Office |

**Robert Glenn Hubbard**                                              CONFIDENTIAL

# Appendix A

| | |
|---|---|
| Member: | American Economic Association, American Finance Association, Association for Public Policy and Management, Econometric Society, International Association of Energy Economists, National Tax Association, the Royal Economic Society, and the Institute for Management Science |
| Referee: | American Economic Review; Canadian Journal of Economics; Columbia Journal of World Business; Econometrica; Economic Journal; Energy Economics; Energy Journal; International Finance; International Tax and Public Finance; Journal of Business; Journal of Business and Economic Statistics; Journal of Economic History; Journal of Economic Literature; Journal of Finance; Journal of Financial Economics; Journal of Financial Intermediation; Journal of Financial and Quantitative Analysis, Journal of Financial Services Research; Journal of Industrial Economics; Journal of International Money and Finance; Journal of Law and Economics; Journal of Macroeconomics; Journal of Money, Credit, and Banking; Journal of Monetary Economics; Journal of Political Economy; Journal of Public Economics; Journal of Regulatory Economics; Journal of Small Business Finance; Management Science; National Tax Journal; Quarterly Journal of Economics; Quarterly Review of Economics and Finance; RAND Journal of Economics; Review of Economic Dynamics; Review of Economic Studies; Review of Economics and Statistics; Review of Financial Economics; Scandinavian Journal of Economics; Southern Economic Journal; National Science Foundation; C.V. Starr Center for Applied Economics (New York University); Addison-Wesley Publishing Company; Ballinger Press; Cambridge University Press; Harvard Business School Press; MIT Press; W.W. Norton; Oxford University Press |
| Former Associate Editor: | *Federal Reserve Bank of New York Economic Policy Review; International Finance; International Tax and Public Finance; Journal of Industrial Economics; Journal of Macroeconomics; Journal of Small Business Finance; National Tax Journal* |

## PUBLICATIONS AND PAPERS

### Edited Volumes

*Transition Costs of Fundamental Tax Reform* (with K.A. Hassett), Washington, DC: AEI Press, 2001.

*Inequality and Tax Policy* (with K.A. Hassett), Washington, DC: AEI Press, 2001.

*Effects of Taxation on Multinational Corporations* (with M. Feldstein and J.R. Hines), Chicago: University of Chicago Press, 1995.

*Taxing Multinational Corporations* (with M. Feldstein and J. R. Hines), Chicago: University of Chicago Press, 1995.

*Studies in International Taxation* (with A. Giovannini and J. B. Slemrod), Chicago: University of Chicago Press, 1993.

*Financial Markets and Financial Crises*, Chicago: University of Chicago Press, 1991.

*Asymmetric Information, Corporate Finance, and Investment*, Chicago: University of Chicago Press, 1990.

### Books

*Healthy, Wealthy, and Wise* (with J.F. Cogan and D.P. Kessler), Washington AEI Press, 2005.

### Textbooks

*Principles of Economics* (with A.P. O'Brien), Prentice Hall, 1st ed., 2006; 2nd ed., 2008.

*Money, the Financial System, and the Economy*, Reading: Addison-Wesley Publishing Company, 1st ed., 1994; 2nd ed., 1997; 3rd ed., 2000; 4th ed., 2002; 5th ed., 2004; 6th ed., 2007.

Robert Glenn Hubbard                                                CONFIDENTIAL

# Appendix A

**Publications**

**Articles**

"House Prices, Interest Rates, and the Mortgage Market Meltdown" (with C. Mayer), Berkeley Economic Press, forthcoming

"Competition in the Mutual Fund Industry: Evidence and Implications for Policy" (with J. Coates), *Journal of Corporation Law*, 33 (Fall 2007).

"Evaluating Effects of Tax Preferences on Health Care Spending and Federal Revenues" (with J.F. Cogan and D.P. Kessler), in J.M. Poterba, ed., *Tax Policy and the Economy*, volume 21, Cambridge: MIT Press, 2007.

"To Bundle or Not to Bundle: Firms' Choices Under Pure Building" (with A. Saha and J. Lee), *International Journal of the Economics of Business*, 14 (2007): 59-83.

"The Effects of Progressive Income Taxation on Job Turnover" (with W.M. Gentry), *Journal of Public Economics* 88 (September 2004): 2301-2322.

"Business, Knowledge, and Global Growth", *Capitalism and Society*, 1 (2006).

"Precautionary Savings and the Governance of Nonprofit Organizations" (with R. Fisman), *Journal of Public Economics*, 2005.

"Government Debt and Interest Rates" (with E. Engen), in M. Gertler and K. Rogoff, *NBER Macroeconomics Annual 2004*, Cambridge: MIT Press, 2005.

"Entrepreneurship and Household Saving" (with W.M. Gentry), *Advances in Economic Analysis and Policy*, 4 (2004).

"Taxing Multinationals" (with M. Devereux), *International Taxation and Public Finance* 10(2003):469-487.

"The Effect of the Tax Reform Act of 1986 on the Location of Assets in Financial Services Firms" (with R. Altshuler), *Journal of Public Economics* 87 (January 2003):109-127.

"The Role of Nonprofit Endowments" (with R. Fisman), in E. Glaeser, ed., *The Governance of Not-For-Profit Organizations*, Chicago: University of Chicago Press, 2003.

"Are There Bank Effects in Borrowers' Costs of Funds?: Evidence from a Matched Sample of Borrowers and Banks" (with K.N. Kuttner and D.N. Palia), *Journal of Business* 75 (October 2002): 559-581.

"The Share Price Effects of Dividend Taxes and Tax Imputation Credits" (with T.S. Harris and D. Kemsley), *Journal of Public Economics* 79 (March 2001): 569-596.

"Tax Policy and Entrepreneurial Entry" (with W.M. Gentry), *American Economic Review* 90 (May 2000).: 283-287.

"Understanding the Determinants of Managerial Ownership and the Link Between Ownership and Performance" (with C.P. Himmelberg and D. Palia), *Journal of Financial Economics* 53 (1999): 353-384.

"A Reexamination of the Conglomerate Merger Wave in the 1960s" (with D. Palia), *Journal of Finance* 54 (June 1999): 1131-1152.

"Inflation and the User Cost of Capital: Does Inflation Still Matter?" (with D. Cohen and K.A. Hassett), in M. Feldstein, ed., *The Costs and Benefits of Achieving Price Stability*, Chicago: University of Chicago Press, 1999.

"Are Investment Incentives Blunted by Changes in Prices of Capital Goods?: International Evidence" (with K.A. Hassett), *International Finance* 1 (October 1998): 103-125.

Robert Glenn Hubbard                                    CONFIDENTIAL

# Appendix A

"Capital-Market Imperfections and Investment," *Journal of Economic Literature* 36 (March 1998): 193-225.

"Fundamental Tax Reform and Corporate Financial Policy" (with W.M. Gentry), in J.M. Poterba, ed., *Tax Policy and the Economy*, volume 12, Cambridge: MIT Press, 1998.

"Distributional Implications of Introducing a Broad-Based Consumption Tax" (with W.M. Gentry), in J.M. Poterba, ed., *Tax Policy and the Economy*, volume 11, Cambridge: MIT Press, 1997.

"How Different Are Income and Consumption Taxes?," *American Economic Review* 87 (May 1997): 138-142.

"Tax Policy and Investment," (with K.A. Hassett), in A.J. Auerbach, ed., *Fiscal Policy: Lessons from Economic Research*, Cambridge: MIT Press, 1997.

"Assessing the Effectiveness of Saving Incentives" (with J. Skinner), *Journal of Economic Perspectives* 10 (Fall 1996): 73-90.

"The Political Economy of Branching Restrictions and Deposit Insurance: A Model of Monopolistic Competition Among Small and Large Banks" (with N. Economides and D. Palia), *Journal of Law and Economics* 39 (October 1996): 667-704.

"Tax Reforms and Investment: A Cross-Country Comparison" (with J.G. Cummins and K.A. Hassett), *Journal of Public Economics* 62 (1996): 237-273.

"Benefits of Control, Managerial Ownership, and the Stock Returns of Acquiring Firms" (with D. Palia), *RAND Journal of Economics* 26 (Winter 1995): 782-792.

"Executive Pay and Performance: Evidence from the U.S. Banking Industry" (with D. Palia), *Journal of Financial Economics* 39 (1995): 105-130.

"Tax Policy, Internal Finance, and Investment: Evidence from the Undistributed Profits Tax of 1936-1937" (with C. Calomiris), *Journal of Business* 68 (October 1995): 443-482.

"A Reconsideration of Investment Behavior Using Tax Reforms as Natural Experiments" (with J.G. Cummins and K.A. Hassett), *Brookings Papers on Economic Activity* (1994:2): 1-59.

"Precautionary Saving and Social Insurance" (with J. Skinner and S. Zeldes), *Journal of Political Economy* 105 (April 1995): 360-399.

"Expanding the Life-Cycle Model: Precautionary Saving and Public Policy" (with J. Skinner and S. Zeldes), *American Economic Review* 84 (May 1994): 174-179.

"The Tax Sensitivity of Foreign Direct Investment: Evidence from Firm-Level Panel Data" (with J. Cummins), in M. Feldstein, J.R. Hines, and R.G. Hubbard, eds., *Effects of Taxation on Multinational Corporations*, Chicago: University of Chicago Press, 1995.

"International Adjustment Under the Classical Gold Standard: Evidence for the U.S. and Britain, 1879-1914" (with C. Calomiris), in T. Bauoumi, B. Eichengreen, and M. Taylor, eds., *Modern Perspectives on the Gold Standard*, Cambridge: Cambridge University Press, 1995.

"Internal Finance and Firm-Level Investment" (with A. Kashyap and T. Whited), *Journal of Money, Credit, and Banking* 27 (August 1995): 683-701.

"Do Tax Reforms Affect Investment?" (with J.G. Cummins and K.A. Hassett), in J.M. Poterba, ed., *Tax Policy and the Economy*, vol. 9, Cambridge: MIT Press, 1995.

"The Importance of Precautionary Motives for Explaining Individual and Aggregate Saving" (with J. Skinner and S. Zeldes), *Carnegie-Rochester Conference Series on Public Policy* 40 (June 1994): 59-126.

"Corporate Financial Policy, Taxation, and Macroeconomic Risk" (with M. Gertler), *RAND Journal of Economics* 24 (Summer 1993): 286-303.

Robert Glenn Hubbard                                                CONFIDENTIAL

# Appendix A

"Internal Net Worth and the Investment Process: An Application to U.S. Agriculture" (with A. Kashyap), *Journal of Political Economy* 100 (June 1992): 506-534.

"Long-Term Contracting and Multiple-Price Systems" (with R. Weiner), *Journal of Business* 65 (April 1992): 177-198.

"Efficient Contracting and Market Power: Evidence from the U.S. Natural Gas Industry" (with R. Weiner), *Journal of Law and Economics* 34 (April 1991): 25-67.

"Interest Rate Differentials, Credit Constraints, and Investment Fluctuations" (with M. Gertler and A. Kashyap), in R.G. Hubbard, ed., *Financial Markets and Financial Crises*, Chicago: University of Chicago Press, 1991.

"Taxation, Corporate Capital Structure, and Financial Distress" (with M. Gertler), in L.H. Summers, ed., *Tax Policy and the Economy*, volume 4, Cambridge: MIT Press, 1990.

"Firm Heterogeneity, Internal Finance, and Credit Rationing" (with C. Calomiris), *Economic Journal* 100 (March 1990): 90-104.

"Coming Home to America: Dividend Repatriations in U.S. Multinationals" (with J. Hines), in A. Razin and J.B. Slemrod, eds., *Taxation in the Global Economy*, Chicago: University of Chicago Press, 1990.

"Price Flexibility, Credit Availability, and Economic Fluctuations: Evidence from the U.S., 1894-1909" (with C. Calomiris), *Quarterly Journal of Economics* 104 (August 1989): 429-452.

"Financial Factors in Business Fluctuations" (with M. Gertler), in Federal Reserve Bank of Kansas City, *Financial Market Volatility—Causes, Consequences, and Policy Responses*, 1989.

"Contracting and Price Adjustment in Commodity Markets: Evidence from Copper and Oil" (with R. Weiner), *Review of Economics and Statistics* 71 (February 1989): 80-89.

"Financing Constraints and Corporate Investment" (with S. Fazzari and B.C. Petersen), *Brookings Papers on Economic Activity*, 1988:1: 141-195; Reprinted in Z.J. Acs, ed., *Small Firms and Economic Growth*, Cheltenham, U.K.: Edward Elgar Publishing Ltd., 1995.

"Investment, Financing Decisions, and Tax Policy" (with S. Fazzari and B.C. Petersen), *American Economic Review* 78 (May 1988): 200-205.

"Market Structure and Cyclical Fluctuations in U.S. Manufacturing" (with I. Domowitz and B.C. Petersen), *Review of Economics and Statistics* 70 (February 1988): 55-66.

"Capital Market Imperfections and Tax Policy Analysis in the Life-Cycle Model" (with K. Judd), Annales d' Economie et de Statistique 9 (January-March 1988): 111-139.

"Social Security and Individual Welfare: Precautionary Saving, Borrowing Constraints, and the Payroll Tax" (with K. Judd), *American Economic Review* 77 (September 1987): 630-646.

"Oligopoly Supergames: Some Empirical Evidence on Prices and Margins" (with I. Domowitz and B.C. Petersen), *Journal of Industrial Economics* 36 (June 1987): 379-398.

"Uncertain Lifetimes, Pensions, and Individual Saving," in Zvi Bodie, John B. Shoven, and David A. Wise (eds.), *Issues in Pension Economics*, Chicago: University of Chicago Press, 1987, pp. 175-205.

"The Farm Debt Crisis and Public Policy" (with C. Calomiris and J. Stock), *Brookings Papers on Economic Activity*, 1986:2: 441-479.

"Liquidity Constraints, Fiscal Policy, and Consumption" (with K. Judd), *Brookings Papers on Economic Activity*, 1986:1: 1-50.

"The Intertemporal Stability of the Concentration-Margins Relationship" (with I. Domowitz and B.C. Petersen), *Journal of Industrial Economics* 35 (September 1986): 13-34.

"Pension Wealth and Individual Saving: Some New Evidence," *Journal of Money, Credit, and Banking* 18 (May 1986): 167-178.

Page 8 of 17

305

Robert Glenn Hubbard                                          CONFIDENTIAL

# Appendix A

"Supply Shocks and Price Adjustment in the World Oil Market," *Quarterly Journal of Economics* 101 (February 1986): 85-102.

"Regulation and Long-Term Contracts in U.S. Natural Gas Markets" (with R. Weiner), *Journal of Industrial Economics* 35 (September 1986): 51-71.

"Business Cycles and the Relationship Between Concentration and Price-Cost Margins" (with I. Domowitz and B.C. Petersen), *RAND Journal of Economics* 17 (Spring 1986): 1-17.

"Inventory Optimization in the U.S. Petroleum Industry: Empirical Analysis and Implications for Energy Emergency Policy" (with R. Weiner), *Management Science 32* (July 1986): 773-790.

"Social Security, Liquidity Constraints, and Pre-Retirement Consumption," *Southern Economic Journal* 51 (October 1985): 471-484.

"Personal Taxation, Pension Wealth, and Portfolio Composition," *Review of Economics and Statistics* 67 (February 1985): 53-60.

"Industry Margins and the Business Cycle: Some New Microeconomic Evidence" (with I. Domowitz and B.C. Petersen), *Economics Letters* 19 (1985): 73-77.

"Oil Supply Shocks and International Policy Coordination" (with R. Weiner), *European Economic Review* 30 (February 1986): 91-106.

"Do IRAs and Keoghs Increase Saving?," *National Tax Journal* 37 (March 1984): 43-54.

*The Financial Impacts of Social Security: A Study of Effects on Household Wealth Accumulation and Allocation, in Monograph Series in Finance and Economics*, New York University, 1983.

## Writings on Public Policy

"The Best Business Education Ever," *BizEd* 6:5 (2007).

"An Action Plan for US Capital Markets," *International Finance* 10:1 (2007): 91-99.

"Nondestructive Creation," *strategy+business* 27 (Summer 2007): 30-35.

"The Productivity Riddle," *strategy+business* 45 (Winter 2006): 28-33.

*"Overview of the Japanese Deficit Question," (with Takatoshi Ito), "Tackling Japan's Fiscal Challenges: Strategies to Cope with High Public Debt and Population Ageing (International Monetary Fund Book)* Palgrave Macmillan (October 31, 2006).

"The U.S. Current Account Deficit and Public Policy," *Journal of Policy Modeling* 28 (2006): 665-671.

"Making Markets Work," (with J.F. Cogan and D.P. Kessler), *Health Affairs* 24 (November/December 2005): 1447-1457.

*How Capital Markets Enhance Economic Performance and Facilitate Job Creation* (with W.C. Dudley), New York: Goldman Sachs Markets Institute, 2004.

"Would a Consumption Tax Favor the Rich?" In A.J. Auerbach and K.A. Hassett, eds., *Toward Fundamental Tax Reform.* Washington, DC: AEI Press, 2005.

"The Economist as Public Intellectual," *Journal of Economic Education* 35 (Fall 2004): 391-394.

"Success Taxes, Entrepreneurship, and Innovation," (with W.M. Gentry), in *Innovation and the Economy*, volume 5, forthcoming.

"Tax Policy and International Competitiveness," *Taxes-The Tax Magazine* (March 2004):233-241.

CONFIDENTIAL

# Appendix A

"Capital-Market Imperfections, Investment, and the Monetary Transmission Mechanism," in Heinz Hermann, ed., *Investing for the Future*. Frankfurt: Deutsche Bundesbank, 2001.

"The Growth of Institutional Stock Ownership: A Promise Unfulfilled,"(with F.R. Edwards), *Journal of Applied Corporate Finance* 13 (Fall 2000): 92-104.

"Telecommunications, the Internet, and the Cost of Capital," in Ingo Vogelsang and Benjamin Compaine, eds., *The Internet Upheaval*, Cambridge: MIT Press, 2000.

"Federal Deposit Insurance: Economic Efficiency or Politics?" (with N. Economides and D. Palia), *Regulation* 22 (1999): 15-17.

*Institutional Investors and Corporate Behavior* (with G. R. Downes, Jr. and E. Houminer), Washington, D.C., American Enterprise Institute, 1999.

*The Magic Mountain: Is There a Budget Surplus?* (with K.A. Hassett), Washington, D.C.: American Enterprise Institute, 1999.

*Medical School Financing and Research: Problems and Policy Options*, Washington, D.C.: American Enterprise Institute, 1999.

"The Golden Goose: Understanding (and Taxing) the Saving of Entrepreneurs," in Gary D. Libecap, ed., *Advances in the Study of Entrepreneurship, Innovation, and Growth*, volume 10, Greenwich: JAI Press, 1998.

"U.S. Tax Policy and Multinational Corporations: Incentives, Problems, and Directions for Reform," in Dale W. Jorgenson and James M. Poterba, eds., *Borderline Case: International Tax Policy, Corporate Research and Development, and Investment*, Washington, D.C.: National Research Council, 1998.

"Distributional Tables and Tax Policy," in David F. Bradford, ed., *Distributional Analysis of Tax Policy*, Washington, D.C.: AEI Press, 1995.

"Is There a 'Credit Channel' for Monetary Policy?," *Federal Reserve Bank of St. Louis Review* 77 (May/June 1995): 63-77.

"U.S. Tax Policy and Foreign Direct Investment: Incentives, Problems, and Reform," *Tax Policy and Economic Growth*, Washington, DC: American Council for Capital Formation, 1995.

"The Use of 'Distribution Tables' in the Tax Policy Process," *National Tax Journal* 46 (December 1993): 527-537.

"Securities Transactions Taxes: Tax Design, Revenue, and Policy Considerations," *Tax Notes* (November 22, 1993): 985-1000.

"Corporate Tax Integration: A View from the Treasury Department," *Journal of Economic Perspectives* (Winter 1993): 115-132; reprinted in P. Roberti, ed., *Financial Markets and Capital Income Taxation in a Global Economy*, Amsterdam: North-Holland, 1998.

"The President's 1992 Health Care White Paper: An Economic Perspective," *National Tax Journal* 45 (September 1992): 347-356.

"Household Income Changes Over Time: Some Basic Questions and Facts," *Tax Notes* (August 24, 1992).

"Household Income Mobility During the 1980s: A Statistical Assessment Based on Tax Return Data" (with J. Nunns and W. Randolph), *Tax Notes* (June 1, 1992).

"Debt Renegotiation," *Institutional Investor* 24 (June 1990).

"Petroleum Regulation and Public Policy" (with R. Weiner), in Leonard Weiss and Michael Klass (eds.), *Regulatory Reform: What Actually Happened*, Boston: Little, Brown, and Company, 1986.

"Natural Gas: The Regulatory Transition" (with R. Braeutigam), in Leonard Weiss and Michael Klass (eds.), *Regulatory Reform: What Actually Happened*, Boston: Little, Brown, and Company, 1986.

Robert Glenn Hubbard                                                CONFIDENTIAL

# Appendix A

"Natural Gas Contracting in Practice: Evidence from the United States" (with R. Weiner), in Michael Hoel and Bruce Wolman (eds.), *Natural Gas Markets and Contracts, Contributions to Economic Analysis Series*, North-Holland, 1986.

"Contracting and Regulation Under Uncertainty: The Natural Gas Market" (with R. Weiner), in John P. Weyant and Dorothy B. Sheffield (eds.), *The Energy Industries in Transition: 1985-2000*, Boulder: Westview Press, 1985.

"Oil and OECD Economies: Measuring Stockpile Coordination Benefits" (with J. Marquez and R. Weiner), in Mark Baier (ed.), *Energy and Economy: Global Interdependencies*, Bonn: Gesellschaft für Energiewissenschaft und Energiepolitik, 1985.

"Managing the Strategic Petroleum Reserve: Energy Policy in a Market Setting" (with R. Weiner), *Annual Review of Energy* 10 (1985): 339-359.

"Modeling Oil Price Fluctuations and International Stockpile Coordination" (with R. Weiner), *Journal of Policy Modeling* 7 (Summer 1985): 339-359.

"Crude Oil Trading and Price Stability" (with R. Weiner), in William F. Thompson and David J. De Angelo (eds.), *World Energy Markets: Stability or Cyclical Change*, Boulder: Westview Press, 1985.

"Energy Price Shocks, Inflation, and Economic Activity: Simulation Results of the Hubbard-Fry Model", in Bert Hickman and Hillard Huntington (eds.), *Macroeconomic Impact of Oil Supply Shocks: Report of the Energy Modeling Forum VII Project*, 1985.

"Drawing Down the Strategic Petroleum Reserve: The case for Selling Futures Contracts" (with S. Devarajan), in Alvin Alm and Robert Weiner (eds.), *Oil Shock: Policy Response and Implementation*, Cambridge: Ballinger Press, 1983.

"Government Stockpiles in a Multi-Country World: Coordination versus Competition" (with R. Weiner), in Alvin Alm and Robert Weiner (eds.), *Oil Shock: Policy Response and Implementation*, Cambridge: Ballinger Press, 1983.

"The 'Sub-Trigger' Crisis: An Economic Analysis of Flexible Stock Policies" (with R. Weiner), *Energy Economics* 5 (July 1983): 178-189.

"Temporary Tax Reductions as Responses to Oil Shocks," in Alvin Alm and Robert Weiner (eds.), *Oil Shock: Policy Response and Implementation*, Cambridge: Ballinger Press, 1983.

"Policy Analysis with Your Hands Tied: The Case of Disruption Tariff Under Oil Price Controls," in Fred S. Roberts (ed.), *Energy Modeling IV: Planning for Energy Disruptions*, Institute of Gas Technology, 1982.

*Comments, Notes, and Reviews*

"Comment" on A.J. Auerbach, "The Choice Between Income and Consumption Tax: A Primer," in A.J. Auerbach and D. Shaviro, eds., *Essays In Honor of David Bradford*, forthcoming.

"Pay Without Performance: A Market Equilibrium Critique," *Journal of Corporation Law* 30 (Summer 2005): 717-720.

"Financing Constraints and Corporate Investment: Response to Kaplan and Zingales," *Quarterly Journal of Economics* 115 (May 2000): 695-705.

"Comment" on Charles Handlock, Joel Houston, and Michael Ryngaert, "The Role of Managerial Incentives in Bank Acquisitions," *Journal of Banking and Finance* 23 (1999): 250-254.

"Comment" on D.H. Moss, "Courting Disaster?: The Transformation of Federal Disaster Policy Since 1903," in K.A. Froot, ed., *The Financing of Catastrophic Risk*, Chicago: University of Chicago Press, 1999.

"Market for Corporate Control" (with D. Palia), in P. Newman, ed., *The New Palgrave Dictionary of Economics and the Law*, London: Macmillan, 1998.

CONFIDENTIAL

# Appendix A

"Comment" on Joseph Peek and Eric Rosengren, "Do Monetary Policy and Regulatory Policy Affect Bank Loans?" in *Is Bank Lending Important for the Transmission of Monetary Policy?* Federal Reserve Bank of Boston, Conference Series (Proceedings) 39 (1995): 47-79.

"Introduction," in M. Feldstein, J.R. Hines, and R.G. Hubbard, eds., *Effects of Taxation on Multinational Corporations*, Chicago: University of Chicago Press, 1995.

"Introduction," in M. Feldstein, J.R. Hines, and R.G. Hubbard, eds., *Taxing Multinational Corporations*, Chicago: University of Chicago Press, 1995.

"Investment Under Uncertainty: Keeping One's Options Open," *Journal of Economic Literature* 32 (December 1994): 1794-1807.

"Introduction," in A. Giovannini, R.G. Hubbard, and J. Slemrod, eds., *Studies in International Taxation*, Chicago: University of Chicago Press, 1993.

"Comment" on G. Peter Wilson, "The Role of Taxes in Location and Source Decisions," in A. Giovannini, R.G. Hubbard, and J.B. Slemrod, eds., *Studies in International Taxation*, Chicago: University of Chicago Press, 1993.

"Market Structure and Cyclical Fluctuations in U.S. Manufacturing: Reply" (with I. Domowitz and B.C. Petersen), *Review of Economics and Statistics*, 1993.

"Introduction," in R.G. Hubbard, ed., *Financial Markets and Financial Crises*, Chicago: University of Chicago Press, 1991.

"Introduction," in R.G. Hubbard, ed., *Asymmetric Information, Corporate Finance, and Investment*, Chicago: University of Chicago Press, 1990.

"Comment" on Alberto Giovannini and James R. Hines, Jr., "Capital Flight and Tax Competition: Are There Viable Solutions to Both Problems?," in A. Giovannini and C. Mayer, eds., *European Financial Integration*, London: Centre for Economic Policy Research, 1990.

"Comment" on Roger H. Gordon and Jeffrey K. MacKie-Mason, "Effects of the Tax Reform Act of 1986 on Corporate Financial Policy and Organizational Form," in J.B. Slemrod, ed., *Do Taxes Matter?: Economic Impacts of the Tax Reform Act of 1986*, Cambridge: MIT Press, 1990.

"Comment" on James M. Poterba, "Tax Policy and Corporate Saving," *Brookings Papers on Economic Activity*, 1987:2.

"Comment" on Robert E. Hall, "Market Structure and Macro Fluctuations," *Brookings Papers on Economic Activity*, 1986:2.

"Comment" on Alan S. Blinder and Angus Deaton, "The Time-Series Consumption Function Revisited," *Brookings Papers on Economic Activity*, 1985:2.

"Comment" on Benjamin S. Friedman and Mark Warshawsky, "The Cost of Annuities: Implications for Saving Behavior and Bequests," in Zvi Bodie, John Shoven, and David Wise (eds.), *Pensions in the U.S. Economy*, Chicago: University of Chicago Press, 1987.

"Energy Security: Book Reviews," *Energy Journal* 4 (April 1983).

"When the Oil Spigot is Suddenly Turned Off: Some Further Thoughts" (with R. Weiner), *Journal of Policy Analysis and Management* 2 (Winter 1983).

## Submitted Papers and Working Papers

"The Effect of Tax Preferences on Health Spending" (with J.F. Cogan and D.P. Kessler), Working Paper, Columbia University, 2009.

Robert Glenn Hubbard

CONFIDENTIAL

# Appendix A

"The Effect of Medicare Coverage for the Disabled on the Market for Private Insurance" (with J.F. Cogan and D.P. Kessler), Working Paper, Columbia University, 2009.

"Tax Policy and Entry into Entrepreneurship" (with W.M. Gentry), Working Paper, Columbia University, 2001.

"Tax Policy and Wage Growth" (with W. M. Gentry), Working Paper, Columbia University, 2001.

"Investor Protection, Ownership, and Investment" (with C.P. Himmelberg and I. Love), Working Paper, Columbia University, 2000.

"Incentive Pay and the Market for CEOs: An Analysis of Pay-for-Performance Sensitivity" (with C.P. Himmelberg), Working Paper, Columbia University, 2001.

"Noncontractible Quality and Organizational Form in the U.S. Hospital Industry," (with K.A. Hassett), Working Paper, Columbia University, 1999.

"Entrepreneurship and Household Saving," (with W. M. Gentry), Working Paper, Columbia University, 2001.

"Corporate Payouts and the Tax Price of Corporate Retentions: Evidence from the Undistributed Profits Tax of 1936-37" (with P. Reiss),Working Paper No. 3111, National Bureau of Economic Research, September 1989.

"Market Structure, Durable Goods, and Cyclical Fluctuations in Markups" (with I. Domowitz and B. Petersen), Working Paper, Northwestern University, 1987.

"Finite Lifetimes, Borrowing Constraints, and Short-Run Fiscal Policy" (with K. Judd), Working Paper No. 2158, National Bureau of Economic Research, 1987.

**GRANTS RECEIVED**

"Institutional Investors, Boards of Directors, and Corporate Governance," Korn/Ferry, 1997.

"An Economic Analysis of Saving Incentives," Securities Industry Association, 1994, with Jonathan Skinner.

"Securities Transactions Taxes: Tax Design, Revenue, and Policy Considerations," Catalyst Institute, 1993.

"Precautionary Saving in the U.S. Economy," Bradley Foundation, 1989-1990, with Jonathan Skinner and Stephen Zeldes.

"Taxation, Corporate Leverage, and Financial Distress," Garn Institute for Finance, 1989-1990.

"Precautionary Saving in a Dynamic Model of Consumption and Labor Supply," National Science Foundation (Economics Group SES-8707997), 1987-1989, with Jonathan Skinner and Stephen Zeldes.

"Industrial Behavior and the Business Cycle: A Panel Data Study of U.S. Manufacturing," National Science Foundation (Economics Group SES-8420152), 1985-1987, with Ian Domowitz and Bruce Petersen.

"Efficient Contracting and Market Power: Evidence from the U.S. Natural Gas Market," Transportation Center, Northwestern University, Summer 1985.

"Constructing a Panel Data Base for Studies of U.S. Manufacturing," University Research Grants Committee, Northwestern University, 1985-1986.

"Economic Analysis of Multiple-Price Systems: Theory and Application, "National Science Foundation (Regulatory Analysis and Policy Group, SES-8408805), 1984-1985.

"Contracting and Price Adjustment in Product Markets," University Research Grants Committee, Northwestern University, 1983-1984.

Page 13 of 17

310