MILBERG LLP
JEFF S. WESTERMAN (SBN 94559)
E-mail: jwesterman@milberg.com
One California Plaza
300 South Grand Ave., Suite 3900
Los Angeles, CA 90071
T: (213) 617-1200 / F: (213) 617-1975

WEISS & LURIE
JOSEPH H. WEISS
E-mail: jweiss@weisslurie.com
RICHARD A. ACOCELLI (admitted
*pro hac vice*)
E-mail: racocelli@weisslurie.com
JULIA J. SUN
E-mail: to jsun@weisslurie.com
551 Fifth Avenue, Suite 1600
New York, New York 10176
T: (212) 682-3025 / F: (212) 682-3010

MILBERG LLP
JEROME M. CONGRESS (admitted *pro
hac vice*)
E-mail: jcongress@milberg.com
JANINE L. POLLACK (admitted *pro
hac vice*)
E-mail: jpollack@milberg.com
ANNA C. DOVER (SBN 217100)
E-mail: adover@milberg.com
JOHN R. S. MCFARLANE (admitted
*pro hac vice*)
E-mail: jmcfarlane@milberg.com
One Pennsylvania Plaza
New York, New York  10119-0165
T: (212) 594-5300 / F: (212) 868-1229

Co-Lead Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| In Re AMERICAN FUNDS FEE LITIGATION | MASTER FILE: CV 04-5593 (GAF) (RNBx) |
| This Document Relates to: | PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| ALL ACTIONS | [L.R. 52-1] |
| | TRIAL DATE:   July 28, 2009<br>CTRM.:          740<br>JUDGE:          Hon. Gary A. Feess |

# TABLE OF CONTENTS

**Page**

I.  FINDINGS OF FACT ................................................................. 1

    A.  The Parties.................................................................... 1

        1.  Defendants ........................................................ 1

        2.  Plaintiffs ........................................................... 2

    B.  The American Funds' Fees ........................................... 3

        1.  Advisory Fees ................................................... 3

            a.  Breakpoints........................................... 4

            b.  Fee Waivers .......................................... 4

        2.  Rule 12b-1 Fees ............................................... 5

        3.  Fund Share Classes .......................................... 6

        4.  AFD's Retention of 12b-1 Fees ....................... 6

        5.  Administrative Services Fees ........................... 8

    C.  Facts Regarding The Excessiveness Of Rule 12b-1 Fees.................... 9

        1.  The Explosive Growth of the Funds Caused Serious Operational Problems for Defendants ............... 9

        2.  The Negative Effect of Fund Growth on Performance ............ 15

        3.  The Negative Effect of Growth on the Funds' Trading Costs ................... 16

        4.  The Flaws in the Directors' Continued Approval of 12b-1 Fees .............. 18

    D.  Facts Demonstrating The Excessiveness Of The Funds' Advisory Fees.................... 20

        1.  Defendants Benefitted from Economies of Scale which They Did not Adequately Share with the Funds..................... 20

        2.  The Advisory Fees Were Inflated in order to Subsidize AFD's Payment of Additional Compensation to Broker-Dealers........................ 24

    E.  Facts Demonstrating The Excessiveness Of The Administrative Fees ................. 24

i

F.   Additional Facts Indicating The Directors Lacked The Information Necessary To Approve The Fees At Issue And Were Not Acting In A Conscientious And Independent Way ........................................27

G.   Plaintiffs' Damages                                                      28

II.   CONCLUSIONS OF LAW .................................................................31

A.   Conclusions Regarding Nature And Quality Of Services .................33

B.   Conclusions Regarding Profitability.....................................34

C.   Conclusions Regarding Comparative Fee Structures .........................34

D.   Conclusions Regarding Economies Of Scale ....................................35

E.   Conclusions Regarding The Conscientiousness And The Adequacy Of Knowledge Of The Directors ..........................................................................36

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

# TABLE OF AUTHORITIES

2

**Page**

3

## FEDERAL CASES

4

*In re American Funds Fees Litigation*,

5
    2005 U.S. Dist. LEXIS 41884 (C.D. Cal. Dec. 16, 2005)...................................33

6

*In re BlackRock Mutual Funds Fee Litigation*,
    2006 U.S. Dist. LEXIS 13846 (W.D. Pa. Mar. 29, 2006)...................................33

7

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 78 L. Ed. 2d 645, 104 S. Ct. 831

8
    (1984) ...............................................................................................................33

9

*Fogel v. Chestnutt*, 533 F.2d 731, 745 (2d Cir. 1975) .........................................36

10

*Galfand v. Chestnutt Corp.*,
    545 F.2d 807 (2d Cir. 1976) .....................................................................32, 36

11

12

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
    528 F. Supp. 1038 (S.D.N.Y. 1981) .....................................................32, 33, 36

13

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
    694 F.2d 923 (2d Cir. 1982), *cert. denied*, 461 U.S. 906 .................31, 32, 35, 36

14

*Kalish v. Franklin Advisors, Inc.*,

15
    742 F. Supp. 1222 (S.D.N.Y. 1990) ............................................................34, 35

16

*Krinsk v. Fund Asset Management, Inc.*,

17
    715 F. Supp. 472 (S.D.N.Y. 1988) ...................................................................34

18

*Krinsk v. Fund Asset Management, Inc.*,
    875 F.2d 404 (2d Cir. 1989) .......................................................................32, 36

19

20

*In re Mutual Funds Investment Litigation*,
    590 F. Supp. 2d 741 (D. Md. 2008).................................................................32

21

*Schuyt v. Rowe Price Prime Reserve Fund*,

22
    663 F. Supp. 962 (S.D.N.Y. 1987) ...................................................................34

23

## FEDERAL STATUTES

24

15 U.S.C. § 80a-35(b)..............................................................................31, 33

25

17 C.F.R. § 270.12b-1...................................................................................5

26

Fed. R. Civ. P. 23.1.....................................................................................37

27

28

1

## MISCELLANEOUS

SEC, Division of Investment Management: Report on Mutual Fund Fees and
Expenses, at B 1 (Dec. 2000), *available at*
http://www.sec.gov/news/studies/feestudy.htm. ................................................35

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    FINDINGS OF FACT

## A.    **THE PARTIES**

### 1.    **Defendants**

1.    In May 2007, the American Funds were the largest mutual fund group in the U.S., with over 1 trillion in assets under management. *See, e.g.*, Trial Exhibit ("Exh.") No. 3.

2.    The Capital Group Companies, Inc. ("Capital Group") is the parent company of a number of subsidiaries including several investment management subsidiaries. *See* Stipulated Fact ¶1 ("Stip. Fact ¶__") listed Amended Final Pre-Trial Conference Order filed in this action on June 24, 2009.

3.    Defendant Capital Research and Management Company ("CRMC") is a wholly-owned subsidiary of Capital Group.  Stip. Fact ¶3.

4.    CRMC is a registered investment adviser under the Investment Advisers Act of 1940.  Stip. Fact ¶4.

5.    CRMC has served as the investment adviser to the American Funds since 1931.  Stip. Fact ¶5.

6.    CRMC's business is devoted exclusively to managing mutual funds and providing related services.  Stip. Fact ¶6.

7.    CRMC currently manages over 30 mutual funds.  Stip. Fact ¶7.

8.    Plaintiffs have brought this lawsuit on behalf of investors in the following eight funds: AMCAP Fund, Inc. ("AMCAP"), American Balanced Fund, Inc. ("AMBAL"), The Bond Fund of America, Inc. ("BFA"), Capital Income Builder, Inc. ("CIB"), The Investment Company of America ("ICA"), The Income Fund of America, Inc. ("IFA"), The Growth Fund of America, Inc. ("GFA"), and Capital World Growth and Income Fund, Inc. ("WGI") (collectively, the "Funds").  Stip. Fact ¶8.

9.    CRMC currently manages equity assets through two investment divisions: Capital World Investors ("CWI") and Capital Research Global Investors ("CRGI").  Stip. Fact ¶9.

10.    CRMC manages fixed income assets through its Fixed Income Division. Stip. Fact ¶11.

11.    Defendant American Funds Distributors, Inc. ("AFD") is a registered broker-dealer, FINRA[1] member, and wholly-owned subsidiary of CRMC.  Stip. Fact ¶13.

12.    AFD is the principal underwriter and distributor of the American Funds. Stip. Fact ¶14.

13.    AFD has formed a selling group comprised of broker-dealers and other financial intermediaries who offer the Funds to the public and service Fund shareholders.  Stip. Fact ¶15.

14.    American Funds Service Company ("AFS"), a wholly-owned subsidiary of CRMC provides services to Fund shareholders as a transfer agent, dividend disbursing agent, and directed redemption agent for the American Funds. Stip. Fact ¶16.

### 2.    Plaintiffs

15.    Plaintiff Rodney T. Jelinek held as of July 15, 2004 and continues to hold Class A shares of ICA.  Stip. Fact ¶17.

16.    Plaintiff David L. Caplan & Robert M. Macko, as Trustees of the David L. Caplan Revocable Trust, held as of July 15, 2004 and continue to hold Class C shares of CIB and IFA.  Stip. Fact ¶18.

17.    Plaintiff Gregory J. Baurnes held as of July 15, 2004 and continues to hold Class A shares of AMBAL, BFA, GFA, CIB, and WGI.  Stip. Fact ¶19.

---

[1] "FINRA" is the "Financial Industry Regulatory Authority."  *See* www.finra.org.

18.   Plaintiff Ernest Visalli held as of July 15, 2004 and continues to hold Class A shares of BFA.  Stip. Fact ¶20.

19.   Plaintiff Paul D. Angotta held, as of July 15, 2004, Class A shares of AMCAP, GFA and ICA.   Mr. Angotta held these shares from July 15, 2004 until on or about June 3, 2009, at which time Mr. Angotta sold all of his shares of these funds.  On June 15, 2009, Mr. Angotta purchased, 20.733, 14.303, and 15.165, Class A shares of AMCAP, GFA and ICA, respectively. Stip. Fact ¶21.  On July 14, 2009, the Court ruled that Mr. Angotta's sales and repurchase of these funds did not divest him of standing in this case.  *See* Docket No. 495.

## B.    THE AMERICAN FUNDS' FEES

20.   CRMC and its subsidiaries charge fees to the Funds in exchange for providing various services to the Funds, including portfolio management, fund accounting, transfer agency, distribution, and shareholder services. Stip. Fact ¶26.

21.   The unaffiliated Directors of the Funds (the "Directors") are responsible for approving each of the fees at issue in this action.  *See, e.g.*, Exh. Nos. 37, 816.

### 1.    Advisory Fees

22.   Pursuant to an Investment Advisory and Service Agreement (the "Advisory Agreement"), CRMC acts as the investment adviser to each of the Funds. Stip. Facts ¶5-8.

23.   The Advisory Agreement is reviewed and approved annually by the Boards of each of the Funds.   Stip. Fact ¶29.

24.   Pursuant to the Advisory Agreement, CRMC provides investment management services, which include choosing securities to purchase and sell,

as well as performing the Funds' executive, administrative, clerical, compliance and bookkeeping functions.  Stip. Fact ¶30.

25. Each Fund compensates for these services by payment of a management fee (sometimes called an advisory or investment advisory fee) to CRMC. Stip. Fact ¶31.

26. The advisory fee is calculated as a percentage of the Fund's assets under management.  Stip. Fact ¶32.

27. The advisory fees for three of the Funds—IFA, BFA and CIB—are calculated as a percentage of assets under management plus a percentage of the gross income earned by the Fund.  Stip. Fact ¶33.

### a.    Breakpoints

28. The advisory fee schedules for all eight Funds include breakpoints.  Stip. Fact ¶34.

29. Breakpoints are scheduled changes to the advisory fee as net assets increase, and in the case of certain funds, as net assets and gross income earned increase.  Stip. Fact ¶35.

30. Breakpoints reduce the advisory fee rate as assets increase.  Stip. Fact ¶36.

### b.    Fee Waivers

31. Effective September 1, 2004, CRMC implemented a 5% voluntary fee waiver that reduced by 5% the advisory fees for all of the American Funds, including the Funds.[2]  Stip. Fact ¶39.

32. Effective April 1, 2005, CRMC increased the voluntary fee waiver from 5% to 10% for all of the American Funds, including the Funds.  Stip. Fact ¶40.

---

[2] The fee waiver did not initially apply to the Cash Management Trust of America ("CMTA") fund because CRMC was already waiving a portion of its advisory fee. In October 2005, CRMC applied the fee waiver to CMTA.  Stip. Fact ¶39, n.4.

33.     Effective January 1, 2009, CRMC discontinued the 10% voluntary fee waiver for all American Funds, including the Funds.  Stip. Fact ¶41.

### 2.    Rule 12b-1 Fees

34.     During the relevant period[3], each of the Funds operated under a Plan of Distribution pursuant to Rule 12b-1 ("the Plans of Distribution").  *See* 17 C.F.R. § 270.12b-1.  Stip. Fact ¶47.

35.     Under the Plans of Distribution, each Fund is permitted to spend assets for activities primarily intended to result in the sale of Fund shares.   The Plans of Distribution permit each Fund to finance activities designed to facilitate the distribution of Fund shares and to compensate brokers for providing ongoing services to Fund shareholders.  Stip. Fact ¶51.

36.     Defendants have admitted that although the Plans of Distribution permit the 12b-1 fees to finance distribution and service, there is no way to adequately distinguish services that do not contribute to distribution.  *See, e.g.*, Exh. No. 2492; Deposition of David Short taken in this action on January 14, 2009 at 79:10-17.

37.     The Selling Group Agreement pursuant to which the brokers receive their 12b-1 service fees states that the primary purpose of these payments is for the brokers to "promote selling efforts."  *See, e.g.*, Exh. No. 599.  Thus, it is clear that the role of AFD and the effect of the 12b-1 fees paid by the Funds is essentially to promote sales.

38.     The Funds have adopted and maintained Plans of Distribution for each class of Fund shares other than Class F-2, Class R-5, and Class R-6.  Stip. Fact ¶49.

---

[3] The "relevant period" in this case is from July 15, 2003 to the present.  *See* Docket No. 240.

39. The fees paid pursuant to the Plans of Distribution are referred to as Rule 12b-1 fees. Stip. Fact ¶50.

40. The Plans of Distribution are reviewed and approved annually by the Boards of each of the Funds. *See, e.g.*, Exh. No. 1014.

### 3. Fund Share Classes

41. The Fund pays 12b-1 fees from Fund assets on the different share classes. These Fund expenses are allocated among the share classes for accounting purposes, in accordance with their respective Plans, in order to calculate the net asset values of the shares within each class. *See, e.g.,* Exh. Nos. 680-687, 1278.

42. B shares and 529-B shares of the Funds convert to A shares after eight years. *See, e.g.*, Exh. No. 686.

43. C shares of the Funds convert to F shares after ten years. *See, e.g.*, Exh. No. 686.

### 4. AFD's Retention of 12b-1 Fees

44. Non-commissionable sales of A shares are generated by large purchases (in excess of $1 million) or purchases by individuals or entities (such as large retirement plans) that can aggregate existing holdings in order to invest without a sales charge. *See, e.g.*, Exh. No. 813. Despite the fact that the investor pays no commission ("no load") on the purchase, selling broker dealers and AFD wholesalers receive commissions of up to 1% from AFD, which Defendants refer to as "NOLA commissions." *Id.*

45. AFD is reimbursed from 12b-1 fees from Fund assets for NOLA commissions it has paid out to broker-dealers as well AFD's own wholesalers (who are AFD employees) on sales of Class A shares of the Funds. *See, e.g.*, Exh. Nos. 806, 813.

46. The NOLA commission reimbursement represents a direct economic benefit to AFD from the Funds' payment of 12b-1 fees.

47. Class B shares of the Funds are sold without any front end sales charge but incur a 1% 12b-1 fee. *See, e.g.*, Exh. Nos. 686, 813.

48. Class B shares are subject to a contingent deferred sales charge of 5.00% if the investor sells during the first year, which declines to 0% six years after purchase. *See, e.g.*, Exh. No. 1198.

49. For Class B shares, under the terms of a financing agreement with Citibank, during the relevant period, AFD sold the right to receive the .75% distribution component of the 1% 12b-1 fee (along with AFD's right to receive any contingent deferred sales charges payable by shareholders in respect of those shares) in return for Citibank's payment of 4.55% of the purchase price. *See, e.g.*, Exh. Nos. 37, 806.

50. AFD then pays broker-dealer firms a 3.75% commission at the time of sale. AFD also pays the broker-dealer a .25% up front 12b-1 service fee at the time of sale. *See, e.g.*, Exh. Nos. 37, 806, 812.

51. Per the Citibank agreement, AFD retains whatever Citibank provides to it in excess of the 3.75% commission advanced to the broker with respect to the Class B shares of the Funds. The amount that AFD retains in this regard constitutes, in substance, an advance payment of 12b-1 fees to AFD financed by the sale of AFD's right to those fees to Citibank, and therefore derives directly from the 12b-1 fees paid by the Fund and becomes a revenue item for AFD. *See, e.g.*, Exh. Nos. 37, 806, 812.

52. Although Citibank receives the .75% distribution component of 12b-1 fees paid by the Fund, during the first year, .25% of the 1% 12b-1 fee on B shares is reimbursed to AFD for the .25% service fee it advanced to the dealer. Because the .25% service fee AFD receives in the first year is based on a

percentage of assets, this is not a straight "reimbursement" because AFD may retain more than it paid out to the dealer if assets have grown by year end.

53.   Given that AFD sells its right to the 12b-1 fees to Citibank and receives payment in return in excess of amounts advanced to broker dealers, AFD receives a direct economic benefit from the 12b-1 fees paid by the Funds on Class B shares.  There is a separate contract with Citibank for Class 529-B shares but it is functionally identical.

54.   Similarly, on C shares, AFD advances a 1% commission to the broker dealer at the time of sale.  During the first year, the Funds' 1% 12b-1 fee is used to "reimburse" AFD for this commission payment but, as with the B shares, this is not a straight "reimbursement" because AFD may retain more than it paid out to the dealer if assets have grown by year end.  *See, e.g.*, Exh. Nos. 15, 812.

### 5.    Administrative Services Fees

55.   Pursuant to an Administrative Services Agreement, entered into between CRMC and each Fund, CRMC provides and/or contracts and arranges to have provided transfer agency, recordkeeping and related shareholder services for the Funds' Class C, F, R, and 529 shares.  Stip. Fact ¶57.

56.   The Administrative Services Agreement is approved on an annual basis by the Boards of each of the Funds.  Stip. Fact ¶58.

57.   The Administrative Services Agreement provides that in consideration of administrative services performed or caused to be performed by CRMC for the Funds' Class C, F, R, and 529 shares, the Fund shall pay CRMC an annual administrative services fee up to 0.15% (up to 0.10% in consideration of Class R-5 shares and up to 0.05% in consideration of Class R-6 shares) based on each Fund Class' average daily net assets.  Stip. Fact ¶59.

58. According to the Administrative Services Agreement, administrative services include account maintenance, transaction processing, tax reporting, and shareholder and fund communications. Stip. Fact ¶60.

59. Under the Administrative Services Agreement, CRMC is obligated to monitor, coordinate, oversee, and assist the third parties who provide these services. Stip. Fact ¶61.

60. During CRMC's fiscal years 2003 to 2005, the Funds paid a 0.15% administrative services fee on Class C, Class F, 529 shares and R-shares except Class R-5. Stip. Fact ¶62.

61. Beginning July 1, 2005, CRMC capped the amount it would receive for provision of administrative services to no more than 0.05%. To the extent the cap is exceeded in a given year, the administrative fee paid is reduced. Stip. Fact ¶63.

62. The remainder (above the 0.05% cap) of the administrative services fee paid to CRMC is paid out to third-parties including AFS. Stip. Fact ¶64.

## C.  FACTS REGARDING THE EXCESSIVENESS OF RULE 12b-1 FEES

### 1.  The Explosive Growth of the Funds Caused Serious Operational Problems for Defendants

63. Beginning in 2003, and continuing through CRMC's 2008 fiscal year, the net assets of the American Funds grew at previously unprecedented rates, as illustrated below (dollars are in billions). *See* Stip. Fact ¶73.

| Fund | FY Ending | 2003 ($ B) | 2004 ($ B) | 2005 ($ B) | 2006 ($ B) | 2007 ($ B) | 2008 ($ B) |
|---|---|---|---|---|---|---|---|
| AMBAL | 12/31 | $28.9 | $45 | $51.9 | $56.2 | $60.6 | $43.1 |
| AMCAP | 2/28 | $7.7 | $14.4 | $18.6 | $23.3 | $27.6 | $24.7 |
| BFA | 12/31 | $17.0 | $19.8 | $23.0 | $28 | $35.8 | $32.2 |
| CIB | 10/31 | $22.5 | $36.5 | $55.4 | $77.7 | $113.7 | $75.4 |
| WGI | 11/30 | $16.7 | $30.9 | $51.2 | $80.0 | $113.3 | $64.5 |
| GFA | 8/31 | $53.7 | $79.2 | $114.7 | $147.1 | $185.9 | $179.1 |

9

| IFA | 7/31 | $30.6 | $44.9 | $60.2 | $68.5 | $86.3 | $76.5 |
| ICA | 12/31 | $66.5 | $75.9 | $79.4 | $89.1 | $89.2 | $53.1 |
| **Total assets under management of Funds at Issue** | **6/30** | **$243.60** | **$346.6** | **$454.4** | **$569.8** | **$710.5** | **$548.6** |
| **Total assets under management for all American Funds** | **6/30** | **$422.0** | **$603.7** | **$756.8** | **$940.6** | **$1,224.9** | **$1,195.6** |

64. Starting in early 2004, the Directors began voicing concerns to Defendants about the growth in the American Funds' assets under management and the size of the Funds. *See, e.g.*, Exh. Nos. 97, 2362, 2459, 2468.

65. By December 2004, members of CRMC's Executive Committee were concerned about the operational problems growth was causing to the point where they were considering closing some funds. *See, e.g.*, Exh. Nos. 2487, 2488, 2491.

66. As part of their discussions regarding the growth of the funds, CRMC executives also considered various other alternatives to slow the growth of the Funds. *See, e.g.,* Exh. Nos. 2487, 2488, 2490-92.

67. Several of these alternatives were set forth in a January 26, 2005 memorandum by David Short (at the time AFD's National Sales Manager) which functioned as a follow up to the CRMC executives' discussions regarding the "fund size issue." Exh. No. 2492.

68. Mr. Short's January 26, 2005 memorandum expressly recognized that growth of the funds was a problem and listed for consideration various alternative ways to slow the funds' growth including, among many other alternatives: (1) cutting back on sales and marketing activities (which are funded by 12b-1

fees); (2) working closely with third parties such as Morningstar to help Defendants "'manage' the right message" so they can "slow sales"; and (3) reducing or eliminating AFD's payment of additional compensation to dealers. Exh. No. 2492.

69. Mr. Short's January 26, 2005 memorandum further stated that Defendants' ability in slowing down sales would have been "greatly enhanced if [AFD could] get to a point of revealing the problem to our own associates." This indicates that management regarded the problem and the possible solutions as too serious and sensitive to be discussed openly with the employees while alternative strategies were being developed. Exh. No. 2492.

70. Also in early 2005, CRMC executives sent out a survey questionnaire to their investment professionals (the portfolio managers and research analysts) soliciting their opinions regarding how to deal with major issues facing CRMC. CRMC asked that the investment professionals provide responses to the surveys by April 1, 2005. *See, e.g.*, Exh. No. 2504.

71. Many of the survey responses demonstrate that the portfolio counselors and research analysts were experiencing problems from growth of the American Funds including:

a) reduced ability to make "high conviction" investments because fund security holdings had become so large that they were increasingly at internal or external limits for such holdings (*see, e.g.*, Exh. Nos. 2500, 2505, 2510, 2512,2513 2519);

b) the initial strategy for dealing with growth was not working well and had to be revised (*see, e.g.*, Exh. Nos. 2497, 2512, 2518, 2522);

c) the portfolio counselors and research analysts were experiencing too much pressure to invest the enormous sums pouring into the Funds and felt they were being pushed to do so even if they had to invest in their

lower conviction investment choices (*see, e.g.*, Exh. Nos. 2500, 2505, 2510, 2512, 2513, 2519, 2496);

d)   many portfolio counselors and research analysts were overburdened and experiencing significant stress from having to manage the new inflow of assets. *See, e.g.*, Exh. Nos. 2500, 2502, 2506, 2512.

72.   Starting prior to 2005, CRMC had tried to address the problems generated by fund growth by creating two CRMC divisions named Capital World Investors and Capital Research Global Investors (CWI and CRGI).

73.   One of the chief potential benefits of dividing investment management activities between those two divisions (known as "disaggregation") was supposed to be that CRMC could eventually alleviate the problem of growth causing investment professionals to be "maxed out" under the applicable ownership limits.  *See, e.g.*, Exh. Nos. 641, 643.  However, to accomplish this, CRMC needed the approval of the Securities and Exchange Commission ("SEC") that CWI and CRGI were separate investment entities.  *See, e.g.*, Exh. Nos. 642, 1093.  This did not occur until December 31, 2007, the date the SEC officially recognized the two entities as separate and permitted them to file separate, rather than aggregated, securities ownership reports.  Stip. Fact ¶10.

74.   As reflected in the survey responses, the disaggregation of the CRMC entities was a difficult and time consuming process involving a lot of trial and error.  *See, e.g.*, Exh. Nos. 2497, 2506, 2512, 2518, 2522, 2523.

75.   Meanwhile, during this time, the Directors continued to express further concern about the impact of the continued growth of the Funds. *See, e.g.*, Exh. Nos.  62, 71, 114, 2550, 2559, 2562.  At this point, the Directors also knew that industry commentators were growing increasingly concerned about

the size of some of the Funds. *See, e.g.*, Exh. Nos. 41, 1067, 2401, 2559, 2610.

76. In response, Defendants assured the Directors that disaggregation would facilitate CRMC's ability to manage increasing amounts of new assets, and did not disclose that its investment professionals were experiencing serious problems because of the unprecedented growth of the Funds as revealed by the survey responses. *See, e.g.*, Exh. Nos. 90, 93, 115.

77. Defendants also responded to the Directors' concerns by assuring them that CRMC's "Multiple Portfolio Counselor System" and planned division of the CRMC investment groups into two different portfolio management teams would adequately address any potential problems in managing the increasing amount of assets under management. *See, e.g.*, Exh. Nos. 90, 93, 115.

78. The "Multiple Portfolio Counselor System" is supposed to allow each of the portfolio counselors in a particular fund to invest according to his or her highest convictions. *See, e.g.*, Exh. No. 881.

79. In practice, however, from at least 2005 through 2007, the Multiple Portfolio Counselor System did not allow the portfolio counselors to invest in their highest convictions because they were running up against their allowable investment limits. *See, e.g.*, Exh. Nos. 79, 2505, 2607.

80. While CRMC internally debated what to do about its increasing size and the problems associated with it, CRMC executives misled the Directors by presenting them with a "white paper" on May 18, 2006 concerning managing mutual fund asset growth that made no reference to the problems that were actually being experienced (the "Growth White Paper"). *See* Exh. No. 1.

81. In contrast to the numerous options being examined internally by management, the Growth White Paper presented closing the funds as the only available option to slow or reverse growth. *See* Exh. No. 1.

82.  CRMC Executives made several material misrepresentations in the Growth White Paper in an effort to purportedly demonstrate that growth was not a problem at CRMC when they knew that there were serious concerns at the executive level about growth. *See* Exh. No. 1.

83.  For example, in support of the claim that CRMC's Multi-Portfolio Counselor System is uniquely suited to handle large growth in assets, CRMC states in the Growth White Paper: "[i]mportantly, this system allows investment professionals to focus on their highest investment convictions." *See* Exh. No. 1.  This statement is contradicted by the repeated comment in the survey responses that the unprecedented growth was preventing CRMC investment professionals from making their high conviction investments. *See, e.g.*, Exh. Nos. 2500, 2505, 2510, 2512, 2513, 2519.

84.  CRMC assured the Directors in the Growth White Paper that the American Funds were liquid.  In support, CRMC stated in the Growth White Paper that "[CRMC] believe[s] that [CRMC] could easily sell 20% of most holdings in about one or two days at close to carrying values based on average trading volume." This statement was supported by a chart.  The chart, in a footnote, disclosed that "this measure assumes our trades represent all of the average trading volume [in each stock, on each day]."  Exh. No. 1.  Thus, that estimate was based on the very unrealistic assumption that CRMC's traders would represent all of the average trading volume in the security.

85.  Even if that assumption were realistic, the Growth White Paper misleadingly ignored the understanding of CRMC's top management that CRMC normally could not trade more than 15-20% of a given day's volume of a security without having an unacceptably adverse impact on the stock price. Exh. No. 2485.

86.    Although during the relevant period CRMC had repeatedly assured the Directors that disaggregation would solve the problems of growth, it was not until December 31, 2007, that CWI and CRGI began to report their securities ownership to the SEC separately.    Stip. Fact ¶10.    Prior to that time, securities ownership of CWI and CRGI was aggregated for the purpose of measuring CRMC's securities holdings against applicable ownership limits. Therefore, it was several years before the disaggregation program was able to provide meaningful relief from the problems of being "maxed out" under ownership limits.

87.    Despite their concerns, the Funds' Directors continued to recommend that the 12b-1 plans be renewed annually in ever greater dollar amounts.  *See, e.g.*, Exh. Nos. 97, 1014.

88.    The effect of those payments was to continue to enhance the activities of AFD and the broker-dealers aimed at selling additional Fund shares, at the same time that CRMC was struggling to solve the operational problems that growth had created.

## 2.    The Negative Effect of Fund Growth on Performance

89.    In addition to statements from CRMC contained within the Growth White Paper, CRMC continued to assure the Directors that the continuing growth of fund assets would not adversely affect investment results.

90.    The Court accepts the testimony of Plaintiffs' expert, Dr. Edward O'Neal, that continued growth of the Funds from January 2000 to September 2008 adversely impacted the relative performance of AMCAP, AMBAL, BFA, GFA and IFA.  Exh. No. 2669.

91.    Dr. O'Neal's testimony demonstrates that there is a statistically significant negative relationship between size and relative investment performance for all the funds managed by Defendants collectively, for the Funds collectively,

and for AMCAP, AMBAL, BFA, GFA and IFA individually.   Exh. No. 2669.

92. The Court finds that, at a minimum, AMCAP, AMBAL, BFA, GFA and IFA have been injured by Defendants' continued effort to grow these funds because their performance in comparison with their peers was adversely affected by their growth in assets during the relevant time period.

93. With respect to the three funds as to which Dr. O'Neal did not find a statistically significant negative relationship (CIB, WGI and ICA), the Court finds that, nevertheless, the evidence provides ground for concern as to whether their performance was adversely affected.   As stated below, the Directors did not have sufficient information to conclude that it would be in the best interest of any of the Funds to spend hundreds of millions of their assets to promote additional growth.

94. Defendants regularly informed the Directors of the performance rankings for the Funds as reported by the Lipper company.   Even by Defendants' own Lipper statistics, for five of the Funds (AMCAP, AMBAL, GFA, BFA and IFA), the Funds' Lipper rankings with respect to investment returns deteriorated as the Funds grew larger during the 2003-2008 time frame.   *See* Stip. Fact ¶ 74.

### 3.    The Negative Effect of Growth on the Funds' Trading Costs

95. In addition, the growth of the Funds caused the Funds' trading costs to deteriorate in comparison with the trading costs of their peers.

96. The Court accepts the testimony of Dr. O'Neal that: (1) as the size of a mutual fund increases, the size of the trades that must be made for the portfolio will also increase, all other things being equal; and (2) larger trades are generally less liquid than smaller trades.   *See* Exh. No. 2669.

97.  CRMC itself recognized that larger size leads to higher trading costs and realized in 2003 that it needed a service to quantify trading costs. CRMC thus hired Plexus, a third party service, to provide a detailed equity trading cost analysis for the American Funds beginning in late 2003. *See, e.g,* Exh. Nos. 2669, 2442.

98.  Plexus estimated the trading cost for transactions that CRMC executed for the American Funds and provided analysis of these trading costs in reports to CRMC. *See, e.g.*, Exh. Nos. 1390, 1401, 2669.

99.  In May 2008, a CRMC executive, Matt Lyons, reported that, "in line with previous reports, CRMC has the largest order size amongst its peers and a higher average cost of orders due to the large order size." *See* Exh. No. 489.

100.  Dr. O'Neal's analysis of Defendants' Plexus trading data shows that, over the period from the fourth quarter of 2003 to the third quarter of 2007, Defendants (on behalf of the American Funds) had equity trading costs on U.S. trades that ranked on average in the 32nd percentile -- meaning that roughly two-thirds of the institutional traders that Plexus monitors had lower trading costs than Defendants. Exh. No. 2669.

101.  Dr. O'Neal's analysis further demonstrates that from 2000 to the third quarter of 2007, during which time Defendants' trading volume and average trade size increased greatly, Defendants' trading cost advantage relative to other institutional traders on similarly-sized trades deteriorated. Exh. No. 2669.

102.  This Court accepts the testimony of Dr. O'Neal that his analysis of the trading costs suggests that growth caused the American Funds to incur high trading costs, and caused the Funds' trading costs relative to the Plexus universe to deteriorate.

### 4.    The Flaws in the Directors' Continued Approval of 12b-1 Fees

103.    As early as 2004, Directors were questioning whether continued payment of 12b-1 fees was justified.  *See, e.g.*, Exh. Nos. 97, 2456.

104.    Between 2004 and 2007, the Directors repeatedly expressed confusion about AFD's distribution operations and the sources and uses of 12b-1 fees.  *See, e.g.*, Exh. Nos. 55, 67, 2460, 2535, 2538, 2597, 2616.

105.    Despite such gaps in their knowledge, and despite the negative effects growth was having on the Defendants' ability to manage the assets, trading costs, and relative performance, the Directors approved ever increasing dollar amounts of 12b-1 fees.  In 2003, $883,177,402 in 12b-1 fees were charged to the American Funds and by 2007 this number had increased to $2,087,290,083.  *See, e.g.*, Exh Nos. 793, 796.

106.    To justify the increasing 12b-1 payments during the 2003-2008 period, the Directors were required to find that there was a reasonable basis to conclude that the economic benefits to the Funds were sufficient to outweigh the substantial cost of those fees.  *See, e.g.*, Exh. Nos. 37, 816.

107.    The Directors based their approval on various factors typically reiterated in the board minutes.  *See, e.g.*, Exh. No. 1014.  As part of their approval of the 12b-1 fees, Directors did not request, and did not receive, information that showed that the benefits of Rule 12b-1 fees were sufficient to outweigh their substantial costs.

108.    One of the factors on which the Directors based their approval of the Rule 12b-1 fees was on the supposed benefits to the Funds that would come from CRMC's sharing with the Funds economies of scale that would be generated by growth.  *See, e.g.* Exh. Nos. 88, 119, 878.

109. Defendants told the Directors that this sharing of economies of scale would occur through new breakpoints that would reduce the advisory fee percentages, and through fee waivers. *See, e.g.* Exh. Nos. 69, 830.

110. However, the dollar amount given back through reduced advisory fee percentages and fee waivers was far less than the amount paid by the Funds in 12b-1 fees. *See, e.g.*, Exh. No. 2669.

111. In approving the 12b-1 fees, the Directors relied on the idea that 12b-1 fees discouraged redemptions of Fund shares by customers. *See, e.g.* Exh. Nos. 55, 878.

112. However, the issue confronting the Funds during the relevant period was not that they might have insufficient assets to fund redemptions or that they would shrink to a level that was economically undesirable. Instead, the issue confronting the Funds was that assets under management were too large. *See, e.g.*, Exh. Nos. 97, 2362, 2459, 2468, 2487, 2488, 2490-92.

113. The Court find that there is insufficient evidence that payment of 12b-1 fees is what caused the Fund's redemption rate to be lower than that of the industry generally. The Fund's redemption rates were lower than the industry before 12b-1 fees came into existence.

114. The Directors also approved 12b-1 fees in part on the ground that it was necessary to pay brokers to continue providing services to Fund security holders. *See, e.g.*, Exh. No. 1014.

115. The Court finds that there is little evidence in the record as to whether the amounts paid were justified by the services provided by brokers. Furthermore, this consideration is irrelevant to the substantial portion of 12b-1 fees paid for distribution (*i.e.* marketing) rather than service by broker-dealers. In 2007, for example, approximately 35-40% of all 12b-1 fees complex wide were not paid out as service fees. *See, e.g.,* Exh. No. 2633.

116.    Although the Directors repeatedly expressed concern about whether growth was hurting the Funds, repeatedly raised the question whether 12b-1 fees needed to be paid at the extraordinary levels involved, and repeatedly asked CRMC for information about AFD's operations and distribution program they had not yet received, the Directors nevertheless regularly approved continuations of the 12b-1 fees for marketing purposes (*i.e.* growth). Thus, the Directors annually approved the 12b-1 fee payments despite the lack of information that would have been important to their evaluation of the proposed fees.

### D.    FACTS DEMONSTRATING THE EXCESSIVENESS OF THE FUNDS' ADVISORY FEES

#### 1.    Defendants Benefitted from Economies of Scale which They Did not Adequately Share with the Funds

117.    Economies of scale exist in the mutual fund business. *See, e.g.*, Exh. No. 2669.

118.    CRMC has admitted that economies of scale exist in its advisory operation, at least in the short run. *See, e.g.*, Exh. Nos. 2, 830.

119.    According to CRMC, the 2004 fiscal year was an example of how economies of scale occurred in the advisory part of its business. *See, e.g.*, Exh. No. 830.

120.    Throughout the relevant period, multiple independent counsel to the Directors specifically requested that CRMC provide the Directors with information concerning the nature and extent of economies of scale realized by CRMC in providing services to the Funds and the extent to which such economies of scale were appropriately shared with the funds in the schedule of advisory fees paid by the Funds or otherwise shared with shareholders. *See, e.g.*, Exh. Nos. 30, 37.

121.    Defendants were aware that legal commentators believe that "[i]n addition to a historical cost analysis, the adviser should provide the directors with

20

information about the estimated additional costs of delivering investment management services to incremental assets in the fund at specified asset levels." *See, e.g.*, Exh. No. 2315.

122. At least as early as 2004, the Directors repeatedly requested Defendants provide an estimation of economies of scale, including requests for "hard data." *See, e.g.*, Exh. Nos. 41, 57, 838, 1010, 2468, 2479, 2481, 3033, 3070.

123. Also in early 2004, certain Directors believed that the advisory fee reductions due to breakpoints in GFA had become "minimal" because of the growing size of the funds. *See, e.g.*, Exh. Nos. 2456, 2459. The only thing that occurred in response to this concern was to implement still more breakpoints in March 2004 that would be properly characterized as "minimal." *See, e.g.*, Stip. Fact ¶ 38.

124. At the Independent Director Seminar in March 2004, Defendants presented the Directors with a budget for fiscal year 2004 (ending June 30, 2004) which demonstrated that, by December 31, 2003, sales were already double what the budget had anticipated. *See, e.g.*, Exh. No. 333.

125. Given this unprecedented amount of sales, and the obvious windfall such sales would generate to the adviser for the 2004 fiscal year, the Directors could have requested, but did not request, that CRMC implement a fee waiver or some other "give back" for the 2004 fiscal year (other than the minimal breakpoints added in March 2004) when they realized that CRMC was operating at double the sales budget by mid-fiscal year.

126. CRMC implemented no fee waivers for the 2004 fiscal year.

127. In June 2004, at the end of its fiscal year, due to the windfall it had achieved from the massive in-flows in the 2004 fiscal year, CRMC gave a special "summer bonus" to its associates. In addition, for the 2004 fiscal year CRMC's compensation levels to its associates increased from the 2003 fiscal

year by 43%. *See, e.g.*, Exh. No. 2453. Over 67% of the increase in employee compensation represented payments under CRMC's profit sharing plan. *See, e.g.*, Exh. No. 877.

128. Nonetheless, the Directors never requested that CRMC waive a portion of its advisory fees to share a meaningful portion of economies of scale during its 2004 fiscal year.

129. Instead, at the start of the second quarter of the 2005 fiscal year, in a memorandum dated October 13, 2004, CRMC itself proposed a voluntary and temporary 5% fee waiver that was only retroactive to September 1, 2004--six months after the March 2004 Independent Directors' Seminar when it was revealed that CRMC was at double its budgeted sales. *See, e.g.*, Exh. Nos. 333, 830. With respect to the 5% fee waiver, the Directors accepted without question that the 5% figure just felt "right" to CRMC. *See, e.g.*, Exh. Nos., 57, 99, 830. None of these actions affected CRMC's management fees for CRMC's 2004 fiscal year

130. Moreover, Defendants never provided the Directors with an estimation of economies of scale realized by CRMC but instead only provided them with a "white paper" on the subject of economies of scale on August 11, 2006 that failed to include any such data or quantification. *See, e.g.*, Exh. Nos. 41, 838, 839.

131. This Court accepts the testimony of Dr. O'Neal, which demonstrates that Defendants were enjoying significant economies of scale, both in the long and short term, and especially during CRMC's 2004 fiscal year when growth was extraordinary. *See, e.g.*, Exh. No. 2669. Dr. O'Neal's report shows that CRMC shared with the Funds only 4% of its additional profits from economies of scale in the 2004 fiscal year. This analysis by Dr. O'Neal focuses on CRMC's revenues and expenses without consolidation with AFD

and AFS, and views profit sharing payments as a distribution of profit for the purposes of the analysis. The Court finds that this approach is consistent with the advice provided to the Directors as to how to perform an economies of scale analysis by their independent counsel. *See, e.g.*, 3069. The Court accepts Dr. O'Neal's report in this regard and finds that the amount of economies of scale shared constitutes an unreasonably low percentage.

132.   The breakpoints in the Funds' fee schedules were not set with reference to the economies of scale Defendants enjoyed. *See, e.g.*, Exh. Nos. 60, 103, 3025.

133.   This Court accepts the testimony of Dr. O'Neal that CRMC gave Directors a misleading and overstated estimate of the financial benefit of new breakpoints introduced by Defendants during the 2004 fiscal year. *See, e.g.*, Exh. No. 2674. In an October 13, 2004 memorandum provided by CRMC to the Directors, CRMC stated that the value of the new breakpoints introduced in fiscal 2004 was approximately $75 million, when in fact those breakpoints reduced the advisory fees below the previous fee schedule by only $2.7 million. *See, e.g.*, Exh. Nos. 830, 2674.

134.   Defendants have asserted that they share economies of scale with the Funds by making improvements that benefit the Funds, but Defendants have not provided any quantification of such improvements. *See, e.g.*, Exh. No. 2.

135.   The vast majority of the improvements that CRMC made to its business consisted of technological and other improvements that CRMC made to address the problems of growth and in order to remain competitive in the advisory business. Defendants have not identified any improvements they made as a way of sharing economies of scale.

### 2. The Advisory Fees Were Inflated in order to Subsidize AFD's Payment of Additional Compensation to Broker-Dealers

136. In obtaining approval of its proposed advisory fees, CRMC told the directors that it typically had to subsidize AFD's operations and that CRMC's advisory fees should be sufficient for it to make a reasonable profit over and above expenses that included AFD's payment of "additional compensation to dealers," which was listed as an AFD expense. *See, e.g.* Exh. No. 37.

137. As a result, the Directors approved a fee schedule designed, among other things, to reimburse Defendants for "additional compensation to dealers."

138. However, the Funds paid this component of advisory fees for a "service" that was hurting rather than helping the Funds, because the essential function of "additional compensation to dealers" was to promote further growth of the Funds. *See, e.g.*, Exh. Nos. 57, 89, 335, 813, 1028, 2368, 3035.

139. Inflating the advisory fee to cover "additional compensation" payments to broker-dealers constituted an indirect use of fund assets for the purpose of marketing and distributing fund shares. The Directors knew, or should have known, that to make such use of fund advisory payments through the advisory fee violated SEC regulations.

### E. FACTS DEMONSTRATING THE EXCESSIVENESS OF THE ADMINISTRATIVE FEES

140. During the relevant period, Directors continually requested more information regarding the administrative fees because the Contract Committee materials CRMC had provided did not contain information regarding the costs to CRMC for providing such services. *See, e.g.,* Exh. Nos. 55, 102.

141. In an August 15, 2005 memorandum to all Board members of all of the American Funds, CRMC stated that it had determined that it was retaining too much of the administrative services fees and was voluntarily going to cap

itself at five basis points (.05%) going forward. *See* Exh. No. 814. The Court finds that this constituted an admission by CRMC that it was retaining too much of the administrative services fees from the beginning of the relevant period until at least July 1, 2005 (the effective date of the five basis point cap).

142. Despite this admission and self-imposed cap, CRMC never gave back any monies it received from administrative services fees during the relevant period through July 1, 2005 and the Directors never requested that any such monies be given back to the Funds.

143. In addition, Defendants erroneously stated to the Directors that capping CRMC's administrative fee retention at .05% would mean that CRMC would not make a profit on this fee because it would be converted to a pass-through expense. *See, e.g.* Exh. No. 814, 1014. This functioned as an admission that the administrative fees from the 2004 to the 2005 fiscal year were disproportionate to the services rendered; none of which were returned to the Funds.

144. Even after CRMC imposed the five basis point cap, the Directors still were not receiving information regarding the costs to CRMC of providing administrative services, yet they continued to approve such fees on an annual basis. *See, e.g.*, Exh. No. 15.

145. After a routine books and records examination, on September 21, 2006, the staff of the Pacific Regional Office of the SEC advised CRMC that the Directors had not been receiving an estimate of a breakdown of CRMC's costs and profits from the administrative fees, and that such an estimate was essential for the Directors to properly carry out their responsibility to evaluate the reasonableness of these fees. *See, e.g.*, Exh. No. 3060.

146. At the SEC's request, CRMC provided to the SEC a breakdown of CRMC's costs and profits relating to the administrative function for the 12-month period ended April 30, 2006, and the SEC included it in a letter to CRMC which was, in turn, provided to all of the American Funds' Boards of Directors. *See, e.g.*, Exh. No. 3060. This breakdown showed that it only cost CRMC one basis point to provide these services. *Id.* At no time did CRMC inform the Directors that it believed that the breakdown it provided to the SEC was inaccurate.

147. On October 30, 2006, CRMC responded to the SEC and stated that CRMC believed that it had given the fund boards all the necessary information to consider the reasonableness of the administrative fees. *See, e.g.*, Exh. No. 2373. CRMC, however, indicated that it was reviewing the possibility of providing the information the SEC thought was required. *Id.*

148. On January 26, 2007, CRMC sent the SEC a follow-up letter regarding the SEC's concern about reporting costs and profitability of the administrative function to the Directors. *See, e.g.*, Exh. No. 2375. Notwithstanding the passage of time, CRMC merely indicated that they would continue to explore the issue. *Id.*

149. From at least the beginning of the relevant period (July 15, 2003) to late 2008, the Directors continually approved the administrative services fees despite having no knowledge of the cost to CRMC to provide them or how much profit CRMC was making from them. *See, e.g.*, Exh. Nos. 299, 1006.

150. Following the 2006 SEC cost allocation (which CRMC now contends is inaccurate despite that it was provided to the Directors), CRMC did not provide the Directors with an estimate of a breakdown of the costs and profits relating to the administrative function in connection with their

approval of the administrative services fees until late 2008--over two years later.  *See., e.g.¸* Exh. No. 19.

151.    Several Directors testified in this action that they did not need any of the information that the SEC stated they should have regarding the costs and profitability of the administrative services fees because they just considered the expense ratio as a whole.

152.    The Court find that the Directors were not sufficiently informed about the administrative services fees during the relevant period up until late, 2008. Several Directors were unaware that the administrative services function was a profit center for CRMC and yet others were unaware which entity received the administrative services fees.  *See, e.g.*, Exh. Nos. 2510, 2616.

   **F.    ADDITIONAL FACTS INDICATING THE DIRECTORS LACKED THE INFORMATION NECESSARY TO APPROVE THE FEES AT ISSUE AND WERE NOT ACTING IN A CONSCIENTIOUS AND INDEPENDENT WAY**

153.    The Directors lacked sufficient information to make an informed decision on whether the proposed advisory, Rule 12b-1, and administrative services fees proposed by CRMC and AFD were reasonable.

154.    Certain Directors periodically requested information they said was needed to adequately review proposed fees.  That information was never provided in certain instances, and not provided for a period of years after the request in other instances.  They even lacked basic information concerning the sources and uses of the 12b-1 fees.  Nevertheless, the Directors always approved the fees Defendants proposed to them.

155.    The Directors did not seriously try to negotiate lower fees, but only tried to make a record that they could use to defend themselves if the fees they approved were challenged in court.  *See., e.g.*, Exh. Nos. 2510, 3029.

156. The Directors asked for, received and relied on legal advice from Defendants, instead of their independent legal counsel. *See., e.g.*, Exh. No. 2339.

## G.    PLAINTIFFS' DAMAGES

157. Given that AFD's role was to promote sales and discourage redemptions, all of the amount that AFD retained from 12b-1 fees was used for the primary purpose of promoting fund sales and discouraging redemptions.

158. The Court accepts Dr. O'Neal's analysis of the extent to which the 12b-1 fee payments during the 2005-2007 period were excessive. *See, e.g.*, Exh. No. 2671.

159. Dr. O'Neal conservatively assumed that by January 2005, CRMC had learned that the rapid recent growth in assets under management at the funds had created operational difficulties.

160. Dr. O'Neal concluded that at this point it was, or should have been, clear to CRMC management and to the Directors that the 12b-1 fees were not benefitting the Funds by promoting asset growth.

161. Given Defendants' statement that in 2007, approximately 60-65% of the 12b-1 fee was paid for service, Dr. O'Neal concluded that the remaining 35-40% of the 12b-1 fees were paid for marketing and promotion.  Dr. O'Neal conservatively used the 35% figure to estimate the dollar amount of 12b-1 fees that Defendants retained that were used to market the Funds.  The Court notes that this analysis by Dr. O'Neal is, if anything, favorable to Defendants because the evidence supports a conclusion that virtually all the 12b-1 fees retained by AFD were utilized for the purposes of promoting growth and discouraging redemptions.  Dr. O'Neal applied the 35% figure to the amount of 12b-1 fees retained according to Defendants' interrogatory responses to

calculate the amount of 12b-1 fees retained for promoting asset growth and discouraging redemptions and determined that the amount so retained was approximately $239.4 million.

162.    The Court finds that the $239.4 million figure represents the excessive amount of 12b-1 fees that the Directors approved without adequate review and justification, and that hurt rather than helped the Funds and did not generate documented benefits for the Funds.[4]

163.    The Court accepts Dr. O'Neal's analysis that the economies of scale realized by CRMC in its 2004 fiscal year is adequately represented by the sum of: (1) increased profits retained by CRMC owners; (2) increases in employee compensation arising from profit sharing; and (3) reductions in management fees. Based on this analysis, the total economies of scale at CRMC for its 2004 fiscal year were $448 million, of which only $18 million (or 4 percent) was shared with the Fund shareholders. *See, e.g.*, Exh. No. 2669. (O'Neal Opening Report at ¶64)

164.    The Court finds that the damages arising from Defendants' failure to adequately share economies of scale in CRMC's 2004 fiscal year should be at least equal to the average of the economies of scale CRMC shared with the Funds during the next three years through breakpoints and fee waivers. According to Dr. O'Neal's analysis, during its fiscal 2005, 2006 and 2007 years, CRMC shared 19.1%, 18.9%, and 13.3%, respectively, of economies

---

[4] In light of Defendants recent changes to their interrogatory responses as reflected in their June 3, 2009 revised Interrogatory Responses, it has come to Plaintiffs' attention that Dr. O'Neal did not include the amount of 12b-1 fees that AFD retained from the sale to Citibank of such fees on the Class B and 529-B shares in his analysis, because he reasonably assumed that amount was already included in the amount of 12b-1 fees those interrogatory answers said was retained. If the evidence at trial confirms that the amount AFD retained from Citibank payments was not included in Defendants' responses as part of 12b-1 fees retained, Plaintiffs will request that the Court allow Dr. O'Neal to revise his analysis to include those payments as economic benefits received by AFD, for its efforts to promote growth from the Funds.

of scale for an average of 17.1%. The Court finds that the difference between the 4% shared in 2004 and the average of 17.1% shared over the next three years would be a very conservative measure of the extent to which management fees were excessive in 2004. 17.1% of the economies of scale realized by CRMC in its 2004 fiscal year, as determined by Dr. O'Neal, would be $76,608,000. Subtracting the $18 million Dr. O'Neal identified as the dollar amount of economies of scale distributed to the Funds in CRMC's 2004 fiscal year indicates that at least an additional $58,608,000 should have been provided to the Funds in that year.

165. The Court also awards damages for Defendants' inflation of their advisory fee for additional compensation to dealers in the amount of all payments of additional compensation to dealers during the relevant period, adjusted to reflect to *pro rata* share of the Funds' advisory fees out of all advisory fees by all of the American Funds.

166. The Court finds that the Directors did not have adequate information to approve the administrative fees from at least the beginning of the relevant period.

167. For purposes of the calculation of damages for the administrative services fees, the Court will adopt Defendants' cap on the administrative services fees of five basis points is appropriate and therefore finds that the damages or other relief with respect to the administrative services fees should be the amount of the fee which exceeded the five basis points of net assets that CRMC retained from the administrative services fees charged to the Funds from July 15, 2003 until July 1, 2005 (the latter being the date on which CRMC instituted its cap of five basis points on such fees).

## II.    CONCLUSIONS OF LAW

168.    Section 36(b) states that:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in the respect of such compensation or payments paid by such registered investment company or the security holders thereof to such investment adviser or person.

15 U.S.C. § 80a-35(b).

169.    The Section 36(b) claim in this case has been tried under the standard articulated in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 925, 928 (2d Cir. 1982) ("*Gartenberg II*"), *cert. denied*, 461 U.S. 906; 76 L. Ed. 2d 808; 103 S. Ct. 1877 (1983).  *See* May 28, 2009 *Order Continuing Hearing* at 2 (Docket No. 401).

170.    *Gartenberg* held that a Section 36(b) violation occurs if the fees at issue are "so disproportionately large as to constitute a breach of fiduciary duty in violation of § 36(b)," and that the test to be applied is "whether the fee

schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Id.* at 925, 928.

171. Under *Gartenberg*, "[t]he following factors are to be considered in applying this standard: (a) the nature and quality of services provided to fund shareholders; (b) the profitability of the fund to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures; and (f) the independence and conscientiousness of the trustees." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (*citing Gartenberg, supra*).

172. However, in determining the reasonableness of the advisory fee, Congress "intended that the court look at all the facts in connection with the determination and receipt of such compensation." *Gartenberg*, 694 F.2d at 930 (*citing* Senate Report at 4910), and the listed factors are not exclusive of other relevant considerations.

173. To the extent that a portion of the fees paid to the investment adviser was " 'disproportionate, excessive, or unearned,' … because it was based upon the existence of [facts] not disclosed when the fees were negotiated, plaintiffs …. may recover that portion of the fees."   *In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 760 (D. Md. 2008); *accord Galfand v. Chestnutt Corp.*, 545 F.2d 807, 812 (2d Cir. 1976).  *See also Gartenberg v. Merrill Lynch Asset Mgmt., Inc*., 528 F. Supp. 1038, 1047 (S.D.N.Y. 1981) ("*Gartenberg I*")(quoting *Galfand*: "'The conduct of the investment adviser must be governed by the 'duty of uncompromising fidelity' and 'undivided loyalty' to the Fund's shareholders that is imposed by Section 36(b)").

174. However, "even when full disclosure has been made, the courts must "'subject the transaction to rigorous scrutiny for fairness.'" *Gartenberg I*, 528 F. Supp.at 1047 (citing, *inter alia, Galfand*, 545 F.2d at 811-12).

175. Courts, including this Court, have held that while Section 36(b) is not subject to Fed. R. Civ. P. 23.1 (*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 78 L. Ed. 2d 645, 104 S. Ct. 831 (1984)), it is analogous to a derivative claim on behalf of the mutual fund itself and *not* a direct claim of shareholders. *See*, e.g., *In re Am. Funds Fees Litig.*, No. 04-5593, 2005 U.S. Dist. LEXIS 41884, at *15-16 (C.D. Cal. Dec. 16, 2005); *In re BlackRock Mut. Funds Fee Litig.*, No. 04-164, 2006 U.S. Dist. LEXIS 13846, at *33 (W.D. Pa. Mar. 29, 2006) (collecting cases).  The Court concludes that the language of the statue does not speak in terms of share classes but rather states that an "action may be brought under [Section 36(b)] by a security holder of such registered investment company **on behalf of such company**."  15 U.S.C. § 80a-35(b) (emphasis added).  Thus, Plaintiffs have standing to assert their Section 36(b) claim on behalf of all shares of all of the Funds.

## A.    <u>CONCLUSIONS REGARDING NATURE AND QUALITY OF SERVICES</u>

176. This Court concludes that the performance of the Funds and the relative level of their trading costs were both negatively affected by the decisions of Defendants to continue to strongly promote growth of the Funds' assets under management by promoting sales of Fund shares and discouraging redemptions. In this respect, the services performed by CRMC were of diminished value.

177. This Court concludes that because the fund growth fueled by Rule 12b-1 fees did not benefit the funds and hurt their performance, the distribution services

provided in exchange for Rule 12b-1 fees were of little value to the Funds and did not represent high quality service.

178.  Furthermore, the services performed by the advisors include keeping the Directors fully informed of information pertinent to the Directors' responsibilities.  The quality of the advisory services in that respect was poor in that CRMC failed to keep the Directors adequately informed and actually mislead the Directors as found above.

## B.    CONCLUSIONS REGARDING PROFITABILITY

179.  With respect to profitability comparisons made for *Gartenberg* purposes, courts considering this issue have held that, "to the extent that comparisons are probative at all, a mutual fund advisor-manager must be compared with members of an appropriate universe: advisor-managers of similar funds." *Kalish v. Franklin Advisors, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990).

180.   The Court holds that CRMC dwarfs most of the advisors with which it hopes to compare its profitability (and with whom it compared its profitability to the boards).  *See* Stip. Fact ¶96.  Furthermore, only a very small percentage of all mutual fund advisors make their profitability public. For this reason, the profitability figures are not probative in analyzing whether Defendants breached their fiduciary duties under Section 36(b).

## C.    CONCLUSIONS REGARDING COMPARATIVE FEE STRUCTURES

181.  The Second Circuit in *Gartenberg II* held that the normally "unseverable relationship between the adviser - manager and the fund it services tends to weaken the weight to be given to rates charged by advisers of other similar funds." *Gartenberg II*, 694 F.2d at 929; *accord Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 486 (S.D.N.Y. 1988);  *Schuyt v. Rowe Price Prime Reserve Fund*, 663 F. Supp. 962, 973 (S.D.N.Y. 1987) ("the price charged by other similar advisers to funds managed by them *is not* the principal factor to

be considered in evaluating a fee's fairness.") (emphasis added); *Kalish*, 742 F. Supp. at 1227 ("*Gartenberg*…holds that 'the principal factor' in evaluating that fairness cannot be 'the price charged by other similar advisers to funds managed by them' and thus putting the "comparative fees" factor 'last in the batting order').

182.    The Court concludes that fee comparisons to other mutual funds deserve little weight because, given the massive size of the Funds at issue, there is a paucity of "similar" mutual funds. Furthermore, the evidence does not support any conclusion that competition in the mutual fund industry provides assurance that Defendants' fees were reasonable.  Rather, the apparent lack of arm's-length bargaining between mutual fund advisers and their funds generally leaves open the question whether fees charged by others are a reliable basis for evaluating Defendants' fees.

## D.    CONCLUSIONS REGARDING ECONOMIES OF SCALE

183.    *Gartenberg* requires that the Court consider "*the extent to which* the adviser-manager realizes economies of scale as the fund grows larger." *Gartenberg II*, 694 F.2d at 929 (emphasis added).  "The concept of 'economies of scale' assumes that as a mutual fund increases in size, its operational costs decrease proportionally.  If a fund realizes economies of scale, its willingness to let the shareholders participate in the resulting benefits becomes a factor in evaluating the reasonableness of the adviser-manager's fees." *Kalish*, 742 F. Supp. at1237.

184.    If a fund is experiencing economies of scale, "fund directors have an obligation to ensure that fund shareholders share in the benefits of the reduced costs by, for example, requiring that the adviser's fees be lowered, breakpoints be included in the adviser's fees or that the adviser provide

additional services under the advisory contract." SEC, Division of Investment Management: Report on Mutual Fund Fees and Expenses, at B 1 (Dec. 2000), *available at* http://www.sec.gov/news/studies/feestudy.htm.

185. Defendants, although enjoying significant economies of scale during CRMC's 2004 fiscal year, did not equitably share economies of scale resulting from growth through lower advisory fees or Rule 12b-1 fees in that year.

## E.   CONCLUSIONS REGARDING THE CONSCIENTIOUSNESS AND THE ADEQUACY OF KNOWLEDGE OF THE DIRECTORS

186. The "expertise of the independent trustees of a fund, whether they are fully informed about all facts bearing on the adviser-manager's service and fee, and the extent of care and conscientiousness with which they perform their duties are important factors to be considered in deciding whether they and the adviser-manager are guilty of a breach of fiduciary duty in violation of § 36(b)." *Gartenberg II*, 694 F.2d at 930. *Accord Krinsk* at 875 F.2d 404, 412 (stating that, "[t]he expertise of the trustees, whether they are fully informed, … *are among the most important factors to be examined* in evaluating the reasonableness of compensation under section 36(b).") (emphasis added)

187. The investment adviser owes a "duty of full disclosure to the trustees and shareholders of the Fund." *Gartenberg I,* 528 F. Supp. at 1047 (*citing, inter alia, Galfand*, 545 F.2d at 811). The investment adviser's "communication of information must be 'effective,' bearing in mind that the independent directors are not full-time employees and that 'neither their activities nor their experience' may be "primarily connected with the special and often technical problems of fund operation.'" *Fogel v. Chestnutt,* 533 F.2d 731, 745 (2d Cir. 1975) (quotation omitted)

188.  The Court concludes that the Directors were not adequately informed or conscientious in approving the fees at issue because:

a)  Defendants concealed key information regarding the effects of growth from the Directors that the Directors required in order to be able to consider whether the Rule 12b-1 fees were reasonable and benefitted the funds;

b)  the Directors continually approved ever higher amounts of Rule 12b-1 fees in spite of their concern about whether growth was in the Funds' best interest;

c)  the Directors did not know what economies of scale were being shared with the Funds because they never received any estimation of the amount of economies of scale realized by Defendants;

d)  the Directors were unaware of some of the most basic information relevant to evaluating the fees they approved;

e)  the Directors were not provided, during most of the relevant period, with any breakdown of the costs profitability of the administrative services fees to CRMC; and

f)  the Directors did not seriously try to negotiate lower fees, but only tried to make a record that they could use to defend themselves if the fees they approved were challenged in court.

189.  The Court concludes that, based on the above findings of fact and conclusions of law, Defendants received excessive compensation with respect to the 12b-1 fees charged to the Funds during the relevant period which were disproportionate to the value of the services rendered and could not have been the result of arm's-length bargaining.  Thus, Defendants breached their fiduciary duty under Section 36(b) with respect to the 12b-1 fees charged to the Funds during the relevant period.

190.    The Court concludes that, based on the above findings of fact and conclusions of law, Defendants received excessive compensation with respect to the advisory fees charged to the Funds during the relevant period which were disproportionate to the value of the services rendered and could not have been the result of arm's-length bargaining.    Thus, Defendants breached their fiduciary duty under Section 36(b) with respect to the advisory fees charged to the Funds during the relevant period.

191.    The Court concludes that, based on the above findings of fact and conclusions of law, Defendants received excessive compensation with respect to the administrative services fees charged to the Funds during the relevant period which were disproportionate to the services rendered and could not have been the result of arm's-length bargaining.    Thus, Defendants breached their fiduciary duty under Section 36(b) with respect to the administrative services charged to the Funds during the relevant period.

192.    The Court awards damages to the Funds in amounts to be determined as set forth above in the Findings of Fact.

DATED: July 20, 2009

MILBERG LLP
JEROME M. CONGRESS
JANINE L. POLLACK
ANNA C. DOVER
JOHN R. S. MCFARLANE


JANINE L. POLLACK

One Pennsylvania Plaza
New York, New York  10119-0165
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229
E-mail: jcongress@milberg.com

38

jpollack@milberg.com
adover@milberg.com
jmcfarlane@milberg.com

MILBERG LLP
JEFF S. WESTERMAN
One California Plaza
300 South Grand Ave., Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile:  (213) 617-1975
E-mail: jwesterman@milberg.com
  skim@milberg.com

WEISS & LURIE
JOSEPH H. WEISS
RICHARD A. ACOCELLI
JULIA J. SUN
551 Fifth Avenue, Suite 1600
New York, New York 10176
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010
E-mail: jweiss@ weisslurie.com
racocelli@weisslurie.com
jsun@weisslurie.com

*Co-Lead Counsel for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### <u>DECLARATION OF SERVICE BY E-MAIL</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, employed in the County of Los Angeles, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One California Plaza, 300 South Grand Avenue, Suite 3900, Los Angeles, California 90071-3149.

2.      That on July 20, 2009, declarant served the PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW **via e-mail** to the parties listed on the attached Service List.

3.      That there is a regular communication via email between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th day of July, 2009, at Los Angeles, California.

ELIZABETH VILLALOBOS

40

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

### AMERICAN FUNDS
### Service List

| Counsel for Defendants | |
|---|---|
| Gareth T. Evans<br>Andrew Z. Edelstein<br>GIBSON DUNN & CRUTCHER<br>333 S. Grand Avenue, 45th Floor<br>Los Angeles, CA  90071-3197<br>Telephone: (213) 229-7000<br>Facsimile:  (213) 229-7520<br>E-mail: gevans@gibsondunn.com***<br>aedelstein@gibsondunn.com*** | James N. Benedict<br>Sean M. Murphy<br>C. Neil Gray<br>MILBANK, TWEED, HADLEY<br>  & McCLOY LLP<br>One Chase Manhattan Plaza<br>New York, NY  10005<br>Telephone: (212) 530-5000<br>Facsimile:  (212) 530-5219<br>E-mail: jbenedict@milbank.com***<br>smurphy@milbank.com***<br>cngray@milbank.com*** |
| *** Denotes service via e-mail. | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW