GIBSON, DUNN & CRUTCHER LLP
GARETH T. EVANS, SBN 138992
GEvans@Gibsondunn.com
ANDREW Z. EDELSTEIN, SBN 218023
AEdelstein@Gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

MILBANK, TWEED, HADLEY & McCLOY LLP
JAMES N. BENEDICT, *Pro Hac Vice*
JBenedict@Milbank.com
SEAN M. MURPHY, *Pro Hac Vice*
SMurphy@Milbank.com
JAMES G. CAVOLI, *Pro Hac Vice*
JCavoli@Milbank.com
C. NEIL GRAY, *Pro Hac Vice*
CNGray@Milbank.com
L. ANTHONY PELLEGRINO, *Pro Hac Vice*
APellegrino@Milbank.com
One Chase Manhattan Plaza
New York, NY 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

Attorneys for Defendants
CAPITAL RESEARCH AND MANAGEMENT
COMPANY and AMERICAN FUNDS
DISTRIBUTORS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| In re AMERICAN MUTUAL FUNDS FEE LITIGATION | Case No. CV 04-5593 GAF (RNBx) |
| | **DEFENDANTS' POST-TRIAL BRIEF** |
| | Judge:           Hon. Gary A. Feess |
| | Hearing Date:  Sept. 2, 2009 |
| | 9:30 A.M. |
| | Place:           Courtroom 740 |

Gibson, Dunn & Crutcher LLP

# TABLE OF CONTENTS

I. **Preliminary Statement** ..................................................................1

II. **The Total Fees Were Not Disproportionate** ...................................2

    A.    **Assessing Total Fees/Services Is The Proper Approach** ....................2

    B.    **In Any Event, The Totality of the Circumstances Must Be Considered** ................................................................................3

    C.    **The *Gartenberg* Factors Applied to the Total Fees** ............................6

        1.    **Nature and Quality of Services** ....................................6

        2.    **Independence and Conscientiousness of the Directors** .............8

        3.    **Profitability** ..............................................................11

        4.    **Comparative Fees** .......................................................12

        5.    **Fall-Out Benefits** ........................................................13

        6.    **Economies of Scale** .....................................................13

III. **The Advisory Fees Were Not Disproportionate** ...........................16

    A.    **The Nature and Quality of Services** .........................................16

    B.    **Comparative Fees** ...............................................................16

    C.    **Profitability** ........................................................................16

    D.    **Independence and Conscientiousness of the Directors** ....................16

    E.    **Economies of Scale** .............................................................17

IV. **The Rule 12b-1 Fees Were Not Disproportionate** ..........................18

    A.    **Rule 12b-1 Fees and Fund Growth** .........................................18

        1.    **Survey Responses** .......................................................19

        2.    **Dr. O'Neal's Regressions** .............................................20

        3.    **The Benefits of Rule 12b-1 Fees** ....................................22

    B.    **Defendants Have No Fiduciary Duty With Respect to Rule 12b-1 Fees That Are Paid to Broker-Dealers** ................................27

    C.    **The *Gartenberg Factors* Applied to The Rule 12b-1 Fees** ...............28

        1.    **Nature and Quality of Services** ....................................28

        2.    **Profitability** ..............................................................29

        **3.**    **Comparative Fees**......................................................................29

        **4.**    **Economies of Scale**.................................................................29

        **5.**    **Independence and Conscientiousness of the Board**.................30

**V.**    **The Administrative Services Fees Were Not Disproportionate** .................31

    **A.**    **Preliminary Matters Relating to Administrative Services Fees**........32

    **B.**    **The *Gartenberg* Factors Applied to the Administrative Services Fee**.....................................................................................................32

        **1.**    **Nature And Quality Of Services**...............................................32

        **2.**    **Independence and Conscientiousness of the Directors** ............34

        **3.**    **Profitability** ...............................................................................35

        **4.**    **Comparative Fees**......................................................................36

        **5.**    **Economies of Scale**.................................................................37

    **C.**    **The "Cap" On the Portion of the Administrative Services Fees Retained By CRMC** ..............................................................................37

**VI.**    **Conclusion** .........................................................................................38

# TABLE OF AUTHORITIES

**Page**

**Cases**

Allen v. Wright,
468 U.S. 737 (1984)............................................................................32

Benak v. Alliance Capital Mgmt.,
No. Civ A. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) ...............................3

Davis v. Yageo Corp.,
481 F.3d 661 (9th Cir. 2007) ................................................................32

Gallus v. Ameriprise Fin., Inc.,
497 F. Supp. 2d 974 (D. Minn. 2007),
rev'd on other grounds, 561 F.3d 816 (8th Cir. 2009)...........................................25

Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,
528 F. Supp. 1038 (S.D.N.Y. 1981),
aff'd 694 F.2d 923 (2d Cir. 1982)................................................................passim

Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,
694 F.2d 923 (2d Cir. 1982)..........................................................1, 4, 6, 12

Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,
740 F.2d 190 (2d Cir. 1984)...................................................................11

In re Am. Mut. Funds Fee Litig.,
No. 04 CV-5593 (C.D. Cal. July 23, 2009) (Dkt. No. 514)...............................4, 27

In re Am. Mut. Funds. Fee Litig.,
No. 04 CV-5593 (C.D. Cal. June 6, 2009) (Dkt. No. 423).....................................12

In re Davis Selected Mut. Funds Litig.,
No. 04 Civ. 4186, 2005 WL 2509732 (S.D.N.Y. Oct. 11, 2005)............................19

ING Principal Prot. Funds Deriv. Litig.,
369 F. Supp. 2d 163 (D. Mass. 2005)..........................................................27

Jones v. Harris Assocs.,
527 F.3d 627 (7th Cir. 2008),
cert. granted 129 S. Ct. 1579, 173 L. Ed. 2d 675 (U.S. 2009)........................11, 13

Kalish v. Franklin Advisers, Inc.,
742 F. Supp. 1222 (S.D.N.Y. 1990) .............................................................passim

Korland v. Capital Research and Mgmt.,
No. CV 08-4020, 2009 U.S. Dist. LEXIS 33937 (C.D. Cal. Feb. 10,
2009)...........................................................................................18, 19

Krantz v. Prudential Invs. Fund Mgmt. LLC,
305 F.3d 140 (3rd Cir. 2002)......................................................................1

Krinsk v. Fund Asset Mgmt., Inc.,
715 F. Supp. 472 (S.D.N.Y. 1988),
aff'd, 875 F.2d 404 (2d Cir.) .......................................................................passim

Krinsk v. Fund Asset Mgmt., Inc.,
875 F.2d 404 (2d Cir. 1989).............................................................11, 12, 13, 14

*Meyer v. Oppenheimer Management Corp.,*
  895 F.2d 861 (2d Cir. 1990) ................................................................5, 24

*Meyer v. Oppenheimer Mgmt. Corp.,*
  707 F. Supp. 1394 (S.D.N.Y. 1988) .................................................12

*Pfeiffer v. Bjurman, Barry & Assocs.,*
  No. 03 Civ. 9741, 2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004) .........................39

*Pfeiffer v. Bjurman, Barry & Assocs.,*
  No. 03 Civ. 9741, 2006 U.S. Dist. LEXIS 7862 (S.D.N.Y. Mar. 2, 2006).............27

*Schuyt v. Rowe Price Res. Fund, Inc.,*
  663 F. Supp. 962 (S.D.N.Y. 1987) ...............................................passim

*Yameen v. Eaton Vance Distribs., Inc.,*
  394 F. Supp. 2d 350 (D. Mass. 2005)...........................................18, 27

*Zucker v. AIM Advisors, Inc.,*
  371 F. Supp. 2d 845 (S.D. Tex. 2005).................................................27

**Statutes**

15 U.S.C. § 80a-35(b)(1)..............................................................1

15 U.S.C. § 80a-35(b)(3).............................................................21

**Other Authorities**

Best Practices and Practical Guidance For Directors Under Rule 12b-1,
  *Report of the Mutual Fund Directors Forum*, at 15 (May 2007 ..............................27

Investment Company Act Release No. 10862 (Sept. 7, 1979)....................................22

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.A.A.N. 4897, 4910
  ("S. Rep. No. 91-184") ................................................................3, 11, 35

Securities and Exchange Commission, Division of Investment Management,
  Report on Mutual Fund Fees and Expenses § IV.B.1 (Dec. 2000) ..........................15

**Regulations**

17 C.F.R. § 270.12b-1..................................................................30

## I.    Preliminary Statement

Defendants submit this memorandum in support of their request that the Court enter an order of judgment in their favor. Plaintiffs bear the burden of proving that the fees at issue were "so disproportionately large" that they bear "no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982); 15 U.S.C. § 80a-35(b)(1). This requires an "examin[ation] of the relationship between the fees charged and the services rendered." *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3rd Cir. 2002). In most instances, Plaintiffs introduced no evidence germane to the *Gartenberg* factors.[1]

Any analysis under Section 36(b) starts with the level of fees and the nature and quality of the services provided. Here, all of the fees were among the lowest in the industry. In exchange, shareholders enjoyed a far ranging set of high quality services, including superior investment results. These simple and irrefutable facts prevent any finding of disproportionality. The fees also were approved by the Funds' independent directors, who were highly qualified, independent, fully informed, and diligent in their deliberations. This—coupled with the low fees and great service—is the death knell for Plaintiffs' case. There is simply no evidence that would justify this Court substituting its business judgment for that of the directors.

Plaintiffs attempt to obscure these core facts by asking this Court to ignore "all the surrounding circumstances" (which must be considered under *Gartenberg*) and focus instead on individual fees and isolated minutiae. But having advocated for this approach, Plaintiffs failed to even engage in a *Gartenberg*-style analysis of the individual fee components. Their core attacks on isolated fees fail to meet their burden

---

[1] The non-exclusive factors to consider under the *Gartenberg* test, which are applied herein, are discussed in full in Defendants' Memorandum of Contentions of Fact and Law 35-55 ("Defs. Conts.") (Dkt. No. 419), and Defendants' Proposed Findings of Fact and Conclusions of Law 75-90 ("Defs. Facts and Law") (Dkt. No. 529).

Gibson, Dunn & Crutcher LLP

of proof for the following reasons, among others:

- With respect to advisory fees, Plaintiffs focus primarily on a single *Gartenberg* factor—economies of scale. But it is undisputed that breakpoints and fee waivers alone returned over $1.2 billion to shareholders during the relevant period.

- With respect to Rule 12b-1 fees, Plaintiffs presented no evidence comparing the fees to the services provided, asserting instead that the fees caused harmful growth in Fund size and were thus improper *ab initio*. This claim is not only flawed as a matter of law, but it has no support in the record. No proof establishes that increased Fund size harmed investment results, let alone that Rule 12b-1 fees caused the increase in size. The 12b-1 fees were primarily to pay for ongoing shareholder services provided by financial advisers, and these services were highly valuable to shareholders. The Funds' directors—fully aware of possible issues regarding Fund size—exercised their business judgment that the 12b-1 fees were reasonable, benefited shareholders, and were necessary for competitive reasons. There is no support in the record to upset that judgment.

- With respect to administrative service fees, Plaintiffs never attempted to compare the fees to the nature and quality of services. The undisputed proof shows that the fees were low and the services were extensive and top-notch. Plaintiffs focus on a single fact—that, until 2006, the Directors did not receive allocated cost data regarding administrative services—asserting that this alone establishes liability. However, the Directors possessed more than ample information to approve the administrative service fee, and allocated cost data was wholly immaterial.

In the end, Section 36(b) is an equitable cause of action that requires a court to assess whether fund shareholders received a fair deal. No matter how the Funds' fees and services are sliced, the answer to that question in this case is a resounding yes.

## II.    The Total Fees Were Not Disproportionate

### A.    Assessing Total Fees/Services Is The Proper Approach

Respectfully, Defendants continue to maintain that the proper and most logical approach under Section 36(b) is to assess total fees in order to determine whether a breach of fiduciary duty occurred. That approach is supported by the text of the statute, the market and economic reality that consumers purchase a bundled package of

services, and that the directors consider the total package in approving a given fee.[2] The legislative history of Section 36(b) specifically states that:

> it is intended that the court look at *all the facts* in connection with the determination and receipt of such compensation, *including all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser has properly acted as a fiduciary in relation to such compensation*.

S. Rep. No. 91-184 at 15 (1969), *reprinted in* 1970 U.S.C.A.A.N. 4897, 4910 ("S. Rep. No. 91-184") (emphasis added).[3]  Neither this Court, nor the *Meyer v. Oppenheimer* court (which was cited by Plaintiffs as support for an isolated-fee approach), addressed this Congressional mandate in rendering their decisions.  Moreover, the record evidence developed at trial establishes that a total fees/services approach is proper.  *See infra* Section II.B.  As such, Defendants respectfully request reconsideration of the Court's pretrial evidentiary ruling.

## B.    In Any Event, The Totality of the Circumstances Must Be Considered

Even if Section 36(b) contemplates assessing fee components in isolation, it is clear that other aspects of Defendants' relationships with the Funds are properly considered at a minimum as *relevant* evidence in assessing whether any particular fee

---

[2]  This argument is fully set forth in the Defendants' opening and reply briefs (Dkt. Nos. 437 and 478) in support of their June 29, 2009 Motion *in Limine* to Exclude Evidence Relating To Alleged Excessiveness of Isolated Fee Components.

[3]  Following this legislative mandate, several courts have assessed the totality of services provided and the adviser's overall relationship with the fund.  *See Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1052 (S.D.N.Y. 1981) (it is "entirely proper for the fiduciary to consider the totality of the values placed at the disposal of the shareholders"), *aff'd* 694 F.2d 923 (2d Cir. 1982); *Benak v. Alliance Capital Mgmt.*, No. Civ A. 01-5734, 2004 WL 1459249, at *6-8 (D.N.J. Feb. 9, 2004) ("it is the overall nature and quality of the services provided by the investment adviser that is at issue—not merely some small percentage of those services"); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 498 (S.D.N.Y. 1988) *aff'd*, 875 F.2d 404 (2d Cir.) ("To the extent that the 12b-1 fees are excessive for the purpose intended, they should be considered with the advisory fee to determine whether payment of the two, in combination, amounts to a breach of fiduciary duty").

1
2
could have been negotiated at arm's-length.  Certainly nothing in *Meyer* or this Court's previous ruling on the issue undermines this legal tenet.[4]

3
4
5
6
Section 36(b) and *Gartenberg* do not envision a rigid application of static factors.  Rather, the standard must be applied equitably to take into account "*all* of the surrounding circumstances." *Gartenberg,* 694 F.2d at 928; *Krinsk*, 715 F. Supp. at 501.  As noted in *Gartenberg*:

7
8
9
10
> Equity has traditionally refused to be hemmed in by rigid boundaries; on the contrary, equitable powers are inherently flexible.  Equity always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the real relations of parties.

11
*Gartenberg*, 528 F. Supp. at 1049 (citations omitted).

12
13
14
15
16
17
18
19
20
21
22
*Krinsk* is also directly on point.  There, plaintiff challenged the fund's advisory fee under Section 36(b).  But shareholders also received services from an affiliate of the adviser as part of a Cash Management Account ("CMA").  *Krinsk*, 715 F. Supp. at 476.[5]   The CMA services were provided pursuant to separate agreements, not as part of the advisory agreement, and were paid for by a separate fee.  *Id.* at 478-79.   At trial, directors testified that they "evaluated the fairness of the advisory fee in light of costs and benefits of the CMA program as a whole, not simply [the adviser]'s management of the Fund."  *Id.* at 481.  While the issue presented was whether the adviser "breached its fiduciary duty to the Fund alone in its receipt of the advisory fee," the court agreed that "the Fund cannot be viewed separately from the other program components."  *Id.* at 485.    Therefore, the court considered the CMA services to be "a 'surrounding

23
24
25
26
27
28

---

4    Indeed, this Court has acknowledged "the well-established principle that a court must consider the totality of the circumstances when determining liability under Section 36(b)." *See In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593, at *5 (C.D. Cal. July 23, 2009) (Dkt. No. 514).

5    The services provided pursuant to the CMA program included a securities brokerage account, a savings vehicle, a VISA debit card, check writing privileges and a comprehensive monthly statement.  *Krinsk*, 715 F. Supp. at 476-77.

circumstance' which would pervade all aspects of a hypothetical arm's-length negotiation over the Fund's advisory fee." *Id.* at 486.

Thus, the case law holds that "surrounding circumstances" are relevant under Section 36(b), even if a single fee component is challenged.[6]  Here, as in *Krinsk*, it is clear that there are other circumstances that pervaded the negotiation of any one contract between Defendants and the Funds.  Those circumstances include: (1) over the relevant period, AFS provided billions of dollars in high quality shareholder services at cost, and automatically shared all economies of scale it realized; (2) AFD provided distribution-related services at a loss; (3) the Funds' total expense ratios are among the lowest in the industry; and (4) Defendants shared significantly in any economies of scale across *all* of the individual fee components.

Ignoring these "surrounding circumstances" would be inconsistent with the reality of how the Funds' fees were set.  For example, the evidence proves that AFS would "absolutely not" provide about $1 billion in shareholder services at cost, but for CRMC's other agreements with the Funds.  Tr. 450:9-19 (Gorvetzian).[7]  And it is undisputed that the directors logically considered the total services and total fees when approving individual fees.  *See* Tr. 949:20-25, 950:1-4, 982:22-25, 983:1-2 (Christie); 806:11-15, 868:4-12 (Newman).  The directors also focused on Defendants' overall profitability during deliberations—rather than the profitability of individual contracts.  Tr. 849:2-18 (Newman).  Finally, the Funds are bundled products, and shareholders cannot purchase individual service components separately.  *See* Ex. 651 (Hubbard Report ¶ 24); Tr. 1291:6-9 (Hubbard); 1525:14-1526:6 (Bobroff).

---

[6]  *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861 (2d Cir. 1990), cannot be read to undermine the need to assess the "totality of the circumstances" or the "all of the surrounding circumstances" as part of evaluating any particular fee.

[7]  AFD also would not provide distribution and related services at a loss (nor would CRMC provide capital contributions to meet AFD's legal operating requirements), but for the existence of CRMC's other agreements with the Funds.

Thus, even assessing isolated fee components, some consideration must be given to other benefits provided to shareholders and the overall bargain they received. To avoid consideration of these facts "would be to exalt form over substance and disregard the expressed Congressional intent that all the facts in connection with the determination and receipt of such compensation be considered." *Gartenberg*, 694 F.2d at 931 (citations omitted).

## C.    The *Gartenberg* Factors Applied to the Total Fees

### 1.    Nature and Quality of Services

The most important indicator of the nature and quality of services provided to shareholders is "the fund's performance relative to other funds of the same kind." *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1229 (S.D.N.Y. 1990); *see Krinsk*, 715 F. Supp. at 488. Here the performance of the Funds was exceptional.

Each of the Funds achieved superior long-term investment results. The Funds outperformed every metric or benchmark—whether it be Lipper peer groups (Exs. 2212, 2227, 2213A-H), Morningstar peer groups (Ex. 2228), or other indices (Ex. 2210A-H). Numerous witnesses made clear that the investment results of the Funds have been remarkable. Exs. 2227-28; Tr. 176:21-22 (Rothenberg); 1202:3-1209:16; 1211:2-7 (Peavy); 1479:4-7 (Pendleton); 1443:12-13 (Riggs). CRMC was able to achieve these outstanding results while limiting volatility (*i.e.*, risk) to the Funds' shareholders.[8]

The investment results of GFA are illustrative. A $10,000 investment in GFA at net asset value on December 31, 1997 was worth $27,205 on March 31, 2008, whereas that same money invested in the S&P 500 index would have been worth only $16,076. Tr. 136:6-17 (Rothenberg); Ex. 2210B. Even if the shareholder paid the maximum 5.75% load, the investment would have grown to $25,636—far in excess of the index. Tr. 136:18-22, 191:8-192:15 (Rothenberg); Exs. 2210B-1, 2210B-2. In short, the

---

[8]   Ex. 2211 (6 of the 8 Funds had higher returns and lower volatility than the S&P 500 Index and the MSCI World Index; GFA, had higher returns than both indices).

1    quality of the investment advisory services was of the highest order.[9]

2        In addition to performance, courts also have recognized the importance of

3    additional services. *See Kalish*, 742 F. Supp. at 1228; *Krinsk*, 715 F. Supp. at 488;

4    *Schuyt v. Rowe Price Res. Fund, Inc.*, 663 F. Supp. 962, 975-76 (S.D.N.Y. 1987).

5    Here CRMC provided a wide array of additional services to the Funds in exchange for

6    the advisory fee, including fund administration, fund accounting, treasury services,

7    portfolio trading,[10] compliance and bookkeeping. *See* Ex. 690; Tr. 668:17-671:2

8    (Haaga); Ex. 2223.[11]  In addition, AFD and third-party brokers provide a variety of

9    services in exchange for the 12b-1 fees (*see infra* Section IV.C.1) and shareholders

10   receive extensive administrative services. *See infra* Section V.B.1.

11       The nature and quality of the transfer agency services provided to shareholders by

12   AFS were also first rate.[12]  Such services include maintaining shareholder accounts and

13   the Funds' books and records, processing investments and redemptions, sending out

14   confirmations, account statements and quarterly statements, providing tax information,

15   answering shareholder and adviser questions, and making account changes.  Tr. 444:11-

16   18, 496:9-497:3 (Gorvetzian); Ex. 688 (shareholder services agreement).  In 2008 alone,

17   these services included 150 million financial transactions, 8 million service-related

---

[9] Plaintiffs concede the stellar performance of the Funds.  They claim, however, that *some* of the Funds performance *could have been even better* if the Funds were smaller.  But Plaintiffs failed to establish that there was any negative impact on performance from growth, *see infra* Section IV.A.2, and, in any event, the law does not recognize such a claim.  Under Section 36(b), "it is *not enough* for [a court] to find that a better bargain was possible." *Gartenberg,* 528 F. Supp. at 1047.

[10] CRMC's trading systems are state-of-the-art. Tr. 1120:22-1122:10 (Lyons).  The trading services provided to the Funds consistently surpass industry peers and CRMC was able to obtain among the lowest commission rates in the industry. *See* Ex. 649 (Peavy Report ¶¶ 50-71, Ex. 11); Tr. 1199:13-21, 1222:6-15 (Peavy); 1140:8-21 (Lyons).

[11] Information concerning these various services is set forth at Tab 9 of the Director Information Books. *See, e.g.,* Ex. 33 at CORBI_0350069-76.

[12] Transfer agency services are provided to the Funds' Class A and B shares.  AFS provides these same services to a small portion of the Funds' Class C, F, R, and 529 shareholders under the Administrative Services Agreement, while third parties provide the bulk. *See infra* Section VI.B.1.

1
2
phone calls, and nearly 50 million hits on the American Funds' website.[13]   Ex. 2224; Tr. 444:19-446:7 (Gorvetzian).

3
4
5
6
7
8
9
10
Plaintiffs offered no evidence suggesting that these non-investment advisory services were not highly valuable to shareholders.   In fact, CRMC receives a *de minimis* number of complaints each year from the more than 50 million American Fund shareholders.   Tr. 674:14-675:13 (Haaga); Ex. 29 at CORBI_019591.   The Funds also have very high shareholder retention rates.   *See* Pls.' and Defs.' Stipulated Facts ¶¶ 77 ("Stipulated Facts") (Dkt. No. 533); Tr. 676:15-677:25 (Haaga); Ex. 2219A-I.   These are strong indicators of high quality services.   *See* Tr. 678:1-679:3, 697:13-698:5 (Haaga); Ex. 648 (Bobroff Report 27).

11
## 2.    Independence and Conscientiousness of the Directors

12
13
14
15
16
17
18
19
20
The evidence establishes that the Funds' directors were well-qualified, well-informed and independent of the adviser.   They are highly educated, leaders in their respective professions, and have had successful careers in business, finance and academia.   *See* Exs. 2208A-B; Stipulated Facts ¶¶ 110-117; Ex. 648 (Bobroff Report 11-12).   Each understood and took seriously his or her fiduciary duty to protect the interests of Fund investors.   *E.g.*, Tr. 1474:21-1475:11 (Pendleton); Fenton Dep. 111:15-113:12, 196:16-19, 196:22-197:15.   Indeed, virtually all of the directors are themselves shareholders.   Tr. 905:11-906:8 (Newman); 1442:19-1443:16 (Riggs); 996:15-25 (Christie); Ex. 1272 at 12.[14]

21
22
The American Funds also adhere to industry best practices with respect to the information provided to directors.   Stipulated Facts ¶¶ 137-145; Tr. 1500:16-1506:20,

23
24
25
26
27
28
---

[13] The state-of-the-art website offers investment planning and educational tools for shareholders.   Tr. 446:25-448:7 (Gorvetzian); Exs. 2224, 2225.

[14] Industry's "best practices" were also followed with respect to governance procedures.   *See* Stipulated Facts ¶¶ 118-136, 146-149.   Seventy-five percent of each Board is independent; committees are comprised solely of independent directors (Ex. 648 (Bobroff Report 13-20)); an Independent Director chairs each Board (Tr. 613:24-614:19 (Haaga)); and each Board is advised by independent counsel (Tr. 617:24-619:16 (Haaga)).

Gibson, Dunn &
Crutcher LLP

8

1534:10-1538:9 (Bobroff); Ex. 648 (Bobroff Report 23-24).    Expert Geoff Bobroff testified that the Board materials presented to the Funds' boards were complete and among the best he had seen in the industry.    Tr. 1500:16-1506:20.    Among the voluminous information the directors received were the following:

- Director Information Books, which included detailed information regarding each of the *Gartenberg* factors. *See, e.g.,* Tr. 639:22-648:23 (Haaga); Ex. 43.[15]

- Monthly and other mailings, quarterly materials for board meetings, white papers on selected topics, seminar materials, and information via the Director website. *See* Stipulated Facts ¶¶ 137, 141-145; Tr. 651:2-652:2 (Haaga); 973:23-979:22 (Christie); Ex. 648 (Bobroff Report 20); Ex. 1 (White Paper on Size); Ex. 2 (White Paper on Economies of Scale); Ex. 3 (White Paper on Mutual Fund Fees and Expenses).

- Orientation sessions and seminars for directors and attendance at industry conferences. *See* Tr. 619:17-620:20 (Haaga); Neale Dep. 96:3-8; Woolf Dep. 41:5-24; Ex. 648 (Bobroff Report 18); *see, e.g.,* Ex. 826 (director orientation program material); Ex. 337 (seminar materials).

- Visits to Defendants' facilities and broker dealers to assess first-hand the nature and quality of services provided to fund shareholders and others who interact with the American Fund complex. *See* Tr. 959:1-960:2 (Christie); 856:10-21 (Newman); Neale Dep. 158:15-159:1; Woolf Dep. 177:13-23.

Additionally, the directors testified that their requests for additional information were always responded to and they had sufficient information to make an informed business judgment. Tr. 1377:7-1381:3 (Riggs); 906:13-23 (Newman); 989:7-12 (Christie); 1478:17-22 (Pendleton).[16]

The evidence at trial also demonstrated that the Boards engaged in vigorous arm's-length negotiations and there was a "healthy tension" between the directors and

---

[15] Paul Roye, former Director of the SEC's Division of Investment Management, which regulates the mutual fund industry, heads the Group that creates the DIBs and ensures that they comport with best industry practices. Tr. 638:5-639:10 (Haaga); Stipulated Facts ¶¶ 139-40.

[16] The directors never voted on a fee until independent counsel assured them that they had sufficient information. Tr. 863:20-864:7 (Newman); 968:4-20, 982:15-983:7 (Christie).

Gibson, Dunn &
Crutcher LLP

CRMC. Tr. 1430:17-1431:5 (Riggs).[17]  To cite just a few examples:

- Contracts Committee meetings occurred two to three months before full-board votes on a contract to give the Directors time to analyze the material and request additional information.  Tr. 862:6-23 (Newman).

- Directors requested additional, unscheduled meetings with management before voting. Tr. 1380:17-22 (Riggs); Fenton Dep. 76:25-77:12, 137:9-14

- Directors routinely asked for additional information throughout the year.  *E.g.*, Ex. 648 (Bobroff Report Ex. F); Fenton Dep. 114:19-117:23, 135:23-136:2.

- The Boards considered all of the *Gartenberg* factors when approving the advisory fee contracts.  *See* Exs. 51-122 (Contracts Committee minutes).

The most compelling evidence of the successful arm's-length negotiations between the directors and the adviser is the result they achieved—the Funds' fees are among the lowest in the industry.  In this respect, the directors inserted breakpoints into each of the Funds' advisory fee schedules (Tr. 534:21-23 (Haaga)), and were instrumental in causing CRMC to effect two separate 5% waivers of advisory fees in September 2004 and April 2005.  Tr. 555:5-14 (Haaga); 840:25-842:4 (Newman).  In addition, in 2005, CRMC agreed to waive a portion of the Rule 12b-1 fees and to limit the portion of the administrative service fee it retains to no more than 5 basis points.  Ex. 814; Tr. 1583:18-1584:13 (Bobroff).  The Funds' transfer agency agreements also prohibit CRMC from paying third parties more for providing shareholder services to omnibus accounts than AFS' own internal costs of providing the same services.  Ex. 50 at CORBI_0470418; Tr. 1514:8-1517:4 (Bobroff).

---

[17] Plaintiffs argue that the directors were not conscientious because of an April 11, 2005 email from Stuart Strachan (a former CRMC employee) that purports to convey a conversation he had with Director Riggs.  *See* Ex. 2510; Pls.' Mem. of Conts. of Fact and Law 10 ("Pls.' Conts.") (Dkt. No. 412).  Plaintiffs suggest that the email shows that the directors were not seriously trying to negotiate lower fees, but only trying to make a record to defend this case.  Pls.' Conts. 10.  Riggs made clear that the content of the e-mail, and the inferences Plaintiffs draw therefrom, are just wrong.  Tr. 1443:17-1447:16.  Indeed, to suggest that Riggs is anything but a careful and diligent director is contrary to the voluminous set of memos and emails authored by Riggs, many of which pre-date the email and even this lawsuit.  *See  e.g.*, Exs. 2429, 2435, 2479, 2362, 2550 (emails from Riggs requesting more information); Tr. 1378:11-14, 1379:23-1381:3, 1381:4-1383:4, 1385:14-1386:6; *see also* Tr. 1434:1-6 (Riggs); Woolf Dep. 123:8-14.

Gibson, Dunn &
Crutcher LLP

Congress made clear that it did not intend courts to "second-guess" the business judgment of the directors that the fees at issue were reasonable and, as demonstrated above, there is no reason to do so here.[18]

### 3. Profitability

While profitability is a *Gartenberg* factor, Section 36(b) does not regulate an adviser's profits. An "investment adviser is entitled to make a profit" and Section 36(b) was not intended to "suggest that a 'cost-plus' type of contract would be required" or "introduce general concepts of rate regulation as applied to public utilities." S. Rep. No. 91-184 at 5; *see Jones v. Harris Assocs.*, 527 F.3d 627, 633 (7th Cir. 2008), *cert. granted* 129 S. Ct. 1579, 173 L. Ed. 2d 675 (U.S. 2009).

Assessing profitability requires the reviewing court to "look to *all* the costs and benefits associated with the Fund." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 740 F.2d 190, 194 (2d Cir. 1984); *see Krinsk*, 715 F. Supp. at 481-82 (directors assessed profitability on a combined basis rather than "trying to pull out a piece of it and look at it as though it were a stand-alone piece"). Thus, the proper benchmark here is the profitability of CRMC on a *consolidated* basis, which captures all of the expenses and revenues associated with the Funds. Tr. 881:15-24 (Newman).

From 2004 to 2008, CRMC's consolidated *pre-tax* operating margin was never more than 35%. Stipulated Facts ¶ 90. This was consistently less than the profitability of the ten mutual fund investment advisors for which data is publicly available. Stipulated Facts ¶¶ 94-95; Ex. 2221.[19] It is also well within the range of profitability

---

[18] *See* S. Rep. No. 91-184 at 15 (Section 36(b) "is not intended to authorize a Court to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees"); *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 412 (2d Cir. 1989) ("The expertise of the [independent directors], whether they are fully informed, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined in evaluating the reasonableness of compensation under [S]ection 36(b).") (citing *Gartenberg*, 694 F.2d at 930).

[19] This is also true when comparing CRMC's pretax net operating income as a percentage of average assets to these ten publicly held advisers. *See* Ex. 2221. This comparison is significant because it shows that CRMC's profitability accounts for a

courts have found acceptable under Section 36(b).  *See Schuyt*, 663 F. Supp. at 978-79 (estimated pre-tax margins up to 77.3% and post-tax margins up to 38.6%); *Krinsk*, 715 F. Supp. at 494 (pre-tax margins up to 33%); *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988) (pre-tax margins up to 89%); *see also Kalish*, 742 F. Supp. at 1250 (*post-tax* margins up to 37.8%).

### 4.    Comparative Fees

*Gartenberg* also instructs that courts examine comparative fees.  *Gartenberg*, 694 F.2d at 928-29; *Krinsk*, 875 F.2d at 409.  The most appropriate fee comparison uses the Funds' total expense ratios.  Ex. 651 (Hubbard Report ¶ 35, Exs. 7A-H); Tr. 664:22-665:6 (Haaga).[20]

The Funds have some of the lowest total expense ratios in the industry. Stipulated Facts ¶¶ 81-88; Ex. 648 (Bobroff Report 32, 36, 44); Ex. 651 (Hubbard Report ¶ 36); Tr. 875:25-877:3, 870:5-7, 907:2-14 (Newman).  Moreover, during the period at issue, the Funds' expense ratios generally declined.  *See* Exs. 2214A-H. Shareholders thus received outstanding investment results in exchange for very low fees, resulting in a tremendous bargain.  *See* Trial Tr. 702:13-23 (Haaga); 907:2-14 (Newman); 1479:1-7 (Pendleton).

The Funds' very low comparative fees are of particular importance given the dramatic increase in competition in the industry since *Gartenberg* was decided.[21]   In unrebutted testimony, economist Dr. Glenn Hubbard explained that the fund industry has low barriers to entry, is unconcentrated, has experienced large numbers of successful new entrants since 1998, and grew from 199 complexes in 1985 to 584 in 2008, with a 1,870% increase in assets.  *See* Ex. 651 (Hubbard Report ¶¶ 51-62, Ex. 8).

---

much smaller share of fund assets than its competitors.  Tr. 685:10-686:3 (Haaga); *see also* Tr. 880:8-881:14 (Newman).

[20]  The total expense ratio is the percentage of the fund's net assets that are expended each year on all fees—advisory, Rule 12b-1, transfer agency, administrative services fees, as well as other Fund expenses.  Tr. 644:5-16 (Haaga).

[21]  This Court has held that competition is a proper factor to consider.  *In re Am. Mut. Funds. Fee Litig.*, No. 04 CV-5593, at *13 (C.D. Cal. June 6, 2009) (Dkt. No. 423).

He also established that investors are sensitive to fee levels. *Id.* ¶¶ 82-93, Ex. 18. Thus, competition serves as a restraint on mutual fund pricing. *Id.* ¶¶ 94-106; Trial Tr. 1293:6-1316:5 (Hubbard). While Plaintiffs argued that Dr. Hubbard's position regarding competition somehow guts Section 36(b), it does no such thing. Trial Tr. 1314:23-1315:6 (Hubbard). Rather, the vigorous competition in the industry warrants placing greater weight on the long-established comparative fee factor than was previously afforded under *Gartenberg.*[22]

### 5. Fall-Out Benefits

Plaintiffs offered no evidence of any fall-out benefits.

### 6. Economies of Scale

Defendants acknowledge that scale economies may have existed during the relevant time frame, at least in short-term periods. *See* Ex. 2 at CORBI_0230809-813 (White Paper on Economies of Scale); Tr. 686:4-688:9 (Haaga). By way of so-called economies of scale analyses—presented by Dr. O'Neal—Plaintiffs purport to show substantial scale economies and argue that the level of sharing was insufficient. But Plaintiffs fail to meet their burden in this respect, as their analyses are exactly the type previously rejected as failing to prove economies of scale.[23]

To meet their burden, Plaintiffs must demonstrate that "the per unit cost of performing Fund transactions decrease[d] as the number of transactions increased." *Krinsk,* 875 F.2d at 411; *Kalish*, 742 F. Supp. at 1238 (economies of scale "requires proof of decreasing costs on a per-unit basis, as the fund increases in size"); *Gartenberg,* 528 F. Supp. at 1055 (finding no economies of scale where "unit processing costs did not significantly diminish as the Fund grew larger"). Dr. O'Neal *admitted* that his analyses fail to make this required showing. Tr. 1057:4-9 (conceding

---

[22] *See Jones*, 527 F.3d at 632-34 (outlining the increase in competition in mutual fund industry since 36(b) was enacted, and holding that Congress' belief 38 years ago regarding "inadequate" competition no longer applies).

[23] Plaintiffs bear the burden of proving economies of scale and the absence of equitable sharing. *Kalish*, 742 F. Supp. at 1238-39; *Krinsk*, 875 F.2d at 411.

he had no data to determine how much CRMC's per unit cost of operating the fund decreased as the fund's assets increased).[24]   Rather, O'Neal only analyzed the ratio of CRMC's expenses to revenues over time as the Funds grew.[25]   This *exact approach* has been rejected as insufficient.  *Krinsk*, 875 F.2d at 411 ("that the fact that 'expenses . . . declined at a time when the Fund size grew . . . does not establish that such decline was necessarily due to economies of scale'"); *Kalish*, 742 F. Supp. at 1240 (holding a "declining ratio of expenses to revenues at a time of increasing size" was insufficient).[26]

There are many additional reasons why Plaintiffs' economies of scale analyses fall short.  For example, O'Neal's primary analysis focused on CRMC only, ignoring sharing from AFD and AFS.  Tr. 1057:10-14 (O'Neal).  No court has ever analyzed only one aspect of a defendant's services in assessing economies of scale.  To the contrary, courts routinely analyze whether economies of scale realized in portfolio management were offset by diseconomies of scale in other services.  *See Schuyt*, 663 F. Supp. at 980 n.53 (noting that economies of scale in portfolio management may be offset by increased servicing of new accounts); *Gartenberg*, 528 F. Supp at 1055 (assessing economies of scale in portfolio management, general administrative services and shareholder services); *Krinsk*, 715 F. Supp. at 496 (same).

Even assuming that Dr. O'Neal's analyses were accepted as a quantification of

---

[24] To prove economies of scale, the plaintiff must "create a detailed analysis of each element of a transaction surrounding [the Fund], over an extended period of time, over different levels of activity."  *Krinsk*, 715 F. Supp. at 496.  Here, Dr. O'Neal did not attempt to do so.

[25] Plaintiffs' insistence that CRMC should have "quantified" scale economies for fund directors is baseless since their own expert failed to do so.  In any event, there is no law or regulation imposing such a requirement, and economies of scale are nearly impossible to quantify.  Tr. 1564:12-1565:15, 1598:19-1599:22 (Bobroff); 824:16-826:3 (Newman); 92:25-93:22 (Rothenberg).  For this reason, investment advisers throughout the industry do not quantify economies of scale.  Tr. 1556:2-23, 1560:14-1562:9, 1599:25-1600:9, 1604:22-1605:5 (Bobroff).

[26] Critically, Dr. O'Neal does not attempt to analyze why costs were changing as assets increased.  Rather, he improperly assumed that *every* change in cost was from economies of scale, even though he concedes that costs can—and do—change for reasons that have nothing to do with scale.  Tr. 1057:1-3 (O'Neal); *see* Tr. 1318:2-8 (Hubbard).

1    economies of scale, they confirm that there was substantial sharing.[27]   According to Dr.

2    O'Neal, from 2003 to 2007, Defendants shared approximately $2.3 billion, or 46% of

3    all economies of scale realized by Defendants and their affiliates.[28]   *See* Tr. 1070:24-

4    1071:17 (O'Neal); Ex. 2671 (O'Neal Reply Report 42).   While this amount alone

5    constitutes equitable sharing, the 46% figure is understated because it excludes two

6    other forms of sharing.   First, CRMC made significant reinvestments to provide

7    enhanced services to shareholders, which both Plaintiffs and the SEC have recognized

8    as a form of sharing.[29]   Second, CRMC shared economies of scale by charging very low

9    fees (relative to competitors) at the outset of the period in question.   *Schuyt*, 663 F.

10   Supp. at 979 (considering the defendant's low fee relative to other advisers' fees to be

11   evidence that the fund was sharing economies of scale); Tr. 1319:13-24, 1320:24-

12   1321:3 (Hubbard); 561:25-562:21 (Haaga); Woolf Dep. 76:6-14.   Thus, under any

13   scenario, Defendants equitably shared any economies of scale with the Funds, even by

14   Plaintiffs' own account.

15                    *                    *                    *

16        In sum, when all services provided to, and all fees paid by, the Funds are

17   analyzed, each and every *Gartenberg* factor leads to the conclusion that the fees were in

---

18   [27]  An adviser need not confer all the benefits from scale to fund shareholders; rather,
19   whether those benefits were shared equitably with shareholders is a factor to
     consider in assessing the fees at issue.   *See Gartenberg*, 528 F. Supp. at 1054
20   ("'[T]his bill recognizes that investors should share *equitably* . . . in the economies
     available as a result of the growth and general acceptance of mutual funds.'")
21   (quoting S. Rep. No. 91-184 at 4) (emphasis added).

22   [28] Even if profit sharing payments are excluded from the analysis (as Dr. O'Neal
     advocates), the amount of sharing declines minimally, from 46% to 41%. Of course,
23   Dr. O'Neal had no basis to exclude profit sharing.   Indeed, aside from his lack of
     expertise on profit sharing, Dr. O'Neal admitted it would impact his opinion on the
24   issue if profit sharing was necessary to make compensation competitive. Trial Tr.
     1080:1-5.  The unrebutted evidence at trial confirms that this was the case.  Trial Tr.
     169:13-25 (Rothenberg).

25   [29] Pls.' Trial Mem. 18 n.13, 21-22 (Dkt. No. 523) (Plaintiffs' conceding that enhanced
26   services is a form of sharing); Securities and Exchange Commission, Division of
     Investment Management, Report on Mutual Fund Fees and Expenses § IV.B.1 (Dec.
27   2000) (economies of scale may be shared by requiring that "the adviser provide
     additional services under the advisory contract."); *see also* Tr. 1320:6-15 (Hubbard);
28   139:11-141:5 (Rothenberg); Fenton Dep. 173:23-174:11.

Gibson, Dunn &
Crutcher LLP

no way disproportionate to the services rendered. Plaintiffs simply have not proven a breach of fiduciary duty.

## III.    The Advisory Fees Were Not Disproportionate

The investment advisory fee is paid to CRMC primarily for portfolio management (*i.e.,* the selection of securities to purchase and sell for each Fund), as well as trading and a host of executive, administrative, legal, clerical, compliance and bookkeeping functions. Ex. 690; Stipulated Facts ¶¶ 28-31. Even if the advisory fee was viewed in isolation—and not as part of a bundled product—Plaintiffs have not met their burden of proving that such fee was excessive under *Gartenberg.*

### A.    The Nature and Quality of Services

As set forth above, *supra* Section II.C.1, Plaintiffs have not challenged the nature or quality of the advisory services rendered by CRMC, which were outstanding.

### B.    Comparative Fees

The Funds' advisory fees are among the lowest and, in many cases, the lowest, among comparable funds. Seven of the eight Funds at issue ranked first—*i.e.,* **the lowest advisory fee**—in their respective Lipper peer group at least once during the time period in question, and five of them had the top ranking multiple times. *See* Stipulated Facts ¶¶ 81-88; Ex. 648 (Bobroff Report 44); Tr. 870:5-7 (Newman); 951:1-2 (Christie). And, for every year at issue, the Funds' advisory fees were lower than at least 75% of their peers. Stipulated Facts ¶¶ 81-88.

### C.    Profitability

Plaintiffs did not attempt to present any evidence regarding profitability of the *advisory* fees, notwithstanding their insistence on examining each fee in isolation.

### D.    Independence and Conscientiousness of the Directors

As set forth above, *see supra* Section II.C.2, the independence and conscientiousness of the Funds' directors is beyond question. Plaintiffs argued that the directors did not act conscientiously in approving the advisory fee because they approved a fee schedule designed to reimburse Defendants for additional compensation.

Pls.' Trial Mem. 24.[30]   Plaintiffs rely exclusively on a set of meeting minutes which purport to reflect a statement by Mr. Haaga that CRMC was exploring ways to further reduce fees "taking into account revenue sharing payments CRMC projected for the future." *Id.*; Ex. 89.  This in no way advances Plaintiffs' cause.

First, Mr. Haaga testified that he never made such a statement.   Tr. 569:12-570:14.   Second, and more importantly, on its face these Board minutes speak to CRMC's considerations, not that of the directors, who alone made decisions as to the propriety of fees.   Tr. 659:24-660:2 (Haaga).   Finally, the unrebutted proof at trial established that the directors did not consider additional compensation in any way in approving advisory fees, and would not do so even if CRMC had advised them to do so. Tr. 882:22-883:23 (Newman); 988:4-19 (Christie).[31]   Plaintiffs' "theory" here has no record support whatsoever.

### E.   Economies of Scale

Even if it were appropriate to look at economies of scale in the context of a single fee (no court has ever done so), Plaintiffs failed to do so with respect to the advisory fees.  Tr. 1073:21-1074:2 (O'Neal); *see supra* Section III.B.6.[32]

Moreover, CRMC shared a substantial amount of any economies of scale realized with respect to advisory services.  Breakpoints were added as assets increased and CRMC waived advisory fees, first by 5% in 2004, then by 10% in 2005.  *See* Stipulated

---

[30] Additional compensation payments are payments by AFD, from its general revenues, for the education and training of broker-dealers. *See* Ex. 335 at CORBI_0290311 (noting that two objectives of additional compensation are guiding clients into suitable funds through education of financial advisers and sharing the costs of doing so with broker-dealer firms); 492:22-493:1 (Haaga) (same); 835:1-10 (Newman).

[31] Moreover, CRMC's profitability is presented to directors exclusive of amounts expended on additional compensation. Stipulated Facts ¶ 108; Ex. 50 at 69. In fact, the directors believed that the entire range of profitability margins were reasonable under the circumstances, whether additional compensation expenditures were included in the calculations or not. Tr. 882:8-21 (Newman).

[32] O'Neal's analyses of CRMC alone includes advisory fees, administrative service fees, and "other" unidentified fees.   There is no credible basis to consider management fees and administrative service fees together, but exclude economies of scale shared with the Funds through lower shareholder servicing fees.

1  Facts ¶¶ 38(a)-(h), 39-46.  During the relevant period, breakpoints resulted in lowering

2  the advisory fees by over $600 million.  *See* Ex. 2218A-B.  The fee waivers resulted in

3  an additional savings in excess of $620 million.  Ex. 2218A.[33]

## IV.    The Rule 12b-1 Fees Were Not Disproportionate

### A.    Rule 12b-1 Fees and Fund Growth

6  Plaintiffs' challenge to the Rule 12b-1 fees is based exclusively on their theory

7  that those fees were not in the interest of Fund shareholders.[34]  According to Plaintiffs,

8  because the size of the Funds purportedly had a negative impact on investment results,

9  Rule 12b-1 fees were harmful to the extent they promoted growth.  This argument does

10  not satisfy Plaintiffs' burden under Section 36(b), either legally or factually.

11  Even if Plaintiffs could show that the Rule 12b-1 fees were not in the best

12  interests of shareholders, that does not establish a violation of Section 36(b).  *Yameen v.*

13  *Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 356-58 (D. Mass. 2005) (dismissing

14  Section 36(b) claim based on allegation that 12b-1 plan would not benefit Fund); *see*

15  *Korland*, 2009 U.S. Dist. LEXIS 33937 at *10-11; *In re Davis Selected Mut. Funds*

16  *Litig.*, No. 04 Civ. 4186, 2005 WL 2509732, at *3-4 (S.D.N.Y. Oct. 11, 2005).  This

17  Court has made clear that a claim that there is no reasonable likelihood that Rule 12b-1

18  fees will benefit shareholders is not, as a matter of law, cognizable under Section 36(b).

[33] The savings from fee waivers and breakpoints on just the eight Funds—over $1.2 billion—reveals a critical weakness in O'Neal's analysis.  He somehow purports to show only $591 million in sharing (for all of the American Funds in the complex), which is less than half of the sharing with just the eight Funds.  O'Neal claims this is because CRMC "took back" economies of scale through increases in administrative service fees and higher advisory fees to other American Funds not at issue.  But the only change to the administrative services fee during the relevant time period was a fee *reduction*, which could only increase sharing.  Exs. 2216A-H; Tr. 1321:10-17 (Hubbard).  Given that the fees charged to the Funds generally stayed flat or went down during the relevant period, there is no way the total sharing could be less than the savings from breakpoints and waivers.

[34] Mutual funds are permitted to pay Rule 12b-1 fees "so long as the directors determine in the exercise of reasonable business judgment and the proper exercise of fiduciary duty 'that there is a reasonable likelihood that the plan will benefit the company and its shareholders.'"  *Korland v. Capital Research and Mgmt.*, No. CV 08-4020, 2009 U.S. Dist. LEXIS 33937, at *5 (C.D. Cal. Feb. 10, 2009) (quoting 17 C.F.R. §270.12(b)-1(e)).

*Korland*, 2009 U.S. Dist. LEXIS 33937 at \*10.   Instead, to successfully attack Rule 12b-1 fees under Section 36(b), Plaintiffs must satisfy *Gartenberg*'s "so disproportionately large" standard.  *Id*. at 6.  Plaintiffs did not do so and thus failed to meet their burden.  *See infra* Section IV.C.

In any event, Plaintiffs also failed to prove that the Rule 12b-1 plan was not in the best interests of shareholders.  To support their claim, Plaintiffs rely on: (1) selected survey responses from CRMC associates; and (2) regression analyses by Dr. O'Neal.[35] But neither establishes that Fund size had adverse effects, let alone that the 12b-1 fees were not likely to benefit shareholders.

### 1.    Survey Responses

First, despite pointedly being asked to identify issues concerning size, many survey respondents did not raise concerns over the growth of the Funds.  In fact, several expressed the view that size was not an issue, or that asset growth was a benefit.  Tr. 307:1-315:7 (Armour).

With respect to those respondents that did express some concern, most dealt with "ownership limits."  However, ownership limits did not negatively impact investment results.   The vast majority of limits were self-imposed as a means of achieving diversification and promoting new investment ideas.  Tr. 280:18-281:20 (Armour).  In that regard, the limits have improved the Funds' investment results.  Tr. 283:10-13 (Armour).[36]   Indeed, it was in CRMC's self interest to achieve superior investment

---

[35] Plaintiffs also point out that in 2005 CRMC considered ways to "slow fund growth." But Defendants were interested in "slowing" (not stopping) growth, and only growth from short-term investors who may have been attracted to the Funds for the wrong reasons.  Tr. 276:2-23 (Armour).  This provides additional support for *approving* the Rule 12b-1 fees, which help ensure that shareholders are properly matched with the Funds for the long run.  Tr. 797:1-24 (Clifford); 996:22-997:14 (Christie).

[36] Often times the portfolio counselors' "highest conviction" ideas are not the best ideas, and CRMC imposes limits to avoid taking a large position in a single company as a means of reducing risk in the portfolio.  Tr. 280:23-281:7 (Armour).  This tends to result in associates finding different investment ideas, and CRMC has found that the "third, fourth or fifth ideas" often provide better returns as those companies are typically less understood by the marketplace.  Tr. 281:7-17 (Armour).

results and, if it believed that ownership limits blocked its ability to do so, it could have removed the internal limits. Tr. 283:5-9 (Armour). Furthermore, Defendants addressed the "concerns" regarding ownership limits by splitting the investment group, and raising ownership limits in 2005 and early 2007. Tr. 129:23-130:13 (Rothenberg); 281:21-282:6, 285:20-22 (Armour). These steps greatly abated the complaints. Tr. 284:20-285:25, 329:4-19 (Armour).[37]

Other less prevalent concerns expressed in survey responses also fail to establish any harm from size. Many of the survey responses upon which Plaintiffs rely were from newer associates. Tr. 227:2-5 (Armour). Some concerns were unfounded. Tr. 218:15-219:5, 225:17-20, 246:3-10, 249:2-10 (Armour). While others had merit, those concerns were addressed by the split of the investment group (Tr. 285:5-25, 316:14-317:24 (Armour)) or other measures. Tr. 298:17-299:12 (Armour). In fact, many of the respondents correctly noted that the "issues" related to size would be resolved in the near term through the split of the investment group. Tr. 299:13-304:22, 329:4-19 (Armour).

## 2. Dr. O'Neal's Regressions

Dr. O'Neal's regressions also fail to establish that the Funds' growth was harmful. His regressions cannot be reconciled with the single best evidence of whether size hurt investment results—the Funds' returns were excellent, and their best investment results came when the Funds were at their largest. Tr. 136:1-137:6 (Rothenberg), 321:5-19 (Armour).[38] While this alone is sufficient to end the inquiry,

---

[37] Plaintiffs recognize that the split of the investment group solved many of the concerns raised in survey responses, but attempt to argue that the split was not complete until late-2007. However, the evidence clearly reflects that many benefits of the split were realized long before filing for formal disaggregation with the SEC in January 2008. Tr. 124:22-126:22, 150:3-15 (Rothenberg); 278:13-280:17 (Armour).

[38] Plaintiffs point to some of the Funds' lifetime results versus peer funds being better than their ten year results, which were in turn better than the five year relative returns. Ex. 3157. These results are not surprising, however, given the nature of CRMC's investing philosophy (*i.e.*, low volatility and a focus on long term results). Such data does not address whether increased sized *caused* such changes in relative investment results since 2003. Tr. 322:9-325:7 (Armour); 817:4-818:16 (Newman);

Dr. O'Neal's analyses suffer from other fundamental defects:

- It is undisputed that, under O'Neal's own methodology, growth in assets had absolutely no negative impact on investment results from 2003 to 2008, the only relevant period in this case. Ex. 649 (Peavy Report ¶¶ 98-99, Ex. 17); Tr. 1244:21-1246:17 (Peavy); 15 U.S.C. § 80a-35(b)(3).

- O'Neal's results change completely depending on the period chosen. At best, he found a "correlation" between size and performance for 5 of the 8 Funds for the period 2000-2008. But when he looked at a slightly longer period (beginning in 1998), the correlation existed for only *one* Fund. Tr. 1088:9-1089:13 (O'Neal); 1238:15-1239:16 (Peavy); Ex. 649 (Peavy Report 41-43). These variations over time completely undermine O'Neal's attempt to show a causal link. Tr. 1247:4-20 (Peavy).

- O'Neal admits that up to 99% of the Funds' investment results were explained by factors other than size, and he could not say whether size had any material impact on results. Ex. 2669 (O'Neal Report tables 4-11); Tr. 1035:22-1036:19, 1083:14-24 (O'Neal); 1243:16-1244:3 (Peavy); Ex. 649 (Peavy Report ¶ 83).

- Even in those few instances where he found that size was negatively *correlated* with results, O'Neal failed to establish a *causal* link.[39] Tr. 1233:9-1235-24, 1240:18-1241:18 (Peavy). Moreover, he could not identify when size "impacted" results within the 2000-2008 period, and concedes it may have been before the beginning of the period at issue here.[40] Tr. 1086:15-1087:16 (O'Neal).

- The largest and fastest growing Funds (CIB and WGI) also had the best investment results. Tr. 321:5-12 (Armour); 1247:21-1248:12 (Peavy); Ex. 649 (Peavy Report ¶¶ 93-94).

- One of O'Neal's core premises—that size harms performance because trading costs increase—does not apply to the Funds. The trading costs for the complex

---

1258:22-1261:18 (Peavy). Moreover, an adviser whose returns were in the 60th percentile on a yearly basis each year would expect investment results to be in a higher and higher percentile over longer periods of time as performance *consistently* outpaces peers.

[39] By way of example, as Dr. Peavy pointed out, Morningstar, a publication that had previously advocated the closing of the Growth Fund of America, stated *the morning of Dr. Peavy's testimony* that they were incorrect in that assertion, and that CRMC has been able to effectively manage such an extremely large fund. Trial Tr. 1260:10-20.

[40] In addition, O'Neal's "results" are all based on data through the end of 2008. Tr. 1095:5-23 (O'Neal). Thus they are pure hindsight, and in no way constitute evidence that the directors' business judgment *from 2003 to 2008* that growth benefited the Funds was anything but sound. Tr. 1257:11-15 (Peavy).

overall never increased as assets increased; and CRMC had a competitive trading advantage throughout the period. Tr. 1099:5-1100:10 (O'Neal); 1212:9-1215:22, 1222:6-1224:20 (Peavy).

- His other core premise—that the academic literature posits that increased size harms performance—also does not apply to the Funds. The articles he cites specifically state that any negative correlation between size and performance does not apply to large cap funds, which are the type of Funds at issue here. Tr. 1224:21-1228:21 (Peavy); Ex. 649 (Peavy Report ¶¶ 73-75).

- O'Neal himself found no negative correlation between increased sales of the Funds and investment results. Ex. 2669 (O'Neal Report, table 5); Tr. 1088:4-8 (O'Neal). Thus, to the extent Rule 12b-1 fees led to new sales, there is absolutely no evidence those sales harmed the Funds.

### 3. The Benefits of Rule 12b-1 Fees

An assessment of whether the Rule 12b-1 fees were reasonably likely to benefit shareholders should give substantial weight to the directors' business judgment. The standard under Rule 12b-1 "[wa]s intended to make clear that [directors] would possess a significant measure of discretion" in approving 12b-1 plans. Investment Company Act Release No. 10862 at 38-39 (Sept. 7, 1979). Where "disinterested directors are well-qualified, fully informed individuals who demonstrate a willingness to act independently of fund management, their determination that the standards of [Rule 12b-1] have been met should be weighted heavily." *Id.*

Here, there is ample evidence to support the Board's business judgment that the Rule 12b-1 plan would and did benefit shareholders. The primary purpose of the Rule 12b-1 fees is to compensate brokers for providing ongoing shareholder services. Tr. 810:22-811:15 (Newman); 997:4-12 (Christie); Fenton Dep. 99:25-100:13; 485:22-486:5, 522:10-14 (Gorvetzian); 796:2-11 (Clifford); 333:8-18 (Armour); 697:5-12 (Haaga).[41] Over 95% of those fees were used for exactly that purpose. Tr. 487:8-13

---

[41] Plaintiffs' attack on Rule 12b-1 fees fails for this reason alone. Their argument is predicated on the notion that such fees are primarily designed to promote growth. But that is not their purpose. Indeed, the most significant benefits of Rule 12b-1 have little to do with selling more shares in the Funds. *See Krinsk*, 715 F. Supp. at

(Gorvetzian); 796:8-11 (Clifford).[42]  It was entirely reasonable for directors to conclude that these services were of significant value to shareholders.  For example:

- Brokers provide advice on fund suitability and modify investments when shareholder objectives change.  Tr. 797:1-11 (Clifford); 997:8-12 (Christie); 902:8-19 (Newman).

- Brokers create investment plans for shareholders that include asset allocation, financial, tax and estate planning, etc.; brokers review that plan with the shareholder periodically, and modify the plan as appropriate.  Tr. 486:6-487:7 (Gorvetzian); 553:13-554:25 (Haaga); 797:1-11 (Clifford).

- Brokers meet with shareholders regularly (*e.g.,* quarterly) to review accounts and provide advice.  Tr. 486:6-10 (Gorvetzian); 797:4-5 (Clifford).

- AFD fields thousands of calls each day from brokers asking for information about their clients' investments in the Funds, which brokers use to assist in the services they provide.  Tr. 468:20-469:13 (Gorvetzian).

- Rule 12b-1 fees encourage shareholders to be long-term investors, and compensate brokers for objective advice in down markets, which helps prevent selling at the worst possible time.  Tr. 333:16-334:4 (Armour); 798:3-9 (Clifford); Fenton Dep. 99:18-100:13.  As a result, Fund shareholders capture a greater level of the positive investment returns than other fund groups.  Tr. 119:18-120:22 (Rothenberg); 678:1-679:3 (Haaga).

- Rule 12b-1 fees help prevent redemptions.  Tr. 334:5-10 (Armour); 704:7-23 (Haaga); 798:3-9 (Clifford).  This is beneficial because managing a fund with significant redemptions is difficult (Tr. 334:11-335:1 (Armour))[43] and allow a fund to continue to take advantage of breakpoints, thereby avoiding fee increases.  Tr. 489:2-9 (Gorvetzian).[44]

---

500 (finding Rule 12b-1 plan did not violate Section 36(b) where existing "[f]und shareholders benefit by improved service resulting from 12b-1 payments").

[42] Plaintiffs' only supposed evidence to the contrary is a cryptic one-sentence email (which they never asked a single witness to explain) stating that the 0.25% service fee accounts for 60-65% of all Rule 12b-1 fees.  But, as Dr. O'Neal admitted (Tr. 1077:3-1078:7), it is unclear whether this email even addresses the split between service and distribution, as opposed to what percentage of total 12b-1 fees are attributed to class A shares.

[43] *See Meyer*, 895 F.2d at 865 (Rule 12b-1 fees prevent redemptions, thus avoiding difficulty in managing the fund); *Krinsk*, 715 F. Supp. at 483 (a decline in assets "inhibits fund performance since a manager must then focus on liquidity needed to satisfy redemptions, rather than on investments that can increase yield.").

[44] *See Meyer*, 895 F.2d at 865 (noting that lower total assets would lead to a higher effective advisory fee).

Gibson, Dunn & Crutcher LLP

- Rule 12b-1 fees are a competitive necessity, and prevent brokers from encouraging shareholders to switch to funds that do pay Rule 12b-1 fees.[45]   Tr. 118:8-120:22 (Rothenberg); 1542:6-1543:5, 1575:4-1576:3 (Bobroff).

Rather than challenge these clear benefits to shareholders, Plaintiffs point to the increase in Rule 12b-1 fees in raw dollars. They note, for example, that Rule 12b-1 fees for GFA grew from $200 to $500 million a year by 2007. *See* Tr. 1436:17-1437:6 (Riggs); Ex. 3158E. But this misses the point. ***As total Rule 12b-1 payments increased during this time, the number of shareholder accounts grew by nearly the same rate.*** *See* Ex. 2224; Tr. 501:6-502:13 (Gorvetzian); Ex. 621 at CORBI_362734 (showing that the total number of average active accounts was 35 million in 2004 and 71 million in 2008). Thus, there were significantly more shareholders to serve, and more brokers to be compensated for providing those services. *Id.*; Tr. 1438:1-5 (Riggs). That total Rule 12b-1 fees increased in dollars therefore does not change the analysis of whether those fees were justified.

In fact, looking at Rule 12b-1 fees in terms of total dollars rather than the rate can be deceptive. The American Funds are large, but the minimum account balance is only $250 (*see, e.g.,* Ex. 1221 (AMCAP 2009 Prospectus 7)), and the average account size is approximately $15,000. Ex. 608 at CORBI_207947 (showing that the average account balance was $15,000 in fiscal year 2004). Thus, the "average" shareholder pays an ongoing servicing fee to the broker of about $3.00 per month (0.25% of $15,000), which covers all of the valuable services outlined above. While cumulatively the Funds paid hundreds of millions of dollars in Rule 12b-1 fees, that is only because there was an increasing number of shareholders to serve each year.

---

[45] *Meyer*, 895 F.2d at 865 (noting the need to pay Rule 12b-1 fees out of "sheer economic necessity" in order to "meet competition"); *Krinsk*, 715 F. Supp. at 484 (trustees approved Rule 12b-1 plan because of their belief that a "failure to meet the[se] competitive threats [posed by other funds with 12b-1 plans] could result in substantial diminution of the Fund assets with concomitant increase in the expense ratio."). The rate for Rule 12b-1 fees is set by market forces, and not paying a competitive rate would put the Funds at a competitive disadvantage. Tr. 799:5-11 (Clifford); 826:18-23 (Newman); 1327:12-21 (Hubbard).

Gibson, Dunn & Crutcher LLP

Plaintiffs did not offer any evidence that the services provided in exchange for Rule 12b-1 fees were not beneficial to the Funds' shareholders.[46]  Indeed, the Plaintiffs themselves testified that the services provided by their brokers were quite valuable.  *See* Caplan Dep. 67:21-68:7 ("All my services came through my broker"; and was "happy with the service"); *id.* at 184:10-185:1 (testifying that he is "satisfied" with broker who monitors investments, discusses the markets, and provides advice); Angotta Dep. 90:18-91:3, 151:9-152:3 (broker provides services like monitoring investments, offers his "expertise and his knowledge of the mutual fund industry," and broker "provides good service"); Jelinek Dep. 72:22-74:14, 98:8-15 (broker advised them on holdings as they neared retirement and he "values the services" of broker).[47]

Even if Rule 12b-1 fees were used for distribution, there is substantial evidence to support the directors' judgment that growth was beneficial.  For example:

- The Funds' fees, which were already the lowest in the industry, declined as a result of growth, *via* breakpoints, waivers and other reductions.  *See supra* Section II.C.4, III.B, and *infra* V.B.4, V.C.

- Growth allows CRMC to continually invest in research.  Tr. 273:20-274:4 (Armour); 138:13-141:12 (Rothenberg).  Because of its large asset base, CRMC has more extensive research capabilities than almost any other investment adviser.  Tr. 266:18-267:22 (Armour).

---

[46]  Plaintiffs repeatedly suggested at trial that the directors should have quantified the benefits of the Rule 12b-1 plan and measured them against the Rule 12b-1 payments.  *See* Tr. 813:9-13 (Newman).  But many of the benefits are simply not quantifiable.  Tr. 813:12-19 (Newman).  Indeed, notwithstanding their stance on this issue or the fact that they have the burden of proof, Plaintiffs never even attempted to quantify the benefits to shareholders resulting from the ongoing services provided by brokers.  More fundamentally, it is plain that the law imposes no such "quantification" requirement on directors.  *Krinsk*, 715 F. Supp. at 501 ("Rule 12b-1 does not require trustee to reduce to a dollar figure the benefits they expect a fund to receive from a plan."); *see also Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974 (D. Minn. 2007) (rejecting claim that Rule 12b-1 fees were excessive because they exceeded reductions in other fee schedules because up to 85% of those fees were used to cover shareholder servicing), *rev'd on other grounds*, 561 F.3d 816 (8th Cir. 2009).

[47]  Plaintiffs argue that brokers would provide services to clients even if they were not paid, but there is absolutely no evidence to support this, and the directors' business judgment was to the contrary.  In fact, refusing to pay Rule 12b-1 fees would lead brokers to find other ways to get compensated for their services, which ultimately would result in higher fees. Tr. 414:7-19 (Gorvetzian); 552:15-22 (Haaga).

- The size of the Funds allows CRMC to invest in the business with a long-term perspective, even in difficult times when other advisers are cutting back. Tr. 153:18-154:8 (Rothenberg); 895:5-17 (Newman).

- Size allows CRMC to attract and retain talented personnel. Tr. 274:18-22 (Armour); 895:5-9 (Newman); 993:1-7 (Christie); 1139:18-24 (Lyons); 1439:6-16 (Riggs); 153:18-154:18, 188:5-8 (Rothenberg).[48]

- The size of the Funds has led to lower brokerage commissions, enhanced CRMC's competitive advantage in trading, and led to better service from trading partners. Tr. 274:5-9 (Armour); 1139:10-1141:7 (Lyons).

- Steady inflows lead to greater liquidity and stability of assets, making the Funds easier to manage. Tr. 119:21-120:5 (Rothenberg); 274:9-11 (Armour).[49]

- Size has facilitated significant investments in shareholder services, which have translated into high quality state-of-the-art services. Tr. 273:25-274:4 (Armour); 689:23-690:10 (Haaga); 139:11-141:5 (Rothenberg); 895:2-13 (Newman); 992:17-993:1 (Christie); 1439:6-16 (Riggs).

- Size means better access to the companies the Funds invest in, enhancing investment results. Tr. 274:23-275:7 (Armour); *see also* Tr. 1140:1-3 (Lyons).

Moreover, even Rule 12b-1 fees used for "distribution" can benefit shareholders in ways that have nothing to do with "growing" the Funds. For example, a portion of the Rule 12b-1 fees on class B shares is for "distribution" in the sense that they are essentially a means of financing a front-end load. Tr. 486:1-5 (Gorvetzian); 692:5-17 (Haaga). However, regardless of whether these fees caused growth of the Funds, these fees are beneficial to shareholders because they provide them with an alternative payment option and allows them to put more of their money "to work" immediately. Tr.

---

[48] *Krinsk*, 715 F. Supp. at 500 (Rule 12b-1 fees benefit shareholders "by the recruitment and retention of better management personnel who may be attracted to a larger fund.").

[49] Having regular net inflow levels presents the optimal level for managing the fund as it provides a means of funding new ideas without being forced to sell names already in the portfolio. Tr. 334:19-335:1 (Armour); *see Krinsk*, 715 F. Supp. at 500 ("an inflow of assets to a fund has a positive effect on investment performance regardless of the fund's absolute size"; also noting that "getting bigger is better" and that "when a fund is losing assets due to increased redemptions the fund is more difficult to manage").

360:19-361:6 (Gorvetzian); 693:11-694:11 (Haaga).[50]

**B.    Defendants Have No Fiduciary Duty With Respect to Rule 12b-1 Fees That Are Paid to Broker-Dealers**

Defendants cannot be held liable under Section 36(b) for the payment of [Rule 12b-1] fees to broker-dealers. *Pfeiffer v. Bjurman, Barry & Assocs.*, No. 03 Civ. 9741, 2006 U.S. Dist. LEXIS 7862, at *1-2 (S.D.N.Y. Mar. 2, 2006); *see Zucker v. AIM Advisors, Inc.*, 371 F. Supp. 2d 845, 849 (S.D. Tex. 2005).[51]

Before trial, the Court indicated that it was "not yet persuaded" that *Pfeiffer* should be applied here. *In re Am. Mut. Funds Fee Litig.*, No. 04 CV-5593, at *3 (C.D. Cal. July 23, 2009) (Dkt. No. 514). Specifically, the Court hypothesized that if Defendants had negotiated the payment of 12b-1 fees for the purpose of growing the Funds to a level that harmed investors, while at the same time increasing assets upon which fees are calculated, it would "arguably implicate[] the . . . conflict-of-interest problem noted by Congress" when enacting Section 36(b). *Id.*

But evidence at trial establishes that: (1) 12b-1 fees are set by competition; (2) their primary purpose is to compensate brokers for providing valuable ongoing services, not for growing the Funds; and (3) in any event, growth of the Funds did not harm investors. Thus, the hypothetical posed by the Court does not apply here.

Over 95% of the Rule 12b-1 fees paid by the Funds were used to compensate third parties. Tr. 485:15-21 (Gorvetzian); 796:2-11 (Clifford). The only potential "benefits" AFD received in connection with Rule 12b-1 fees were:

---

[50]  Indeed, the same Rule 12b-1 "distribution" fees on B shares have been approved even when they are paid by funds which are closed to new investors. *Yameen*, 394 F. Supp. 2d at 358; *ING Principal Prot. Funds Deriv. Litig.*, 369 F. Supp. 2d 163, 169 (D. Mass. 2005); *see also* Best Practices and Practical Guidance For Directors Under Rule 12b-1, *Report of the Mutual Fund Directors Forum*, at 15 (May 2007) (multiple share classes allow individual shareholders "to choose the manner in which their representatives will be compensated"); Tr. 119:3-13 (Rothenberg).

[51]  For a full discussion of the legal principles on this issue, *see* Defs.' Conts. 28 and Defs.' Motion *in Limine* No. 1 (Dkt. No. 438)

- <u>A Shares</u>:  AFD received less than 1% of the total amount of Rule 12b-1 fees paid by the Funds.  Tr. 481:17-22 (Gorvetzian).

- <u>B Shares</u>:  The net benefit to AFD was the difference between the 3.75% it advanced to brokers and the payment it received from Citibank in exchange for the future Rule 12b-1 fee stream.  This difference was 35 basis points (0.35%) for most of the relevant period.  Tr. 482:5-20 (Gorvetzian).  Significantly, however, this benefit was only in the first year after a new purchase, and AFD received nothing on B share 12b-1 fees after that time.  Tr. 483:1-7 (Gorvetzian).  Also, B shares were a very small amount of the total assets under management.  Tr. 694:24-695:2 (Haaga) (estimating B shares account for 2% of assets).[52]

- <u>C Shares</u>:  AFD fronts a 1% payment to brokers at the time of sale, and is reimbursed during the next 12 months via Rule 12b-1 fees.  AFD may benefit— *i.e.*, it may be reimbursed more than it fronted—if Fund assets appreciate due to market action (*i.e.*, not due to new sales).  But AFD may lose money if the market declines (as it did in 2008), and AFD bears the risk.  Tr. 483:12-484:4.

These are the only Rule 12b-1 fees to which AFD had a fiduciary duty.  However, almost all of the evidence presented by Plaintiffs at trial focused on *total* Rule 12b-1 fees, including those paid to brokers.[53]  Significantly, Plaintiffs failed to identify the services provided *by AFD* in exchange for the Rule 12b-1 fees it received.  Thus Plaintiffs failed to meet their burden of proving the Rule 12b-1 fees were excessive.

## C.    The *Gartenberg Factors* Applied to The Rule 12b-1 Fees

### 1.    Nature and Quality of Services

---

[52]  Of the potential benefits to AFD with respect to Rule 12b-1 fees on class A, B and C shares, the largest benefit is on B shares.  However, none of the Plaintiffs own B shares and thus were not affected at all by the payment of these fees.  Tr. 355:4-12, 362:9-364:6, 481:4-11 (Gorvetzian).    Plaintiffs lack standing to challenge these payments. *See* Defs.' Conts. 30-34.

[53]  Plaintiffs relied on interrogatory responses that list the amount of Rule 12b-1 fees "retained" by AFD.  But the evidence established that these "retained" Rule 12b-1 fees include fees that merely reimbursed AFD for monies it advanced to brokers.  Tr. 384:20-385:22, 391:6-394:11, 488:23-24, 515:14-520:13 (Gorvetzian).    Not only does AFD have no fiduciary duty with respect to these fees (under *Pfeiffer*), they cannot possibly be disproportionate under *Gartenberg*.    That is, the 0.25% fee cannot be disproportionate to the service rendered if that "service" is advancing that same amount of money to the broker out of AFD's own resources.

The quality of services provided *by brokers* in exchange for Rule 12b-1 is discussed above.   Plaintiffs offered no contrary evidence and their own testimony establishes the services were valuable. *See supra* p. 25.

With respect to services provided by AFD, its wholesalers help train and educate brokers about the Funds so they can assist shareholders in achieving their long term goals and better serve their clients.   Tr. 793:11-794:17 (Clifford).   Directors testified that, based on their experience, AFD does an excellent job educating brokers on how to serve their clients.   Tr. 874:9-18 (Newman).   Most of the AFD associates work in service centers, handling telephone calls with advisers related to servicing their clients (such as selecting the proper funds to meet the shareholder's investment objectives). *Id.* There is no evidence indicating that the services provided by AFD were not high quality. *See* Exs. 335 at CORBI_0209265-93; 600 (Overview of AFD).

## 2.    Profitability

AFD, the only entity that received Rule 12b-1 payments, does not make a profit on those fees. Tr. 488:23-24 (Gorvetzian).   AFD's overall profitability is generally negative, with a net operating loss in 21 of the previous 36 years.   Stipulated Facts ¶¶ 99-100.   During the relevant period 2003 to 2008, AFD lost about \$9 million. *Id.* While AFD's overall profitability was positive in 2004-2006, those profits were mostly driven by revenues from the retention of front-end sales loads on A shares, *not* Rule 12b-1 fees. *See* Ex. 603 at CORBI_0208354; *see also* Ex. 50 at 71, 73.

## 3.    Comparative Fees

The Rule 12b-1 fees charged to the Funds either were comparable to or lower than those Rule 12b-1 fees charged by most other mutual funds.   Tr. 798:25-799:4 (Clifford); 1286:12-17 (Hubbard).  Plaintiffs offered no proof on this issue.

## 4.    Economies of Scale

Plaintiffs did not offer any evidence that economies of scale exist in the provision of Rule 12b-1 services. Dr. O'Neal did not perform an analysis of economies of scale for AFD alone,[54] although he concedes that AFD shared approximately $500 million in efficiencies. Tr. 1070:11-20 (O'Neal).[55]

### 5. Independence and Conscientiousness of the Board

The directors were routinely provided voluminous materials concerning Rule 12b-1 fees and services.[56] Tr. 695:10-696:24 (Haaga). Plaintiffs have not challenged the accuracy of these materials.[57] The directors also experienced Rule 12b-1 shareholder services first-hand. Tr. 960:1-961:2 (Christie); 856:10-21, 874:2-18 (Newman). The directors' diligence is reflected in their consistently asking for more information in connection with their annual renewal of the Plans of Distribution. Tr. 593:1-23 (Haaga); 944:16-945:24 (Christie); 1433:22-1434:6 (Riggs). Finally, independent counsel advised that they had sufficient information to approve the fees. Tr. 901:8-11 (Newman); 980:25-982:2 (Christie).

---

[54] Dr. O'Neal did perform one analysis of AFD and CRMC combined, but this says nothing about scale economies associated with Rule 12b-1 fees. That combined analysis includes revenues (and costs) from advisory services, administrative services and front-end sales loads, all of which would swamp the impact of the *de minimus* revenue that AFD received on Rule 12b-1 fees.

[55] In 2005, AFD waived the Rule 12b-1 it receives on certain accounts, thus reducing Rule 12b-1 fees (and thereby sharing economies of scale). Ex. 814; Tr. 827:2-6 (Newman).

[56] The following are merely examples of such information: Ex. 3 (Mutual Fund Fees and Expenses White Paper); Exs. 4-50 (DIBs); Exs. 51-122 (Contracts Committee minutes); Exs. 137-331 (Board Books for Full Board meetings); Exs. 333, 335-336 (Independent Director Seminar Board Books); Ex. 603 (Board Book on AFD); Exs. 671, 673-679 (Fund Principal Underwriting Agreements); Exs. 692-705, 707-38, 742-62, 766-86 (Fund Plans of Distribution); Ex. 806 (Handout for Directors - Review of GFA 12b-1 Expenses); Exs. 812, 814, 816-17, 820, 841, 851-52, 854, 857 (Memoranda to Directors); Ex. 1087 (Presentation to Directors).

[57] Plaintiffs suggest that the quarterly expense reports detailing the Rule 12b-1 fee expenditures were somehow inadequate because they did not specify the brokers to whom the fees were paid. Plaintiffs cite no authority that such information was required. Rule 12b-1 certainly does not require this. *See* Ex. 648 (Bobroff Report 50); 17 C.F.R. § 270.12b-1. In fact, the independent directors did not believe this information would be helpful. Tr. 832:16-833:11 (Newman). In any event, the directors were aware of the rates of the Rule 12b-1 fees, as well as which brokers received such fees from other materials provided to them. Tr. 696:4-24 (Haaga); 1510:10-1511:18 (Bobroff); 832:21-833:5 (Newman).

Plaintiffs have argued that the directors lacked adequate information because they were not shown the internal survey responses. But the evidence makes clear that the challenges of size raised in those responses were well known to the directors. And, having now seen the survey responses, the directors testified that the surveys would not have provided any new information to them. Tr. 897:6-898:17 (Newman); 993:8-994:19 (Christie); *see also* 699:11-700:16 (Haaga). Indeed, size was a constant topic of discussion between CRMC and the directors, with the issue coming up at virtually every Board meeting during the relevant period. Tr. 141:19-143:10 (Rothenberg); 698:6-16 (Haaga); 326:3-9 (Armour); 887:17-24, 890:1-25 (Newman); 1404:8-14 (Riggs); 993:11-19, 1002:9:-1003:1 (Christie). Directors also discussed the difficulties of managing a large fund directly with portfolio counselors, analysts and trading personnel. Tr. 890:1-15 (Newman); 990:3-991:2 (Christie). Also, CRMC presented the Boards with a white paper that discussed many of the same challenges voiced by survey respondents and attached academic articles describing differing views as to the impact of fund size. *See* Ex. 1 at CORBI_0230601-767; Tr. 890:19-893:22 (Newman).

After fully considering all available information, the directors determined that any potential concerns over Fund size could be appropriately handled through the multiple portfolio counselor system (Tr. 1403:23-1404:3 (Riggs)), a determination that is fully supported by expert testimony (*see* Tr. 1228:22-1230:19 (Peavy)), and the academic literature (*see* Ex. 1 at CORBI_0230687). The directors determined that, while there may be challenges to size, the benefits to growth outweighed those challenges. Tr. 893:23-894:1, 899:10-17 (Newman); 992:14-16 (Christie). The Boards properly exercised their judgment that the Rule 12b-1 fees were reasonable. Tr. 822:19-823:1-2 (Newman); 981:22-983:2 (Christie); 1433:22-1434:6 (Riggs). There is no basis to upset that judgment.

## V.    The Administrative Services Fees Were Not Disproportionate

The evidence makes clear that Plaintiffs failed to meet their burden of establishing that the administrative services fee ("ASF") was excessive.

### A.   Preliminary Matters Relating to Administrative Services Fees

Before addressing the *Gartenberg* standard, it is important to note that—for two reasons—only a very small portion of the ASF is at issue.

First, the ASF was paid only with respect to C, F, R and 529 share classes and had no impact on other share classes (*e.g.*, A and B classes).   Tr. 416:21-417:2 (Gorvetzian); 842:8-19 (Newman); Ex. 691.   Only two of the six Plaintiffs own a share class (class C) that pays the ASF, and those shares are owned in only two of the Funds (CIB and IFA).   Stipulated Facts ¶¶ 17-23.   Thus, Plaintiffs' standing to challenge the ASF is limited to class C shares of CIB and IFA, as they have no injury in fact for any other Funds or share class.[58]

Second, most of the ASF was paid to third parties for the provision of regular transfer agent services.   *See* Ex. 814 at CORBI_0219945-46; Tr. 418:21-25, 419:1-421:21, 498:9-22 (Gorvetzian).[59]   Under *Pfeiffer*, Defendants owe no fiduciary duty with respect to fees passed-through to third parties.   *See supra* Section IV.B.   Thus, the only possible basis for liability with respect to the ASF would be the portion retained by CRMC.

### B.   The *Gartenberg* Factors Applied to the Administrative Services Fee

#### 1.   Nature And Quality Of Services

The administrative services provided by CRMC were wide-ranging and top-

---

[58] *See* Defs.' Conts. 30-34; *see also Allen v. Wright*, 468 U.S. 737, 751 (1984) (must establish personal injury to have standing); *Davis v. Yageo Corp.*, 481 F.3d 661, 675 (9th Cir. 2007) (affirming dismissal for lack of standing; "[i]n order to have standing [a party] must show injury in fact").

[59] Regular transfer agent services include record maintenance, shareholder communications, transactional services and tax reporting for shares of the funds or the series held on the books of AFS or third party service providers.   Ex. 2382 at CORBI_0389683.   The ASF was instituted in 2001, with the advent of Class C shares.   Tr. 435:7-17, 453:18-454:14 (Gorvetzian).   The vast majority of class C, F, R and 529 shares are held in accounts managed by third parties (not AFS, who provides transfer agent services primarily to Class A and B share accounts).   As a result, significantly more oversight, monitoring and assistance was required for these classes of shares when it comes to the provision of quality transfer agent services.   Tr. 453:18-454:24, 499:18-501:2 (Gorvetzian).

Gibson, Dunn & Crutcher LLP

quality for the many millions of shareholders serviced. CRMC and its affiliates "coordinate, monitor and oversee the activities of third parties with which CRMC or AFS contract[ed] to ensure that shareholders receive high quality services." Ex. 2382 at CORBI_0389683; Ex. 765. At all relevant times, approximately 50 associates were dedicated to administrative services efforts full-time, and 300-400 more devoted significant parts of their day to these endeavors. *See* Tr. 470:16-471:13 (Gorvetzian). The services they provided included, but were not limited to:

- Arranging for the provision of regular transfer agent services by third parties including the selection of qualified transfer agents, and negotiating, and drafting contracts. Tr. 453:18-454:24, 470:16-23 (Gorvetzian); Ex. 765.

- Regularly collecting and analyzing information. Among other things, the Home Office Service Team ("HOST") routinely collected information from third party providers as to the accuracy and timeliness of transactions, compliance with fund prospectuses and the availability of automated shareholder servicing functions. HOST also regularly analyzed auditor reports. Ex. 2382 at CORBI_0389683; *see also* Tr. 455:21-456:11 (Gorvetzian).

- Regular onsite visits. Personnel from CRMC and/or its affiliates frequently traveled to third party service providers to evaluate their facilities, systems and quality of service; when appropriate, remedial measures were taken to improve the services. Ex. 3 at CORBI_0231747; Ex. 2382 at CORBI_0389683; Tr. 455:21-456:15 (Gorvetzian).

- Daily assistance to third party service providers. AFD associates regularly assist third party providers on myriad topics, including cost basis calculations, share class conversion, retirement plan distributions, and fund market timing policies. Ex. 2382 at CORBI_0389684. Also, hundreds of AFD associates field thousands of calls per day, many of which relate to the provision of administrative services (*e.g.*, account related information (tax issues, account balances, verification and/or explanation of transactions), the explanation of information contained in account statements, and assistance in using the American Funds website). Tr. 468:20-470:15 (Gorvetzian).

- The provision of recordkeeping programs. AFD offers a proprietary recordkeeping program, and 30 associates have full-time responsibility for interfacing with retirement plan sponsors to ensure that all data is properly and accurately transferred to the record-keeping provider and to field all questions from a plan sponsor relating to the Funds. Tr. 467:23-468:19 (Gorvetzian).

In sum, the services provided in exchange for the portion of the ASF retained by CRMC were extensive and of high quality. *See, e.g.,* Tr. 1511:23-1517:4 (Bobroff).

## 2.    Independence and Conscientiousness of the Directors

The directors had a sound grasp on the nature and purpose of the services provided by CRMC under the administrative services agreement.    Tr. 844:10-846:4 (Newman); 951:24-952:13 (Christie); Woolf Dep. 184:7-22.[60]   They regularly received massive amounts of information relating to the ASF and the services provided. *See* Ex. 3 at CORBI_0231587; 0231599-600; 0231608-612 (White Paper on Fees); Exs. 5-15, 17, 19, 21-26, 28-33, 35-37, 39, 42-43, 45-50 (Contract Committee DIBs); Ex. 814 (memo regarding the ASF).   The Funds' boards received more than ample information to make an informed decision in approving the ASF. *See* Tr. 1517:5-1518:6 (Bobroff); Ex. 648 (Bobroff Report 34-36).

Plaintiffs' only challenge to the independence and conscientiousness of the directors with respect to the ASF is their contention that directors lacked data regarding the profitability of that fee alone. *See* Pls.' Conts. 8-9.   The law and the proof at trial put this argument to rest.

First, the approval of a fee in the absence of a single piece of information does not establish a violation under Section 36(b), absent a showing that the fee was disproportionate to the services rendered.   Indeed, since even fraud by an adviser upon fund directors cannot, standing alone, amount to a Section 36(b) violation, *see In re Am. Mut. Funds Fee Litig.*, CV 04-5593, Hearing Tr. 6:17-8:22 (C.D. Cal. June 29, 2009), it cannot be that a non-fraudulent information "deficiency" makes the fee excessive. *See also* S. Rep. No. 91-184 at 15 (defect in directors' deliberations is not "controlling in

---

[60]  For example, Director Christie testified that "the idea of having 15 potential basis points . . . didn't seem unreasonable because there was a lot more monitoring [as compared to services on A and B shares, which ranged from 8 to 12 bps].   They have a huge organization . . . that works more closely because we were, in effect, delegating authority in a lot of stock transfers and a lot of activities.   So it seemed like a reasonable fee . . . ."  Tr. 951:20-952:13 (Christie).

1    determining whether or not the fee encompassed a breach of fiduciary duty").

2        Second, the directors had ample profitability information to make informed

3    decisions regarding the approval of the ASF. Tr. 424:14-21, 438:9-13, 474:8-12, 476:3-

4    5 (Gorvetzian); 845:25-846:4, 849:5-18, 900:11-19 (Newman); 995:12-15 (Christie).

5        Third, the evidence overwhelmingly demonstrates that service-level cost data for

6    administrative services—which could only be "determined" through a major cost

7    allocation effort—was in no way "essential" information.[61]  The directors who testified

8    made clear that profit figures for the ASF provided no incremental value in the decision-

9    making process because they were derived from subjective allocations. The directors

10   determined, in their business judgment, that it was better to rely on total, unallocated

11   cost figures. See Tr. 847:9-849:18 (Newman); 1417:11-1418:7 (Riggs); 950:16-951:4,

12   995:22-996:21 (Christie). This was confirmed by the expert testimony of Dr. Maher.

13   Ex. 650 (Maher Report 6-7, 9-15); Tr. 1156:16-1169:3 (Maher). Also, when CRMC

14   provided allocated cost "data" in both 2006 and 2008 (see Exs. 18, 3061), the directors

15   approved the ASF each time. Tr. 480:5-481:2 (Gorvetzian).    This confirms the

16   directors' business judgment that service-level cost data was immaterial.[62]

17       **3.    Profitability**

18       CRMC's pre-tax "profit" margin from the ASF was approximately 19% in 2008

19

20   [61] See Krinsk, 715 F. Supp. at 481-82, 489 (as to cost allocations, holding that "[l]ittle
     certainty exists in the field where different, albeit rational, methodologies lead to
     widely disparate results.").

21   [62] In support of their position that allocated cost data was somehow "essential,"
22   Plaintiffs' rely solely on the statements of an SEC staff member in a letter dated
     September 21, 2006. Ex. 3060.  But this letter provides no support at all. It is not
23   only trumped by the overwhelming weight of contrary record evidence, but the Staff
     member's suggestion rests on the flawed premise that Section 17(d) (and Rule 17d-
24   1) and Section 15(c) of the ICA supposedly mandate the provision of cost data on a
     service-by-service basis. Id. at CORBI_0220485-486. Nothing in these statutes or
25   regulations require the provision of such data. See Defs.' Conts. 53-54; Defs.' Trial
     Mem. 26-28 (Dkt. No. 506); Defs.' Mot. in Limine No. 6 at 13, n.18 (Dkt. No. 473);
26   Ex. 648 (Bobroff Report 34-35, 35 n.19); Tr. 1581:10-13 (Bobroff). Plaintiffs have
     never successfully countered this legal reality, and offered no contrary proof at trial.
27   Moreover, there is absolutely no legal authority suggesting that the failure to provide
     allocated cost data to fund directors is a breach of fiduciary duty under Section
28   36(b).

1   and in 2009 it is losing money on some Funds. *See* Ex. 2382 at CORBI_0389686; Ex.

2   650 (Maher Report 5); Tr. 471:18-473:2 (Gorvetzian). Moreover, that 19% "profit"

3   figure was conservative (*i.e.*, overstated) given that it does not account for certain costs

4   incurred by CRMC in connection with the provision of administrative services. *See* Ex.

5   2382 at CORBI_0389686; Tr. 480:5-19 (Gorvetzian); Ex. 650 (Maher Report 5-6).[63]

6   Notwithstanding its overstatement, the 19% figure is far below levels that courts have

7   found to be reasonable in Section 36(b) cases. *Schuyt*, 663 F. Supp. at 978-79.[64]

8                     **4.    Comparative Fees**

9            Plaintiffs failed to offer proof about comparative fees as it relates to the ASF. To

10  the extent the record contains any basis for comparing the ASF against other fees in the

11  industry, it shows that the ASF compares quite favorably. From 2004 to 2008, the

12  median expense for transfer agent services for similar funds ranged from 0.10% to

13  0.27% (*see* Exs. 2215A-2215H) with the maximum 0.15% ASF falling at the low-end of

14  that range. Importantly, this is not an apples-to-apples comparison in that the transfer

15  agent fees of competitors listed in Exhibits 2215A-H are limited to traditional transfer

16  agency services, whereas the ASF at issue encompassed *both* those services *and* the

17  significant oversight, monitoring and assistance provided by CRMC. *See supra* Section

18  V.B.1. Even though the ASF covers significant additional services, the comparative fee

19  data indicates that the ASF is at the low end of the industry. This is further confirmed

20

21  [63] Certain costs were not accounted for in arriving at this "profit" figure, such as the
22  costs of compensation of senior management, various technology costs, and costs
    incurred with respect to the generation of written shareholder materials. *See* Ex.
    2382 at CORBI_0389686; Tr. 480:5-19 (Gorvetzian).

23  [64] The cost and revenue data relating to administrative services contained in the SEC's
24  September 21, 2006 letter (*see* Ex. 3060 at CORBI_220484) suggests a "profit" to
    CRMC of approximately 39%. The trial evidence established, however, that this
25  margin is significantly overstated since the "cost" figure used to calculate it was
    understated by a very sizable amount. *See* Tr. 421:24-423:20, 432:16-433:24,
26  476:24-477:18 (Gorvetzian); 750:12-751:25 (Omiya). With no adjustment, the 39%
    figure still falls within the range recognized as reasonable by courts; if a more
27  complete cost assessment had been possible at the time, it is clear that the profit
    would have been well *below* these levels. *See* Tr. 511:14-17 (Gorvetzian) ($10.6
28  million figure "was tens of millions of dollars less than what the actual costs were").

Gibson, Dunn &
Crutcher LLP

by the fact that the Funds' total expense ratios (which include the ASF) are among the lowest in the industry. *See supra* II.C.4.

### 5. Economies of Scale

Finally, Plaintiffs failed to analyze economies of scale that exist with respect to the provision of administrative services, let alone that scale economies were not shared equitably. *See Kalish*, 742 F. Supp at 1238-39. The closest they came was O'Neal's "evaluation" of CRMC excluding AFD and AFS. *See* Ex. 2669 (O'Neal Report ¶ 60); Tr. 1057:10-14 (O'Neal). But this analysis includes revenues from both advisory fees and the portion of the ASF retained by CRMC. *See* Ex. 2669 (O'Neal Report ¶ 60). It also excludes a large part of the costs incurred in providing the administrative services. *See* Tr. 794:18-795:11 (Clifford); 1067:19-24 (O'Neal). Thus, it says nothing about scale economies relating to administrative services.

Moreover, as the Funds grew in size, CRMC imposed a cap on its retained ASF, which resulted in lower fees.[65] In some cases, the cap reduced the ASF by as much as 47%. *See* Exs. 2216A-2216H. Thus, CRMC clearly shared equitably in any scale economies relating to administrative services.

### C. The "Cap" On the Portion of the Administrative Services Fees Retained By CRMC

Plaintiffs assert that CRMC's proposal to cap its retained amount of the ASF at 0.05% was an "admission" that "the fees retained by CRMC had been excessive for several years." *See* Pls.' Conts. 9. This contention is factually baseless and legally irrelevant. At no point did CRMC "admit" that the ASF was excessive. Instead, CRMC simply noted that, for a period, it had retained a "higher portion" of the ASF in the F and 529 shares than it originally anticipated because the payments to third parties went down over time after the ASF was first launched. Ex. 814 at CORBI_0219945-

---

[65] *See* Tr. 435:7-437:12, 471:18-474:2 (Gorvetzian); 995:12-21 (Christie) ("the fee was operating more efficiently than we had anticipated [so it allowed us] to lower the fees").

46; Tr. 419:9-22, 471:18-473:2 (Gorvetzian).  These statements simply do not address the relevant inquiry, which requires a court to "examine what the Fund paid *and* what it received" to determine if the payment was disproportionate.  *Gartenberg*, 528 F. Supp. at 1047 (emphasis added).[66]  Remarkably, Plaintiffs are here attempting to use CRMC's *reduction* of the ASF—which clearly constitutes the sharing of increased efficiencies—as evidence that Defendants somehow breached their fiduciary duty.  This warped argument is completely contrary to one of the central purposes of Section 36(b)—"to ensure that investment advisers pass[] on to fund investors [any] savings they realized from . . . economies of scale." *Pfeiffer v. Bjurman, Barry & Assocs.*, No. 03 Civ. 9741, 2004 WL 1903075, at *4 n.8 (S.D.N.Y. Aug. 26, 2004) (quotation omitted).

## VI.  Conclusion

For the reasons set forth above and in Defendants' other pretrial submissions, Defendants request that the Court enter an order of judgment in their favor and dismiss the complaint with prejudice.

DATED:  August 24, 2009

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  _____/s/ Gareth T. Evans_____
Gareth T. Evans

---

[66] Plaintiffs' argument regarding the 0.05% cap also improperly ignores the undisputed fact that, while there was a period (fiscal years 2004 and 2005) in which CRMC retained amounts above 0.05% (*see* Tr. 499:3-5 (Gorvetzian)), there were also periods—*i.e.*, in the early years of the ASF, and year-to-date 2009—when CRMC retained *much less* than 0.05% and even lost money on administrative services for certain of the Funds at issue.  *See* Tr. 471:18-473:2, 507:16-509:10 (Gorvetzian).  The law requires a court to consider "all the facts" in determining whether a Section 36(b) violation exists.  *See supra* Sections II.A, II.B.

MILBANK, TWEED, HADLEY &
 MCCLOY LLP

By: _____
        James N. Benedict

Attorneys for Defendants
CAPITAL RESEARCH AND MANAGEMENT
COMPANY and AMERICAN FUNDS
DISTRIBUTORS, INC.

### CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2009, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Jules Brody: | jbrody@ssbny.com |
| Jordan L Lurie: | jlurie@weisslurie.com,infoca@weisslurie.com |
| Jeff S Westerman: | jwesterman@milberg.com, schang@milberg.com, cchaffins@milberg.com |
| Robert A Meyer: | rmeyer@loeb.com |
| Joseph H Weiss: | jweiss@weisslurie.com |
| Joseph D Cohen: | jcohen@weisslurie.com |
| Paul Benedict Salvaty: | psalvaty@omm.com |
| Elizabeth P Lin: | elizabethl@blbglaw.com, denab@blbglaw.com |
| Charles J Piven: | piven@browerpiven.com |
| Thomas A Zaccaro: | thomaszaccaro@paulhastings.com |
| Gareth T Evans: | gevans@gibsondunn.com |
| Janine L Pollack: | jpollack@milberg.com, jbaum@milberg.com, mbarrett@milberg.com |
| Jerome M Congress: | jcongress@milberg.com |
| Eric R Maier: | emaier@maiershoch.com |
| Sabrina S Kim: | skim@milberg.com, schang@milberg.com, cchaffins@milberg.com |
| Andrew Zachary Edelstein: | aedelstein@gibsondunn.com |
| Anna Christina Dover: | adover@milberg.com |
| Michael R Reese: | michael@reeserichman.com |

| | | |
|---|---|---|
| 1 | Steven S Kaufhold: | skaufhold@akingump.com, |
| 2 | | smartinson@akingump.com, |
| 3 | | westdocketing@akingump.com |
| 4 | Stuart M Glass: | sglass@goodwinprocter.com |
| 5 | James S Dittmar: | jdittmar@goodwinprocter.com |
| 6 | William Michael Brody: | wbrody@loeb.com, wbrody@chrismill.com, |
| 7 | | mortiz@loeb.com |
| 8 | James N Benedict: | jbenedict@milbank.com |
| 9 | Sean M Murphy: | smurphy@milbank.com |
| 10 | C Neil Gray: | cngray@milbank.com |
| 11 | Richard Acocelli: | racocelli@weisslurie.com |
| 12 | Michiyo M Furukawa: | mfurukawa@milberg.com, schang@milberg.com, |
| 13 | | cchaffins@milberg.com |
| 14 | Louis A Pellegrino: | apellegr@milbank.com |
| 15 | John R S McFarlane: | jmcfarlane@milberg.com |
| 16 | James G Cavoli: | jcavoli@milbank.com |
| 17 | Julia J Sun: | jsun@weisslurie.com |

/s/ Gareth T. Evans

100717841_1.DOC

Gibson, Dunn &
Crutcher LLP