MILBERG LLP
JEFF S. WESTERMAN (SBN 94559)
E-mail: jwesterman@milberg.com
One California Plaza
300 South Grand Ave., Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975

WEISS & LURIE
JOSEPH H. WEISS
E-mail: jweiss@weisslurie.com
RICHARD A. ACOCELLI (admitted
*pro hac vice*)
E-mail: racocelli@weisslurie.com
JULIA J. SUN
E-mail: to jsun@weisslurie.com
551 Fifth Avenue, Suite 1600
New York, New York 10176
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

MILBERG LLP
JEROME M. CONGRESS (admitted
*pro hac vice*)
E-mail: jcongress@milberg.com
JANINE L. POLLACK (admitted *pro
hac vice*)
E-mail: jpollack@milberg.com
ANNA C. DOVER (SBN 217100)
E-mail: adover@milberg.com
JOHN R. S. MCFARLANE (admitted
*pro hac vice*)
E-mail: jmcfarlane@milberg.com
One Pennsylvania Plaza
New York, New York 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Co-Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| In Re AMERICAN MUTUAL FUNDS FEE LITIGATION | MASTER FILE: CV 04-5593 (GAF) (RNBx) |
| This Document Relates to: | PLAINTIFFS' POST TRIAL BRIEF [L.R. 16-10] |
| ALL ACTIONS. | Hon. Gary A. Feess |
| | Hearing Date: September 2, 2009 |

# TABLE OF CONTENTS

**Page**

ARGUMENT ........................................................................................................ 1

I.    BULLET POINT SUMMARY OF THE EVIDENCE AT TRIAL ..... 1

II.    THE LACK OF AN ARM'S-LENGTH RELATIONSHIP BETWEEN CRMC AND THE DIRECTORS ................................... 1

III.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO THE FUNDS BY CHARGING EXCESSIVE RULE 12B-1 FEES .... 2

    A.    The Requirements of Rule 12b-1 ............................................. 2

    B.    Defendants Spent Billions in 12b-1 Fees to Promote Growth ... 3

    C.    Growth was Adversely Impacting the Quality of Services ........ 4

    D.    The Explosive Asset Growth Negatively Affected the Funds' Relative Performance and Trading Costs ................................. 10

    E.    The Directors Were Not Well-Informed Or Conscientious Regarding Rule 12b-1 Fees ....................................................... 11

    F.    The 12b-1 Fees Paid by the Funds were Disproportionate to the Value of the Services ................................................................. 14

        1.    The Amount AFD Retained was Disproportionate ........ 14

        2.    The 12b-1 Fees Received by AFD and Passed to Brokers Were Disproportionate ................................................... 15

IV.    DEFENDANTS' PROFITABILITY COMPARISONS HAVE LIMITED USEFULNESS AND ARE MISLEADING ..................... 15

V.    THE ADVISORY FEES PAID IN FISCAL 2004 WERE EXCESSIVE ........................................................................................ 16

    A.    Directors Believed the Small Breakpoint Adjustments Made During Fiscal 2004 Were Insufficient But Acquiesced ........... 16

    B.    The Nature and Quality of the Services Does Not Support the Level of Advisory Fees Paid in 2004 ....................................... 17

    C.    Defendants Did Not Equitably Share Economies Of Scale in Fiscal 2004 ............................................................................... 17

    D.    The Unaffiliated Directors Were Neither Conscientious Nor Adequately Informed with Respect to Economies of Scale ..... 22

VI.    CRMC'S ADVISORY FEES FOR FISCAL 2004 THROUGH 2008 WERE EXCESSIVE BECAUSE THEY WERE DESIGNED TO COVER EXPENSES INCLUDING ADDITIONAL

- i -

COMPENSATION TO DEALERS ..................................................... 23

VII.   DEFENDANTS' AND THEIR EXPERTS' RELIANCE ON
       COMPARATIVE FEES AND COMPETITION SHOULD NOT BE
       CREDITED 26

VIII.  THE ADMINISTRATIVE SERVICES FEES WERE
       DISPROPORTIONATE TO THE VALUE OF THE SERVICES .... 28

       A.   Directors Were Not Well Informed or Conscientious When
            They Approved the Admin Fees................................................ 29

       B.   The Admin Fees Were A Hidden Source of Excessive Profits
            For CRMC ............................................................................. 32

IX.    SECTION 36(B)(3) DOES NOT LIMIT PLAINTIFFS' RECOVERY
       TO ONLY THOSE 12B-1 FEES THAT DEFENDANTS DID NOT
       PAY TO THIRD PARTIES ................................................. 34

X.     SECTION 36(B) REQUIRES THAT EACH FEE BE EVALUATED
       FOR FAIRNESS SEPARATELY AGAINST THE RESPECTIVE
       SERVICES  36

XI.    PLAINTIFFS HAVE STANDING FOR THEIR SECTION 36(B)
       CLAIM     38

CONCLUSION.................................................................................... 40

1

# TABLE OF AUTHORITIES

Page

2

3

## FEDERAL CASES

4

*In re American Funds Fees Litigation*,
No. 04-5593, 2005 U.S. Dist. LEXIS 41884 (C.D. Cal. Dec. 16, 2005) .................................................................................... 17

5

6

*In re BlackRock Mutual Funds Fee Litigation*,
04 Civ. 164, 2006 U.S. Dist. LEXIS 13846 (W.D. Pa. Mar. 29, 2006) ....................................................................................... 17

7

8

*Daily Income Fund, Inc. v. Fox*,
464 U.S. 523  78 L. Ed. 2d 645  104 S. Ct. 831 (1984) ...................... 4, 17

9

*Galfand v. Chestnutt Corp.*,
545 F.2d 807 (2d Cir. 1976) ................................................................ 16

10

11

*Gartenberg v. Merrill Lynch Asset Management*,
94 F.2d 923 (2d Cir. 1982) ............................................................ 5, 15

12

*Gartenberg v. Merrill Lynch Asset Management*,
528 F. Supp. 1038 (S.D.N.Y. 1982) ....................................................... 5

13

14

*Kalish v. Franklin Advisors, Inc.*,
742 F. Supp. 1222 (S.D.N.Y. 1990) ........................................ 4, 10, 15, 16

15

16

*Krinsk v. Fund Asset Management, Inc.*,
715 F. Supp. 472 (S.D.N.Y. 1988 ..................................................... 4, 15

17

*Levy v. Alliance Capital Management L.P.*,
189 F.3d 461 (2d Cir. 1999) ................................................................ 15

18

19

*Meyer v. Oppenheimer Asset Management Corp.*,
895 F.2d 861 (2d Cir. 1990) ................................................................ 15

20

*In re Mutual Funds Investment Litigation*,
519 F. Supp. 2d 580 (D. Md. 2007) ....................................................... 18

21

22

*Pfeiffer v. Bjurman, Barry & Associates*,
No. 03 Civ. 9741, 2006 U.S. Dist. LEXIS 7862 (S.D.N.Y. Mar. 2, 2006) ................................................................................................. 12, 15

23

24

*Satterfield v. Simon & Schuster, Inc.*, No. 07-16356, 2009 U.S. App. LEXIS 13197 (9th Cir. June 19, 2009) .......................................... 17

25

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
663 F. Supp. 962 (S.D.N.Y. 1987) ..................................................... 2, 4

26

## STATE CASES

27

*Meinhard v. Salmon*,
 164 N.E. 545 (N.Y. 1928) ................................................................ 16

28

- iii -

# FEDERAL STATUTES

15 U.S.C. § 80a-35(b) .................................................................................. 17

17 C.F.R. § 270.12b-1(e) ............................................................................... 2

U.S.C.S. §809-15(a)(2) ............................................................................... 15

# MISCALANIOUS

1980 SEC LEXIS 444, at 30 (Oct. 28, 1980) ............................................... 2

S. Rep. No. 184, 91st Cong., 1st Sess., reprinted in 1970 U.S. Code Cong. & Ad. News 4897 ................................................................... 4

## ARGUMENT

### I.  BULLET POINT SUMMARY OF THE EVIDENCE AT TRIAL

- There was no arm's-length relationship between CRMC and the unaffiliated directors, who ignored CRMC's conflict of interest in advising them on fees, passively acquiesced in CRMC's decisions, and annually approved the fees at issue without having the necessary information to adequately evaluate them;

- Directors annually approved billions of dollars in 12b-1 fees designed to market the Fund shares, when growth was causing the quality of CRMC's services and the Funds' investment performance to deteriorate;

- The advisory fees for fiscal 2004 were excessive because, despite unprecedented growth that was causing a huge windfall in advisory fee revenue: (a) advisory fee reductions in that year were limited to small and insufficient breakpoint changes; and (b) CRMC failed to equitably share the economies of scale realized in fiscal 2004 with the Funds, and, instead, distributed almost all of them to its parent and to its employees through the profit sharing plan;

- Defendants requested, and the Directors agreed, that the hundreds of millions of dollars in additional compensation/revenue sharing paid to brokers be taken into account in setting advisory fee levels; this money was intended to promote sales and was thus excessive for the same reasons as the 12b-1 fees;

- Defendants did not themselves provide the directors with full and accurate information regarding the administrative fees charged to the Funds for certain share classes until November 2008, conceded in mid-2005 that such fees had been excessive from the beginning of the relevant period, and took advantage of the Directors' ignorance to earn windfall profits on such fees.

### II.  THE LACK OF AN ARM'S-LENGTH RELATIONSHIP BETWEEN CRMC AND THE DIRECTORS

Bobroff opines that the unaffiliated Directors ("Directors") were independent, conscientious and well-informed and that there was no collusion between them and CRMC.  Trial Exhibit ("Ex.") 648 at 13-22.  The overwhelming evidence at trial is to the contrary.   Director Riggs erroneously stated that there is no conflict of interest between CRMC and the funds/shareholders.  Trial Transcript ("Tr.") at 1401:20-1402:4.  The Directors concurred that they trust CRMC and, as a result, do not need to provide serious oversight of CRMC.  Tr. at 936:12-938:12;

946:9-25; 1401:20-1402:4; 1429:15-1431:5.  Thus, contrary to the goal of the ICA that the Directors are the watchdogs for the shareholders, the culture at CRMC is that the Directors ultimately go along with whatever CRMC proposes -- a fact that CRMC's senior in-house counsel repeatedly noted in emails.  Exs. 2437 at 398922; 2510.  This is no surprise, given the close personal relationships of senior CRMC executives to the unaffiliated directors.  One of the directors sends executive Paul Haaga emails signed, "Love and a hug."  Neale Depo. at 16:22-17:2, 17:7-19:14 (Ex. 2544).(lodged with the other cited depositions on July 27, 2009/Docket #527).

This submissive culture permeates the directors' approval process of the fees.  Directors begin the annual review process for 12b-1 fees with the foregone conclusion that the maximum 12b-1 fees must be paid to brokers because they accept CRMC's claims these fees are "institutionalized"  *See, e.g.*, 1439:17-1440:4.  Similarly, at trial Director Christie attempted to change his deposition testimony in which he stated that when CRMC proposed a cap on administrative fees, the Directors "accepted it pretty much as presented" because of their "high level of confidence" in CRMC.  Tr. at 951:20-953:11.  Far from being the watchdogs, the Directors dutifully acquiesce in CRMC's actions and, as a result, allow it to charge fees that are disproportionate to the services rendered and not what would have resulted from arm's-length bargaining.[1]

## III.  DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO THE FUNDS BY CHARGING EXCESSIVE RULE 12B-1 FEES

### A.    The Requirements of Rule 12b-1

Rule 12b-1 creates an exclusive safe harbor that permits mutual funds to pay for distribution expenses from their own assets, thereby excluding those payments from the blanket prohibition against such activities set forth in Section 12(b) of the

---

[1] Directors' independence is in serious question given that CRMC's in-house and outside counsel in this case prepared them for their deposition and trial testimony. Tr. 804:7-805:21.

ICA. 17 C.F.R. § 270.12b-1(e). As Professor Alan Palmiter, Plaintiffs' expert, explained in his report, the exception is a limited one because the SEC has recognized that fund advisors have a "serious" conflict of interest when funds bear distribution expenses. Ex. 2670 at 6-7. The conflict exists because advisors have an incentive to use shareholder funds, rather than their own profits, to finance marketing activities that increase the assets under management from which advisory fees are calculated. *See* Ex. 37 at 032025;[2] Ex. 47 at 031410. As such, the requirements of Rule 12b-1 are stringent and are clearly laid out to protect investors from these conflicts of interest. *See* Ex. 2670 at 5.

Rule 12b-1 only allows the continuation of the payments for efforts primarily intended to sell shares, and Directors must find that "there is a reasonable likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e). The Directors must obtain all necessary information to assure that the 12b-1 plan expenditures are accomplishing the Plan's original purposes. *See* Ex. 47 at 031410. Part of the information that Directors have a duty to request is whether the costs of the 12b-1 plans are justified by the benefits realized. Tr. at 813; *see also* Ex. 47 at 31412;[3] Ex. 2670 at 5.

**B.    Defendants Spent Billions in 12b-1 Fees to Promote Growth**

From CRMC's 2004 fiscal year through most of its 2007 fiscal year, Defendants caused the eight Funds at issue (the "Funds") to pay over $5.5 billion in 12b-1 fees. Ex. 793 at Attachment 1.[4] During this same period, the assets under

---

[2] All six-digit cites to page numbers in exhibits have a "CORBI_0" prefix unless otherwise noted.

[3] Defendants and the Directors argue that Rule 12b-1 has "morphed" into being for service rather than sales. As Professor Palmiter explains: "the purposes and concerns reflected in Rule 12b-1 have not changed over time…No SEC rule, amendment or interpretive release has modified the operative language or structure of the rule, which imposes heavy burdens on fund sponsors and fund directors to justify implementing *and continuing* any 12b-1 plan." Ex. 2670 at 7.

[4] Annual 12b-1 fees increased from over $883 million in 2004 to $1.6 billion in 2007. Ex. 793 at Attachment 1.

management of the American Funds and thus, CRMC's advisory fee revenues, grew at previously unprecedented rates (Tr. at 22:6-11; Ex. 1413 at ¶63), largely because of the net flows (*i.e.*, the dollar amount of new sales less redemptions) (Tr. at 22:12-23:2) that were the principal objective of the 12b-1 fee payments.

Sales of fund shares is the express principal purpose of Defendants' 12b-1 plans. *See* Ex. 3216 at 32287-89; Tr. at 358; Woolf Depo. at 148:13-19, 150:5-16. AFD's "mission" is to promote sales and prevent redemptions. Ex. 2482 at 391405; Tr. at 787. Even the Selling Group Agreement that governs payment of the 12b-1 service fees ties payment of those fees to the need to "promote selling efforts," and redemption rates are the only specific listed criterion for evaluating service. Ex. 333 at 208986.

In order to avoid liability in this case, Defendants say 95 to 99% of all 12b-1 fees are paid for ongoing shareholder services rather than for distribution. Tr. at 487:8-488:22; 796:2-14. Defendants' litigation position cannot be correct because if Defendants were actually paying over 95% of 12b-1 fees for shareholder services, they would be engaged in a continuing violation of regulatory requirements capping service fees at 25 basis points.[5] In fact, contemporaneous documentation, as well as testimony by Defendants' expert, Bobroff, confirm that at least 35-40% of all 12b-1 fees paid complex-wide were distribution fees rather than service fees. Ex. 2633.

## C.    Growth was Adversely Impacting the Quality of Services

By October 2003, CRMC's Executive Committee recognized that problems

---

[5] Under the regulations of the Financial Industry Regulatory Authority ("FINRA"), mutual fund advisers cannot pay brokers more than 0.25% of net assets (25 basis points) for 12b-1 service fees. *See* FINRA Rule 2830(d)(5). All share classes of American Funds that incur 12b-1 fees, other than A shares, pay 12b-1 fees of .50% to 1.00% of assets. If 95 to 99% of that .50% to 1.00% fee were going toward service (as opposed to distribution/sales), Defendants would be exceeding the FINRA cap by a wide margin as well as violating the express terms of their own prospectuses. *See, e.g.*, Exs. 1173 at 074486; 1190 at 075397; 1214 at 33.

from asset growth were adversely impacting the investment process. Tr. at 51:15-21; Ex. 3012 at 297544.  In February 2004, CRMC told its associates that it was splitting into two separate investment groups (*i.e.* disaggregating) to deal with continued expected growth. *See* Ex. 630 at 291656.  The purpose of that program was to alleviate ownership limit and other problems by encouraging diversification between the investment portfolios of CRGI and CWI. The ultimate objective was for CWI and CRGI to file separate ownership reports with the SEC.  *See* Exs. 630, 3012.

By December 2004, however, it was apparent that the disaggregation program had not solved the problems of growth.  Executive Committee members considered closing funds as well as various other alternatives to slow the growth of the Funds, including, among other things: (1) cutting back on sales and marketing activities (which are funded by 12b-1 fees); and (2) reducing or eliminating AFD's payment of additional compensation to dealers.  *See, e.g.,* Exs. 2487-2492.

In early 2005, the Executive Committee sent out a survey questionnaire to CRMC's investment professionals soliciting their opinions on how to deal with CRMC's major issues.  *See, e.g.*, Ex. 2380; Tr. at 41:9-42:9.  Many of the survey responses reported problems resulting from growth, including: (1) investment professionals were being precluded from making their "high conviction investments" (*see, e.g.*, Exs. 2500 at 369584, 2505 at 369596-7, 2512 at 369617-8, 2513 at 369611, 2519 at 369659); (2) it had become harder to invest in small and mid-cap companies (*see, e.g.*, Exs. 2496 at 369564, 2498 at 369565, 2505 at 369596, 2512 at 369621); (3) investment professionals felt pressured to invest the enormous sums pouring into the Funds even if they had to make lower conviction investment choices than they were comfortable with (*see, e.g.*, Exs. 2500 at 369584, 2505 at 369597, 2512 at 369617, 2519 at 369659, 2496 at 369567, ); (4) the disaggregation program had created a situation in which an increase in

"reversals" was preventing some portfolio counselors from investing in their high conviction names  (*see, e.g.*, Exs. 2500 at 369584; 2516 at 369643; Tr. at 297:2-298:20); (5) problems with liquidity had arisen (*see, e.g.* Ex. Nos. 2519 at 369660, 2522 at 369678); (6) the split had created research holes  (*see, e.g.* Ex. 2507 at 369603); (7) the initial strategy for dealing with growth was not working well and had to be revised (*see, e.g.*, Exs. 2497 at 369569, 2512 at 369624, 2518 at 369655, 2522 at 369678);[6]  (8) various investment professionals reported generally that size was hampering the ability to invest and was a serious problem that had to be addressed.  *See, e.g.*, Exs. 2497 at 369569, 2498 at 369573-4, 2501 at 369586, 2502 at 369590, 2505 at 369597, 2512 at 369622, 2517 at 369646, 2519 at 369660, 2520 at 369675, 2522 at 359678.

Of the 63 individuals whose survey responses and interviews were in evidence at trial, at least 37 reported such problems--almost 60%.[7] Thus, after almost two years of working on disaggregation, the investment services being provided to the Funds continued to be adversely affected by growth.

In addition, growth was causing concern about the number of 13G filings that had to made. Schedule 13G requires persons who beneficially own more than 5% of a class of U.S. listed voting equity securities to file ownership reports with the SEC.   Tr. at 55:21-56:3.   CRMC's investment professionals did not like making 13G filings  because these filings facilitated "front running" and could drive up the price of purchases.[8]  *See, e.g,.* Ex. 643 at 291679; Ex. 2512 at 369624.

---

[6]  For example, the existing structure, under which CWI and CRGI shared management of each of the Funds, was creating problems and had to be changed (*see, e.g.*, Exs. 2502, 2515); and the move to "legal" disaggregation (*i.e.*, separate filings with SEC) was going too slowly.  *See, e.g.*, Exs. 2506, 2512.

[7]  These surveys were from portfolio counselors and research analysts across the entire spectrum of levels of experience.  *See, e.g.*, Exs. 3130, 2499 at 369576 2500 at 369584, 2502 at 369589-90, 2505 at 369596-7, 2515 at 369640, 2517 at 369646.

[8]  Armour disingenuously attempted to change his deposition testimony on this subject at trial.  Tr. at 243:21-245:15.

In 2007, CRMC recognized that obtaining SEC approval to file ownership reports separately on behalf of CWI and CRGI would dramatically reduce the number of 13G filings it was making. Ex. 1096 at 210320. SEC approval to file separately would also alleviate the issue of being "maxed out" by external limits. *See, e.g.,* Tr. at 55:1-20. However, that approval did not occur until December 31, 2007. Ex. 1413 at ¶10.

Rothenberg and Armour testified that the problems reported in the surveys were addressed, and gave the impression that the complaints quickly died out. Tr. at 146:3-150:15; 316:12-317:18. Armour indicated that a crucial step in completing disaggregation occurred in February 2006, when CWI and CRGI fully stopped sharing information, and that diversification between the investment portfolios of those two units was already underway by then. Tr. at 277:17-278:7; 346:7-347:22. Even assuming that testimony were correct, the adverse impact of growth on quality of services would have lasted from October 2003 until early 2006. However, there is substantial evidence that problems with growth did not end in February 2006.

First, it is apparent from Armour's testimony that diversification between the investment portfolios of the two units was occurring gradually and was still a work in process in February 2006. Tr. at 346:7-347:22. Second, the conclusory testimony of Rothenberg and Armour that internal limits were addressed between 2005 and 2007 is belied by other evidence which indicates that material changes in internal ownership limits did not occur during those years, with the possible exception of certain limits on foreign securities.[9] The reason for CRMC's

---

[9] The White Paper on Mutual Fund Growth mentioned a recent change in ownership limits for foreign securities (Ex.1 at 230597). The Statements of Additional Information ("SAIs") and Prospectuses of the Funds during 2005-2007 list only one instance of an increased internal limit involving the amount of foreign securities IFA could own. Ex. 1268 at 11. *See,* with respect to GFA, Exs. 1237 at 079899, 1253 at 075602-3, 1277 at 7-8, which references no changes in internal ownership limits.

1    reluctance to make material changes in the internal ownership limits is evident

2    from Armour's testimony that those limits were needed to force diversification and

3    preserve liquidity, and that CRMC was therefore reluctant to adjust them upwards.

4    Tr. at 209:10-210:7, 240:9-241:4.

5        Rothenberg testified to the numerous issues that had to be addressed and

6    tasks that had to be completed before the two units were operating effectively as

7    separate entities, and the time frame for accomplishing all this extended to the end

8    of 2007.  Tr. at 62:9-63:5. A complete separation did not occur until just before

9    CRMC filed with the SEC. Tr. 60:18-63:18.  Furthermore, during CRMC's 2004

10    fiscal year, CRMC's trading cost advantage deteriorated relative to the average

11    trading costs of other institutional traders on similarly-sized trades.  Ex. 2669 at

12    10-18.  That deterioration did not reverse itself between 2004 and 2008.  *Id.*

13        Although Defendants suggested the complaints quickly died away, a notable

14    absence from the trial was testimony from any of the survey respondents to

15    confirm that fact, other than Rothenberg himself.

16        Meanwhile, starting in 2004 and continuing into early 2006, the Directors

17    periodically expressed concern about the impact of the continued growth of the

18    Funds.[10]  In response, Defendants merely assured the Directors that disaggregation

19    and the multiple portfolio counselor system would help CRMC manage the

20    increasing fund assets.  *See, e.g.*, Exs. 90 at 031065; 115 at 041571.  In fact, the

21    record is devoid of any contemporaneous evidence that the problems described in

22    the survey responses were adequately conveyed to the Directors.  *See, e.g.*, Tr. at

23    897:17-22; 1004:14-1005:4.  Director Martin Fenton specifically testified that he

24    learned of no operational problems at CRMC.  Fenton Depo. at 129:2-12

25        The contemporaneous record - largely the minutes of board meetings at

26

27    _____

[10] *See, e.g.*, Exs. 97 at 030405; 2362 at 254069 (2004); Exs. 62 at 040876; 71 at 040889 (2004); 114 at 041571; 2550 at 436812; 2559 438719-20 (2005).

28

which growth or disaggregation was discussed - shows CRMC executives repeatedly assuring the Directors that growth could not or would not be a problem. *See, e.g.*, Exs. 71 at 0040889; 90 at 031065; 113 at 202588-89; 882 at 206024; 1044 at 202650.   Rothenberg and Armour testified that those minutes were not accurate.[11]   Trial Tr. at 68:15-72:8; 73:2-74:23; 330:4-331:10.  However, in light of the fact that the minutes were circulated in draft to all directors, certain CRMC executives, and counsel before being finalized, (*e.g.*, Ex. 2345; Tr. at 807:5-808:1), it is evident that those minutes accurately conveyed the message given by CRMC to the Directors regardless of whether the minutes set forth the exact words that were used.

Ultimately, CRMC executives misled the Directors by presenting them with a "White Paper" on May 18, 2006 concerning managing mutual fund asset growth that made no reference to the problems that were actually being experienced (the "Growth White Paper").  *See* Ex. 1; Tr. at 908:6-18; 1403:24-1404:3; Fenton Dep. at 118:10-120:2.   That White Paper asserted that the multi-portfolio counselors system enabled portfolio counselors to focus on their "highest investment convictions," although the surveys demonstrated the opposite was occurring.[12] *See, e.g.*, Exs. 2500 at 369584, 2505 at 369596-7, 2512 at 369617-8, 2513 at 369611, 2519 at 369659.   It represented that CRMC had no difficulty in being able to execute small and mid-cap stock transactions, when that was one of the very problems from growth that Rothenberg acknowledged and the surveys reported. Exs. 2496 at 369564, 2498 at 369565, 2505 at 369596, 2512 at 369621.  Finally, Rothenberg essentially admitted that the Growth White Paper overstated the speed

---

[11] Throughout the trial, Defendants repeatedly testified that the board minutes are not accurate when the contents of the minutes conflicted with Defendants' litigation position in the case.  *See, e.g.* Tr. at 329:24-331:11; 569:1-570:14; 908:18-909:15.

[12] Asset growth outpaced he growth of investment professionals.  Ex. 1314 at ¶¶73, 76.

with which CRMC could liquidate its portfolio by a factor of five.[13]

### D. The Explosive Asset Growth Negatively Affected the Funds' Relative Performance and Trading Costs

Plaintiffs' expert, Dr. Edward O'Neal, concluded that continued growth of the Funds from January 2000 to September 2008 adversely impacted the Funds' relative performance. Ex. 2669 at 18-37. Dr. O'Neal's testimony demonstrates that there is a statistically significant negative relationship between size and relative investment performance for all the funds managed by Defendants collectively (*Id.* at 21-22), for the Funds collectively (*Id.* at 20), and for AMCAP, AMBAL, BFA, GFA and IFA individually. *Id.* at 26.[14] Even by Defendants' own Lipper statistics, the investment performance of five of the Funds in comparison with their peers deteriorated over the five years covered by this lawsuit. *See* Ex. 1413 at ¶ 74; Ex. 3157. *Notably, that deterioration occurred with respect to the same five Funds for which Dr. O'Neal found a statistically significant negative correlation between size and performance.*

In addition, the growth of the Funds caused the Funds' trading costs to deteriorate in comparison with the trading costs of their peers.[15] Dr. O'Neal's analysis demonstrates that from 2003 to the third quarter of 2007, during which

---

[13] The White Paper states that the Funds were liquid, based on the alleged fact that "[CRMC] could easily sell 20% of most holdings in about one or two days at close to carrying values based on average trading volume." Ex. 1 at 230596. This statement was supported by a chart, which disclosed that "this measure assumes our trades represent all of the average trading volume [in each stock, on each day]." *Id.* Rothenberg testified that 15-20% of a given day's volume was more realistic, given management's understanding that CRMC normally could not trade more than 15-20% of a given day's volume of a security without having an unacceptably adverse impact on the stock price. Tr. at 82-86.

[14] With respect to the three funds as to which Dr. O'Neal did not find a statistically significant negative relationship (CIB, WGI and ICA), the relationships were still primarily negative and the evidence provides ground for concern as to whether their performance was adversely affected.

[15] Matt Lyons, CRMC's head trader, regularly reported that, "in line with previous reports, CRMC has the largest order size amongst its peers and a higher average cost of orders due to the large order size." *See, e.g.*, Ex. 489 at 470064.

- 10 -

time Defendants' trading volume and average trade size increased greatly, Defendants' trading cost advantage relative to other institutional traders on similarly-sized trades deteriorated. Ex. 2669 at 10-18.[16]

In the face of all the problems that had developed because of the unprecedented growth, Defendants and the Directors made no significant effort to put the brakes on growth while they tried to solve those problems. To the contrary, for CRMC and AFD it was business as usual. They made enormous -- and increasing -- payments to broker-dealers and AFD from Fund assets in the form of 12b-1 fees and payments of additional compensation to dealers. Despite occasional expressions of concern, the unaffiliated Directors passively acquiesced in that process.

### E.    The Directors Were Not Well-Informed Or Conscientious Regarding Rule 12b-1 Fees

The extent to which the Directors are "fully informed" and the "extent of care and conscientiousness with which they perform their duties" are critical factors in the Section 36(b) analysis. *Gartenberg II*, 694 F.2d 923 930 (2d Cir. 1982)("*Gartenberg II*"). To this end, the Funds' investment adviser has a fiduciary responsibility of full disclosure to the Directors. *Gartenberg v. Merrill Lynch Asset Mgmt.*, 528 F. Supp. 1038, (S.D.N.Y. 1982) ("*Gartenberg I*") 1047. As discussed above, the Directors did not receive full disclosure from Defendants regarding the adverse effects of growth, and thus lacked information that was critical to their evaluation of proposed Rule 12b-1 fees.

To justify the increasing 12b-1 payments, the Directors were required to have a reasonable basis to conclude that the economic benefits to the Funds were sufficient to outweigh the substantial cost of those fees. *See, e.g.*, Tr. at 812:20-

---

[16] Contrary to Mr. Lyons' testimony (Tr. at 1130), the minutes of the Best Execution Committee confirm that CRMC relied primarily, if not exclusively, on the Plexus Reports with respect to determining best execution. Ex. 487 at 379816.

813:8; Ex. 47 at 031412.  They did not request or receive the needed information. In fact, Riggs actually testified that the massive nature of the increase in the Funds' 12b-1 payments over time was not a relevant consideration for the directors.  Tr. at 1437.

Directors relied on redemption rates being lower than the industry as a principal reason to approve the burgeoning 12b-1 fees.[17]  As Defendants' expert, Bobroff, admitted, there is no evidence that payment of 12b-1 fees is what caused the Funds' redemption rates to be lower than that of the industry.  Tr. at 1578:5-1579:24; *see also* Tr. at 181:15-17; 488:25-491:3; Woolf Depo. at 153:12-154:20. In fact, the Funds' redemption rates were already lower than the industry *before* 12b-1 fees came into existence.  Tr. at 181:3-14; 800:19-23; Ex. 37 at 032223; 315 at 100569.

The Directors also based their approval of 12b-1 fees in part on the supposed benefits of sharing the economies of scale that would be generated by the Funds' growth.  *See, e.g.,* Exs. 87 at 019480; 878 at 205981.  Defendants told the Directors that this sharing would occur through new breakpoints and fee waivers. *See, e.g.,* Ex. 69 at 31046.  However, the Directors never even considered that the dollar amounts given back through reduced advisory fee percentages and fee waivers were dwarfed by the amounts paid by the Funds in 12b-1 fees.  *See, e.g.*, Ex. 2669 at 72-73; Tr. at 813:20-814:3; *see also* Woolf Depo. at 157:15-158:2, 169:49; 169-15-170:23.

The Directors did not receive adequate information as to whether the amounts paid were justified by the shareholder services provided by brokers.  The quarterly reports on 12b-1 payments in the board materials contain no information on what services the brokers are providing in exchange for the 12b-1 fees.  *See,*

---

[17] *See, e.g.*, Ex. 55 at 018281; Tr. at 813:9-19; 815:5-18; 8276:18-828:7; 996:22-997:14; 1375:16-1376:12; 1438:6-1439:5; Fenton Depo. at 142:12-22.

*e.g.*, Ex. 47 at 031541, 31543. Indeed, even Defendants had no specific information about the extent to which American Funds security holders actually use the broker services for which 12b-1 service fees are paid.

As the Court noted in certain questions to Bobroff, a portion of the increase in 12b-1 service fee payments resulted from the bull market rather than the need to provide services to additional security holders. Tr. at 1591:11-1594:15. The Directors ignored this fact and the consequent economic windfall to the brokers. Woolf Depo. at 174:22-176:16. At no time did the Directors make any meaningful effort to determine whether aggressive negotiations between CRMC and the brokers could result in a modification of the 12b-1 fee payments during the period of particularly intense asset growth.[18]

The *pro forma* nature of the 12b-1 fee approval process is demonstrated by the Directors' adoption of Defendants' position that they had no other choice but to approve the full amount of 12b-1 fees proposed because those fees were a "competitive necessity" and an "institutionalized" part of AFD's relationship with the brokers. *See, e.g.*, Tr. at 799:5-9; 826:4-827:10, 1424:8-1425:16; *see also* Neale at 50:7-10. The record demonstrates, however, that AFD had leverage to negotiate more favorable 12b-1 terms with brokers and was not necessarily required to pay the amount of 12b-1 fees being paid by other distributors.[19]

Between 2004 and 2007, the Directors (including those who had been on the

---

[18] Although Riggs raised this question in 2004 and specifically suggested that Fund security holders may not actually need the services for which 12b-1 fees are paid (Ex. 2362 at 254069), CRMC was able to convince him that such thoughts were a result of his "naïveté." Tr. at 1394:20-1397:23.

[19] For example, the Funds do not pay 12b-1 service fees for the first year after the customer's purchase of A shares, despite being asked by brokers to do so and despite the fact that most advisers pay service fees in the first year on A shares. Tr. at 412:1-413:6. The charts of comparable 12b-1 fees in Defendants' contracts committee materials belie Defendants' assertion that all brokers receive the same service fees. *See, e.g.,* Ex. 30 at 031156. In fact, during the 1990s, CRMC had breakpoints in place on 12b-1 fees, but the directors eliminated such breakpoints. Tr. at 416:4-20.

Boards for 20-30 years) repeatedly expressed confusion and ignorance about AFD's distribution operations and the sources and uses of 12b-1 fees. *See, e.g.*, Exs. 55 at 018280; 67 at 019444; 2460 at 375842, 2535 at 372729; 2538; 2616. In October 2005, Haaga sent an email to Riggs apologizing that the Directors felt frustrated by their lack of information relevant to AFD. Ex. 2538. The Directors' confusion was not helped by the fact that Defendants gave the Directors conflicting information.[20]

### F. The 12b-1 Fees Paid by the Funds were Disproportionate to the Value of the Services

#### 1. The Amount AFD Retained was Disproportionate

During the relevant period, AFD retained over $450 million of the 12b-1 fees charged to the Funds and used that money to double/triple sales. Ex. 793 at Attachment 1; Tr. at 790:23-791:25; Ex. 3218 at 300789. While CRMC's Executive Committee struggled to find a way to manage the operational problems caused by the unprecedented growth in assets, AFD devoted the 12b-1 fees it retained to achieving another $130 billion in mutual fund sales in 2005. Ex. 2484 at 300010. Because this effort was hurting rather than helping the Funds, the amount retained was disproportionate to the services.

Although everything AFD retained was essentially for promoting sales and encouraging redemptions, to be conservative, Dr. O'Neal only treated the percentage of 12b-1 fees Defendants themselves said were for distribution rather than service - 35% - as devoted to sales. *See* Exs. 2669; 2633. To be even more conservative, Dr. O'Neal's figures do not include 12b-1 payments in 2004 and

---

[20] For instance, in April 2007, Defendants provided the Directors with a chart entitled "Following the Money" which according to Riggs, was a "comprehensive" chart on 12b-1 fees. Ex. 3064 at MF01265; Tr. at 1434:11-1436:10. That chart showed that AFD received no 12b-1 payments on ***any*** share classes. However, Defendants previously told the Directors that they retained 12b-1 fees on the A, B and, C shares (Ex. 335 at Appendix I) and Defendants have so testified in this action. Tr. at 395:9-396:25.

leave out B share 12b-1 amounts retained from Citibank. Based on that very conservative analysis, the amount retained and used for marketing rather than service is approximately $240 million.[21]  Plaintiffs submit that if $240 million or more of Fund assets could have been saved rather than put to a use by AFD which did not benefit the Funds, it was the fiduciary duty of Defendants and the Directors to do so.

### 2.    The 12b-1 Fees Received by AFD and Passed to Brokers Were Disproportionate

Paying the brokers to stimulate sales that were *hurting* the Funds was also disproportionate to the value of services.  *See, e.g.*, Ex. 315; Tr. at 814:4-815:8. There is no evidence demonstrating that the enormous increase in 12b-1 fees the brokers received was justified by any increase or improvement in services.

## IV.    DEFENDANTS' PROFITABILITY COMPARISONS HAVE LIMITED USEFULNESS AND ARE MISLEADING

Courts considering the issue of profitability in the *Gartenberg* context have held that, "[t]o the extent that comparisons are probative at all, a mutual fund adviser-manager must be compared with members of an appropriate universe: adviser-managers of similar funds." *See, e.g.*, *Kalish v. Franklin Advisors, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990).  The advisers with whom CRMC compares its profitability are not such an "appropriate universe" because CRMC's profitability was significantly distorted during the relevant period by profit sharing payments to employees. For example, by Director Newman's calculations, if profit sharing were considered part of profits during fiscal 2004, CRMC's net income

---

[21] Dr. O'Neal did not include the amounts paid to AFD by Citibank on B shares for CRMC's sale of its right to receive the .75% distribution 12b-1 fees because it appeared from Defendants' interrogatory responses that such monies were included in the amount Defendants "retained" on all 12b-1 fees.  Indeed, at trial, Defendants' own employees were initially unsure of the details regarding these interrogatory responses. Tr. at 386:14-388:12.  These Citibank 12b-1 monies add an additional $23.9 million dollars to the 12b-1 damages, bringing the total to $253.3 million dollars.  *See* Exhibit 1083, Appendix 3.

- 15 -

after tax would have been $838 million, instead of $545 million. *See* Tr. at 914:22-915:8; Ex. 1413 ¶ 98. CRMC dwarfs most of the advisers with whom it compared its profitability in the board materials in terms of the size of assets under management and the dollar amount of advisory fees. *See, e.g.*, Ex. 37 at 032129.

## V.    THE ADVISORY FEES PAID IN FISCAL 2004 WERE EXCESSIVE

### A.    Directors Believed the Small Breakpoint Adjustments Made During Fiscal 2004 Were Insufficient But Acquiesced

In fiscal 2004, CRMC's net assets under management increased from approximately $362 billion to over $520 billion (44%), and CRMC's advisory revenue increased from approximately $361 million to over $545 million (43%), partly as a result of strong sales. *See* Ex. 859 at 209399; Tr. 532:4-18. Early in calendar 2004, Directors were informed that AFD's sales and revenues were double budget for the six months ended December 31, 2003. Tr. 783:4-785:5 *citing* Ex. 333 at 208903. Directors knew then that CRMC was going to reap an enormous windfall from vastly increased advisory fees for fiscal 2004.

For almost a year, Directors had been expressing concern to CRMC that fund growth was producing only small breakpoint[22] reductions in advisory fees that were being "swamped" by increases in other fees. Tr. 1372:1-1374:7. Nevertheless, neither CRMC nor the Directors took any steps to go beyond the type of breakpoint changes Riggs criticized as "minimal" (Ex. 2362) until fiscal 2005, when CRMC voluntarily waived 5% of its fees.

The evidence shows that the directors did not regard such minor breakpoint changes as sufficient to create a fair fee without the addition of the fee waiver. Riggs confirmed that without the fee waivers, CRMC's small breakpoint reductions would have been insufficient. Tr. 1388:24-1391:11, *citing* Ex. 3149.

---

[22] Breakpoints were not calculated by reference to any actual or projected economies of scale. Tr. 92:11-93:22; Deposition of Kelly Webb 192:13-23.

Defendants and the Directors presented no legitimate rationale for failing to implement a meaningful reduction in the advisory fee schedule during fiscal 2004. Such action could have occurred in February 2004 when CRMC implemented new, but very small, breakpoint changes. *See*, Ex. 1413, ¶38. In the past CRMC had periodically established retroactive reductions in the advisory fee schedule, and the October 2004 5% waiver was itself retroactive to September 1, 2004. *See* Ex. 858.

Directors testified that they delayed in acting because they were not sure growth would continue, and they thought it would take additional time before growth actually produced savings from economies of scale (Tr. 872:15-873:1:1391:9-20). Neither rationale is convincing. Enormous growth had been occurring ever since April 2003 (*See* Ex. 859 at 209388-9; Tr. 784:10-13), and the Directors never bothered to obtain any approximate figure for the amount of economies of scale being realized.

### B. The Nature and Quality of the Services Does Not Support the Level of Advisory Fees Paid in 2004

As discussed above, the investment management services provided by CRMC deteriorated during fiscal 2004 as a result of the explosive growth of the Funds. The Directors had no rational basis for allowing a 43% increase in management fee revenues at a time when the quality of services had declined and CRMC was continuing to promote the very growth that had caused that decline.

### C. Defendants Did Not Equitably Share Economies Of Scale in Fiscal 2004

*Gartenberg* requires that the Court consider "*the extent to which* the adviser-manager realizes economies of scale as the fund grows larger." *Gartenberg II*, 694 F.2d at 930 (emphasis added). Defendants stated to the Directors that CRMC realized economies of scale from growth of fund assets during CRMC's fiscal 2004. *See* Ex. 830 at 029590. However, as discussed below, CRMC never

provided the Directors with any estimate of the dollar amount of economies of scale achieved in 2004 or any other year. Rather, Defendants took the position that in a rising environment economies of scale are adequately shared as long as CRMC's profit margins remain approximately the same from year to year. Tr. 93:23-94:10. The evidence at trial confirmed that it is eminently feasible to perform a reasonable analysis documenting an approximate level of economies of scale, and further that only a very small percentage of CRMC's economies of scale were shared with the Funds during fiscal 2004.

Dr. O'Neal analyzed economies of scale and found that the Funds received very little of such economies in fiscal 2004. In his original report, Dr. O'Neal performed both a more traditional economies of scale analysis, and a less traditional one which was designed to be closer to the approach taken by Defendants and their emphasis on profit margins. Ex. 2669 at 37-68. In his more traditional analysis, Dr. O'Neal determined that the unconsolidated CRMC net expenses in fiscal 2003 was $615 million, which is approximately 0.17% of average assets under management ("AUM"). *Id.* at 66, 60.[23] He calculated that, if net expenses were the same proportion of AUM in 2004, they would have been $885 million. *Id.* at 66. In fact, the actual 2004 expenses were only $831 million. *Id.* Of that amount approximately $150 million in expenses came from *increases* in profit sharing payments in 2004,[24] which Dr. O'Neal considered a distribution of

---

[23] Defendants' expert, Hubbard, agreed with Dr. O'Neal that scale economies are appropriately examined on a complex-wide (*i.e.* CRMC) rather than fund-by-fund basis. Ex. 651 at 48. CRMC representatives and directors who testified that directors could rely on CRMC's profit margin to evaluate economies of scale implicitly concur. *See, e.g.*, Tr. 688:19-689:16-878:22-879:12; 941:4-19. Although CRMC has never provided an economies of scale analysis, it also refuses to provide a fund-by-fund profitability breakdown. *See, e.g.*, Ex. 6 at 29656-7. Consequently, Defendants' criticism that Dr. O'Neal did not isolate economies of scale or givebacks for each of the eight Funds is not well taken.

[24] Dr. O'Neal based this estimate on Rothenberg's report to directors that of the 43% increase in CRMC's compensation expense in 2004 "approximately 5% was attributable to increases in employment, approximately 3.5% was attributable to

profits rather than an expense for the purpose of an economies of scale analysis. *Id.* at 66-67.

Dr. O'Neal subtracted $150 million in profit sharing from the $831 million of net expenses in fiscal 2004 to yield a revised expense total of $681 million in 2004. *Id.* at 67. The difference between the $885 million mentioned above and $681 million is $204 million, which represents the cost savings created by economies of scale during fiscal 2004.

Dr. O'Neal determined the amount shared with the Funds by looking at the difference between revenues CRMC would have received from the Funds had the Funds paid CRMC the same percentage of AUM in 2004 as they paid in 2003; and CRMC's actual 2004 revenues. *Id.* at 67. In fact, the Funds paid $18 million less, which is the amount that Dr. O'Neal estimates was shared with the Funds. $18 million represents only 8% of the total economies of scale generated. *Id.*

In his less traditional analyses of scale economies, Dr. O'Neal treated the total economies of scale for CRMC in fiscal 2004 as represented by the sum of the increased profits retained by CRMC, the increases in employee compensation arising from profit sharing, and reductions (from the 2003 percentage) in the advisory fees borne by fund shareholders. *Id.* at 63.[25] Utilizing that methodology, in fiscal 2004 only 4% of the total $448 million increase in benefits that were divided among those three categories of recipients went to the funds.

Defendants argue that the only appropriate way to examine economies of

---

regular pay increases, and approximately 5.5% was attributable to bonuses, leaving a balance of 29% attributable to growth in CRMC's profit sharing plan." Ex. 877.

[25] Dr. O'Neal estimated the amount shared with the Funds in the same way as he did in the traditional analysis. As stated above, that amount was $18 million. He determined that the increase in net income for CRMC from 2003-2004, on a stand alone basis, was $280 million. Ex. 877 at 63. He then estimated that approximately $150 million of the increase in employee compensation expense from fiscal 2003 to fiscal 2004 constituted payments out of the profit sharing pool. Id. at 62. This meant that the economies of scale generated were approximately $448 million.

scale is to look at CRMC results consolidated with AFD and AFS. However, Richard Phillips, counsel to certain of the unaffiliated directors, expressly advised directors on December 1, 2004, that an analysis of economies of scale *should exclude* AFD and AFS because economies "are likely to exist only in connection with the investment management and administrative functions; they would not appear in the transfer agent [AFS] function absent an increase in average shareholder account size." Ex. 3069; Tr. 572:18-574:24.[26] Consistent with Phillips' statement about AFS, there were internal discussions about AFS being unproductive due to the growth in the funds. Tr. 771:22-773:21; Ex. 2535 at 372727.[27]

With respect to AFD, commentators specifically recommend that an economies of scale analysis exclude distribution costs. *See* Investment Lawyer Volume 12, No. 8 at 13, which was produced from Defendants' files.[28]

Defendants argue that Dr. O'Neal's analyses omit economies of scale CRMC shared with the Funds through making various improvements. Tr. 94:11-14; Tr. 95:9-18. These improvements were not specifically made to share economies of scale, and were made, in large part, to deal with the increasing complexity and size of CRMC's business that resulted from Fund growth. Tr. 95:19-97:10. S*ee also* Neale Depo. at 87:21-88:5,89:15-23. CRMC made no effort

---

[26] Notably, Haaga and director Pendleton were present at the meeting (Ex. 3069). None of the CRMC representatives at this meeting expressed any disagreement with Phillips (Tr. 573:20-574:24).

[27] Although Defendants argue that AFS' status as a non-profit organization means that it automatically passes on economies of scale, AFS would not generate economies of scale unless its average cost per unit actually went down. The evidence raises a substantial question whether AFS would be enjoying economies of scale because "there is obviously no motivation for us to leverage economies of scale in our direction." Ex. 2535.

[28] Defendants' self-serving testimony that economies of scale should be looked at over the long term or on a cumulative basis should not be credited, as fund directors are required to approve advisory fees annually to determine whether they are reasonable. *See* U.S.C.S. §809-15(a)(2)**.**

1   to quantify this purported sharing, nor could it even estimate the value of such
2   improvements, as Defendants' expert Bobroff readily conceded. Tr. at 1568:6-9.
3   S*ee also, e.g.,* Ex. 834 at PW000793; Tr. 689:23-690:15, Neale Depo. at 40:4-25,
4   90:9-15.  To the extent that CRMC was making such improvements, the expense
5   involved was included on CRMC's financial statements (Tr. 185:7-186:12).
6   Because Dr. O'Neal's more traditional economies of scale analysis utilizes
7   CRMC's expense figures, it takes account of any such improvements.

8       Furthermore, there is ample evidence that CRMC did not need to dip into its
9   profits in fiscal 2004 or 2005 to make improvements for the Funds.  Rothenberg
10  stated that historically CRMC had been dividending only 30-40% of its net income
11  to its parent so that it could retain the rest for working capital purposes (Ex. 113 at
12  202589-90). In fiscal 2004 and 2005, however, it distributed 100% and 95% of its
13  net income as a dividend, respectively.  Although the reason given was a tax issue
14  concerning CRMC's retained earnings, CRMC's controller testified that the
15  retained earnings issue existed because CRMC had no reasonable need to utilize its
16  profits for the benefit of the Funds in those years.  Tr. 741:13-742:10.

17      The evidence also strongly supports Dr. O'Neal's position that the profit
18  sharing payments should be treated as a distribution of profit rather than an
19  expense for the purposes of an economies of scale analysis.  That position is
20  consistent with what directors and unaffiliated counsel *themselves* recognized.[29]

21      A major purpose of the profit sharing plan is to facilitate an intergenerational
22  transfer of ownership of CRMC in order to preserve its status as a privately owned
23  company. Ex. 858 at 219427, 219451, 219453. The change in stock ownership
24  occurs slowly, "so the profit-sharing plan allows [CRMC] to move money into the
25  hands of people who are making a big contribution, but we can't get you
26  ownership because the shares don't turn over as rapidly."  *See* Tr. 169:3-25; Tr.

27  _____
    [29] Exs. 2465, 3069; Ex. 48 at 041982.

28

189:5-9. Rothenberg agreed that in this regard profit sharing payments are *analogous to giving the recipients a stock dividend.* Tr. 189:10-1. As such, those payments are distributions of profit rather than expenses.

Defendants failed to provide any evidence documenting that Defendants need to pay the amounts paid to CRMC associates, including the profit sharing payments, in order to retain good employees. There is no evidence showing how amounts paid to CRMC associates compare with what other firms pay, or even what CRMC itself pays. *See* Exhibit 858 at 219451; Tr. 189:25-190:12.

Regardless of whether the appropriate figure for the percentage of economies of scale shared in fiscal 2004 is 8% or 4%, CRMC's advisory fees in fiscal 2004 were excessive because CRMC did not come anywhere close to adequately sharing the economies of scale it enjoyed from managing the assets of the American Funds in that banner year.

### D. The Directors Were Neither Conscientious Nor Adequately Informed on Economies of Scale

From at least the spring of 2004, directors repeatedly requested that CRMC provide them with additional information on economies of scale, but without success. *See, e.g.,* Tr. 1379:1-1380:22, Ex. 2465; Tr. 1381:4-1383:4, Ex. 2479; Ex. 57 at 051875 ; Woolf Depo. at 99:11-23; Ex. 99. In light of the fact that CRMC regularly provided the directors with information regarding its revenues, expenses and profit margins, as set forth in its financial statements, the Directors clearly did not believe such information was sufficient to give them an adequate understanding of the extent to which CRMC was benefitting from economies of scale. *See, e.g.,* Ex. 5 at 62-69, 188-200. [30] Nonetheless, the Directors continued

---

[30] Riggs testified that the October 2004 memorandum provided by CRMC that supported the 5% fee waiver (the "2004 Fee Waiver Memo") lacked the "hard data" on economies of scale directors had requested. Tr. 1383:5-1384:7. *See also* Woolf 89:11-90:11.

to approve the advisory agreements without any real basis to identify the extent to which economies of scale were being enjoyed by CRMC. *See, e.g.* Tr. 1384:10-1385:9; Ex. 3026 at 297943; 1386:7-1387:6 *citing* Ex. 838. Directors were also advised by their counsel[31] that they needed to obtain an estimate of economies of scale in order to ensure that CRMC equitably shared them with the Funds. [32]

From as early as December 2003 to as late as September 2006, CRMC recommended and directors approved each of the Funds' Rule 12b-1 plans expressly on the basis that, *inter alia:* (a) "the Plans will stimulate sales of shares of the Fund"; and (b)  there were potential advantages to Fund shareholders of maintained or "continued growth of the asset base of the fund, including …. achievement of greater economies of scale."[33]  Under these circumstances, it was incumbent for CRMC to provide reasonable estimates of its economies of scale, and it was impermissible for the directors to passively acquiesce in CRMC's continuing refusal to provide such estimates.

Ultimately, in August 2006, Defendants furnished directors with an "economies of scale" white paper which, instead of presenting the issue in a neutral fashion, merely argued that no estimate of economies of scale was necessary or practicable and the Directors should be happy with the information they were already getting. Ex. 2 at 230809.

## VI.    CRMC'S ADVISORY WERE EXCESSIVE BECAUSE THEY WERE DESIGNED TO COVER EXPENSES INCLUDING ADDITIONAL COMPENSATION TO DEALERS

---

[31] *See, e.g.,* Ex. 6 at 029672-3; Ex. 7 at 040571-2; Ex. 10 at 343144.

[32]  Bobroff opined that he has never seen an analysis that could quantify a dollar amount of scale economies.  Tr. 1555:12-1556:23.  However, the basis for his opinion is completely unverifiable and unreliable because he refused to respond to any questions or provide any materials to support his opinion due to confidentiality orders.  *See* Tr. 1553:14-1554:24

[33] *See, e.g.,* Ex. 874 at 205903-4, Ex. 1018 at 206352.

- 23 -

"Additional compensation to dealers," also known as "revenue sharing",[34] are payments that AFD makes to broker-dealer firms that sell American Fund shares, over and above payments made by the Funds under Rule 12b-1.  Tr. 399:2-7; Tr. 400:6-8.[35]   In fiscal 2004, AFD spent almost $60 million in additional compensation to dealers and in each of 2005-2007 it spent more than $100 million. *See* Ex. 017 at 348024.

CRMC takes AFD's projected payments of additional compensation into account in deciding on the level of advisory fees it will propose.  For example, when discussing the possibility of further advisory fee reductions in view of the 43% growth in assets in 2004 at a Contracts Committee meeting, Haaga stated that CRMC was exploring other ways to reduce fees while still taking into account "revenue sharing payments that CRMC projected for the future."  Ex. 87.  CRMC also told Directors that AFD's projected need to pay additional compensation to dealers, and the likelihood that CRMC would need to subsidize those payments in the future from its own advisory fees, was a reason why CRMC properly limited its initial fee waiver to 5%, rather than providing the Funds with a larger fee waiver. Tr. 560:18-567:13; Ex. 830 at 219424, 6.

Director Newman admitted that Directors took into account "additional compensation" when approving CRMC's advisory fee.  Tr. 840:7-11.  Board minutes also reflect that when CRMC was questioned about its profitability and economies of scale in 2004, it emphasized that AFD often operated at a loss, which

---

[34] *See* Tr. 568:11-20. "Revenue sharing" occurs when advisors pay brokers that sell their funds in order to get "space on the shelf."  Tr. 401:24-402:6. Tellingly, in the agreement that governs "additional compensation to dealers," AFD required that brokers classify the American Funds as "'approved' or 'preferred' (or an equivalent)," thus putting the American Funds on the shelf. Tr. 400:14-20; Ex. 0335 at 209312.

[35] CRMC indirectly pays "additional compensation" because AFD, and thus CRMC on a consolidated basis, records payments of additional compensation as an expense.  *See, e.g.,* Ex. 17 at  348024.  In years in which AFD generates a loss, CRMC subsidizes AFD through support payments.  *See, e.g.,* Ex. 17 at  348024.

included the expensing of additional compensation.  Ex. 57 at 51876.  "Additional compensation" expense was also factored into budgets given to directors.  Tr. 568:21-25.[36]

CRMC's conduct in this regard was both in violation of SEC rulings and a breach of fiduciary duty because it resulted in excessive advisory fee payments.  Under Rule 12b-1, advisers are prohibited from indirectly using fund assets to pay for distribution.  *See* Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11,414, 1980 SEC LEXIS 444, at *30 (Oct. 28, 1980), *Schuyt,* 663 F. Supp. at 987-88; *Gartenberg I,* 528 F. Supp. at 1052.  By inflating its advisory fee so that it could make its full profit after payment of AFD's expenses including additional compensation, CRMC charged an excessive advisory fee.  As with the 12b-1 fees, that portion of the advisory fee which was increased to cover additional compensation to dealers was being used in a way that hurt, rather than helped, the Funds.    Therefore, those payments were disproportionate to the value of any services received in return.

Defendants' litigation position that the purpose of "additional compensation" is for the "education" of brokers (Tr. 399:2-7, Woolf Tr. 56:7-19) is refuted by the facts in the record.   The best selling broker firms were paid 10 basis points on the prior year's sales of American Fund shares, and one basis point on the brokers' American Funds assets under management.  *See, e.g.,* Tr. 402:19-404:21; Ex. 335 at 209309.   Other factors taken into account, such as the redemption rate and relationship, only varied the amount of additional compensation payable by +/- 10%.  *Id.*   No broker dealer firm was paid additional

---

[36] Although Directors were provided with a footnote in the Director Information Books ("DIBs") showing what CRMC's profitability would be if additional compensation to dealers was not expensed (Tr. 682:18-684:1), this does not negate the fact that CRMC expressly asked Directors to take additional compensation into consideration. Notably, for fiscal 2007 and 2008, when additional compensation was not included as an expense, it caused CRMC's profitability to increase by 10% as reported to the Directors. *See* Stipulated Facts ¶92.

1  compensation based in any way on an estimate of the *actual expenses the broker*

2  *incurred* in allowing CRMC to "educate" its financial advisors about the American

3  Funds.[37]  *Id.*

4      Directors were neither conscientious nor knowledgeable with respect to

5  additional compensation.  For example, Woolf had reviewed the ICI Fund

6  Directors' Guidebook in connection with her duties as a director.  Deposition of

7  Patricia Woolf at 30:12-22.  That handbook stated that mutual fund directors need

8  to determine whether revenue sharing "constitute[s] an indirect use of fund assets

9  to finance the distribution of its shares."  *Id.* at 43:20-22.  That information had

10  little meaning for her, however, because she, like director Martin Fenton,

11  erroneously believed that CRMC was not making revenue sharing or shelf-space

12  payments.  *Id.* at 47:21-49:25; 56:7-19, Fenton Tr. 88:13-91:3. [38]

13      The Funds should be reimbursed for additional compensation in an amount

14  equivalent to the total "additional compensation" expenses during the relevant

15  period, adjusted to reflect the *pro rata* share that the Funds' advisory fees represent

16  of all advisory fees paid by all of the American Funds.

17

18  **VII.  DEFENDANTS' AND THEIR EXPERTS' RELIANCE ON COMPARATIVE FEES AND COMPETITION SHOULD NOT BE CREDITED**

19

20      Defendants' contention that American Funds' fees are among the lowest in

21  the industry should be given little weight.  *Gartenberg* squarely rejected that

22  position, holding that the normally "unseverable relationship between the adviser-

23  manager and the fund it services tends to weaken the weight to be given to rates

---

[37]  AFD also pays "Miscellaneous Dealer Expenses" to dealers, a payment Defendants similarly now describe as for "broker education and training."  *See, e.g.,* Ex. 17 at 348026; *see also* Tr. 734:3-15.   In 2008, AFD spent over $12 million on these expenses. Ex. 10 at 343236.

[38]  There was no evidence at trial that brokers were insistent on obtaining additional compensation payments.

charged by advisers of other similar funds." *Gartenberg II*, 694 F.2d at 929 (citations omitted).[39]    Here, comparison to other mutual funds is particularly unavailing given the gargantuan size of the American Funds, as there are few mutual funds that could be considered "similar."

Despite this clear jurisprudence, Hubbard opined that competition in the mutual fund market and investor fee sensitivity create market pressures which prevent advisers from sustaining "economically" excessive fees.  Ex. 651  ¶¶ 6(c), 94.  Given the *Gartenberg* language quoted above, Hubbard's position cannot be credited.  Congress in the legislative history of § 36(b) rejected this view and recognized that the statute was enacted to provide protection to investors precisely because of the lack of effective competition.[40]    Acceptance of Hubbard's radical theory would essentially read § 36(b) out of existence.

As Dr. O'Neal testified, there are practical realities that prevent investors from simply switching funds to "punish" an adviser with excessive fees.  For example, liquidation by an investor in a taxable account would produce certain unwanted capital gains taxes (Tr. 1053:1-19); for investors in tax-deferred retirement accounts, there are typically very few options for switching investments (Tr. 1053:20-1054:4); and brokers who advise investors have huge incentives not to recommend a change in fund families given the windfalls they receive from asset-based fees on the growing American Funds (Tr. 1054:5-19). Dr. O'Neal stated, advisers' promotional materials focus investors primarily on performance, so they are unlikely to notice, let alone punish the adviser for charging, excessive fees.  (Tr. 1054:20-25).  Finally, the experts for both sides agreed that mutual fund boards almost never terminate their advisers.  Tr. 1055:1-4; Tr. 1345:8-14.

---

[39] *Accord Krinsk*, 715 F. Supp. at 486; *Schuyt*, 663 F. Supp. at 973; *Kalish*, 742 F. Supp. at 1227-28 (comparative fees is "last in the batting order" of factors).

[40] *See* S. Rep. No. 184, 91st Cong., 1st Sess., reprinted in 1970 U.S. Code Cong. & Ad. News 4897; *Daily Income*, 464 U.S. 523, 537 (1984).

Dr. Hubbard tacitly admits that, market forces notwithstanding, excessive fees could still be generated within a year because competition would not protect against "one-time grabs of large amounts of fees." Tr. 1343:17-21. *See* Ex. 124 at 59. As described above, this is precisely what occurred during fiscal 2004 because CRMC failed to implement any fee waivers despite soaring profits.[41]

## VIII. THE ADMINISTRATIVE SERVICES FEES WERE DISPROPORTIONATE TO THE VALUE OF THE SERVICES

CRMC repeatedly refused to provide the Directors information that was essential to evaluating the proposed administrative services fees and reaped windfall profits as a result.

Beginning in 2001 when CRMC began to introduce share classes other than A and B, the Funds each paid CRMC an administrative service fee (the "Admin Fee") on behalf of the C, F, R and 529 share classes. *See, e.g.,* Ex. 0015 at 052408; Tr. 471:20-22. For CRMC's fiscal years from 2003 to 2005, the Admin Fee was an annual fee of up to .15% of the average daily net assets attributable to the relevant share classes, with the exception of Class R-5 shares which was up to .10%. Ex. 1413. Stipulated Facts ¶ 62. The Funds continue to pay .15% with the exception of Classes R-5 and R-6. *Id.* at ¶ 59.[42] In exchange for the Admin Fees, CRMC agrees to provide or arrange for the provision of transfer agency services and "monitor, coordinate, oversee and assist" third parties, *including AFS,* who

---

[41] While Hubbard stated that it would not matter to him what employees are being paid in terms of the fairness of the advisory fee due to his competition theory, Hubbard conceded that it would concern him if the adviser were paying above competitive rates for talent. Tr. 1359:6-18. He admitted, however, that he had no knowledge for any year how much money Rothenberg or any other portfolio manager or executive earned at CRMC.

[42] The total amounts paid by the Funds/retained by CRMC on Admin Fees were as follows: 2004: $51.2 million/$29.1 million; 2005: $99.7 million/$58.2 million; 2006: $127.9 million/$68.1 million; 2007: $175.3 million/$75.8 million. *See* Stipulated Facts ¶ 66. It should have been a red flag to Directors that in some years CRMC was retaining more for "oversight" than it was paying third parties to actually provide the services. Defendants did not provide information for 2008.

provide such services to the Funds.  *Id.* at ¶¶60-61.[43]  Thus, of the 15 basis points the Funds paid to CRMC, CRMC paid out a certain amount to third parties, including AFS, and retained the rest (in July 2005, this retained amount was capped at 5 basis points, as described below).[44]  Until November 2008, however, CRMC did not fully or accurately inform the Directors of its cost to perform this purely oversight role.

### A.   Directors Were Not Well Informed or Conscientious When They Approved the Admin Fees

During the relevant period until November 2008, Fund directors did not have a sufficient record upon which to approve the Admin Fee, and were thus not well informed or conscientious under *Gartenberg*.  The Directors of the Funds annually approve the Admin Fee.  Ex. 1413, Stipulated Facts at ¶ 58.  The Directors were informed by their counsel that the standard for approval of these fees was "fairness and reasonableness" from the perspective of fund shareholders. *See, e.g.,* Ex. 47 at 031409; Ex. 6 at 029680; Ex. 7 at 040581.[45]  Directors' counsel also advised them that when approving the Admin Fee they should consider "*the extent to which* [the administrative service fees] exceed the CRMC's costs in providing such services," and information regarding fees charged by others for services of the same nature and quality.  *See, e.g.,* Ex. 5 at 018025; Ex. 6 at

---

[43] Although the Admin Fee is charged as a percentage of assets, the same types of services are provided by AFS to Class A and B shareholders in exchange for the transfer agency fee which is charged on a per-account and per-transaction basis. Tr. 453:6-454:14; 443:25-444:10; Ex. 688.   AFS, which provides the transfer agency services, however, operates on a not-for-profit basis (Tr. 448:13-449:8) since the time it was established in 1969 (Tr. 450:2-8).

[44] *See, e.g.,* Ex. 7 at 40740 (for the year ending June 30, 2005, out of 15 bps charged to all shares in Class C, F, 529, R1-4 and R5 across the American Funds, CRMC retained 6, 11, 11, 7 and 6 bps, respectively).

[45] The view of Defendants' expert, Bobroff, that there is no standard at all for Directors' approval of this fee cannot be credited and is contradicted by the independent counsel memos.

029681; Ex. 7 at 040581; Ex. 10 at 343146.[46]   The record reflects that Directors requested this information as early as August 2003.  *See, e.g.,* Exs. 55 at 018280; 82 at 050858; 102 at 041168. *See also,* Ex  62 at 040878.

CRMC did not, however, voluntarily provide directors with a full analysis of its costs or profits from the Admin Fee until November 2008.  Tr. 425:21-430:17. Until then, the only specific information CRMC provided directly to directors in the DIB's was a description of the general nature of the administrative services and the actual amount of the fee.  *See, e.g.,* Ex.15 at 052408-9.  Unlike for the other fees approved by directors, the DIB's have never included a comparison of how the administrative fees rank compared to similar fees charged to similar funds.[47] More troubling, however, is the fact that unaffiliated directors *did not know* until recently *whether* CRMC made a profit from the Admin Fee.  Tr. 842:20-843:3; 950:16-951:4; Neale Depo at 218:21-220:25. Yet others were not aware of such fundamental details *as who receives the fee*.  (*See, e.g.,* Ex. 2510; 2616; Neale Depo at 214:21-215:1).

CRMC's failure to keep the Directors well informed was criticized by the staff of the Pacific Regional Office of the SEC when it sent a letter on September 21, 2006 *directly to the boards* stating that it had done an examination of the books and records of the Funds and concluded that "in reviewing and approving the Funds' advisory and administrative services agreements" directors lacked certain "key" information in determining if the fee was fair and reasonable to

---

[46] *Counsel to the directors was stressing the importance of additional profitability information specific to administrative fees as early as May 23, 2003.  *See* Tr. 1391:21-1393:9 *citing* Ex. 2430.

[47] CRMC's belief that comparative information is very challenging to prepare (Tr. 505:12-506:7), may, in fact, be valid – however, that only made CRMC's duty to provide what information it *could* gather, *i.e.* a profitability breakdown, *even more necessary*.

shareholders. Ex. 3060.[48] Specifically, the SEC stated that "the Advisor's internal costs and actual profit in providing the administrative services, even if approximate, is essential in making this determination." *Id. See also* Tr. 423:21-424:25. The SEC also noted that Directors did not receive comparable information regarding the administrative fees paid by other, similar funds. Ex. 3060 at 220485.

During its examination, the SEC required CRMC to provide a breakdown of CRMC's costs and profits relating to the administrative function, a summary of which was included in the SEC's letter to the boards. Ex. 3060.[49] That summary (the "2006 SEC Cost Breakdown") shows that for the 12-month period ended April 30, 2006, on administrative revenues of $191 million CRMC paid to third parties $104 million and had internal costs of $10.6 million or one basis point. Ex. 3060 at 220484. As a result, CRMC had an approximate profit during this period of $76 million on revenues it retained of $86.7 million. *Id.* Accordingly, CRMC's estimated profit margin on the administrative fees it retained at that time was over 87%. This includes a portion of the time *after* CRMC's cap on Admin Fees (discussed below).[50] No director suggested this profit margin was disproportionate

---

[48] Despite the seriousness of the SEC's comments, at least one director did not recall having ever received or read the letter (*See*, Woolf 195:2-18; 197:15-200:19).

[49] Defendants' argument that they were not required by law to provide a breakdown of costs/profit to the Directors is erroneous. As the SEC explained in its letter to the unaffiliated directors, under Section 17 of the ICA and Rule 17d-1, an investment adviser is *prohibited* from entering into service contracts with affiliated investment companies unless the SEC permits it by order. Under so-called "no action" letters, the staff had provided no action would be taken if the compensation paid to the affiliated person was approved by the disinterested directors as fair and reasonable under the process set forth for advisory contracts under Section 15(c) of the ICA. Defendants' citation to the SEC's withdrawal of a rule explicitly requiring this does not aid them as that withdrawal specifically states that "Withdrawal of the proposed amendment *is not intended to indicate any change* in the no-action positions of the Division of Investment Management (emphasis added). Investment Company Contracts for Services With Affiliated Persons Withdrawal of Proposed Rule Amendment, Investment Company Act Release No. 10,822, 1979 SEC LEXIS 932 (SEC 1979).

[50] CRMC's position that the 2006 SEC Cost Breakdown understates its costs should be given little weight. Tr. 477:5-18. The SEC letter expressly states that

to the purely oversight role CRMC was paying for receipt of these fees.

Notably, two years elapsed from the time of the SEC letter until November 2008 when CRMC finally sent the Directors a cost/profit breakdown in the DIB's (the "2008 DIB Cost Breakdown").  However, the purported cost of providing these services increased from $10 million to $86 million for an equivalent one-year period.  No director questioned this huge increase. Instead, the Directors testified that they did not need to know CRMC's costs or profits on these fees but only CRMC's total profitability.  Directors' testimony that their knowledge of CRMC's consolidated profit margin was enough information upon which to approve the Admin Fee is not credible.  Tr. 843:4-846:4.  This belief was unjustified given the express advice they were receiving from their counsel and the SEC.  This assertion is also not credible in light of Board minutes in August 2003 showing directors were directly requesting CRMC provide more information on these fees, including CRMC's costs.  Tr. 1586:24-1588:12. [51] *See also* Tr. 1393:10-1394:19.[52]

## B.    Admin Fees Were A Hidden Source of Excessive Profits

In an August 15, 2005 memorandum to the Board (the "August Memo"), CRMC stated that it had determined that it was retaining too much of the Admin

---

CRMC's counsel confirmed the estimates were accurate. Ex. 3060 at 220484 Mr. Gorvetzian testified that he was the counsel who confirmed the accuracy. Tr.425:1-5. Tellingly, CRMC never informed the SEC of its purported belief that the figure was understated.  Tr. 510:8-14; Tr. 750:17-23.  *See* Ex. 3060 at 220484; Tr. 425:1-5.  CRMC also never informed the unaffiliated directors of their belief. Tr. 510:15-18. In any event, Defendants' position only serves to confirm that the Directors did not receive a full analysis of CRMC's costs until at least November 2008.

[51] Directors' supposition that it was too costly for CRMC to determine its profitability on the Admin Fees lacks a reasonable basis.  Directors did not have an understanding of whether it was actually costly.  Tr. 848:24-849:4..

[52] Defendants' expert, Mr. Bobroff, conceded at trial that he had no authority whatsoever to support his position that the directors did not need cost/profit information for these services, but could rely on the overall profit margin of CRMC. Tr. 158:4-14-158:2.

Fees and was going to voluntarily cap the amount that it would retain at five basis points (0.05%). Ex. 814; Tr. 419:1-22. This constituted an admission by CRMC that it was retaining too much of the Admin Fees from the beginning of the relevant period until at least July 1, 2005 (the effective date of the cap). The August Memo also explained that the cap would convert the Admin Fee into a "pass-through" expense. Ex. 814 at 219945-6. This was an untrue and misleading statement, as CRMC would continue to make a profit on this fee. The memo further stated that if this cap had been in place since the inception of these share classes, the American Funds would have realized approximate savings of about $57 million. Ex. 814. CRMC, however, never refunded any monies it received from Admin Fees during the period prior to imposing a cap on July 1, 2005, and the unaffiliated directors never requested that any such monies be given back to the funds. Tr. 435:7-9.

At trial, Defendants argued that they did not need to provide directors with profitability information because it would be the result of a cost allocation which, in the words of their expert, Professor Maher, is "inherently arbitrary." Tr. 1161:12-19; *see also* Ex. 650. Maher concluded that directors were better off looking at CRMC's consolidated financial statements because, he suggested, those are not predicated on cost allocations. Tr. 1167:12-1169:3. However, Maher was wrong. CRMC's financial statements include costs allocated to it from its corporate parent, Capital Group Companies Inc. ("Capital Group"). Tr. 1174:21-1175:24. In fact, Capital Group allocates a variety of costs across all of its subsidiaries, including CRMC. Tr. 733:1-734:2; 754:19-756:9. Thus, when unaffiliated directors rely upon *CRMC's* financial statements (and profit margin), they are also subject to the vicissitudes of numerous cost allocations.

Maher's condemnation of cost allocations is really an academic criticism and should be given little weight. For example, Maher states that "the validity and

reliability of the resulting amount *cannot be known.*"  Ex. 650 at 14.    However,
working accountants routinely review cost allocations for misstatement.[53]    Cost
allocations do not violate Generally Accepted Accounting Principles ("GAAP").
Tr. 1174:6-9.[54]

Given that from the beginning of the relevant period through November
2008, directors did not have full and accurate information as to the windfall CRMC
was making on these fees, Plaintiffs submit that the amount that should be returned
to the Funds is the total amount of Admin Fees retained by CRMC after payment
to third parties less one basis point (the amount CRMC stated in the 2006 SEC
Cost Breakdown was its cost to provide such services).  This would effectively
mean that CRMC would have provided these services "at cost" to the C, F, R, and
529 classes as it did for the A and B classes.

## IX.    PLAINTIFFS' DAMAGES ARE NOT LIMITED TO 12B-1 FEES THAT DEFENDANTS DID NOT PAY TO THIRD PARTIES

Defendants claim that under Section 36(b) they are not responsible for Rule
12b-1 fees that they paid to broker-dealers.  However, in effect, Defendants have
subcontracted AFD's responsibility to serve as the marketing agent for the Funds
to the broker-dealer community.  As such, AFD's dissemination of 12b-1 fees it
receives from the Funds to broker-dealers is properly viewed as AFD's payment of
the expenses it incurs to carry out its distribution responsibilities.  Therefore, AFD
had a responsibility to make sure the monies expended are not disproportionate to

---

[53] CRMC routinely allocates costs among its various subsidiaries and affiliates.  Tr. 433:25-434:9.  *See* Tr. 753:9-754:10; Ex. 2634; *see also, e.g.,* Exs. 656 at 230253 and 657 at 230235.

[54] Professor Maher's conclusion that the expenses of estimating CRMC's costs in providing administrative services outweigh the benefits should also be given little weight.  CRMC claims it spent hundreds of hours of employee time to prepare the 2008 DIB Cost Allocation. Tr. 478:18-479:9.  Leaving aside that there is no evidence in the record supporting this assertion, as Maher recognized, not only was that cost likely immaterial to a company with CRMC's finances (Tr. 1180:7-1181:5), but once a cost allocation methodology is established, calculations in subsequent years are less costly (Tr. 1181:6-9).

the value of the services provided by the brokers.  If Defendants can avoid liability for 12b-1 fees in this manner while promoting additional sales that will drive up CRMC's advisory fee revenues,  this would violate the letter and spirit of Section 36(b).

In *Pfeiffer v. Bjurman, Barry & Assocs.,* No. 03 Civ. 9741, 2006 U.S. Dist. LEXIS 7862, at *11 (S.D.N.Y. Mar. 2, 2006), the court held that "receipt" under Section 36(b)(3) "allowed claims to proceed against parties that potentially benefited from the lack of arm's-length bargaining.". In the instant case, evidence at trial demonstrated that Defendants have both "received" and benefited from Rule 12b-1 fees paid on each share class.

Plaintiffs believe there are two alternative methods to computing damages on 12b-1 fees.  In the first, the Court would not consider 12b-1 fees that CRMC gave away to broker-dealers.  Plaintiffs' damages would thus be the $239.4 million calculated by Dr. O'Neal plus the $23.9 million retained from Citibank for a total of $263.3 million.[55] *See* discussion above.

Under the second approach, the Court would consider all the 12b-1 fees received by AFD even though some were subsequently paid to broker-dealers as compensation for doing the marketing CRMC/AFD would have done for itself but essentially subcontracted out to broker-dealers. In this respect, the fact that AFD pays out 12b-1 fees it has received to reimburse brokers for marketing services does not withdraw those fee payments from the ambit of Section 36(b) any more than the fact that an adviser which pays portions of its advisory fees out to third parties for services rendered prevents that portion of the advisory fee payment

---

[55] Defendants' interrogatory responses purported to set forth the amount of the Rule 12b-1 money they "retained" from each Fund each year. Ex. 1083 at Appendix 1. However, Defendants did not include in those figures the money they received from Citibank in return for the sale of Defendants' right to receive Class B share 12b-1 fees from the Funds. Plaintiffs proved at trial that such monies are, in fact, from 12b-1 fees.  *See e.g.*, Tr. 525:14-526:13; 366:4-387; Ex. 335 at 209274-5, 314-5.

from falling within the coverage of Section 36(b).[56]

Under the above analysis, the limit of Defendants' liability under Section 36(b) as already calculated by Dr. O'Neal, would be the total amount of 12b-1 fees paid by the Funds to Defendants from 2005 to 2007 Ex. 2671 at 47, which totals $1,384.5 million.  35% of that money ($484.6 million) as well as the 12b-1 distribution fees from Citibank ($23.9) was hurting the Funds instead of benefitting them because it was being used for marketing. Therefore, this portion was excessive and should be returned to the Funds.  It is Plaintiffs' belief that this damages calculation most closely approximates the excessiveness of the 12b-1 fees in this case.

## X.  36(B) REQUIRES THAT EACH FEE BE EVALUATED FOR FAIRNESS SEPARATELY AGAINST THE RESPECTIVE SERVICES

Defendants' argument that this Court should examine only the total fees (*i.e.* the Funds' expense ratios) and the total bundle of services provided by Defendants is erroneous.[57]  In *Gartenberg,* the District Court interpreted the legislative history as requiring that a court must consider all services provided in exchange for a ***particular fee***. The most recent Second Circuit case on point, *Meyer v. Oppenheimer Asset Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990) directly contradicts Defendants' argument:

The statement [that a claim that payments made under Rule 12b-1 are

---

[56] Unlike the Pfeiffer case, here the record militates against finding that CRMC was merely a passive conduit for Rule 12b-1 fees that went to brokers.  First, the Funds do not directly pay brokers Rule 12b-1 fees.  Instead, AFD negotiates "selling group" agreements between it and individual brokerage firms and promises them Rule 12b-1 fees, to be paid under conditions AFD establishes.  Tr. 788:13-790:22; Ex. 333.  Directors, acting on behalf of the Funds, believed it was not their responsibility to know where the 12b-1 money went or how much any brokerage firm received (Tr. 945:25-946:25), and they relied on AFD to determine how much 12b-1 money went to brokers (Tr. 945:25-946:25). See also, Woolf Tr. at 153:3-20.

[57] This argument is fully set forth in Plaintiffs' Opposition to Defendants' Motion in Limine No. 5.  Docket # 491.

1
2
3
4

excessive when combined with advisory fees, where both payments
are made to "affiliated persons" of an investment adviser, is
cognizable under Section 36(b)] does not, however, stand for the
additional proposition that 12b-1 payments to an adviser's affiliates
are to be aggregated with advisory fees to determine the merits of a
Section 36(b) claim. ***The two kinds of payments are for entirely
different services***.

5

District Courts following *Meyer* agree with Plaintiffs' interpretation.[58]

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

   *Meyer* and its progeny make clear that it is not enough for a fund board – or

a reviewing court – to conclude that overall fees are fair.   Instead, each fee

category must withstand separate scrutiny.  This makes good sense.  Not only do

12b-1 fees cover distribution expenses, while advisory fees cover investment

management and fund operations, but the 12b-1 fees must meet different (and more

stringent) regulatory requirements.    Even if a fund's overall expense ratio

(including all of the fees charged to the fund) falls within or below an industry

range, a particular fee comprised in that expense ratio may nonetheless be

excessive.  *See, e.g.*, *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1249,

1228 (S.D.N.Y. 1990).  Moreover, to determine whether the particular fee charged

to the fund was a fee that would have been the result of arm's-length bargaining

under Section 36(b), a court must evaluate what services were provided for a

particular fee pursuant to the particular fee agreement. *Id.* at 1228. Tr. at 519:15-

21.  If the only relevant consideration were the "overall bargain," there would be

no need for the various *Gartenberg* factors, such as the nature and quality of the

particular services rendered in connection with that particular fee.[59]

---

[58] *See, e.g., Levy v. Alliance Capital Mgmt. L.P.*, 189 F.3d 461 (2d Cir. 1999) (table
decision);   *Pfeiffer v. Integrated Fund Servs., Inc.*, 371 F. Supp. 2d 502, 508
(S.D.N.Y. 2005).   Although *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472
(S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) held to the contrary, this Court
has held that "the district court cited no authority for this proposition, and in any
event, the case was decided before *Meyer II*."   Order Denying Motion in Limine
Nos. 1 and 5, at 5 (Docket No. 514).

[59] Section 36(b) requires investment advisers and their affiliates to satisfy the high
standards of fiduciary responsibility embodied in the common law of fiduciary
duty generally.  *See, e.g., Galfand v. Chestnutt Corp.*, 545 F.2d 807, 811 (2d Cir.
1976); *Gartenberg*, 528 F. Supp. at 1047. When a fiduciary enters into a contract,
it has an obligation to treat the beneficiary (here the fund) fairly on that particular

- 37 -

Furthermore, Section 36(b) has been violated even if the fees and expenses are viewed in a bundled manner. The 12b-1 fees would still involve a breach of fiduciary duty regardless of whether the overall expense ratio of the Funds was low compared with its peers, because hundreds of millions of dollars in fees were being paid out in a manner that hurt, rather than helped, the Funds. Similar considerations apply to the inflation of the overall amount of fees being paid by factoring in additional compensation to dealers when the advisory fee percentage is set. Defendants' approach only makes a difference if, contrary to the overwhelming body of case law, this Court decides that a comparison of industry fee structures and expense ratios should be the controlling factor in the analysis.

## XI.    PLAINTIFFS HAVE STANDING FOR THEIR 36(B) CLAIM

Defendants have erroneously argued that some of the Plaintiffs lack standing to pursue some of their claims because Plaintiffs are not shareholders of a particular class of shares upon which the Funds pay, and AFD retains, Rule 12b-1 and administrative fees Plaintiffs claim are excessive.

Section 36(b) states that "[a]n action may be brought under this subsection .... by a security holder of such registered investment company on behalf of such company . . . ." 15 U.S.C. § 80a-35(b). Nowhere in the text of Section 36(b) does the statute limit actions to, or even permit actions by, security holders suing on behalf of the holders of particular classes of securities and, as such, is unambiguous. *See Satterfield v. Simon & Schuster, Inc.*, No. 07-16356, 2009 U.S. App. LEXIS 13197, 7-8 (9th Cir. June 19, 2009) ("our inquiry begins with the statutory text, and ends there as well if the text is unambiguous.").

---

contract. Defendants' "overall bargain" argument would permit a fiduciary to overcharge the beneficiary on one contract in a series of contracts between the parties as long as the fiduciary treated the beneficiary fairly on another contract that is part of the same series. This approach flies in the face of the duty of fiduciaries to treat their beneficiaries fairly in each transaction. *See, e.g., Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.)

1    Plaintiffs are security holders in each of the Funds at issue.  Defendants'

2    argument must be rejected on this basis alone.  Furthermore, the overwhelming

3    majority of courts, including this Court, has held that Section 36(b) is analogous to

4    a derivative claim on behalf of the mutual fund itself and *not* a direct claim of

5    shareholders.[60] Indeed, as the parties agreed in their Stipulated Facts, the Rule 12b-

6    1 fees *are paid by the Funds themselves*, not by the share classes.  Therefore, the

7    impact on shareholders is only indirect.

8    Plaintiffs have standing under Section 36(b) because they could not be

9    injured directly, only indirectly through a decrease in the value of their shares.

10    Accordingly, the injury for the purpose of Article III standing is to the Fund.[61]

11    Moreover, even if the Court believes that the relevant focus under Article III is on

12    each of the Plaintiffs and not the Fund, each of the Plaintiffs clearly has been

13    injured by Defendants from the charging of excessive fees.  Plaintiffs assert one

14    claim -- for breach of fiduciary duty with respect to compensation -- and each

15    Plaintiff complains that Defendants' fees, including advisory fees and Rule 12b-1

16    fees paid by *all* share classes, were excessive.[62]

---

[60] *See, e.g., In re Am. Funds Fees Litig.*, No. 04-5593, 2005 U.S. Dist. LEXIS 41884, at *15-16 (C.D. Cal. Dec. 16, 2005); *In re BlackRock Mut. Funds Fee Litig.*, 2006 U.S. Dist. LEXIS 13846, at 33 (W.D. Pa. Mar. 29, 2006) (collecting cases); *see also Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 535, 78 L. Ed. 2d 645 655, 104 S. Ct. 831 838 (1984)

[61] The record demonstrates that the distinctions Defendants attempt to draw are meaningless because all classes of Fund shares were injured by Defendants' conduct.   Rule 12b-1 fees paid on Class A, B and C shares contributed to distributor AFD's revenues.  Ex. 335 at Appendix I; Tr. at 395:9-396:25.  These revenues were used to promote sales of all American Fund shares indiscriminately, which, in turn, increased the advisory fee revenues paid by all classes of Fund shares.  Thus regardless of whether individual shareholders were harmed by direct payment of Class B 12b-1 fees, they were harmed from the resulting underperformance caused by the growth in fund assets and increase in advisory fees that affected all shareholders.

[62] *See In re Mut. Funds Inv. Litig.*, 519 F. Supp. 2d 580, 586 (D. Md. 2007) (holding that recent Supreme Court authority does not imply "that a plaintiff lacks Article III standing to assert a claim where she plausibly alleges that (1) she has suffered an injury in fact traceable to a defendant and redressable by the court, and (2) her claimed injury is shared in common with others who have been similarly

1     Finally, the evidence at trial was clear that each of the various classes of

2 shares of the Funds represents interests in the *same portfolio of investments* in the

3 Fund. *See, e.g.*, Ex. 1278 at 36. Accordingly, purchasers of different share classes

4 have an ownership interest in the *same fund*. The assets and liabilities in a

5 particular fund are not segregated between share classes, and joint and individual

6 expenses of share classes are allocated merely by accounting solely for the purpose

7 of determining a net asset value. Thus, the individual share classes of the Funds

8 are not analogous to separate funds.

## CONCLUSION

Plaintiffs request this Court find Defendants have violated their fiduciary

duties under Section 36(b) and enter judgment in their favor.

DATED: August 24, 2009       MILBERG LLP


                                         */S/ Janine Pollack*
                                       JANINE POLLACK

---

harmed by the same defendant's actions."). In addition, without any fees, Class B shares automatically convert into Class A shares after 8 years and Class C shares automatically convert into Class F shares after 10 years, and American Funds shareholders are able to convert their shares from one class to another with the payment of a fee. Tr. at 355:17-356:4; Ex. 686 at 296940-41. Thus, Defendants' attempt to artificially create rigidity between share classes is belied by their own procedures. In fact, given this automatic conversion, if a Class B shareholder brought a lawsuit under Section 36(b), Defendants would simply seek to delay that lawsuit until the day after the B shares converted to A shares (or C to F) so the plaintiff would lose standing. No such result was contemplated by Congress and the language of the statute makes clear that standing exists for any shareholder and damages are to the Fund, not the specific share class.

JEROME M. CONGRESS
JANINE L. POLLACK
ANNA C. DOVER
JOHN R.S. MCFARLANE
One Pennsylvania Plaza, 49th Floor
New York, New York  10119-0165
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229
E-mail: jcongress@milberg.com
   jpollack@milberg.com
   adover@milberg.com
   jmcfarlane@milberg.com


MILBERG LLP
JEFF S. WESTERMAN
One California Plaza
300 South Grand Ave., Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile:  (213) 617-1975
E-mail: jwesterman@milberg.com


WEISS & LURIE
JOSEPH H. WEISS
RICHARD A. ACOCELLI
JULIA J. SUN
551 Fifth Avenue, Suite 1600
New York, New York 10176
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010
E-mail: jweiss@ weisslurie.com
   racocelli@weisslurie.com
   jsun@weisslurie.com

***Co-Lead Counsel for Plaintiffs***

- 41 -

**DECLARATION OF SERVICE BY ECF**

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, employed in the County of New York, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One Pennsylvania Plaza, New York, New York 10119.

2.     That on August 25, 2009, declarant served the **PLAINTIFFS' POST TRIAL BRIEF via ECF** to the parties listed on the attached Service List.

3.     That there is a regular communication via email between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of August, 2009, at New York, NY.

JEFFREY BAUM

1

## AMERICAN FUNDS
### Service List

2

| *Counsel for Defendants* | |
|---|---|
| Gareth T. Evans<br>Andrew Z. Edelstein<br>**GIBSON DUNN & CRUTCHER**<br>333 S. Grand Avenue, 45th Floor<br>Los Angeles, CA  90071-3197<br>Telephone: (213) 229-7000<br>Facsimile:  (213) 229-7520<br>E-mail: gevans@gibsondunn.com***<br>aedelstein@gibsondunn.com*** | James N. Benedict<br>Sean M. Murphy<br>C. Neil Gray<br>**MILBANK, TWEED, HADLEY<br>& McCLOY LLP**<br>One Chase Manhattan Plaza<br>New York, NY  10005<br>Telephone: (212) 530-5000<br>Facsimile:  (212) 530-5219<br>E-mail: jbenedict@milbank.com***<br>smurphy@milbank.com***<br>cngray@milbank.com*** |
| ***  **Denotes service via e-mail.** | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28