# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Renee Fisher | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**          **(In Chambers)**

### STATEMENT OF INTENDED DECISION

        The following sets forth this Court's statement of its intended decision in this case. The document does not address every detail of the case, contains only a few citations to the record, and should not be construed as the Court's findings of fact and conclusions of law. Rather, it states the Court's intended resolution of the case and provides direction to the prevailing parties, who will prepare proposed findings of fact and conclusions of law that are consistent with this document. In short, this document should be viewed as a decision with guidance. In that regard, although the Court anticipates that the proposed findings and conclusions will be substantially more detailed than this document, will likely cover matters not expressly addressed in this document, and will contain citations to the record, the Court expects that the proposed findings and conclusions will be consistent with this statement of decision.

## I.
## INTRODUCTION

        Plaintiffs, investors in eight different American Funds mutual funds managed by defendant Capital Research and Management Company ("CRMC"), bring this derivative action under section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b), alleging that CRMC and its subsidiary, defendant American Funds Distributors, Inc. ("AFD"), breached their fiduciary duties to fund investors in connection with the receipt of compensation for services or of payments of a material nature. Specifically, Plaintiffs contend that the management, Rule 12b-1 fees, and servicing fees that Defendants charged to the funds from

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

2004 to 2007 violated the standard established in <u>Gartenberg v. Merrill Lynch Asset Mgmt., Inc.</u>, 694 F.2d 923, 928–30 (2d Cir. 1982), and its progeny, <u>e.g.</u>, <u>Krinsk v. Fund Asset Mgmt., Inc.</u>, 875 F.2d 404, 409 (2d Cir. 1989) ("<u>Krinsk II</u>").

  In support of their claim, Plaintiffs rely heavily on evidence that CRMC failed to disclose to the funds' unaffiliated directors the sum and substance of a survey of CRMC's investment associates, and that, until an inquiry was conducted by the Securities and Exchange Commission ("SEC"), failed to inform the unaffiliated directors that CRMC's servicing fees resulted in a profit to the company. In Plaintiffs' view, CRMC and its related companies promoted rapid growth of the funds, which resulted in a dramatic increase in assets under management from 2003 to 2008 and, in turn, resulted in a substantial increase in fees paid to CRMC, without providing any additional benefits to shareholders. To make matters worse, according to Plaintiffs, the growth was financed through Rule 12b-1 fees that the funds themselves bore. Thus, the funds paid for the costs of promoting and achieving the very growth that benefitted CRMC but worked to the detriment of existing shareholders. Plaintiffs also argue that, to the extent that growth of the funds actually achieved economies of scale, the benefits of those economies were diverted from fund shareholders to the owners and employees of the company, in part through the payment of 35% of pre-tax net operating income into an employee profit-sharing plan.

  Defendants counter with evidence that, during the relevant period, they provided high-quality services and adequately shared economies of scale with investors, who achieved better-than-average long-term returns, paid lower-than-average fees, and were well-served by boards made up of a supermajority of experienced, well-educated, unaffiliated directors who received detailed information regarding fund management and performed their duties with great care and conscientiousness. Defendants also place much emphasis on competition and the funds' strong performance in comparison to comparable mutual fund complexes. From Defendants' perspective, Plaintiffs cannot credibly argue that the fees charged to the funds were so disproportionate that they could not have been the product of arm's-length negotiations.

  Having now heard and considered all of the evidence in this case and the arguments presented by both sides, the Court concludes that Plaintiffs have failed to satisfy their burden of proving a breach of fiduciary duty under section 36(b). Although the evidence in the record raises legitimate concerns regarding the independence of some of the unaffiliated directors, Plaintiffs have not proffered sufficient evidence to establish that the fees at issue could not have been the product of arm's-length bargaining. Accordingly, Defendants are hereby **ORDERED** to prepare detailed proposed findings of fact and conclusions of law that are consistent with the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|----------|------------------------|------|---------------------|
| Title | In re American Funds Fee Litigation | | |

following discussion, and to file and serve them no later than ***Friday, October 2, 2009***. Defendants are also **ORDERED** to provide the Court with a copy of the document on iBrief® software.

**II.**
**OVERVIEW**

**A. THE AMERICAN FUNDS COMPLEX**

The American Funds mutual fund complex consists of over 30 mutual funds of varying size, asset mix, and investment strategy. Eight of those funds are at issue in this case: American Balanced Fund, Inc. ("AMBAL"), AMCAP Fund, Inc. ("AMCAP"), The Bond Fund of America, Inc. ("BFA"), Capital Income Builder ("CIB"), The Investment Company of America ("ICA"), The Income Fund of America, Inc. ("IFA"), The Growth Fund of America, Inc. ("GFA"), and Capital World Growth and Income Fund, Inc. ("CWGIF"). Since July 15, 2004, plaintiff Rodney T. Jelinek has held Class A shares of ICA; plaintiffs David L. Caplan and Robert M. Macko have held Class C shares of CIB and IFA in their capacities as trustees of the David L. Caplan Revocable Trust; plaintiff Gregory J. Baurnes has held Class A shares of AMBAL, BFA, GFA, CIB, and WGI; and plaintiff Ernest Visalli has held Class A shares of BFA. Plaintiff Paul Angotta held Class A shares of AMCAP, GFA, and ICA from July 15, 2004 to June 3, 2009, and has held those shares from June 15, 2009 to the present time. None of the Plaintiffs own Class B, F, R, or 529 shares, or Class C shares in AMCAP, AMBAL, BFA, ICA, GFA, or WGI.

CRMC is a registered investment adviser under the Investment Company Act and has served as the American Funds' investment adviser since 1931. AFD is a registered broker-dealer and wholly owned subsidiary of CRMC and the principal underwriter and distributor of the American Funds. AFD enters into Selling Group Agreements with third-party broker-dealers and financial intermediaries, which then make the American Funds available for purchase by the public. AFD has operated at a loss for 21 of its 36 years of operation. In fiscal years 2002, 2003, 2007, and 2008, AFD experienced losses of approximately $40 million, $37 million, $35 million, and $59 million, respectively. However, AFD realized profits of approximately $45 million, $54 million, and $24 million dollars during fiscal years 2004, 2005, and 2006, respectively.

CRMC manages fixed-income assets through its Fixed Income Division, and equity assets through two separate and independent investment divisions: Capital World Investors and Capital

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|----------|------------------------|------|--------------------|
| Title | In re American Funds Fee Litigation | | |

Research Global Investors. CRMC utilizes a "multiple portfolio counselor system" in which every fund is divided among a number of portfolio counselors and research analysts, each of whom is responsible for a particular percentage of fund assets. The primary purposes of this system are to increase diversification and to minimize the impact of external and internal ownership limits.

From fiscal years 2003 to 2008, the American Funds experienced significant growth in assets under management, with net assets under management increasing from $422 billion in fiscal year 2003 to nearly $1.2 trillion in fiscal year 2008, with a high of $1.224.9 trillion in fiscal year 2007. Net assets under management for the funds at issue increased from $243.6 billion to $548.6 billion during that period, with a high of $710.5 billion in fiscal year 2007. In fiscal year 2003, CRMC's and its subsidiaries' net income after taxes was approximately $361 million; by fiscal year 2008, net income had increased to over $1.195 billion.

From fiscal years 2002 to 2006, CRMC and its subsidiaries collectively employed several thousand employees to carry out CRMC's consolidated operations, with 2,777 associates employed in fiscal year 2002 and 4,060 associates employed in fiscal year 2006. Qualified associates may participate in CRMC's profit-sharing plan, known as the Special Compensation Plan ("SCP"). Under the SCP, CRMC allocates as profit-sharing payments to qualified associates 35% of the substantial operating revenue remaining after the payment of employee salaries, bonuses, and benefits and all other operating expenses of the business. Employees who have become shareholders in the Capital Group Companies, Inc. ("Capital Group") receive additional compensation through the payment of dividends.[1] In fiscal year 2003, CRMC spent approximately $664 million to cover employee compensation and benefits; this figure swelled to approximately $1.794 billion in fiscal year 2008.

**B. FEES CHARGED TO AMERICAN FUNDS INVESTORS**

---

[1] The Court cannot state precisely how much money was paid into the SCP each year, nor can it say how much was paid to individual qualified employees, because that information is not included in the materials provided to the unaffiliated directors, nor have the directors ever requested such information. Likewise, the Court cannot say whether similar payments were made to similarly situated employees in other mutual fund companies, and if so, whether the payments made to those employees was comparable to compensation paid to Capital Group's qualified employees. Representatives of management, without providing hard data, assured the directors of the necessity of making such payments to retain competent staff and represented that the payments were comparable to those made by CRMC's competitors. But again, the Court cannot assess such representations because the directors apparently never felt the need to independently determine how much was being paid to profit-sharing recipients and whether compensation in those amounts was truly needed to compete in the marketplace.

LINK: 554

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|----------|------------------------|------|--------------------|
| Title    | In re American Funds Fee Litigation | | |

Every fund at issue in this action offers multiple share classes to investors. Each share class possesses a specific fee structure that differentiates it from other share classes. Moreover, each share class bears the expenses that are directly attributable to that class based on each class's pro rata share of the net assets in the particular fund at issue. Four broad categories of fees are at issue in this litigation: (1) investment advisory fees; (2) Rule 12b-1 fees; (3) transfer agent fees; and (4) administrative services fees. In fiscal year 2004, the funds at issue paid over $1.896 billion in fees; by fiscal year 2007, this number had increased to over $3.523 billion.

## 1. INVESTMENT ADVISORY FEES

Pursuant to Investment Advisory and Service Agreements that the unaffiliated directors must review and approve each year, CRMC provides investment management services such as investment research, investment selection, and portfolio trading, as well as related clerical and administrative services. To cover the costs of providing these services, CRMC charges each shareholder an advisory fee, which is calculated either as a percentage of the particular fund's assets under management, or in the case of IFA, BFA, and CIB, as a percentage of assets under management plus a percentage of the funds' gross income. The advisory fees charged by CRMC to shareholders of the funds at issue increased from over $508 million in fiscal year 2003 to over $1.708 billion in fiscal year 2008. During that same period, the number of average active full-service accounts, excluding street-name and omnibus accounts, increased from 11.3 million to nearly 23 million.

The advisory fee schedules for the eight funds at issue include various breakpoints, which reduce the rate of the advisory fee as net assets under management increase. From fiscal year 2004 to the end of calendar year 2008, advisory fee breakpoints resulted in savings of nearly $617 million. In addition, as of September 1, 2004, during fiscal year 2005, CRMC implemented a fee waiver that reduced the advisory fees charged to the American Funds by five percent. As of April 1, 2005, CRMC increased the fee waiver to ten percent. For the funds at issue, the fee waivers caused an additional reduction in advisory fees of approximately $540 million from September 1, 2004 to June 30, 2008. CRMC discontinued the fee waiver as of January 1, 2009 after suffering substantial losses in assets under management during the recent economic crisis. Overall, the investment advisory fees paid by the funds at issue ranged from 21 basis points to 42 basis points during the relevant period, and increased from $508 million in fiscal year 2003 to nearly $1.709 billion in fiscal year 2008.

## 2. RULE 12b-1 FEES

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

From 2003 to 2008, the unaffiliated directors annually reviewed and approved Plans of Distribution that AFD entered into with each of the funds at issue. The Plans of Distribution permit AFD to assess Rule 12b-1 fees to finance distribution and marketing activities that are primarily intended to result in sales of shares, to compensate broker-dealers for ongoing shareholder services, and to reimburse AFD for commissions paid to broker-dealers for no-load Class B and C shares.[2]

The amount of the Rule 12b-1 fees each share class must pay is based on the average daily fund assets attributable to each share class. Class A shares require payment of an up-front sales charge of up to 5.75% for purchases below $1 million, i.e., "commissionable sales." On commissionable sales of Class A shares, the broker-dealer receives five percent and AFD receives the remaining 75 basis points. Class A shareholders pay an annual Rule 12b-1 fee of 25 basis points of average net assets under management beginning in the second year after purchase.

Class B and C shares do not carry a front-end sales charge, thereby permitting investors to invest all of their money right away. To facilitate this arrangement, AFD pays broker-dealers a four percent commission at the time of sale for Class B shares and a one percent commission at the time of sale for Class C shares. AFD finances these commission payments by charging Rule 12b-1 fees of one percent of average assets under management. The Rule 12b-1 fees borne by Class B shareholders consist of a distribution fee of 75 basis points and a service fee of 25 basis points. In the first year after purchase, AFD retains the 25 basis points assessed on Class B shares and the entire one percent assessed on C shares as reimbursement for the sales commissions. After the first year, broker-dealers receive the 25-basis-point service fee paid by Class B shareholders and all Rule 12b-1 fees paid by Class C shareholders. Shareholders who redeem Class B shares within one year of purchase must pay a contingent deferred (back-end) sales charge of five percent, which declines to zero percent six years after purchase. Class C shareholders must pay a contingent deferred sales charge of one percent if they redeem within the first year after purchase. Until April 2009, AFD was a party to a financing agreement with

---

[2] The Court gives little weight to the testimony of CRMC's and AFD's executives that 95% to 99% of the Rule 12b-1 fees were used to finance "ongoing shareholder services," such as the creation of financial plans for shareholders and periodic meetings with investors. Such assertions directly conflict with the express language of the Rule 12b-1 plans in evidence in this case. (See, e.g., Ex. 10 at CORBI_0343277; Ex. 115 at CORBI_0202688; Ex. 3216 at CORBI_0032287.) Although Rule 12b-1 fees possess a service component, the 12b-1 plans state that their primary purpose is to finance marketing and distribution expenses. The documentary evidence that describes Rule 12b-1 fees as relating primarily to sales of the American Funds is consistent with AFD's allotment of only 25 basis points of Rule 12b-1 fees on Class B shares to finance shareholder services.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

Citibank whereby AFD sold, in exchange for cash, its right to receive from Class B and 529-B shareholders the 75-basis-point distribution component of Rule 12b-1 fees and any contingent deferred sales charges.[3]  AFD retains any contingent deferred sales charges it assesses on Class C shares.  Class B shares automatically convert to Class A shares eight years after purchase; Class C shares automatically convert to F shares after ten years.

In fiscal year 2004, the funds at issue paid Rule 12b-1 fees totaling over $883 million; by fiscal year 2007, this figure exceeded $2 billion.  (Ex. 793; Ex. 3158.)  From fiscal years 2004 to 2007, AFD collected 12b-1 fees totaling approximately $5.5 billion.  AFD retained approximately $500 million of those fees, though a substantial percentage of the retained amount constituted reimbursement for monies advanced to broker-dealers by AFD on no-load shares.

### 3. "ADDITIONAL COMPENSATION"

In addition to Rule 12b-1 fees, AFD pays its top 75 broker-dealers additional commissions, known as "additional compensation."  CRMC's purported purposes for paying additional compensation are to defray the costs of training and educating broker-dealers and to ensure that investors' assets are placed in funds that suit investors' investment objectives.  To be eligible to receive these additional funds, a broker-dealer must classify the American Funds as "approved" or "preferred."  Criteria that AFD considers in determining whether to pay additional compensation include sales volume, redemption rates, and the quality of AFD's relationship with the particular broker-dealer.  Payments of additional compensation may not exceed ten basis points of the prior year's fund sales by the broker-dealer, or 2 basis points of the total assets attributable thereto.  From fiscal year 2003 through fiscal year 2008, AFD paid broker-dealers more than $600 million in additional compensation.

### 4. TRANSFER AGENT FEES

From 2003 to 2008, each of the eight funds at issue entered into annual Shareholder Services Agreements with non-party American Funds Service Company ("AFS"), a wholly owned subsidiary of CRMC, for the provision of transfer agent, dividend disbursement,

---

[3] From 2000 to 2003, Citibank paid AFD 4.55% of the purchase price for each Class B share for which it received the right to collect fees.  Citibank's fee was reduced to 4.27% in March 2003, increased to 4.35% in May 2006, and subsequently changed to 4.10% or 4.35%, depending upon the aggregate purchase price, in May 2008.  For Class 529-B shares, Citibank paid 4.45% from February 2002 until February 2005, 4.27% from February 2005 to May 2008, and 4.22% or 4.27%, depending on the aggregate purchase price, as of May 2008.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

redemption agent, and related shareholder services such as transaction processing and distribution of prospectuses. Only Class A and B shares pay for and receive these services. AFS operates "at cost," meaning that it charges fees not to garner a profit, but to cover its expenditures. However, if AFS makes a profit in a given fiscal year, it retains those profits. The rate of the transfer agent fees charged to Class A and B shareholders of the funds at issue generally remained flat or decreased slightly from fiscal year 2003 to fiscal year 2008. In fiscal year 2004, AFS collected more than $234 million in transfer agent fees; by fiscal year 2007, this number had increased to over $400 million.

**5. ADMINISTRATIVE SERVICES FEES**

Pursuant to Administrative Services Agreements executed by CRMC and the American Funds and approved annually by the unaffiliated directors, CRMC provides or arranges the provision of transfer agent, record keeping, account maintenance, transaction processing, tax reporting, and related shareholder services for Class C, F, R, and 529 shares. The majority of transfer agent services for Class C, F, R, and 529 shares are provided by third parties. When CRMC delegates the provision of administrative services to third parties, it monitors and oversees those companies to ensure the provision of adequate services. These oversight activities are carried out by CRMC's Home Office Service Team, which is comprised of AFS associates and is assisted by CRMC's legal and compliance group.

Each applicable share class pays CRMC up to 15 basis points of average daily net assets in exchange for administrative services and CRMC's oversight of third parties, except that Class R-5 shares pay up to ten basis points and Class R-6 shares pay up to five basis points of average daily net assets. As of July 1, 2005, CRMC capped the amount of administrative services fees it retains to five basis points. Any administrative services fees exceeding the five-basis-point threshold are paid out to third parties, including AFS. In 2004, before the institution of the five-basis-point cap, the eight funds at issue paid administrative fees totaling over $51 million, over $29 million of which CRMC retained. In 2007, the amount of administrative services fees paid by the funds at issue totaled over $175 million, with CRMC retaining nearly $76 million of those fees.

**C. THE AMERICAN FUNDS' BOARDS OF DIRECTORS**

In general, the American Funds' unaffiliated directors are well-educated individuals with successful careers in a number of different industries. Over one quarter of the unaffiliated directors are individuals with careers in the financial services industry. The boards of directors of the American Funds are organized into 11 "clusters," with each cluster overseeing the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

operation of multiple funds. The boards and board committees of each cluster generally meet at the same time and share certain members. Most unaffiliated directors sit on one or two boards, though some sit on three. Each fund cluster is chaired by an unaffiliated director and supported by independent counsel, whose fees are paid by the funds. Independent counsel attend all board meetings.

Every board of directors consists of various board committees that are comprised exclusively of unaffiliated directors, including contracts committees, nominating and governance committees, and audit committees. In addition, one unaffiliated director from each fund cluster sits on the AFS Review and Advisory Committee and the AFD Distribution Oversight Committee. The contracts committees are charged with considering and approving the annual renewals of the mutual funds' various fee agreements, including (1) the Investment Advisory and Service Agreements; (2) the Principal Underwriting Agreements; (3) the Rule 12b-1 Plans of Distribution; and (4) the Administrative Services Agreements. The nominating and governance committees are responsible for electing unaffiliated directors for their respective boards, as well as conducting annual self-evaluations to ensure adequate performance of the unaffiliated directors. The audit committees oversee the American Funds' accounting and financial-reporting policies, practices, and internal controls. The AFS Review and Advisory Committee and AFD Distribution Oversight Committee oversee and keep the boards informed about AFS's and AFD's operations.

Board meetings take place each quarter. The contracts committees for each fund cluster meet once per year to vote on the renewal of the various fee arrangements. Fee schedules approved by the contracts committees must be approved by the entire board of each fund at the following quarterly board meeting. The unaffiliated directors hold executive sessions at every board meeting and contracts committee meeting, where they may discuss issues outside of the presence of affiliated directors and CRMC executives. CRMC also holds seminars for the unaffiliated directors at least once per year to allow the directors from all of the various fund clusters to discuss important issues at the same venue.

CRMC provides written materials to the unaffiliated directors throughout the year, including monthly mailings and quarterly board memoranda. The quarterly memoranda, which are meant to help the unaffiliated directors prepare for upcoming board meetings, contain updates on the size and growth of the American Funds. Each year, before the annual contracts committee meeting, CRMC provides the unaffiliated directors with director information books for their respective fund clusters. The director information books contain, among other things: draft minutes of the prior year's contracts committee meeting, which the unaffiliated directors

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

must approve; information relating to CRMC's various fee agreements; legal memoranda from independent counsel setting forth and analyzing the legal standards governing the unaffiliated directors' review and approval of the fee agreements; proposed fee schedules; charts and tables outlining the performance, size, and other pertinent characteristics of the particular funds at issue; and information regarding CRMC's, AFD's, and AFS's income and retained earnings. During the past several years, CRMC also disseminated "white papers" on issues that are of particular importance, such as fund size and growth, fees and expenses, and the sharing of economies of scale. The white papers contained a wealth of external information, such as scholarly articles that provide competing views on important issues.

**III.**
**DISCUSSION**

Section 36(b) of the Investment Company Act imposes upon investment advisers of registered investment companies "a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person." 15 U.S.C. § 80a-35(b). "To be guilty of a violation of § 36(b) . . . the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Gartenberg, 694 F.2d at 928. "The test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." Id. [4] To determine whether this standard has been met, a court must consider "all facts in

_____

[4] Although the Ninth Circuit has not squarely addressed the proper standard to be applied in a section 36(b) case, the majority of circuits and district courts have followed Gartenberg and applied its standard in assessing whether an investor has met his or her burden of proving a breach of fiduciary duty. Given its wide acceptance, this Court has determined to apply that standard even though Gartenberg establishes a barrier so high that the Court has found no instance where an investor/plaintiff successfully met that burden. Although the Court explored possible alternatives to Gartenberg, the reasoning of the two cases that have applied a different standards is flawed. The Seventh Circuit's alternative standard creates an even higher barrier to plaintiffs and for all practical purposes completely emasculates section 36(b). Jones v. Harris Associates L.P., 527 F.3d 627 (7th Cir. 2008), cert. granted, 129 S.Ct. 1579 (2009) (rejecting Gartenberg "because it relies too little on markets" and holding that, so long as the fiduciary makes full disclosure the law places no cap on compensation). Jones concludes that the Court should not second guess the judgment of fiduciaries even though section 36(b) suggests that the Court should do just that. Gallus v. Ameriprise Financial, Inc., 561 F.3d 816, 823 (8th Cir. 2009), on the other hand, expands the statute to provide a cause of action even where the challenged "fee passed muster under the Gartenberg standard." Because the statute expressly provides for a cause of action for breach of fiduciary duty in respect to compensation, Gallus appears to create a cause of action broader than that contemplated by the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

connection with the determination and receipt of such compensation," including: (1) the nature and quality of services rendered; (2) the profitability of the fund to the investment adviser; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence of the unaffiliated directors and the care and conscientiousness with which they performed their duties. Id. at 929–30; accord Krinsk II, 875 F.2d at 409.

## A. STANDING

As noted above, Plaintiffs collectively own Class A shares of ICA, CIB, AMBAL, BFA, GFA, WGI, and AMCAP, and Class C shares of CIB and IFA. Defendants argue that Plaintiffs may proceed on behalf of only those security holders who own shares in the share classes that Plaintiffs own. Specifically, Defendants contend that, because CRMC retains only those Rule 12b-1 fees paid by Class B shares, Plaintiffs lack standing to assert that Defendants charged excessive Rule 12b-1 fees. Similarly, Defendants argue that, because Plaintiffs own Class C shares only in CIB and IFA, Plaintiffs may not challenge the administrative service fees paid by Class F, R, and 529 shareholders of CIB and IFA, or Class C, F, R, and 529 shareholders of the remaining six funds.

Section 36(b) creates a private right of action for "security holder[s]" of registered investment companies; it does not distinguish among owners of different classes of shares in a mutual fund. 15 U.S.C. § 80a-35(b). Defendants do not cite a single case that supports their theory that a section 36(b) plaintiff lacks standing to proceed on behalf of shareholders who own different share classes; rather, Defendants cite cases which held only that a plaintiff lacks standing under section 36(b) if she does not own shares in the mutual fund at issue. Moreover, Defendants' contention that Plaintiffs have not suffered an injury-in-fact with respect to the shares that they do not own is unpersuasive because the different share classes in a particular American Fund invest in the same portfolio of assets, receive the same types and level of service, and are managed in the same manner. Thus, insofar as any excessive fees were disproportionate to the services rendered and impaired the funds' performance, the investors in the funds suffered these injuries equally, regardless of share class.

In short, the main difference among the different share classes is the manner in which sales charges are assessed against investors—a difference that is not sufficient to preclude Plaintiffs from proceeding on behalf of all shareholders of the funds at issue. The Court

statute. Whether the Ninth Circuit will ultimately adopt one of these standards, or establish its own standard under section 36(b), remains to be seen.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

therefore rejects Defendants' standing argument and proceeds to weigh the merits of the case with respect to all share classes in all eight funds.

## B. APPLICATION OF THE GARTENBERG FACTORS

The Court reviews the record in light of the factors established in Gartenberg and its progeny. For the reasons set forth below, the Court concludes that Plaintiffs have not met their burden of proving that the fees charged by CRMC and AFD during the relevant period were so disproportionate to services rendered that the fees could not have been the product of arm's-length bargaining.

### 1. NATURE & QUALITY OF SERVICES

#### a. Rule 12b-1 Fees[5]

---

[5] Defendants, relying primarily on Pfeiffer v. Bjurman, Barry & Assocs., No. 03 Civ.9741(DLC), 2006 WL 497776 (S.D.N.Y. Mar. 2, 2006), aff'd, 215 F. App'x 30 (2d Cir. 2007), assert that section 36(b) requires Plaintiffs to prove that the fees charged by Defendants were excessive in the aggregate. In a prior Order, the Court found Bjurman's reasoning unpersuasive and permitted Plaintiffs to present evidence on the alleged excessiveness of the individual fees. The Court finds the case no more persuasive today than it did several weeks ago. To hold that liability under section 36(b) requires a showing that the fees charged are excessive in the aggregate would undermine the objectives of section 36(b) and effectively permit an investment adviser that charges an excessive rate for one type of fee to escape liability if all fees in the aggregate might not be considered excessive. Moreover, as a practical matter, an aggregation requirement would create serious problems relating to proof, given that Gartenberg requires plaintiffs to prove disproportionality between fees and the specific services rendered in exchange for those fees. See In re Goldman Sachs Mut. Funds, No. 04 Civ. 2567(NRB), 2006 WL 126772, at *9 (S.D.N.Y. 2006) ("[A]llegations regarding *Rule 12b-1* fees . . . are inappropriate to establish that the *advisory* fees were excessive." (emphases in original)). As a result, the Second Circuit and district courts in the Southern District of New York have repeatedly held that aggregation is not required. See Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861, 866 (2d Cir. 1990); Levy v. Alliance Capital Mgmt. L.P., 189 F.3d 461, at *2 (2d Cir. 1999) (table decision); Pfeiffer v. Integrated Fund Servs., Inc., 371 F. Supp. 2d 502, 508 (S.D.N.Y. 2005); In re Goldman Sachs, 2006 WL 126772, at *9 & n.22. Accordingly, although the Court will, as it must, consider all relevant evidence in the record, Plaintiffs may prevail on their section 36(b) claim if they show that any of the fees at issue were disproportionate to the services rendered in exchange for those fees.

The Court also rejects Defendants' contention, based on Bjurman, that CRMC and AFD cannot be held liable for charging Rule 12b-1 fees that they did not retain. In the Bjurman world, section 36(b) exposure for the imposition of excessive Rule 12b-1 fees cannot be redressed—the broker-dealer cannot be sued under the statute because it is not a fiduciary under the statute, and the fiduciary who assessed the fee cannot be sued because it does not "receive" or "retain" the fee. In this Court's view, such a construction of section 36(b) makes no sense. Moreover, it appears clear that the imposition of Rule 12b-1 fees is designed to benefit CRMC and AFD by paying for services to investors that enhances investors' perception of CRMC and AFD, and that CRMC and AFD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

Rule 12(b) of the Investment Company Act prohibits open-end management investment companies from serving as distributors of securities of which they are issuers, except through underwriters.  15 U.S.C. § 80a-12(b).  This means that a mutual fund company may not directly or indirectly finance any activity that "is primarily intended to result in the sale of shares issued by such company, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature."  17 C.F.R. § 270.12b-1(a)(2).

In 1980, the SEC adopted Rule 12b-1, which authorizes mutual fund companies to serve as distributors of securities they issue so long as any distribution-related payments "are made pursuant to a written plan describing all material aspects of the proposed financing of distribution," the plan is approved by the board of directors both at the onset of the plan and on an annual basis, and the company provides the board of directors with quarterly written reports detailing the amounts expended and the purposes of the expenditures.  Id. §§ 270.12b-1(b)(2) to (3).  Rule 12b-1 creates a potential conflict of interest because it permits an investment adviser to use fund assets to promote growth, which may or may not benefit investors but always benefits the investment adviser because the adviser's income is determined as a percentage of assets under management.  As a result, Rule 12b-1 imposes upon the directors of mutual fund companies "a duty to request and evaluate," and upon mutual fund companies a duty to produce, "such information as may reasonably be necessary to an informed determination of whether such plan should be implemented or continued."  Id. § 270.12b(d).  To fulfill their duties, directors must "consider and give appropriate weight to all pertinent factors," and continue a Rule 12b-1 plan only if they conclude, "in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and under sections 36(a) and (b) of the [Investment Company Act], that there is a reasonable likelihood that the plan will benefit the company and its shareholders."  Id. §§ 270.12b(d) to (e).

Plaintiffs' basic contention regarding Rule 12b-1 fees is that CRMC and AFD violated section 36(b) by charging billions of dollars in Rule 12b-1 fees that were designed to promote growth and increase assets under management at a time when the American Funds were already experiencing unprecedented growth that was creating significant problems with fund management and causing fund performance to deteriorate.  According to Plaintiffs, CRMC and AFD should have eliminated Rule 12b-1 fees, at least until they had resolved the various

would otherwise have to pay for these services out of their own revenues.  The Court therefore declines to follow Bjurman's construction of section 36(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

problems associated with fund growth.

Plaintiffs do not present a viable theory of liability under section 36(b) with respect to Rule 12b-1 fees, because Plaintiffs' position does not implicate the nature and quality of any actual shareholder services. Plaintiffs focus principally on the notion that CRMC and AFD misused the revenues they acquired via Rule 12b-1 fees. (See, e.g., Pls.' Post-Trial Br. at 15 ("Plaintiffs submit that if $240 million or more of Fund assets could have been saved rather than put to a use by AFD which did not benefit the Funds, it was the fiduciary duty of Defendants and the Directors to do so.").) But section 36(b) "addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds." In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005), aff'd sub nom. Bellikoff v. Eaton Vance Corp., 481 F.3d 110 (2d Cir. 2007). Thus, improper use of Rule 12b-1 fees cannot serve as the basis for liability under section 36(b). In re Goldman Sachs Mut. Funds, No. 04 Civ. 2567(NRB), 2006 WL 126772, at *10 (S.D.N.Y. 2006). Likewise, "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive." Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 327 (4th Cir. 2001). Accordingly, Plaintiffs have failed to present any evidence regarding the nature and quality of the actual services rendered in exchange for Rule 12b-1 fees.

Even if Plaintiffs' arguments relating to Rule 12b-1 were viable under section 36(b), the evidence Plaintiffs presented as evidence that growth caused fund performance to deteriorate is at best ambiguous. Plaintiffs rely primarily on a series of regression analyses performed by their expert, Dr. Edward O'Neal, who concluded that the American Funds' growth from 2000 to 2008 adversely impacted fund performance. Dr. O'Neal's analyses, however, were flawed for a number of reasons and failed to withstand the challenges of Defendants' expert, Dr. John Peavy. First, Dr. O'Neal's analyses were time variant, meaning that the results of the analyses changed drastically depending on the time period under study.[6] Dr. O'Neal also failed to explain adequately why his analyses did not reveal statistically significant negative correlations for CWGIF and CIB, two of the largest and fastest-growing funds of the eight funds at issue. (See Trial Tr. at 1040, 1094–95.) Second, Dr. O'Neal's conclusion that deterioration in fund

---

[6] Dr. O'Neal based his conclusions on his examination of the time period January 2000 to September 2008, which revealed a statistically significant negative correlation between fund performance and fund growth for five of the eight funds at issue. Dr. Peavy explained, however, that the same analyses performed for the time periods January 1998 to September 2008 and July 2003 to September 2008 elicited negative coefficients for only one fund and for zero funds, respectively. Dr. O'Neal was unable to articulate a persuasive reason why the variability of his results do not affect their reliability. (See Trial Tr. at 1090–95.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

performance caused CRMC's trading costs to increase, thereby eliminating the substantial trading advantage CRMC previously enjoyed, was based on Plexus data that covered trading costs only for equity securities, not fixed-income securities. The omission is significant because four of the eight funds at issue trade in fixed-income securities, and equity securities make up only two-thirds of the pools of assets of those eight funds. The Plexus data also covered all of the American Funds, not just the eight funds at issue in this case. Third, Dr. Peavy testified that the statistically significant negative correlations between performance and growth set forth in Dr. O'Neal's regression analyses may have been the product of an aberrationally high period of performance followed by an influx of assets and average performance. Dr. O'Neal did not adequately explain how his regression analyses controlled for such "regression to the mean," or why his results were not skewed by any such phenomenon.

In addition, CRMC's investment associates' responses to the survey conducted by CRMC in early 2005 cannot be used to show disproportionality with respect to Rule 12b-1 fees. While the surveys highlighted some of the specific problems investment associates may face when a mutual fund experiences significant growth in assets under management, neither the survey responses nor the other evidence presented by Plaintiffs establish that the investment services were so adversely affected by growth that they were somehow disproportionate to the advisory fees used to finance those services. Moreover, that Plaintiffs attempt to prove the alleged excessiveness of Rule 12b-1 fees by citing problems relating to the provision of *advisory* services underscores the Court's earlier point that Plaintiffs have not presented a viable theory with regard to Rule 12b-1 fees.

Finally, Plaintiffs criticize Defendants for failing to present evidence regarding the extent to which investors utilized shareholder services covered by Rule 12b-1 fees, or evidence that any broker-dealers threatened to leave or cease doing business with CRMC if Rule 12b-1 fees were reduced or eliminated. These arguments ignore the fact that Plaintiffs carry the burden of affirmatively proving that Rule 12b-1 fees were disproportionate to services purchased with those funds. Likewise, while the Court recognizes that Defendants' argument that Rule 12b-1 fees are a "competitive necessity" ignores the original purpose of Rule 12b-1, which was to provide mutual fund companies that were suffering from high redemption rates a means of avoiding the use of scarce resources to increase assets under management,[7] the unpersuasiveness

---

[7] Although the original purpose of Rule 12b-1 has been the subject of much debate in recent years, the Court subscribes to the SEC's view that Rule 12b-1 was initially implemented as a temporary means of stimulating growth at a time when the mutual fund industry was experiencing high redemption rates that were causing average assets under management to decrease and expense ratios to increase. The director information books that CRMC provides to the unaffiliated directors are consistent with this interpretation. (See, e.g., Ex. 8 at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

of this defense is ultimately irrelevant if Plaintiffs cannot meet their burden of proof in the first instance.

### b. *Investment Advisory Fees*

Plaintiffs assert two separate arguments regarding the nature and quality of advisory fees. First, they contend that the investment advisory fees assessed in fiscal year 2004 were excessive because CRMC unreasonably failed to implement a fee waiver until fiscal year 2005, even though the American Funds experienced 43% growth in assets under management and a 44% increase in advisory fee revenues in fiscal year 2004. Plaintiffs claim that if the advisory fees that the unaffiliated directors approved for fiscal year 2004 had actually been the product of arm's-length negotiations, CRMC would have done more than merely make slight adjustments to the breakpoints on its advisory fee schedule. In essence, Plaintiffs contend that CRMC delayed in implementing a fee waiver in order to capitalize on the substantial increase in advisory fees that occurred in fiscal year 2004.

Plaintiffs, however, fail to present evidence establishing that the advisory services carried out by CRMC were inadequate. Rather, Plaintiffs again focus on the problems generated by growth, which, as explained above, fail to address the fundamental issue of whether the nature and quality of the services performed by CRMC and its affiliates were commensurate with the costs of those services. Likewise, that some CRMC associates viewed the American Funds' growth as problematic does not establish that the nature and quality of CRMC's advisory services "deteriorated" as a result of growth. Indeed, the long-term performance of the majority of the funds at issue, which ranged from good to excellent at five-year, ten-year, and lifetime intervals, suggests otherwise. Plaintiffs place much stock in the relatively poor performance of the funds during calendar year 2008; however, the short-term performance of a mutual fund generally is not a good indicator of a fund's overall performance—especially poor performance in a year of widespread economic turmoil.

Plaintiffs' second argument is that the advisory fees CRMC charged and collected during the relevant period were disproportionate to the services rendered because a portion of those fees was used to finance additional compensation to broker-dealers. The Court is well-aware that the

---

CORBI_0051885; Ex. 10 at CORBI_0343167.)  At the same time, it is undeniable that Rule 12b-1 fees have evolved to a permanent means of imposing distribution-related expenses on current investors. Whether this supports amendment or revocation of the rule, however, is a matter for the SEC. The Court's only task in the matter at hand is to determine whether Plaintiffs have met their burden of proving that the Rule 12b-1 fees at issue in this case were disproportionate to the services rendered in exchange therefor.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|----------|------------------------|------|---------------------|
| Title | In re American Funds Fee Litigation | | |

issue of so-called "revenue sharing," which involves the payment by an investment adviser of compensation to brokerage houses to induce them to push investors to purchase the adviser's mutual funds, has been the subject of much controversy in recent years. The Court is also aware of CRMC's history of involvement in revenue sharing schemes. See In re American Funds Sec. Litig., 556 F. Supp. 2d 1100, 1104–05 (C.D. Cal. 2008). Nevertheless, evidence of revenue sharing is insufficient to establish a violation of section 36 (b) because, under the Gartenberg standard, such evidence only goes to the propriety of the use of an investment advisor's fees, not whether those fees bore a reasonable relationship to the services rendered. See In re Goldman Sachs, 2006 WL 126772, at *10 (citing In re Eaton Vance, 380 F. Supp. 2d at 238).

### c. Transfer Agent & Administrative Services Fees

As summarized above, administrative services fees are primarily used to finance the provision of transfer agent, record keeping, account maintenance, and related shareholder services for Class C, F, R, and 529 shares by AFS or third parties, and to cover the costs of overseeing those third parties. Defendants proclaim that these services are "top-quality," yet they do not provide any hard evidence to back up their claims. Nevertheless, the onus is on Plaintiffs to produce evidence which establishes that the nature and quality of the administrative services is lacking, which they have failed to do.

Plaintiffs contend that CRMC essentially admitted that it had been charging excessive administrative services fees when, on July 1, 2005, it instituted a five-basis-point cap on the amount of administrative services fees it could retain. According to Plaintiffs, CRMC received a windfall as a result of retaining and not returning the unusually high administrative services fees it collected before instituting the cap. Plaintiffs also argue that CRMC did not adequately inform the unaffiliated directors of CRMC's profit margin on the administrative services fees, and that it conveyed untrue and misleading statements to the directors. None of these arguments or the evidence presented at trial implicate the quality or nature of the transfer agent or administrative services fees that CRMC, AFS, or third parties provided during the relevant period. Thus, for example, although CRMC retained over $154 million in 2008 to cover its oversight of third parties while it paid out only $108 million to those same third parties to carry out the administrative services fees, this alone does not show that the fees CRMC retained were disproportionate to the oversight and support services CRMC rendered in exchange for those fees. One cannot conclude that the fee was so grossly disproportionate to services rendered that it could not have been the result of arm's length bargaining.

### 2. THE PROFITABILITY OF THE FUNDS

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

During fiscal years 2003 through 2008, CRMC's, AFD's and AFS's combined (pre-tax) operating profit margin ranged from 30% to 35%; CRMC's and AFD's combined operating profit margin ranged from 42% to 48%; CRMC's and AFS's combined operating profit margin ranged from 37% to 40%; and CRMC's operating margin decreased from 50% to 2003 to 36% in 2008, with a peak of 52% in 2005. These levels fall within the range of profit margins that other courts have deemed acceptable under section 36(b). See, e.g., Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 494 (S.D.N.Y. 1988). Furthermore, AFD made a total profit on Rule 12b-1 fees of over $122 million from fiscal years 2004 to 2006, but suffered total losses on Rule 12b-1 fees of approximately $131 million in fiscal years 2003 and 2007 to 2008. Thus, AFD suffered a net loss of approximately $9 million during the period at issue. Finally, CRMC's pre-tax profit margin on administrative services was approximately 19% in 2008. Again, this figure is well below the profit margin on administrative services that others courts have found to be acceptable. See, e.g., Meyer v. Oppenheimer Mgmt. Corp., 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988).

Based on the evidence in the record, the profitability of CRMC and AFD does not weigh in favor of finding a violation of section 36(b). Plaintiffs make no attempt to argue otherwise, but argue only that CRMC's size "dwarfs most of the advisers with whom [CRMC] compared its profitability in the board materials." (Pls.' Trial Br. at 16.)

**3. ECONOMIES OF SCALE**

Plaintiffs' main contention with respect to economies of scale is that CRMC did not equitably share economies of scale in fiscal year 2004. In support of this proposition, Plaintiffs again rely on the analyses and testimony of Dr. O'Neal. Dr. O'Neal first performed a "traditional" analysis of economies of scale whereby he determined that CRMC's net expenses in fiscal year 2003 of $615 million constituted approximately 17 basis points of CRMC's average net assets under management. Dr. O'Neal reasons that if this ratio had remained constant in fiscal year 2004, i.e., if CRMC's continued growth did not result in economies of scale, then CRMC's expenses would have been $885 million. However, CRMC's actual expenses in fiscal year 2004 were $831 million. Based on this $54 million difference, and assuming that $150 million of CRMC's 2004 expenses consisted of profit-sharing payments, which Dr. O'Neal treats as profits rather than an expense, Dr. O'Neal asserts that CRMC enjoyed economies of scale of $204 million in fiscal year 2004 ($885 million – ($831 million – $150 million)). According to Dr. O'Neal, because CRMC's expenses decreased by $18 million in fiscal year 2004, CRMC shared only eight percent of economies of scale with investors. In addition, Dr. O'Neal also conducted an alternative analysis based on how CRMC's revenues and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

profits changed from fiscal year 2003 to fiscal year 2004. Based on that analysis, Dr. O'Neal concluded that CRMC shared only four percent of economies of scale with investors, and directed the bulk of economies of scale to CRMC associates through the SCP.

Upon reviewing Dr. O'Neal's expert reports and his testimony, the Court concludes that his economies-of-scale analyses were inadequate for a number of reasons. First, Dr. O'Neal admitted that the cost of mutual fund services may decrease for reasons other than economies of scale, and that he did not undertake any analyses to determine whether any other factors may have caused or contributed to the decrease in CRMC's costs in fiscal year 2004. When questioned by the Court at trial, Dr. O'Neal confirmed that he merely inferred that economies of scale were achieved. (Trial Tr. at 1056–58.) Yet it is clear that Plaintiffs carry the burden of proving that economies of scale existed in the first place, separate and apart from proving that economies of scale were not adequately shared with investors. To meet this burden, Plaintiffs must show that CRMC's per-unit operating costs decreased as fund size increased. Krinsk II, 875 F.2d at 411; see also Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222, 1238 (S.D.N.Y. 1990). "[M]erely because the ratio of fee based expenses to fee based revenues declined at a time when the Fund size grew . . . does not establish that such a decline was necessarily due to economies of scale." Krinsk I, 715 F. Supp. at 496; accord In re Goldman Sachs, 2006 WL 126772, at *9 ("Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors."). But Dr. O'Neal conceded that he was unable to determine the extent to which CRMC's per-unit costs decreased as fund size increased because of a lack of data. The fundamental flaw in Dr. O'Neal's analyses, therefore, is his failure to prove that economies of scale actually existed. Because Plaintiffs offered no other proof on this point, they failed to sustain their burden of proving the existence of economies of scale.

Further, even if the Court were to assume for purposes of discussion that economies of scale existed, the total amount of economies of scale for fiscal year 2007 set forth in Dr. O'Neal's analysis ($596 million) was approximately half of the amount investors saved that year through breakpoints and fee waivers ($1.2 billion). (See Trial Tr. at 1059–65.) When confronted with this discrepancy, Dr. O'Neal stated that AFD had changed its asset mix over time, driving more investments into higher-expense funds such as equity funds and smaller funds with higher fee rates. However, Dr. O'Neal offered no persuasive (or even comprehensible) testimony to explain how a shift in asset mix would explain why CRMC's investors received the benefits of breakpoints and fee waivers that doubled the amount of purported savings through economies of scale. Moreover, Dr. O'Neal admitted that his analyses applied to all thirty American Funds, and that a shift toward investing in more expensive funds would not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

necessarily affect the amount of sharing of economies of scale for shareholders in the eight funds at issue in this case. (Id. at 1062–63.) Likewise, Dr. O'Neal failed to adequately explain why the fact that administrative services fees remained flat from 2003 to 2005 demonstrated that CRMC failed to deliver economies of scale, or why those figures would impact savings from breakpoints and fee waivers that enured to investors' benefit in fiscal year 2007. Dr. O'Neal's analyses also failed to account for economies of scale that might be shared through such means as improvements in technology, facilities, and equipment. The foregoing deficiencies severely undermine the probative value and reliability of Dr. O'Neal's analyses and conclusions.

Finally, Dr. O'Neal's testimony left the Court without a sufficient basis upon which to conclude that it is proper to focus only on CRMC when determining whether CRMC adequately shared economies of scale with investors. Dr. O'Neal testified that it was proper for him to exclude AFD and AFS from his economies-of-scale analyses; however, he was not able to provide a persuasive response to the criticism of Defendants' expert, Dr. R. Glenn Hubbard, that it is appropriate to include AFD and AFS in such analyses because American Funds investors purchase a bundle of services that includes shareholder and administrative services. Furthermore, Dr. O'Neal admitted that AFS automatically shares any economies (or diseconomies) of scale with investors, and that if AFD and AFS were included in his analyses, his results would show that an additional $1.7 billion in economies of scale were shared with investors for fiscal years 2004 to 2007. (Id. at 1069–70.) Thus, according to Dr. O'Neal's own analyses, CRMC shared $2.262 billion in economies of scale with investors from fiscal years 2004 to 2007, which constituted approximately 40% of all economies of scale realized by CRMC, AFD, and AFS during that period, even when one *excludes* profit-sharing payments. (Id. at 1071–72.) The only conclusion to be drawn from this evidence is that any economies of scale that may have been realized during the relevant period were sufficiently shared with investors.

### 4. COMPARATIVE FEE STRUCTURES

Dr. Hubbard testified that the mutual fund industry has evolved since Gartenberg was decided, and that, in sum and substance, market forces help ensure that investment advisers do not charge excessive fees, regardless of the fee structure permitted by a mutual fund's board, because investors will "vote with their feet" if assessed high fees. According to Dr. Hubbard, the American Funds could not have experienced substantial growth from 2003 to 2008 if CRMC and AFD were charging excessive fees. The Court rejects this view.

As the Court noted in a previous Order, Gartenberg recognized that evidence of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

comparative fee structures, though relevant, is of minimal probative value in a section 36(b) inquiry "because of the potentially incestuous relationships between many advisers and their funds." 694 F.2d at 929–30. Thus, Gartenberg expressly rejected the notion that the principal factor to be considered when determining whether a fee is excessive is the price charged by other investment advisers. Id. at 929. Certainly, conscientious investors may take fees into account when choosing a mutual fund in which to invest. However, Dr. Hubbard fails to distinguish between competition for investors among mutual fund companies, and competition among investment advisers for fund business. This distinction is of particular importance because "[a] fund cannot move easily from one adviser-manager to another." Gartenberg, 694 F.2d at 929. Further, Gartenberg expressly recognized this distinction, stating that competition among funds "for shareholder business does not support an inference that competition must therefore also exist between adviser-managers for fund business. ***The former may be vigorous even though the latter is virtually non-existent. Each is governed by different forces. Reliance on prevailing industry advisory fees will not satisfy § 36(b).***" Id. (emphasis added).

In addition, upon questioning by the Court, Dr. Hubbard acknowledged that "switching costs," such as capital gains taxes, front- and back-end loads, and the like may prevent investors who pay excessive fees from switching mutual funds, because rational investors will choose to pay excessive fees rather than switch mutual funds if the cost of changing funds exceeds the amount of fees. (Trial Tr. at 1349–50.) And while tax-deferred vehicles such as 401(k) accounts and individual retirement accounts may eliminate some switching costs, many such accounts provide few fund options to investors, thereby hindering competition. Additionally, the Court was not presented with sufficiently specific evidence to evaluate meaningfully Dr. Hubbard's claim that "market discipline" forces mutual fund companies to keep fees down even if all investors are not fee sensitive, because individual investors will ride the coattails of the "marginal investors" who are fee sensitive. Accordingly, although the Court has considered how the expense ratios of the funds at issue compare to peer funds, the Court concludes that such evidence is of minimal probative value.

### 5. INDEPENDENCE & CONSCIENTIOUSNESS OF THE UNAFFILIATED DIRECTORS

Plaintiffs emphasized throughout this litigation that the unaffiliated directors of the funds at issue were not independent and did not perform their duties with sufficient care and conscientiousness. According to Plaintiffs, the unaffiliated directors were not engaged in arm's-length relationships with CRMC; rather, they generally acquiesced to CRMC and did not provide serious oversight thereof. As a result, the unaffiliated directors approved fees that were disproportionate to the services rendered, and which the directors would not have approved had

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

they actually engaged in arm's-length bargaining.

As the Court explained at closing arguments, the evidence proffered by Plaintiffs troubled the Court and raised legitimate concerns regarding the independence of some of the unaffiliated directors. For example, e-mails by CRMC's former in-house counsel suggest that the vehemence and diligence with which unaffiliated directors scrutinized the information provided to them by CRMC was seriously lacking. The trial testimony of unaffiliated director Henry Riggs serves as an excellent example. Riggs testified that he was not concerned by the increase in Rule 12b-1 fees from fiscal years 2003 to 2007 because the fees were based on average assets under management, which were also increasing during that time. But the manner in which Riggs viewed the net increase in Rule 12b-1 fees failed to account for the fact that assets under management were growing not just because of net inflows, but also because of investment gains on existing shares. Where an increase in assets under management is driven by gains on existing shares, the need to provide additional shareholder services that are covered by Rule 12b-1 fees may be minimal. Without more exacting scrutiny by the unaffiliated directors, the possibility exists that issues of significant importance will not receive the attention they deserve, ultimately harming investors.

In addition, the four unaffiliated directors who testified at trial all met with defense counsel and, in some cases, CRMC's in-house counsel, before they took the witness stand. Perhaps it should not be surprising, then, that so much of the unaffiliated directors' trial testimony tracked—at times nearly word for word—the testimony of the CRMC executives who took the stand. It seems to the Court that the unaffiliated directors who testified essentially aligned themselves with CRMC and AFD instead of retaining their status as independent third parties in this litigation. These factors undermine the testimony of the directors and persuade the Court to give it less weight than to which the testimony might otherwise be entitled.

Nevertheless, Defendants presented substantial evidence which supports their claim that the unaffiliated directors are sufficiently independent for purposes of satisfying the <u>Gartenberg</u> standard. For instance, Defendants presented evidence that each fund cluster has a nominating and governance committee comprised only of unaffiliated directors that is in charge of nominating and electing the unaffiliated directors. The nominating and governance committees annually review their respective board members' performance to determine the existence of any performance-related issues that need to be addressed. Furthermore, that the unaffiliated directors are advised by independent counsel whose fees are paid by the funds and who attend all board and contracts committee meetings and review the materials provided by CRMC is an important consideration, because independent counsel have a contractual and ethical obligation to ensure

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

that the unaffiliated directors are sufficiently independent and well-informed.

There is also evidence in the record that all board committees consist entirely of independent directors, that all board chairpersons are independent directors, that each fund is comprised of a supermajority of unaffiliated directors, that each board meeting includes an executive session where the unaffiliated directors have the opportunity to meet outside the presence of CRMC management and affiliated directors, and that the entire group of unaffiliated directors for each fund cluster sits on the contracts committee for that cluster. This evidence supports Defendants' position that the unaffiliated directors are sufficiently independent and are able to carefully and conscientiously carry out their responsibilities to the funds.

Plaintiffs also criticize the amount of information that CRMC provided to the unaffiliated directors, and the rate at which it did so. For example, Plaintiffs maintain that the unaffiliated directors lacked sufficient information when they approved the Administrative Services Agreements because CRMC did not provide the directors with comprehensive information regarding its profit margins on administrative services fees, or any information regarding how the administrative services fees compared to those charged by similar funds, until November 2008. In addition, Plaintiffs contend that the unaffiliated directors were not well-informed regarding Rule 12b-1 fees and economies of scale, that CRMC misled the unaffiliated directors by failing in its white paper on growth to reference the specific problems mentioned in CRMC's associates' survey responses, and that CRMC failed to provide a neutral analysis in the white paper on economies of scale because it did not quantify CRMC's economies. Plaintiffs assert also that, although unaffiliated directors expressed concerns regarding growth and fund size as early as 2003, CRMC failed to provide them with any meaningful information until much later. Finally, Plaintiffs posit that CRMC repeatedly ignored the requests of unaffiliated directors for additional information regarding economies of scale, and that the directors approved fee schedules without determining whether CRMC was adequately sharing economies of scale.

In the Court's view, CRMC plainly did not provide the unaffiliated directors with sufficient information regarding its profit margins on administrative services fees until November 2008. The SEC's Pacific Regional Office agreed in a September 21, 2006 letter to the American Funds' boards, in which it explained that the unaffiliated directors lacked key information regarding CRMC's "costs and actual profit in providing the administrative services." (Ex. 3060.) Defendants' attempts to downplay the significance of the SEC's findings is unpersuasive. Nevertheless, under Gartenberg, this evidence cannot support a finding of section 36(b) liability in the absence of evidence regarding the nature and quality of the administrative services rendered by AFS and third parties and the oversight of third parties

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 04-05593 GAF (RNBx) | Date | September 16, 2009 |
|---|---|---|---|
| Title | In re American Funds Fee Litigation | | |

provided by CRMC.

Moreover, CRMC provided enough information regarding Rule 12b-1 fees to the unaffiliated directors to permit them to effectively scrutinize the Plans of Distribution that they approved each year.  For instance, in the white paper on fees and expenses, CRMC provided a detailed history of Rule 12b-1, discussed the recent movement to repeal the rule, and provided ample reading material regarding the debate on the continued vitality of Rule 12b-1.  The white papers also included a host of materials that raised many of the same issues concerning Rule 12b-1 that Plaintiffs have raised in this action.  Likewise, the director information books provided to the unaffiliated directors each year contained detailed discussions regarding Rule 12b-1 fees.  In short, the record lacks sufficient evidence to support the conclusion that the unaffiliated directors did not receive sufficient information regarding Rule 12b-1 fees such that they could not make an informed decision as to whether to continue to approve those fees.

### IV.
### CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs have failed to sustain their burden of proving that CRMC charged fees that were "so disproportionately large that [they bore] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  Accordingly, the Court finds for CRMC and AFD.  CRMC and AFD are **ORDERED** to prepare and submit proposed findings of fact and conclusions of law that are consistent with this statement of intended decision no later than ***Friday, October 2, 2009***.  Plaintiffs should submit their findings and conclusions on iBrief® software.

**IT IS SO ORDERED.**