1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    WESTERN DIVISION

4    THE HON. JUDGE GARY ALLEN FEESS, JUDGE PRESIDING

5

6    NICHOLAS J. CORBI, et al.,          )
                                         )
7                      Plaintiffs,       )
                                         )
8          vs.                           ) NO. CV-04-05593-GAF
                                         )
9    THE CAPITAL GROUP COMPANIES,        )
     INC., et al.,                       )
10                                       )
                       Defendants.       )
11                                       )
     IN RE AMERICAN MUTUAL FUNDS FEE     )
12   LITIGATION.                         )
     _____)

13

14

15         REPORTER'S TRANSCRIPT OF COURT TRIAL

16           Volume VII - A.M. Session Only

17             Los Angeles, California

18            Thursday, August 6, 2009

19

20

21

22

23    LISA M. GONZALEZ, CSR 5920 - Official Reporter
                Roybal Federal Building
24       255 East Temple Street - Room 181-C
               Los Angeles, CA  90012
25         (213) 621-7709; csrlisag@aol.com

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:   MILBERG LLP
                           BY:  JEROME CONGRESS
 4                         and JANINE L. POLLACK
                           and ANNA CHRISTINA DOVER
 5                         and JOHN R.S. McFARLANE
                           One Pennsylvania Plaza
 6                         New York, NY  10119
                           (212) 946-9376/9485
 7
                           WEISS & LURIE
 8                         BY:  RICHARD A. ACOCELLI
                           The Fred French Building
 9                         551 Fifth Avenue
                           New York, New York 10176
10                         (212) 682-3025

11   FOR THE DEFENDANTS:   MILBANK, TWEED, HADLEY & MC CLOY LLP
                           BY:   JAMES N. BENEDICT
12                         and SEAN M. MURPHY
                           and LOUIS A. PELLEGRINO
13                         and JAMES M. CAVOLI
                           One Chase Manhattan Plaza
14                         New York, New York  10005-1413
                           (212) 530-5696
15
                           GIBSON, DUNN & CRUTCHER LLP
16                         BY:  GARETH EVANS
                           333 South Grand Avenue
17                         Los Angeles, California  90071-3197
                           (213) 229-7734
18

19

20

21

22

23

24

25
```

# I N D E X

## CHRONOLOGICAL INDEX OF WITNESSES

| PLAINTIFFS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| Henry Riggs | 1367 | | | | | |

| DEFENDANTS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| Robert G. Hubbard | 1281 | 1328 | 1362 | | | |

```
 1        Los Angeles, California, Thursday, August 6, 2009

 2                          8:36 a.m.

 3                           -o0o-

 4            THE COURT:  All right.  Back on the record in the

 5   American Funds Mutual Funds case.

 6            Let's see.  Who's got the first witness this

 7   morning?  Is it the defense?

 8            All right.  Call your witness, please.

 9            MR. CONGRESS:  Your Honor, I would like to

10   introduce Mr. Richard Acocelli of the firm of Weiss and

11   Lurie, who's sitting at plaintiffs' conference table today.

12            THE COURT:  Good morning.

13            MR. ACOCELLI:  Good morning.

14            MR. MURPHY:  The defendants call Dr. Glen Hubbard.

15    ROBERT GLEN HUBBARD, DEFENDANTS' WITNESS, SWORN

16            THE CLERK:  Please be seated.  Please state your

17   full name and spell your last for the record.

18            THE WITNESS:  Robert Glen Hubbard, H-u-b-b-a-r-d.

19            THE COURT:  Go ahead, counsel.

20                      DIRECT EXAMINATION

21   BY MR. MURPHY:

22   Q    Dr. Hubbard, what is your current occupation?

23   A    I am a professor of economics at Columbia University

24   where I'm also a professor of finance in the business school

25   and dean of the business school.
```

1   Q      Could we show Appendix A of Joint Exhibit 651.

2            Dr. Hubbard, is this a current version of your CV?

3   A      Yes.  It looks to be my CV probably relatively

4   current.

5   Q      And it's attached as Appendix A to your expert report

6   in this case?

7   A      Yes.

8   Q      Can you please tell us your educational background

9   beginning with college?

10  A      Sure.  I got my BA and BS degree from the University

11  of Central Florida summa cum laude, and then I did my

12  graduate work in economics at Harvard University, where I

13  got a master of arts and Ph.D.

14  Q      How long have you been teaching at Columbia?

15  A      I've been at Columbia since 1988, other than leaves in

16  government service.  I began my teaching career elsewhere.

17  Q      Where else have you taught?

18  A      I began my career at Northwestern University in the

19  department of economics.  I've also had visiting positions

20  at the University of Chicago, the Kennedy School, Harvard,

21  and Harvard Business School.

22  Q      And what areas of economics have you taught and

23  researched?

24  A      My research centers on a number of topics in applied

25  microeconomics ranging from financial economics to public

```
 1    economics, industrial organization, and broad topics and
 2    public policy.
 3    Q     Have you published any textbooks on economics?
 4    A     Yes.  My textbook on Money and Banking will be coming
 5    out soon in its Seventh Edition, and my freshmen "Principals
 6    of Economics" textbook will be out soon in its Third
 7    Edition.
 8    Q     And have you written articles on the area of
 9    economics?
10    A     Yes.  I enjoy writing research papers.  I have a
11    little more than 100 refereed research papers, and then I
12    write frequently in the popular press.
13    Q     And have you written at all on the subject of mutual
14    funds?
15    A     I have.
16    Q     And on what specific subjects?
17    A     I've written on competition in the mutual fund
18    industry, regulatory questions and mutual funds, and the
19    descriptions of mutual funds in my textbook.
20    Q     And have you ever -- you mentioned you were on leave
21    for government service?
22    A     Yes.
23    Q     And what positions in government service have you had?
24    A     In the early '90s, 1991 to 1993, I served as deputy
25    assistant secretary for tax policy in the Treasury
```

1284

1    Department; that's essentially the Treasury Department's tax

2    function, revenue estimates, and so on.

3            In 2001 to 2003, I was the chairman of the Council

4    of Economic advisers in the White House, and also the

5    chairman of the economic policy committee for OECD.

6    Q    And when you were the chairman of the Council of

7    Economic advisers, who did you report to?

8    A    The President.

9    Q    Of the United States?

10   A    Yes.

11   Q    And what did you advise the President on in that

12   position?

13   A    Well, that's a position that really depends on what he

14   wants.  And the time that I was there, the topics were

15   really his tax policy, his regulatory issues, international

16   financial crisis, the corporate accounting scandals, 911;

17   you know, the topics of the day.

18   Q    Have you served as a consultant to any government

19   agencies?

20   A    I have.

21   Q    Which agencies?

22   A    The Federal Reserve, both the board and the Federal

23   Reserve Bank of New York, the International Trade

24   Commission, and the IRS.

25   Q    And have you ever sat on the board of a mutual funds

1    complex?

2    A      Yes, I have; and I do.

3    Q      Which board?

4    A      The closed-end complex of BlackRock.

5    Q      And you're serving as an independent director to that

6    board?

7    A      Yes.

8    Q      And how long have you been on that board?

9    A      Since 2005.

10   Q      You were retained as an expert in this case?

11   A      Yes.

12   Q      And what was your assignment in this case?

13   A      My assignment was really twofold.  To look at the

14   economic arguments for whether or not there were excessive

15   fees charged by the American Funds and to look at the

16   plaintiffs' expert report by Dr. O'Neal and opine on it.

17   Q      And what types of analysis did you do to investigate

18   those issues?

19   A      Well, a number of analyses.  In a case like this, the

20   key question is defining a price to study, and there I did

21   some work on the total cost, the total fee.  Second, looking

22   at competition in the mutual funds industry because in a

23   competitive market, one would suggest a benchmark from

24   peers; so I looked at the underlying characteristics of

25   competition, and also did some empirical work about

1286

1    consumers' responsiveness to changes in price.

2    Q    And if we could pull up Joint Exhibit 651, please.

3         And, Dr. Hubbard, is this the expert report you've

4    prepared in this case?

5    A    Yes, it is.

6    Q    And does it accurately reflect your opinions that you

7    reached?

8    A    Yes, it does.

9    Q    Can you just briefly summarize the opinions you've

10   reached in the case based on the analyses that you've just

11   described.

12   A    Certainly.  Again, first the relevant price at issue

13   is a total cost, total expense ratio.  Second, the

14   underlying characteristics and empirical evidence for this

15   industry are indicative of very vigorous competition.  The

16   eight funds at issue had among the lowest fees in their peer

17   group at the time of issue.

18        I also reviewed information about the sharing of

19   realized economies of scale and concluded that there had

20   been sharing of those economies of scale with investors.

21        I also looked at the arguments concerning

22   economies of scale and 12b-1 fees from Dr. O'Neal, and I

23   found them to be both incorrect and incomplete.

24   Q    And you mentioned the funds at issue here had low

25   fees; is that correct?

1  A      Yes.

2  Q      And as part of your analysis, did you look at how the

3  funds' fees compared to the fees charged to comparable

4  mutual funds?

5  A      Yes, I did.  And it's important to step back there and

6  ask why one would do that, and it's also a staple in any 15C

7  proceeding, too.  And it is because in a competitive

8  marketplace, the benchmark from peers is what one needs to

9  examine, so, yes, I did that analysis here.

10  Q      Can you describe how you did that comparative fee

11  analysis?

12  A      Certainly.  I used data that were sourced from

13  strategic insight, so-called SIM fund data to sort by load

14  characteristics, distribution characteristics, so that I'm

15  trying to get similar funds for comparison.

16         I also did some comparisons benchmarked against

17  only large funds since, obviously, these funds at issue were

18  very large.

19  Q      Can we show Defendants' Exhibit 2229.

20         Do you recognize this document, Dr. Hubbard?

21  A      Yes, you could -- that would come from calculations

22  that are presented in the report.

23  Q      Can you walk us through what this chart shows.

24  A      Sure.  On the left, of course, are the eight funds at

25  issue, and then the three share classes A, B, and C.  What a

```
1    rank means is the lower numbers would be lower fees.  So if

2    you take AMCAP Fund Class A shares, two out of 176 would

3    mean it's the second out of 176 in terms of fees.  The vast

4    bulk will be higher.

5    Q    And in terms of the 176 you've just referred to for

6    AMCAP, those are 176 funds that share similar

7    characteristics to AMCAP?

8    A    Yes.  It's important to do that obviously in

9    constructing the peer group.

10            THE COURT:  What are they?  Are we talking about

11   just load funds?  Are we talking about only funds that

12   charge 12b-1 fees?  Are we talking about no load, no 12b-1

13   fee funds?  Who's the peer group?

14            When I read your report, the hardest thing I had

15   to deal with was understanding what you meant by "peer

16   group."

17            THE WITNESS:  Perhaps, we can look at some of the

18   individual exhibits.  I'll answer your question.  I'm happy

19   to walk you through the exhibits to see if that helps, Your

20   Honor.

21            THE COURT:  That's up to Mr. Murphy.  If you can

22   just -- if you can answer --

23            THE WITNESS:  But to answer your question, sir,

24   it's really the load and distribution channels are the two

25   principal characteristics, but I can walk you through the
```

```
 1    exhibits if you wish.

 2               THE COURT:  I think I understand what you mean.

 3               So go ahead, Mr. Murphy.

 4    BY MR. MURPHY:

 5    Q     Just so I understand, Mr. Hubbard, is the 176 in the

 6    AMCAP, is that only load funds?

 7    A     Those would be, yes, load funds.

 8    Q     And did you do any analysis of AMCAP versus non-load

 9    funds?

10               Do you know how the total expense ratio compares

11    whether there's a load or not a load?

12    A     Well, yes, you could do that.  In the data reported in

13    the report, the AMCAP expense ratio was very low in the

14    entire distribution of funds.

15    Q     No matter whether it's compared to a load fund or not

16    load fund?

17    A     Correct.

18    Q     And when you do peer group comparisons, you did them

19    at the total expense ratio level?

20    A     Yes.

21    Q     And total expense ratio includes Rule 12b-1 fees?

22    A     Yes, it does.

23    Q     And is it possible that some of those funds that were

24    in the 176 peer group comparisons that you did where you

25    compared the total expense ratio, they didn't have a 12b-1
```

1290

1  fee?

2  A      It's possible, sure.

3  Q      And even though -- even where they didn't charge 12b-1

4  fees, did the results change or did the eight funds

5  generally remain low fee?

6  A      The eight funds at issue were low fee no matter how

7  you cut it.

8  Q      And looking at this chart, and you did a number of

9  expense ratio comparisons, what overall conclusions do you

10  draw about the fees charged in the eight funds at issue, no

11  matter how you slice the data?

12  A      Again, it's important to look at a benchmark of peers;

13  that would be where the competitive pressure comes from.

14  And within any of these benchmarks, these eight funds are

15  among the very lowest in the entire industry.

16  Q      Can you pull up the heading on this chart.  This is

17  expense ratio rank, which is the total expenses charged to

18  the fund?

19  A      That's correct.

20  Q      And including 12b-1?

21  A      That's correct.

22  Q      And why did you focus your analysis on the total

23  expense ratio?

24  A      Well, just to step back and ask what are investors

25  buying when they buy a mutual fund.  A mutual fund is an

1    investment vehicle to save for something:  Your retirement,

2    your children's education, whatever it is.  So what you care

3    about is the net return from that investment and that's a

4    combination obviously from your gross return and your total

5    fees.  It's the total fee that's the price.

6    Q    And investors, mutual fund investors can't buy the

7    components services of a mutual fund separately?

8    A    They're not able to buy these as unbundled products,

9    no.

10   Q    And is that significant at all in your analysis?

11   A    Well, it's significant insofar it again is the total

12   price that's what's germane.

13   Q    And as part of your work in this case, did you

14   undertake any effort to analyze any of the component fees

15   charged to the eight funds?

16   A    I did because 12b-1 fees are obviously at issue in the

17   case.  I did look at the distribution of 12b-1 fees as well.

18   Q    And what did you find with respect to your analysis of

19   12b-1 fees?

20   A    Well, for 12b-1 fees, again, it's important to hold

21   some things constant because they vary, of course, across

22   distribution channels, potential investment categories as

23   well.  When you do that, you find that the funds at issue

24   have 12b-1 fees within two-and-a-half basis points of the

25   vast majority of other firms.  Between two-thirds and

1    90 percent.

2    Q      And can you show demonstrative -- Defendants' Exhibit

3    2230, please.

4             Do you recognize this chart, Dr. Hubbard?

5    A      Yes, it would be taken from an exhibit -- the data

6    taken from an exhibit that's in the report, 22 or 23.  One

7    of the exhibits near the end.

8    Q      Can you just walk us through what this chart shows.

9    A      Sure.  Remember, I'd said that it is important to make

10   sure you're comparing apples to apples here.  So this is an

11   attempt to do this by share class.  And so take a given

12   fund.  In this table, it's the Growth Fund of America for

13   2006.  So if you look at Class A, the 25 basis points for

14   the Growth Fund of America, if I ask how many firms are

15   charging 12b-1 within two-and-a-half basis points of the

16   Growth Fund of America, you see that would be 72 percent, 18

17   percent would be charging fees greater than two and half

18   basis points more than Growth Fund, and 10 percent, less.

19   Q      And on class B shares, 88 percent are charging within

20   two-and-a-half basis points --

21   A      Yes.

22   Q      -- of the 100 basis point charged --

23   A      Right.  The level of 12b-1 fee is obviously different

24   for Class B and Class A, that's why it's important to

25   separate; but, yes, almost 90 percent of the funds there

1    would be within two-and-a-half basis points of what the

2    American Funds, or, in this case, Growth Fund of America

3    would charge.

4    Q     And the same holds true with class C shares.

5    A     Yes.  Again, about 90 percent.

6    Q     Do you believe competition can act to constrain mutual

7    fund pricing?

8    A     Competition is a very powerful constraint on pricing

9    as long as the conditions for competition are met; hence,

10   the analysis I had to do in the report.  But, yes, I do

11   believe that for this industry.

12   Q     And how does it constrain pricing?  Can you describe

13   how that happens.

14   A     Well, the simple way in which it constrains price is

15   if a fund or an adviser were to attempt to hold fees

16   significantly above a competitive level, as long as

17   consumers have access to information and are fee sensitive,

18   they'll leave.

19         I did a statistical analysis of that in the report

20   and concluded that at the levels of fee sensitivity, I

21   estimated it wouldn't be profit maximizing for an adviser to

22   do that.

23   Q     When you say, "it wouldn't be profit maximizing," what

24   do you mean?

25   A     In other words, if an adviser thought that by holding

 1  a fee above the competitive level for a sustained period of

 2  time as profits would go up, as long as there's not a legal

 3  issue there, that would be a profit maximizing act.  I find

 4  it wouldn't be in the interest of the adviser to do that on

 5  purely economic grounds.

 6          THE COURT:  How does one know what fee sensitivity

 7  there is in the investor community?

 8          THE WITNESS:  What one can do, Your Honor, is to

 9  estimate the effect of fees on assets under management,

10  holding everything else constant.

11          THE COURT:  How do you do that?

12          THE WITNESS:  Okay.  So the regression analysis

13  that I present, Your Honor, holds constant investment

14  category, distribution, age of the fund, other

15  characteristics that have been known to effect demand.  So

16  that you don't just want to look at a correlation between

17  fee and assets under management, you want to hold everything

18  else constant.

19          In addition, I do a statistical technique to try

20  to sort out whether the relationship I'm picking up is

21  purely economies of scale, that is, large funds leading to

22  low fees or whether I'm effectively picking up the demand

23  curve:  Low fees leading to large funds.  I find it's the

24  latter.

25  ///

BY MR. MURPHY:

Q    And can you just -- in addition to the fee sensitivity
you just described, can you just summarize the other types
of analyses you've done of the mutual fund market to assess
whether it's competitive?

A    Sure.  The mutual fund market has changed dramatically
since the last major wave of competition analysis -- it's
actually more than a generation old -- and so I looked at
the number of funds, number of complexes, hundreds of
opportunities and thousands of funds as opportunities for
investors.  I looked at the ease of entry, looking at some
large funds and large complexes, quite high in the size
distribution that weren't even in existence ten years ago
telling me that entry and scale are possible quickly.

        I then looked at measures of concentration that
are often used in antitrust matters and found that at no
time would this industry have approached the concentration
levels that would even initiate a discussion in antitrust
circles.

        I then looked at the prevalence of assets being
held in tax preferred accounts, which by construction have
no tax transaction costs.  The capital gains tax does not
apply as long as you're within those accounts.  And then I
looked at the easy availability of information because of
technology today relative to say a generation ago.

1296

1       So all of those factors would enable competition.

2   It's then the case that one has to look at whether consumers

3   really are fee sensitive, and that's the empirical analysis

4   that the judge had just queried me about.

5   Q     And what are the characteristics of a competitive

6   market, generally?  And I should caution you to slow down

7   before the reporter gets very upset with us.

8   A     I apologize.  I'm from the South.  I should speak more

9   slowly.

10      But a competitive market is one that has many

11  sellers.  It has information attributes that are obtainable

12  by the purchasers.  It has entry and exit, and it has

13  substantial discipline by price where price could mean the

14  literal price being charged or competition in the provision

15  of extra services around a bundle.  Those would be

16  characteristics of any competitive -- vibrantly

17  competitively industry.  All of those characteristics are in

18  place here.

19  Q     Now, you mentioned that you looked at the number of

20  funds and complexes.  Do mutual fund investors have many

21  options to choose from?

22  A     Well, they have many options in terms of investment

23  style, in terms of how they want to pay for a fund -- the

24  different share classes and so on -- many, many options.

25  Q     How many funds exist in the market today?

1   A      Thousands of funds.

2   Q      And do investors have many more funds to choose from

3   today than in the past?

4   A      Yes.  I offered an exhibit in the report.  If you look

5   at the time series, it's pretty clear that both the number

6   of funds and the number of complexes offering those funds

7   have grown over the past two decades.

8   Q      And we're going to get to that in a minute.

9          You mentioned you also did an analysis of

10  concentration levels; is that correct?

11  A      Yes.

12  Q      And what analysis did you do on concentration levels?

13  A      Anti-trust proceedings often focus on a measure that

14  economists would call Herfendall-Hershman Index, and the

15  threshold for deciding whether there's a problem that the

16  Department of Justice often uses would be a Herfendall Index

17  of about 1,000.  10,000 would be a monopoly.  Very small

18  number, you know, per competition.  At no time does this

19  industry approach the thousand threshold.

20  Q      And can we show Exhibit 8 to Joint Exhibit 651.  Let

21  me just blow that up a little bit.

22         Do you recognize this document, Dr. Hubbard?

23  A      Yes.

24  Q      What does it reflect?

25  A      Well, it reflects two things that we were talking

1    about.  One is the growth over time in the number of funds

2    and the number of complexes as you can see.  And, then, the

3    final column is the concentration measure.

4    Q     And so when you were referring to your exhibit that

5    shows the change in the number of mutual fund, am I correct

6    that this reflects that information?

7    A     Yes.

8    Q     Over time?

9    A     Yes.

10   Q     And is -- there was 1,042 mutual funds in 1985?

11   A     Yes.

12   Q     And today there are --

13   A     Well, as of 2008, you know, more than five times that

14   many.

15   Q     And number of complexes?  What is a complex?

16   A     A complex would be a family of funds; so, for example,

17   the American Funds has the eight funds at issue and many

18   other funds.  It would all be American Funds as a complex.

19   Q     And the number of complexes has grown from 199 in 1985

20   to 584 complexes in 2008?

21   A     Yes.

22   Q     And in terms of the HHI, the final column of the

23   chart, just looking at, for example, 2004 to 2008, the HHI

24   range from 550 to 650, generally; 546 to 655.

25             What do you conclude from that with respect to the

1  time period 2004 to 2008?

2  A     Well, again, the threshold that the Department of

3  Justice would generally use would be an HHI index of around

4  1,000.  So at no point during this period would this have

5  raised the specter measured in this way of an overly

6  concentrated industry.

7  Q     And if the market is unconcentrated, how does that

8  impact your opinions about competition?

9  A     Well, again, in a vibrantly competitive market, while

10  there are obviously going to be firms of different size,

11  loose -- relatively low levels of concentration suggests

12  that there's substantial entry and market discipline.

13  Q     And do mutual funds compete with other products like

14  ETFs or treasuries or any other number of securities?

15  A     Well, sure.  Again, ask yourself why is somebody

16  buying a mutual fund.  It's to store wealth for that goal:

17  Retirement, your children's education, whatever it is, so at

18  that level virtually any asset is at least a potential

19  substitute.  Closer in substitutes would include things like

20  ETFs or direct investments in similar securities that the

21  funds are buying.

22  Q     And looking at Exhibit 8, obviously a number of funds

23  and complexes have entered the mutual fund industry in the

24  last 20 years or decade at least?

25  A     Yes.

1    Q     And have these new entrants been able to compete

2    effectively?

3    A     Yes, in many cases there are substantial funds and

4    complexes that simply didn't exist at the beginning of the

5    sample period.  I presented some information on that in the

6    report.

7    Q     And can we go to Exhibit 9 in this same report, which

8    is Joint Exhibit 651.

9          Do you recognize this, Dr. Hubbard?

10   A     Yes, I do.

11   Q     And what does this reflect?

12   A     This is getting at this question of how successful

13   were some large entrants over this period.

14         So if I look at the 20 largest mutual fund

15   complexes as ranked by assets that didn't offer mutual funds

16   a decade prior, I see that some of them are actually quite

17   significant.  So if I look at the first entry there,

18   Vantagepoint, it says "Asset Size Percentile" 87-and-a-half

19   percent; so that complex is bigger than 87-and-a-half

20   percent than other complexes, despite the fact that it's not

21   even ten years old.

22   Q     So all of the 20 complexes on this list are in the top

23   40 percent in terms of market share?

24   A     The lowest there is 61 percent.

25   Q     If you can show Exhibit 10 to Exhibit 651.

```
 1              And what does this chart reflect, Dr. Hubbard?

 2    A     This is a similar exercise, except this time about the

 3    individual fund as opposed to complex.  So how easy is it to

 4    start a new fund and have it attract assets under

 5    management.  So, again, if I look at the first entry there,

 6    Dodge and Cox International Stock Fund, assets under

 7    management at the close of the period, $25 billion.  It's

 8    asset size percentile 99.6 means that it's bigger than

 9    99.6 percent than all the funds despite the fact that it's

10    relatively young.

11    Q     So these 20 funds that didn't exist in 1998, all 20 of

12    them are in the top 4 percent of largest funds?

13    A     That's correct.  Again, they're selected deliberately

14    to be the 20 largest that enter, so that's not a surprise;

15    but, yes, they are all very large.

16    Q     And what conclusions can you draw from the two charts

17    we just looked at in terms of the success of these new

18    entrants, in terms of assessing competition in the mutual

19    fund industry?

20    A     Entry appears to be not only possible but successful

21    over this time period.

22    Q     And what does "successful entry" mean in terms of

23    competition?

24    A     Again, gathering a share measured in this case by the

25    consumer's assets under management.
```

1302

```
1    Q     If the mutual fund market is competitive, would you

2    expect mutual fund providers to compete on the basis of

3    fees?

4    A     They would certainly compete on the basis of fees.

5    They would also compete on the basis of services or any

6    other attribute that an investor might value.  They also

7    compete, obviously, on their performance, their gross

8    return.  It's the net return an investor cares about; that's

9    both fees and performance.

10   Q     Do you believe mutual fund advisers lower fees in

11   order to compete?

12   A     Well, I have direct statistical evidence of that I've

13   presented in the paper.  Yes, I do believe that.

14   Q     And can we show Exhibit 11, please.

15         Can you blow that up a little bit.  And,

16   Dr. Hubbard, what does this chart reflect?

17         And, again, just for the record, we're still in

18   Joint Exhibit 651.

19   A     For the American Funds themselves, of course, I looked

20   directly at their own fee waivers.  More generally, I wanted

21   to get a sense of share classes that had changed expense

22   ratios.  If you look at the SIM fund data from which these

23   come, there's some noise if a change is no more than a

24   couple of basis points; so what I tried to do is say within

25   five basis points.  So you can see from the first column
```

1303

1    percentage of share classes that cut expenses in that year.

2    Likewise, in the final column, the fraction that raised

3    price.

4    Q    And how is this relevant about your opinion about

5    competition in the mutual fund industry?

6    A    Well, again, prices change with frequency.  It's not

7    that prices are simply set and left there.

8    Q    And have you seen any anecdotal evidence of mutual

9    funds competing on price?

10   A    Well, certainly one obvious example was the famous

11   Vanguard-Fidelity fee war which led, actually, Fidelity to

12   create what are now called the Spartan Class Low-cost Index

13   Funds.  That was from direct competitive pressure from

14   Vanguard.  It is what you would expect in a competitive

15   marketplace.

16   Q    And you've discussed a lot today about some changes in

17   the mutual fund industry over time?

18   A    Yes.

19   Q    Can you generally describe some of the changes to the

20   mutual fund industry since 1980.

21   A    Well, a number of changes.  First, just the scale of

22   the industry has grown dramatically.  And it's important to

23   ask, well, why did that happen.  Part of that was the large

24   entry by many funds and complexes that we've already

25   discussed.  Partly, it was reductions in transactions costs,

1304

1   the availability of lower cost investment options in mutual

2   funds, increases in information.  It's very easy today on

3   the Web for an investor to get information.  The SEC also

4   requires some information about hypothetical investments to

5   be made available.

6          And, finally, the prevalence of tax-preferred

7   arrangements that lower the tax component of any switching

8   costs have really grown dramatically over this time period.

9   So all of those together suggest a real change in the past

10  20 or 25 years in the scale and potential competitiveness of

11  the industry.

12  Q    When you refer to the prevalence of tax deferred

13  vehicles, are you talking about 401(k)s, for example?

14  A    Well, 401(k)s, but also self-directed vehicles, like

15  an IRA or Keough account.

16  Q    Can we show Exhibit 12 to Joint Exhibit 651.  Can you

17  blow up the top half of that, please.

18         And do you recognize this, Dr. Hubbard?

19  A    I do.

20  Q    And what does it reflect?

21  A    The middle column is just telling you about the scale

22  of the industry.  This is mutual fund assets.

23         The first column is retirement plan holdings that

24  are in mutual funds.  Not all funds held for retirement, but

25  the funds that are held in mutual funds.  So the final

```
 1    column is the fraction of mutual fund assets in this form.
 2              So you can see that in 1985 about an eighth of
 3    mutual fund assets represented assets in some tax-deferred
 4    vehicle.  By the end of this period -- and the fed hadn't
 5    collected the data for 2008 yet, that's why this ends in
 6    2007.  By the end of the period, you know, more than
 7    two-fifths of the assets were in the tax-deferred vehicles.
 8    Q    So retirement plan assets used to account for about
 9    12 percent of mutual fund assets in 1985, but by 2007, it
10    had grown to 42.4 percent of all mutual fund assets?
11    A    That's correct.
12    Q    And investors in these plans are not subject to
13    capital gains tax when they, for example, switch mutual
14    funds?
15    A    Remember, the capital gains tax is not really a tax on
16    capital income, it's a tax on transactions.  You have to
17    realize a capital gain to pay the tax and so it is a direct
18    switching cost.  So taking assets into a tax-deferred
19    vehicle reduces the tax component of switching cost to zero.
20    Q    And how would this increase in the amount of
21    tax-deferred mutual fund assets affect competition in the
22    mutual fund industry?
23    A    Well, it suggests that, you know, that consumers were
24    looking at these vehicles as being very attractive.  And so
25    with the clear growth in tax-deferred investing, there would
```

1306

```
 1    be an incentive for entry and product competition to lure
 2    those assets from consumers.
 3    Q     You mentioned switching costs?
 4    A     Yes.
 5    Q     What are switching costs?
 6    A     A switching cost would be how much does it cost me to
 7    leave option A and go to option B.
 8    Q     And as a result of increase in retirement plan assets
 9    have there been lower switching costs in the mutual fund
10    industry?
11    A     Yes.
12    Q     Are mutual fund fees more transparent to investors
13    today than they were in the past?
14    A     Well, they're certainly very transparent today.  The
15    information that's available for an investor includes not
16    only the expense ratio and sometimes components of the
17    expense ratios, information about loads, and typically on
18    Web sites, hypothetical -- playing out of a value of an
19    investment over time at given levels of expense.  So, yes,
20    it's quite easy to get that information from the privacy of
21    one's own computer.
22    Q     And does increased fee information affect competition?
23    A     Well, it's again one of the important characteristics
24    in a competitive market.  A buyer needs to be informed to
25    know, or at least a group of buyers needs to be informed
```

1    about what their options are.

2    Q     Can we show Joint Exhibit 651, please, the first part.

3          What does this reflect, Dr. Hubbard?

4    A     These are shares of assets under management.  Think of

5    them as market share data for the large mutual fund

6    complexes in selected years.

7          So the point is here that, first of all, these

8    aren't static.  You should think of the industry as simply

9    having firms in a fixed position.  They change a lot over

10   time.  And, second, where you see the most significant

11   growth.  If you look at the bottom there at Vanguard, and

12   you look at the American Funds -- those are the cases where

13   you see the greatest growth -- those are also the two very

14   low-fee complexes.  I then go on to do a number of analyses

15   to sort of complete that picture, but the germ of that

16   thought is in this table.

17   Q     And do you believe the ability of American Funds and

18   Vanguard to increase their share substantially is related to

19   their low fees?

20   A     My statistical evidence would suggest, yes, that that

21   is the case.

22   Q     How does changing market shares generally across the

23   whole spectrum of advisers here relate to your opinion about

24   the competitiveness of the mutual fund industry?

25   A     Well, it's an indicator of a great deal of give and

```
 1   take of advisers coming out with new products, different fee

 2   schedules, all number of things, services provided, that

 3   would try to lure the assets under management.

 4            So the fact that we see market shares changing a

 5   lot suggests there's a lot of turn in the industry.

 6   Q    If low fees attract investors, would you expect low

 7   fee funds to be large?

 8   A    Yes.

 9   Q    And did you look to see whether that was, in fact, the

10   case?

11   A    I did.  I did so in a easy to see more informal way,

12   and then in a more rigorous economic way as well.  But the

13   bottom line is the same.

14   Q    And can you show Exhibit 15 to Joint Exhibit 651,

15   please.

16            Does this reflect the, what I'll say, the

17   easy-to-see analysis you referred to?

18   A    Sure.  So what this tells you is what the

19   distributions look like by fee level.  Some are management

20   style but just to make it simple, let's just look at the

21   total line at the bottom.

22            So if your mutual fund assets and funds with

23   expense ratios in the bottom 20 percent, you're in the first

24   quintile; almost 60 percent of the assets live there.

25            Now, this is an interesting correlation.  It says
```

1   that low fee funds are larger.  You would require more

2   analysis to go to the point that low fees cause the size,

3   and that's what I do later; but in this table, you can

4   clearly see that investors are in the low fee funds.

5   Q     This is based on the number of assets; is that

6   correct?

7   A     Yes.

8   Q     So for both passive and actively managed funds, the

9   total means 88.2 percent of all mutual fund assets are in

10  funds that have the lowest 50 percent of fees in the

11  industry?

12  A     Right.  The reason you need to do more work here is

13  this isn't holding anything else constant so there could be

14  different types of funds with different fees -- all these

15  things that would need to be held constant, but the bold

16  fact jumps right off the page here.  It also jumps out of

17  the statistical analysis, but you can see it right here.

18  Q     Before we get to the statistical analysis, the bottom

19  20 percent, that means almost 60 percent or 56.6 percent of

20  all mutual fund assets are in funds with the lowest 20

21  percent of fees?

22  A     That's correct.

23  Q     And in terms of -- you said you had to control for

24  other variables and test whether, in fact, it was the case;

25  you did that; correct?

1   A      I did, yes.

2   Q      Was that the analysis you were discussing with the

3   judge?

4   A      Yes, it is because you would need to control for

5   investment category, distribution, other fund

6   characteristics to be able to make a more precise

7   description of what that table shows.

8   Q      And could you just again, generally, describe how you

9   did the analysis.

10  A      Sure, I used a --

11  Q      I'm sorry.  Doctor, before you start, the analysis you

12  did was economically to test whether, in fact, the reason

13  large funds are low fees is because investors are fee

14  sensitive; is that correct?

15  A      Yes.  I needed to do that for a couple of reasons.

16  One, to document the fee sensitivity, which would be

17  important in a competitive marketplace; and second, to get

18  at the question of whether it would be profitable for an

19  adviser, if it chose to do so, to maintain a fee level above

20  the competitive benchmark.  So I needed a number there, not

21  just an idea.  So what I did was a simple regression of the

22  assets under management on fees, and then the controls.

23            So the controls are all the things that I

24  mentioned.  There are many of them, but they fall into a few

25  simple buckets of the investment style, the distribution and

1311

1    other fund characteristics; age; and so on that have been

2    shown to affect assets under management.

3            When you do that, you find that there's a strong

4    partial effect of fees on assets under management, and it is

5    negative.  So high fees, all else equal -- the regression

6    tells you what the "all else is" -- high fees would reduce

7    assets under management.  I know that that isn't just an

8    economies of scale story because I use a statistical

9    technique called "instrumental variables" to sort out the

10   pure fee component.

11           THE COURT:  Excuse me.  One thing -- I want to

12   make absolutely certain, that when we're talking about low

13   fees now, we're talking about as a percentage of assets

14   under management; right?

15           THE WITNESS:  Yes, the expense ratio.

16           THE COURT:  The ratio?

17           THE WITNESS:  Yes.

18   BY MR. MURPHY:

19   Q     In terms of the ratio, would an investor care about --

20   is that what they focus on in your experience?

21   A     Well, an investor cares about net return.  And so what

22   is a net return?  It's gross returns that happen in a

23   particular style or possible skill of the adviser and then

24   it's subtracting out the costs of the investment vehicle.

25   So they care about both.

1312

1    Q      And can you show Exhibit 17 to Joint Exhibit 651.

2           Does this reflect the results of your fee

3    sensitivity analysis?

4    A      Yes, it does.  So the part to discuss here is really

5    the first row where it says "Coefficient on Expense Ratio."

6    This is done in logs.  So you think of this as an elasticity

7    effects a percentage changes.  So a 1 percent increase in

8    the expense ratio, all else equal, would reduce assets under

9    management by about 2.6 percent.

10   Q      So if you -- I'm sorry.  If you increased fees by what

11   percent?  1 percent?

12   A      This is an elasticity, so 1 percent increase would be

13   2.58 times that, with a negative sign, in terms of the

14   effect on assets under management; so 2.6 percent decline in

15   assets under management.

16   Q      Meaning, if you increase your fee, it will lower your

17   assets as investors leave?

18   A      Yes.  Investors leaving would reduce assets under

19   management and obviously reduce revenue to the adviser.

20   Q      And based on that ratio you just described, 1 to

21   negative to 2.58, can you conclude whether it would be

22   profitable to increase prices above a competitive level?

23   A      It would not be profitable because the response is

24   relatively quick.  These are annual data.  So this is

25   telling you about a fairly quick response of investors to

1313

1   changes in price.  It would not be profitable to do that.

2   Q    And when you say "it's a response," the response is

3   investors leaving the fund?

4   A    Right.  The mechanics of how this works is I observe

5   that a fee is high on this fund relative to other funds that

6   I'm looking at for my investments.  I say that fee is higher

7   than my next best alternatives.  I'll just switch from this

8   one to another fund or to some other investment.  That's the

9   mechanics of how this would happen.

10        THE COURT:  Does your analysis distinguish between

11   new investors and existing investors?

12        In other words, do we know whether or not the

13   change in the expense ratio is deterring -- merely deterring

14   new investment or is it encouraging those who are already in

15   the fund to leave?

16        THE WITNESS:  It isn't possible to break those two

17   a part in these data, Your Honor.

18   BY MR. MURPHY:

19   Q    In terms of competition, does it matter that some

20   investors don't care about fees?

21   A    Absolutely.  It's not the requirement in a competitive

22   market that everybody be fee sensitive.  If I were to go buy

23   a tube of Crest toothpaste somewhere in Los Angeles, if I

24   walk into a Walgreens, I may or may not know what the

25   appropriate price for Crest is; but there are people who are

1    better shoppers than I am, perhaps, who do that.

2            In the case of this business, all that's required

3    is that the marginal investors are fee sensitive.

4    Q    Meaning, if there's enough investors that care about

5    fees, it can discipline pricing even if not everyone does?

6    A    Correct.  As with any competitive market, many of us,

7    frankly, free ride on the shopping of people who are fee

8    sensitive.

9    Q    And based on all the analyses we've gone through today

10   and some additional analyses in your expert report, what do

11   you conclude about competition in the mutual fund industry

12   today?

13   A    I conclude that today the industry has all of the

14   characteristics of a vigorously competitive marketplace and

15   that the estimated fee sensitivities for consumers would

16   suggest that in this type of a competitive marketplace,

17   market discipline would be harsh.

18   Q    And do you believe market forces help protect fund

19   investors with respect to the level of fees?

20   A    There's certainly a very important component of

21   protection for investors as they are with any competitive

22   market.

23   Q    And if the mutual fund market is competitive, can

24   there ever be a violation of 36(b)?

25   A    Well, I'm not an attorney.  What I could say is it is

```
 1    possible in a competitive market that you could still
 2    observe a fee that is excessive.  And what would happen in a
 3    competitive market is a combination of market discipline
 4    would punish that adviser, combined with the activities of
 5    an independent board; and, finally, the third leg being
 6    36(b) itself as a right of action.  So, yes, it's possible.
 7    Q    And I want to switch topics, Dr. Hubbard, to economies
 8    of scale.
 9              THE COURT:  Before you do that, I have one other
10    question.
11              When you talk about the free-rider effect, where
12    the many can coattail the few who are good shoppers, it's
13    got to be more than one person; right?  You've got a large
14    market.
15              What is the critical mass?  Is there any analysis,
16    any empirical data as to how many shoppers for mutual funds
17    would have to be fee sensitive before the complexes would be
18    responsive?
19              THE WITNESS:  Well, there's no hard and fast rule,
20    Your Honor.  You can tell from the estimates that are there
21    that there's quite a response in this industry; so somebody
22    is pretty quickly moving money when fees go up.  There's no
23    hard and fast rule, but the estimated fee sensitivity here
24    suggests the presence of a very substantial number of
25    shoppers.
```

```
 1   BY MR. MURPHY:
 2   Q     Just so I'm clear, meaning, you don't know exactly how
 3   many, but if you can test to whether there is enough to
 4   discipline super-competitive pricing?
 5   A     Correct.
 6   Q     Switching to economies of scale.
 7         What are economies of scale?
 8   A     Economies of scale occur when the long-run average
 9   cost of producing something falls with the level of
10   production, holding constant everything else.
11   Q     And how is scale measured in the mutual fund industry,
12   in your opinion?
13   A     The most logical measure of scale would be assets
14   under management.  You could also look at number of
15   accounts, I suppose.
16   Q     And which costs do you look at when you're assessing
17   whether or not economies of scale exist?
18   A     Well, the theory is pretty clear on this.  It's the
19   statement about the long-run average cost.  It's the total
20   cost.  Some simple intuition tell you why that is.
21         I mean, suppose we were looking at the production
22   of say milk, where we both have to produce milk and
23   distribute it.  There may be very large economies of scale
24   at the level of the factory, the production of milk, but if
25   we had only one large milk factory in the United States,
```

1317

```
 1   distribution would be pretty costly.  So there's a reason we
 2   don't.  So you have to look at the entire cost structure,
 3   not just the cost of an individual element.
 4   Q     So there can be economies of scale on one component
 5   and diseconomies on another component of total costs?
 6   A     That would be frequent in the case where you have both
 7   production and distribution involved in the delivery of a
 8   good.
 9   Q     And do the economic textbooks generally focus on total
10   costs as the proper measure of economies of scale?
11   A     They always do, yes.
12   Q     Are economies of scale difficult to measure in the
13   mutual fund industry?
14   A     It's worth spending a second on why they're difficult
15   to measure anywhere.  Go back to the definition.  People
16   often say, well, following a long-run average cost when
17   output goes up; but if you finish the definition, it says
18   "holding everything else constant."  So there's several
19   complications here.  One is the measurement of cost.  Cost
20   data aren't always easily available to researchers, and then
21   one would have to hold constant other things that could be
22   shifting.  So, for example, changes in technology over time
23   might be affecting cost.  Investor preferences for different
24   types of funds with different costs of producing them may be
25   shifting the cost curve.  You have to control for all of
```

1   those things.

2   Q     There's a wide range of factors that can make an

3   adviser's costs go up or down that have nothing to do with

4   economies of scale?

5   A     Sure.  I mean, economies of scale would just mean

6   changing the level of output.  In this case, the level of

7   assets under management, but again, shifts in technology,

8   investor preferences could be moving the cost curve as well.

9   Q     In a competitive marketplace, if there were

10  substantial economies of scale in the fund industry, would

11  smaller mutual fund competitors be able to effectively

12  compete?

13  A     Well, there's a couple of things to note about a

14  competitive marketplace here.  One is the economies of scale

15  to which you referred would be shared, that's part of the

16  process of competition; but also if economies of scale were

17  the big story, let's say that they're close to inexhaustible

18  or a principal driver, you'd expect this to be a very

19  concentrated industry.  It's not.  And, indeed, I show in

20  the report that it's possible to persist as a small or

21  medium-size fund or complex for many, many years.  So that's

22  inconsistent with the notion of economies of scale being the

23  principal determinant of size.

24  Q     And you mentioned at the outset today that you did

25  some analysis of the sharing of economies of scale by the

1319

```
1   defendants in this case; is that correct?

2   A     I did.

3   Q     And what did you find?

4   A     I found that a number of vehicles were there for

5   sharing, and I quantified many of these.  One, of course, is

6   the very low levels of fees themselves.

7             Second would be fee waivers and breakpoints.

8   Third, the sharing that's built into the structure of AFS.

9   Since it doesn't retain profits, it must past them on; and

10  then, finally, the provision of additional services to

11  investors.  All of those are ways to share economies of

12  scale.

13  Q     And the first one you mentioned was just having

14  generally low fees.

15            Can an adviser share economies of scale just by

16  having low fees even if it has no breakpoints, no fee

17  reductions, and no fee waivers?

18  A     Oh, sure.  Let me give you a simple example.  An

19  investment vehicle that had a low fee for all time that

20  didn't change, no breakpoints, or one that had a higher mean

21  fee but sloped down with breakpoints.  Obviously, you'd

22  prefer the one with the low fee all the time; that's where

23  you're going to get the greatest return.  So that's one way

24  of sharing.

25  Q     So if there was an adviser that had a breakpoint
```

1    schedule that started at 100 basis points and went down to

2    50, would he be sharing less economies of scale potentially

3    than just an adviser that had a flat fee of 40 basis points?

4    A     There would be no way that you could know that until

5    you've actually looked at the cost.

6    Q     And you mentioned additional service.  Can an adviser

7    share economies of scale by enhancing shareholder services

8    or other services provided to a mutual fund?

9    A     Sure.  From an economic perspective, what sharing

10   economies of scale means is improving the bundle the

11   consumer gets.  That could be a lower price, or it could be

12   a richer product.  For example, in this case, technology

13   investments, the provision of financial planning tools

14   online and things like that could be an investment for the

15   ultimate consumer.

16   Q     And you mentioned you quantified to some of the

17   sharing in this case?

18   A     Yes, I did.

19   Q     And what aspect of the different types of sharing did

20   you quantify?

21   A     Well, I quantified the sharing from the breakpoints

22   and shifts down in the fee schedule.  There's also some data

23   in this proceeding quantifying the savings from fee waivers

24   as well.  I did not attempt a separate quantification of the

25   sharing from the low fees because these fees were, you know,

1    among the very lowest in the industry.  You could compare

2    them to a benchmark and do that, but that would be gilding

3    the lily.

4    Q    But do you believe that the defendants were sharing by

5    virtue of just having really low fees?

6    A    That is certainly an acceptable way of sharing

7    economies of scale from an economic perspective.

8    Q    Can we call up Defendants' Exhibit 2231, please.  And

9    blow up the top half of that, please.

10        What does this chart reflect, Dr. Hubbard?

11   A    This reflects one of the calculations that we were

12   just discussing.  So in this case, it's -- the first row are

13   savings from breakpoints and fee schedule changes for the

14   eight funds at issue.  So over the period from 2003 to 2008,

15   just looking at the changes in the schedule and breakpoints

16   would lead to cumulative savings for the investor just shy

17   of $800 million.

18        In addition, the fee waivers generated another

19   500ish millions of dollars.  These two elements, which total

20   about $1.3 billion over the period, are in addition to

21   anything that might have occurred from simply having very

22   low fees or providing extra services.

23   Q    And I just want to shift again to Dr. O'Neal's report.

24   I believe you said you reviewed it and drew some conclusions

25   about his analyses.

1322

```
 1   A     Yes.

 2   Q     Can you summarize the opinions you reached regarding

 3   Dr. O'Neal's analyses.

 4   A     Well, first of all, the analysis was incorrect.  Going

 5   back to your original question about what is economies of

 6   scale, Dr. O'Neal doesn't attempt an analysis of economies

 7   of scale.

 8         A simple example will probably make the point

 9   better than economics.  Let's suppose I have a lemonade

10   stand, and I sell lemonade for $1 a glass.  And it costs me

11   75 cents to produce lemonade.  And so I sell 100 today.  So

12   my profit is 25.  $100 less 75.

13         Now, let's suppose I double, but I don't change my

14   average cost.  It's still 75 cents.  Now, we know there are

15   no economies of scale there.  I set up the example.  Under

16   Dr. O'Neal's methodology, there are economies of scale

17   because the new level of profits, one of his components, has

18   gone up.  So this is just a simple way of saying this is

19   incorrect.  The being incorrect isn't just at the big level

20   about misunderstanding what economies of scale are.  Even at

21   the level of execution there are problems.  Profit sharing,

22   which was part of compensation for some of the professionals

23   was arbitrarily declassified in his analysis as not

24   compensation.  That would not be appropriate either.  He's

25   only looking at components of cost.  And, again, theory
```

1323

1   tells you you're looking at the total cost.  But I would

2   note that whatever one's criticisms are from an economic

3   perspective of what Dr. O'Neal did, even his own numbers

4   would suggest the sharing of almost half of his purported

5   economies of scale.

6   Q      In terms of the lemonade stand example, in that

7   example the cost didn't change, the per unit cost of

8   producing lemonade didn't change?

9   A      I fixed it by definition.  It's 75 cents.  There can't

10   be economies of scale.  Yet the way he would measure it,

11   there would have been.

12   Q      Because you'd show an increase in profits?

13   A      I'd show an increase in profits.

14   Q      Just by virtue of producing more units?

15   A      Right.  Instead of selling 100 glasses of lemonade,

16   I'd sell 200.  My profits double, but that's not a measure

17   of economies of scale.

18   Q      So based on that, do you believe Dr. O'Neal's analysis

19   show economies of scale at all or address that issue?

20   A      I don't believe they address the issue of economies of

21   scale.  I believe they're flawed, but to the extent that one

22   accepts them as he purports, they show very substantial

23   sharing, albeit, of an incorrect concept.

24   Q      And you mentioned Dr. O'Neal did an analysis of

25   economies of scale at less than the total cost level?

1324

1    A     Yes.

2    Q     Is that because he excluded AFD and AFS?

3    A     That's correct.

4    Q     And based on our discussion earlier, do you believe to

5    properly assess economies of scale, you should look at the

6    total costs, including AFS and AFD?

7    A     Absolutely.  Consumers here are buying a fund called a

8    mutual fund that has to come through a particular

9    distribution channel; so you want to look at the cost of

10   producing that.  And, of course, by construction, AFS has

11   complete sharing of economies of scale; so his omission

12   there is rather critical.

13   Q     You mentioned Dr. O'Neal's treatment of profit sharing

14   in his economies of scale analysis?

15   A     Yes.

16   Q     And you mentioned you disagree with that?

17   A     I do.

18   Q     And why do you disagree with it?

19   A     Well, from a matter of economics, what counts is what

20   it takes to retain talent in terms of compensation.  Whether

21   I pay an individual by means of a wage, a bonus, or a profit

22   share is irrelevant, as long as I'm paying that individual

23   all in whatever his or her competitive salary is.  I saw

24   nothing in this case, in the record, to suggest that these

25   payments were anything other than that.

1  Q     And did you review Dr. O'Neal's supplemental expert

2  report in this case?

3  A     I did.

4  Q     And are you aware what his supplemental report says

5  about economies of scale?

6  A     Well, he does revise upward many of his numbers, but

7  the flaws are really still there.  I mean, there's more

8  sharing in the supplemental report, but the flaws are still

9  there.

10  Q     And are you aware that Dr. O'Neal says that CRMC took

11  back certain economies of scale by increasing administrative

12  service fees?

13  A     I'm aware that he says that, but it's false.

14  Q     Is it possible for CRMC to have taken back shared

15  economies of scale if the rate of administrative service

16  fees was decreasing?

17  A     Absolutely not.  The rate of administrative service

18  fees was constant or falling for all of the funds at issue

19  here.  What he may be trying to pick up are shifts in the

20  composition of holdings across share classes, but that has

21  nothing to do with so-called taking back.  It's a pretty

22  elementary error.

23  Q     If administrative service fees rates were going down,

24  would that add to the amount of sharing with the funds at

25  issue in this case?

1    A      Of course.

2    Q      Switch topics for the last time.

3           12b-1.  Do you have an understanding of what Rule

4    12b-1 fees are used for with respect to American Funds?

5    A      Well, I'm not an attorney, but my laymen's

6    understanding of 12b-1 would be for servicing and

7    distribution.

8    Q      And you mentioned some opinions you reached with

9    respect to Dr. O'Neal's analysis of Rule 12b-1 fees?

10   A      Yes.

11   Q      What are those opinions?

12   A      Well, first one has to consider the cost of

13   distributing a product and so the payment of 12b-1 fees are

14   one ways in which consumers pay for the ultimate product;

15   whether they're paying, quote, "too much" or, quote, "too

16   little" requires an analysis first and foremost of the total

17   cost -- we've already had that discussion.  But I also

18   looked at 12b-1 fees compared to peers.  We talked about

19   that in a demonstrative a few minutes ago.

20           So there's no evidence in the record of a 12b-1

21   fee for any of the American Funds at issue that would be out

22   of line with a competitive benchmark.

23   Q      And based on the mutual fund market as you've studied

24   it, what would be the importance of a Rule 12b-1 fee for a

25   broker-sold fund complex like the American Funds?

1327

1   A      Well, as I pointed out in the report, different

2   advisers market in different ways.  Some advisers have their

3   own captive sales forces, others use principally a direct

4   channel.  That is not what the American Funds has done.

5   They have historically and quite successfully obviously sold

6   through brokers and financial advisers in order to

7   compensate advisers for the costs in that distribution and

8   for servicing the records of individual shareholders.

9   Obviously, payments have to be made.  You can call them

10  12b-1 fees, you can call them something else, but investors

11  would have to pay for that.

12  Q      Do you believe there's a competitive rate for Rule

13  12b-1 fees?

14  A      There's certainly a competitive rate in the sense that

15  if advisers were to again have outside total costs, they

16  would face market discipline.  And, again, I looked at even

17  narrowly 12b-1 fees, they're in a pretty tight range.

18  Q      And what do you believe would happen if the

19  American Funds stopped paying 12b-1 fees?

20  A      Well, you can't just not pay for a service.  That

21  service just simply wouldn't be provided.

22          MR. MURPHY:  I have no further questions,

23  Your Honor.

24          THE COURT:  All right.  Cross-examine.

25                  *CROSS-EXAMINATION*

1328

1    BY MR. ACOCELLI:

2    Q      Good morning, Dr. Hubbard.

3    A      Good morning.

4    Q      Dr. Hubbard, in your expert report, you refer to an

5    article you co-wrote with John Coates.  It's entitled,

6    "Competition in the Mutual Fund industry:  Evidence and

7    Implications in Policy."

8           Do you recall that article?

9    A      Yes, I do.

10   Q      Can we bring up 124, please.

11          You'll understand if I refer to this as the

12   Coates-Hubbard article?

13   A      Yes.

14   Q      And do you recognize Exhibit 124?

15   A      Yes.

16   Q      And is this, in fact, the Coates-Hubbard article?

17   A      It certainly appears to be.

18   Q      And it was published in 2006; correct?

19   A      In the "Journal of Corporation Law," yes.

20   Q      And this article -- as you note "Journal of

21   Corporation Law."

22          And being that this article is published in a law

23   journal, would you consider it to be peer reviewed by an

24   economist?

25   A      It's peer reviewed by lawyers.  That's what happens in

1   law reviews.

2   Q     And are the views and opinions expressed in the

3   Coates-Hubbard article consistent with those expressed in

4   your expert report?

5   A     Yes, they are.

6   Q     And are there opinions expressed in the Coates-Hubbard

7   article that are not consistent with the opinions expressed

8   in your expert report?

9   A     Not to my knowledge, no.

10  Q     Were you paid to write the Coates-Hubbard article,

11  Dr. Hubbard?

12  A     I did receive a honorarium.  To do a project like this

13  is very expensive because of the enormous data costs.

14  Q     And do you recall how much you were paid?

15  A     I really don't.  I'm sorry.  It was fairly modest.

16  Q     If we could pull up Bates 549, please.

17        If you'll turn your attention to the footer --

18  actually, it's up there on the first page.  The footer notes

19  that the investment institute -- Investment Company

20  Institute supported Analysis Group's work.

21        Do you see that reference?  It starts on the

22  fourth line from the bottom and continues to the next line.

23  A     Yes, I see that.

24  Q     First of all, is Analysis Group a consulting firm that

25  is in the business of both providing litigation support to

```
 1    experts like yourself, as well as locating and retaining
 2    experts on behalf of their clients?
 3    A     That would certainly be a major business for the firm,
 4    yes.
 5    Q     And the Investment Company Institute is the national
 6    association for investment companies like CRMC; is that
 7    correct?
 8    A     Yes, that's true.
 9    Q     The Investment Company Institute is commonly known as
10    ICI?
11    A     That's correct.
12    Q     And do they support an Analysis Group's work by
13    providing financial support?
14    A     I'm really not aware what the ICI does with its money
15    one way or the other.
16    Q     Well, if you'll note, in the footer, in the third line
17    from the bottom, it notes:  That ICI and the John M. Olin
18    Center for Law, Economics, and Business at Harvard Law
19    School provided financial assistance.
20    A     Yes.
21    Q     Were you paid by ICI Mutual in connection with your
22    preparation of this article?
23    A     They were a source of an honorarium, yes.  The bulk of
24    the money ICI Mutual and the Olin Center paid was for the
25    acquisition of the data that was used.  Probably around
```

1    $200,000.

2    Q      Is ICI Mutual the insurance arm of the Investment

3    Company Institute, to your knowledge?

4    A      That's my understanding, roughly, yes.

5    Q      And the ICI Mutual is a predominant provider of D&O

6    liability insurance to the U.S. mutual fund industry; do you

7    know that to be true?

8    A      I don't know that to be true, but I wouldn't be

9    surprised.

10   Q      Was Paul Haaga the senior -- who is the senior

11   executive at CRMC -- are you familiar with Mr. Haaga?

12   A      I am

13   Q      Was he the chairman of the ICI in 2002 and 2003?

14   A      I really don't know one way or the other.

15   Q      Turning to your Coates-Hubbard article for a moment,

16   do you agree that the central recommendations -- one of the

17   central recommendations of the Coates-Hubbard article is

18   that in evaluating 36(b) cases, courts should be open to

19   evidence about price competition in a given sector of the

20   mutual fund industry?

21   A      Yes, John and I do say that.

22   Q      And that's on or about Page 59?

23   A      You have a better memory than I have for the article

24   if you know that.  But it's certainly my view, yes.

25   Q      Now, between 2006 and the present, you've been

1   retained as an expert in at least four mutual fund cases

2   against mutual fund investment advisers; is that correct?

3   A    Yes, that's correct.

4   Q    And they were brought under 36(b)?

5   A    Yes.

6   Q    Do you remember those as the case involving Fidelity,

7   Franklin, and American Century, as well as this case?

8   A    Yes.

9   Q    And I assume that you're aware that Milbank, Milbank

10  Tweed, the firm Milbank Tweed is representing CRMC in this

11  case; is that correct?

12  A    Yes.

13  Q    And did they also represent any of the defendants in

14  any of those cases I just mentioned, to your knowledge?

15  A    Yes, they do.

16  Q    Would that be Fidelity and American Century out of

17  those cases?

18  A    Yes, there are other counsel as well, but I do believe

19  Milbank is involved as well.

20  Q    By the way, if we can just bring up 124 again.  The

21  first footnote.  I just wanted to ask you if the Sean Murphy

22  mentioned in this footnote is the Sean Murphy who just

23  conducted your direct examination?

24  A    Yes, it is.

25  Q    Let's turn to the substance of your expert report for

1333

1    a moment.

2    A      Okay.

3    Q      Could you bring up 651, please.  In paragraphs 34 to

4    42 of your expert report, you constructed a peer group and

5    compared the analysis of the expense ratios charged by CRMC

6    to those of your peer group?

7    A      Yes.

8    Q      I believe you discussed that with Mr. Murphy just a

9    moment ago?

10   A      Yes.

11   Q      And you concluded that the expense ratios charged by

12   CRMC compare favorably to the industry norm; is that

13   correct?

14   A      That's correct.

15   Q      If we can look at paragraph 42, please.

16          In paragraph 42, the last two lines of your expert

17   report, you write:  "Thus, the funds' expense ratios could

18   not be considered excessive unless the expense ratios of

19   mutual funds offered by most other mutual fund complexes

20   were even more excessive.  By themselves, these comparisons

21   of the funds' expense ratios to the industry norm imply that

22   there is no economic basis for considering the expense

23   ratios of the funds to be excessive."

24          You wrote that in your report, did you not?

25   A      Yes.

1334

1  Q    First, let me ask you a question about economic

2  excessiveness.

3         Is economic excessiveness the same as

4  excessiveness under 36(b)?

5  A    I'm not an attorney, sir.  I can't help you there.  I

6  can describe the economics.

7  Q    I understand that.  I'm just wondering if you're using

8  the term synonymously with excessiveness under 36(b).

9  A    My understanding as a non attorney is that 36(b) is

10  rather vague as to what excessive means.  There is a precise

11  economic definition, but I can't speak to the law.

12  Q    I'm not asking you for a legal opinion.  I just did

13  want to ask you or note that a good portion of your

14  Coates-Hubbard article deals with 36(b), Gartenberg's

15  framework and certain refinements that you might be

16  interested in in the Gartenberg 36(b) framework; is that

17  correct?

18  A    I don't think it would be fair to characterize that

19  John or I were trying to rewrite the Gartenberg decision.

20  Merely pointing out the fact of competition as being

21  important.

22  Q    Whatever your view is fine, but it did involve an

23  extensive discussion of Gartenberg and 36(b); is that

24  correct?

25  A    Yes, because that had been the principal case.

1   Q      So you don't know whether economically excessive means

2   excessive under 36(b)?

3   A      I'm not an attorney.

4   Q      Let me ask you this, then:  In considering whether or

5   not an adviser is charging an excessive fee, an economically

6   excessive fee, if you determine that the expense ratios

7   compare favorably to those charges by other advisers, you

8   stop the analysis right there?  Is that the end?

9   A      The end of deciding whether a fee is excessive?

10  Q      Right.  Consider whether there --

11  A      Well, it takes an enormous amount of analysis to get

12  to that point, but certainly if I saw that it was similar to

13  the peers, and I was persuaded that I hadn't made any

14  mistake in the construction of those peers, there were no

15  other offsetting factors, then, yes, I could reasonably

16  conclude that the fee was not excessive from an economic

17  standpoint.

18  Q      So your answer is "yes" to my question?

19  A      My answer is the answer that I just gave.

20          THE COURT:  Which I construe as "yes," counsel.

21          MR. ACOCELLI:  Thank you.

22  BY MR. ACOCELLI:

23  Q      So under such circumstances, when you find that the

24  expense ratios of the adviser in question compare favorably

25  to those of their peers and considering economic

```
 1   excessiveness, would you need, then, to continue on and do,

 2   for instance, an economy of scale analysis?

 3   A    You would certainly need to do an economy of scale

 4   analysis if you're interested in the topic of measuring the

 5   economies of scale that were realized and whether they'd

 6   been shared.

 7   Q    But it wouldn't be necessary to determine economic

 8   excessiveness?

 9   A    It is certainly part of it, of course.

10   Q    But would it be necessary to determine whether it was

11   economically excessive?

12   A    No.

13   Q    Would you be required to do a separate analysis of the

14   adviser profitability as it compares to expenses?

15   A    That would certainly be a factor you would be looking

16   at in trying to determine excessiveness.

17   Q    Would you need to, though?

18   A    It would certainly be a factor you would look at.

19   Q    But would you need to?

20   A    I'm not sure.  Need to for what?

21   Q    Well, in the situation where -- to determine economic

22   excessiveness, when the expense ratio compares favorably to

23   those of a peer group.

24   A    Well, the economic excessiveness question refers to

25   the fee or the total costs being charged.  You might have an
```

```
 1    adviser that is profitable by having lower costs, but that
 2    in and of itself doesn't mean the fee is excessive.
 3    Q    I believe we just discussed with Mr. Murphy the
 4    possibility of violating 36(b) given what you consider the
 5    market protections of a competitive market.
 6              Do you recall that discussion?
 7    A    Yes.
 8    Q    And you mentioned that is theoretically possible to
 9    violate 36(b)?
10    A    Of course.
11    Q    Is it true, then, that 36, in your view, only protects
12    against one-time grabs of large amounts of fees by an
13    adviser?
14    A    36(b), as I think about it as an economist is one of
15    three legs of a stool:  Market, discipline, and the
16    activities of independent directors is one of the legs of
17    the stool.
18    Q    I do recall that testimony this morning with
19    Mr. Murphy.
20              Could you bring up -- Dr. Hubbard, we're just
21    going to take a look at the Coates-Hubbard article.
22    A    Okay.
23    Q    Bates 607.  It's Page 59 of your article.
24              And if you'll zoom in on the second full paragraph
25    under "Refinements to Gartenberg."  And if you look at the
```

1338

1     sentence that begins:  "The existing standard."  It's the

2     second sentence.

3     A     Yes, I see that.

4     Q     You see that.

5          And you have written with John Coates:  "The

6     existing standard announced in Gartenberg strikes an

7     appropriate balance between preventing the only plausible

8     means by which advisers could negate the effects of the

9     competitive market for fund investors through one-time grabs

10     of large amounts of fees," and it continues from there?

11     A     Yes.

12     Q     So I was asking you if that's -- if this one time grab

13     for fees that you refer to in this paragraph from your

14     Coates-Hubbard article is the only way that an investor can

15     violate 36(b).

16     A     It's not what this sentence says.  It says:  In a

17     competitive market, the only option beyond market discipline

18     to punish you would be some private right of action if you

19     suddenly made a grab is all that's saying.  So, again, it's

20     one leg of the stool is how I read it.

21     Q     Let's take a look at some of the other parts of your

22     report.

23          In your expert report, you often employ the term

24     "in the long-term" or "in the long run" in discussing your

25     competitive theory.

1    　　　　　Do you recall that?

2    A    Yes.

3    Q    Let's take a look at the expert report, paragraph 6C.

4    　　　　　For example, paragraph 6C says:  "The

5    competitiveness in the market in which mutual funds are sold

6    and the sensitivity of mutual fund demand to fees prevent

7    mutual fund advisers from sustaining economically excessive

8    fees over the long run."  And there's similar paragraphs --

9    A    Yes.

10   Q    Now, have you quantified how much the long-term or the

11   long run is as you use it here and in other parts of your

12   report?

13   A    Well, the best thing that one could say statistically

14   is, to go back to the judge's question earlier about a fee

15   sensitivity.  The fact that I estimate very large departures

16   if fees were to be raised means the long run doesn't take

17   that long.  I've argued in the report, and certainly the

18   Coates-Hubbard paper, that you need other protections too

19   because the long run isn't tomorrow it's a period of time.

20   And that's the independent board and 36(b).

21   Q    I'm not sure you answered my question.  Thank you for

22   your response.

23   　　　　　Can you quantify an exact period of time or is

24   that not possible?

25   A    Well, there is no unique definition of a long run.

1    What you can quantify, and I did quantify, was the outflows

2    that would happen if fees were elevated.

3              THE COURT:  Would it mean the same thing if this

4    sentence read:  "Economically excessive fees over time"?

5              THE WITNESS:  Yes.

6              THE COURT:  I mean, what you're talking about is

7    some period of time, not necessarily quantifiable but

8    working out over some -- long enough so that the effect of

9    the action could be -- generate a response in the

10   marketplace?

11             THE WITNESS:  Absolutely.  That's a very helpful

12   distinction because if, let's say, fees were raised

13   10 percent today, you couldn't infer from my estimate that

14   tomorrow only those investors would have left; it would have

15   taken time.  So, yes, it's a good distinction.

16   BY MR. ACOCELLI:

17   Q    How long would you expect it to take in the face of

18   excessive fees to start to see fund flows out of an

19   adviser's fund who's charging excessive fees?

20   A    Well, if you look at the estimates that I provided in

21   the report, even a 1 percent increase over a benchmark level

22   would lead to 2.6 percent of the assets under management

23   leaving.

24   Q    How long would you begin to see those fund flows?

25   A    Those are annual data, over a period of a year.

1341

Q      You would begin to see fund flows within a year?

A      That's what the data suggests.

Q      Are you saying your use of the term "long run" is
basically one year or less?

A      You've asked the question before, I'll try to answer
it again.  I think the judge's distinction is a helpful one.
You're really trying to just look at a period of time.  It
can't be a day, it's not ten years.  My empirical evidence
suggests that even within a year, you get a very substantial
response.

Q      And you might recall, you used the term "long run" and
"long term" in your Coates-Hubbard article as well; is that
correct?

A      Yes.

Q      Would your response concerning my question concerning
the use of the term "long run" and "long term" in your
expert report apply to the Coates-Hubbard article as well?

A      You would need to show me the sections, but my guess
is yes.

Q      We'll take a look at the section.  If you can bring up
124, Bates 555.  That will be Page 7 of the report.

         If you'll look at what we have on the screen,
which is Page 7, starting with the highlighted:  "Under
competition, the desire to maximize profits forces firms to
minimize costs in order to survive in the long term.  Under

1   competition, the initial desire of a seller to increase

2   prices as high as possible is constrained by the presence of

3   other sellers who will undercut excessive prices."

4           So, in that context, is the long term consistent

5   with your prior response?

6   A      Yes.

7   Q      Actually, let's take a look at Page 26 of the

8   Coates-Hubbard report.  That's Bates 574.  And here you make

9   another reference to long term:  "Even in the short term,

10  substantial shifts in shares occur as competition on

11  performance leads investors to shift among funds and fund

12  complexes.  Examples from Table 7 for the period 2000 to

13  2004 include American Fund shares increasing from

14  8.5 percent to 14.1, and Dodge and Cox's share rising from

15  .3 to 1.6 percent.  The substantial share changes from 1990

16  to 2000 include Janus's shares rising from .6 to 4.5 percent

17  and Putnam's fund share rising from 2.8 to 5.4 percent.

18          Now, is that a different -- do you have a

19  different definition of what the long term is in that

20  paragraph?

21  A      From an economic perspective, I have the same

22  definition.  I think I'm using short term more in the plain

23  English of the word here.  When economists say "the long

24  run," it's just a fancy way of saying an equilibrium.

25  Q      In your expert report in paragraph 61, you use the

1   term "long run" and that's in response to Dr. O'Neal's

2   economy of scale analysis.

3            Paragraph 141, please:  "The economies of scale

4   pertain to long-run costs.  Dr. O'Neal has done no analysis

5   of how size affects long-run costs nor has he attempted to

6   control for how changes in technology or changes in input

7   costs have affected the costs of CRMC."

8            Again, is this a different definition of "long

9   run" here?

10  A     No.

11  Q     So can you define "long term" or "long run"

12  differently in different contexts?

13  A     What "long run" means is when you achieve equilibrium,

14  that's going to differ across industries.  All I can say

15  here statistically, which is what I did, is that the flows

16  are very pronounced even over the period of one year.

17  Q     So if you start to see the flows within a year, isn't

18  it true that excessive fees could still be generated within

19  that year?

20  A     I've already said that that's possible, which is why

21  you have the other two legs of the stool.

22  Q     Just wondering, in considering the performance of a

23  mutual fund, do you consider one year results to be long

24  term or short term?

25  A     I would not consider one year to be the longest term

1344

```
1    over which I would look at the performance of a fund.
2    Q    And you often talk about investors or reasonable
3    investors in your report.
4         Do you believe that reasonable investors evaluate
5    mutual funds for performance over the long term?
6    A    I think they try to do that.  Unfortunately, past
7    isn't prologue but, yes, they try to do that.
8    Q    And do you believe that a reasonable investor
9    considers the long term to be one year or less?
10   A    I think you're using the term "long term" in a
11   different context than your previous questions.  The
12   question is what's the horizon for evaluating performance.
13   That's probably several years.
14   Q    I'd like to talk about some other parts of your
15   report -- well, first of all, do you agree, Dr. Hubbard,
16   that competition between advisers for mutual fund business
17   does not exist?
18   A    I'm sorry.  I don't quite understand the question.
19   Q    Your report deals basically with the competition
20   between mutual fund advisers for investors.  Now, I'm
21   talking about competition between mutual fund advisers for
22   funds, fund business.
23   A    But certainly the legal entity, the contract between
24   the fund and the adviser is unique to that adviser.  None of
25   that negates the vigorous process of competition among
```

1    advisers for the actual customers.  That's what competition

2    is about.

3    Q    Again, that's in the context of the adviser for the

4    investor business?

5    A    But that's the problem.  That's the whole issue we're

6    trying to explain here.  It's the ultimate investor that is

7    the market.

8    Q    Let me ask this a different way:  Do mutual funds --

9    do fund boards ever fire their advisers?

10   A    I believe it's incredibly rare.

11   Q    So you can see that that's not in dispute, that they

12   rarely, if ever, fire their advisers?

13   A    I wouldn't dispute that, no.  It has little to do with

14   the process of competition, but I wouldn't dispute the fact.

15   Q    That was the point of my question.  You're looking at

16   competition between investors and the adviser and there's a

17   difference between competition between an adviser for fund

18   business.

19   A    But that would not be relevant to the matter at hand.

20   Q    As we heard this morning, perhaps, one of the most

21   critical factors in your competition theory is that

22   investors are fee sensitive and will gravitate toward a

23   mutual fund offering that offers the best price and service;

24   is that correct?

25   A    Yes, all else equal.

1346

1    Q      And would you agree that investors, as well as

2    advisers, are profit maximizers; what you refer to as profit

3    maximizers, meaning that the former investors will try to

4    pay as little as possible for maximum returns and the latter

5    will try to charge as much as possible?

6    A      That's what buyers and sellers do in any transaction,

7    yes.

8    Q      So you acknowledge this creates a conflict of

9    interest?

10   A      Every commercial transaction has the identical, quote,

11   "conflict" between a buyer and a seller.

12   Q      And you're obviously aware that the American Funds are

13   distributed through brokers-dealers who you describe as

14   non-proprietary channels?

15   A      Yes, that's correct.

16   Q      Do you agree that third parties non-proprietary

17   sellers are profit maximizers as well?

18   A      I would hope that they are, yes.

19   Q      You would expect that, though; right?

20   A      I would certainly expect that.

21   Q      So is it true that these third parties may have a

22   conflict of interest not to sell the best value funds to

23   their -- at the lowest fees, or that had the lowest fees to

24   their clients to make the largest profit possible?

25   A      That would be unlikely for two reasons.  The largest

1347

```
 1    reason being the cost in reputation and market discipline,
 2    but mechanically we know that the fees are all in a pretty
 3    narrow range, that they're paid from various advisers; so
 4    there's no advantage of one over the other.
 5    Q    Certainly theoretically possible, though?
 6    A    Yeah, it's theoretically possible.
 7    Q    There have been recent examples.  There have been
 8    scandals involving -- do you know what revenue sharing --
 9    have you heard that term?
10    A    Yes.
11    Q    Your knowledgeable of the recent scandals involving
12    revenue sharing where the allegations have been by the SEC
13    that certain third-parties, brokers, were compromising their
14    clients' best interests because they're being paid revenue
15    sharing?
16    A    Yes, I'm aware of that.
17    Q    Again, so that's a real world example of where a
18    broker might compromise his client's best interest to sell
19    them a type of fund?
20    A    Yes, and the market discipline has been very harsh.
21    Q    Another important component of your competition theory
22    is that investors are free to vote with their feet.  If they
23    identify a better investment option, then, they'll purchase
24    it.  Do I have that right?
25    A    Yes, more or less.
```

1348

1   Q      You acknowledge, though, and you've acknowledged in

2   your report and with Mr. Murphy this morning, what you refer

3   to as switching costs.

4            Do you recall that testimony?

5   A      Yes.

6   Q      You do acknowledge that switching costs exist; is that

7   correct?

8   A      Absolutely.

9   Q      Although, in your -- so let's talk about long-term

10  capital gains taxes.  Although you state in your report that

11  maximum long-term capital gains taxes have fallen in the

12  past 30 years, you state that they're approximately

13  16 percent at the moment; is that correct?

14  A      Would be 15 at the federal level, yes.

15  Q      Do you agree that a reasonable investor would still

16  consider a 15 percent tax rate to be significant?

17  A      I've written on this a lot in my career.  I think the

18  optimal capital gains tax is zero; so I couldn't agree more

19  that even 15 percent is too high.  The point is simply that

20  it is much lower over time.

21  Q      Well, in an appreciating market, would a reasonable

22  investor tolerate excessive fees and possibly for a number

23  of years as long as the excessiveness of the fee is lower

24  than the capital gains tax they would pay in order to

25  switch?

1    A     Well, you can put the capital gains in with any of a

2    number of switching costs in doing that, which is why you

3    also have the activities of independent boards and 36(b) as

4    I've said before.

5    Q     But it might be -- it would be a factor, you know,

6    15 percent capital gains tax and constraining the free

7    switchability of it?

8    A     It's a factor but not necessarily a large one because

9    remember it's not a requirement that everybody, or even the

10   incumbent investor with the largest capital gains, switch,

11   but just that there are or is a group of investors that

12   switches.  So it's important for an investor but not

13   necessarily for the outcome.

14         THE COURT:  Let me ask a different question,

15   counsel.  Let's put it in these terms:  It is a fact that a

16   rational investor would consider in making the decision;

17   right?

18         THE WITNESS:  Absolutely.

19         THE COURT:  So if I'm looking at my mutual fund,

20   I'm going to look at 1, what's its performance; 2, how much

21   am I paying; performance, of course, will include that

22   because it will be net of that; 3, what's the performance of

23   somebody else; 4, what are their costs; 5, what are the

24   other costs I'll have to pay to switch.  And if I'm rational

25   within the meaning of the economic world, I'll say, well, if

1350

1   it cost more to switch than the benefit from switching, I

2   won't switch.

3            THE WITNESS:  That's correct, Your Honor.

4            THE COURT:  And if it does -- if it doesn't, then,

5   I will, or I may.

6            THE WITNESS:  Yes, sir.  That's correct from the

7   perspective of an individual investor, but what counts here

8   is the activity of a cluster of investors.  So there may be

9   some investors for whom the tax issue doesn't loom large,

10  for example, the retirement account holders or other low --

11           THE COURT:  I'm just talking about an individual

12  decision maker.

13           THE WITNESS:  Yes, sir.  That makes exact sense.

14           THE COURT:  Go ahead, counsel.

15           MR. ACOCELLI:  Thank you, Your Honor.

16  BY MR. ACOCELLI:

17  Q    You just mentioned the retirement accounts, and you've

18  talked about the increase in tax deferred investments in

19  this country recently.  We've looked at a nice chart from

20  your expert report.

21           It is true, however, that a large portion of the

22  investors who have moved into retirement accounts hold their

23  money in 401(k) accounts; is that correct?

24  A    It's been a while since I've looked at the data, but

25  my recollection from the feds -- that the larger share would

1    be self-directed, IRAs and Keoughs; but, yes, 401(k)s are

2    quantitatively important if that's your question.

3    Q    Do you have statistics about the different amounts of

4    investments of 401(k)s versus a straight up IRA?

5    A    It's been a while since I looked at this, but 401(k)s

6    are not as large as self-directed in the aggregate, but I

7    don't remember the exact number.

8    Q    But it is true that, to your knowledge, someone who

9    has a 401(k), for instance, through their employment would

10   have a limited universe of stocks in which to invest in; is

11   that correct?

12   A    It would be defined in a plan.  How limited it is

13   depends on the plan.  Some plans have large number of

14   options, others fewer.

15   Q    Do you know of any 401(k) plans that had the entire

16   universe of 6,000 or so mutual funds in which to pick from?

17   A    I'm not aware of any, no.

18   Q    In your report at -- you mention that Loads Max has a

19   limitation on the willingness of an investor to switch --

20           THE COURT:  Counsel, I think before we get into

21   that, hold that thought.  You can start there at the end of

22   the break.

23           We'll take about a 15-minute recess, and then

24   we'll resume.

25           We'll be in recess for about 15 minutes.

1       (Recess taken at 10:10 a.m.

2          Proceedings resumed at 10:30 a.m.)

3          THE COURT:  All right.  Back on the record.

4          Go ahead, counsel.

5          MR. ACOCELLI:  Thank you, Your Honor.

6   BY MR. ACOCELLI:

7   Q    Dr. Hubbard, we're going to switch gears and move over

8   to economies of scale.

9          In your report, you criticized Dr. O'Neal's

10  economy of scale analysis because he doesn't consider total

11  costs.

12         Do you recall that?

13  A    Yes, sir, among other concerns.

14  Q    By the way, did you read Dr. O'Neal's reply report?

15  A    Yes, I did.

16  Q    Where he did do an analysis of economies of scale,

17  including both AFD and AFS?

18  A    Yes.  It's still flawed, but that's why I said in my

19  previous testimony even with his, once you include that,

20  half is shared; but, yes, it's still flawed.

21  Q    I was just wondering because during your direct

22  testimony, you didn't mention that he had done a reply

23  report that included it, so I was wondering if you had read

24  it?

25         THE COURT:  No, he mentioned it, counsel.  Oh, it

1   was mentioned, yeah.

2          MR. ACOCELLI:  I apologize.

3   BY MR. ACOCELLI:

4   Q     In your opinion, did you analyze whether or not EOS

5   had passed from CRMC to the respective American Fund

6   shareholders as the assets under management of funds

7   increased from 2003 to 2008?

8   A     I looked at a number of ways in which such sharing

9   could occur.  The quantification I did was for the waivers,

10  for breakpoints and changes in the fee schedules.  I also

11  mentioned that the very low fees themselves were, of course,

12  a form of share.

13  Q     So your economic analysis consisted of adding up the

14  fee waivers and the breakpoints; is that correct?

15  A     What I did was that.  I also could have done something

16  for the low fees, but given that they were the lowest in the

17  industry, I felt I was gilding the lily.

18  Q     You did talk about some service enhancements, but you

19  aren't able to quantify those service enhancements?

20  A     No.

21  Q     In your opinion, if a fund has the lowest advisory fee

22  in the mutual fund industry, do the directors have a need to

23  do a scale economies analysis?

24  A     I think the directors should always be vigilant on the

25  topic of economies of scale for funds of this size.  They're

1   -- I would be stymed if there are any marginal economies of

2   scale, but they clearly have to be concerned about whether

3   previous economies of scale have been shared.

4   Q     Right.  Because in your report, you indicate that

5   there is an optimal level of economies of scale, you just

6   don't know what it is; is that correct?

7   A     I don't believe I said that.  And optimal is a very

8   precise term in my world, so I don't think I said something

9   like that.

10  Q     We'll get back to that in a moment.  If a fund has a

11  low advisory fee or comparatively low advisory fee, is it

12  your opinion, as an economist, that it doesn't matter

13  whether the fund's achieving large economies of scale,

14  marginal economies of scale, or no economies of scale?

15  A     No, that's not my opinion at all.  As I said before,

16  in a competitive marketplace firms have to share their

17  economies of scale.  How they do it might vary across funds

18  and complexes.

19  Q     Let's talk about your portion of your report that

20  deals with service enhancements as a way that CRMC passed

21  economies of scale to its shareholders, to the funds.  You

22  mentioned in that regard some services that CRMC passed on

23  to its shareholders such as a multi-exchange function, as

24  well as a Microsoft money option, and a heavy investment in

25  IT.

1355

```
1              Do you recall that portion of your report?

2    A     Yes, sir.

3    Q     First of all, in evaluating -- strike that.

4              Aside from whether or not you have the ability to

5    quantify these service enhancements, in paragraph 118 of

6    your report, you state as follows:  "There are numerous

7    other reasons why costs could change irrespective of scale.

8    For example, a technological change could have reduced the

9    cost of providing mutual fund services at every asset level.

10   Similarly, the price of an input, including, for example,

11   wages and salary may have fallen reducing the cost of

12   providing mutual fund services at all asset levels.

13   Additionally, the mutual fund adviser may have taken steps

14   to be more cost efficient, and this efficiency may have

15   nothing to do with scale.  Finally, the adviser may have

16   changed the level or quality of shareholder services that it

17   provides, which would make it more or less costly to provide

18   mutual fund services at every level of assets."

19             Do you recall that?

20   A     Yes, it's just a longer version of the simple words

21   "All else equal."

22   Q     Isn't it true, Dr. Hubbard, that you -- these service

23   enhancements that you identified were instituted by American

24   Funds due to competitive pressures and not for sharing

25   economies of scale?
```

1356

```
 1    A      Again, for my purposes, those two are a coin.  I can
 2    look at the heads or the tail but it's the same coin.  It is
 3    precisely those competitive pressures that compel the
 4    sharing whether it's through services, fees, or anything
 5    else; so that will be fine for my argument if it's
 6    competitive pressures.
 7    Q      Don't you agree that they're principally undertaken to
 8    keep up with the Joneses, so to speak?
 9    A      Well, I can't say that for all of them, but that would
10    certainly be an acceptable way of sharing some of your
11    economies of scale.  That's what competition is about.
12    Q      But you wouldn't say that they were principally
13    undertaken for that reason?
14    A      It really wouldn't matter for my argument, sir, if a
15    hundred percent were for that reason.  My conclusion would
16    be identical.
17    Q      You recall your deposition testimony, when you
18    indicated that the service enhancements were principally
19    passed on -- principally undertaken, as you said, to keep up
20    with the Joneses?
21    A      I don't recall, but if that's in the transcript, I
22    just said that that's perfectly fine.
23    Q      We don't need to take the time to look at it.  That's
24    fine.
25             Now, you had discussed three legs of the stool.
```

1    Do you recall that?

2  A    Yes, sir.

3  Q    We talked about that at your deposition, and you also

4  mentioned it with Mr. Murphy.

5    You don't really think that the conscientiousness

6  of the board is an important factor when analyzing fees --

7  when analyzing whether fees are excessive, do you?

8  A    Yes, I do.  It's what I've written.

9  Q    Can we take a look at paragraph 97 of the report.

10  Paragraph 97 of your report, you write:  "Because advisers

11  compete to attract investors in the long run, an adviser

12  operating in its own self-interest will set fees at the

13  competitive level even if the mutual fund board was unable

14  or unwilling to do so.  Thus, a competitive market would

15  prevent advisers from sustaining excessive fees over time.

16  Even if mutual fund boards do not."

17    Do we have that highlighted up there?

18  A    You don't need to highlight it.  I heard you.  But

19  this goes pack to the judge's helpful distinction earlier.

20  None of this says that boards aren't valuable in the period

21  of time it takes for competition to do its work, so I --

22  they're both important.  All this says is that a competitive

23  market is the ultimate discipline over time and that is

24  always true.

25  Q    In paragraph 90 -- I'm sorry.  Paragraph 97, Footnote

1358

1   90, the last line of the paragraph you sort of expand on

2   this idea:

3           "Even if mutual fund boards were abolished, one

4   would still observe the same competitive pricing strategy

5   for the new funds."

6           You still maintain that mutual fund boards are

7   important; is that correct?

8   A    I think they're an important leg of the stool for the

9   reasons I mentioned, yes.

10          MR. ACOCELLI:  I have nothing further.  Thank you.

11          THE WITNESS:  Thank you.

12          THE COURT:  All right.  Dr. Hubbard, you're

13  familiar with John Bogel?

14          THE WITNESS:  Yes, I am.

15          THE COURT:  And he was one time, I think, he was

16  head of the Vanguard family?

17          THE WITNESS:  He was, indeed.

18          THE COURT:  And would you agree that Mr. Bogel

19  thinks that fees in the industry, in general, are and have

20  been excessive?

21          THE WITNESS:  Jack has said that many times.  In

22  fact, I invited him to Columbia Business School to present

23  his point of view --

24          THE COURT:  Has he done that?

25          THE WITNESS:  He has, indeed.  He gave a

1    leadership lecture.

2             THE COURT:  I take it you don't agree with him?

3             THE WITNESS:  I do not for the reasons that I've

4    mentioned.  His success at Vanguard is an illustration of

5    the power of competition being a low fee reliable complex.

6             THE COURT:  Does it matter, in your view, how much

7    is being paid to CRMC's employees in terms of actual dollars

8    independent of what the fee percentage -- what the fee

9    percentage is that's being charged for advisory fees?

10            Does that have any -- any impact at all on your

11   analysis?

12            THE WITNESS:  It wouldn't from the perspective of

13   competition.  The only concern, Your Honor, might be if

14   people were paying above competitive rates for talent.

15   Let's suppose that a portfolio manager should be paid a

16   million and instead he or she is being paid five, then you

17   might have something to talk about, but I'm aware of no such

18   evidence in this case.

19            THE COURT:  Do you know how much, for example,

20   Mr. Rothenberg made in 2003?

21            THE WITNESS:  I don't, sir.

22            THE COURT:  Or any other year?

23            THE WITNESS:  I don't, sir.

24            THE COURT:  Do you know how much any other

25   portfolio manager or executive of CRMC got paid in any

1360

1    particular year?

2             THE WITNESS:  No, sir.  Because in a competitive

3    market what CRMC chooses to do with its own profits are a

4    matter of concern to its shareholders but not to public

5    policy.

6             THE COURT:  Well, that was actually my first

7    question, I think.  If -- if one is going to contend that

8    what is paid to portfolio counselors or an executive or

9    anyone else in the company is necessary to meet competitive

10   pressures, don't you need to know what your competitors are

11   paying?

12            THE WITNESS:  Well, sir, in this case because we

13   have the ultimate price, which is the matter of concern to

14   consumers, being clearly set in a competitive way, it's

15   lowest in a big distribution, it really isn't a concern.  A

16   concern would arise if you thought that basically everybody

17   were charging too much, and then just simply passing that

18   along to employees.  But the fact that you do have a large

19   distribution of fees, and some are very low, particularly

20   the American Funds, I can't see it as an issue here.

21            THE COURT:  But even a small basis point figure,

22   if the effective fee over the entire family of funds is

23   25 basis points.  Twenty-five basis points applied to

24   $1.3 trillion in assets is a big number.

25            THE WITNESS:  It's a very large number.

1361

```
 1              And, then, to keep that in mind, remember how fee
 2    sensitive consumers are in the data.  A manager and an
 3    adviser would hold a fee too high at his or her peril.
 4              THE COURT:  Are you aware that in Gartenberg, the
 5    Second Circuit Court of Appeals said that fee sensitivity is
 6    not, indeed, as a matter of law, is not something that the
 7    Court accepted; and, in fact, concluded that there was very
 8    little competitive pressure in the marketplace for advisory
 9    services, and that that's why 36(b) exists in the first
10    instance?
11              THE WITNESS:  As a laymen, I agree with your
12    reading of the record, Your Honor.  What I would say and had
13    offered in my report is that the world has changed a great
14    deal.  And it strikes me if we're going to talk about fee
15    sensitivity, we should estimate it.  That's all I'm trying
16    to do, not challenge the law.
17              THE COURT:  All right.  But to get back to the
18    point about the compensation to employees at American Funds,
19    that's not something that you consider particularly relevant
20    because that's backed into the calculus that you make
21    through the fee ratio that's charged to the customer?
22              THE WITNESS:  Yes, sir.  As long as the fee is
23    appropriate, what CRMC does with its money is not something
24    that would concern me.
25              THE COURT:  All right.  One thing that was a
```

1362

```
 1    curiosity to me is in the American Funds' documentation,

 2    there was an e-mail somewhere talking about breakpoints and

 3    how they were figured, and using the Fibonacci sequence to

 4    do that.

 5           Do you know of any reason economically or

 6    mathematically, or any other reason why, one would select

 7    the Fibonacci sequence as a method of doing the breakpoints?

 8           THE WITNESS:  I would only be speculating.  It had

 9    been the first time I had thought about Fibonacci in a long

10    time.  It came up in this case.  It does provide a certain

11    smoothness to the pattern, but what matters from an

12    economist's perspective is really that the sharing happens,

13    whether it's through low fees or breakpoints or waivers

14    doesn't really matter.

15           THE COURT:  So there's no economic principle that

16    says that this particular sequence is an appropriate

17    sequence in these circumstances?

18           THE WITNESS:  I could not give you such a

19    justification, no.

20           THE COURT:  All right.  Mr. Murphy.

21                    REDIRECT EXAMINATION

22    BY MR. MURPHY:

23    Q    Dr. Hubbard, do you recall discussing that investors

24    on a 401(k) plan have limited options?

25    A    Yes, sir.  I recall those questions.
```

1363

1  Q    And when plan sponsors select mutual funds to place a

2  401(k) plan, to provide the menu of options for the

3  employees, do they choose from the full range of mutual

4  funds that are out there?  The 6,000 mutual funds?

5  A    Yes.  In principle, they have the entire range

6  available to them.

7  Q    Would you expect some sponsors to focus on price, when

8  selecting what funds are included in the menu of options

9  among other things?

10 A    I think, among other things, yes, I would think

11 focusing on performance, investment styles, the price, of

12 course.

13 Q    And do you recall discussing the impact of capital

14 gains on switching costs?

15 A    Yes.

16 Q    And some investors would face capital gains which

17 would be a switching cost; correct?

18 A    Yes, the tax is not yet zero.

19 Q    But not all investors have to have low switching

20 costs -- correct -- in order to discipline super competitive

21 pricing?

22 A    Absolutely.  All that's required is that there are a

23 group of investors for whom the gains to switching are high

24 or the costs of switching are low.  What is relevant to me

25 as an individual about switching is not necessarily relevant

1  for the price.

2  Q     And based on your analysis, are you confident that

3  enough investors face low switching costs in order to make

4  the market competitive?

5  A     I am -- the implied elasticities are very large.  Even

6  a 1 percent higher fee would lead a reduction, all else

7  equal, 2.6 percent of assets under management.  That's a

8  very big reaction.

9  Q     And I just want to revisit the issue of long run.  The

10  Growth Fund of America is a very large fund; correct?

11  A     Correct.

12  Q     And if the price of the Growth Fund of America was

13  raised above a competitive level, do you believe the Growth

14  Fund of America would lose assets?

15  A     Based on my statistical analysis, yes, it would not be

16  in the adviser's interest to do that.

17  Q     And it's a very large fund; it may take many years to

18  continue to lose assets before it went to zero, for example;

19  correct?

20  A     Absolutely.  But it is still losing substantial

21  profitability for CRMC every year that it chose that

22  strategy; so, again, I wouldn't expect them to do it.

23  Q     Right.  But CRMC could maintain that price for a

24  number of years, continue charging investors; it would lose

25  assets, but it could do it?

1365

```
 1    A      It would not only lose assets, it would lose profits,

 2    which is why I would doubt that they -- if they were

 3    rational, they would not do it.  Let me leave it at that.

 4    Q      Do you know the Fibonacci sequence?  I'm not an expert

 5    on it myself, but is it generally a declining sequence of

 6    events; so if you were drawing a line, it would go like

 7    this?

 8    A      Yes.  And that's why I said it has a certain

 9    smoothness would be the attraction, I would guess; but I'm

10    not familiar in this case.

11    Q      Do you have a sense of economies of scale, in the

12    mutual fund industry, if they're generally considered to be

13    large early on in the life of a fund or a complex at small

14    levels of assets?

15    A      Well, it depends on styles, but economies of scale

16    would have been hit long before the scale of any of these

17    funds.  They're very, very large.  Most of the empirical

18    evidence would suggest that if you're getting low tens of

19    billions of dollars, you're probably not having marginal

20    economies of scale.

21    Q      And, generally, in the mutual fund industry or

22    industries in general, do mutual funds -- sorry, do

23    economies of scale become exhausted at some point?

24    A      Yes.  That's what I meant by no marginal economies of

25    scale.  There's still the existing economies of scale would
```

1366

1   need to be shared with investors, but at the margin there

2   really wouldn't be any economies of scale.

3   Q    Typically, for example, as a fund got larger, when you

4   say the marginal economies of scale -- so if it goes from

5   100 billion to 101 billion, the economies of scale on that

6   additional one billion might be very small at that point?

7   A    Correct.  Even though maybe earlier in the fund's life

8   there may have been quite substantial economies of scale.

9   Q    Would that generally be consistent if there were large

10  economies of scale early on in the life of the fund but very

11  small marginal economies of scale, when a fund gets very

12  large, would be consistent with a sloping line, like a

13  Fibonacci sequence?

14  A    Yes, it would.  Early on, of course, funds are often

15  losing or trying to get up to scale but, yes, somewhere in

16  the middle, yes, there, indeed, is achieving of economies of

17  scale exhausted at the end; so it would match the pattern of

18  the Fibonacci numbers.

19           MR. MURPHY:  I have no further questions,

20  Your Honor.

21           THE COURT:  Anything further?

22           MR. ACOCELLI:  I have nothing further, Your Honor.

23           THE COURT:  All right.  You may step down,

24  Dr. Hubbard.

25           THE WITNESS:  Thank you, sir.

```
 1              THE COURT:  All right.  Who has the next witness?

 2              MR. CONGRESS:  Your Honor, apparently our exhibit

 3  books for Mr. Riggs are on the chair there.  Can we approach

 4  there to place them up so he can have access to them?

 5              THE COURT:  Yes.

 6              Do you want to say for the record who you are

 7  calling.

 8              MR. CONGRESS:  Yes, I'm sorry.  Plaintiffs call

 9  Mr. Henry Riggs.

10              THE COURT:  Thank you.

11         HENRY RIGGS, PLAINTIFFS' WITNESS, SWORN

12              THE COURT:  Please be seated.  State your name for

13  the record.

14              THE WITNESS:  My name is Henry Riggs.

15                    DIRECT EXAMINATION

16  BY MR. CONGRESS:

17  Q    Good morning, Mr. Riggs.

18  A    Good morning.

19  Q    You are a director of several of the American Funds?

20  A    I am.

21  Q    And among those are Growth Fund of America?

22  A    Fundamental Investors.

23  Q    Fundamental Investors --

24  A    Income Fund of America --

25  Q    Right.
```

1368

```
 1   A      -- and American Balanced fund?

 2   Q      Are you the chairman of the contracts committees of

 3   all those funds?

 4   A      I am.

 5   Q      And --

 6   A      I'm sorry.  I have been.  I am no longer, as of a year

 7   ago, chair of the contracts committee of Investment Fund of

 8   America and Income Fund of America and American Balanced

 9   Fund.

10   Q      When did you first become a director of any of the

11   American Funds?

12   A      1989.  Twenty years ago.

13   Q      So you've had a fairly lengthy period of time over

14   which you've had the opportunity to obtain a lot of

15   information about the funds?

16   A      Yes, and I've asked for a lot.

17   Q      Yes.  And you've also had the opportunity to obtain a

18   lot of information about Capital Research and Management,

19   American Funds Distributors, and American Funds Service

20   Company?

21   A      Yes, sir.

22   Q      And is it okay if we refer to those companies as CRMC,

23   AFD, and AFS?

24   A      Yes.

25   Q      Now, you have -- we put two binders up there of
```

1369

```
 1   exhibits, Mr. Riggs.  There's one of two, and two of two.
 2   And when I ask you to look at certain exhibits, you can look
 3   in the book or the picture will flash up on the computer
 4   screen as well.
 5   A     Thank you.
 6   Q     Would you turn to Tab 1 in the first binder, which is
 7   Exhibit 2472.
 8   A     Yes.
 9   Q     And do you see there are several e-mails set forth on
10   this exhibit?
11   A     Yes, I do.
12   Q     And would you go to the second page of the document.
13   And you see that's an e-mail from you to certain people at
14   CRMC?
15   A     Yes.
16   Q     And it's dated July 24, 2003.
17   A     Yes.
18   Q     And let me read what's on here into the record:
19           You say:  "Patrick:  I'm generally okay with these
20   minutes, but I don't think the minutes of the executive
21   session in particular properly reflect the committee's
22   concern that overall fees to shareholders are increasing.
23   This particularly concerns me because the industry,
24   including CRMC, keeps saying that fees are coming down.
25   That's only true of investment advisory fees.  Indeed, it
```

1370

```
 1   was that discussion that led the committee to ask for more

 2   detail on the other fees."

 3            And then you say:  "Note that for the past

 4   18 months, the committee has been asking for more clarity

 5   about succession planning at Capital.  I realize that this

 6   is a sensitive subject, but I think that, at least, the

 7   committee should be told when we might receive such

 8   additional clarity."

 9            Do you see that?

10   A     Yes, sir.

11   Q     What was the issue about succession planning at

12   Capital that you're referring to in this e-mail?

13   A     Particularly, the senior management of CR&MC, although

14   we are directors of the funds, not directors of CR&MC, it

15   seemed to us that being certain we had good continuity in

16   the senior management was important to our shareholders and

17   so we were asking if we could have a little more insight

18   into the kind of planning that was going on for succession

19   of top management at CRMC.

20   Q     Was there a need to see whether the younger people at

21   CRMC, as they moved up the ladder, would have the financial

22   wherewithal to buy out the interests of the more senior

23   people at CRMC?

24   A     Once again, this is not our concern.  This is CR&MC

25   concern.  We were simply interested in being certain that
```

1    the outstanding culture of CR&MC remained strong and would

2    be perpetuated by the successors to the senior management.

3    Q      But when you had discussions about succession

4    planning, did those discussions include the question of

5    whether -- how would the younger people have enough money to

6    buy sufficient equity interests in the Capital Group?

7    A      We knew this was an issue that was on the mind of

8    senior management at CR&MC, but it was not a matter in which

9    we dealt at all.

10   Q      Do you recall if there were any discussions about

11   whether one of the functions -- let me step back a minute.

12          Do you recall that there's a profit-sharing plan

13   in place at CRMC?

14   A      Yes.

15   Q      Were there any discussions of whether one of the

16   benefits of having the profit-sharing plan was that it could

17   be used to provide assets to the younger associates so they

18   would have the ability to eventually afford enough of an

19   interest in Capital Group so they could become the new group

20   of leaders?

21   A      We were -- we were interested in the structure of the

22   profit-sharing plan, mostly in terms of the motivations that

23   it would provide to the portfolio counselors and analysts.

24   We wanted to be certain that those motivations were not

25   short term and were in the best interest of our shareholders

1372

```
1    and that was the extent of our concern about profit sharing.

2    Q    Let's turn to Exhibit 2429.  I have to look down and

3    see which tab that is.

4           Okay.  It's Tab 45, which would be in the second

5    book.

6    A    Forty-five.

7           Yes, sir.

8    Q    And you got that in front of you, Mr. Riggs?

9    A    Yes, I do.

10   Q    And that's an e-mail -- there are two e-mails on that

11   page.

12          Would you look at the e-mail on the bottom of the

13   page.  That's an e-mail from you to Paul Haaga in May of

14   2003?

15   A    Yes.

16   Q    And let's look at the paragraph that's no. 2 on the

17   page.

18   A    Yes.

19   Q    And that says:  "In upcoming contracts committee

20   meetings, I hope we can spend some -- talking about overall

21   fees, not just the advisory fee.  I noted with interest your

22   testimony to Congress where you state, on behalf of ICI,

23   that mutual fund fees are trending downward.  In fact, for

24   the four American Funds that I pay close attention to, the

25   trend has been the reverse, though, granted the amounts are
```

1373

1    one or two basis points.  Still, we wrestle in the contracts

2    committee deliberations about tenths of a basis point in the

3    advisory fee, when, in fact, those small changes are swamped

4    by the wrong-way trend of other fees."

5           Do you see that?

6    A    I do.

7    Q    So by May, 2003, you were concerned that advisory fee

8    reductions through basis points were quite small, while

9    other fees were swamping those changes?

10   A    Yes.

11   Q    Now, you continued to raise that concern with CRMC

12   management during 2003 and 2004, did you not?

13   A    Yes.

14   Q    Now, after you sent this e-mail to Mr. Haaga in May

15   2003, did you take any positive action to try to bring about

16   some lower fees for the funds?

17   A    I tried to bring about and did bring about a good deal

18   of information that explained the phenomenon that I was

19   pointing to in this e-mail that, in fact, the advisory fees

20   were coming down, albeit, since these funds are very large

21   at a small rate as has been discussed, but we determined

22   that the transfer agency fees was a major factor here and

23   that had to do with the fact that we were attracting many

24   shareholders, including many new shareholders.  And the

25   transfer agency fee is a function of a number of

1374

1   shareholders, not the number of assets -- not AUM of the

2   funds.  So by asking this question, I was able to find -- or

3   we were able to find out additional information that got us

4   comfortable with the fact that the overall fees might be

5   creeping up slightly.

6              I would also say that during this period, there

7   was a substantial move in share classes away from A towards

8   other classes which had higher administrative fees.

9   Q     Let's go to Tab 17, and that's Exhibit 95.

10  A     Yes, sir.

11  Q     And you see that's the minutes of the contracts

12  committee for Fundamental Investors and Growth Fund of

13  America for May 13, 2003?

14  A     Yes.

15  Q     And at that meeting, the board recommended approval of

16  the various fees that had come up for annual renewal?

17  A     Yes.

18  Q     Okay.  And am I correct there was no substantial

19  change in any of the fee structures between the time that

20  you sent the May 1st, 2003 e-mail that we were talking about

21  a minute ago, to the time that these new advisory fee

22  agreements were approved on May 13th?

23  A     I don't know that without reading the minutes in

24  detail.

25  Q     Okay.  But you don't recall anything --

1  A     I'm sorry?

2  Q     You don't recall anything off the top of your head?

3  A     That's right.

4  Q     Now, would you look -- going to the second page of

5  this document, in the next to last paragraph -- I'll read

6  the next to last paragraph:

7         "The members then discussed" -- I think the wrong

8  thing is on the screen.

9         "The members then discussed the information

10  provided by its profitability" -- I'm sorry --

11         MR. BENEDICT:  Where?

12         MR. CONGRESS:  I'm sorry.  I'm on Page 0018787.

13         MR. BENEDICT:  Page 3?

14         MR. CONGRESS:  Page 3 of the document.

15         The next to last paragraph.

16  BY MR. CONGRESS:

17  Q     "The members then discussed the information provided

18  by CRMC about its profitability and the various components

19  of its costs, as well as the comparative information from

20  various publicly owned mutual fund managers.  There then

21  followed favorable comments concerning the strong sales of

22  fund shares and comparatively low redemption rates of the

23  funds and the role that 12b-1 payments contribute to these

24  positive developments."

25         Do you see that?

1    A      Yes.

2    Q      So the directors approved 12b-1 fees at this meeting

3    in part on the ground that 12b-1 payments contribute to

4    sales of fund shares and low redemption rates; is that

5    correct?

6    A      I would put the emphasis far more on lower redemption

7    rates, which we believe, we directors believe, is in the

8    best interest of our shareholders.  We attempt to attract

9    long-term investors, and the 12b-1 provides the services by

10   the broker-dealers to their customers who are our fund

11   shareholders.  And so getting low redemption rates,

12   achieving low redemption rates -- and ours are roughly half

13   of the industry -- is an admirable result.

14   Q      Now, do you recall that in the -- in one of the

15   earlier e-mails we discussed this morning, you had sent an

16   e-mail mentioning that the advisory fee changes had become

17   very small because the size of the funds had grown?

18   A      Yes.

19   Q      The approval of the advisory fees, at the meeting on

20   May 13th, 2003, continued the process of approving advisory

21   fees, despite the fact that breakpoint reductions result in

22   very small changes?

23   A      We had approved breakpoints and reductions with

24   breakpoints in previous meetings and no change was made at

25   this meeting, so far as I can recall.

1377

1    Q      Now, let's go to Tab 28, which is Exhibit 2435.

2    A      Yes.

3    Q      And this an e-mail from you to Patrick Quan?

4    A      Yes.

5    Q      Patrick Quan is an executive at CRMC?

6    A      He was the secretary of these two funds, is, and

7    remains the secretary of these two funds.

8    Q      Okay.  And would you look down at the bottom of this

9    page, just below where you put your name Hank.  It reads --

10   no, actually it's Mr. Quan in another e-mail putting your

11   name there.  He says:  "Hank, these are the minutes from the

12   FI/GFA contracts committee meeting of 5/13.  Please let me

13   know if you have any comments."

14          Do you see that?

15   A    I see that.

16   Q      So he's sending you the minutes of the meetings that

17   we just looked at; is that correct?

18   A      Yes.

19   Q      And going up to the top of the page, you say to

20   Patrick Quan:

21          "Patrick, I'm generally okay with these minutes,

22   but I don't think the minutes of the executive session, in

23   particular, properly reflect the committee's concern that

24   overall fees to shareholders are increasing.  This

25   particularly concerns me because the industry, including

1378

1    CRMC, keeps saying that fees are coming down.  That's only

2    true of investment advisory fees.  Indeed, it was that

3    discussion that led the committee to ask for more detail on

4    the other fees."

5           Do you see that?

6    A    Yes.

7    Q    Now, your e-mail here is dated July 24, 2003.

8           So am I correct that whatever was explained to you

9    previously about why the fees, other than advisory fees were

10   going up, you still regarded that fact as a problem that had

11   to be addressed, when you got to July 2003?

12   A    I am forever asking for additional information.  And

13   I'm sure that in time that I got that information, got

14   comfortable with it.  I cannot remember the timing exactly

15   from '03, when I got the information on additional fees.

16   Q    Okay.  Now, am I correct that one of your concerns

17   about fees was that you had very insufficient information

18   about the extent to which CRMC was benefiting from economies

19   of scale as the funds grew larger?

20   A    I'm sorry.  Would you ask the question again.

21   Q    Yeah.  Was one of your concerns about evaluating the

22   advisory fees that were being proposed, was that you had

23   very little information about the extent to which CRMC was

24   realizing economies of scale as the funds grew?

25   A    No, sir.  I think that I express in this e-mail that

1379

1     I'm generally satisfied with the investment advisory fee.

2     Q     Okay.  Let's turn to Tab 29, which is Exhibit 2465.

3           And you see that the first page there is a May 25,

4     2004, e-mail from you to Paul Haaga --

5     A     Yes.

6     Q     -- concerning the contracts committee, GFA and FI?

7     A     Yes.

8     Q     And you mention to him that you're attaching a memo

9     summarizing the executive session of the contract committee

10    meeting on May 18 for those two funds.

11          Do you see that?

12    A     "I have compared notes with Mike Glazer and, thus,

13    this memo is our combined effort."

14          Is that what you're referring to?

15    Q     I'm reading on the first page of the document.  It

16    says:  "Attached is a memo summarizing the executive session

17    of the contract committee meeting on May 18 for GFA and

18    Fundamental."

19          So -- do you see that?

20    A     I see the page that's down on the screen.

21    Q     And is the second page of this document and the third

22    page, is that the memo summarizing --

23    A     Yes.

24    Q     Let's go to the second page.

25          And let's go down one, two, three, five paragraphs

1380

```
1    down on the second page.  And you say, "We feel we need
2    additional information regarding the other two -- economies
3    of scale and profitability.  The independent directors are
4    very interested in receiving additional information about
5    the way in which advisory fees and breakpoints are set, and
6    particularly, the economies of scale that CRMC realizes and
7    shares with shareholders as the funds grow."
8              Do you see that?
9    A    Yes.
10   Q    So does that refresh your recollection that in the --
11   at this point in time, you felt that you and the other
12   independent directors still had insufficient information
13   about economies of scale?
14   A    I believe we probably had sufficient information to
15   make a decision, but I am sort of perpetually asking for
16   additional information because I think it's my duty as a
17   director to know as much as I can.
18              You'll note that we did not, at this meeting,
19   approve the contracts, but asked rather that another
20   contracts committee be scheduled and held before the matter
21   went to the full board.  And so we were asking for
22   additional information that would be provided to us prior to
23   final action on these contracts.
24   Q    Okay.  And how quickly did you get that -- did you get
25   that additional information?
```

1381

1    A     I'm sure we got that additional information by the

2    time of the -- I think it's the August meeting.  I'm sure we

3    did get sufficient information to get comfortable with

4    approving the contracts.

5    Q     Would you turn to Tab 30, which is Exhibit 2479.  And

6    you see on the bottom half of the first page, there's an

7    e-mail from you to Paul Haaga?

8    A     Yes.

9    Q     And you sent this September 8th, 2004?

10   A     Yes.

11   Q     Okay.  Would you turn to the second page.  And I'm

12   going to read the paragraph that's near the top of the page

13   that's paragraph no. 1.

14         It says: "Economies of scale.  This is the big

15   issue.  The proclamations of JBL and JL, that there are no

16   economies of scale in this business are simply unconvincing,

17   all the more so now that the SEC is specific in demanding

18   that independent directors address this matter.  All the

19   independent directors really have to judge by are the fiscal

20   year 2004 financial statements, and they certainly suggest

21   enormous economies of scale.  I hope CRMC can give us some

22   hard data.

23         "John Lily asked for a study of the amount of the

24   fee reductions that the existing shareholders received last

25   year solely from the breakpoints that were achieved by the

1382

 1   huge new sales.  This may be a useful study, but I hope it

 2   is not all we will see."

 3            Do you see that?

 4   A     Yes.

 5   Q     Does that refresh your recollection that as of this

 6   date, September 2004, you still felt that there was

 7   important information concerning economies of scale that you

 8   didn't yet have?

 9   A     There was additional information that I thought would

10   be -- would be useful to us, yes.  And subsequently,

11   sometime later, there was a quite formal response in the

12   form of a White Paper on the subject of economies of scale,

13   but I think throughout this time, in various ways, we were

14   learning an increasing amount about the issue of economies

15   of scale.  And, perhaps, more importantly, to the extent

16   economies of scale were realized, how they were shared with

17   shareholders both directly and indirectly.  That is, both by

18   more frequent breakpoints, which we'd insisted on and the

19   reductions in fee that went along with those, but also in

20   investments in other parts of CR&MC.

21            For example, in securities trading.  A great deal

22   was spent there, and we came to understand that in our

23   subsequent discussions.  A great deal was spent on that and

24   on, if you will, kind of hiring ahead.  So we knew that we

25   were getting the best possible analysts and portfolio

1383

```
 1   counselors and, if you will, our bench was long.  And that
 2   was going to be important given the increase in size of
 3   these funds.  So that is another use of economies of scale
 4   which can, and we believe did, have a direct payoff to the
 5   shareholders in improved performance.
 6   Q    Okay.  Let's go to Tab 22, Mr. Riggs.
 7   A    I'm sorry.  32?
 8   Q    Twenty-two.
 9   A    Twenty-two.
10   Q    And that's Exhibit 858.
11   A    Yes.
12   Q    And do you recognize this as a memorandum that CRMC
13   sent to all the directors in October 2004 discussing the
14   proposed 5 percent voluntary fee waiver?
15   A    Yes.
16   Q    Now, would you turn to the second page -- the third
17   page of the document and toward the bottom there's a heading
18   entitled "Perspective on the Economies of Scale Debate."
19        Do you see that?
20   A    Yes.
21   Q    And if you flip through this, that discussion fills up
22   the next page and the top of Page 5.
23   A    Yes.  Page 5 or 4.
24   Q    Well, it goes through Page 4 and then it ends --
25   there's a few lines on the top of Page 5.
```

1384

```
 1    A      Yes.

 2    Q      Is there anything in that discussion that provides the

 3    hard data on the economies of scale that you asked for?

 4    A      Hard data are awfully difficult to come by in the

 5    service business; so are there hard data, no.  Are there

 6    economies of scale, yes; and is CR&MC responding to those,

 7    yes.  Indeed, that's the purpose of the memo is to propose a

 8    waiver of fees at this time.

 9    Q      Now --

10    A      Which were later increased to 10 percent.

11    Q      Now, let's go to Tab 46.  And this is Exhibit 878.

12           Do you recognize that as the minutes of the

13    regular meetings of the boards of American Balanced Fund and

14    Income Fund of America, December 9, 2004?

15    A      I do.

16    Q      And am I correct that the boards approved the new

17    advisory fee agreements or the renewed advisory fee

18    agreements for these funds at that meeting?

19    A      Yes.

20    Q      And would you turn to the page -- it's Page 14 of the

21    minutes and the Bates-number at the bottom of the page is

22    0205976.

23           And looking at the first paragraph on this page,

24    I'm going to read a little more than halfway down the

25    sentence starting:  "While noting, a series of recent
```

1385

```
 1    presentations on AFD compensation matters, the 5 percent
 2    advisory fee waiver, and additional advisory fee breakpoints
 3    to address the funds' growth, he said there was interest by
 4    committee members in continuing discussions on CRMC
 5    profitability, economies of scale, investment advisory fee
 6    breakpoints, including IFA's bifurcated fee arrangement,
 7    growth of certain non-advisory fee expenses, and the
 8    specific duties and work plans for the funds' CCO."
 9            Do you see that?
10    A     Yes.
11    Q     So you were still, despite the fact that you approved
12    the agreements, advisory fee agreements, you were still
13    indicating that you would like to have more information on
14    economies of scale?
15    A     Well, sir.  I have a tendency to constantly ask for
16    additional information.  It seems to me that's the role of a
17    director.  I've been a director of quite a number of funds.
18    I mean, quite a number of organizations, profit and
19    nonprofit over the last 45 years; and I consider it a major
20    part of my job is to ask questions, ask provocative
21    questions.  And I have always received good information in
22    return in response to those.  And when and if I haven't, I
23    have left those boards.  I have always received responsive
24    information from Capital.  I am extremely enthusiastic about
25    the way in which Capital has provided information, when it
```

1386

```
 1    is requested by the directors.  So this is a ongoing
 2    process.  There isn't an end to our finding out about these
 3    things.  We're learning more and more as we go along.  So I
 4    believe that we had sufficient information to approve these
 5    contracts at the time we approved them.  That doesn't mean
 6    we didn't have an interest in additional information.  In
 7    this case, we asked for it.
 8    Q    Let's go to Tab 23, which is Exhibit 838.
 9         Is that a memorandum to all the American Funds --
10    it's a memorandum to the governance of contracts committees
11    of Fundamental Investors and Growth Fund of America in June
12    of 2006.
13         Do you see that?
14    A    Yes.
15    Q    It's from CRMC.  And you see in the second paragraph,
16    there's a discussion that you reported that questions were
17    raised in three areas.
18         Do you see that?
19    A    Yes.
20    Q    And area no. 3 that's listed -- and I'll read it, is:
21    "There was general interest in additional analysis regarding
22    the role of economies of scale in determining the fairness
23    of advisory fees."
24         Do you see that?
25    A    Yes.
```

1387

1   Q     So you're still feeling that you really could use more

2   information about economies of scale?

3   A     Yes.

4   Q     And you mentioned before that while it took a while,

5   CRMC finally provided you with information about economies

6   of scale in the form of a White Paper on that?

7   A     In '06.

8   Q     So it took two to three years after you were asking

9   for this information for them to produce the White Paper?

10  A     I think it's unfair to isolate that one comprehensive

11  study from all the discussions we had in four meetings a

12  year, two independent director seminars, other activities;

13  and remember, it's about now when Capital's proposed another

14  additional 5 percent waiver.

15  Q     Mr. Riggs, in mid 2006, did you have a concern that

16  the current fee schedules of the funds you were involved

17  with didn't look too defensible?

18  A     No.

19  Q     Let's turn to Tab 11.

20  A     I'm sorry.

21          THE COURT:  Eleven.

22  BY MR. CONGRESS:

23  Q     Which is Exhibit 3148.  Okay.

24  A     Yes.

25  Q     Mr. Riggs, is this your handwriting?

1388

1   A       It is.

2   Q       And are these notes that you took in the middle or

3   around May 23rd, 2006?

4   A       Yes.

5   Q       Would you look down on the left-hand side and there's

6   something that you wrote that's in a box.

7           Could you read what's inside that box.

8   A       I can:  "Fee okay, but needs to be more defensible.

9   Two or three breakpoints only.  .005 per breakpoint.

10  Precedent setting (GFA)."

11  Q       And when you mentioned two or three breakpoints only,

12  .005 per breakpoint, was that in connection with your

13  thought that the fees needed to be more defensible?

14  A       If I may, I'd like to point out that these were notes

15  that I wrote in advance of the meeting of the contracts

16  committee.  I was chair of this committee, and it's been my

17  habit to write notes as to what I think needs discussion and

18  what I think we could stipulate as you'll see in the

19  right-hand column, stipulate, and therefore, focus our

20  attention on those issues that were particularly important.

21          And I thought it was important that we have

22  additional information about the breakpoints ahead of us,

23  whether two or three were sufficient, and whether .005 per

24  breakpoint is the right amount.

25  Q       Okay.  Would you turn to Tab 12, which is Exhibit --

1389

1    A      Yes.

2    Q      -- 3149.

3           And the second page of the exhibit is actually

4    identical with the first?

5    A      Yes.

6    Q      Because we put two pages down because the first page

7    has something blocked off with the exhibit stamp.

8    A      Yes.

9    Q      And these are also -- this is also your handwriting?

10   A      It is indeed.

11   Q      Okay.  Pardon?

12   A      Yes.

13   Q      Okay.  And you see up at the top left -- on the top

14   right, there's a reference to distribution oversight?

15   A      Yes.

16   Q      Do you have any recollection of when you wrote these

17   minutes?

18   A      I don't, but it was in connection with a contracts

19   committee meeting which I was chairing; and, again, these

20   are notes that I wrote before the meeting, at least most of

21   them are, and the distribution oversight committee was

22   simply a reminder to myself to tell -- to remind all the

23   members of the contracts committee, the independent

24   directors, that the distribution oversight committee was

25   then in formation or perhaps in its early part of its life.

```
 1    These are not notes in connection with the distribution
 2    oversight committee.  It was simply a reminder to myself to
 3    tell my fellow directors that it was -- that we were off and
 4    running with the DOC.
 5    Q    Now, you have numbers one, two, three on the left.
 6    And let's look at what you've written next to no. 3.  And I
 7    will read part of it, and you can tell me if I'm reading it
 8    wrong.  It says:  "Four contracts.  Investment advisory
 9    contract, approved last year.  Two somethings" -- I can't
10    read it.
11    A    "Two decreases in fees, 10 percent in total."  Those
12    were the waivers.
13    Q    Yeah.  In total since then.
14          "Had those not happened conversation quite
15    different."
16          Do you see that?
17    A    Yes.
18    Q    Is that -- is what you meant there, that the
19    conversation would have been different because the
20    breakpoints by themselves were not a sufficient fee
21    reduction?
22    A    Given the very large increase in assets under
23    management in very short period of time we would have -- we
24    would have been put -- had suggested some waiver or some
25    adjustment of fees after that situation.  In fact,
```

1391

1    10 percent -- the 10 percent waiver was already in place,

2    and we were happy with that action.

3    Q    Well, the first of the fee waivers occurred in fiscal

4    2005; isn't that correct?

5    A    I can't remember exactly when it occurred.

6    Q    I'll represent to you that the record is clear -- I'll

7    represent to you that the record is clear that the first of

8    the two fee waivers came in in fiscal 2005?

9    A    Thank you.

10   Q    So for fiscal 2004, there was no fee waiver --

11   correct -- on that assumption?

12   A    Yes.

13   Q    So wasn't it inadequate to not -- in terms of the

14   level -- shouldn't the directors have added a fee waiver in

15   2004 to make up for the smallness of the breakpoints in

16   light of the huge growth that was occurring during fiscal

17   2003 and 2004?

18   A    While that's all with the benefit of hindsight.  We

19   actually did not expect that the inflow of funds would

20   continue at anywhere near the pace that, in fact, it did in

21   '05, '06.

22   Q    Okay.  Let's go to Tab 26, which is Exhibit 2430.

23   A    Yes, sir.

24   Q    And looking at the bottom half of the page, you see

25   there's an e-mail exchange between you and Robert Carlson?

1392

```
 1    A      Yes.

 2    Q      And was Robert Carlson one of the independent counsel

 3    to the directors?

 4    A      He was counsel to the independent directors.

 5    Q      Right.  And Mr. Carlson wrote you an e-mail on

 6    May 23rd, 2003?

 7    A      Yes.

 8    Q      Let's turn to the second page of this document.  And

 9    I'm going to read about half of the first paragraph on this

10    document.

11           Mr. Carlson says:  "I also want to take this

12    opportunity to reiterate my suggestion to the committee that

13    it request a more complete explanation from CRMC of the

14    services provided under the administrative services

15    agreement, the basis for the fees charged for those

16    services, and their, quote, 'profitability,' close quote to

17    CRMC; and that these services continue to be outside of Rule

18    12b-1."

19           Do you see that?

20    A      Yes.

21    Q      So your independent counsel told you you needed to

22    know, or at least to estimate the profitability of the

23    administrative services agreement to CRMC; correct?

24    A      He is suggesting that we get additional information,

25    yes.
```

1393

1    Q       And did the directors obtain information concerning

2    how profitable the administrative services agreement was to

3    CRMC?

4    A       We obtained profitability information, a great deal of

5    it, on the Capital -- on CR&MC in total, excluding AFD and

6    excluding AFS.  We did not get profitability because -- on a

7    particular fee because that involves more cost accounting

8    and cost allocations which I, for one, have no confidence

9    in.  So did we get profitability on those particular fees,

10   no.

11   Q       Now, let's go to Tab 12, Exhibit 3149.

12   A       So we're back to --

13   Q       We're back to Tab 12, and it's one of the handwritten

14   documents that we looked at before.

15   A       Just give me one moment.  Yes.

16   Q       And let's -- you see under the -- there's a heading

17   there next to number 3:  "Four contracts."  And then below

18   that there's A, B, C, and D.

19              Do you see that?

20   A       Yes.

21   Q       And D says:  "Administrative Services agreement.

22   We've asked for more information.  Not yet forthcoming."

23              Do you see that?

24   A       Yes.

25   Q       So at that point, you were still waiting for

1    information that you'd asked for?

2    A    Not me.  Underline the word "more."  We were asking

3    for more information.  We believed we had sufficient

4    information.  By the way, it was the view of our independent

5    counsel also -- that we had sufficient information to act on

6    the administrative services agreement, which was the subject

7    of this meeting.

8    Q    Do you have any idea of when you made these notes?

9    A    I'm sorry?

10   Q    Do you have any idea of when you made the notes on

11   this page?

12   A    Yes.  Just -- well, no.  Just before the meeting, but

13   I don't remember the date of the meeting.

14   Q    Do you have any idea of the year?

15   A    I imagine it was the year the distribution oversight

16   committee was formed; and at the moment -- no, I can't

17   remember the exact year.

18   Q    When was the distribution oversight committee formed?

19   A    I think it's been in existence for three or four

20   years.

21   Q    All right.  Let's go to Tab 27, which is Exhibit 2362.

22         And the first page is a e-mail from you to

23   Paul Haaga and others in March of 2004.  I believe it's --

24   A    Yes, but the memo is late February, yeah.

25   Q    And if you turn to the next page, that's a memorandum

 1   that you prepared and sent to Paul Haaga and two others?

 2   A     Yes.

 3   Q     And it was talking about the independent directors'

 4   session of AMBAL and IFA, in February of 2004.

 5         Do you see that?

 6   A     Yes.

 7   Q     And let's drop down one, two, three paragraphs.  Okay?

 8   A     Yes.

 9   Q     And let me read that paragraph into the record:

10         "We raise questions as to whether the 12b-1 plan

11   continues to be in the best interests of our shareholders.

12   Given 1, very strong investment results in the

13   American Funds; 2, Capital's leadership position in gaining

14   mutual fund assets, and 3, increased scrutiny of mutual fund

15   expenses, particularly fees paid to brokers.  If ever there

16   were a logical time to modify or eliminate the 12b-1, now is

17   that time.  If American Funds can, under the current fee

18   expense structure, consistently and over time beat their

19   benchmarks by, say, 150 to 200 basis points, dropping up to

20   25 basis points from 12b-1 would widen that gap by a very

21   meaningful amount.  The fact that other costs borne by

22   shareholders have increased and investment advisory fee

23   reductions have become minimal because of the size of the

24   funds.  This issue is best tackled at the annual contracts

25   committee meeting."

1           Do you see that?

2    A    Yes.

3    Q    Let me back up and read the paragraph just before that

4    because I'm going to ask you about their interrelationship.

5    The paragraph just before the one I read says:

6           "The very rapid growth in assets, the size of the

7    funds:  The independent directors expressed some uneasiness

8    about both the absolute size of and the rapid growth in

9    assets of the funds.  We recognize that CRMC views these

10   booming sales as good news to use Paul's phrase.  We want to

11   make sure that it is, in fact, good news for our

12   shareholders.  The following two issues relate to this

13   concern."

14          Do you see that?

15   A    Yes.

16   Q    And then you go and discuss the 12b-1 plan.  So your

17   discussion of the 12b-1 plan related to the issue about

18   growth because you believed 12b-1 fee payments stimulate

19   growth of assets?

20   A    I believe that the paragraph under 12b-1 in this memo

21   actually expresses some of my own naiveté.  12b-1 has

22   morphed, if you will, from its original purpose, when it was

23   first permitted by the SEC, into now being a very much part

24   of the financial structure of the distribution channel that

25   American Funds has chosen.  It was at this time that we were

1  setting up the distribution oversight committee and, among

2  other things we did, was to get very much closer to this

3  question of 12b-1.  And, in fact, during this time and

4  subsequently, I spent several days in the marketplace with

5  our wholesalers calling on broker-dealers; and it was then

6  that I learned just -- in kind of a visceral way the role

7  that 12b-1 was playing for the brokers in providing the

8  services that we felt that our shareholders very much

9  needed.  That is, we -- the whole business model of the

10 American Funds is to provide good investment vehicles for

11 people who are not necessarily sophisticated investors and

12 need the attention of broker-dealers.  These broker-dealers

13 need to be paid for that service if they're providing it.

14 The 12b-1 plan does just that.  It may reduce -- and,

15 indeed, I think it does reduce redemptions and that, in

16 fact, of course, will augment the total size of the fund.

17 But the 12b-1 was not being used to go out and gather fresh

18 new assets.  And I think we began to fully understand that

19 only as we dug more deeply into the subject.

20 Q    Now, did the independent directors ever discuss --

21 even if you were stuck with -- even if you needed to pay

22 these continuing 12b-1 fees to the brokers whether it was

23 still feasible to reduce the amount of 12b-1 fees being paid

24 to AFD for marketing efforts?

25 A    I'm sorry.  Would you repeat that, please.

1    Q    What you were just talking about was the importance of

2    paying 12b-1 service fees to the broker so they could

3    provide the service needed by your security holders;

4    correct?

5    A    Yes.

6    Q    Did the independent directors ever discuss whether you

7    could save some money on 12b-1 fees by reducing the amount

8    of 12b-1 fees paid to AFD which AFD would use to market and

9    promote the additional shares of the funds?

10   A    That was a small amount of the total fees.  And AFD

11   had the ongoing responsibility of working with these major

12   broker houses, and it was about this time they set up the

13   HOST program and so on.  Did we discuss that directly, I

14   don't recall.

15   Q    Let's turn to exhibit -- I'm sorry.  Tab 5, which is

16   Exhibit 2580.

17   A    Yes, sir.

18   Q    And down at the bottom of the page and going over into

19   the next several pages of this exhibit, Mr. Riggs, there's

20   an e-mail from Martin Fenton --

21   A    Yes.

22   Q    -- to a number of people, including you?

23   A    Yes.

24   Q    And Martin Fenton was also an independent director of

25   the funds?

1399

1   A     Not on the fund that I serve on, but he is an

2   independent director in other clusters.

3   Q     And he circulated this e-mail in April 2005?

4   A     All right.  Yes.

5   Q     And I'm going to read about three, four paragraphs

6   down where it starts with the words:  The questions and

7   concerns.  It says:  "The questions and concerns about

8   disaggregation and succession are ongoing, but it was

9   reassuring to hear from side that Capital was forthcoming

10  and reassuring in that Capital would encourage board

11  participation, discussion, and input with respect to any

12  management transitions or structural changes within CRMC."

13          Do you see that?

14  A     Yes.

15  Q     And then dropping down another two paragraphs, I'll

16  read the beginning of that paragraph.  It says:  "For the

17  go-go group, Hank Riggs spoke of the challenge of managing a

18  ballooning portfolio.  GFA is now hovering around

19  140 billion and there is external discussion to the effect

20  that perhaps the sales of fund shares should be closed and

21  what impact that might have on other funds.  Size also

22  complicates agility in the marketplace and raises the

23  question:  How deep is Capital's bench."

24          Do you see that?

25  A     Yes.

1400

1    Q    So you were aware that the disaggregation program had

2    actually begun a couple of years or three years earlier,

3    weren't you?

4    A    We're supposed to call it XY; correct?

5    Q    So now we're in May 2006, or April 2006, and the board

6    is recognizing there are ongoing concerns and questions

7    about disaggregation; correct?

8    A    Yes.

9    Q    And do you have any understanding of what Mr. Fenton

10   is referring to when he says you spoke for the go-go group?

11   A    I really don't know what "go-go group" means, but it

12   is true that GFA was the largest of the American Funds, and

13   I was chairman of the board of that fund.

14   Q    Okay.  Let's turn to Tab 4, which is Exhibit 2559.

15   A    Tab what?

16   Q    To Tab 4, which is Exhibit 2559.

17   A    Yes.

18   Q    And you see partly down the page there's an e-mail

19   from you dated April 6th, 2006?

20   A    Right.

21   Q    And dropping down a couple of paragraphs, I'll read

22   from -- I'll read the next paragraph:  "I believe that we,

23   as board members for GFA and Fundamental, have done a good

24   job of addressing the issues the author raises.  But

25   obviously our job is ongoing, and the continued avalanche of

1   new money to GFA requires that we again address the size

2   issue in a comprehensive manner at the May contracts

3   committee meeting for GFA and FI."

4        Do you see that?

5   A    Yes.

6   Q    And dropping down to the next paragraph, do you see

7   where next to no. 2, you discuss the possibility that the

8   board might get an outside consultant to aid the independent

9   directors in addressing these issues?

10  A    Yes.

11  Q    Did the board have to retain an outside director to

12  advise them on how to deal with the challenges of growth?

13  A    We did not.  We discussed this at some length and

14  considering the capabilities that existed, the diverse

15  capabilities but deep capabilities, the independent

16  directors, the knowledge of our outside counsel and the good

17  work of Capital, we felt that we were sort of in

18  unprecedented territory and that an outside consultant would

19  add little or nothing, and so we made the specific decision

20  not to turn to outside help.

21  Q    Did you recognize that CRMC had a conflict of interest

22  in advising the independent directors about whether there

23  was a problem with growth?

24  A    I'm not sure they did have a conflict of interest

25  in -- I think they are -- the Capital people are so oriented

1    to the welfare of the shareholders that if they felt it was

2    not in the best interest of the shareholders -- if it were

3    in the best interest to close the fund or do something else,

4    I believe they would have done it.  And would have urged us

5    to do it.

6    Q    But you did recognize that as assets grew, the dollar

7    amount of the advisory fee would automatically grow?

8    A    Of course.

9    Q    Let's go to --

10   A    If the result of that was to dilute the performance of

11   the funds that would not have been in the best interest of

12   our shareholders nor of Capital.

13   Q    Let's go to Tab 3, which is Exhibit 2550.

14            And on the bottom half of the first page there's

15   an e-mail from you to Paul Haaga in February 2006?

16   A    Yes.

17   Q    And it's reporting on the independent directors

18   seminar that had been held?

19   A    Yes.

20   Q    And you mention in the first -- in the second

21   paragraph, you mention that:  "At the conference call on

22   Tuesday," I'm quoting now, "several comments were made about

23   the size of the funds and the avalanche of new money that

24   Capital was getting.  We talked some about that in the

25   executive session of GFA/FI meeting today, and I think the

1403

1    question nags directors and investors more than they

2    verbalize."

3            Do you see that?

4    A    Yes.

5    Q    So as of this time, even though disaggregation had

6    been going on for several years, the directors were still

7    worried about whether growth was good for the funds?

8    A    We were -- we were still openly questioning what was

9    in the best interest of our shareholders.

10   Q    Okay.  Would you go to the second page of this

11   memorandum.  And dropping down -- there's a one-sentence

12   paragraph in the middle of the page that reads:

13            "In short, size seems to be the elephant in the

14   room that we haven't addressed directly, candidly, and

15   convincingly."

16            Do you see that?

17   A    Yes.

18   Q    So it was your view that several years into

19   disaggregation in early 2006, the directors in CRMC hadn't

20   been candid and convincing in addressing the size issue?

21   A    I hope that this comment on my part has something to

22   do with Capital's responding with a White Paper in '06 on

23   growth of assets -- which I found very convincing.

24   Q    Okay.  So you relied on the contents of the growth

25   White Paper in the sense that it assuaged your concern about

1    whether there was a problem from growth?

2    A    Yes, although I also have had always the strong

3    feeling that our multiple portfolio counselor system was a

4    huge factor in permitting us to deal with large funds.

5    Q    And was it your understanding that the independent

6    directors generally relied in a material way on the White

7    Paper on Growth in deciding whether growth was a continuing

8    concern or not?

9    A    I don't believe that there was a meeting of the

10   directors in the period '04 to '08, sir, where we did not

11   talk about the growth of the fund and are we able to handle

12   the inflow of money.  We talked to traders, we talked to

13   analysts, we talked to portfolio counselors to try to assess

14   as best we could, before and after the White Paper, the

15   effect of the increase in the size of the funds.

16   Q    But despite those conversations, there was still a

17   continuing concern at the director level when you get into

18   the first half of 2006?

19   A    It seems to me we would have been irresponsible had we

20   not been concerned about the size of the funds.  After all

21   Morningstar was writing reports:  Why doesn't GFA close the

22   fund.  We were, of course, interested in that.

23   Q    Let's go to Tab 19.

24   A    Nineteen?

25   Q    Nineteen, which is Exhibit 103.

1405

1    A      Okay.

2    Q      Oh, I'm sorry.  It's Exhibit 102.

3    A      Indeed.

4    Q      But it's Tab 19.

5    A      Yeah.

6    Q      First of all, you recognize this as the minutes of the

7    meeting of the governance and contracts committees of FI and

8    GFA May 24th, 2005?

9    A      Yes.

10   Q      Let's go two pages into the document where it says

11   Page 3 at the bottom.  And one, two, three, paragraphs down,

12   I'll read that paragraph:

13          "Messrs. Haaga and Rothenberg then responded to a

14   variety of questions from the committee.  Mr. Rothenberg

15   addressed the drivers of American Funds sales, including the

16   fact that recent overall relative market returns overall

17   were the best in its history, the impact of industry

18   scandals and the large proportion of equity products in the

19   American Funds family at a time of strong equity fund sales.

20   He also indicated that the costs of the recent

21   disaggregation of CRMC's portfolio manager organization were

22   not significant, and would not lead to a major increase in

23   personnel."

24          Do you see that?

25   A      Yes.

1406

1   Q     There's a reference to disaggregation there, but

2   there's no discussion of whether or not there are any

3   problems or concerns about the disaggregation program or

4   about growth, at least at that point in the minutes, is

5   there?

6   A     Would you repeat that question.

7   Q     In what I just read, although there's mention of

8   disaggregation, there's no discussion of any concern about

9   how the disaggregation program, how effectively it's dealing

10  with the problem of growth?

11  A     Well, it wasn't in this particular sentence, but it

12  was an ongoing discussion we had at every meeting.

13  Q     I tried to find it in these minutes, and I couldn't

14  find it.

15        Do you want to take a quick skim and --

16  A     I don't know that it's practical.

17        THE COURT:  What's the question, counsel?

18  BY MR. CONGRESS:

19  Q     Okay.  The question was:  In the one place where I

20  believe the minutes refer to the disaggregation program,

21  there's no discussion about any issues or problems about

22  growth.

23        THE COURT:  I'm still waiting for the question.

24        THE WITNESS:  Yeah, I'm still waiting for the

25  question, too.

1407

```
 1              THE COURT:  Hold on a second.  See what he just
 2   read.
 3              THE WITNESS:  Yes.
 4              THE COURT:  It references disaggregation.
 5              THE WITNESS:  Right.
 6              THE COURT:  Doesn't say any problems with it.
 7              THE WITNESS:  Yes.
 8              THE COURT:  I guess the question is:  Is there
 9   anything else in this document where a question is raised
10   relating to potential problems connected to this issue of
11   disaggregation?
12              THE WITNESS:  Well, I don't recall.  What I do
13   recall is that we were asking at this point whether there
14   were going to be substantial additional costs incurred by
15   Capital in connection with disaggregation such that it would
16   put pressure on the fees or the profits of the company in a
17   way that would be detrimental to the services of the
18   shareholders.
19              THE COURT:  And Rothenberg said no?
20              THE WITNESS:  Right.
21              THE COURT:  Why don't we break for lunch.
22              MR. CONGRESS:  Okay.
23              THE COURT:  Start up again at 1:00 o'clock with
24   Mr. Riggs.
25              We'll see you at 1:00 o'clock.
```

1    THE WITNESS:  Thank you.

2        (Recess taken at 12:00 a.m.;)

3

4                    -oOo-

5

6

7                CERTIFICATE

8

9        I hereby certify that pursuant to Section 753,

10   Title 28, United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings held in the above-entitled matter and that the

13   transcript format is in conformance with the regulations of

14   the Judicial Conference of the United States.

15

16   Date:  August 8, 2009

17

18

19   _____

                   LISA M. GONZALEZ, U.S. COURT REPORTER
20                 CSR NO. 5920

21

22

23

24

25