# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| In re AMERICAN MUTUAL FUNDS FEE LITIGATION | Case No. CV 04-5593 GAF (RNBx) |
| This Document Relates to: | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| ALL ACTIONS | |

## PRELIMINARY STATEMENT

The Court has now read and considered: (1) Defendants' Revised Proposed

Findings of Fact and Conclusions of Law; (2) Plaintiffs' Objections to Defendants'

Proposed Findings of Fact and Conclusions of Law (which includes 85 additional

proposed findings); (3) Defendants' Ex Parte Application For Leave to File A Reply in

Support of Their [Proposed] Findings of Fact and Conclusions of Law; and (4)

unrequested materials including Defendants Memorandum of Points and Authorities

Regarding the Court's Statement of Intended Decision and related responses and replies. Before the Court presents its detailed findings of fact and conclusions of law, it will address certain issues that the parties have raised in these documents and that seem best addressed separately from the remainder of the document.

(1) Plaintiff's Objections: Though Defendants quarrel with the specifics of a number of the objections, the Court will not address those disputes in any detail. The Court's response to the objections is incorporated in the findings and conclusions set forth below. However, the Court feels that a recurring objection requires a comment. Plaintiffs have, on many occasions, objected to the content of findings because the subject was not included in the Court's Statement of Intended Decision ("Statement"). That objection may have merit where the material included in the findings is inconsistent with the Court's Statement, but not otherwise. The Court expressly advised that it expected the proposed findings and conclusions would be substantially more detailed than the Statement and would cover matters not addressed in the Statement. While the Court agrees that there are items in Defendants' proposed findings that are not consistent with the Court's views of this case, those items have been deleted. However, the document contains much material that the Court anticipated would and should be included, and that material has been retained.

(2) Defendant's Objections: In a memorandum not requested by the Court, Defendants take issue with the Court's comments regarding the collaboration of the directors with management in connection with the litigation of this dispute.

Defendants argue that, in assessing the independence of the directors, the Court should focus solely on the conduct that occurred during their deliberations and not on their conduct at trial because there are reasons why they would be aligned with management in the defense of the case. The argument tends to prove the Court's point. A witness's association with a particular position may be considered in assessing the weight to be given the witness's testimony. Model jury instructions direct a trier of fact to consider demeanor, manner, apparent bias, and a witness's interest in the outcome of the litigation in evaluating the credibility of, and weight to be given to, a witness's testimony. The Court's comments go principally to those issues, which are a proper consideration.

But the memorandum also implicitly complains that the Court has not commended the directors for the job they did on behalf of the investors. For example, Defendants claim that the record "supports a finding that . . . the independent directors were well-informed on all material issues, and exercised their business judgment in a manner that they reasonably determined was in the best interests of fund shareholders." (Mem., at 5-6 n.3.) Such a statement does not reflect the Court's view, and the Court will not adopt those portions of the findings and conclusions that laud the work of the directors precisely because the Court does not believe that praise is warranted. The tenor of such proposed findings suggests that the directors achieved the best possible result for fund shareholders – a conclusion not warranted by the record but not required by controlling case law.

To be clear, the Court understands that a violation of section 36(b) under the *Gartenberg* standard requires proof that "the adviser-manager [has charged] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2nd Cir. 1982). But in the Court's view, this standard establishes a very low threshold for the mutual fund companies and a very high hurdle for a plaintiff.[1]  Because there is no real arm's-length bargaining between funds and their management,[2] and because true arm's length bargains are treated by some Courts as an irrelevant consideration, *Jones v. Harris Assocs. L.P.*, 527 F.3d 627, 634-35 (7th Cir. 2008), *reh. and reh.en banc denied*, 537 F.3d 928 (7th Cir. 2008), *cert. granted*, 129 S. Ct. 1579 (2009), there is little useful data from which to assess whether a management fee is consistent with arm's-length bargaining.  Even if such data existed, it would be of limited significance under

---

[1]Judge Posner, in his dissent from the denial of rehearing en banc in <u>Jones</u>, made the same point:
It's not as if *Gartenberg* has proved to be too hard on fund advisers. "Subsequent litigation [after *Gartenberg* ] in excessive fee cases has resulted almost uniformly in judgments for the defendants ... although there have been some notable settlements wherein defendants have agreed to prospective reduction in the fee schedule." James D. Cox et al., SECURITIES REGULATION: CASES AND MATERIALS 1211 (3d ed.2001); see also James D. Cox & John W. Payne, "Mutual Fund Expense Disclosures: A Behavioral Perspective," 83 WASH. U.L.Q. 907, 923 (2005).

[2]"As a rule, [mutual] fund shareholders neither benefit from arm's-length bargaining nor from prices that approximate those that arm's-length bargaining would yield were it the norm."  Jones, 537 F.3d, at 731-32.  (Posner, J., dissenting and quoting from Freeman & Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. CORP. L. 609, 634 (2001)).

*Gartenberg* because that case teaches that evidence that a better deal could have been struck would not establish a violation of Section 36(b). *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,* 528 F. Supp. 1038, 1047 (S.D.N.Y. 1981) ("It bears repeating that in order to provide relief under Section 36(b), it is not enough for this Court to find that a better bargain was possible."), *aff'd*, 694 F.2d 923 (2d Cir. 1982). For these reasons, a defendant's success in litigation, where the availability of a better bargain is considered insufficient to prove a breach of fiduciary duty, proves little about the conduct of the unaffiliated directors.

Judge Posner addressed this issue in his <u>Jones</u> dissent. Criticizing the rationale of the panel decision, he wrote:

> The panel bases its rejection of *Gartenberg* mainly on an economic analysis that is ripe for reexamination on the basis of growing indications that executive compensation in large publicly traded firms often is excessive because of the feeble incentives of boards of directors to police compensation. See, e.g., Lucian Bebchuk & Jesse Fried, Pay without Performance: The Unfilfilled Promise of Executive Compensation 23-44 (2004); Charles A. O'Reilly III & Brian G.M. Main, "It's More Than Simple Economics," 36 Organizational Dynamics 1 (2007); Ivan E. Brick, Oded Palmon & John K. Wald, "CEO Compensation, Director Compensation, and Firm Performance: Evidence of Cronyism?," 12 J. Corp. Finance 403 (2006); Arthur Levitt, Jr., "Corporate Culture and the Problem of Executive Compensation," 30 J. Corp. Law 749, 750 (2005); [numerous additional citations.]

537 F.3d, at 730. Further, he noted, "Competition in product and capital markets can't be counted on to solve the problem because the same structure of incentives operates on all large corporations and similar entities, including mutual funds." *Id*. Judge Posner's observation regarding incentives is particularly apt. The Court finds little in

the record to establish a potent incentive on the part of the directors, regardless of their education, background and experience, to police the compensation paid to CRMC to manage the Funds.

One example, in particular, is noteworthy: the directors were never provided with data showing, either in the aggregate or in specific instances, the compensation paid to employees of the defendants. There is no evidence that any director ever asked for such information, and when management advised that its compensation levels (which were undisclosed) were necessary to meet competition in the marketplace, the directors simply accepted that claim as gospel. There is not a shred of evidence that any director asked management to identify who CRMC perceived as its competition, to provide information regarding compensation levels at those competing firms, to compare those compensation levels to compensation paid to CRMC and AFD employees, or to explain why those compensation levels were necessary to attract and retain personnel or to provide services at a specified level of quality. Given that, after CRMC paid all of its expenses, *including salary and bonuses*, it contributed 35% of the net revenues to its Special Compensation Plan, one would have expected some level of interest on the part of the directors. But no such interest was shown. The existing incentives were simply insufficient to move even the most aggressive director to raise questions on this subject. Thus, although the directors were represented by counsel and were provided with detailed materials to which they and Defendants can point to and say, "see how thorough and careful we were," the entire process seems

less a true negotiation and more an elaborate exercise in checking off boxes and papering the file. Nonetheless, this is what controlling case law and SEC regulations demand, and is sufficient to immunize Defendants against section 36(b) liability so long as the fees charged are not grossly out of line with the range of fees charged in the industry.

The Court will not belabor the point further. In the end, the *Gartenberg* standard establishes a very high hurdle to overcome, and Plaintiffs failed in that effort. But, in the Court's view, that conclusion should not be mistaken for a determination that the directors obtained the best possible deal for investors as suggested in some of Defendants' proposed findings and conclusions of law. For that reason, the Court has omitted a number of the findings and conclusions directed to what the Defendants describe as the independence and diligence of the Unaffiliated Directors. In sum, although Defendants proposed certain findings that included what amounted to a commendation for the work of the directors, they will have to be satisfied with merely winning the lawsuit.

## FINDINGS OF FACT

**I.     OVERVIEW**

**A.     The Plaintiffs**

1.     Plaintiffs bring this lawsuit on behalf of investors in the following eight American Funds:  AMCAP Fund, Inc. ("AMCAP"), American Balanced Fund, Inc. ("AMBAL"), The Bond Fund of America, Inc. ("BFA"), Capital Income Builder, Inc. ("CIB"), The Investment Company of America ("ICA"), The Income Fund of

America, Inc. ("IFA"), The Growth Fund of America, Inc. ("GFA"), and Capital World Growth and Income Fund, Inc. ("WGI") (collectively, the "Funds"). [SF-8][1]

2.      Plaintiff Rodney T. Jelinek held as of July 15, 2004, and continued to hold Class A shares of ICA as of June 24, 2009. [SF-17]

3.      Plaintiff David L. Caplan & Robert M. Macko, as Trustees of the David L. Caplan Revocable Trust, held as of July 15, 2004, and continued to hold Class C shares of CIB and IFA as of June 24, 2009. [SF-18]

4.      Plaintiff Gregory J. Baurnes held as of July 15, 2004, and continued to hold Class A shares of AMBAL, BFA, GFA, CIB, and WGI as of June 24, 2009. [SF-19]

5.      Plaintiff Ernest Visalli held as of July 15, 2004, and continued to hold Class A shares of BFA as of June 24, 2009. [SF-20]

6.      Plaintiff Paul D. Angotta held, as of July 15, 2004, Class A shares of AMCAP, GFA and ICA. On or about June 3, 2009, Mr. Angotta sold all of his shares of these funds. On June 15, 2009, Mr. Angotta purchased 20.733, 14.303, and 15.165 Class A shares of AMCAP, GFA and ICA, respectively, and continued to hold those shares as of June 24, 2009. [SF-21]

7.      None of the Plaintiffs owns Class B, F, R, or 529 shares of the Funds. [SF-22]

8.      No Plaintiff owns Class C shares in AMCAP, AMBAL, BFA, ICA, GFA, and WGI. [SF-23]

---

[1] The Parties' Stipulated Facts (June 24, 2009) (Dkt. No. 425.3) are indicated by [SF-_].

### B. Defendants and Related Entities

#### 1. CRMC

9. Defendant Capital Research and Management Company ("CRMC") is a wholly-owned subsidiary of The Capital Group Companies, Inc. ("Capital Group"), a privately owned company. [SF-1,3]

10. CRMC is a registered investment adviser under the Investment Advisers Act of 1940. [SF-4]

11. CRMC has served as the investment adviser to the American Funds since 1931. [SF-5]

12. CRMC's business is devoted exclusively to managing mutual funds and providing related services. [SF-6]

13. CRMC maintains a long-term perspective in managing the American Funds. Ex. 648 at 27, 39; Tr. 259:3-13.

14. Capital Group is a global firm with twenty-three offices throughout the world. Tr. 107:4-11.

15. CRMC manages fixed income assets through its Fixed Income Division. [SF-11]

16. CRMC currently manages equity assets through two investment divisions: Capital World Investors ("CWI") and Capital Research Global Investors ("CRGI"). [SF-9]

17. From fiscal years 2002 to 2006, CRMC and its subsidiaries collectively employed several thousand associates to carry out CRMC's consolidated operations, with 2,777 associates employed in fiscal year 2002 and 4,060 associates employed in fiscal year 2006. [SF-76]

#### 2. AFD

18. Defendant American Funds Distributors, Inc. ("AFD") is a registered broker-dealer and wholly owned subsidiary of CRMC. [SF-12]

19.     AFD is the principal underwriter and distributor of the American Funds. [SF-13]; *see also* Tr. 352:24-353:1.

20.     AFD distributes and markets the Funds almost exclusively through broker-dealers and other financial intermediaries.  Ex. 335 at CORBI_0209265; Ex. 648 at 52 n.34; Tr. 354:11-14.

21.     AFD has formed a selling group comprised of broker-dealers and other financial intermediaries who offer the Funds to the public and provide services to American Funds shareholders.  [SF-14]

22.     AFD enters into a Selling Group Agreement with each broker-dealer firm selling the Funds, pursuant to which AFD grants the broker-dealer firm the authority to sell the Funds.  [SF-72]

23.     Under the Selling Group Agreement, the broker-dealer firm agrees to abide by certain policies set forth in the Agreement regarding order processing, redemptions, use of sales literature, and maintaining securities law qualifications and registrations.  In addition, the broker-dealer firm must represent that it complies with all applicable federal and state laws and will continue to do so.  Ex. 333 at CORBI_0208988-90; *see also* Tr. at 788:21-790:4.

### 3.     AFS

24.     American Funds Service Company ("AFS"), a wholly owned subsidiary of CRMC, provides services to Fund shareholders as a transfer agent, dividend disbursing agent, and directed redemption agent for the American Funds.  [SF-15]

25.     The transfer agency services provided by AFS include recordkeeping, account maintenance, transaction and distribution processing, tax reporting, responding to account related calls from shareholders and advisers, shareholder and fund communications, and website-based services.  *See, e.g.*, Ex. 688 at CORBI_0204157; Tr. 444:5-18, 496:9-497:3.

26.     AFS is not a Defendant in this action.  [SF-16]

C.    **The American Funds**

27.    The American Funds mutual fund complex consists of thirty (30) mutual funds of varying size, asset mix, and investment strategy.  Ex. 649 at ¶¶ 16, 20; Ex. 1134 at CORBI_0075721.

28.    The investment objectives of the eight Funds at issue are as follows:  [SF-25]

- AMBAL: The fund's investment objectives are:  (1) conservation of capital, (2) current income and (3) long-term growth of capital and income.

- AMCAP:  The fund's investment objective is to provide long-term growth of capital.

- BFA:  The fund's investment objective is to provide as high a level of current income as is consistent with the preservation of capital.

- CIB:  The fund has two primary investment objectives.  It seeks (1) to provide a level of current income that exceeds the average yield on U.S. stocks generally and (2) to provide a growing stream of income over the years.

- ICA:  The fund's investment objectives are to achieve long-term growth of capital and income.

- IFA:  The fund's investment objectives are to provide current income while secondarily striving for capital growth.

- GFA:  The fund's investment objective is to provide growth of capital.

- WGI:  The fund's investment objective is to provide long-term growth of capital while providing current income.

29.    Net assets under management for the American Funds mutual fund complex increased from $422 billion in fiscal year 2003 to approximately $1.2 trillion in fiscal year 2008, with a high of $1.225 trillion in fiscal year 2007.  Net assets under management for the Funds at issue increased from $243.6 billion in fiscal year 2003 to

$548.6 billion in fiscal year 2008, with a high of $710.5 billion in fiscal year 2007. [SF-73]

30.     From fiscal year 2003 to fiscal year 2008, the number of average active full-service accounts, excluding street-name and omnibus accounts, increased from 11.3 million to nearly 23 million.  *See* Ex. 2224; Ex. 621 at CORBI_0362734 (showing that the total number of average active accounts, including street name and omnibus accounts, was approximately 35 million in 2004 and 71 million in 2008); Tr. 501:6-502:13.

### D.     Fees Charged to American Funds Investors

31.     Every fund at issue in this litigation offers multiple share classes to investors (*e.g.*, Class A, B, C, F, R and 529 shares).  [SF 17-23].  Each share class possesses a specific fee structure that differentiates it from other share classes.  Ex. 3 at CORBI_0231606-CORBI_0231612; Tr. 354:6-355:10, 481:4-11, 635:23-636:16.

32.     While each share class has a different fee structure, as a result of different arrangements for shareholder services or for distribution related services, the different share classes invest in the same portfolio of assets and receive the same investment management services.  Ex. 1208 at 16; Tr. 361:22-362:6.

33.     CRMC and its subsidiaries charge the Funds various fees in exchange for providing services to the Funds, including portfolio management, fund accounting, transfer agency, distribution, and shareholder services.  [SF-26]

34.     The Funds are sold to investors as an integrated product.  An investor cannot purchase these services separately.  Ex. 651 at ¶ 24; Tr. 1525:14-1526:3. Nonetheless, the payment of certain of these fees, notably the 12b-1 fees provide greater benefit to the defendants than to investors in the American Funds.

35.     CRMC discloses each Fund's fees and total expenses in the Fund's prospectus, annual report, semi-annual report, and statement of additional information. [SF-27]

## 1. Investment Advisory Fees

36.     Pursuant to Investment Advisory and Service Agreements (the "Advisory Agreements"), CRMC acts as the investment adviser to each of the Funds and provides investment management services such as investment research, investment selection, and portfolio trading, as well as related executive, administrative, clerical, compliance and bookkeeping services.  *E.g.*, [SF-28-30]; Ex. 690; Tr. 108:8-14.

37.     In exchange for providing these services, CRMC charges each fund an advisory fee (sometimes called a management or investment advisory fee).  [SF-31]

38.     The advisory fee is calculated either as a percentage of the particular fund's assets under management, or in the case of IFA, BFA, and CIB, as a percentage of assets under management plus a percentage of the fund's gross income earned by the fund.  [SF-32-33]

39.     The advisory fee schedules for the eight Funds include various breakpoints, which are scheduled reductions in the rate of the advisory fee as net assets under management increase.  [SF-34-36]

40.     Since 2002, there have been at least twenty-six (26) new breakpoints added to the fee schedules of the eight Funds at issue in this action.  [SF-38]

41.     Seventeen (17) breakpoints were added to six of the eight Funds at issue during fiscal year 2004 alone.  [SF-38]

42.     The advisory fee schedule for each Fund for the period relevant to this litigation (July 2003 to present) is set out below.  [SF-38]

### a. AMCAP

| | |
|---|---|
| 7/1/93 to 11/30/03<br>.485% on first $1 billion of assets<br>.385% from $1 to $2 billion<br>.355% from $2 to $3 billion<br>.335% from $3 to $5 billion<br>.32% from $5 to $8 billion<br>.31% on assets over $8 billion | |
| 12/1/03 to 3/31/06 | 4/1/06 to date |

| | |
|---|---|
| .485% on first $1 billion of assets | .485% on first $1 billion of assets |
| .385% from $1 to $2 billion | .385% from $1 to $2 billion |
| .355% from $2 to $3 billion | .355% from $2 to $3 billion |
| .335% from $3 to $5 billion | .335% from $3 to $5 billion |
| .32% from $5 to $8 billion | .32% from $5 to $8 billion |
| .31% from $8 to $13 billion | .31% from $8 to $13 billion |
| .30% from $13 to $21 billion | .30% from $13 to $21 billion |
| .295% on assets over $21 billion | .295% from $21 to $27 billion |
| | .29% on assets over $27 billion |

**b.     AMBAL**

| 1/1/03 to 4/4/04 | 4/5/04 to 12/31/04 |
|---|---|
| .42% on first $500 million of assets | .42% on first $500 million of assets |
| .324% from $500 million to $1 billion | .324% from $500 million to $1 billion |
| .30% from $1 to $1.5 billion | .30% from $1 to $1.5 billion |
| .282% from $1.5 to $2.5 billion | .282% from $1.5 to $2.5 billion |
| .27% from $2.5 to $4 billion | .27% from $2.5 to $4 billion |
| .262% from $4 to $6.5 billion | .262% from $4 to $6.5 billion |
| .255% from $6.5 to $10.5 billion | .255% from $6.5 to $10.5 billion |
| .25% from $10.5 to $13 billion | .25% from $10.5 to $13 billion |
| .245% from $13 to $17 billion | .245% from $13 to $17 billion |
| .24% from $17 to $21 billion | .24% from $17 to $21 billion |
| .236% from $21 to $27 billion | .235% from $21 to $27 billion |
| .232% on assets over $27 billion | .230% from $27 to $34 billion |
| | .225% from $34 to $44 billion |
| | .220% on assets over $44 billion |

| 1/1/05 to 12/31/05 | 1/1/06 to Present |
|---|---|
| .42% on first $500 million of assets | .42% on first $500 million of assets |
| .324% from $500 million to $1 billion | .324% from $500 million to $1 billion |
| .30% from $1 to $1.5 billion | .30% from $1 to $1.5 billion |
| .282% from $1.5 to $2.5 billion | .282% from $1.5 to $2.5 billion |
| .27% from $2.5 to $4 billion | .27% from $2.5 to $4 billion |
| .262% from $4 to $6.5 billion | .262% from $4 to $6.5 billion |
| .255% from $6.5 to $10.5 billion | .255% from $6.5 to $10.5 billion |
| .25% from $10.5 to $13 billion | .25% from $10.5 to $13 billion |
| .245% from $13 to $17 billion | .245% from $13 to $17 billion |
| .24% from $17 to $21 billion | .24% from $17 to $21 billion |
| .235% from $21 to $27 billion | .235% from $21 to $27 billion |
| .230% from $27 to $34 billion | .230% from $27 to $34 billion |
| .225% from $34 to $44 billion | .225% from $34 to $44 billion |
| .220% from $44 to $55 billion | .220% from $44 to $55 billion |
| .215% on assets over $55 billion | .215% from $55 to $71 billion |
| | .210% on assets over $71 billion |

c.      **BFA**

| 11/1/98 to 10/31/03 | 11/1/03 to 3/31/04 |
|---|---|
| .30% on first $60 million of assets | .30% on first $60 million of assets |
| .21% from $60 million to $1 billion | .21% from $60 million to $1 billion |
| .18% from $1 to $3 billion | .18% from $1 to $3 billion |
| .16% from $3 to $6 billion | .16% from $3 to $6 billion |
| .15% from $6 to $10 billion | .15% from $6 to $10 billion |
| .14% on assets over $10 billion; PLUS | .14% from $10 to $16 billion |
| 2.25% of first $8,333,333 of monthly gross income | .13% on assets over $16 billion; PLUS |
| 2% of monthly gross income over $8,333,333 | 2.25% of first $8,333,333 of monthly gross income |
| | 2% of monthly gross income from $8,333,333 to $41,666,667 |
| | 1.75% of monthly gross income in excess of $41,666,667 |

| 4/1/04 to 10/31/07 | 11/1/07 to present |
|---|---|
| .30% on first $60 million of assets | .30% on first $60 million of assets |
| .21% from $60 million to $1 billion | .21% from $60 million to $1 billion |
| .18% from $1 to $3 billion | .18% from $1 to $3 billion |
| .16% from $3 to $6 billion | .16% from $3 to $6 billion |
| .15% from $6 to $10 billion | .15% from $6 to $10 billion |
| .14% from $10 to $16 billion | .14% from $10 to $16 billion |
| .13% from $16 to $20 billion | .13% from $16 to $20 billion |
| .12% on assets over $20 billion; PLUS | .12% from $20 to $28 billion |
| 2.25% of first $8,333,333 of monthly gross income | .115% from $28 to $36 billion |
| 2% of monthly gross income from $8,333,333 to $41,666,667 | .11% on assets over $36 billion; PLUS |
| 1.75% of monthly gross income in excess of $41,666,667 | 2.25% of first $8,333,333 of monthly gross income |
| | 2% of monthly gross income from $8,333,333 to $41,666,667 |
| | 1.75% of monthly gross income over $41,666,667 |

### d.     CIB

| 3/1/95 to 10/31/03 | |
|---|---|
| .24% on first $1 billion of assets | |
| .20% from $1 to $2 billion | |
| .18% from $2 to $3 billion | |
| .165% from $3 to $5 billion | |
| .155% from $5 to $8 billion | |
| .15% on assets over $8 billion; PLUS | |
| 3% of annual gross income | |

| | |
|---|---|
| <u>11/1/03 to 5/31/04</u><br>.24% on first $1 billion of assets<br>.20% from $1 to $2 billion<br>.18% from $2 to $3 billion<br>.165% from $3 to $5 billion<br>.155% from $5 to $8 billion<br>.150% from $8 to $13 billion<br>.145% from $13 to $17 billion<br>.140% from $17 to $21 billion<br>.135% from $21 to $27 billion<br>.130% on assets over $27 billion; PLUS<br>3% of annual gross income | <u>6/1/04 to 10/31/05</u><br>.24% on first $1 billion of assets<br>.20% from $1 to $2 billion<br>.18% from $2 to $3 billion<br>.165% from $3 to $5 billion<br>.155% from $5 to $8 billion<br>.150% from $8 to $13 billion<br>.145% from $13 to $17 billion<br>.140% from $17 to $21 billion<br>.135% from $21 to $27 billion<br>.130% from $27 to $34 billion<br>.125% from $34 to $44 billion<br>.120% on assets over $44 billion; PLUS<br>3% of first $1.2 billion of annual gross income<br>2.5% of annual gross income over $1.2 billion |
| <u>11/1/05 to 10/31/06</u><br>.24% on first $1 billion of assets<br>.20% from $1 to $2 billion<br>.18% from $2 to $3 billion<br>.165% from $3 to $5 billion<br>.155% from $5 to $8 billion<br>.150% from $8 to $13 billion<br>.145% from $13 to $17 billion<br>.140% from $17 to $21 billion<br>.135% from $21 to $27 billion<br>.130% from $27 to $34 billion<br>.125% from $34 to $44 billion<br>.120% from $44 to $55 billion<br>.117% on assets over $55 billion; PLUS<br>3% of first $1.2 billion of annual gross income<br>2.5% of annual gross income over $1.2 billion | <u>11/1/06 to 10/31/07</u><br>.24% on first $1 billion of assets<br>.20% from $1 to $2 billion<br>.18% from $2 to $3 billion<br>.165% from $3 to $5 billion<br>.155% from $5 to $8 billion<br>.150% from $8 to $13 billion<br>.145% from $13 to $17 billion<br>.140% from $17 to $21 billion<br>.135% from $21 to $27 billion<br>.130% from $27 to $34 billion<br>.125% from $34 to $44 billion<br>.120% from $44 to $55 billion<br>.117% from $55 to $71 billion<br>.114% from $71 to $89 billion<br>.112% on assets over $89 billion; PLUS<br>3% of first $1.2 billion of annual gross income<br>2.5% of annual gross income over $1.2 billion |

| 11/1/07 to present |  |
|---|---|
| .24% on first $1 billion of assets |  |
| .20% from $1 to $2 billion |  |
| .18% from $2 to $3 billion |  |
| .165% from $3 to $5 billion |  |
| .155% from $5 to $8 billion |  |
| .150% from $8 to $13 billion |  |
| .145% from $13 to $17 billion |  |
| .140% from $17 to $21 billion |  |
| .135% from $21 to $27 billion |  |
| .130% from $27 to $34 billion |  |
| .125% from $34 to $44 billion |  |
| .120% from $44 to $55 billion |  |
| .117% from $55 to $71 billion |  |
| .114% from $71 to $89 billion |  |
| .112% from $89 to 115 billion |  |
| .110% on assets over $115 billion; PLUS |  |
| 3% of first $1.2 billion of annual gross income |  |
| 2.5% of annual gross income over $1.2 billion |  |

### e. ICA

| 1/1/00 to 2/15/05 | 2/16/05 to present |
|---|---|
| .39% on first $1 billion of assets | .39% on first $1 billion of assets |
| .336% from $1 to $2 billion | .336% from $1 to $2 billion |
| .30% from $2 to $3 billion | .30% from $2 to $3 billion |
| .276% from $3 to $5 billion | .276% from $3 to $5 billion |
| .258% from $5 to $8 billion | .258% from $5 to $8 billion |
| .246% from $8 to $13 billion | .246% from $8 to $13 billion |
| .24% from $13 to $21 billion | .24% from $13 to $21 billion |
| .234% from $21 to $34 billion | .234% from $21 to $34 billion |
| .231% from $34 to $44 billion | .231% from $34 to $44 billion |
| .228% from $44 to $55 billion | .228% from $44 to $55 billion |
| .225% from $55 to $71 billion | .225% from $55 to $71 billion |
| .222% on assets over $71 billion | .222% from $71 to $89 billion |
|  | .219% on assets over $89 billion |

### f.    IFA

| 1/1/00 to 12/31/04 | 1/1/05 to 12/31/05 |
|---|---|
| .25% on first $500 million of assets | .25% on first $500 million of assets |
| .23% from $500 million to $1 billion | .23% from $500 million to $1 billion |
| .21% from $1 to $1.5 billion | .21% from $1 to $1.5 billion |
| .19% from $1.5 to $2.5 billion | .19% from $1.5 to $2.5 billion |
| .17% from $2.5 to $4 billion | .17% from $2.5 to $4 billion |
| .16% from $4 to $6.5 billion | .16% from $4 to $6.5 billion |
| .15% from $6.5 to $10.5 billion | .15% from $6.5 to $10.5 billion |
| .144% from $10.5 to $13 billion | .144% from $10.5 to $13 billion |
| .141% from $13 to $17 billion | .141% from $13 to $17 billion |
| .138% from $17 to $21 billion | .138% from $17 to $21 billion |
| .135% from $21 to $27 billion | .135% from $21 to $27 billion |
| .133% from $27 to $34 billion | .133% from $27 to $34 billion |
| .131% from $34 to $44 billion | .131% from $34 to $44 billion |
| .129% on assets over $44 billion; PLUS | .129% from $44 to $55 billion |
| 2.25% of annual gross income | .127% on assets over $55 billion; PLUS |
|  | 2.25% of annual gross income |
| **1/1/06 to 12/31/07** | **1/1/08 to present** |
| .25% on first $500 million of assets | .25% on first $500 million of assets |
| .23% from $500 million to $1 billion | .23% from $500 million to $1 billion |
| .21% from $1 to $1.5 billion | .21% from $1 to $1.5 billion |
| .19% from $1.5 to $2.5 billion | .19% from $1.5 to $2.5 billion |
| .17% from $2.5 to $4 billion | .17% from $2.5 to $4 billion |
| .16% from $4 to $6.5 billion | .16% from $4 to $6.5 billion |
| .15% from $6.5 to $10.5 billion | .15% from $6.5 to $10.5 billion |
| .144% from $10.5 to $13 billion | .144% from $10.5 to $13 billion |
| .141% from $13 to $17 billion | .141% from $13 to $17 billion |
| .138% from $17 to $21 billion | .138% from $17 to $21 billion |
| .135% from $21 to $27 billion | .135% from $21 to $27 billion |
| .133% from $27 to $34 billion | .133% from $27 to $34 billion |
| .131% from $34 to $44 billion | .131% from $34 to $44 billion |
| .129% from $44 to $55 billion | .129% from $44 to $55 billion |
| .127% from $55 to $71 billion | .127% from $55 to $71 billion |
| .125% on assets over $71 billion; PLUS | .125% from $71 to $89 billion |
| 2.25% of annual gross income | .123% on assets over $89 billion; PLUS |
|  | 2.25% of annual gross income |

## g.  GFA

| 9/1/00 to 2/29/04 | 3/1/04 to 8/31/05 |
|---|---|
| .50% on first $1 billion of assets | .50% on first $1 billion of assets |
| .40% from $1 to $2 billion | .40% from $1 to $2 billion |
| .37% from $2 to $3 billion | .37% from $2 to $3 billion |
| .35% from $3 to $5 billion | .35% from $3 to $5 billion |
| .33% from $5 to $8 billion | .33% from $5 to $8 billion |
| .315% from $8 to $13 billion | .315% from $8 to $13 billion |
| .30% from $13 to $21 billion | .30% from $13 to $21 billion |
| .29% from $21 to $27 billion | .29% from $21 to $27 billion |
| .285% from $27 to $34 billion | .285% from $27 to $34 billion |
| .281% from $34 to $44 billion | .280% from $34 to $44 billion |
| .278% from $44 to $55 billion | .275% from $44 to $55 billion |
| .276% on assets over $55 billion | .270% from $55 to $71 billion |
| | .265% from $71 to $89 billion |
| | .260% on assets over $89 billion |

| 9/1/05 to 8/31/06 | 9/1/06 to 8/31/07 |
|---|---|
| .50% on first $1 billion of assets | .50% on first $1 billion of assets |
| .40% from $1 to $2 billion | .40% from $1 to $2 billion |
| .37% from $2 to $3 billion | .37% from $2 to $3 billion |
| .35% from $3 to $5 billion | .35% from $3 to $5 billion |
| .33% from $5 to $8 billion | .33% from $5 to $8 billion |
| .315% from $8 to $13 billion | .315% from $8 to $13 billion |
| .30% from $13 to $21 billion | .30% from $13 to $21 billion |
| .29% from $21 to $27 billion | .29% from $21 to $27 billion |
| .285% from $27 to $34 billion | .285% from $27 to $34 billion |
| .280% from $34 to $44 billion | .280% from $34 to $44 billion |
| .275% from $44 to $55 billion | .275% from $44 to $55 billion |
| .270% from $55 to $71 billion | .270% from $55 to $71 billion |
| .265% from $71 to $89 billion | .265% from $71 to $89 billion |
| .260% from $89 to $102.5 billion | .260% from $89 to $102.5 billion |
| .255% from $102.5 to $116 billion | .255% from $102.5 to $116 billion |
| .25% from $116 to $130 billion | .25% from $116 to $130 billion |
| .245% on assets over $130 billion | .245% from $130 to $144 billion |
| | .242% from $144 to $166 billion |
| | .239% on assets over $166 billion |

| | |
|---|---|
| 9/1/07 to Present<br>.50% on first $1 billion of assets<br>.40% from $1 to $2 billion<br>.37% from $2 to $3 billion<br>.35% from $3 to $5 billion<br>.33% from $5 to $8 billion<br>.315% from $8 to $13 billion<br>.30% from $13 to $21 billion<br>.29% from $21 to $27 billion<br>.285% from $27 to $34 billion<br>.280% from $34 to $44 billion<br>.275% from $44 to $55 billion<br>.270% from $55 to $71 billion<br>.265% from $71 to $89 billion<br>.260% from $89 to $102.5 billion<br>.255% from $102.5 to $116 billion<br>.25% from $116 to $130 billion<br>.245% from $130 to $144 billion<br>.242% from $144 to $166 billion<br>.239% from $166 billion to $188 billion<br>.236% from $188 billion to 210 billion<br>.233% on assets over $210 billion | |

### h.    WGI

| 11/1/00 to 5/31/04 | 6/1/04 to 10/31/05 |
|---|---|
| .60% on first $500 million of assets<br>.50% from $500 million to $1 billion<br>.46% from $1 to $1.5 billion<br>.43% from $1.5 to $2.5 billion<br>.41% from $2.5 to $4 billion<br>.40% from $4 to $6.5 billion<br>.395% from $6.5 to $10.5 billion<br>.39% from $10.5 to $17 billion<br>.385% on assets over $17 billion | .60% on first $500 million of assets<br>.50% from $500 million to $1 billion<br>.46% from $1 to $1.5 billion<br>.43% from $1.5 to $2.5 billion<br>.41% from $2.5 to $4 billion<br>.40% from $4 to $6.5 billion<br>.395% from $6.5 to $10.5 billion<br>.39% from $10.5 to $17 billion<br>.385% from $17 to $21 billion<br>.38% from $21 to $27 billion<br>.375% from $27 to $34 billion<br>.37% from $34 to $44 billion<br>.365% on assets over $44 billion |

| 11/1/05 to 10/31/06 | 11/1/06 to 10/31/07 |
|---|---|
| .60% on first $500 million of assets<br>.50% from $500 million to $1 billion<br>.46% from $1 to $1.5 billion<br>.43% from $1.5 to $2.5 billion<br>.41% from $2.5 to $4 billion<br>.40% from $4 to $6.5 billion<br>.395% from $6.5 to $10.5 billion<br>.39% from $10.5 to $17 billion<br>.385% from $17 to $21 billion<br>.38% from $21 to $27 billion<br>.375% from $27 to $34 billion<br>.370% from $34 to $44 billion<br>.365% from $44 to $55 billion<br>.360% on assets over $55 billion | .60% on first $500 million of assets<br>.50% from $500 million to $1 billion<br>.46% from $1 to $1.5 billion<br>.43% from $1.5 to $2.5 billion<br>.41% from $2.5 to $4 billion<br>.40% from $4 to $6.5 billion<br>.395% from $6.5 to $10.5 billion<br>.39% from $10.5 to $17 billion<br>.385% from $17 to $21 billion<br>.38% from $21 to $27 billion<br>.375% from $27 to $34 billion<br>.370% from $34 to $44 billion<br>.365% from $44 to $55 billion<br>.36% from $55 to $71 billion<br>.356% from $71 to $89 billion<br>.352% on assets over $89 billion |
| 11/1/07 to present<br>.60% on first $500 million of assets<br>.50% from $500 million to $1 billion<br>.46% from $1 to $1.5 billion<br>.43% from $1.5 to $2.5 billion<br>.41% from $2.5 to $4 billion<br>.40% from $4 to $6.5 billion<br>.395% from $6.5 to $10.5 billion<br>.39% from $10.5 to $17 billion<br>.385% from $17 to $21 billion<br>.38% from $21 to $27 billion<br>.375% from $27 to $34 billion<br>.370% from $34 to $44 billion<br>.365% from $44 to $55 billion<br>.36% from $55 to $71 billion<br>.356% from $71 to $89 billion<br>.352% from $89 to $115 billion<br>.350% on assets over $115 billion | |

43.     In addition to breakpoints, CRMC has also waived portions of the Funds'
advisory fees.  [SF-39].

44. As of September 1, 2004, CRMC implemented a voluntary fee waiver that reduced the advisory fees charged to the American Funds, including the Funds, by five percent. [SF-39]; Ex. 858.

45. As of April 1, 2005, CRMC increased the fee waiver to ten percent. [SF-40]

46. Before implementing each of the fee waivers, CRMC presented its proposal for the waiver to the Boards of Directors. Ex. 858; Ex. 859; Tr. 555:1-14, 977:23-978:3, 985:13-986:8.

47. In both instances, the Directors approved the proposed fee waivers. *See, e.g.*, Ex. 107 at CORBI_0342547-CORBI_0342549; Tr. 871:19-872:14, 942:4-9.

48. The fee waivers resulted in a decrease in advisory fees paid by all American Funds of approximately $1.2 billion during the period September 1, 2004, through December 31, 2008. [SF-42]

49. For the eight Funds at issue, the fee waivers reduced advisory fees by approximately $540 million from September 1, 2004, to June 30, 2008, in addition to the reductions realized from breakpoints. [SF-43]

50. With respect to the Funds at issue, CRMC waived the following amounts of investment advisory fees pursuant to the fee waivers during the relevant CRMC fiscal years: [SF-44]

|       | FY Ending 6/30/05 | FY Ending 6/30/06 | FY Ending 6/30/07 | FY Ending 6/30/08 | Total |
|-------|-------------------|-------------------|-------------------|-------------------|-------|
| AMCAP | $ 3,234,413 | $ 7,200,051 | $ 8,045,471 | $ 8,380,721 | $ 26,860,656 |
| AMBAL | $ 5,972,095 | $ 12,438,836 | $ 13,341,630 | $ 14,098,440 | $ 45,851,001 |
| BFA   | $ 2,698,491 | $ 5,740,673 | $ 6,976,466 | $ 8,749,260 | $ 24,164,890 |
| CIB   | $ 6,352,371 | $ 15,331,278 | $ 20,277,550 | $ 26,679,269 | $ 68,640,468 |
| WGI   | $ 7,412,427 | $ 20,981,724 | $ 30,962,043 | $ 40,265,537 | $ 99,621,731 |
| GFA   | $14,718,887 | $ 35,613,175 | $ 43,810,311 | $ 50,245,458 | $144,387,831 |
| ICA   | $ 9,589,049 | $ 19,001,778 | $ 20,934,842 | $ 20,445,781 | $ 69,971,450 |
| IFA   | $ 7,241,848 | $ 15,496,105 | $ 19,164,751 | $ 21,006,109 | $ 62,908,813 |

| Total | $57,219,581 | $131,803,620 | $163,513,064 | $189,870,575 | $542,406,840 |
|---|---|---|---|---|---|

51.     After suffering a substantial decline in assets under management during the recent economic crisis, CRMC determined that the reasons the fee waivers were originally implemented no longer existed and it would be appropriate to discontinue the fee waivers.  Tr. 664:8-21, 873:7-21.

52.     CRMC discontinued the fee waiver as of January 1, 2009.  [SF-41]  The Directors of the Funds supported this decision.  Tr. 873:2-21, 987:21-23.  This occurred during a period when the funds' investors were suffering catastrophic losses.

53.     During the relevant period through December 31, 2008, CRMC saved the Funds the following amounts of advisory fees pursuant to fee waivers *and* breakpoints: Ex. 2218B; Tr. 663:17-664:7.

| | Savings from Fee Waivers Through December 31, 2008 | Savings from Breakpoints Through December 31, 2008 | Total |
|---|---|---|---|
| AMCAP | $ 29,993,999 | $ 28,606,814 | $ 58,600,813 |
| AMBAL | $ 51,768,881 | $ 51,618,653 | $ 103,387,534 |
| BFA | $ 28,631,741 | $ 18,941,510 | $ 47,573,251 |
| CIB | $ 79,896,649 | $ 98,585,178 | $ 178,481,827 |
| WGI | $ 115,468,608 | $ 132,949,258 | $ 248,417,866 |
| GFA | $ 164,711,062 | $ 221,988,959 | $ 386,700,021 |
| ICA | $ 77,612,580 | $ 23,532,396 | $ 101,144,976 |
| IFA | $ 72,169,023 | $ 40,463,471 | $ 112,632,494 |
| Total | $ 620,252,543 | $ 616,686,239 | $ 1,236,938,782 |

54.     Overall, the investment advisory fees paid by the Funds at issue during the relevant period ranged from 21 basis points to 42 basis points, as follows:  [SF-46]

| Fund | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| AMBAL | .26% | .24% | .22% | .22% | .22% | .22% (7/31/08) |
| AMCAP | .36% | .34% | .32% | .29% | .29% | .29% (11/19/08) |
| BFA | .27% | .25% | .22% | .22% | .23% | .22% (9/4/2008) |

| CIB | .30% | .27% | .24% | .23% | .22% | .22% (6/11/2008) |
| WGI | .42% | .40% | .36% | .34% | .33% | .33% (6/11/2008) |
| GFA | .31% | .29% | .27% | .25% | .25% | .24% (5/6/2008) |
| IFA | .28% | .25% | .24% | .22% | .22% | .22% (7/31/08) |
| ICA | .25% | .24% | .22% | .21% | .22% | .22% (11/26/2008) |

55.     In dollars, the advisory fees increased from over $508 million in fiscal year 2003 to over $1.708 billion in fiscal year 2008.  [SF-45]

## 2.     Rule 12b-1 Fees

56.     Rule 12b-1 fees are widely used in the mutual fund industry as a method of compensating broker-dealers for distributing fund shares as well as providing information, advice, and ongoing support services to mutual fund investors.  Tr. 333:12-334:8, 796:2-7, 797:1-11, 933:3-12, 1396:19-1397:18, 1459:7-11.  Because 12b-1 fees allow the mutual fund manager to pay the costs of distribution out of revenues belonging to its customers, and because the mutual fund manager is compensated through advisory fees based on the total assets under managements, the interests of fund investors and the fund manager are potentially in conflict over the imposition of this fee.

57.     The American Funds paid Rule 12b-1 fees pursuant to Plans of Distribution that were reviewed and approved annually by each Fund's Board of Directors, including the Unaffiliated Directors.  [SF-47; SF-126; SF-132]; Tr. 356:21-24, 358:13-15.

58.     The Plans of Distribution permitted the Funds to pay Rule 12b-l fees to finance distribution and marketing activities that were primarily intended to result in sales of shares and to reimburse AFD for commissions paid to broker-dealers for sales of no-load Class A shares and Class B and C shares.  Ex. 3216; Ex. 335 at CORBI_0209268-69.

59. The amount of the Rule 12b-l expenses each share class incurs is based on the average daily net assets attributable to each share class. Tr. 356:5-15, 359:22-360:1, *see, e.g.*, Ex. 696 at CORBI_0205616.

### a. Class A Shares

60. Class A shares require payment of an up-front sales charge of up to 5.75% for purchases below $1 million. The broker-dealer receives a maximum of five percent and AFD receives the remaining 75 basis points. Ex. 335 at CORBI_0209268; Tr. 360:2-5, 364:19-365:3.

61. An annual Rule 12b-l fee of 25 basis points of average net assets under management is paid to dealers beginning in the second year after purchase. Ex. 3 at CORBI_0231607; Tr. 360:2-10.

62. To facilitate the payment of this fee to brokers, the Fund initially pays this fee to AFD, which passes the fees through to the broker-dealers who, in AFD's discretion, are entitled to payment of these fees. Tr. 481:17-482:2.

63. On Class A share purchases in amounts exceeding $1 million, the shareholder does not pay a sales charge. AFD pays commissions to broker-dealers and its wholesalers, and AFD may be reimbursed for these payments through Rule 12b-1 fees. Ex. 335 at CORBI_0209268; Tr. 365:4-17.

### b. Class B Shares

64. Class B shares do not carry a front-end sales charge, thereby permitting shareholders to invest the entire amount of their investment right away. Ex. 335 at CORBI_0209268; Tr. 360:11-13, 360:18-361:10, 366:8-11.

65. The Funds, in connection with Class B shares, paid a Rule 12b-1 fee in an amount up to 1.00% of the assets in the Fund. Pursuant to FINRA rules, 75 basis points of this is characterized as "distribution," and 25 basis points is characterized as "service." Ex. 603 at CORBI_0208433; Tr. 360:14-361:10, 366:8-11, 366:15-22, 487:14-488:4.

66.     AFD sold its right to receive the distribution component of the Rule 12b-1 fees in connection with Class B shares to Citibank.  Ex. 335 at CORBI_0209269. From 2000 to 2003, Citibank paid AFD 4.55% of the purchase price for each Class B share for which it received the right to collect fees.  Ex. 3192.  The payment was reduced to 4.45% in February 2002 (Ex. 3196), reduced further to 4.27% in February 2005 (Ex. 3201), increased to 4.35% in May 2006 (Ex. 3208), and subsequently changed to 4.10% or 4.35%, depending upon the aggregate purchase price, in May 2008.  Ex. 3213.  For Class 529-B shares, Citibank paid 4.45% from February 2002 until February 2005, 4.27% from February 2005 to May 2008, and 4.22% or 4.27%, depending on the aggregate purchase price, as of May 2008.  Ex. 3212.  Of the amounts paid to AFD, AFD paid 4.00% to the broker-dealer, which includes the 0.25% service fee for the first year.  Ex. 335 at CORBI_0209269; Tr. 366:12-22, 482:7-25.

67.     During the first year following a shareholder's purchase of a Class B share, AFD retains the 0.25% service component of the Rule 12b-1 fee, which reimbursed AFD for the 0.25% shareholder servicing payment that AFD had advanced to the dealer at the time of purchase.  Ex. 335 at CORBI_0209269; Ex. 603 at CORBI_0208433; Tr. 384:20-385:9.

68.     After the first year, broker-dealers received the 0.25% service fee paid by the Funds on Class B shares.  Ex. 335 at CORBI_0209269; Tr. 483:1-7.

69.     Other than receipt of  the 0.25% service fee during the first year, AFD received no other Rule 12b-1 fees from the Funds on Class B shares, although it did receive the above-referenced payment from Citibank for its sale of the .75% distribution component of the 12b-1 fees.  Ex. 335 at CORBI_0209269; Tr. 483:1-11.

70.     Shareholders who redeemed Class B shares within one year of purchase paid a contingent deferred (back-end) sales charge of 5%, which declined to zero percent six years after purchase.  Ex. 603 at CORBI_0208423; Tr. 366:23-367:2.

71.     Class B shares automatically convert to Class A shares eight years after purchase.  Ex. 335 at CORBI_0209269; Tr. 355:17-21.

72. American Funds stopped selling Class B shares in April 2009. Ex. 1221 at 15.

### c. Class C Shares

73. Like Class B shares, Class C shares do not carry a front-end sales charge, thereby permitting investors to invest all of their money right away. Ex. 1208 at 17; Tr. 361:15-17, 391:6-10.

74. In connection with Class C shares, the Funds pay Rule 12b-1 fees in an amount up to 1.00% each year. Ex. 335 at CORBI_0209269; Tr. 361:18-21; 391:6-10.

75. Class C shareholders pay a contingent deferred sales charge of one percent if they redeem within the first year after purchase. Ex. 603 at CORBI_0208411; Tr. 391:15-19.

76. AFD retains any contingent deferred sales charges it assesses on Class C shares. Ex. 335 at CORBI_0209269; Tr. 391:15-19.

77. Class C shares automatically convert to F shares after ten years. Ex. 335 at CORBI_0209269; Tr. 355:25-356:4.

### d. Amount of Rule 12b-1 Fees Paid

78. In fiscal year 2004, the Funds paid Rule 12b-l fees totaling over $883 million; by fiscal year 2007, this figure exceeded $2 billion. Ex. 793; Ex. 3158A-I; Tr. 389:19-390:20. From fiscal years 2004 to 2007, the Funds paid Rule 12b-l fees totaling approximately $5.5 billion. Ex. 793.

79. AFD retained approximately $500 million of those fees during the period 2004-2007, although a substantial percentage of the retained amount constituted reimbursement for monies advanced to broker-dealers by AFD on Class B and C shares. The remaining Rule 12b-1 fees were paid to broker-dealers. Ex. 793; Tr. 485:15-21.

80. Beginning in 2005, CRMC agreed to waive any Rule 12b-1 fees it received in connection with shareholder accounts for which there was no broker of record (*i.e.*, "orphan" accounts). Ex. 814 at CORBI_0219945.

### 3. Additional Compensation

81. In addition to Rule 12b-1 fees, AFD pays its top 75 borker-dealers additional commissions, known as "additional compensation."  Ex. 335 at CORBI_0209277.

82. Payments of additional compensation are paid by AFD, although the Court notes that AFD is not profitable and frequently required "support payments" from CRMC.  Ex. 335 at CORBI_0209277; Tr. 404:25-405:5, 494:24-25.  For that reason, it is not possible to identify in all cases with great specificity the source of funds used to pay additional compensation.

83. AFD's stated purpose for paying additional compensation is to defray the costs of training and educating broker-dealers and to ensure that investors' assets are placed in funds that are consistent with the investors' investment objectives.  Ex. 335; Tr. 399:4-400:8, 402:10-18, 492:19-494:2; 835:5-9.

84. To be eligible to receive these additional funds, a broker-dealer must represent that it will classify the American Funds as "approved" or "preferred"  (or an equivalent).  Ex. 335 at CORBI_0209312; Tr. 401:4-16, 494:3-23.

85. In determining whether to pay additional compensation to a particular broker-dealer, AFD considers, among other things, sales volume, redemption rates, and the quality of AFD's relationship with the broker-dealer.  Ex. 335 at CORBI_0209277; Tr. 403:25-404:11.

86. Payments of additional compensation may not exceed the sum of ten basis points of the prior year's fund sales by the broker-dealer and 2 basis points of the total assets attributable thereto.  Ex. 335 at CORBI_0209277.

87. From fiscal year 2003 through fiscal year 2008, AFD paid broker-dealers more than $600 million in additional compensation.  Ex. 10 at CORBI_0343236.

### 4. Transfer Agent Fees

88. The Funds pay transfer agent fees to AFS pursuant to the fee schedule in the Shareholder Services Agreement.  [SF-54]; Tr. 448:8-12.

89.     The transfer agency expense ratio incurred by the Funds' Class A and B shareholders generally remained flat or decreased slightly from fiscal year 2003 to fiscal year 2008.  Ex. 621 at CORBI_0362738, CORBI_0362739, CORBI_0362744-CORBI_0362745, CORBI_0362747, CORBI_0362751-CORBI_0362752, CORBI_0362754; Exhs. 2215A-2215H.

90.     The table below shows the Funds' transfer agency expense for each year during the relevant period:[2]

| Fund | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|------|------|------|------|------|------|
| AMBAL | 0.13% | 0.10% | 0.09% | 0.08% | 0.08% | 0.08% |
| AMCAP | 0.12% | 0.09% | 0.09% | 0.09% | 0.09% | 0.09% |
| BFA | 0.11% | 0.11% | 0.11% | 0.11% | 0.10% | 0.10% |
| CIB | 0.08% | 0.07% | 0.06% | 0.06% | 0.06% | 0.06% |
| WGI | 0.10% | 0.08% | 0.08% | 0.08% | 0.07% | 0.08% |
| GFA | 0.16% | 0.10% | 0.09% | 0.07% | 0.07% | 0.07% |
| IFA | 0.07% | 0.06% | 0.06% | 0.06% | 0.05% | 0.06% |
| ICA | 0.10% | 0.08% | 0.08% | 0.07% | 0.07% | 0.08% |

91.     Any payments made to third parties by AFS in connection with the servicing of shareholder accounts (*e.g.*, where AFS subcontracts out to a third party the provision of transfer agency and shareholder services for omnibus accounts) are limited to AFS's cost to provide that same service.  *See, e.g.*, Ex. 688 at CORBI_0204158.

92.     In fiscal year 2004, AFS collected more than $234 million in transfer agent fees, which grew to over $400 million by fiscal year 2007.  Ex. 793 at 1.

93.     However, AFS provides transfer agency services to the Funds effectively "at cost." [SF-56]; Tr. 448:13-449:8, 495:25-496:2; 868:4-5.

_____

[2] *See* Ex. 621 at CORBI_0362738, CORBI_0362739, CORBI_0362744-CORBI_0362745, CORBI_0362747, CORBI_0362751-CORBI_0362752, CORBI_0362754; Exhs. 2215A-2215H.

94.     If AFS makes a profit in a given fiscal year, it retains those profits.  Ex. 688 at CORBI_0204158; Tr. 448:13-449:3.  AFS is contractually prohibited from distributing any net income to CRMC, and any retained earnings would be returned to the Funds if AFS wound down its operations.  Ex. 621 at CORBI_0362707; Tr. 448:13-449:8.

95.     During the period fiscal year 2003 to fiscal year 2008, AFS had a net operating loss of $21 million.  [SF-105]

### 5.     Administrative Services Fees

96.     Pursuant to an Administrative Services Agreement entered into between CRMC and each Fund, CRMC provides and/or contracts and arranges to have provided transfer agency, recordkeeping, and related shareholder services for the Funds' Class C, F, R, and 529 shares.  [SF-57]; Tr. 416:23-417:2, 453:10-14.

#### a.     The Services

97.     The transfer agency/shareholder services under the Administrative Services Agreement include the same types of recordkeeping, account maintenance, transaction processing, tax reporting, and shareholder and fund communications services that are provided to Class A and B shareholders under the Shareholder Services Agreement.  *See* Ex. 3 at CORBI_0231610; Tr. 453:6-454:14, 497:12-23, 499:21-500:12.

98.     In addition, the Agreement requires CRMC to coordinate, monitor, oversee, and assist with the provision of shareholder services.  Ex. 43 at CORBI_0468568; Ex. 648 at 29.

#### b.     The Fee Level

99.     The Administrative Services Agreement is reviewed and approved on an annual basis by the Boards of each of the Funds.  [SF-58]; Tr. 417:10-12.

100.    During CRMC's fiscal years 2003 to 2005, the Funds paid a 0.15% administrative services fee on Class C, F, 529, and R-shares except Class R-5.  [SF-62]; Tr. 418:5-11.  During the same period, the Funds paid up to 10 basis points on

Class R-5 shares.  [SF-59]; Tr. 418:5-11.  CRMC passed through varying amounts of the fee to third parties with whom it arranged to provide the transfer agency services, as contemplated by the agreement.  Until July 1, 2005, any amounts not paid to third parties were retained by CRMC.  Tr. 418:21-25; 420:21-23.

101.   Beginning July 1, 2005, CRMC agreed to cap the amount it retained for monitoring, coordinating, overseeing and assisting with the provision of shareholder services at 0.05%.  Ex. 814 at CORBI_0219945-CORBI_0219946; Tr. 419:9-22, 471:20-472:23.   CRMC's intent in imposing the cap was to reduce the total amount of administrative services fees paid by the Funds.  Those fees did in fact decline after the cap was imposed.  Exhs. 2216A-H; Tr. 421:8-12, 473:3-24.

102.   Under the current structure, CRMC can lose money under the Administrative Services Agreement to the extent the payments it makes to third parties exceeds the 0.15% administrative services fee it receives from the Funds.  Ex. 814 at CORBI_0219945.  For certain share classes and funds, CRMC payments to third parties have exceeded the 0.15% it received from the funds.  Tr. 436:16-437:12, 472:11-473:2, 507:23-509:5.

103.   For fiscal years 2006 to 2008, while the 0.05% cap was in effect, the Funds paid the following administrative services fees (in basis points) in each of those years with respect to Class C and Class F Shares as follows:  [SF-65]

| Class C Shares | 2006 | 2007 | 2008 |
|---|---|---|---|
| AMBAL | 13 bps | 13 bps | 13 bps |
| AMCAP | 15 bps | 14 bps | 14 bps |
| BFA | 14 bps | 14 bps | 13 bps |
| CIB | 12 bps | 11 bps | 11 bps |
| GFA | 15 bps | 15 bps | 13 bps |
| IFA | 10 bps | 10 bps | 10 bps |
| ICA | 13 bps | 12 bps | 12 bps |
| WGI | 14 bps | 14 bps | 13 bps |
| Class F Shares | 2006 | 2007 | 2008 |
| AMBAL | 8 bps | 8 bps | 9 bps |
| AMCAP | 9 bps | 9 bps | 10 bps |

| | | | |
|---|---|---|---|
| **BFA** | 8 bps | 9 bps | 10 bps |
| **CIB** | 9 bps | 8 bps | 8 bps |
| **GFA** | 10 bps | 9 bps | 10 bps |
| **IFA** | 8 bps | 8 bps | 9 bps |
| **ICA** | 9 bps | 9 bps | 11 bps |
| **WGI** | 10 bps | 8 bps | 9 bps |

104.   In 2004, before the institution of the five basis point cap, the eight funds at issue paid administrative fees totaling over $51 million, over $29 million of which was retained by CRMC.  [SF-66]; Ex. 793 at 1.

105.   In 2007, the amount of administrative services fees paid by the Funds totaled over $175 million, of which CRMC retained nearly $76 million.  [SF-66]

106.   CRMC retained over $154 million in 2008 to cover its oversight of third parties, which includes monitoring, coordinating and assisting third party service providers.  CRMC paid out $213 million to those same third parties to carry out their administrative responsibilities.  Ex. 18 at CORBI_0389686.

**E.    Issues Related To Fund Size**

**1.    Benefits of Growth and Size**

107.   The growth in assets benefited the Funds in a number of ways.  Tr. 153:18-154:24, 895:2-17.[3]

108.   For a part of the relevant time period, the fees paid by the Funds declined (in percentage terms) as a result of growth, via breakpoints, waivers, and reductions in the other fees charged to the Funds.  *See* Findings of Fact ("FOF") ¶¶ 36-57, 92-107, 239-46.

---

[3] Plaintiff's object to the placement of these facts in this document, and contend that they should be included in the discussion of the <u>Gartenberg</u> factors.  The Court places no importance on the location of the discussion of any particular factor. Facts relevant to the <u>Gartenberg</u> analysis will be considered regardless of the organization of this documents.

109. Growth allowed CRMC to continually invest in research. Tr. 273:24-274:3, 138:13-141:12. Because of its large asset base, CRMC has extensive research capabilities. Tr. 266:18-268:1. Size also means better access to the companies the Funds invest in, enhancing investment results. Tr. 274:16-275:11, 1140:1-3.

110. Defendants claim that size has facilitated significant investments in shareholder services. Tr. 273:24-274:8, 689:23-690:10, 139:11-141:5, 895:2-13, 992:17-993:1, 1139:18-22, 1439:6-16. However, the record does not disclose any particular service or level of service that is notably better than services provided by Defendants' competitors.

111. Defendants claims that the size of the organization and the volume of assets under management allowed CRMC to attract and retain talented personnel. Tr. 274:20-24, 895:5-9, 993:1-7, 1139:18-24, 1439:6-16, 153:18-154:18, 188:4-7. That contention has not been borne out because the evidence needed to test the assertion has never been disclosed to the Court, to the Plaintiffs, or, indeed, to the unaffiliated directors. The record contains enough evidence to suggest that the profit sharing pool is enormous and that at least some employees are compensated at levels that might be viewed as excessive. Without knowing more details about these payments, and without information identifying the competitors for their employee's services or the compensation levels of those competitors, the Court cannot say that the size of the organization and the volume of assets (and the fees it receives as a result) have benefitted investors by supporting the hiring and retention of highly skilled employees.

112. The size of the Funds has led to lower brokerage commissions, enhanced CRMC's competitive advantage in trading, and led to better service from trading partners. Tr. 274:9-15, 1139:10-1141:8.

113. Steady inflows lead to greater liquidity and stability of assets, making the Funds easier to manage. Tr. 119:21-120:5, 274:9-15. Having regular net inflows into the funds provides management advantages because it provides a means of funding

new ideas without being forced to sell investments already in the portfolio.  Tr. 334:17-335:5.

## 2.    CRMC Effectively Managed Fund Growth

114.    Throughout the relevant time period, CRMC's investment process for managing the funds helped effectively manage growth in assets under management, and CRMC also took additional steps to handle the influx of assets.  Tr. 124:11-21.

115.    CRMC utilized a multiple portfolio counselor system (the "MPCS") to manage its assets.  Tr. 131:21-132:8, 259:14-23; *see also* Ex. 2209B; 2115 at 6-7.  The MPCS differentiates CRMC from most investment advisory firms, which often employ a single portfolio manager for each fund.  Tr. 131:23-132:8, 259:14-260:9, 260:23-261:23.

116.    Under the MPCS, CRMC divides each Fund's assets into smaller portions and allocates them to individual portfolio counselors and a research portfolio.  Ex. 2209B; Ex. 2115 at 6; Tr. 131:21-132:8, 259:14-260:9.

117.    One segment, the research portfolio, is further divided and allocated among research analysts.  The research analysts invest in the sectors and industries they follow for the research portfolio.  Ex. 2115 at 6; Tr. 134:23-135:7, 259:14-260:9.

118.    In addition to individual portfolio counselors and research analysts, each Fund has a coordinating committee that: (1) ensures the fund is managed according to its goals and objectives; (2) monitors gains, losses and dividend income for the entire fund; and (3) monitors the allocation of new assets to portfolio counselors.  Ex. 2115 at 6; Tr. 131:21-132:8.

119.    Individual portfolio counselors typically manage no more than 20% of a Fund's assets.  Tr. 134:8-14.

120.    Further, as assets grow, new portfolio counselors may be added to provide additional resources to assist in managing the fund and to help ensure a balance among portfolio counselors in the fund.  Ex. 2115 at 7; Tr. 133:3-23, 259:14-260:9, 292:2-9.

121. CRMC maintains a long-term focus on the management of its business, focuses on long-term fund investment results, and discourages high-volume and short-term trading. Ex. 2115 at 4; Tr. 112:6-21, 259:3-13, 344:5-8.

122. To deal with problems associated with extraordinary growth, CRMC also split the management of the Funds' equity assets among two investment divisions: Capital World Investors ("CWI") and Capital Research Global Investors ("CRGI"). [SF-9]

123. Following the split, portfolio counselors in CRGI and CWI began making independent investment decisions, enabling them to better manage money with a long-term view, the least amount of limitation, and greater flexibility. Ex. 630 at 1; Tr. 130:18-25; 283:22-284:3, 346:15-347:22, 1123:1-3.

124. The process for splitting the CRMC equity investment group into these two divisions began in 2003. Ex. 641 at CORBI_0291816-17; Tr. 124:22-126:22.

125. This process evolved over time and by February 2006 the two divisions stopped sharing research, resulting in a divergence in investments and increasing investment diversity. Ex. 641 at CORBI_0291818; Tr. 63:9-12, 130:18-25, 277:9-278:7, 1123:4-12.

126. As of December 31, 2007, CWI and CRGI began to report their securities holdings to the U.S. Securities and Exchange Commission ("SEC") separately on Schedule 13G. [SF-10]

127. The diversity in investment strategies began to emerge before filing for formal disaggregation with the SEC in January 2008. Exhs. 630 at 1-2, 632 at 2, 641 at CORBI_0291816-22; Tr. 124:22-126:22, 150:3-15, 278:3-280:13.

128. In addition, CRMC significantly added to its staff to assist in managing the growth of the Funds. [SF-76]

129. From fiscal years 2002 to 2006, CRMC and its subsidiaries, increased the number of associates as follows: [SF-76]

|  | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| **Investment Professionals** | 137 | 140 | 152 | 154 | 167 |
|  |  |  |  |  |  |
| **Total CRMC/CRC** | 479 | 486 | 515 | 570 | 627 |
|  |  |  |  |  |  |
| **AFD** | 673 | 607 | 631 | 707 | 788 |
|  |  |  |  |  |  |
| **AFS FTE*** | 1625 | 1756 | 1850 | 2103 | 2645 |
|  |  |  |  |  |  |
| **Total CRMC Consolidated** | 2777 | 2849 | 2996 | 3380 | 4060 |

*FTE: Full-time equivalent

130.    CRMC also invested in new trading systems to allow it to more effectively trade securities on behalf of the Funds.  Ex. 815 at CORBI_0209586; Tr. 286:8-25, 1121:13-1122:16.

131.    Some of the Funds' best investment results came during the period when the Funds were at their largest (Ex. 649 at ¶¶ 97-99), and some of the largest and fastest growing Funds were among the best performing.  *See* FOF ¶¶ 137; Tr. 136:1-137:6, 321:9-23.  The Court notes, however, that the results were achieved at a time when many other funds were also obtaining good results because of a rapidly rising market.

### 3.    Dr. O'Neal's Regressions

132.    There was no persuasive evidence demonstrating that the size and growth of the Funds negatively impacted the Funds' performance.

133.    Plaintiffs' expert, Dr. Edward O'Neal, testified based on a series of regression analyses he performed that the growth of five of the Funds adversely affected fund performance from 2000 to 2008.  Ex. 2669 at 4; Tr. 1031:1-1032:6. However, Dr. O'Neal's analyses are flawed for a number of reasons and failed to withstand the challenges of Defendants' expert, Dr. John Peavy.

134.    First, Dr. O'Neal's analyses were time variant, meaning that the results of the analyses changed drastically depending on the time period under study.  Ex. 649 at 41-43; Tr. 1088:9-1089:13, 1238:15-1239:16.

135.    For example, when he performed the analysis for the period 1998 to 2008, only one of the eight Funds showed a statistically significant correlation between performance and fund size.  Ex. 2669 at Table 6-11; Tr. 1088:9-1089:13.  When the same methodology was used for the period 2003 to 2008, none of the Funds showed any correlation between size and investment results.  Ex. 649 at ¶¶ 98-99, Ex. 17; Tr. 1245:1-1246:17.

136.    These variations over time undermined Dr. O'Neal's attempt to show a causal link.  *See* Ex. 649 at ¶¶ 95-99; Tr. 1247:4-20.  Dr. O'Neal was unable to articulate a persuasive reason why the variability of his results does not affect their reliability.  *See* Tr. 1089:21-1093:5.

137.    Second, Dr. O'Neal failed to explain adequately why his analyses did not reveal statistically significant negative correlations for WGI and CIB, two of the largest and fastest-growing Funds.  Tr. 1094:11-25.  These two Funds also had among the best investment results.  Ex. 649 at ¶¶ 93-94; Tr. 321:9-20, 1247:21-1248:12.

138.    Third, Dr. O'Neal's conclusion that the growth in assets impacted CRMC's trading costs and reduced the substantial trading advantage CRMC previously enjoyed over its competitors was based on Plexus data that covered trading costs only for equity securities, not fixed-income securities.  Ex. 649 at ¶ 52; Tr. 1097:19-24.  The omission is significant because four of the eight Funds trade in fixed-income securities (Tr. 1136:6-15), and equity securities make up only two-thirds of the pools of assets of the eight Funds.  Ex 649 ¶ 52; Ex. 2671 at ¶ 44; Tr. 1201:2-1202:2, 1212:16-1215:22.  The Plexus data also covered all of the American Funds, not just the eight Funds at issue.  Ex. 649 ¶ 52; Tr. 1096:11-1097:18, 1212:8-15.

139.    Fourth, the purportedly statistically significant negative correlations between performance and growth set forth in Dr. O'Neal's regression analyses may

have been the product of an aberrationally high period of performance followed by an influx of assets and average performance. Ex. 649 at ¶ 80; Tr. 1248:13-1250:20. Dr. O'Neal did not adequately explain how his regression analyses controlled for such "regression to the mean," or why his results were not skewed by any such phenomenon. Tr. 1041:10-1043:6.

140. Fifth, under Dr. O'Neal's own methodology, growth in assets had no negative impact on investment results from 2003 to 2008, the only relevant period in this case. Ex. 649 at ¶¶ 98-99, Ex. 17; Tr. 1244:21-1246:17; 15 U.S.C. § 80a-35(b)(3). Even for the period 2000 to 2008, where he purported to show a correlation, Dr. O'Neal could not identify when size "impacted" results, and conceded it may have been before the relevant period. Tr. 1086:15-1087:16.

141. Sixth, according to Dr. O'Neal, up to 99% of the Funds' investment results were explained by factors other than size, and he could not say whether size had any material impact on results. Ex. 649 at ¶ 83; Ex. 2669 at Tables 4-11; Tr. 1035:22-1036:19, 1083:14-24, 1243:16-1244:3.

142. For these reasons, Dr. O'Neal's analysis failed to establish that Fund size negatively impacted investment results.

### 4. Associate Survey Responses

143. CRMC's investment associates responded to a survey conducted by CRMC in early 2005. Among other things, the survey specifically asked associates: (1) what are the major issues facing CRMC today; (2) how do you think we best deal with the issues you raised; (3) how do we successfully handle our absolute size in terms of assets and number of associates. Ex. 2380; Tr. 1506:21-1507:5.

144. Some survey respondents did not raise any concerns over the growth of the Funds. A number expressed the view that size was not an issue, or that asset growth was a benefit. *E.g.*, Exhs. 2500, 2497, 2513, 2249, 2523 at CORBI_0369687, 2519 at CORBI_0369660, 2520 at CORBI_0369668; Tr. 307:1-315:11.

145.   Many others expressed concern over the size of the funds, but tended to focus on "ownership limits." *See, e.g.*, Ex. 2512 at CORBI_0369621, CORBI_0369624; Ex. 2501. Ownership limits are rules that limit the amount of securities that can be purchased by the Funds. Tr. 126:23-128:22, 280:22-281:21.

146.   The vast majority of limits were self-imposed as a means of achieving diversification and promoting new investment ideas. Tr. 241:15-18, 280:22-281:21.

147.   Many of the concerns raised in the surveys were addressed by the split of the investment group, Tr. 285:6-23, 316:16-317:23, and by raising ownership limits in 2005 and early 2007. Tr. 129:23-130:13, 281:25-282:10, 285:19-23, 298:11-299:16, 284:18-286:1, 329:5-19.

148.   Many of the survey respondents who raised concerns also stated that the issues related to size would be resolved in the near term through the split of the investment group. *E.g.*, Exhs. 2501, 2507, 2170, 2512 at CORBI_0369620-21 & CORBI_0369623; Tr. 299:11-304:22, 329:5-19.

149.   The survey responses do not establish that size materially affected the investment advisory services provided by CRMC to the Funds.

*   *   *

## II.    THE *GARTENBERG* FACTORS

### A.    The Nature and Quality of the Services

150.   With respect to the *overall* nature and quality of services provided to the Funds, Plaintiff failed to present evidence that any significant number of shareholders in the Funds were dissatisfied with the services provided.

151.   The record reflects that CRMC received a *de minimis* number of complaints each year from the more than 50 million American Fund shareholders. Ex. 29 at CORBI_019591 (CIB/WGI Contracts Committee DIB); Tr. 674:14-675:13.

152.   In addition, the American Funds have experienced a redemption rate (*i.e.*, the percentage of assets redeemed (sold) in the funds each year) below the industry

average and, at times, less than one-half of the industry average.  [SF-77]; *see also* Ex. 634; Exhs. 2219A-I.

153.   For example, in 2007 the American Funds redemption rate was 12% while its competitors' redemptions rates ranged from 18% to 31%.  Ex. 2219I.

154.   The Funds' very high shareholder retention rates and low level of complaints are consistent with sharehold satisfaction with the level of services provided.  [SF-77]; Ex. 648 at 27; Exhs. 2219A-I; Tr. 678:1-679:3, 697:13-698:5, 1511:23-1517:4, 676:15-677:25.

### 1.    Rule 12b-1 Fees

155.   The Plans of Distribution permit the Funds to incur Rule 12b-1 fees to finance distribution and marketing activities that are primarily intended to result in the sale of fund shares.  *See, e.g.*, Ex. 115 at CORBI_0202688; *see* Ex. 10 at CORBI_0343277-82; Ex. 3216 at CORBI_0032287.

156.   Even so, a portion of the Rule 12b-1 fees is used to compensate for providing "ongoing shareholder services," such as the creation of financial plans for shareholders and periodic meetings with investors.  Tr. 486:6-487:7, 796:2-11.

157.   The portion of the Rule 12b-1 fees paid to broker-dealers for the provision of ongoing shareholder services covered the following types of service:

- Brokers generally advise shareholders on which Funds are suitable for them; at the time of their investment and as their objectives change over time.  Tr. 797:1-11, 997:4-14, 902:8-19, 486:6-487:7.

- Brokers may create investment plans for shareholders that include asset allocation, financial planning, tax planning, and estate planning; they review that plan with the shareholder periodically; and advise on whether that plan needs to be modified to fit the shareholder's needs (*i.e.*, whether the shareholder is saving enough, or how much a shareholder can withdraw during retirement without outliving their savings).  Tr. 486:6-487:7, 553:13-554:25, 554:4-18, 796:12-797:11, 932:20-933:12.

- Brokers typically meet with shareholders regularly (often quarterly) to go over their account, provide advice, and discuss markets, for example. Tr. 486:6-23, 797:1-11.

158.   In the course of providing services, brokers often utilize AFD to obtain information about their clients' investments to provide shareholders with personalized advice. Tr. 793:11-794:17, 468:20-469:13. Most of the AFD associates work in service centers, handling telephone calls with advisers related to servicing their clients. Ex. 600 at CORBI_0182022-23; Tr. 874:9-18.

159.   Plaintiffs did not offer any evidence that the ongoing shareholder services provided in exchange for Rule 12b-1 fees were disproportionate to the fees charged. Rather, numerous Plaintiffs testified that their brokers were of value to them as investors. Caplan Dep. 67:21-68:7 ("All my services came through my broker"; Plaintiff was "happy with the service" provided by the broker); *id*. at 184:10-185:1 (noting that his broker, among other things, monitors investments for him, discusses the markets with him, and provides advice, and he is "satisfied" with broker); Angotta Dep. 90:18-91:3, 151:9-152:3 (noting that broker provides services like monitoring investments, offers his "expertise and his knowledge of the mutual fund industry," and Plaintiff believes the broker "provides good service"); Jelinek Dep. 72:22-74:14, 98:8-15 (noting reliance on broker to advise him about his holdings as he is getting closer to retirement, and he "values the services that [his] broker provides").

160.   Rule 12b-1 fees on Class B and C shares are essentially a means of financing a front-end load. *See* Ex. 335 at CORBI_020968-69; Tr. 485:22-486:5, 692:5-17. These fees are beneficial to shareholders because they provide an alternative payment option that allows them to avoid paying a front-end load and put more of their investment "to work" immediately. Tr. 360:18-361:10, 693:11-694:10.

161.   Plaintiffs did not offer evidence challenging the nature and quality of distribution services provided in exchange for Rule 12b-1 fees.

## 2. Investment Advisory Fees

### a. Investment Advisory Services

162. Many CRMC investment professionals spend their entire career at the company and have significant experience managing money. For example, GFA's portfolio counselors average thirty-one years of experience. Ex. 2209A.

163. CRMC has invested extensively in research. Tr. 139:3-10, 262:10-263:2, 266:14-267:11.

164. For example, from June 2002 through June 2006, CRMC increased the number of equity and fixed income research analysts and associates by 40%. The research department grew between 6% and 8% annually for several years, and as of 2009 consists of more than 100 research analysts in the equity area and between 30 and 40 research analysts in fixed income. Tr. 141:6-12, 262:4-22, 266:14-21.

165. The research analysts are located in Capital Group's investment offices around the world giving them a global research network. Tr. 138:16-139:2, 266:22-267:11.

166. The table below sets forth each Fund's average annual total returns (%) as of December 31, 2008, compared against its benchmark, as reported in the Fund's prospectus, and each Fund's ranking within its peer group, as defined by Lipper. [SF-74]

| Funds and Indexes | 1 Year Return | 5 Year Return | 10 Year Return | Lifetime Return |
|---|---|---|---|---|
| **AMBAL** | **-25.7%** | **-0.1%** | **4.0%** | **10.5%** |
| S&P 500 | -37.0% | -2.2% | -1.4% | 10.6% |
| Ranking vs. Lipper Balanced Funds | 327 of 850 | 208 of 501 | 11 of 279 | 8 of 26 |
| **AMCAP** | **-37.7%** | **-3.1%** | **1.2%** | **10.7%** |
| S&P 500 | -37.0% | -2.2% | -1.4% | 9.0% |
| Ranking vs. Lipper Multi-Cap Core Funds | 304 of 792 | 307 of 460 | 77 of 180 | 2 of 7 |
| **BFA** | **-12.2%** | **0.7%** | **3.7%** | **8.3%** |
| Barclays Capital | 5.2% | 4.7% | 5.6% | 8.5% |

| Funds and Indexes | 1 Year Return | 5 Year Return | 10 Year Return | Lifetime Return |
|---|---|---|---|---|
| U.S. Aggregate Index | | | | |
| Ranking vs. Lipper Corp A-Rated Bond Funds | 134 of 171 | 92 of 146 | 38 of 68 | 4 of 9 |
| **CIB** | **-30.1%** | **3.1%** | **5.0%** | **9.4%** |
| S&P 500 | -37.0% | -2.2% | -1.4% | 7.4% |
| Ranking vs. Lipper Income Funds | 481 of 542 | 9 of 219 | 2 of 69 | 1 of 7 |
| **GFA** | **-39.1%** | **-0.8%** | **3.2%** | **13.2%** |
| S&P 500 | -37.0% | -2.2% | -1.4% | 10.1% |
| Ranking vs. Lipper Multi-Cap Growth Funds | 127 of 506 | 65 of 320 | 15 of 144 | 1 of 9 |
| **ICA** | **-34.7%** | **-1.2%** | **1.6%** | **12.0%** |
| S&P 500 | -37.0% | -2.2% | -1.4% | 10.4% |
| Ranking vs. Lipper Growth & Income Funds | 523 of 1705 | 296 of 950 | 130 of 545 | N/A |
| **IFA** | **-28.9%** | **0.7%** | **3.8%** | **11.0%** |
| S&P 500 | -37.0% | -2.2% | -1.4% | 10.1% |
| Ranking vs. Lipper Income Funds | 442 of 542 | 95 of 219 | 7 of 69 | 1 of 5 |
| **WGI** | **-38.4%** | **4.0%** | **6.8%** | **10.5%** |
| MSCI World Index | -40.3% | 0.0% | -0.2% | 5.7% |
| Ranking vs. Lipper Global Funds | 131 of 471 | 12 of 290 | 8 of 140 | 2 of 26 |

167.   As of December 31, 2008, seven of the eight Funds beat their Lipper peer group average in 10-year annualized returns.  Ex. 2227.

168.   As of December 31, 2008, all of the Funds beat their Morningstar peer group average in 10-year annualized returns.  Ex. 2228.

169.   As of December 31, 2008, six of the eight Funds beat their Lipper peer group average in 6-year annualized returns.  Ex. 2227.

170.   As of December 31, 2008, seven of the eight Funds beat their Morningstar peer group average in 6-year annualized returns.  Ex. 2228.

171.   As of December 31, 2008, six of the eight Funds beat their Lipper peer group average in 5-year annualized returns.  Ex. 2227.

172.   As of December 31, 2008, six of the eight Funds beat their Morningstar peer group average in 5-year annualized returns.  Ex. 2228.

173.   As of December 31, 2008, seven of the eight Funds beat their Lipper peer group average in 3-year annualized returns.  Ex. 2227.

174.   As of December 31, 2008, six of the eight Funds beat their Morningstar peer group average in 3-year annualized returns.  Ex. 2228.

### b.    Trading

175.   The trading services provided to the Funds consistently surpass industry peers and CRMC was able to obtain among the lowest commission rates in the industry.  Ex. 649 at ¶¶ 50-71 & Ex. 11; Tr. 1199:13-21, 1222:6-15, 1134:12-16, 1140:8-13.

176.   CRMC has enhanced investment returns by (1) employing highly qualified trading personnel, (2) developing state-of-the-art trading systems, and (3) reducing the Funds' trading costs over time.  Tr. 274:9-15, 286:8-25, 1139:16-1140:21.

177.   CRMC has internal committees that monitor the trading process:  the Trading Oversight Committee and the Best Execution Committee.  Tr. 604:25-605:7; 1503:19-1504:8.

178.   CRMC has also retained at least two third-party firms (Plexus Group and Elkins/McSherry) that measure both direct and indirect trading costs.  Tr. 605:11-17, 1030:12-15.

179.   Plexus has found that CRMC's equity trading commissions decreased as the total assets under management for all American Funds grew and that CRMC consistently added value in executing trades.  This is consistent with the conclusion of CRMC's expert, John Peavy, that trading costs did not increase with fund size and therefore did not harm performance.  Ex. 649 at ¶¶ 57-70 & Exhs. 11-15; Tr. 1199:13-21, 1222:6-1224:20.

180.   Elkins/McSherry has found that CRMC's trading costs for fixed income securities were lower than the industry average.  Ex. 649 at ¶¶ 69-70 & Ex. 15.

181.   In addition to monitoring and evaluating trading costs, CRMC has also invested in systems to keep trading costs low.  Ex. 815 at CORBI_0209586; Tr. 286:8-287:12, 1140:8-21.

182.   CRMC maintains eight equity trading desks, two in each of Los Angeles, San Francisco, London and Hong Kong.  These trading desks allow traders to focus on and maintain a proficiency in the local market in which they trade.  Ex. 649 at ¶ 45.  Most advisers do not have overseas trading desks, which gives CRMC a competitive advantage.  Tr. 1119:25-1120:14.

183.   CRMC employs highly qualified and experienced trading personnel, and it increased the number of traders during the relevant period from twelve in early 2003 to twenty-two in 2009.  Ex. 649 at ¶ 45.

184.   Moreover, through the end of 2008, CRMC maintained a staff of approximately 35 people dedicated to maintaining, servicing, and updating CRMC's proprietary electronic trading software and other technological platforms relating to trading.  Ex. 649 at ¶ 45; Tr. 1122:11-16.

185.   CRMC has also made significant investments in technology to ensure state-of-the-art trading capabilities, spending over $5 million on trading systems each year.  Tr. 1122:11-16.  Most recently, in 2008, CRMC rolled out a new proprietary electronic trading platform called ETP, at a cost of approximately $23 million.  Tr. 1120:22-1121:7, 1122:9-10.

186.   CRMC uses ETP to process and confirm trades, as well as to provide electronic communication capabilities between CRMC traders and the broker-dealers with whom they interact.  Tr. 1121:8-15.  ETP was built to interact efficiently with all the various pools of liquidity in the market on a global basis.  This helps CRMC minimize the Funds' transaction costs and facilitate the trading of large blocks of shares.  Tr. 1121:13-1122:8.

187.  Moreover, in addition to traditional broker-dealer trading, CRMC increasingly engages in various forms of non-traditional trading, typically referred to as "electronic venue" trading, all of which requires significant monetary investment. Ex. 649 at ¶ 47; Tr. 274:9-15, 286:10-25, 1121:17-24.  Forty-one percent (41%) of CRMC's worldwide equity trading was conducted via electronic trading platforms in 2008.  This was up from four percent (4%) in 2003.  Ex. 649 at ¶ 47.

188.  These improvements in technological systems, and CRMC's increased use thereof, have increased the effectiveness and reduced the cost of trading.  Tr. 1139:16-1140:21.  Electronic platforms are generally associated with lower commission costs. Ex. 815 at CORBI_0209586; Ex. 2553 at CORBI_0301306.

189.  Consistent with industry practices, trading costs are deducted from the returns of the funds.  Therefore, the Funds' shareholders directly benefited from these improvements.  Tr. 1202:18-1203:12.

### 3.   Transfer Agency Fees

190.  Pursuant to the Shareholder Services Agreement, more commonly known as a transfer agency agreement, AFS provides transfer agent, dividend disbursement, redemption agent, and other related services to shareholders of the Funds' Class A and B shares.  [SF-53]; Tr. 453:6-9, 496:3-5.

191.  These services include recordkeeping, account maintenance, transaction and distribution processing, tax reporting, responding to account related calls from shareholders and advisers, shareholder and fund communications, and website-based services.  Ex. 688 at CORBI_0204157; Ex. 648 at 33; Tr. 444:5-18, 496:9-497:3.

192.  In 2008 alone, these transfer agency services included 150 million financial transactions, 8 million service-related phone calls, and nearly 50 million hits on the American Funds' website.  Ex. 2224; Tr. 444:19-446:7.

193.  The American Funds website offers investment planning and educational tools for shareholders.  Exhs. 2224, 2225; Tr. 446:24-448:7.

194.    AFS also monitors and assists the financial intermediaries and other third parties who provide shareholder services to the Funds and their shareholders.  *See* Ex. 610 at CORBI_0207985.

### 4.    Administrative Services Fees

195.    Between 30 and 50 associates were dedicated to administrative services efforts full-time, and hundreds of others devoted a portion of their time to functions associated with administrative services.  Tr. 470:16-471:13.

196.    The majority of transfer agent services for Class C, F, R, and 529 shareholders are provided by third parties who are responsible for certain of the Funds' omnibus and retirement accounts.  *See* Ex. 2382 at CORBI_0389683; Ex. 765 at CORBI_0205097; Tr. 453:18-454:14, 500:19-501:2.

197.    When CRMC delegates the provision of administrative services to third parties, it coordinates and assists in the provision of those services and also monitors and oversees those companies to ensure the provision of adequate services.  [SF-61]; Tr. 417:18-418:4.

198.    The assistance provided to third parties under the administrative services agreement include the following examples:

- Cost basis calculations, share class conversion, retirement plan distributions, and fund market timing policies.  Ex. 18 at CORBI_0389683-CORBI_0389684.

- On a daily basis, AFD associates handle hundreds of calls related to the servicing of shareholder accounts (*e.g.*, the provision of account-related information such as tax issues, account balances, verification and/or explanation of transactions, and assistance using the American Funds website).  Ex. 2224; Tr. 467:23-470:15.

- AFD offers a proprietary recordkeeping program, and 30 associates have full-time responsibility for interfacing with retirement plan sponsors to ensure that all data is properly and accurately transferred to the record-

keeping provider and to field all questions from a plan sponsor relating to the Funds.  Ex. 601 at CORBI_0220880-CORBI_0220881; Tr. 467:23-468:19.

199.  CRMC's oversight of third party service providers includes two primary elements:

- First, CRMC periodically collects information from third parties regarding, among other things, the accuracy and timeliness of financial and non-financial transactions, compliance with fund prospectuses, and availability of automated shareholder servicing functions; and

- Second, CRMC makes on-site visits to the third parties when it concludes, based on its review of available information, that the services provided by the third party are not reaching an acceptable level.  When this occurs, CRMC takes remedial measures to improve the quality of these services.

Ex. 3 at CORBI_0231610, CORBI_0231747; Ex. 2382 at CORBI_0389683-CORBI_0389684; Tr. 455:21-457:12.

200.  These oversight activities are carried out by AFS's Home Office Service Team ("HOST"), which is comprised of AFS associates (whose compensation is paid by CRMC) and is assisted by CRMC's legal and compliance group.  Ex. 3 at CORBI_0231610-CORBI_0231611; Ex. 47 at CORBI_0031550; Tr. 352:5-16; 455:21-456:11.

201.  HOST's mission is to establish and maintain operational relationships with the broker-dealers who sell the American Funds and/or service fund shareholders. *See* Ex. 47 at CORBI_0031550; Ex. 800 at CORBI_0207971-CORBI_0207972.

202.  As part of its compliance function, HOST associates conduct reviews of firms with large servicing responsibilities for American Funds shareholders.  These reviews have three primary objectives:  (1) to better understand the overall shareholder experience being provided by the firm; (2) to ensure that the firm has adequate controls in place and that these controls are regularly tested; and (3) to ensure that the firms are

recordkeeping accounts in accordance with the funds' prospectuses and AFS's standards of service.  Ex. 610 at CORBI_0207979-CORBI_0207980; Tr. 455:21-456:11, 140:17-24.

203.   HOST also monitors for compliance with applicable rules regarding the time at which orders are placed, proper applications of breakpoints, Class B share sales limits, anti-money laundering, and the imposition of contingent deferred sales charges, among other things.  Ex. 3 at CORBI_0231747; Tr. 456:21-457:12.

**B.    Profitability**

204.   In fiscal year 2003, the combined net income after taxes of CRMC, AFD, and AFS was approximately $361 million.  In fiscal year 2008, net income increased to over $1.195 billion.  *See* Ex. 31 at CORBI_0041736; Ex. 50 at CORBI_0470366.

205.   During fiscal years 2003 through 2008, CRMC's, AFD's, and AFS's combined (pre-tax) operating profit margin ranged was as follows:  [SF-90]

| Year | Pre-Tax Operating Margin (based on audited data) |
|------|--------------------------------------------------|
| 2003 | 30% |
| 2004 | 33% |
| 2005 | 35% |
| 2006 | 34% |
| 2007 | 35% |
| 2008 | 34% |

206.   CRMC's and AFD's combined operating profit margins for fiscal years 2003 through 2008 were as follows:  [SF-92]

| Year | Pre-Tax Operating Margin (based on audited data)[4] |
|------|-----------------------------------------------------|

[4] Excludes any supplemental distribution payments (including partnership payments made to the top five selling dealer firms, and payments made to a broker marketing pool of the top 100 firms) as an expense.  Including those payments as an expense

[continued on next page]

| | |
|---|---|
| 2003 | 42% |
| 2004 | 44% |
| 2005 | 48% |
| 2006 | 46% |
| 2007 | 46% |
| 2008 | 45% |

207.   CRMC's and AFS's combined operating profit margins for fiscal years 2003 through 2008 were as follows:  [SF-91]

| Year | Pre-Tax Operating Margin (based on audited data) |
|---|---|
| 2003 | 37% |
| 2004 | 37% |
| 2005 | 40% |
| 2006 | 39% |
| 2007 | 35% |
| 2008 | 35% |

208.   CRMC's pre-tax operating margins from fiscal year 2003 to fiscal year 2008 were as follows:  [SF-93]

| Year | Pre-Tax Operating Margin (based on audited data) |
|---|---|
| 2003 | 50% |
| 2004 | 49% |
| 2005 | 52% |
| 2006 | 50% |
| 2007 | 36% |
| 2008 | 36% |

---

[continued from previous page]
results in pre-tax operating margins ranging from thirty-five percent (35%) to forty-four percent (44%).

209.   Throughout most of its history, AFD has generally operated at a loss. [SF-99]  As of fiscal year 2008, AFD had generated operating losses in 21 of the previous 36 years.  [SF-100]

210.   In the years that AFD is unprofitable, CRMC provides financial support to AFD as necessary to comply with applicable net capital requirements.  [SF-101]

211.   AFD's profits or losses from fiscal year 2002 to fiscal year 2008 were as follows:  [SF-104]

| Fiscal Year Ending on June 30 | AFD's Profits (Losses) From Operations |
| --- | --- |
| FY 2002 | ($40,409,000) |
| FY 2003 | ($37,324,000) |
| FY 2004 | $44,806,000 |
| FY 2005 | $53,657,000 |
| FY 2006 | $23,734,000 |
| FY 2007 | ($34,975,000) |
| FY 2008 | ($59,280,000) |

212.   Thus, AFD suffered a net loss of approximately $9 million during the period at issue (2003 to 2008).

213.   CRMC's pre-tax profit margin on administrative services was approximately 19% in 2008.  Ex. 50 at CORBI_0470406; Ex. 650 at 4.

214.   A number of associates of CRMC, AFD, and AFS and other affiliated companies may participate in a profit-sharing plan, known as the Special Compensation Plan ("SCP").  Ex. 830 at CORBI_0029598; Tr. 744:15-745:3.

215.   Under the SCP, the annual profit sharing pool is equal to 35% of the operating revenue remaining after the payment of associate salaries, bonuses, and benefits and all other operating expenses of the business.  Ex. 830 at CORBI_0029624; Tr. 168:16-24, 711:7-712:13, 746:23-748:16.

216. Associates who have become Capital Group shareholders may receive additional compensation through the payment of dividends on their shares. Ex. 830 at CORBI_0029624; Tr. 712:14-713:22.

217. In fiscal year 2003, CRMC spent approximately $664 million to cover associate compensation, benefits, and profit-sharing, while in fiscal year 2008 CRMC spent approximately $1.794 billion. No evidence was offered about how much of this amount was specifically attributable to profit-sharing payments. Ex. 31 at CORBI_0041736; Ex. 50 at CORBI_0470366.

## C. Comparative Fee Structures

218. Lipper, Inc. ("Lipper") is a recognized industry-leading third-party source for mutual fund industry data. Tr. 667:12-17; 1489:6-1490:7.

219. Every year during the relevant period, Lipper prepared comparative fee data for each of the Funds to a group of "peer" funds selected by Lipper as similar. Generally, this included the 30 largest funds in the relevant investment category, as determined by Lipper. [SF-79]

### 1. Total Expense Ratio and Advisory Fees

220. The amount of a mutual fund's total expenses (including all fees paid to an investment adviser and its various affiliates) expressed as a percentage of the mutual fund's total assets is called the "expense ratio." [SF-67]

221. The following charts compare the Funds' advisory fees and Class A expense ratios to comparable mutual funds in each Fund's peer group as defined by Lipper.

222. AMBAL's Advisory Fee and Expense Ratio comparison: [SF-81]

|      | Fund Advisory Fee | Advisory Fee Rank Within Lipper Index[5] | Median Advisory Fee for Funds in Lipper Category | Class A Share Expense Ratio | Expense Ratio Rank Within Lipper Index |
|------|------|------|------|------|------|
| 2003 | .27 | 3 of 23 | .47 | .70 | 8 of 23 |
| 2004 | .26 | 2 of 21 | .49 | .67 | 7 of 21 |
| 2005 | .25 | 2 of 21 | .50 | .62 | 5 of 21 |
| 2006 | .22 | 3 of 21 | .45 | .59 | 5 of 20 |
| 2007 | .22 | 2 of 20 | .47 | .58 | 4 of 20 |
| 2008 | .21 | 1 of 15 | .48 | .58 | 3 of 15 |

223.   AMCAP's Advisory Fee and Expense Ratio comparison:  [SF-82]

|      | Fund Advisory Fee | Advisory Fee Rank Within Lipper Index | Median Advisory Fee for Funds in Lipper Category | Class A Share Expense Ratio | Expense Ratio Rank Within Lipper Index |
|------|------|------|------|------|------|
| 2003 | .36 | 7 of 27 | .56 | .77 | 12 of 27 |
| 2004 | .34 | 4 of 27 | .65 | .73 | 6 of 26 |
| 2005 | .32 | 4 of 27 | .67 | .68 | 5 of 27 |
| 2006 | .29 | 3 of 27 | .66 | .66 | 5 of 27 |
| 2007 | .29 | 1 of 24 | .67 | .65 | 3 of 25 |
| 2008 | .29 | 1 of 24 | .67 | .65 | 3 of 24 |

224.   BFA's Advisory Fee and Expense Ratio comparison:  [SF-83]

|      | Fund Advisory Fee | Advisory Fee Rank Within Lipper Index | Median Advisory Fee for Funds in Lipper Category | Class A Share Expense Ratio | Expense Ratio Rank Within Lipper Index |
|------|------|------|------|------|------|
| 2003 | .31 | 3 of 30 | .56 | .71 | 13 of 30 |
| 2004 | .27 | 2 of 30 | .56 | .67 | 5 of 30 |
| 2005 | .25 | 3 of 30 | .50 | .65 | 11 of 30 |
| 2006 | .22 | 2 of 27 | .49 | .62 | 9 of 27 |

[5] The lowest advisory fee in a peer group is ranked number 1.

| | | | | | |
|---|---|---|---|---|---|
| 2007 | .23 | 2 of 27 | .50 | .62 | 9 of 27 |
| 2008 | .23 | 2 of 28 | .50 | .61 | 9 of 28 |

225.   CIB's Advisory Fee and Expense Ratio comparison:  [SF-84]

| | Fund Advisory Fee | Advisory Fee Rank Within Lipper Index | Median Advisory Fee for Funds in Lipper Category | Class A Share Expense Ratio | Expense Ratio Rank Within Lipper Index |
|---|---|---|---|---|---|
| 2003 | .31 | 3 of 28 | .60 | .67 | 7 of 28 |
| 2004 | .30 | 4 of 24 | .60 | .65 | 5 of 24 |
| 2005 | .28 | 4 of 25 | .56 | .59 | 6 of 26 |
| 2006 | .23 | 3 of 20 | .55 | .57 | 6 of 21 |
| 2007 | .23 | 3 of 14 | .49 | .55 | 3 of 14 |
| 2008 | .22 | 1 of 14 | .52 | .55 | 3 of 14 |

226.   WGI's Advisory Fee and Expense Ratio comparison:  [SF-85]

| | Fund Advisory Fee | Advisory Fee Rank Within Lipper Index | Median Advisory Fee for Funds in Lipper Category | Class A Share Expense Ratio | Expense Ratio Rank Within Lipper Index |
|---|---|---|---|---|---|
| 2003 | .42 | 2 of 21 | .75 | .82 | 1 of 22 |
| 2004 | .42 | 4 of 27 | .75 | .81 | 2 of 27 |
| 2005 | .40 | 3 of 31 | .75 | .77 | 6 of 33 |
| 2006 | .35 | 1 of 28 | .75 | .73 | 1 of 28 |
| 2007 | .34 | 1 of 28 | .75 | .69 | 1 of 28 |
| 2008 | .34 | 1 of 23 | .74 | .69 | 2 of 23 |

227.   GFA's Advisory Fee and Expense Ratio comparison:  [SF-86]

| | Fund Advisory Fee | Advisory Fee Rank Within Lipper Index | Median Advisory Fee for Funds in Lipper Category | Class A Share Expense Ratio | Expense Ratio Rank Within Lipper Index |
|---|---|---|---|---|---|
| 2003 | .31 | 1 of 31 | .66 | .75 | 2 of 31 |
| 2004 | .31 | 2 of 28 | .67 | .76 | 2 of 28 |

| 2005 | .29 | 2 of 28 | .65 | .70 | 3 of 28 |
| 2006 | .25 | 1 of 28 | .69 | .71 | 2 of 28 |
| 2007 | .25 | 1 of 25 | .67 | .63 | 2 of 25 |
| 2008 | .25 | 1 of 28 | .69 | .62 | 2 of 28 |

228.   IFA's Advisory Fee and Expense Ratio comparison:  [SF-87]

|  | Fund Advisory Fee | Advisory Fee Rank Within Lipper Index | Median Advisory Fee for Funds in Lipper Category | Class A Share Expense Ratio | Expense Ratio Rank Within Lipper Index |
| --- | --- | --- | --- | --- | --- |
| 2003 | .27 | 1 of 27 | .53 | .61 | 2 of 14 |
| 2004 | .28 | 1 of 13 | .57 | .61 | 2 of 13 |
| 2005 | .25 | 2 of 14 | .53 | .57 | 3 of 15 |
| 2006 | .22 | 2 of 15 | .55 | .54 | 2 of 15 |
| 2007 | .22 | 1 of 14 | .49 | .53 | 2 of 14 |
| 2008 | .22 | 1 of 14 | .52 | .54 | 2 of 14 |

229.   ICA's Advisory Fee and Expense Ratio comparison:  [SF-88]

|  | Fund Advisory Fee | Advisory Fee Rank Within Lipper Index | Median Advisory Fee for Funds in Lipper Category | Class A Share Expense Ratio | Expense Ratio Rank Within Lipper Index |
| --- | --- | --- | --- | --- | --- |
| 2003 | .24 | 5 of 30 | .56 | .59 | 6 of 30 |
| 2004 | .25 | 2 of 30 | .66 | .59 | 4 of 30 |
| 2005 | .24 | 2 of 30 | .62 | .57 | 4 of 30 |
| 2006 | .21 | 2 of 29 | .58 | .55 | 3 of 29 |
| 2007 | .21 | 1 of 29 | .54 | .54 | 2 of 29 |
| 2008 | .21 | 1 of 29 | .56 | .54 | 3 of 29 |

230.   Seven of the eight Funds at issue ranked first—*i.e.*, the lowest advisory fee—in their respective Lipper peer group at least once during the relevant time period,

and five of them achieved the top ranking multiple times.  [SF-81-88]; Ex. 648 at 44; Exhs. 2218A-B; Tr. 870:5-7, 951:1-2.

231.   For every year at issue, the Funds' advisory fees were lower than at least 75% of their peers.  [SF-81-88]

### 2.    Transfer Agency Fees

232.   The transfer agency fees paid by the Funds were well below the transfer agency fees paid by peer funds.

233.   The table below shows transfer agency fees paid by the Funds (in basis points) with respect to all share classes for each of CRMC's fiscal years during the relevant period compared to the median fee of each Fund's peer group as defined by Lipper.  [SF-89]

| FUND | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| **AMBAL** | **0.13%** | **0.10%** | **0.09%** | **0.08%** | **0.08%** | **0.08%** |
| Lipper peer group | 0.18% | 0.17% | 0.14% | 0.14% | 0.12% | 0.11% |
| **AMCAP** | **0.12%** | **0.09%** | **0.09%** | **0.09%** | **0.09%** | **0.09%** |
| Lipper peer group | 0.19% | 0.19% | 0.15% | 0.16% | 0.14% | 0.13% |
| **BFA** | **0.11%** | **0.11%** | **0.11%** | **0.11%** | **0.10%** | **0.10%** |
| Lipper peer group | 0.11% | 0.10% | 0.13% | 0.13% | 0.15% | 0.12% |
| **CIB** | **0.08%** | **0.07%** | **0.06%** | **0.06%** | **0.06%** | **0.06%** |
| Lipper peer group | 0.14% | 0.15% | 0.10% | 0.11% | 0.11% | 0.11% |
| **WGI** | **0.10%** | **0.08%** | **0.08%** | **0.08%** | **0.07%** | **0.08%** |
| Lipper peer group | 0.24% | 0.27% | 0.20% | 0.20% | 0.17% | 0.15% |
| **GFA** | **0.16%** | **0.10%** | **0.09%** | **0.07%** | **0.07%** | **0.07%** |
| Lipper peer group | 0.26% | 0.26% | 0.25% | 0.23% | 0.21% | 0.17% |
| **IFA** | **0.07%** | **0.06%** | **0.06%** | **0.06%** | **0.05%** | **0.06%** |
| Lipper peer group | 0.14% | 0.15% | 0.10% | 0.11% | 0.11% | 0.11% |
| **ICA** | **0.10%** | **0.08%** | **0.08%** | **0.07%** | **0.07%** | **0.08%** |
| Lipper peer group | 0.16% | 0.18% | 0.17% | 0.16% | 0.13% | 0.12% |

### 3.    Rule 12b-1 Fees

234.   The Rule 12b-1 fees charged to the Funds either were generally comparable to or lower than those Rule 12b-1 fees charged by most other mutual funds that are distributed by brokers.  Tr. 798:25-799:4; 1286:12-17.

235. The table below shows the Rule 12b-1 fees paid by the Funds (in basis points) with respect to Class A shares for each of the Fund's fiscal years during the relevant period compared to the median Rule 12b-1 fee paid by each Fund's peer group: (Ex. 651 at Ex. 23)

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| **AMBAL** | **.250** | **.250** | **.250** | **.250** | **.250** | **.250** |
| Peer group median | .251 | .250 | .250 | .250 | .250 | .250 |
| **AMCAP** | **.248** | **.246** | **.224** | **.225** | **.229** | **.233** |
| Peer group median | .251 | .251 | .250 | .250 | .250 | .250 |
| **BFA** | **.250** | **.249** | **.250** | **.249** | **.250** | **.250** |
| Peer group median | .250 | .250 | .250 | .250 | .250 | .250 |
| **CIB** | **.224** | **.215** | **.227** | **.225** | **.236** | **.226** |
| Peer group median | .250 | .250 | .250 | .249 | .250 | .249 |
| **WGI** | **.252** | **.234** | **.227** | **.225** | **.236** | **.231** |
| Peer group median | .250 | .251 | .250 | .249 | .250 | .249 |
| **GFA** | **.249** | **.251** | **.250** | **.250** | **.246** | **.243** |
| Peer group median | .251 | .251 | .250 | .250 | .250 | .250 |
| **IFA** | **.233** | **.231** | **.223** | **.233** | **.243** | **.236** |
| Peer group median | .251 | .250 | .250 | .250 | .250 | .250 |
| **ICA** | **.231** | **.226** | **.228** | **.232** | **.232** | **.228** |
| Peer group median | .250 | .250 | .250 | .250 | .251 | .249 |

### 4. Administrative Services Fees

236. As described above, the administrative services fee covers transfer agency services, plus oversight and monitoring of third parties by CRMC. It is difficult to meaningfully compare administrative services fees across peer funds because the services provided in exchange for administrative services fees varies greatly across different mutual funds in the industry. However, it is possible to compare the American Funds' administrative services fee to peer funds' transfer agency fees, which cover a significant component of the services covered by the administrative services fee. Tr. 505:14-506:4, 1518:7-1519:3, 1525:7-13.

237. From 2004 to 2008, the median expense for transfer agent services for similar funds ranged from 0.10% to 0.27%. Exhs. 2215A-2215H. The maximum

0.15% administrative services fee charged to the Funds fell at the low-end of that range.

238.    The transfer agent fees of competitors listed in Exhibits 2215A through H are limited to traditional transfer agency services, whereas the administrative services fees at issue encompassed both those services and the oversight, coordination, monitoring, and assistance provided by CRMC.  *See* FOF ¶¶ 212-20.

239.    Even though the administrative services fee covers additional services, the comparative fee data indicates that the administrative services fee is at the low end of the industry.

### D.    **Economies of Scale**

240.    Economies of scale exist when long-run average production costs (cost per unit) decrease as output quantity increases.  Ex. 651 at ¶ 107.

241.    If long-run average costs increase as output quantity increases, then diseconomies of scale exist.  Ex. 651 at ¶¶ 107-08, 110.

242.    To determine whether economies of scale exist involves an examination of how total costs change with the level of output.  Thus, relying on a subset of costs in an economies of scale analysis may yield incorrect results.  Analyzing only a subset of costs does not allow for the possibility that a firm may realize economies of scale in one function, but also realize diseconomies of scale in other functions.  Ex. 651 at ¶ 110.

243.    Within the mutual fund industry, scale or output may be measured by assets under management, the quantity of shareholder accounts, or the number of funds.  Ex. 651 at ¶ 108.

244.    In addition, as both parties' experts agreed, economies of scale is properly analyzed at the fund complex level and not at the fund level.  Ex. 651 at ¶ 116; Ex. 2669 at ¶ 52; Tr. 1062:17-23; Hr'g Tr. at 20, Sept. 2, 2009.

245.    It is difficult to analyze the relationship between costs and mutual fund assets because costs can change for many reasons other than economies of scale.  Ex.

651 at ¶ 118. For example, technological changes may result in savings, input prices can fall, or an adviser may have changed the level of service being provided. Ex. 651 at ¶ 118); Tr. 824:19-825:7, 990:18-991:2.

## 1. Dr. O'Neal's Analysis of Economies of Scale

246. Plaintiffs attempted to establish the existence of economies of scale through the analyses and testimony of Dr. O'Neal.

247. Dr. O'Neal first performed a "traditional" analysis of economies of scale whereby he determined that CRMC's net expenses in fiscal year 2003 of $615 million constituted approximately 17 basis points of CRMC's average net assets under management. *See* Ex. 2669 at ¶ 69 & Table 24.

248. Dr. O'Neal reasoned that if this ratio had remained constant in fiscal year 2004 (*i.e.*, if CRMC's continued growth did not result in economies of scale), then CRMC's expenses would have been $885 million. Ex. 2669 at ¶ 69. However, CRMC's actual expenses in fiscal year 2004 were $831 million. Id., at Table 24

249. Based on this $54 million difference, and assuming that $150 million of CRMC's 2004 expenses consisted of profit-sharing payments which Dr. O'Neal treats as profits rather than an expense, Dr. O'Neal asserted that CRMC enjoyed economies of scale of $204 million in fiscal year 2004 ($885 million - $831 million = $54 million + $150 million). Ex. 2669, at¶16, Table 24, line 16. According to Dr. O'Neal, because CRMC's expenses decreased by $18 million in fiscal year 2004, CRMC shared only eight percent of economies of scale with investors. Id.

250. In addition, Dr. O'Neal also conducted an alternative analysis based on how CRMC's revenues and profits changed from fiscal year 2003 to fiscal year 2004. Id., at ¶¶ 59-64. Based on the alternative analysis, Dr. O'Neal concluded that CRMC shared only four percent of economies of scale with investors, and directed the bulk of economies of scale to CRMC associates through the SCP. Id. at ¶ 64.

251. Dr. O'Neal's economies of scale analyses were inadequate, and his conclusions materially flawed, for a number of reasons.

252. First, although Dr. O'Neal admitted that the cost of mutual fund services may decrease for reasons other than economies of scale, he did not undertake any analyses to determine whether any other factors may have caused or contributed to the decrease in CRMC's costs in fiscal year 2004. Tr. 1056:17-25. When questioned by the Court at trial, Dr. O'Neal confirmed that he merely inferred that economies of scale were achieved. Tr. 1057:1-3.

253. Dr. O'Neal also conceded that he was unable to determine the extent to which CRMC's per-unit costs decreased as fund size increased because of a lack of data. 1057:4-9.

254. With respect to sharing, Dr. O'Neal found that the total amount of economies of scale shared through fiscal year 2007 was $596 million, which was approximately half of the amount shared with investors through breakpoints and fee waivers ($1.2 billion). Tr. 1059:4-25, 1062:12-25.

255. When confronted with this discrepancy, Dr. O'Neal stated that CRMC's asset mix changed over time, with more investments in higher-expense funds such as equity funds and smaller funds with higher fee rates. Tr. 1061:5- 1062:6.

256. However, Dr. O'Neal offered no persuasive testimony to explain how a shift in asset mix would explain why CRMC's investors received only half of the benefits returned to them in the form of breakpoints and fee waivers. Tr. 1062:12-1063:15.

257. Moreover, Dr. O'Neal admitted that a shift toward investing in more expensive funds would not necessarily affect the amount of sharing of economies of scale for shareholders in the eight Funds at issue in this case. Tr. 1062:12-1063:15.

258. Dr. O'Neal also failed to adequately explain why the fact that administrative services fees remained flat from 2003 to 2005 demonstrated that CRMC failed to deliver economies of scale, or why those figures would impact savings from breakpoints and fee waivers that inured to investors' benefit in fiscal year 2007. Tr. 1064:11-1066:12.

259.    Dr. O'Neal's analyses also failed to account for economies of scale that might be shared through such means as improvements in technology, facilities, and equipment.  Ex. 651 at ¶ 144.

260.    The foregoing deficiencies severely undermine the probative value and reliability of Dr. O'Neal's analyses and conclusions related to economies of scale.

261.    Finally, Dr. O'Neal's testimony did not provide a sufficient basis upon which to conclude that it is proper to focus only on CRMC when determining whether economies of scale were adequately shared with investors.  Tr. 1069:4-13.

262.    Dr. O'Neal testified that it was proper for him to exclude AFD and AFS from his economies of scale analyses.  Tr. 1047:14-1048:13.  However, he offered no persuasive response to Dr. R. Glenn Hubbard's criticism that it is more appropriate to include AFD and AFS in such analyses because American Funds investors purchase a bundle of services that includes shareholder and administrative services provided by these entities.  See Ex. 651 at ¶ 139.

263.    Dr. O'Neal admitted that AFS automatically shares any economies (or diseconomies) of scale with investors, and that if AFD and AFS were included in his analyses, his results would show that an additional $1.7 billion in economies of scale were shared with investors for fiscal years 2004 to 2007.  Tr. 1069:14-1070:20.

264.    According to Dr. O'Neal's own analyses, when all of the sharing from the three entities that service and manage the funds are included, $2.262 billion in economies of scale were shared with investors from fiscal years 2004 to 2007.  This constituted approximately 40% of all economies of scale realized by CRMC, AFD, and AFS during that period, even if one excludes profit-sharing payments.  Tr. 1071:15-1072:21.

265.   This amount of sharing found by Dr. O'Neal increases to 46% if profit-sharing payments are treated as a compensation expense rather than profit.  Ex. 2671 at Table 4; Tr. 1071:25-1072:5.[6]

### E.   **Fall-Out Benefits**

266.   There was no evidence establishing that Defendants received any fall-out benefits from the Funds.  Ex. 648 at 32; Ex. 858 at CORBI_0219418.

267.   Defendants only manage mutual funds and therefore do not receive profits from any other related services or products.  Ex. 648 at 31; Ex. 858 at CORBI_0219418.

268.   All revenue received by CRMC or its affiliates from the Funds are included in its consolidated financial statements and provided to the Fund Boards.  Ex. 648 at 32.  Thus, in any event, any potential fall-out benefits would have been considered by the Board as part of their review of those financial statements.

### F.   **The Unaffiliated Directors**

269.   The Funds' Boards have thirty-nine (39) Unaffiliated Directors as that term is used in governing statutes and regulations.  Ex. 648 at 10.  As discussed below, these directors were successful, well-educated business people with knowledge regarding financial markets and financial services.  Of that there can be no doubt.  Further, they received voluminous documentation on issues that were discussed at board meetings.  However, as noted in the Court's preliminary statement, the Court

---

[6] The Court has deleted proposed findings that assert that CRMC shared the benefits of any economies of scale that it achieved.  CRMC has consistently argued that economies of scale cannot be achieved or measured, but had also argued that it has conferred the benefits of economies of scale on its clients.  CRMC cannot have it both ways.  Moreover, while CRMC contends that the use of break points demonstrates that investors receive the benefits of economies of scale, the Court noted that the breakpoints were determined through the use of the Fibonacci sequence $[F(n) = F(n-1) + F(n-2)$ with seed values of $F(0) = 0$ and $F(1) = 1]$ with no cogent explanation as to why that sequence bears any relationship to the any economies of scale achieved in CRMC's operations.

does not find that the directors negotiated the best possible arrangement for the investors or that the incentives exist to achieve such a result.

270.   The Unaffiliated Directors are well-educated individuals with successful careers in a number of different industries.  The Unaffiliated Directors are qualified based on their education and professional backgrounds, their knowledge and expertise, their accomplishments in business and civic endeavors, and their diverse life experiences.  [SF-110-117]; Ex. 2208A-B; Ex. 648 at 11-12; Tr. 851:12-854:21, 955:11-959:4, 1472:20-1474:18.  Several Unaffiliated Directors have served, or currently serve, on the boards of directors of Fortune 500 companies (including Allegheny Technologies, B.F. Goodrich, Kellogg's, Kimberly Clark Corporation, William Wrigley Jr. Company), as well as various charitable organizations.  AMCAP SAI (May 1, 2006), CORBI_ 0062934; BFA SAI (March 1, 2007), CORBI_0065753; ICA SAI (March 1, 2007), CORBI_ 0078777; Exh. 2208B; Tr. 1441:6-1442:14.

271.   The Funds' Unaffiliated Directors have a combined total of approximately 470 years of service on the Boards, with some members each having served for 38 years.  Ex. 648 at 12; Tr. 1368:9-11.

272.   Over one quarter of the Unaffiliated Directors are individuals with careers in the financial services industry.  Ex. 2208B; Tr. 615:24-616:12.[7]

---

[7] Whether this is a positive or a negative is a matter of legitimate debate.  Judge Posner in his Jones dissent observed:

Directors are often CEOs of other companies and naturally think that CEOs should be well paid. And often they are picked by the CEO. Compensation consulting firms, which provide cover for generous compensation packages voted by boards of directors, have a conflict of interest because they are paid not only for their compensation advice but for other services to the firm-services for which they are hired by the officers whose compensation they advised on.  [Numerous citations.]

537 F.3d, at 730.

273.   Approximately 97% of the Funds' Unaffiliated Directors have an undergraduate degree, with approximately 24% earning their undergraduate degrees at Yale University, Harvard University, and Stanford University.  Ex. 2208A.

274.   Almost 72% of the Funds' Unaffiliated Directors have a post-graduate degree, with half having earned their post-graduate degrees at Harvard University and Stanford University.  Ex. 2208A.

275.   Over 53% of the Funds' Unaffiliated Directors hold the title of "President" at their respective employers, 46% hold the title of "Chairman," and 38% hold the title of "Chief Executive Officer."  Ex. 2208B; but see Footnote 7 below.

276.   Some of the Unaffiliated Directors are themselves shareholders, some with substantial sums of money invested in the Funds.  Tr. 905:11-906:8, 1442:19-1443:16, 997:15-25.

277.   The table below shows the percentage of Unaffiliated Directors on the Boards of each Fund at issue during the relevant time period:  [SF-118]

|  | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| **AMCAP** | 80% | 80% | 80% | 82% | 83% | 83% |
| **AMBAL** | 78% | 80% | 80% | 80% | 78% | 89% |
| **BFA** | 70% | 70% | 70% | 73% | 82% | 82% |
| **CIB** | 77% | 77% | 82% | 86% | 86% | 86% |
| **WGI** | 83% | 82% | 82% | 86% | 86% | 86% |
| **GFA** | 78% | 78% | 80% | 80% | 80% | 80% |
| **IFA** | 80% | 89% | 89% | 89% | 88% | 91% |
| **ICA** | 67% | 67% | 67% | 77% | 77% | 77% |

278.   Each of these figures exceeds the requirement under the Investment Company Act that a majority of each Board be comprised of unaffiliated directors, [SF-119], as well as the two-thirds standard recommended by the Investment Company Institute (the "ICI").

279.   Although not required, since 2007 every Fund Board has been composed of at least 75% unaffiliated directors.  [SF-120]; Tr. 614:20-23.

280. Each Board has elected an Independent Chairperson of the Board. Ex. 648 at 18; Tr. 614:2-11; 962:3-5.

281. Each Board is also advised by independent counsel, whose fees are paid by the Funds. Tr. 619:12-16. Independent counsel attend all Board and Committee meetings. [SF-124]; Tr. 972:21-23.

282. The Unaffiliated Directors of AMCAP, CIB, WGI, and ICA are advised by independent counsel from the firm of O'Melveny & Myers LLP ("O'Melveny"). [SF-122]

283. The Unaffiliated Directors of AMBAL, IFA, GFA, and BFA are advised by independent counsel from the firm of Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"). [SF-123]

284. Both O'Melveny and Paul Hastings advise the Unaffiliated Directors with respect to: (1) their fiduciary duties; (2) the adequacy of materials provided by CRMC; (3) their review and consideration of the Funds' agreements; (4) their responsibilities with respect to the annual self-evaluation process; and (5) regulatory requirements and developments; as well as many other issues. Tr. 618:8-25, 858:10-859:8.

285. The Unaffiliated Directors have adopted a Code of Ethics [SF-125], engage in an annual self-evaluation process, and meet regularly in executive session without management. Tr. 859:1-8, 862:24-863:19.

286. The boards of directors of the American Funds are organized in a "cluster system." Under the cluster system, the boards and board committees of several Funds share certain members and generally meet at the same time. [SF-146]

287. As part of this cluster system, the Unaffiliated Directors serve on a small number of boards of funds that utilize similar investment strategies. Most Unaffiliated Directors sit on one or two board clusters, though some sit on three. Tr. 617:1-23, 1367:19-25, 1456:3-7. This is unusual in the mutual fund industry, as many fund

complexes have only one or two boards for the entire complex, with responsibility for overseeing many more funds.  Tr. 617:1-23.

288.   There are currently eleven (11) board clusters for the American Funds complex.  [SF-148]

289.   With respect to the Funds at issue, AMBAL and IFA are part of the same cluster; CIB and WGI are part of the same cluster; and AMCAP, BFA, GFA, and ICA are not in a cluster with any Fund at issue.  [SF-147]

290.   Each Fund cluster has an independent chairperson.  [SF-149]

291.   Every Board has various Board committees that are comprised exclusively of Unaffiliated Directors, including Nominating Committees, Audit Committees, Contracts Committees, Proxy Committees, and Governance Committees.  [SF-126]  In addition, an unaffiliated director from each fund cluster sits on the AFS Review and Advisory Committee and the AFD Distribution Oversight Committee.  [SF-134]; Tr. 450:20-451:9.

292.   Neither CRMC associates nor the interested directors are members of any of these committees, although they may be invited to participate in the meetings of these committees from time to time.  [SF-127]

293.   The Nominating Committees are charged with reviewing such issues as the Boards' composition, responsibilities, committees, and compensation.  The Nominating Committees recommend any changes to the full Boards of Directors.  [SF-128]

294.   The Nominating Committees are also responsible for evaluating, selecting, nominating, and electing Unaffiliated Directors for their respective Boards, as well as conducting annual self-evaluations and evaluations of their respective Board members' performance to determine the existence of any performance-related issues that need to be addressed.  [SF-129]

295.   Once elected, new Unaffiliated Directors receive substantial background and educational materials, have an opportunity to meet with fund counsel, as well as

training at an orientation session organized by the Nominating Committees. The orientation session educates new directors with regard to CRMC, and their roles and responsibilities as Unaffiliated Directors. Ex. 582 at CORBI_0349699; Ex. 853 at CORBI_0220848-86; Tr. 619:17-620:17, 975:25-976:1.

296. The Nominating Committees review Unaffiliated Director compensation at least every two years. The Boards make changes to Unaffiliated Director compensation based on recommendations from the Nominating Committees, as well as information they receive regarding industry-wide director compensation. [SF-128]; Ex. 648 at 15.

297. Compensation for the Unaffiliated Directors is generally below the median of compensation paid to the Unaffiliated Directors of similar fund complexes. Ex. 206 at CORBI_0469255; Ex. 648 at 15.

298. The Audit Committees oversee the Funds' accounting and financial reporting policies and practices, and its internal controls. [SF-130]

299. The AFS Review and Advisory Committee keeps Board members informed of AFS' financial and operational matters and recommends revisions, as needed, to the Shareholder Services Agreement to each Fund Board. [SF-135]; Tr. 450:20-451:9.

300. The Distribution Oversight Committee keeps Board members informed of AFD's operations.

301. The Contracts Committees consider and approve the annual renewals of the mutual funds various fee agreements, including: the Investment Advisory and Service Agreements; the Principal Underwriting Agreements; the Rule 12b-1 Plans of Distribution; and the Administrative Services Agreement. [SF-131-32]

302. The entire group of Unaffiliated Directors for each fund cluster sits on the Contracts Committee for that cluster. Tr. 622:9-13, 859:20-21.

303. The Proxy Committees are charged with reviewing procedures and policies for voting proxies of companies held in a Fund's portfolio, monitoring certain

contested proxy voting issues, discussing related current issues, and, in some cases, voting proxies on behalf of funds.  Ex. 1279 at 20.

304.  Throughout the relevant period, the Boards had in place a process designed to facilitate the Unaffiliated Directors' review of information relevant to the annual approval of the Funds' agreements and to facilitate their discussions with CRMC.  Ex. 648 at 20; Tr. 630:18-632:14, 1430:19-1431:5, 1502:2-15.

305.  The Boards view the renewal of all relevant agreements as a year-long process.  Ex. 648 at 20; Tr. 623:1-2, 630:18-632:14, 860:25-861:2, 975:23-25, 1428:3-11.

306.  The annual approval process begins each year with a memorandum from counsel to the Unaffiliated Directors.  Paul Hastings sends a formal memorandum to CRMC discussing the *Gartenberg* factors and requesting information necessary for the Unaffiliated Directors' annual consideration of each Fund's agreements.  O'Melveny provides a memorandum to the Unaffiliated Directors which also reviews the *Gartenberg* factors and the types of information that the directors should consider.  Ex. 816 at CORBI_0041652-59; Ex. 817 at CORBI_0042645-64; Ex. 834; Tr. 630:18-632:14; 633:25-634:9, 637:19-638:4, 973:2-12.

307.  After discussing with the Directors and fund counsel the information that they would like provided, CRMC's Fund Administration Unit prepared thorough responses to the requests in the form of a Director Information Book ("DIB").  *E.g.*, Ex. 10.  Tr. 640:2-15; 973:13-16.  Preparation of the materials was overseen by Paul Roye, the former Director of the SEC's Division of Investment Management.  Tr. 630:18-632:14, 638:10-23.

308.  The Funds' Contracts Committees generally met at least two weeks after receiving a Fund's DIB to consider the proposed contract approvals or renewals for the annual period.  [SF-140]; Tr. 860:13-15.

309.  During this meeting, the Contracts Committees met with CRMC executives to discuss the terms of the proposed agreements, as well as other issues

affecting the Funds and/or CRMC.  Ex. 648 at 21; Tr. 623:6-14, 630:18-631:24, 973:18-974:16.

310.   The Contracts Committees periodically held additional meetings to further consider CRMC's proposals, as well as to receive follow-up information from CRMC. Ex. 648 at 21 & Ex. F; Tr. 650:12-651:1, 861:23-862:5, 974:17-22.

311.   The Contracts Committees do not make their recommendation to the full Board until after they have been assured by their independent counsel, in an executive session, that they have been provided with all the information which they need.  Tr. 863:23-864:7, 968:4-20.

312.   After reviewing and considering the information contained in the DIBs as well as all other information received throughout the year, the Contracts Committees for each fund cluster meet at the next scheduled quarterly Board meeting to vote on the renewal of the various fee arrangements.  Fee schedules approved by the Contracts Committees must thereafter be approved by the entire Board of each fund at the following quarterly board meeting.  Ex. 648 at 21; Tr. 630:3-632:14, 649:8-22, 861:3-22, 862:6-23.

313.   Throughout the relevant period, each Fund Board met at least quarterly. Tr. 859:9-13.  The Funds' Committees also met regularly throughout the year.  Tr. 620:24-621:3.

314.   The Unaffiliated Directors held executive sessions at every Board and Contracts Committee meeting, where they had the opportunity to discuss issues outside of the presence of affiliated directors and CRMC management.  Ex. 64 at CORBI_0342543; Tr. 862:24-863:19, 972:7-20, 972:24-973:1.

315.   CRMC provided written materials to the Unaffiliated Directors throughout the year.  These materials include, among other things:

      a.     contract renewal materials;

      b.     monthly and other mailings;

      c.      quarterly materials for board meetings (which are meant to help the Unaffiliated Directors prepare for upcoming board meetings and contain updates on the size and growth of the American Funds);

      d.      Director Information Books ("DIBs");

      e.      Memoranda on selected topics ("White Papers");

      f.      Unaffiliated Director seminar materials; and

      g.      DWEB (the Directors' website).  [SF-137]  Tr. 974:23-975:17.

316.    CRMC also provided Board members with quarterly compliance reports from the Funds' Chief Compliance Officer (although only required annually).  Exhs. 835, 862.

317.    Directors also received information from third parties, including:

      a.      auditors;

      b.      Unaffiliated Directors' counsel; and

      c.      industry organizations.  [SF-138]

318.    The DIBs provided to the respective fund clusters annually included the following information, among others:  (*e.g.*, Ex. 43)

      a.      draft minutes of the prior year's Contracts Committee meeting, which the Unaffiliated Directors must approve;

      b.      information relating to CRMC's various fee agreements;

      c.      legal memoranda from independent counsel setting forth and analyzing the legal standards governing the Unaffiliated Directors' review and approval of the fee agreements;

      d.      proposed fee schedules;

      e.      charts and tables outlining the performance, size, and other pertinent characteristics of the particular funds at issue;

      f.      information regarding CRMC's, AFD's, and AFS's income and retained earnings;

g.    reports based on Lipper and other independent industry data containing comparisons of the performance of the Funds with the performance of comparable funds in the industry;

h.    historical trend information regarding the change in the investment advisory fee and total expense ratio compared to the Funds' Lipper peer group for the past ten years, trailing five years, and projected five years;

i.    the profitability of CRMC, AFD, and AFS (*see, e.g.*, Ex. 50 at CORBI_0470366-83);

j.    the nature and quality of the services provided to the Funds, such as summaries of CRMC's trading practices;

k.    reports on the structure, functions, and personnel of CRMC and its affiliates;

l.    information regarding the Administrative Services Fee paid to CRMC;

m.    information regarding the Funds' Rule 12b-1 Plans;

n.    summaries of the shareholder services that CRMC performs or causes to be performed pursuant to the administrative services arrangements;

o.    data concerning transfer agency fees and comparisons to the transfer agency fees charged by comparable mutual funds in the industry;

p.    summaries of the structure and function of the Risk Oversight and Compliance divisions of CRMC, including reports of shareholder correspondence; and

q.    facts and data pertaining to the activities of AFS, including updates on AFS account activity, shareholder call activity, website updates and usage, and reports on the activities of HOST.

Tr. 639:22-648:23, 1502:16-1503:6.

319.    In addition to the DIBs, the Unaffiliated Directors also received "Board Books" in connection with every quarterly Board meeting.  [SF-141]

320.    These Board Books included, among other things, investment results and activities, redemption information and transaction activity data, and graphs of the growth of the respective Funds' asset levels.  *E.g.*, Ex. 206 at CORBI_0469053-61. Tr. 651:2-19.

321.    The members of the AFS Review and Advisory Committee and the Distribution Oversight Committee also received materials in connection with the meetings of those committees.  [SF-142]

322.    CRMC also sent and/or made available to the Unaffiliated Directors on DWEB monthly packages that contained articles of interest to the mutual fund industry, as well as periodic reviews of legal and regulatory developments under the Investment Company Act of 1940, and memoranda relating to specific legal developments.  Tr. 640:24-641:8, 651:20-652:2, 860:21-24.

323.    CRMC also prepared separate materials for each Fund committee meeting and sent those materials to the directors in advance of the meeting.  Tr. 651:2-23.

324.    CRMC also disseminated a number of topic-specific memoranda (called "White Papers") on issues that are of particular importance, such as managing fund growth and size, (Ex. 1); mutual fund fees and expenses, (Ex. 3); and the sharing of economies of scale (Ex. 2).  [SF-143].  The White Papers contained information, such as scholarly articles, that provide competing views on important issues.  Tr. 656:18-658:21, 886:14-17, 888:18-25, 890:19-893:22.

325.    Each year during the relevant period, CRMC typically held at least one (but on occasion two) seminar(s) for the Unaffiliated Directors of all the American Funds.  [SF-144]

326.    These seminars allowed the Directors from all of the various fund clusters to discuss important issues in the same venue.  In this respect, Defendants have

presented on various topics including AFD's operations, equity trading, compliance, succession planning, retirement plan issues, distribution, and corporate governance. [SF-145] Tr. 978:4-979:9.

327. The Unaffiliated Directors also attended industry conferences, and have made on-site visits to Defendants' facilities, including CRMC's investment offices around the globe and service centers housing AFD and AFS associates. Tr. 620:18-23, 856:6-21, 874:2-18.

328. Among other things, CRMC provided the Unaffiliated Directors with numerous materials that were directed to the issue of economies of scale. Tr. 657:18-658:18, 885:14-18, 886:18-23, 989:10-990:12.

329. On August 11, 2006, CRMC sent the Directors a comprehensive memorandum including many exhibits entitled "Mutual Fund Economies of Scale," which was devoted to explaining and examining the concept of economies of scale in the mutual fund industry. The paper attached many studies and academic articles which presented competing views on the topic. Ex. 2; Tr. 657:18-658:21, 886:14-17.

330. On October 13, 2004, CRMC sent the Directors a memorandum detailing the waiver of 5% of the Funds' advisory fees. This memorandum included considerable information and exhibits relevant to analyzing economies of scale, including information regarding the Funds' advisory fees and breakpoints, as well as CRMC's profitability and cash flows. Ex. 830.

331. On March 8, 2005, the Directors received a second memorandum and exhibits from CRMC detailing the waiver of an additional 5% of the advisory fees. Ex. 858; Tr. 653:16-25.

332. Every annual Fund DIB that CRMC provides to the Directors contains additional information related to economies of scale. Ex. 648 at 31; Ex. 42.

333. The DIBs included information on the advisory fees, including fee breakpoint schedule histories, comparisons to the fees of comparable funds, and graphs

of the historical advisory fee levels compared to peer medians.  *E.g.*, Ex. 50 at CORBI_0470342-58.  Tr. 688:10-689:16.

334.  The DIBs also included extensive information on the profitability of CRMC and its affiliates, including the effects of breakpoints and fee waivers on management fee revenue, financial statements, profit comparisons to other fund managers, and future profitability projections (both favorable and unfavorable).  *E.g.*, Ex. 50 at CORBI_0470363-86. Tr. 688:10-689:16.

335.  CRMC does not attempt to provide the Directors with a quantification of economies of scale.  Tr. 1565:1-2.

336.  The Directors received information regarding Rule 12b-1 plans, which allowed them to reach a determination that there was a reasonable likelihood that the plans would benefit the Funds and their shareholders.  Tr. 812:20-813:19, 901:4-11, 1376:1-12.

337.  The Directors received the following information relating specifically to Rule 12b-1 fees:

a.  Quarterly Rule 12b-1 Expense Summary which details the total amount of Rule 12b-1 fees characterized as distribution and service for each share class of the Fund;  (Tr. 696:1-697:12)

b.  a section in each DIB that contains discussions regarding the Rule 12b-1 fees paid by the Funds;

c.  charts showing redemption rates for each Fund at issue;

d.  guidance from Fund counsel regarding Rule 12b-1 Plans;

e.  copies of the Plans of Distribution;

f.  examples of the Selling Group Agreement which sets forth the requirements that broker-dealers must meet to receive Rule 12b-1 fees;

g.  presentations from AFD management regarding distribution;

> h. documents entitled "Overview of AFD," which described, among other things, the Rule 12b-1 fees paid by each share class, AFD's business model, distribution network, and servicing efforts;
>
> i. charts showing the flow of Rule 12b-1 fees after they are paid.

*E.g.*, Ex. 43 at CORBI_0468582-89.[8]

338. The directors were provided a White Paper on fees and expenses in which CRMC provided a detailed history of Rule 12b-l, actions by the SEC to expand the use of Rule 12b-1 in authorizing multiple classes of shares, and the approval of amendments to the NASD maximum rules load rules. It also discussed the recent movement to repeal the rule, and provided a variety of materials regarding the debate on the continued vitality of Rule 12b-l. Ex. 3; Tr. 657:1-5.

339. The Boards were provided a White Paper on economies of scale that was intended to provide them with information regarding the benefits of the Plans of Distribution. Ex. 2.

340. Other information that the Unaffiliated Directors used to assess the Rule 12b-1 fees included the following:

> a. investment results for the Funds;
>
> b. advisory fee comparisons to Lipper peer rankings;
>
> c. fund fee histories;
>
> d. expense ratio analyses;
>
> e. tables listing the effects of the fee waivers and breakpoints on management fee revenue; and
>
> f. profitability data for CRMC and AFD, including future financial projections.

---

[8] *See also, e.g.*, Ex. 3 at CORBI_0231586, CORBI_0231596-CORBI_0231598, CORBI_0231603-CORBI_0231604; Exhs. 51-122; Exhs. 137-331; Exhs. 333, 335-36; Ex. 603; Exhs. 671, 673-79; Exhs. 692-705, 707-38, 742-62, 766-86; Ex. 806; Exhs. 812, 814, 816-17, 820, 841, 851-52, 854, 857; Ex. 1087; Tr. 695:10-696:24.

341.　*E.g.*, Ex. 43 at CORBI_0468489-96, CORBI_0468501-02, CORBI_0468512, CORBI_0468523-29, CORBI_0468536-38.

342.　The Fund Boards also received information regarding the administrative services fee paid to CRMC, including the following:

a.　copies of the Administrative Services Agreements;

b.　the total amount of administrative services fees paid by the Funds, the total amount paid to third parties, and the total amount retained by CRMC;

c.　a White Paper on Mutual Fund Fees and Expenses that discussed the need for and uses of the administrative services fees;

d.　the amount of administrative services fees paid (in dollars and basis points) by each share class, a breakdown of the expenditures (in dollars) of the administrative services fees, (*i.e.*, the amount paid out to third parties and to AFS), and the total amount paid to CRMC (in dollars and basis points) for the services it provides;

e.　a detailed explanation of the services provided under the Administrative Services Agreement; and

f.　aggregate cost and profitability information for all the services which CRMC provided to the Funds.

*E.g.*, Ex. 3 at CORBI_0231587, CORBI_0231599-600, CORBI_0231608-612; Ex. 43 at CORBI_0468568-76; Ex. 764 at CORBI_0205077-82.

343.　In 2006, the Pacific Regional Office of the SEC conducted a routine examination of the books and records of CRMC.　*See* Ex. 3060 at 1; Tr. 474:13-18.

344.　Following that examination, on September 21, 2006, the staff of the Pacific Regional Office of the SEC sent a letter to the American Funds stating that it appeared to the staff that the fund boards had not been receiving certain key information in connection with their annual review of administrative services fees. Specifically, the SEC staff recommended that CRMC provide the Board with

information on the internal costs of providing administrative services.  Ex. 3060 at 3; Tr. 475:4-12.

345.   Prior to that time, CRMC did not attempt to calculate its costs of providing administrative services either for the Boards or its own internal use.  Ex. 648 at 35-36; Tr. 473:25-474:12.

346.   CRMC assembled information to respond to the SEC's request, and provided that to the SEC staff.  Tr. 423:11-20; 477:8-16.  This information reflected a rough cost estimate of $10.6 million for administrative services.  Ex. 3060 at 2; Tr. 476:24-477:18.  CRMC also provided this information (together with the SEC's letter) to the Unaffiliated Directors on September 29, 2006.  *See* Ex. 3061; Tr. 473:25-474:5, 477:19-478:7.

347.   CRMC then surveyed associates and executives in 2007 and 2008 to determine a more accurate allocation of internal costs related to the provision of administrative services.  Tr. 433:2-24, 478:8-480:4.

348.   CRMC provided the Unaffiliated Directors with the results of that effort beginning in November 2008.  Ex. 18; Tr. 431:5-12.  This revised information reflected a profit margin to CRMC from the administrative services fees of 19%.  Ex. 18; Ex. 650 at 5.  Once that information was provided to the Boards, the Unaffiliated Directors again unanimously approved the administrative services agreements with the same fee schedules in effect the prior year.  Tr. 480:20-23.

349.   During the relevant period, CRMC provided the Unaffiliated Directors with a great deal of information relating to the growth of the Funds' assets.  Tr. 141:13-25; 888:11-894:1.  For example, CRMC provided the Unaffiliated Directors with a white paper on the subject of "Managing Asset Growth and Size" that directly addressed the issue of the size of the American Funds.  Ex. 1; Tr. 657:1-5, 888:18-889:20, 890:19-25, 1414:18-1416:2, 1449:10-1450:2.  The white paper attached academic articles that discussed whether size impacts investment results on certain types of mutual funds.  Ex. 1; Tr. 888:16-25.

350.   CRMC also provided the Unaffiliated Directors with a white paper on the subject of economies of scale, which discussed at length the impact of size and growth. Ex. 2; Tr. 657:18-658:12.

351.   At board meetings, the Unaffiliated Directors received explanations regarding the growth of the Funds' assets and discussed these topics with CRMC management.  Tr. 698:6-17; 992:6-993:7.  The minutes of these meetings reflect discussions concerning:  (Ex. 62 at CORBI_0040876, Ex. 71 at CORBI_0040889, Ex. 90 at CORBI_0031065, Ex. 112 at CORBI_0031050-51, Ex. 115 at CORBI_0202686)

    a.    the impact of growth on investment results;  (Ex. 71 at CORBI_0040889)

    b.    the potential impact of closing funds to future investment and CRMC's considerations thereof;  (Ex. 62 at CORBI_0040876, Ex. 115 at CORBI_0202686; Tr. 153:12-14)

    c.    the sustainability of growth in the long-term;  (Ex. 90 at CORBI_0031065)

    d.    growth in the shareholder base and the quality of services provided to those shareholders; and

    e.    the ability of the MPCS to manage asset growth.

Ex. 112 at CORBI_0031050-51; Tr. 889:21-895:1, 1396:15-1397:18, 1449:23-1451:3.

352.   Portfolio counselors, research analysts, and trading personnel also regularly discussed with the Unaffiliated Directors any challenges they had in dealing with the increases in Fund assets.  Tr. 326:4-327:3, 889:21-890:15, 991:3-992:2, 1404:8-21. 1450:23-1451:3.

353.   CRMC management discussed issues related to asset growth with the Unaffiliated Directors at many of the board meetings during this period of time.  Tr. 141:13-25, 698:6-17, 1404:8-21, 1406:6-14, 1414:6-17.

354.   The Unaffiliated Directors were not provided internal survey responses from CRMC associates discussing the issue of size.  Tr. 1506:21-1507:12.  Some

directors were aware of the issues raised in the survey responses from communications with CRMC associates or other materials provided to the Board by CRMC.  Tr. 888:11-890:18, 991:3-992:13, 993:8-994:19, 1003:9-1005:9, 1507:13-1508:

355.   Some of the directors from time to time asked for (and received) additional information throughout the year.  *E.g.*,  Exhs. 2429, 2435, 2479, 2362, 2550; Tr. 701:9-15, 1378:11-14, 1379:23-1381:3, 1381:4-1383:4, 1385:14-1386:6, 1386:14-1387:2, 1420:18-1422:15.

356.   The record contains examples of emails and memoranda from some directors who questioned CRMC management on issues related, for example, to the 12b-1 fees and who sought additional information on issues the Boards were analyzing.  *See, e.g.*, Exhs. 2429, 2435, 2479, 2362, 2550.

357.   Some Unaffiliated Directors at various times requested additional, unscheduled meetings with management before approval of the contracts.  Tr. 1380:17-22, 861:23-862:5.

358.   As directed by counsel, the Unaffiliated Directors considered each of the *Gartenberg* factors each time they approved the investment advisory agreements. Exhs. 51-122; Tr. 863:20-864:7, 973:2-974:14.

359.   A February 17, 2005, email from a former CRMC associate describes a discussion between that counsel and one of the Unaffiliated Directors.  In the e-mail, the author states his impression that the unaffiliated director was requesting more information regarding CRMC in order to "have a good record."  Ex. 2510.  The unaffiliated director testified that although he did not request the information as part of the normal fee negotiations, he did ask for the information so he would be more prepared for questioning by the SEC in connection with a pending investigation.  Tr. 1444:3-1448:21, 1452:14-18.  The Court is not persuaded, however, that the author misinterpreted the comment.

360.   One unaffiliated director testified at trial that he was not concerned by the large increase in aggregate Rule 12b-1 fees from fiscal years 2003 to 2007 because the

fees were based on average assets under management, which also increased during that time.  Tr. 1437:15-24.  The unaffiliated director explained that most of the Rule 12b-1 fees were paid to brokers and that, as assets under management increased, "[w]e have lots more customers, clients, investors, who are invested in . . . these mutual funds whom [the brokers] are serving and for which they need to be paid."  Tr. 1438:1-5.

361.   However, a portion of the growth in assets under management during the relevant time frame was the result of increasing values of existing investments reflecting the generally positive returns in securities markets.  Tr. 1596:21-1597:14. The director appeared not to consider that, to the extent the increase in assets was the result of positive performance, there may not be a commensurate increase in the provision of additional shareholder services that are covered by Rule 12b-1 fees.

## CONCLUSIONS OF LAW

Plaintiffs allege that Defendants CRMC and AFD breached the fiduciary duty imposed on them by Section 36(b) of the Investment Company Act of 1940 with respect to compensation received for various services rendered to the Funds.  *See* 15 U.S.C. § 80a-35(b); Final Pre-Trial Conference Order 3 (Dkt. No. 415.2).  Plaintiffs assert that the Funds were charged excessive advisory, Rule 12b-1,  and administrative fees.  Pls.' Corrected Post-Trial Br. 1.

1.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 80a-35(b)(5).

2.      Claims arising under Section 36(b) are limited to the period commencing one year prior to the filing of the complaint.  15 U.S.C. § 80a-35(b).  Plaintiffs' original complaint was filed on July 15, 2004.  Plaintiffs' claims with respect to all Funds are thus limited to fees charged to the Funds after July 15, 2003.

3.      Under Section 36(b), Plaintiffs bear the burden of proving a breach of fiduciary duty.  15 U.S.C. § 80a-35(b)(1).

4.      Having reviewed the record in its entirety, this Court finds, for the reasons set forth below, that Plaintiffs have standing to pursue a Section 36(b) claim with

respect to each class of shareholder in each of the Funds at issue, but holds that Plaintiffs have failed to meet their burden of proving that any of the fees charged by CRMC and AFD during the relevant period were so disproportionate to the services rendered such that the fees could not have been the product of arm's-length bargaining. Plaintiffs have thus failed to establish a breach of fiduciary duty within the meaning of Section 36(b).

## I.  STANDING

5.  Taken together, the various named Plaintiffs in this action own Class A shares of ICA, CIB, AMBAL, BFA, GFA, WGI, and AMCAP, and Class C shares of CIB and IFA.  No Plaintiff owns Class B, F, R or 529 shares in any of the Funds, and no Plaintiff owns Class C shares in AMCAP, AMBAL, BFA, ICA, GFA or WGI. SF-8, 17-23.

6.  As noted above, administrative services fees are paid only with respect to C, F, R and 529 share classes; they are not paid on Class A and B shares.  SF 53, 57; Tr. 842:8-19; Ex. 691.

7.  In addition, each share class pays different Rule 12b-1 fee levels depending, in part, upon the expenses associated with each class.  Tr. 481:3-11.  For example, the Rule 12b-1 fees paid on Class A and B shares are different in amount. *See* Ex. 3 at CORBI_0231606-08; Ex. 335 at CORBI_0209268-69; No Plaintiffs paid Rule 12b-1 fees on Class B shares because none of them own such shares.

8.  These facts notwithstanding, Plaintiffs have standing to pursue a Section 36(b) claim with respect to Rule 12b-1 and administrative services fees charged to each class of shares for each of the Funds at issue in this litigation.  Plaintiffs are not limited to bringing claims and seeking remedies with respect to only those share classes that they own.

9.  Section 36(b) creates a private right of action for "security holder[s]" of registered investment companies; it does not distinguish among owners of different

classes of shares in a mutual fund, and does not impose any requirement at the share class level. *See* 15 U.S.C. § 80a-35(b).

10. To have statutory standing under Section 36(b), a plaintiff must own shares in the investment company which paid the fees being challenged as excessive. *E.g.*, *In re Am. Mut. Funds Fees Litig.*, No. CV 04-5593 GAF, 2005 U.S. Dist. LEXIS 41884, at *9-10 (C.D. Cal. Dec. 16, 2005); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734-36 (3d Cir. 1970); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ. 1921 (DAB), 2007 U.S. Dist. LEXIS 59643, at *3 (S.D.N.Y. Aug. 14, 2007); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 582 (S.D.N.Y. 2006) ("Plaintiffs have no standing as to funds which they do not own . . . .").

11. At least one of the eight named-Plaintiffs owns shares in each of the Funds which paid the fees at issue. Thus, the statutory standing requirement of Section 36(b) is satisfied.

12. The constitutional standing requirement of "injury in fact" is also satisfied. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 751 (1984); *Davis v. Yageo Corp.*, 481 F.3d 661, 675 (9th Cir. 2007) ("in order to have standing [a party] must show injury in fact").

13. The different share classes in a particular Fund invest in the same portfolio of assets, receive the same types and level of service, and are managed in the same manner. The fact that different share classes are assessed different fees and/or fee levels is not sufficient to preclude Plaintiffs from proceeding on behalf of all shareholders of the funds at issue.

## II. THE LEGAL STANDARDS UNDER SECTION 36(B)

14. Section 36(b) of the Investment Company Act imposes upon investment advisers of registered investment companies "a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person." 15 U.S.C. § 80a-35(b).

15.     Although the Ninth Circuit has not squarely addressed the applicable legal standard, the majority of courts have found that the legal standard to be applied to claims under Section 36(b) is the standard set forth in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928-29 (2d Cir. 1982), and its progeny.  *See, e.g.*, *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 486 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987); *Meyer v. Oppenheimer Mgmt. Corp.*, 715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir.).

16.     Alternative standards to *Gartenberg* were recently set forth by the Seventh Circuit in *Jones v. Harris Associates L.P.,* 527 F.3d 627 (7th Cir. 2008), *cert. granted,* 129 S. Ct. 1579 (2009), and by the Eighth Circuit in *Gallus v. Ameriprise Financial, Inc.,* 561 F.3d 816, 823 (8th Cir. 2009).  However, the reasoning of both cases is flawed.

17.     The *Jones* standard ignores the plain language of Section 36(b) and would essentially emasculate the statute.  *Jones,* 527 F.3d at 632-33 (rejecting *Gartenberg* "because it relies too little on markets" and holding that, so long as the fiduciary makes full disclosure the law places no cap on compensation).[9]

18.     *Gallus*, on the other hand, expands Section 36(b) to provide a cause of action even where the challenged "fee passed muster under the *Gartenberg* standard." *Gallus*, 561 F.3d at 823.  The language of Section 36(b), which establishes a fiduciary duty "with respect to the receipt of compensation," and numerous other cases interpreting Section 36(b) have not found a cause of action for general breaches of common law fiduciary duties.  *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743

---

[9] Certiorari was granted in <u>Jones</u> and the Supreme Court has heard oral argument on the issues raised by that decision.  If the questioning of counsel is any indication, it appears unlikely that the decision will undermine the <u>Gartenberg</u> standard.

(7th Cir. 2002) (an adviser's fiduciary duty under Section 36(b) is "significantly more circumscribed than common law fiduciary duty doctrines"). Thus, to the extent *Gallus* purports to create a cause of action based on something other than a breach of duty in relation to management's compensation, it appears to establish a duty not contemplated by Section 36(b).

19.     Thus, the Court concludes that the proper legal standard to be applied to Plaintiffs' excessive fee claims under Section 36(b) is the standard set forth in *Gartenberg*.

20.     To violate Section 36(b) under the *Gartenberg* standard, "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928. "[T]he test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Id.* It is not enough to demonstrate that a better bargain was possible. *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,* 528 F. Supp. 1038, 1047 (S.D.N.Y. 1981) ("It bears repeating that in order to provide relief under Section 36(b), it is not enough for this Court to find that a better bargain was possible."), *aff'd*, 694 F.2d 923 (2d Cir. 1982).

21.     To determine whether the *Gartenberg* standard has been met, consideration should be given to "all facts in connection with the determination and receipt of such compensation," including: (1) the nature and quality of services rendered; (2) the profitability of the fund to the investment adviser; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence of the unaffiliated directors and the care and conscientiousness with which they performed their duties. *Gartenberg*, 694 F.2d at 929-30; *accord Krinsk v. Fund Asset Mgmt., Inc.,* 875 F.2d 404, 409 (2d Cir. 1989).

Section 36(b) does not require Plaintiffs to establish that the fees charged by Defendants were excessive in the aggregate. Plaintiffs may challenge a particular fee

and may prevail on their Section 36(b) claim if they show that such a fee was disproportionate to the services rendered in exchange for that fee. *See Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990); *Pfeiffer v. Integrated Fund Servs. Inc.*, 371 F. Supp. 2d 502, 508 (S.D.N.Y. 2005); *In re Goldman Sachs Mut. Funds*, No. 04 Civ. 2567 (NRB), 2006 WL 126772, at *9 & n.22 (S.D.N.Y. Jan. 17, 2006).

22.     In assessing whether a particular fee is disproportionate to the services rendered in exchange for that fee, and thus whether an advisor breached the fiduciary duty imposed by Section 36(b), a court must consider all of the surrounding facts and circumstances. *See* S. Rep. No. 91-184 at 15 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4910); *Gartenberg*, 528 F. Supp. at 1049 ("it is intended that the court look at *all the facts* in connection with the determination and receipt of such compensation, including all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser has properly acted as a fiduciary in relation to such compensation") (citation omitted); *id.* at 1052 (it is "entirely proper for the fiduciary to consider the totality of the values placed at the disposal of the shareholders"); *Gartenberg*, 694 F.2d at 931 (to ignore costs incurred by affiliate in providing services "would be to exalt form over substance and disregard the expressed Congressional intent that all the facts in connection with the determination and receipt of such compensation be considered"); *accord Benak v. Alliance Capital Mgmt.*, No. Civ A. 01-5734, 2004 WL 1459249, at *6-8 (D.N.J. Feb. 9, 2004); see also *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 476, 478-486 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989).

23.     Under Section 36(b)(3), no action "shall be brought or maintained against any person other than the recipient" of the challenged compensation or payments. 15 U.S.C. § 80a-35(b)(3).

24.     In *Pfeiffer v. Bjurman*, *Barry & Associates*, No. 03 Civ. 9741 (DLC), 2006 WL 497776 (S.D.N.Y. Mar. 2, 2006), *aff'd*, 215 F. App'x 30 (2d Cir. 2007), the

court held that Section 36(b) does "not impose[] on investment advisors a generalized fiduciary duty with respect to all payments made by mutual funds, but only with respect to those payments that accrue to an advisor or its affiliates." *Pfeiffer*, 2006 WL 497776, at *4. There, the court held that defendants cannot be liable for Rule 12b-1 fees "passed through" to broker-dealers who were providing the services in exchange for those fees. *Id.*

25.    This Court disagrees with the holding in *Pfeiffer*. Under *Pfeiffer's* reasoning, Section 36(b) exposure for the imposition of excessive Rule 12b-1 fees cannot be redressed—the broker-dealer cannot be sued under Section 36(b) because it is not a fiduciary under the statute, and the fiduciary who assessed the fee cannot be sued because it does not "receive" or "retain" the fee. In this Court's view, such a construction of Section 36(b) cannot be squared with its fundamental objective of insuring that a fund's management does not, directly or indirectly, unfairly compensate itself at the expense of its investors. The Court therefore declines to follow *Pfeiffer's* construction of Section 36(b).

26.    As such, the Court finds that it is possible, as a legal matter, for CRMC and AFD to be liable under Section 36(b) for the Rule 12b-1 fees paid by the Funds, even where some of those fees were ultimately passed through to broker-dealers.

## III.    APPLICATION OF THE *GARTENBERG* FACTORS

### A.    The Nature and Quality of Services

#### 1.    Rule 12b-1 Fees

##### a.    Rule 12b-1 Generally

27.    Section 12(b) of the Investment Company Act, enacted in 1940, prohibits open-end management investment companies, such as the Funds here, from serving as distributors of securities of which they are issuers, except through underwriters. 15 U.S.C. § 80a-12(b); 17 C.F.R. § 270.12b-1(a)(1).

28.    Thus, a mutual fund company may not directly or indirectly finance any activity that "is primarily intended to result in the sale of shares issued by such

company, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature." 17 C.F.R. § 270.12b-l(a)(2).

29.    Rule 12b-1, which was adopted by the SEC in 1980, authorizes mutual fund companies to serve as distributors of securities they issue so long as any distribution-related payments "are made pursuant to a written plan describing all material aspects of the proposed financing of distribution" (17 C.F.R. § 270.12b-1(b)), the plan is approved by the board of directors both at the onset of the plan and on an annual basis, (*id*. §§ 270b-1(b)(2) and (b)(3)(i)), the "directors . . . review, at least quarterly, a written report of the amounts so expended and the purposes for which such expenditures were made" (*id*. §§ 270.12b(3)(ii)), and the directors conclude that "there is a reasonable likelihood that the plan will benefit the company and its shareholders" (*id.* § 270.12b-1(e)).

30.    Rule 12b-l creates a potential conflict of interest because it permits an investment adviser and/or its affiliate to use fund assets to promote growth, which may or may not benefit investors but typically benefits the investment adviser because the adviser's income is often determined as a percentage of assets under management. *Siemers v. Wells Fargo & Co*., No. C 05-4518 WHA, 2007 WL 760750, at *8 (N.D. Cal. Mar. 9, 2007); *Bearing of Distribution Expenses By Mutual Funds*, Investment Company Act of 1940 Release No. 11414, 1980 SEC LEXIS 444, at *9, 21-22 (Oct. 28, 1980).

31.    Thus, Rule 12b-l imposes upon the directors of mutual fund companies "a duty to request and evaluate," and upon any party to any agreement relating to a distribution plan a "duty to furnish, such information as may reasonably be necessary to an informed determination of whether such plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d).

32.    To fulfill their duties, Fund directors "should consider and give appropriate weight to all pertinent factors" (*id.* § 270.12b-1(d)), and continue a Rule 12b-l plan only if they conclude, "in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and under sections 36(a) and (b) of the [Investment Company Act], that there is a reasonable likelihood that the plan will benefit the company and its shareholders," (*id.* § 270.12b-1(e)).  *See generally In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 227 (S.D.N.Y. 2005) (discussing strictures of Rule 12b-1).

33.    Although the original purpose of Rule 12b-l has been the subject of much debate in recent years,[10] the Court subscribes to the SEC's view that Rule 12b-l was implemented as a temporary means of stimulating fund growth at a time when the mutual fund industry was experiencing high redemption rates that were causing average assets under management to decrease and expense ratios to increase. *Commission Announces Roundtable Discussion Regarding Rule 12b-1*, SEC Press Release 2007-106 (May 29, 2007), *available at* http://www.sec.gov/news/press/2007/2007-106.htm; *see* Ex. 8 at CORBI_0051885.

34.    As a practical matter, since their authorization in 1980, Rule 12b-l fees have evolved to a permanent means of imposing on investors the costs of financing distribution-related expense, including payments to broker dealers for the provision of on-going shareholder services.  Such use of Rule 12b-1 fees is permissible under Rule 12b-1 and has been facilitated and approved by the rulemaking of the SEC[11] and the

---

[10]  *E.g.*, *Commission Announces Roundtable Discussion Regarding Rule 12b-1*, SEC Press Release 2007-106 (May 29, 2007), *available at* http://www.sec.gov/news/press/2007/2007-106.htm; M. Sharp, et al., *The 12b-1 Debate*: *If It Ain't Broke . . .*, Wall Street Lawyer (Vol. I, Issue 1, Jan. 2008); M. Waddell, *12b-1 Headed for an Overhaul*, Investment Advisory (April 1, 2008), *available at* http://www.investmentadvisor.com/Issues/2008/April%202008/Pages.

[11]  "[P]aying for non-distribution services under 12b-1 plans . . . is not prohibited by the present rule[.] . . . Some funds have paid for such services through a 12b-1 plan, apparently to address the possibility that the payments may later be characterized as

[continued on next page]

NASD (now FINRA).[12] The current use of Rule 12b-1 has also been approved by the courts.[13]

35. Although the uses being made of Rule 12b-1 fees is a matter of concern to the Court, particularly given the inherent conflict of interest that it creates and limited reasons given for the establishment of the rule, the elimination or modification of Rule 12b-1 is a matter for the SEC. The Court's only task in the matter at hand is to determine whether Plaintiffs have met their burden of proving that the Rule 12b-l fees at issue in this case were disproportionate to the services rendered in exchange therefore.

### b. Plaintiffs' Theory Regarding Rule 12b-1 Fees Is Not Viable

36. Plaintiffs' basic contention regarding Rule 12b-l fees is that CRMC and AFD violated Section 36(b) by charging billions of dollars in Rule 12b-l fees that were designed to promote growth and increase assets under management at a time when the American Funds were already experiencing growth that was causing fund performance to deteriorate. *See, e.g.*, Pls.' Corrected Post-Trial Br. 4-11.

---

[continued from previous page]
distribution expenditures." Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16,431, 53 Fed. Reg. 23258-02, at 23272 n.126 (June 21, 1988).

[12] NASD Rule 2830, which was approved by the SEC, permits funds to pay an asset-based service fee, which is defined as "payments by an investment company for personal service and/or the maintenance of shareholder accounts." NASD Rule 2830(b)(9); *see* SEC Order Approving Proposed Rule Change Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, Exchange Act Release No. 30,897, at *3 (July 13, 1992).

[13] *See Korland v. Capital Research & Mgmt. Co.*, No. CV-08-4020 (GAF), 2009 WL 936612, at *3 (C.D. Cal. Feb. 10, 2009) (citing *Krinsk*, 715 F. Supp. at 501 for the proposition that the use of Rule 12b-1 fees to encourage better shareholder service and maintain fund size does not violate Rule 12b-1); *Yameen v. Eaton Vance Distribs.*, 394 F. Supp. 2d 350, 355 (D. Mass. 2005) (finding that service fees "support the sales efforts of the company by assuring that there will be follow-up account maintenance for purchasing shareholders"); *Krinsk*, 715 F. Supp. at 500 (finding that "fund shareholders benefit by improved service resulting from 12b-1 payments").

37.     Plaintiffs do not present a viable theory of liability under Section 36(b) with respect to Rule 12b-l fees because Plaintiffs' position does not implicate the nature and quality of any actual shareholder services provided in exchange for 12b-1 fees. *See Korland*, 2009 WL 936612, at *2 ("To breach its fiduciary duty with respect to 12b-1 fees, an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.") (citations and quotations omitted).

38.     Instead, Plaintiffs focus principally on the notion that CRMC and AFD misused the revenues they acquired via Rule 12b-l fees. *See, e.g.*, Pls.' Corrected Post-Trial Br. 15 ("Plaintiffs submit that if $240 million or more of Fund assets could have been saved rather than put to a use by AFD which did not benefit the Funds, it was the fiduciary duty of Defendants and the Directors to do so.").

39.     But Section 36(b) "addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds." *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005), *aff'd sub nom, Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007). Thus, improper use of Rule 12b-l fees cannot serve as the basis for liability under section 36(b). *In re Goldman Sachs*, 2006 WL 126772, at *10; *see also Yameen*, 394 F. Supp. 2d at 356-58 (dismissing Section 36(b) claim based on allegation that there was no reasonable likelihood that a fund's 12b-1 plan would benefit shareholders because claim failed to allege that the 12b-1 fees were "disproportionate" to the service rendered). Likewise, "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 327 (4th Cir. 2001).

40.     Given their theory with respect to Rule 12b-1 fees, Plaintiffs failed to present any evidence regarding the nature and quality of the actual services rendered in exchange for Rule 12b-l fees. As such, Plaintiffs failed to meet their burden. "Simply

put, the fairness of the fee must be assessed in relation to the services rendered, not to the use to which the fee was put." *In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593 (GAF), 2008 WL 5749910, at *2 (C.D. Cal. Dec. 2, 2008).

41.     Defendants correctly note that the record before the Court demonstrates that the Rule 12b-1 fees charged to the Funds were comparable to other funds' Rule 12b-1 fees throughout the industry.  However, because its competitors suffer from the same conflict of interest, this comparison carries little weight and merits only minor consideration.

### c.     Plaintiffs' Theory Regarding Rule 12b-1 Fees Is Not Supported By The Facts

42.     Even if Plaintiffs' theory of liability relating to Rule 12b-l—*i.e.*, that Rule 12b-1 fees caused fund growth, and fund growth harmed the investment results of the Funds—was viable under Section 36(b), Plaintiffs failed to establish that growth in assets under management of the Funds caused their performance to deteriorate.

43.     Plaintiffs rely primarily on a series of regression analyses performed by their expert, Dr. Edward O'Neal, who concluded that the American Funds' growth from 2000 to 2008 adversely impacted investment results. As detailed above, however, (*see* FOF ¶¶ 139-49), the opinions and analysis of Dr. O'Neal were flawed for a number of reasons, and failed to withstand the challenges of Defendants' expert, Dr. John Peavy, whose testimony the Court credits.

44.     In addition, CRMC investment associates' responses to the survey CRMC conducted in early 2005 fail to establish disproportionality with respect to Rule 12b-l fees.  While the surveys highlighted some of the specific problems investment associates may face when a mutual fund experiences significant growth in assets under management, neither the survey responses nor the other evidence presented by Plaintiffs establish that the investment services were so adversely affected by growth that they were somehow disproportionate to the amount of fees that were paid.

45.     In fact, the record contains evidence that CRMC took steps to address and resolve the concerns raised in the survey responses. Tr. 129:23-130:13; 281:22-282:10; 284:24-286:1; 329:5-19. Moreover, the long-term performance of the majority of the funds at issue ranged from good to excellent at five-year, ten-year, and lifetime intervals, which is inconsistent with a decline in quality of investment advisory services as a result of fund growth. Tr. 136:23-137:6.

## 2.     Investment Advisory Fees

46.     One of the most important measures of the nature and quality of advisory services provided to mutual fund shareholders is "the fund's performance relative to other funds of the same kind." *Kalish*, 742 F. Supp. at 1229; *see also Krinsk*, 715 F. Supp. at 488.

47.     As noted, the long term performance of the majority of the American Funds at issue ranged from good to excellent at five-year, ten-year, and lifetime intervals. Plaintiffs place much stock in the relatively poor performance of some of the funds during calendar year 2008. Ex. 3157; Tr. 1258:22-1259:3. However, the short-term performance of a mutual fund generally is not a good indicator of a fund's overall performance—especially where the poor performance came in a year of widespread economic turmoil. Tr. 1206:12-1207:11, 1260:2-7.

48.     Aside from performance, Plaintiffs failed to offer any evidence about the nature and quality of other advisory services provided by CRMC (*e.g.*, executive, administrative, compliance, bookkeeping, etc.).

49.     Plaintiffs assert two separate arguments regarding the nature and quality of investment advisory services. First, they contend that the investment advisory fees assessed in fiscal year 2004 were excessive because CRMC failed to implement a fee waiver until fiscal year 2005, even though the American Funds experienced 43% growth in assets under management and a 44% increase in advisory fee revenues in fiscal year 2004. Pls.' Corrected Post-Trial Br. 16-17.

50. Plaintiffs, however, failed to present evidence establishing that the advisory services performed by CRMC failed to provide value to fund investors at any time. Rather, Plaintiffs focus on the alleged problems generated by growth of the funds, which fails to address the fundamental issue of whether the nature and quality of the services performed by CRMC and its affiliates were commensurate with the services rendered.

51. Second, Plaintiffs assert that the advisory fees CRMC charged during the relevant period were disproportionate because a portion of those fees was used to finance "additional compensation" paid by AFD to broker-dealers.

52. However, AFD's payment of compensation to dealers is insufficient to establish a violation of Section 36(b) because that fact speaks only to the propriety of the *use* of an investment advisor's fees, not whether those fees bore a reasonable relationship to the services rendered or were somehow disproportionate. *See In re Goldman Sachs,* 2006 WL 126772, at *10 (citing *In re Eaton Vance,* 380 F. Supp. 2d at 238); *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 117-18 (2d Cir. 2007); *In re Scudder Mut. Funds Fee Litig.*, 2007 U.S. Dist. LEXIS 59643, at *48-50.

53. Plaintiffs failed to offer any evidence undermining the conclusion that CRMC's investment advisory services were anything other than high quality.

### 3. Administrative Services Fees

54. As summarized above, administrative services fees are primarily used to finance the provision of transfer agent, record keeping, account maintenance, and related shareholder services for Class C, F, R, and 529 shares by AFS or third parties, and to cover the costs of overseeing those third parties to ensure quality services are being provided.

55. Plaintiffs contend that CRMC essentially admitted that it had been charging excessive administrative services fees when, on July 1, 2005, it instituted a five basis point cap on the amount of administrative services fees it would retain, (*see*

Ex. 814), but failed to return any amounts above five basis points received prior to the imposition of this cap. Pls.' Corrected Post-Trial Br. 32-34.

56.     The Court finds no logic in the argument. Changing conditions permit changes in behavior, and the fact that CRMC determined to cap its administrative services fee at a particular point in time neither proves that it was too high before or that it should be required to make "restitution" of amounts previously collected. More to the point in this case, neither the argument nor the evidence presented at trial implicate the quality or nature of the administrative services that CRMC, AFS, or third parties in fact provided during the relevant period. Plaintiffs, who bore the burden of proof, made no effort to compare those services to the fee exacted, or to challenge the nature or quality of the services provided, and thus failed to establish that the fee was so disproportionate to services rendered that it could not have been the result of arm's length bargaining.

### B.    The Profitability of the Funds

57.     Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit. S. Rep. No. 91-184 ,at 5 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902 (recognizing that "the investment adviser is entitled to make a profit. Nothing in the bill is intended to imply otherwise"); *Schuyt*, 663 F. Supp. at 971-72 (quoting the Senate Report); *Kalish*, 742 F. Supp. at 1237 (finding it is insufficient for a plaintiff to argue that the adviser "just plain made too much money"); *see also Krinsk*, 875 F.2d at 410 (holding that high profitability alone does not support a finding that the advisory fee is excessive); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293, 1316 (S.D.N.Y. 1983) ("[The adviser] and its affiliates are entitled to recoup their costs and to make a fair profit without having to fear that they have violated Section 36(b)."), *aff'd*, 740 F.2d 190 (2d Cir. 1984).

58.     During fiscal years 2003 through 2008, CRMC's, AFD's and AFS's combined pre-tax operating profit margin from operating all of the American Funds

(including the Funds at issue) ranged from 30% to 35%. CRMC's and AFD's combined operating profit margin ranged from 42% to 48%. CRMC's and AFS's combined operating profit margin ranged from 37% to 40%. CRMC's lone operating margin (exclusive of any subsidiaries) decreased from 50% in 2003 to 36% in 2008, with a peak of 52% in 2005. All of these profit levels fall within the range of profit margins that other courts have deemed acceptable under Section 36(b). *See, e.g.*, *Krinsk v. Fund Asset Mgmt. Inc.*, 715 F. Supp. 472, 494 (S.D.N.Y. 1988) (pre-tax margins up to 33%); *Schuyt*, 663 F. Supp. at 978-79 (estimated pre-tax margins up to 77.3% and post-tax margins up to 38.6%); *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988) (pre-tax margins up to 89%), *aff'd*, 895 F.2d 861 (2d Cir. 1990); *see also Kalish*, 742 F. Supp. at 1250 (*post-tax* margins up to 37.8%).

59. AFD, the entity which retained Rule 12b-1 fees, made a total profit of over $122 million from fiscal years 2004 to 2006, but suffered total losses of approximately $131 million in fiscal years 2003 and 2007 to 2008. Thus, AFD suffered a net loss of approximately $9 million during the period at issue.

60. CRMC's 2008 pre-tax profit margin on administrative services of approximately 19% is well below the profit margins that others courts have found to be acceptable. *See, e.g.*, *Meyer*, 707 F. Supp. at 1401 (pre-tax margins up to 89%).

61. That Defendants' profitability was also comparable to or less than other similarly structured investment advisers supports the conclusion that the Defendants' profitability was reasonable within the meaning of applicable case law. Plaintiffs have presented no argument or evidence to support their argument that CRMC's size, which is substantially larger than all of its relevant peers, diminishes the utility of such comparisons. *See* Pls.' Trial Br. 16.

62. Based on the evidence in the record, the Defendants' profitability does not weigh in favor of finding a violation of Section 36(b).

## C.    Economies of Scale

63.    Economies of scale exist when "the per unit cost of performing Fund transactions decrease[s] as the number of transactions increase[s]." *Krinsk,* 875 F.2d at 411; *see also Kalish,* 742 F. Supp. at 1237 ("The concept of 'economies of scale' assumes that as a mutual fund increases in size, its operational costs decrease proportionally").  "The concept [of economies of scale] is meaningful only if increased size of a fund (more shareholders, more assets under management) directly reduces the manager's costs of processing each transaction and servicing each shareholder." *Kalish*, 742 F. Supp. at 1239.

64.    Plaintiffs bear the burden of proof with respect to economies of scale.  *See Kalish*, 742 F. Supp. at 1239; *Krinsk*, 875 F.2d at 411.  This requires Plaintiffs to establish that economies of scale were realized in the first place, separate and apart from their burden of proving that any scale economies were not adequately shared with investors.  *Kalish*, 742 F. Supp. at 1228, 1239.

65.    Demonstrating that "the ratio of fee based expenses to fee based revenues declined at a time when the Fund size grew . . . does not establish that such a decline was necessarily due to economies of scale." *Krinsk,* 715 F.  Supp. at 496; *accord In re Goldman Sachs,* 2006 WL 126772, at *9 ("Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors.").

66.    Rather, Plaintiffs must "create a detailed analysis of each element of a transaction surrounding [the Fund], over an extended period of time, over different levels of activity." *Krinsk*, 715 F. Supp. at 496.  This requires Plaintiffs to show that that the adviser's and its affiliates' per-unit operating costs decreased as fund size increased.  *Krinsk,* 875 F.2d at 411; *see also Kalish*, 742 F. Supp. at 1238.

67.    Plaintiffs' expert, Dr. O'Neal, failed to perform the requisite per-unit cost analysis.  This fundamental flaw prevented him from finding that economies of scale existed.  Dr. O'Neal's analyses of whether economies of scale were realized are also

defective because he improperly assumed that any changes in Defendants' costs were the result of economies of scale, when in fact those cost changes may have been caused by other factors unrelated to scale.

68. Because Plaintiffs offered no other proof to establish the existence of economies of scale beyond Dr. O'Neal's analyses, they failed to sustain their burden of proving the existence of economies of scale.

69. Even if this Court were to assume for purposes of discussion that economies of scale were realized, Plaintiffs' own analyses show that they cannot meet their additional burden of establishing that scale economies were not equitably shared. *See Kalish*, 742 F. Supp. at 1228 (analyzing "whether economies of scale were realized by the adviser-manager *and shared* with the shareholders") (emphasis added).

70. Economies of scale can be shared with fund shareholders in a number of ways, including breakpoints (*Gartenberg*, 528 F. Supp. at 1054), fee reductions and waivers (*Gartenberg,* 694 F.2d at 930), offering low fees from inception (*Schuyt*, 663 F. Supp. at 973), or making additional investments to enhance shareholder services (SEC, Division of Investment Management, *Report on Mutual Fund Fees and Expenses* (Dec. 2000)).

71. Plaintiffs, through Dr. O'Neal, introduced evidence concerning the amount of economies of scale that were shared. Even Dr. O'Neal's analysis indicates that the purported scale economies were equitably shared with the Funds.

72. As Defendants' expert Glenn Hubbard testified, it is appropriate to consider sharing of economies of scale across the entire complex of American Funds, including all services provided by CRMC and its affiliates AFD and AFS. Under this approach, Dr. O'Neal's own analyses show that CRMC shared almost $2.3 billion in economies of scale with investors from fiscal years 2004 to 2007, which constituted approximately 40% of all economies of scale realized by CRMC, AFD, and AFS during that period, even when one *excludes* profit-sharing payments. Ex. 2671 at Table 4; Tr. 1071:15-1072:21. The only conclusion to be drawn from this evidence is

that any economies of scale that may have been realized during the relevant period were sufficiently shared with investors. For that reason, Plaintiffs' economies of scale argument does not support a finding that Defendants' fees were disproportionate to the services rendered.

### D.    Comparative Fee Structures

73.    *Gartenberg* rejected the notion that the principal factor to be considered when determining whether a fee is excessive is the price charged by other investment advisers. 694 F.2d at 929. Certainly, conscientious investors may take fees into account when choosing a mutual fund in which to invest. However, there is a distinction between competition among investors for mutual fund companies and competition among investment advisers for fund businesses because "[a] fund cannot move easily from one adviser-manager to another." *Gartenberg,* 694 F.2d at 929.

74.    *Gartenberg* recognized this distinction, stating that competition among funds "for shareholder business does not support an inference that competition must therefore also exist between adviser-managers for fund business. The former may be vigorous even though the latter is virtually non-existent. Each is governed by different forces. Reliance on prevailing industry advisory fees will not satisfy § 36(b)." *Id.*

75.    While Defendants offered expert testimony in an effort to establish that the state of competition at the investor level has increased since *Gartenberg* was decided, this Court focuses on the competition dynamic between advisors for fund business.

76.    Thus, evidence of comparative fee structures, though certainly relevant, is of limited probative value in a Section 36(b) inquiry "because of the potentially incestuous relationships between many advisers and their funds." *Gartenberg*, 694 F.2d at 929-30.

77.    Here, Defendants' fees were lower than industry averages for comparable funds as measured by independent third parties Lipper and Morningstar, and were often among the lowest in their respective peer groups.

78. This evidence of low comparative fees also supports a finding that Defendants' fees were not disproportionate to the services rendered.

### E. **Fallout Benefits**

79. "Fall-out benefits" are profits to the adviser that "would not have occurred *but for* the existence of the Fund." *Krinsk*, 715 F. Supp. at 495; *see also Krinsk*, 875 F.2d at 411; *Gartenberg*, 573 F. Supp. at 1313.

80. "The burden of proof is on plaintiff to quantify the fall-out benefits and demonstrate the appropriate share for allocation of said benefits as an offset to costs." *Gartenberg*, 573 F. Supp. at 1313.

81. Here, there was no evidence that Defendants realized any fallout benefits. Accordingly, this factor does not support a finding that Defendants' fees were disproportionate to the services rendered.

### F. **The Unaffiliated Directors**

82. "The expertise of the [unaffiliated directors], whether they are fully informed, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined in evaluating the reasonableness of compensation under section 36(b)." *Krinsk*, 875 F.2d at 412 (citing *Gartenberg*, 694 F.2d at 930). A court "will not ignore a responsible decision by the [directors], including a majority of the [unaffiliated directors], to continue the fee structure as it stands." *Krinsk*, 715 F. Supp. at 501.

83. Congress did not intend for courts to "second-guess" the business judgment of a fund's unaffiliated directors in negotiating and approving the management fees. *See Gartenberg*, 528 F. Supp. at 1045 ("This section is not intended to authorize a Court to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees.") (quoting S. Rep. No. 91-184, at 15 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902).

84. Here, the Funds' boards which approved the challenged fees were each comprised of a supra-majority of directors who were not "interested persons" within

the meaning of the 1940 Act. *See* 15 U.S.C. § 80a-2(a)(19). The ICA provides that "[a] natural person shall be presumed not to be a controlled person." 15 U.S.C. § 80a-2(a)(9). There was no evidence offered by Plaintiffs that would rebut this presumption for any of the thirty-nine Unaffiliated Directors serving on the Funds' boards.

85.    The education and experience of a fund's unaffiliated directors is an important consideration. *See Gartenberg*, 528 F. Supp. at 1058 (considering the qualifications and experience of the fund's unaffiliated directors). Here, the Unaffiliated Directors of the American Funds were well-qualified with significant experience relevant to the performance of their duties. The Directors had substantial education and business experience, including finance and accounting, business operation, consulting, securities, academic, engineering, marketing, investment management, private investment firms, real estate development and government service. Plaintiffs did not challenge the credentials or competence of any of the Funds' thirty-nine Unaffiliated Directors.

86.    In addition, the governance structure of the American Funds boards, including the use of clusters and committees, allowed the Unaffiliated Directors to effectively review and analyze the information provided to them. For example: (1) each fund cluster maintained nominating and governance committees—responsible for nominating and selecting Unaffiliated Directors and for reviewing their performance annually—comprised only of Unaffiliated Directors; (2) each board was comprised of a supermajority of Unaffiliated Directors; (3) all board chairpersons were Unaffiliated Directors; and (4) each board meeting included an executive session at which Unaffiliated Directors met outside the presence of CRMC and/or AFD personnel.

87.    The Boards were advised at all times by independent counsel who were obligated to ensure that the Unaffiliated Directors were sufficiently independent and well-informed. *See Kalish*, 742 F. Supp. at 1242 ("An important element of the independent director's informed state is the advice they received from their

independent counsel."); *Krinsk*, 715 F. Supp. at 502 (relying on fact that directors received advice from independent counsel).

88.     The information provided by CRMC to the Board in connection with the annual review of the agreements in question was comprehensive but not always easily understood.  Each year, the directors received voluminous materials relevant to the *Gartenberg* factors and other information relevant to their deliberations.

89.     The information provided to the Unaffiliated Directors was similar to that found in past cases to have been more than sufficient to permit the directors to make informed and knowledgeable decisions in approving the fees at issue.

90.     For example, in *Krinsk* the court held the directors were adequately informed where the adviser provided the directors with "a wealth of information pertinent to an evaluation of the advisory fee," including "exhaustive information on such subjects as the Fund's performance and expense ratios, its portfolio structure and trading activities, . . . as well as comparative information on other funds."  *Krinsk*, 715 F. Supp. at 502.

91.     Similarly, in the *Gartenberg* cases the court noted that the directors were provided voluminous information, including a discussion of the statutory role of the directors under Section 36(b); the advisory and distribution agreement proposed for approval; comparisons of the Fund's fee, performance, operating expenses, and expense ratios with those of other similar funds; information on processing costs and portfolio transactions; and financial statements.  *See Gartenberg*, 528 F. Supp. at 1060; *Gartenberg*, 573 F. Supp. at 1293.

92.     Here, CRMC provided the Unaffiliated Directors with extensive materials that covered the same or similar topics, as well as a host of other information that was relevant to their evaluation of the fees in question.  These materials were comprehensive, and provided sufficient factual detail and explanatory background to allow the Unaffiliated Directors to fulfill their responsibilities to Fund shareholders.

93.     With respect to information regarding Rule 12b-l fees, CRMC provided adequate information to the Unaffiliated Directors to permit them to effectively scrutinize the Plans of Distribution that they approved each year, including quarterly reports in compliance with 17 C.F.R. § 270.12b-1(b)(3)(2).  *See* FOF ¶¶ 367-72.  This information was sufficient to permit the Unaffiliated Directors to make an informed decision as to whether to continue to approve those fees.

94.     With respect to advisory fees, the Unaffiliated Directors were provided detailed information, including material related to the various *Gartenberg* factors.  *See, e.g.*, FOF ¶¶ 345-366.

95.     With respect to administrative services fees, the Unaffiliated Directors were provided with a variety of information to inform their decision to approve those fees.  Plaintiffs established that the Unaffiliated Directors were not provided with detailed information regarding the profits earned by CRMC on those fees until November 2008.  However, this does not support a finding of liability under Section 36(b) in the absence of evidence regarding the nature and quality of the administrative services rendered by AFS and third parties, and the oversight of third parties provided by Defendants.  As noted, Plaintiffs failed to introduce such evidence.

96.     In addition, once the directors received the information relating to the profitability of administrative services, (1) it showed a profit margin of 19% and (2) the directors again voted to unanimously approve the administrative services fees.  Thus, there is no evidence that providing the information to the directors prior to 2008 would have led to a different result.  *See Gartenberg*, 573 F. Supp. at 1304 (although the board did not have data on float and commission benefits until after a court advised the directors to initiate studies of those issues, the results of those studies once completed did "not change the validity of the trustees' conclusion that the fee was not excessive.").

*       *       *

103

97.     Although the record contains sufficient evidence to establish that the directors met their obligation under the <u>Gartenberg</u> standard, the record indicates that the Unaffiliated Directors' did not diligently inquire into some issues of importance and failed to recognize the consequences of some of the information presented to them. As noted above, the Unaffiliated Directors accepted, with virtually no comment, statements made regarding compensation paid to CRMC and AFD employees either in the aggregate or in specific.  Likewise, the directors regularly approved a 25 basis point 12b-1 fee, regardless of the assets under management, on the assumption that the increase in asset size was proportional to the increase in investors.  However, the directors apparently failed to consider that the increase in assets under management resulted in significant part from appreciation of existing accounts and not the addition of new investors.  Moreover, no evidence was presented that the fee was decreased as the assets under management substantially decreased between the middle of 2007 and the end of 2008.  These failures are significant given the Unaffiliated Directors' important role as "independent watchdogs" with primary responsibility for protecting shareholder interests.[14]  *See Burks v. Lasker*, 441 U.S. 471 (1979).  Without exacting

---

[14] [In addition to meeting with their own independent counsel separately, the Unaffiliated Directors who testified at trial also met jointly with their independent counsel, defense counsel, and CRMC's in-house counsel before taking the witness stand.  Courts have recognized that the interests of the adviser and the fund's independent directors may properly be aligned once litigation under Section 36(b) is commenced, as the directors often have a common interest with the adviser in defending *ex post* attacks on their business judgment to have approved the challenged fees.  *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 546 (1984) (Stevens, J., concurring) (recognizing that fund trustees are likely to align themselves with the investment adviser in defending the management contract they negotiated); *Strougo v. BEA Assocs.*, 199 F.R.D. 515 (S.D.N.Y. 2001); *Bennett v. Fidelity Mgmt. & Research Co., et al.*, Civil Action No. 04-11651-MLW, Tr. of Mot. Hr'g 38-39, July 18, 2007 (Docket No. 90).  Nevertheless, the trial testimony of the directors was aligned with Defendants to such an extent that it persuades the Court to give less weight to that testimony than it might otherwise be entitled.]

scrutiny by these directors, the possibility exists that issues of significant importance will not receive the attention they deserve, ultimately harming investors.

98.    However, the questions raised about director conscientiousness are not sufficient to rebut the substantial evidence that overall the conduct of the directors met the <u>Gartenberg</u> standard.  Thus, the Court concludes, based on the entirety of the record before it, that the Unaffiliated Directors carefully and diligently exercised their responsibility in approving the fees at issue.  The approval of the challenged fees by these directors supports a finding that the Defendants' fees were not disproportionate to the services rendered.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court concludes that Plaintiffs have failed to sustain their burden of proving that CRMC charged fees that were "so disproportionately large that [they bore] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Accordingly, the complaint must be dismissed and judgment entered for CRMC and AFD.  Defendants are to prepare and lodge with the Court, by January 8, 2010, a proposed judgment consistent with these findings and conclusions.


**IT IS SO ORDERED**:

Dated: December 28, 2009    _____
                            Gary Feess
                            United States District Court Judge

105